# EXHIBIT 1

**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| NATIONAL ASSOCIATION FOR THE ADVANCEMENT OF COLORED PEOPLE, SPRING VALLEY BRANCH; JULIO CLERVEAUX; CHEVON DOS REIS; ERIC GOODWIN; JOSE VITELIO GREGORIO; DOROTHY MILLER; HILLARY MOREAU; and WASHINGTON SANCHEZ, | 17 Civ. 8943 |
| Plaintiffs, | |
| v. | |
| EAST RAMAPO CENTRAL SCHOOL DISTRICT and MARYELLEN ELIA, IN HER CAPACITY AS THE COMMISSIONER OF EDUCATION OF THE STATE OF NEW YORK, | |
| Defendants. | |

## COMPLAINT

Plaintiffs Spring Valley Branch of the National Association for the Advancement of Colored People, Julio Clerveaux, Chevon Dos Reis, Eric Goodwin, Jose Vitelio Gregorio, Dorothy Miller, Hillary Moreau, and Washington Sanchez (collectively "Plaintiffs"), by their attorneys Latham & Watkins LLP and the New York Civil Liberties Union Foundation, for their Complaint against Defendants East Ramapo Central School District (the "District" or "East Ramapo") and MaryEllen Elia, in her capacity as the Commissioner of Education of the State of New York (the "Commissioner," and collectively, "Defendants"), allege as follows:

## NATURE OF THE ACTION

1.     This action is a challenge to the at-large election system that the East Ramapo Central School District uses to elect the members of the Board of Education ("Board"), which

impermissibly denies to Black[1] and Latino[2] (collectively, "Minority") citizens in the District an equal opportunity to participate in the political process and to elect candidates of their choice to the Board, in violation of Section 2 of the Voting Rights Act of 1965, 52 U.S.C. § 10301 ("Section 2").

2.      Section 2 prohibits any voting practice or procedure that "results in a denial or abridgement of the right . . . to vote on account of race or color . . . ."  52 U.S.C. § 10301(a). Under Section 2, any electoral procedure that "cause[s] an inequality in the opportunities enjoyed by black and white voters to elect their preferred representatives" is illegal.  *Thornburg v. Gingles*, 478 U.S. 30, 47 (1986).  These prohibited inequalities include practices that dilute the voting strength of minority voters.  One common form of vote dilution occurs when an at-large election system[3] is used in a community where racial groups are politically cohesive and where there is racial bloc voting such that Whites[4] overwhelmingly vote for one set of candidates,

---

[1]     For purposes of this Complaint, "Black" and "African American" are used synonymously and as defined by the United States Census Bureau.  *See* United States Census Bureau, Glossary, Black or African American, https://www.census.gov/glossary/#term_BlackorAfricanAmerican (last visited Nov. 11, 2017).

[2]     For purposes of this Complaint, "Latino" and "Hispanic" are used synonymously and as defined by the United States Census Bureau.  *See* United States Census Bureau, Glossary, Hispanic or Latino Origin, https://www.census.gov/glossary/#term_HispanicorLatinoorigin (last visited Nov. 11, 2017).

[3]     Under an at-large system, candidates are not elected from individual geographic districts where the voters are permitted to vote only for representatives of their district.  Instead, all of the voters in the community at-large are entitled to vote for candidates from the entire community.  The impact of this system on minority communities is that the politically cohesive racial group with the largest population, usually white voters, will have the capacity to dominate the electoral outcomes throughout the community regardless of the conflicting preferences of minority voters.

[4]     For purposes of this Complaint, "White" means non-Hispanic single-race White and is synonymous with the term "Non-Hispanic White Alone" as defined by the United States Census Bureau.  *See* United States Census Bureau, Glossary, Non-Hispanic White Alone,

communities of color for another set, and the White-preferred candidates generally win.  Under these circumstances, the electoral strength of a White majority is enhanced to the disadvantage of minority voters, whose ability to translate their voting strength into political power is reduced or nullified.  Since Congress amended the Voting Rights Act in 1982 to respond to the problem of racial vote dilution, an electoral system can be illegal based solely on the effects of a challenged practice, without regard to the defendant's intent in enacting or maintaining that system.

3.     In the District, the current at-large election system has denied Minority citizens an equal opportunity to have a voice in the future of their community's schools.  The toxic combination of an at-large election system and racially-polarized voting, among other factors, has prevented candidates for the Board preferred by Minority voters from winning even a single contested election in the past decade.  This failure of democratic representation, which has resulted in a White-majority Board that consistently advocates for the interests of private schools over public schools, has harmed the District's public school children, alienated Black and Latino members of the community from the Board, and sowed deep distrust between the White community and the Minority community in East Ramapo.

4.     The inequality of voting opportunity, described above and amplified below, would constitute a violation of the Voting Rights Act even if such inequality did not result in adverse secondary consequences.  But the consequence of electoral inequality, in this case, is that the Black and Latino communities in the East Ramapo Central School District experience a severe denial of equal educational opportunity.

5.     Between 2005 and 2014, the Board's drive to lower taxes and divert public money to fund special benefits for private school students degraded the District's public schools by,

_____

https://www.census.gov/glossary/#term_Non-HispanicWhiteAlone (last visited Nov. 11, 2017).

among other measures, eliminating hundreds of teaching and other positions; reducing full-day kindergarten to half-day; reducing or eliminating programs in foreign languages, arts, music, athletics, and extracurricular activities; freezing purchases of supplies, materials, and equipment; and selling off entire school buildings and other property.  During the same time, the District increased funding for services benefitting private school students, who are almost all White, by many millions of dollars.  Also during that time, Board members from the private school community generally ignored—and were frequently hostile to—advocates for the District's public schools, including the students themselves.

6.      By 2014, the decline of the District's public schools and reports of the Board's antipathy to the needs of the District's public schools and Minority students reached a point where the State of New York found it necessary to appoint a monitor to oversee the District's finances.  After deeply critical reports in 2014 and 2015, the State reappointed monitors for the subsequent two years (collectively, the "Monitors") and provided the District with supplemental funds earmarked exclusively for public school services to temporarily relieve some of the cuts.  But many cuts have yet to be restored, and the District's student performance remains unacceptably poor.  The State's intervention is necessary, but not sufficient, to ensure that the interests of the District's Minority children and residents are protected.  The Monitors are not a substitute for compliance with the Voting Rights Act, which entitles the District's Minority voters to an electoral system that provides them an equal opportunity to elect their candidates of choice to the Board.

7.      By this action, Plaintiffs seek to (i) enjoin Defendants from administering, implementing, or conducting any future elections for the Board under the existing at-large election system; and (ii) compel Defendants to replace the current at-large election system with a

4

ward election system that will give the District's Minority citizens an equal opportunity to elect their candidates of choice.

**PARTIES**

8.      Plaintiff National Association for the Advancement of Colored People, Spring Valley Branch ("Spring Valley NAACP") is a local affiliate of the NAACP, the nation's oldest and largest civil rights organization.  The Spring Valley NAACP's mission is to ensure the political, educational, social, and economic equality of rights of all persons, to eliminate racial hatred and racial discrimination, and to remove the barriers of racial discrimination through democratic processes.  Many Spring Valley NAACP members are Black or Latino residents of the District.

9.      Plaintiff Julio Clerveaux is a Black registered voter who resides in the District. Under the current at-large method for electing Board members, Mr. Clerveaux has been denied the ability to elect candidates of his choice to the Board.  Since Mr. Clerveaux began voting in elections for the Board in 2013, no candidate for whom he has voted has won a contested election.  The only winning Board candidate for whom he has voted was Sabrina Charles-Pierre in the 2016 election in which she ran as an incumbent and unopposed.  Mr. Clerveaux wishes to participate in the District's electoral and political processes on an equal basis with all other residents.

10.      Plaintiff Chevon Dos Reis is a Latina registered voter who resides in the District. Ms. Dos Reis has three children attending public schools in the District and is a former student of the District's public schools herself.  Under the current at-large method of electing Board members, Ms. Dos Reis has been denied the ability to elect candidates of her choice to the Board.  No candidate for whom Ms. Dos Reis has recently voted has won a contested election.

The only winning Board candidate for whom she has recently voted was Sabrina Charles-Pierre in the 2016 election in which she ran as an incumbent and unopposed. Ms. Dos Reis campaigned for a seat on the Board in 2017 as the candidate of choice of the public school community and received support from an overwhelming majority of Black and Latino voters. She lost to Joel Freilich, the candidate of choice of the private school community, who received the support of a large majority of White voters and support from a de minimis number of Black and Latino voters. Ms. Dos Reis wishes to participate in the District's electoral and political processes on an equal basis with all other residents.

11.     Plaintiff Eric Goodwin is a Black registered voter who resides in the District. Mr. Goodwin has one child attending public school in the District. Under the current at-large method of electing Board members, Mr. Goodwin has been denied the ability to elect candidates of his choice to the Board. Mr. Goodwin moved to a residence within the District in the summer of 2011 and first voted in a Board election in 2012. Since 2012, no candidate for whom Mr. Goodwin has voted has won a contested election. The only winning Board candidate for whom he has voted was Sabrina Charles-Pierre in the 2016 election in which she ran as an incumbent and unopposed. Moreover, Mr. Goodwin campaigned for a seat on the Board in 2017 as the candidate of choice of the public school community and received support from an overwhelming majority of Black and Latino voters. He lost to Harry Grossman, the candidate of choice of the private school community, who received the support of a large majority of White voters and support from a de minimis number of Black and Latino voters. Mr. Goodwin wishes to participate in the District's electoral and political processes on an equal basis with all other residents.

6

12.    Plaintiff Jose Vitelio Gregorio is a Latino registered voter who resides in the District.  Mr. Gregorio has two children attending public schools in the District and has one child who graduated from public school in the District.  Under the current at-large method of electing Board members, Mr. Gregorio has been denied the ability to elect candidates of his choice to the Board.  Since 2008, none of the candidates for whom he voted in contested races were elected to the Board.  Mr. Gregorio wishes to participate in the District's electoral and political processes on an equal basis with all other residents.

13.    Plaintiff Dorothy Miller is a Black registered voter who resides in the District.  Ms. Miller has two children who attended public schools in the District.  Under the current at-large method of electing Board members, Ms. Miller has been denied the ability to elect candidates of her choice to the Board.  Since 2008, no candidate for whom Ms. Miller has voted has won a contested election.  The only winning Board candidates for whom she has voted were Sabrina Charles-Pierre in 2016, JoAnn Thompson in 2011, and Steve Price and Suzanne Young-Mercer in 2010—each of whom were elected in races in which they ran as incumbents and unopposed.  Ms. Miller wishes to participate in the District's electoral and political processes on an equal basis with all other residents.

14.    Plaintiff Hillary Moreau is a Black registered voter who resides in the District.  Under the current at-large method of electing Board members, Ms. Moreau has been denied the ability to elect candidates of her choice to the Board.  Since 2013, no candidates for whom Ms. Moreau has voted were elected to the Board, except for Pierre Germain in the 2013 election and Sabrina Charles-Pierre in the 2016 election when she ran as an unopposed incumbent.  Ms. Moreau did not vote for Mr. Germain when he ran for re-election in May 2016.  Ms. Moreau

wishes to participate in the District's electoral and political processes on an equal basis with all other residents.

15.    Plaintiff Washington Sanchez is a Latino registered voter who resides in the District.  Mr. Sanchez has one child attending public school in the District.  Under the current at-large method of electing Board members, Mr. Sanchez has been denied the ability to elect candidates of his choice to the Board.  Mr. Sanchez became a naturalized United States citizen in 2015.  No candidates for whom he voted in contested races have ever been elected to the Board.  Mr. Sanchez wishes to participate in the District's electoral and political processes on an equal basis with all other residents.

16.    Defendant East Ramapo Central School District, a political subdivision of the State of New York,[5] serves approximately 8,472 public school students[6] at 14 schools and over 27,000 private school students.[7]   The District includes parts of the towns of Ramapo, Haverstraw, and Clarkstown, including all or parts of the villages of Spring Valley, Monsey, Wesley Hills, New Hempstead, Chestnut Ridge, Suffern, Nanuet, New City, and Pearl River.

17.    Black and Latino children constitute over 90% of the 8,472 public school students.  According to the New York State Education Department, Black and Latino students accounted for 37% and 53%, respectively, of total enrollment in public schools in the District in the 2016-2017 school year.  White students constitute only 4% of the District's public school

---

[5]    N.Y. EDUC. LAW §§ 309, 1801 (granting the Commissioner authority to form, supervise and manage Central School Districts, as defined in New York Education Law).

[6]    N.Y. State Educ. Dep't, East Ramapo CSD (Spring Valley) at a Glance, https://data.nysed.gov/profile.php?instid=800000039112 (last visited Nov. 11, 2017).

[7]    N.Y. State Educ. Dep't, Information and Reporting Services, 2016-17 NonPublic School Enrollment by Race and Ethnicity, http://www.p12.nysed.gov/irs/statistics/nonpublic/ (last visited Nov. 11, 2017) (enrollment calculated based on nonpublic schools associated with NYSED BEDS codes for East Ramapo Central School District).

population.  By contrast, 99.4% of the District's more than 27,000 private school students are White.[8]  The District's voting-age population is 71,913, of which approximately 52% are White, and 48% are non-White, including 23% Black, 17% Latino, and 5% Asian.[9]

18.     The District is responsible for maintaining and administering the system for electing the members of its governing body, the Board.  The Board consists of nine Trustees who are elected by voters residing in the District.  Each year, at-large elections are held in May.  Voters elect three Board members each year in an at-large, staggered election held on the third Tuesday of May.  The most recent at-large election for three seats on the Board was held on May 16, 2017.

19.     Although candidates generally run as part of a slate of three candidates endorsed by organizations or leaders within either the White community or the Minority community, seats are elected by numbered posts, i.e., each candidate runs for one particular seat, but each seat is elected at-large.

20.     Defendant MaryEllen Elia is the New York State Commissioner of Education.  The Commissioner is "the chief executive officer of the state system of education and of the board of regents" and "shall enforce all general and special laws relating to the educational system of the state," pursuant to N.Y. EDUC. LAW § 305(1).  To the extent required by law, the Commissioner is named as a defendant for purposes of implementing and enforcing the remedies sought in this action.  Commissioner Elia is named as a defendant only in her official capacity.

---

[8]     *Id.*

[9]     U.S. CENSUS BUREAU, 2011-2015 American Community Survey.

## JURISDICTION AND VENUE

21.     This is an action for injunctive and declaratory relief under Section 2 of the Voting Rights Act, 52 U.S.C. § 10301.

22.     Jurisdiction is proper under 28 U.S.C. § 1331, 28 U.S.C. § 1343(a), and 52 U.S.C. § 10308(f).  Venue is proper under 28 U.S.C. § 1391.

## FACTUAL ALLEGATIONS

23.     Rockland County and the towns that comprise the District have come a long way to become the racially diverse community they are today, although its diverse residents remain segregated in many respects.  In the 1940s, Minorities accounted for less than 10% of Rockland County's population.  Black residents in the community at that time recall being denied service at restaurants in Ramapo and Pearl River.[10]  One Black resident at the time recalls that when he would enter a public pool, Whites would summarily exit the pool.[11]  In 1943, the NAACP, led by counsel Thurgood Marshall, successfully prosecuted a school segregation case in Ramapo that was an important precursor to *Brown v. Board of Education*.

24.     Over the next several decades, Rockland County saw steady growth in population and racial diversity.  Since 1950, Rockland County's total population has nearly quadrupled, and its Minority population quadrupled alongside it.  Many Black and Latino residents moved out of New York City and into the District and across Rockland County, seeking opportunities to become homeowners for the first time and to raise their children in a community with open space and good quality public schools.  But Rockland County and the District remain residentially and

---

[10]     Dwight R. Worley, *New York more diverse, still segregated*, THE JOURNAL NEWS (NY), Oct. 22, 2014, http://www.lohud.com/story/news/investigations/2014/10/22/diverse-yet-segregated/17690721/.

[11]     *Id.*

educationally segregated.  As the population of residents of all backgrounds within East Ramapo grew, fewer and fewer White children attended the District's public schools.  By 2001, minorities made up 82% of the public school student body in the District.

25.     Even then, the District's superintendent at the time recognized the "constant challenge to educate new immigrants and minimize cultural clashes."[12]  But the District's public schools thrived in spite of these challenges.  The District's two high schools, Ramapo and Spring Valley, were well-regarded institutions that offered students a broad range of academic, artistic, and extracurricular activities.  Many graduates of the District's public schools remained in the area to provide their children with the same quality education they received.  Through 2004, representatives from the public school community constituted a majority of the Board.

26.     However, as the White community grew and continued sending its children to private school at an accelerating pace, the White community's support for the increasingly Minority-populated public schools waned.  Instead of supporting the public schools, the White community sought to increase the District's financial support for the private schools and to lower the taxes that supported the District's budget.  Ultimately, the White community organized to elect its preferred candidates to the Board to implement a policy agenda that increased support for private school students and decreased public school expenditures.  As a result of the District's at-large method of election, the White majority has effectively shut out advocates for the public school community and its largely Minority constituency.

---

[12]     David W. Chen, *In Rockland Suburb, Deep Racial Change Melts Into the Everyday*, THE NEW YORK TIMES, May 5, 2001, http://www.nytimes.com/2001/05/05/nyregion/in-rockland-suburb-deep-racial-change-melts-into-the-everyday.html.

A.    **Since 2005, At-Large Elections Have Allowed the White Voting Bloc to Consistently Defeat Candidates for the Board Preferred by Minority Voters.**

27.    In 2005, White voters organized successfully to elect a slate of candidates who favored lowering the taxes that funded the District's budget and diverting resources away from the District's public schools and towards services used by the District's private school population.  The White-preferred candidates defeated a slate of candidates preferred by Minority voters who favored continuing the District's support for the public schools.  The bloc voting continued in 2006, as a slate of White-preferred candidates who favored increasing support for private school students at the expense of the public schools once again defeated the slate of Minority-preferred candidates who favored continuing the District's support for the public schools.  Going into the 2007 election, White-preferred candidates held seven of nine seats on the Board.  In 2007, a slate of three candidates from the public school community that included the only two public school incumbents were able to muster enough support to win their election after the incumbent President of the Board, Nathan Rothschild, urged the private school candidates to withdraw in order to maintain some public school representation on the Board.[13] White-preferred candidates maintained a 6-3 majority on the Board.

28.    Since 2008, elections have been held for 33 Board seats.  No Minority-preferred candidates have won a contested election during that time.  Including uncontested elections, Minority-preferred candidates have only won election in four out of 33 elections.  Each of those four Minority-preferred candidates was an incumbent at the time.  Today, White-preferred candidates hold eight out of the nine seats on the Board.

---

[13]    Alice Gomstyn, *East Ramapo Budget Watchdogs Focus on School Spending*, THE JOURNAL NEWS, Aug. 12, 2007, at 11A.

29.     The ninth Board member, Sabrina Charles-Pierre, ran for a seat on the Board in May 2015 as a candidate with the support of the largely Minority public school community and lost to a candidate from the private school community elected largely with support of a majority of White voters.   After one of the White-preferred, private school Board members elected in 2015 resigned a few months after taking office, Ms. Charles-Pierre was appointed to fill that vacancy until the next Board election in May 2016.   Ms. Charles-Pierre ran unopposed in May 2016 for a term that was set to expire in May 2018.   However, the Board failed to give Ms. Charles-Pierre the oath of office until more than 30 days after her election and claimed that the remaining two years of her term should be reduced to one year, expiring in May 2017.   The truncation of Ms. Charles-Pierre's term was the subject of a petition to the State Commissioner of Education that was mooted in February 2017, when New York State Governor Andrew M. Cuomo signed a bill restoring Ms. Charles-Pierre's full two-year term.   Ms. Charles-Pierre's seat will be up for election in May 2018.

**B.      Between 2005 and 2014, the Board's Drive to Lower Taxes and Fund Services for Private School Students Degraded the District's Public Schools.**

30.     From the time White-preferred candidates gained control of the Board, they directed their efforts towards increasing public funding for special education, transportation and other benefits used by private school students and decreasing taxes.   The decreases in taxes and increases in services benefitting the private school community came at the expense of the District's public schools, upon which the Board inflicted massive cuts that disproportionately harmed those schools' overwhelmingly Minority constituency.[14]

---

[14]     HENRY M. GREENBERG, REPORT OF INVESTIGATION: EAST RAMAPO: A SCHOOL DISTRICT IN CRISIS 29-33 (2014), http://www.p12.nysed.gov/docs/east-ramapo-fiscal-monitor-presentation.pdf.

31.     In June 2014, after several years of steep decline, then-Commissioner John B. King, Jr. appointed a fiscal monitor, Henry Greenberg, with a broad charge to review the District's fiscal practices, conduct, and history and to offer recommendations for improvement. Mr. Greenberg's resulting report provides an overview of the Board's hostility to the needs of the District's Minority population between 2007 and 2014.

32.     In his November 17, 2014 report, titled "East Ramapo: A School District in Crisis," Mr. Greenberg reported that it was "[m]ost disturbing" that the Board "appear[ed] to favor the interests of private schools over public schools," making "draconian spending cuts to public school programs and services in order to balance its budgets."[15]  Among other examples, Mr. Greenberg observed that from 2009 to 2014, the Board eliminated over 445 positions in the District, including over 200 teaching positions, as well as all social workers, all deans, and all elementary school assistant principals. Mr. Greenberg also reported steep academic and programmatic cuts, for example, reducing full-day kindergarten to a half-day, reducing English as a second language courses, eliminating summer school, reducing high school electives, eliminating transportation for field trips, and cutting athletics and extra-curricular activities by over 50%.[16]   Mr. Greenberg further reported significant cuts to supplies and materials, professional development, and infrastructure administration.

33.     At the same time, Mr. Greenberg also found that there had been massive increases in spending on services that benefited the majority-White private schools, including certain transportation services and special education placements in private schools, with "[n]o meaningful effort made to distribute [the] pain of deep budget cuts fairly among private and

---

[15]     *Id.* at 29.

[16]     *Id.* at 30-32.

public schools."[17]  Mr. Greenberg observed that the District's fiscal policy had left its "finances

teeter[ing] on the edge of disaster."[18]

34.      Mr. Greenberg's report also captures examples of the Board's hostility to the

Minority community's efforts to advocate on behalf of the District's public school students when

they went to Board meetings to voice their concerns.  Mr. Greenberg found that the Board lacked

transparency and public oversight, noting that it would routinely spend 60-70% of its meetings in

private "executive" sessions.[19]

35.      After receiving substantial criticism from meeting attendees during the public

comment period, in 2010, the Board adopted a rule—over the spoken objections of a Board

member representing the public school community—moving public comment periods to the end

of meetings.  Members of the Minority community who attended Board meetings recall that

these "executive sessions" would regularly run well after midnight and sometimes until 2 a.m. or

3 a.m.  Mr. Greenberg observed that the prolonged duration of meetings limited opportunities for

members of the public's participation because the Board had adopted a rule against "allowing the

public to speak until the end of meetings . . . ."[20]

36.      On those occasions when the public school community was able to address the

Board, those interactions were characterized by non-responsiveness at best and hostility at worst

According to Mr. Greenberg, "[d]istrict officials frequently resort[ed] to name-calling [and]

---

[17]      *Id.* at 33.

[18]      *Id.* at 23.

[19]      *Id.* at 35.

[20]      *Id.*

attacking others' motives and integrity, when responding to criticism" from the community.[21]

Mr. Greenberg also noted that "Board meetings degenerate into verbal brawls, with the Board's

attorneys berating students and parents."[22]  For example, in July of 2013, Christopher Kirby, the

Board's lawyer, consistently interrupted Peggy Hatton, a public school parent, as she was

addressing the Board.  Mr. Kirby berated Ms. Hatton, told her to "shut up," and called her

numerous obscene and lewd names.  Mr. Kirby's "obscenity-laced tirade" was so intense it went

"viral."[23]  Mr. Greenberg's report only scratches the surface of the Board's non-responsiveness

to the needs and voices of the Minority community during this time.

37.    In one incident that illustrates the District's antipathy at that time towards the

public schools' majority-Minority student body, Mr. Greenberg reported that the District's

former Superintendent, Joel Klein, said of immigrant children in the public school system: "They

want to learn the language . . . They want free lunch, breakfast, and whatever else they can get.

They know they cannot get a diploma . . . .  It's a major, major issue, so we're dealing with it."[24]

38.    Most importantly, Mr. Greenberg found that academic performance in this once

well-regarded District lagged "well behind" neighboring districts and statewide averages.  It

continues to do so today.  For example, in 2009, Newsweek named Spring Valley High School

---

[21]     *Id.* at 36.  For instance, District officials accused Commissioner King of acceding "to the demands of bigots" and attacked leaders of the NAACP as "disturbingly disingenuous" and "feign[ing] ignorance."  *Id.* (brackets in original).

[22]     *Id.* at 20.

[23]     Nina Golgowski, *Foul-mouthed attorney Christopher Kirby gets firm axed from East Ramapo school board*, NEW YORK DAILY NEWS, July 9, 2013, http://www.nydailynews.com/new-york/foul-mouthed-attorney-axed-school-board-article-1.1393589.

[24]     Mareesa Nicosia, *Immigrants Decry East Ramapo Chief's Dropout Comments*, JOURNAL SENTINEL, Sept. 2, 2014, http://www.lakecountrynow.com/story/news/education/2014/09/02/immigrants-decry-east-ramapo-schools-chiefs-comments/15000799/.

one of the 500 best in the country.[25]   Today, Spring Valley High School has the lowest graduation rate in Rockland County, except for the District's other high school, Ramapo High School.  GreatSchools.org gives Spring Valley High School a 3 out of 10—the site's lowest rating of any public high school in Rockland County.

39.    In his recommendations, Mr. Greenberg emphasized the need for more checks and balances on the Board's decisions in order to protect public school students, including "a vehicle to override, in real time, unreasonable decisions by the Board and Superintendent and ensure that the District conducts its affairs in a transparent fashion."[26]

40.    Mr. Greenberg noted in his report that the District had previously rejected efforts by the State to provide additional funding to the public schools.  In November 2013, the State enacted a law that would have allowed the District to apply for $3.5 million in advance education funds from the State lottery provided that the District create an advisory committee—including a parent, a teacher, and an administrator from the public schools, as well as a Board member and the superintendent—to create a plan for spending the money.  The Board and Superintendent Klein refused to apply for the money, objecting to the requirement of an advisory committee because, as Klein stated in June 2014, Board members "feel, in principle, it is wrong and it is illegal.  *They* are the elected body."  Klein further stated at that time, "The board feels—and I agree with them—that this is the responsibility of the Board of Education and they are both affronted and insulted . . . that an outside group of people could determine how the money is

---

[25]    Benjamin Wallace-Wells, *Them and Them*, NEW YORK MAGAZINE, Apr. 21, 2013, http://nymag.com/news/features/east-ramapo-hasidim-2013-4/.

[26]    GREENBERG, *supra* note 14, at 41 & 48.

used."[27]   In his report later that year, Mr. Greenberg stated that the District had"[n]o strategic, long-term plan . . . for the future."[28]

41.     In May 2015, the next Board elections following the release of Mr. Greenberg's report, a slate of candidates from the private school community again defeated the slate of candidates from the public school community.  Analyses of precinct level-data revealed that the voting in this election exhibited strong racial polarization.

**C.     In December 2015, State-Appointed Monitors Found that the District's Method of Election Dilutes Minority Voting Strength and Permits the Election of a School Board That Is Not Responsive to Minorities' Needs.**

42.     As a result of Mr. Greenberg's November 2014 report, concerns regarding "the consistent reports of [East Ramapo's] educational decline," and "very deep rifts within the community," in August 2015, the New York State Commissioner of Education, MaryEllen Elia, appointed a team of Monitors for the District.  Derek M. Walcott, the former Chancellor of the New York City Department of Education, was appointed as "Monitor for the District," and Dr. Monica George-Fields and Dr. John W. Sipple were appointed as "Monitors to provide specific expertise in the areas of educational practice and finances, respectively."  Their charge was "to protect the District's students and to address the District's failing educational and operational infrastructures, as well as the total breakdown of community trust facing the school community in East Ramapo."[29]

---

[27]     Mareesa Nicosia, *East Ramapo 'Insulted' by Early Lottery Aid Deal*, THE JOURNAL NEWS (NY), June 11, 2014, http://www.lohud.com/story/news/education/2014/06/11/east-ramapo-insulted-early-lottery-aid-deal/10358093/.

[28]     GREENBERG, *supra* note 14, at 22.

[29]     DENNIS M. WALCOTT, MONICA GEORGE-FIELDS & JOHN W. SIPPLE, OPPORTUNITY DEFERRED: A REPORT ON EAST RAMAPO CENTRAL SCHOOL DISTRICT 2 (Dec. 2015).

43.     In their ensuing report titled "Opportunity Deferred," which was released in December 2015, Mr. Walcott, Dr. George-Fields, and Dr. Sipple wrote: "As illuminated by the Monitors' work since August 2015, as reported in Mr. Greenberg's November 2014 report, as documented in the press, and as experienced and voiced by public school families, educators, and community members, the East Ramapo Board of Education has persistently failed to act in the best interests of public school students."[30]

44.     The Monitors further wrote: "East Ramapo has been in a state of distress for years.  In just over 17 weeks, the Monitors have learned that the overarching effect of this distress has been a wearing away of the fundamental building blocks the District needs to successfully educate its students—competent leaders who support teaching and learning in the District and understand and respect community needs; fiscal stability; and community confidence and support.  Lacking these fundamentals, the District requires substantial care and attention to be able to effectively serve the needs of its students and families.  Since August, the Monitors have begun this process by providing intense, on-the-ground oversight of a District in which a deep community rift has made progress of any sort nearly impossible.  The Monitors recognize that the progress made, and the District itself, are both fragile and delicate and that a crisis of this magnitude, years in the making, will not be resolved in 17 weeks."[31]

45.     The Monitors recommended a host of salutary measures, some of which were adopted by the Board, including moving executive sessions to "the end of meetings, rather than

---

[30]     *Id.* at 4.

[31]     *Id.* at 9.

at the beginning, so that the public does not have to wait numerous hours before having the opportunity to comment."[32]

46.     The Monitors also noted that "[w]hen a vacancy was created on the board, the Monitors recommended an inclusive transparent process to ensure that the community had an opportunity to participate in the selection process.  Following this process, the board selected a public school parent to fill the unexpired term," which is how Sabrina Charles-Pierre, the only current representative of the public school community, was seated on the Board.[33]

47.     The Monitors made 19 significant recommendations that "illustrate[] the need for immediate and urgent action to alleviate the crisis in East Ramapo as well as the necessity of longer-term system-wide reform in the District."[34]   Several of these recommendations reflect findings that the District's current election system has failed Minority voters.

48.     The Monitors expressly recommended that the State "[e]nsure representation of public school concerns on the board of education by providing that in each election cycle, all the candidates for at least one of the seats must be parents of children attending public schools selected in a local process by other public school parents."[35]   The Monitors found: "Due to the unique demographics of East Ramapo, the majority of the members of its board are more representative of the families who send their children to private schools and may not be motivated by the same focus on the public schools as a traditional school board member."[36]

---

[32]     *Id.* at 9-10.

[33]     *Id.* at 10.

[34]     *Id.*

[35]     *Id.* at 13.

[36]     *Id.* at 13-14.

Elections for six seats on the Board have been contested since this report was published in December 2015. Candidates representing the private school community, elected with the support of White voters almost exclusively have been elected to all six seats. Today, the only representative from the public school community is Ms. Charles-Pierre, who was initially appointed under the oversight of the Monitors to fill a vacant seat until the next election. She was subsequently elected as an unopposed incumbent to fill the remaining two years of the vacating member's expired term.

49.     The Monitors recommended that the State "[a]ppoint an independent election monitor for school board elections" because "the election process in the District is viewed with suspicion and the Monitors have heard from many District residents that they lack confidence in the process."[37]

50.     The Monitors also recommended that the Board and community members "seek the counsel and advice of a human rights expert to address and intervene on sensitive community issues that may arise," "[d]ue to the history in the District of contentious interactions between members and representatives of the board of education and the community."[38]

D.     **The State's Temporary Intervention Has Reversed Some Cuts, but Does Not Obviate the Need for an Election System that Affords Minorities Meaningful Representation on the Board.**

51.     Only 23 months have elapsed since the publication of the report by Mr. Walcott, Dr. George-Fields, and Dr. Sipple. Following their recommendation, the State has continued to appoint monitors for the District. In 2016 and 2017, the State Legislature also provided the District with $3 million to help restore some of the deep cuts to public school services. At a

---

[37]     *Id.* at 12.

[38]     *Id.* at 14.

school board meeting in October 2017, the Superintendent, Dr. Deborah Wortham, noted that as a result of the supplemental funding, the District was able to restore some of the faculty positions and some programs that had previously been cut.  In celebrating the limited restoration of personnel and services, Dr. Wortham made a statement to the effect of: "I don't even want to think about where we'd be without the $3 million."  No supplemental state funding for East Ramapo is guaranteed for next year or any subsequent year.

52.     To date, the District remains the poorest performing school district in Rockland County.  According to State assessment data from 2017, only 22% of the District's students in grades 3-8 are proficient in English and only 19% are proficient in Math.  In the most recent year for which data is available, Spring Valley High School and Ramapo High School had the lowest graduation rates of any public school in Rockland County at 68% and 64% respectively, as well as the highest dropout rates at 13% and 14% respectively.  By contrast, no other public high school in Rockland County with an enrollment over 10 students had a graduation rate of less than 84% or a dropout rate over 4%.

53.     State intervention remains necessary, but insufficient, to ensure that the interests of Minorities are represented on the Board and the District's public schools serve their constituent students and families adequately.  State intervention does not obviate the need or the legal requirement for Minorities to have an equal opportunity to elect their candidates of choice to the Board.  Without that opportunity, Minorities will continue to lack a voice in the rooms where decisions are made.

## VOTING RIGHTS ACT ALLEGATIONS

54.     Section 2 prohibits the application or imposition of any "voting qualification or prerequisite to voting or standard, practice, or procedure" that "results in a denial or abridgement of the right of any citizen of the United States to vote on account of race or color."  The crux of a

claim under Section 2 is that "a certain electoral law, practice, or structure interacts with social and historical conditions to cause an inequality in the opportunities enjoyed by black and white voters to elect their preferred representatives."[39]

55.    The current at-large system for electing Board members enables the dilution of Minority voting strength in an environment where elections are characterized by racially-polarized bloc voting in violation of Section 2.

A.    *Thornburg v. Gingles* **Preconditions**

56.    In *Thornburg v. Gingles*, 478 U.S. 30, 50-51 (1986), the U.S. Supreme Court identified three necessary preconditions for a vote dilution claim under Section 2: (1) the minority group must be "sufficiently large and geographically compact to constitute a majority in a single-member district"; (2) the minority group must be "politically cohesive"; and (3) the majority must vote "sufficiently as a bloc to enable it . . . usually to defeat the minority's preferred candidate."  Plaintiffs satisfy each of these criteria (the "*Gingles* preconditions").

57.    *First*, the District's Minority population is sufficiently numerous and geographically compact to allow for the creation of multiple majority-minority single-member districts.  According to the five-year 2011-2015 American Community Survey, the Minority citizen population is 34.3% of the citizen population, 39.5% of the citizen voting-age population, and 47% of the voting age population.  There is also significant residential segregation in the District, which allows for drawing compact majority-minority districts.  As a result, the Black population living within East Ramapo is sufficiently numerous and geographically compact to allow for the drawing of three single-member majority-Black voting districts.  Furthermore, the Black and Latino communities, which are politically cohesive, are also sufficiently numerous

---

[39]    *Thornburg v. Gingles*, 478 U.S. 30, 47 (1986).

and geographically compact, to allow for the creation of four majority-minority districts. As such, four majority-minority districts should be included in a ward system replacing the current, at-large system.

58.     *Second*, elections in the District show a clear pattern of politically cohesive voting among Minority voters, who tend to prefer overwhelmingly the same candidates. For example, analyses of precinct-level voting data in the past several Board elections shows that the overwhelming majority of Black voters have coalesced behind the same slate of candidates and so have Latino voters. These analyses also demonstrate that Black and Latino voters are not only cohesive within their own groups, but they are also politically cohesive across both groups. For example, in the past six contested races for seats on the Board, there was near unanimous support among both Black and Latino voters for the same six candidates supported by the public school community in contested Board elections—Chevon Dos Reis, Eric Goodwin, Allie Manigo, Kim Foskew, Jean Fields, and Natasha Morales. In at least five of those six races, more than 90% of Black and Latino voters voted for candidates endorsed by the public schools.

59.     *Third*, the District's at-large election system has enabled the White community in East Ramapo to vote as a bloc in order to defeat Minority-preferred candidates in every contested election beginning in 2008 and continuing to the present. These patterns of racially polarized voting have persisted through the period in which the District has been under State oversight. In the past six contested races for seats on the Board, the winning candidates have each won with the support of at least three-quarters of White voters, while receiving support from only a very small minority of Black and Latino voters.[40]

---

[40]     *See* East Ramapo Central School District, Election Results - 2008 to present, http://www.ercsd.org/pages/East_Ramapo_CSD/Departments/District_Clerk/Budget_Vot e_and_Election_Infor/Election_Results__-_2008_to_pr (last visited Nov. 15, 2017).

B.      The "Totality of the Circumstances" Analysis

60.     The Section 2 analysis considers whether, "based on the totality of [the] circumstances," minority voters "have less opportunity than other members of the electorate to participate in the political process and to elect representatives of their choice."[41]  The Supreme Court in *Gingles* identified a list of nine non-dispositive, non-exclusive factors that are relevant to the totality of the circumstances inquiry.[42]  Here, the totality of the circumstances demonstrates that Minority voters have less opportunity than other members of the electorate in the District to participate in the political process and to elect representatives of their choice.

61.     *First*, there is ample evidence of a history of official discrimination against Minority residents in the District.  For example, during the May 2011 Board election, the Vice-President of the Board at the time, who was elected as a candidate from the private school community with little, if any, support from Minority voters, was arrested and charged with a misdemeanor count of violating Section 17-152 of N.Y. Election Law, conspiracy to promote or prevent election.  According to one publication, Clarkstown police were summoned to Hillcrest Elementary in New City after a poll watcher accused the Board member of photographing and otherwise intimidating voters, and of blocking the entrance to the school, preventing voters from entering the polling station.[43]  For another example, in May 2016, after Sabrina Charles-Pierre won an uncontested election to serve the remaining two years of a term vacated by a White-preferred candidate, the Board failed to administer her the oath of office within 30 days of her election and claimed that her term would be cut short by a year as a result.  An administrative

---

[41]     52 U.S.C. § 10301(b).

[42]     *See Gingles*, 478 U.S. at 36-37.

[43]     James O'Rourke, *East Ramapo Board's Wieder Faces Election Charge, Accused of Blocking Poll Entrance*, THE JOURNAL NEWS (NY), May 20, 2011, at 3A.

challenge before the Commissioner of Education over the duration of Ms. Charles-Pierre's term
was mooted after a state law was passed granting her a two-year term.  As Mr. Walcott, Dr.
George-Fields, and Dr. Sipple noted in their December 2015 report, "the election process in the
District is viewed with suspicion and the Monitors have heard from many district residents that
they lack confidence in the process."[44]

62.     *Second*, elections for the Board are characterized by extreme levels of racially
polarized voting.  For example, in the past two election cycles—which have both taken place
while the District was under State oversight—multiple analyses of precinct-level voting data
show that the six candidates who ran on slates preferred by the White community were elected
with almost zero support from Black and Latino voters and Minority-preferred candidates
received less than one-quarter of the White vote.  These two elections are indicative of a pattern
that goes back years.

63.     *Third*, there are several voting practices or procedures in use in the District that
enhance the discriminatory effect of the at-large election system on Minority voters.  Elections
for the Board take place every year because Board members serve staggered, three-year terms in
classes of three members each.  In addition, Board elections take place in May and do not take
place concurrently with elections for other federal, state, or local offices.  The discriminatory
effect of the at-large election system is enhanced by the use of numbered posts to elect
candidates.  The District does not offer opportunities for early voting or no-excuse absentee
balloting.

64.     *Fourth*, upon information and belief, there is an informal candidate-slating
process from which Minority residents have been denied access.  Leaders and organizations in

---

[44]     WALCOTT ET AL., *supra* note 29, at 12.

the private school community, which is overwhelmingly White, endorse a slate of Board candidates. These private school community institutions do not widely publish information about candidate forums they may hold or their criteria for slating or endorsing candidates. These endorsements are sufficiently powerful that candidates on the slate fielded and endorsed by private school community institutions do not campaign in Minority neighborhoods, attend public campaign forums, or publish campaign web sites. At present, eight of the Board's nine members were candidates who were part of slates endorsed by organizations and leaders from within the private school community and received overwhelming electoral support from White voters and de minimis support from Minority voters. As candidates, these eight Board members did not have campaign web pages, did not campaign substantially in the Minority community, and only one is reported to have attended any of the longstanding open candidate forums held by civic organizations within the Minority community to which all candidates are invited.

65. *Fifth*, Minority residents in the District continue to bear the effects of discrimination in several areas, including education, housing, and criminal justice, which hinders their ability to participate effectively in the political process. As described above, the education system in East Ramapo is effectively segregated with Minority children attending public schools and White children attending private schools. The District is the poorest performing public school district in Rockland County and its students have suffered and continue to suffer from draconian cuts to personnel and programming that occurred over a ten-year period and have not been fully reversed. The District is also residentially segregated. Testing has demonstrated that Minority renters have been subject to discrimination by landlords in the area, who have declined to rent to qualified Minority applicants in favor of White applicants. Homeowners in Minority neighborhoods have also seen the value of their homes decline as the quality of the public school

district has declined. Minorities in the area have also been subject to over-policing and racial profiling. The effects of discrimination in these areas have hindered Minority residents' ability to participate effectively in the District's electoral and political process, reinforcing the exclusionary effects of the existing at-large election system.

66.     *Sixth*, on information and belief, political campaigns in the District have been and continue to be characterized by subtle racial appeals.

67.     *Seventh*, no Minority-preferred candidate has won a contested election for a Board seat in East Ramapo since 2007. Sabrina Charles-Pierre is the only current Board member who ran as a Minority-preferred candidate and who represents the interests of the Minority community on the Board. When Ms. Charles-Pierre originally ran for a seat on the Board in 2015, she lost to a White-preferred candidate. At the urging of State-appointed Monitors, Ms. Charles-Pierre was appointed by the Board to fill a vacancy left by the resignation of a Board member who resigned shortly after his election.[45] In the next election cycle, Ms. Charles-Pierre ran to fill the remaining two years on the vacated seat's term. She ran as an incumbent and was unopposed. However, after her election, the Board did not administer the oath of office to Ms. Charles-Pierre within 30 days. The Board then claimed that her term would have to be reduced from two years to one year as a result.[46] Subsequent litigation over the duration of her term was mooted when Governor Cuomo signed a law granting Ms. Charles-Pierre a two-year term.

68.     In addition to Ms. Charles-Pierre, there are two other Black members of the Board, Bernard Charles, Jr. and Pierre Germain; however, neither Mr. Charles nor Mr. Germain

---

[45]     WALCOTT ET AL., *supra* note 29, at 10.

[46]     *Respect East Ramapo Voters, Restore Trustee's Full term: Editorial*, THE JOURNAL NEWS (NY), Jan. 19, 2017, http://www.lohud.com/story/opinion/editorials/2017/01/19/respect-east-ramapo-voters/96773354/.

were the candidates of choice of the Minority community and they do not represent or advocate on the Board for the interests of Minorities or the public school community. Mr. Charles and Mr. Germain were each part of the slate endorsed by organizations and leaders in the private school community, not the slate endorsed by organizations and leaders in the public school community. Mr. Charles and Mr. Germain did not widely publish campaign materials or campaign substantially in the Minority community. Mr. Charles has not attended any longstanding candidate forums held by organizations in the Minority community. Mr. Germain attended one such forum during the 2016 election, but left early. According to analyses of precinct-level voting data, Mr. Charles and Mr. Germain received de minimis support from Minority voters. Both Mr. Charles and Mr. Germain signed letters opposing the State's decision to appoint monitors to determine whether the Board adequately served the interests of the District's public school students—a measure that received near universal support within the Minority community.

69.     Since 2004, only two Latino candidates, MaraLuz Corado in 2013 and Juan Pablo Ramirez in 2015, have been elected to the Board. Both Ms. Corado and Mr. Ramirez ran as part of slates endorsed by the private school community. They were heavily supported by White voters and received little support from Minority voters, including nearly zero support from Latino voters. Ms. Corado resigned after less than six months on the Board. Mr. Ramirez resigned after less than two months on the Board. Since 2004, there have been elections for 42 seats on the Board, each carrying a three-year term. In that time, Latinos, whose children make up over half of the public school population, have held positions on the Board for a total of *eight months* out of 126 *years* of Board tenure. On information and belief, no Latino candidate preferred by Latino voters has *ever* been elected to the Board.

70.     *Eighth*, extensive evidence demonstrates elected members of the Board have not been responsive to the particularized, substantive needs of the Minority community nor have they been procedurally responsive to the Minority community's efforts to engage with the Board. As Mr. Greenberg observed in his November 2014 report, the Board has consistently favored the interests of private schools, which White students attend almost exclusively, over the interests of public schools, which Minority students overwhelmingly attend.   For years, the Board also generally refused to engage meaningfully with members of the Minority community seeking improvements to the public schools or offering criticisms of the Board's management.   Although some of the cuts have been restored and the Board's behavior towards the public has improved since the State's intervention in the District, Mr. Greenberg's observation that "students and parents have lost faith in the Board and feel that the Board does not understand their needs" still reflects the common sentiment among members of the Minority community living within East Ramapo.

71.     Finally, any policy that may be underlying the Board's continued use of the at-large system is tenuous.

## CLAIM FOR RELIEF

72.     Plaintiffs reassert the allegations in paragraphs 1 through 71 of this Complaint.

73.     The District's at-large method of electing Board members is not equally open to participation by the District's Black and Latino voters, in violation of Section 2 of the Voting Rights Act.   The at-large election system results in Black and Latino voters having less opportunity than White voters to participate in the political process and to elect representatives of their choice.

74.     Unless enjoined by order of this Court, Defendants will continue acting in violation of Section 2 of the Voting Rights Act by administering, implementing, and conducting future elections for the Board using an at-large election system.

## DEMAND FOR RELIEF

WHEREFORE, Plaintiffs respectfully request that the Court enter an order:

1.      Declaring that the District's at-large method of electing Board members in staggered cycles during the month of May violates Section 2 of the Voting Rights Act;

2.      Enjoining the District, its agents and successors in office, and all persons acting in concert with, or as an agent of the District, from administering, implementing, or conducting any future elections for the Board under the existing at-large method of election;

3.      Ordering the implementation of a single-member ward election system for the Board that complies with Section 2 of the Voting Rights Act;

4.      Ordering that all future elections for the District comply with Section 2 of the Voting Rights Act;

5.      Granting Plaintiffs attorneys' fees and any costs that they incur in connection with this action, pursuant to 42 U.S.C. § 1988 and 52 U.S.C. § 10310(e); and

6.      Granting any other relief that the Court may determine to be just and equitable.

Dated: November 16, 2017
      New York, New York.             Respectfully submitted,

                                        /s/ Claudia T.  Salomon
                                        Claudia T. Salomon
                                        Corey A. Calabrese
                                        Claudia.Salomon@lw.com
                                        Corey.Calabrese@lw.com
                                        Latham & Watkins LLP
                                        885 Third Avenue
                                        New York, NY 10022
                                        Phone: (212) 906-1200

                                        Arthur Eisenberg
                                        aeisenberg@nyclu.org
                                        Perry Grossman
                                        pgrossman@nyclu.org
                                        New York Civil Liberties Union Foundation
                                        125 Broad Street
                                        New York, NY 10004
                                        Phone: (212) 607-3329

                                        *Attorneys for Plaintiffs*