**UNITED STATES DISTRICT COURT FOR THE
SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| NATIONAL ASSOCIATION FOR THE ADVANCEMENT OF COLORED PEOPLE, SPRING VALLEY BRANCH; JULIO CLERVEAUX; CHEVON DOS REIS; ERIC GOODWIN; JOSE VITELIO GREGORIO; DOROTHY MILLER; HILLARY MOREAU; and WASHINGTON SANCHEZ, | 17 Civ. 8943 (CS) (JCM) |

                    Plaintiffs,

      v.

EAST RAMAPO CENTRAL SCHOOL
DISTRICT and MARYELLEN ELIA, IN
HER CAPACITY AS THE
COMMISSIONER OF EDUCATION OF
THE STATE OF NEW YORK,

                 Defendants.

## DECLARATION OF DR. OSCAR COHEN

DR. OSCAR COHEN, pursuant to the provisions of 28 U.S.C. § 1746, declares under penalty of perjury as follows:

### *Background*

1.     I am a United States citizen.  I am 76 years old.  I am a white man.

2.     I reside within the East Ramapo Central School District ("East Ramapo" or the "District") and have resided in the District for the past 18 years.

3.     I received my B.A. in Education from Hunter College.  I received an M.A. in Teaching the Deaf from Teachers College, Columbia University.  I received an Ed.D. in Administration from Teachers College, Columbia University.

4.     I am currently retired.  For 35 years, I was employed as a Teacher and an Administrator at the Lexington School and Center for the Deaf in East Elmhurst, New York.  I

retired as Superintendent and Chief Executive Officer of Lexington School at the end of the 2000-2001 school year.

5.       I currently serve as the Co-Chair of the Education Committee for the Spring Valley Branch of the National Association of the Advancement of Colored People (the "Spring Valley NAACP"). I have served in this role since 2009. I am also the Chair of the Education Committee for the Nyack Branch of the NAACP. I have served in that role for over 30 years. The constituency of the Spring Valley NAACP is diverse and includes the black and Latino communities within the District and the Suffern Central School District. For many years, the policies and actions of the District generally and its Board of Education (the "Board") in particular have required attention and advocacy from the Spring Valley NAACP and its Education Committee.

6.       My experience as superintendent of the Lexington School has provided me insight into the administration of an educational organization. In combination with my years chairing the education committees of two local NAACP branches, I have also gained perspective on the need for educators to be sensitive to racial dynamics and the ways in which people of color bear disparate burdens in school settings.

### *The Board's Routine Failure to Respond to the Concerns of the Minority Communities*

7.       During my time in East Ramapo, as a resident and chair of the Education Committee of the Spring Valley NAACP, I have observed the conduct of the Board and its impact on the District's schools and the minority community.

8.       The schools in East Ramapo have become more segregated during my time living within East Ramapo. Private schools in the District serve primarily white children. As white families have moved into the District, they have increasingly sent their children to private schools. East Ramapo public schools have long been racially diverse, but their population has become

increasingly comprised of children of color.  Today, the vast majority of students in East Ramapo public schools are children of color and the vast majority of private school students in East Ramapo are white.

9.     While the East Ramapo schools have become more segregated, the bases of support for Board candidates have also become divided along racial lines.  Two opposing slates back the Board candidates.  One slate, supported by a large white voting bloc, with little minority support, features candidates backed by organizations and leaders favoring lower taxes and maintaining investment in private schools.  The other slate, supported by minority voters with little support from white voters, features candidates backed by organizations and leaders favoring greater investment in East Ramapo public schools.  In Board elections in the last 10 years, the slate favored by white, private school voters has consistently defeated the slate favored by minority voters.

10.    As candidates elected by the District's white voting bloc came to dominate the Board, I witnessed the Board prioritize the preferences of the white community and exhibit increasing insensitivity towards the needs of the District's black and Latino communities.  I have also witnessed the Board fail to give the minority community a meaningful opportunity to have their voices heard on matters related to the education of their children or the conduct of the Board itself.  The Board's decisions since 2008 have led to the disparate treatment between white and black and Latino students.  Beginning in 2009, the District faced a budget crisis.  To make up for its budget shortfall, the Board made deep cuts to public school personnel, academic programming, and extracurricular activities.  At the same time, the Board did not attempt to impose meaningful fiscal discipline on the services—particularly transportation, special education, and books and supplies—that primarily benefitted the overwhelmingly white private schools.

### *The Board's Lack of Responsiveness*

11.     The budget cuts prompted outcry from the District's public school community, comprised largely of black and Latino students and their families.  The Board responded by making it more difficult for these students and families to criticize the Board at meetings.  For example, after the Board experienced a sustained period of regular public criticism, the Board moved the public comment period from an early point in Board meetings to the end of meetings.  The Board would then enter lengthy executive sessions and conduct business outside of public view.  Members of the public were required to wait until late in the evening to voice their concerns.  As an official of the Spring Valley NAACP, I received many complaints from members of the public school community, particularly black and Latino residents of the Districts.  These community members complained about the Board's poor handling of their concerns and of the public schools generally.

12.     In 2010, the Spring Valley NAACP reached out to the Board in an attempt to alleviate the divisiveness between the communities of color and the Board.  The Commissioner from the Commission for Human Rights for Rockland County served as a mediator for meetings between the Spring Valley NAACP and the Board.  Willie Trotman, the President of the Spring Valley NAACP, and I served as two of the representatives of the Spring Valley NAACP.  Nathan Rothschild and Aron Wieder represented the Board as its President and Vice-President, respectively.

13.     In late 2010, the Spring Valley NAACP proposed a conciliation process to the Board.  The process would have called for Board members and representatives of the Spring Valley NAACP, local religious groups representing several faith communities, and other civic groups to convene to address tensions, conflicts, and misunderstandings that had previously divided the

communities.  Mr. Wieder rejected this proposal.  He said that the conciliation process suggested by the Spring Valley NAACP would be too time consuming and expensive.

14.     Spring Valley NAACP later revisited the issue of establishing a meaningful dialogue between the Board and these community groups after Daniel Schwartz succeeded Mr. Rothschild as President of the Board.  But in response to the Spring Valley NAACP's proposal for bridging the divide between communities, Mr. Schwartz stated that there was no incentive for the Board to participate in any remedial talks with representatives of the largely minority, public school community.  He explained that the Board had all of the power and that the Board was the only party with something to lose.  Mr. Trotman and I understood his comments to mean that he did not appreciate the inherent value of establishing a relationship with the communities within his constituency.

15.     During Mr. Schwartz's tenure as President of the Board, he expressed hostility towards the largely minority public school community.  During his presidency, Mr. Schwartz threatened to eliminate the public comment portion of Board meetings altogether, characterizing members of the public school community who had been vocal critics of the Board as a "group of miscreants."  On another occasion, during a Board meeting in 2012, Mr. Schwartz addressed criticism from members of the public school community regarding the Board's extensive cuts to the public school budget by stating: "To suggest that we lack the moral authority to sit in these seats, let me tell you right now—you don't like it, find yourself another place to live because this is the United States of America."  As an official of the Spring Valley NAACP, I heard complaints from members of the black and Latino communities within the District who found Mr. Schwartz's remarks insensitive and offensive.

5

16.     In 2014, the New York State Education Department appointed Henry Greenberg as fiscal monitor for East Ramapo.  On November 17, 2014, Mr. Greenberg released his report and recommendations, which is attached hereto as Exhibit 1.  The report included a recommendation that the Board "immediately participate in and complete diversity training aimed at increasing cultural awareness, knowledge and communication skills."  Exhibit 1 at 53.  As a result of Mr. Greenberg's recommendation, Dr. John B. King, then the Commissioner of Education for the State of New York, directed that the Board and East Ramapo Superintendent, Joel Klein, participate in diversity training and Open Meetings Law training.  In a November 26, 2014 letter to the Board's President, Yehuda Weissmandl, a true and correct copy of which is attached hereto as Exhibit 2, Dr. King instructed the District to consult the head of the Rockland Board of Cooperative Educational Services and develop a plan for the completion of a high-quality live diversity training program.   Dr. King required that the Board complete this training and submit to the Commissioner's office a signed certification of completion by each Board member and the Superintendent no later than February 13, 2015.

17.     Eager to see the Board take steps toward developing racial sensitivity, the Spring Valley NAACP asked the District to provide an update on Mr. Greenberg's recommendation and Dr. King's directive.  The District rebuffed the Spring Valley NAACP's repeated requests for information in the months following the State's instructions.  In November 2016, the Board released substantive information about the training after the Spring Valley NAACP resorted to submitting a Freedom of Information Law request.  The Board's response to this records request revealed that the Board attended a three-day anti-bullying training taught by the Anti-Defamation League.  The curriculum, called "Classroom of Difference" focused on classroom behavior—it did not address possible bias in situations related to Board meetings, governance, or dealing with

6

constituents.  Records revealed that one Board member supported by the white community missed the training.  The records also revealed that two other Board members supported by the white community missed one session each.  The Board's inappropriate choice of curriculum for this diversity training, the Board's incomplete attendance, and the lack of transparency regarding the completion of the program heightened the Spring Valley NAACP's concerns that the Board is insensitive to the black and Latino communities.

18.     Members of the black and Latino community continue to seek greater transparency in the Board's conduct.  The Board continues to ignore requests from the Spring Valley NAACP, including requests for an inventory of textbooks purchased for public and private schools.  Other districts in New York readily provide this type of information.

### *The Board Fails To Address the Physical Safety of Public School Students*

19.     In white neighborhoods, individuals who are not students, parents, or staff members walk through East Ramapo public school grounds as a shortcut.  Public school students, their parents, and organizations in the black and Latino communities have complained of this practice for years.  They have expressed concerns that the unimpeded presence of strangers on school property during school hours, especially during recess and lunch, threatens the safety of students. The Spring Valley NAACP has repeatedly requested that the Board install "No Trespassing" signs to provide notice to these individuals and to aid the local police department's enforcement of the relevant laws.  We informed the Board that the police have stated that they are unable to assist with complaints regarding unauthorized persons on school property in the absence of these signs. But the Board rejected these requests, instead reporting to the Spring Valley NAACP that they are concerned about the possible liability that these signs will create for the District.  The Board did

not comment on the possible liability for the District in the event a stranger harms a public school student during a school day.

20.     As another example, the Board's President, Yehuda Weissmandl, expressed no apparent concern for a student who was physically threatened by the Board's attorney, Albert D'Agostino.  On March 5, 2013, after a Board meeting, Mr. D'Agostino directed profanity and threatening language towards Nicholas Pulakos, then a 17-year-old black student on the honor roll at Ramapo High School.   Mr. D'Agostino offered to physically fight Pulakos and made confrontational movements toward him.   Pulakos did not speak to Mr. D'Agostino in any threatening manner and did not provoke him.  A reporter for New York Newsday witnessed this incident and wrote an article detailing the incident in the following day's paper.   Afterward, Pulakos' mother and I spoke to Mr. Weissmandl.  He dismissed the allegation despite the available witness accounts.  He also dismissed the account in the newspaper as potentially unreliable.  The Board continued employing Mr. D'Agostino and his firm for over a year following this incident.

### *The Board Took Steps To Impair Minority-Preferred Representation*

21.     In October 2015, the Board appointed Sabrina Charles-Pierre to replace a Board member who had resigned in the first year of his three-year term.  A true and correct copy of the petition challenging the removal of Ms. Charles-Pierre that I filed following her election in 2016 ("Pet.") is attached as Exhibit 3.  Ms. Charles-Pierre's appointment was to run until the next election in May 2016.  Exhibit 3 ¶ 8.  On May 17, 2016, the District held an election for four seats on the Board.  *Id.* ¶ 7.  This election included the three seats that were part of a regular election cycle, with three-year terms expiring in 2019, plus the seat that became vacant in October 2015 and had a term expiring in 2018.  *Id.* ¶ 7-8.

8

22.     Ms. Charles-Pierre ran unopposed for the fourth seat in the May 2016 election and was elected by the District's voters to fill that seat until 2018.  Every other candidate in her slate, which was backed by public school advocates and supported by black and Latino voters, ran against opposition and lost to candidates backed by organizations and leaders favoring lower taxes and investment in private schools who were supported by the white community.  Ms. Charles-Pierre is the only woman of color on the Board.  She was also the only Board member at that time who had ever run on a slate backed by public school advocates and supported by black and Latino voters.

23.     The Board's policy mandates that the "Board of Education members-elect take the oath of office at the reorganization meeting of the Board."  A true and correct copy of this policy is attached as Exhibit 4.  The Board's policy also anticipates holding the annual reorganization meeting in the first fifteen days of July in accordance with New York State Education Law.  A true and correct copy of this policy is attached as Exhibit 5.

24.     On July 14, 2016, Ms. Charles-Pierre filed the oath of office along with the three other candidates who had also won seats on the Board in the May 2016 election.  Exhibit 3 ¶ 19.  But during the July 26, 2016 Board meeting, the Board removed Ms. Charles-Pierre from the seat that she had won in the May 2016 election.  *Id.* ¶ 20.

25.     In removing Ms. Charles-Pierre, the Board took the position that Ms. Charles-Pierre failed to file her oath of office within 30 days of her term's commencement.  *Id.* ¶ 20.  The Board attributed this untimely filing to an "'administrative oversight.'"  *Id.* ¶ 22.

26.     The Board did not publicly provide any basis for its determination that Ms. Charles-Pierre's term commenced at a different time than the terms of the other members elected in the

May 2016 election. *Id.* ¶ 21. The Board did not remove any of the other members elected in the May 2016 election.

27.     Following the removal of Ms. Charles-Pierre during the July 26, 2016 meeting, the Board then appointed Ms. Charles-Pierre to another temporary term lasting until the May 2017 election. *Id.* ¶ 23. The Board's actions, however, meant that Ms. Charles-Pierre was required to run in a second election to finish the term of office to which she had already been elected by over 5,000 voters.

28.     On February 1, 2017, Governor Andrew Cuomo signed a bill in response to this controversy. This bill, which was tailored to the District and the May 2016 election, effectively restored Ms. Charles-Pierre's term regardless of whether her term commenced earlier than the other Board members in that year.

### *The Board Declined to Appoint a Qualified Minority-Preferred Representative to Fill a Vacant Seat*

29.     Also within July 2016, the Board solicited applications to fill a separate vacancy on the Board. Among the candidates was Jean Fields. Ms. Fields, a recently retired principal, had nearly 20 years of experience working within the District's public schools. She had run on the same slate as Ms. Charles-Pierre in the 2016 election and received the endorsement of public school advocates and the support of black and Latino voters, but was defeated. Despite Ms. Fields' qualifications as an educator and school administrator and her support within the community, the Board appointed Joe Chajmovicz, a white businessman with no children in the District's public schools, no professional background in education, and no apparent relationships to the black and Latino communities. Shortly after Mr. Chajmovicz's appointment, public school students and parents raised concerns that Mr. Chajmovicz was not a resident of the District. After Mr. Chajmovicz resigned in February 2017, the District reported that Mr. Chajmovicz had moved and

was no longer eligible to serve.  No one was appointed to fill the remaining months of the term of that vacant seat.  In May 2017, Joel Freilich defeated Chevon Dos Reis, a Latina parent of public school students, in a contest to fill that seat.

I declare under penalty of perjury that the foregoing is true and correct.

Dated:          Chestnut Ridge, New York
                December 4 , 2017.

                                                    _____
                                                    Oscar Cohen