UNITED STATES DISTRICT COURT FOR THE
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| NATIONAL ASSOCIATION FOR THE ADVANCEMENT OF COLORED PEOPLE, SPRING VALLEY BRANCH; JULIO CLERVEAUX; CHEVON DOS REIS; ERIC GOODWIN; JOSE VITELIO GREGORIO; DOROTHY MILLER; HILLARY MOREAU; and WASHINGTON SANCHEZ,<br><br>　　　　　　　　Plaintiffs,<br><br>　　　　v.<br><br>EAST RAMAPO CENTRAL SCHOOL DISTRICT and MARYELLEN ELIA, IN HER CAPACITY AS THE COMMISSIONER OF EDUCATION OF THE STATE OF NEW YORK,<br><br>　　　　　　　　Defendants. | 17 Civ. 8943 (CS) (JCM) |

## DECLARATION OF WILLE J. TROTMAN

WILLIE J. TROTMAN, pursuant to the provisions of 28 U.S.C. § 1746, declares under penalty of perjury as follows:

### *Background*

1.　I am a United States citizen. I am 71 years old. I am a black man.

2.　I live in Spring Valley and reside within the East Ramapo Central School District ("East Ramapo" or the "District").

3.　I am President of the Spring Valley Branch of the National Association of the Advancement of Colored People (the "Spring Valley NAACP"). I have served in this role since 2004. Previously, I served as Treasurer and Vice-President of the Spring Valley NAACP. The Spring Valley NAACP is a racial justice organization whose mission includes protecting civil rights. The constituency of the Spring Valley NAACP is diverse and includes the black and Latino

communities within the District and the Suffern Central School District, which was formerly known as the Ramapo Central School District. These communities rely on the Spring Valley NAACP for assistance on matters related to education, criminal justice, housing, employment, voting rights, and more.

4. I currently work part-time for the Rockland Hospital Guild, a community residence where I run the Senior Volunteer Program. I am also a Board Member for the Rockland County Human Rights Commission. For 35 years, I worked for the Rockland Psychiatric Center. I retired as the Director of Multicultural Affairs.

### *The District's Schools and Politics Are Segregated*

5. In my roles in the Spring Valley NAACP, I have assisted constituents with matters related to education in East Ramapo and the District's Board of Education (the "Board"), particularly as the schools in East Ramapo have become more segregated in recent years. Currently, the private schools in the District serve primarily white children. As more white families moved into the District, they increasingly sent their children to private schools. East Ramapo public schools have long been racially diverse, but their population has become increasingly comprised of children of color. Presently, the vast majority of students in East Ramapo public schools are children of color, and the vast majority of private school students in East Ramapo are white.

6. While the East Ramapo schools have become more segregated, District politics have also become more segregated. Two opposing slates back the Board candidates. One slate, supported by a large white voting bloc, with little minority support, features candidates backed by organizations and leaders favoring lower taxes and maintaining investment in private schools. The other slate, supported by minority voters with little support from white voters, features candidates

backed by organizations and leaders favoring greater investment of resources and attention in East Ramapo public schools. In Board elections in the last 10 years, the slate favored by white, private school voters has consistently defeated the slate favored by minority voters.

7.      As candidates elected by the District's white voting bloc came to dominate the Board, I witnessed the Board prioritize the preferences of the white, private school community and exhibit increasing insensitivity towards the needs of the District's black and Latino communities. I have also witnessed the Board fail to give the minority community a meaningful opportunity to have their voices heard on matters related to the education of their children or the conduct of the Board itself. The Board's decisions since 2008, which have negatively impacted the District's black and Latino students, and the Board's lack of responsiveness to communities of color, are described below.

### *The Board's Failure to Respond to the Concerns of the Minority Community*

8.      After the Board began to make deep cuts to the public school budget and initiated a process to close and sell public elementary schools around 2009, tension between the Board and the District's black and Latino communities escalated.

9.      In 2010, in an effort to improve the relationship between the Board and the District's minority community, the Commissioner of Human Rights for Rockland County moderated two meetings between representatives of the Board and the Spring Valley NAACP. Dr. Oscar Cohen and I were two of the representatives for the Spring Valley NAACP, and Nathan Rothschild and Aron Wieder represented the Board. At the November 18, 2010 meeting, the Spring Valley NAACP recommended a process where Board members, representatives of the Spring Valley NAACP, and representatives from key religious and community groups could come together to address tensions, conflicts, and misunderstandings. However, on April 5, 2011, Mr. Wieder

rejected these recommendations, noting that the Spring Valley NAACP's recommended conciliation process would be too time consuming and costly. After Mr. Schwartz succeeded Mr. Rothschild as President of the Board in July 2011, the Spring Valley NAACP asked to revisit the issue of establishing a meaningful dialogue between the Board and these community groups. But in response to the Spring Valley NAACP's proposal for bridging the divide between communities, Mr. Schwartz stated that there was no incentive for the Board to participate in any remedial talks with representatives of the largely minority, public school community. He explained that the Board had all of the power and that the Board was the only party with something to lose. Dr. Cohen and I understood Mr. Rothschild's comments to mean that he did not appreciate the inherent value of establishing a relationship with the communities within his constituency.

### *The Board's Lack of Responsiveness to Minority Concerns in Conducting Meetings*

10. The Board has alienated the public school community in the way it conducts its meetings and other business with the public, including its use of private executive sessions, its reluctance to provide or use interpreters to facilitate communication with community members who speak Spanish or Haitian Creole, and various insensitive remarks made to the public school community.

11. Around 2010, the Board began moving the public comment period to the end of Board meetings. The Board would then hold lengthy executive sessions out of public view, which would delay the opportunity for public comment. As a result, parents and community members were unable to participate in meetings or voice their concerns until 11:30 p.m. or after midnight. The Spring Valley NAACP repeatedly challenged the practice of scheduling the public comments at the end of meetings. For example, on March 23, 2011, the Spring Valley NAACP sent a letter to the Board asserting that this practice discouraged the community's involvement and

participation in Board meetings, ran counter to the District's own written communication policy, and stood in contrast to the standard practice of nearly every other school district in New York. The March 23, 2011 letter noted that Mr. Rothschild and Mr. Wieder, the President and Vice-President of the Board, respectively, had previously stated that the public commentary was moved toward the end of the meeting as punishment for the parents' previous criticisms of the Board. A true and correct copy of a final draft of my March 23, 2011 letter is attached as Exhibit 1. I signed this letter and transmitted its contents as they appear in this draft. In response, Mr. Wieder suggested that, in the absence of conveniently scheduled public commentary opportunities in Board meetings, parents could submit public comment through emails and other forms of written communication instead.

12.     In a follow-up letter dated April 15, 2011, the Spring Valley NAACP explained to Mr. Wieder that some parents did not have access to email, and others had limited literacy, which contributed to their reluctance and inability to correspond through writing. A true and correct copy of a final draft of my April 15, 2011 letter is attached as Exhibit 2. I signed this letter and transmitted its contents as they appear in this draft. Notwithstanding our requests, the Board refused to change its practice of holding the public comment sessions at the end of the Board meetings, until the State appointed monitors for the District several years later.

13.     The Board had also refused to make accommodations for non-native English speakers in the community, many of whom are public schools parents. During an August 19, 2014 Board meeting, the East Ramapo superintendent, Dr. Joel Klein, was recorded stating that older immigrant students only want free breakfasts, free lunches, and whatever else they could get, but knew they could not get diploma. After those insensitive remarks, there were months of protests against Mr. Klein and the District's treatment of the immigrant and Latino communities. Members

of the Latino community, in coordination with the Spring Valley NAACP, demanded that a Spanish-speaking interpreter be available during Board meetings. Those members of the Latino community even offered to bring their own interpreter if the Board was concerned about costs. Although the District has a large Latino and Spanish-speaking population, Spanish-English translation was only made available for the first time at a Board meeting on December 2, 2014; translation, however, was only available for one part of the meeting—a presentation on the District's English-as-a-Second-Language program. Mr. Weissmandl, President of the Board, stated that the translation service would be disruptive to the meeting and therefore would only be available for the one presentation and to summarize discussions during breaks. Immediately following this incident, the Spring Valley NAACP requested that the Board promptly implement an effective, efficient translation protocol for Board meetings and other events in Spanish and other languages. The Spring Valley NAACP also offered to help the Board organize volunteers to translate meetings to ensure that every Board meeting was translated at little or no cost to the District.

14. In April 2015, the Board eventually acquired professional translation services technology, but at that time, the Board stated it would decide prior to each meeting whether translation services would be available. Notwithstanding the availability of translation services, I have received reports from community members attending Board meetings that even with the availability of this technology, there have been instances where Board members have removed the necessary earpiece during portions of Board meetings or refused to use the technology entirely.

### *The Board's Discriminatory Conduct Towards the Public School Community*

15. The Board has taken steps that have negatively impacted students in the largely minority public school community. For example, around 2009, the Board began implementing

6

drastic budget cuts that led to the termination of District staff and teachers and the cancellation of classes and extracurricular activities without any effort to balance these cuts with reductions in funding for the white, private school community.

16. After several years of cuts to public school staffing and programming, during the 2011-12 school year, the Spring Valley High School NAACP, a school club comprised of students, surveyed students who reported too little class instruction, too many lunch periods and study halls, outdated textbooks, crowded school buses, crowded hallways and classrooms, lack of supplies for teachers, no school psychologists, insufficient guidance counselors, outdated school and sports equipment, and insufficient extracurricular activities and electives. The students also complained about leaking ceilings and dirty facilities. I have visited the schools and witnessed these conditions firsthand.

### *Discrimination in Services Provided to Special Education Students and English Language Learners*

17. In 2010, the Spring Valley NAACP filed a complaint with the United States Department of Education Office of Civil Rights ("OCR") alleging that the District had violated federal civil rights laws by discriminating on the basis of race. A true and correct copy of that complaint, dated November 9, 2010, is attached hereto as Exhibit 3. This complaint centered on the District's practice of placing a majority of students of color with disabilities in special education programs within the District while placing white students with disabilities in programs outside of the District. At the time, a majority of white special education students living in the District received education in special programs outside of East Ramapo while nearly 100% of the students of color living in the District were enrolled in special education programs in public schools within the District.

18.     In 2015, OCR summarized its findings in a letter to the Spring Valley NAACP, finding evidence to support the allegations of disparate treatment and setting forth a remedial plan for the District's procedures for placement of special education students. OCR also summarized its findings to a second, anonymous complaint alleging that the District discriminated on the basis of national origin in the placement of students in special education programs and in the provision of services to students who are English Language Learners ("ELL"). A true and correct copy of this letter from OCR to Willie Trotman, President of the Spring Valley NAACP, dated October 27, 2015, is attached hereto as Exhibit 4. The letter explains that OCR determined, after conducting a statistical analysis, "that there was a statistically significant disproportionate number of white disabled students placed out-of-district in school year 2010-2011, as compared to non-white disabled students." Exhibit 4 at 3.

19.     The letter also explains that OCR determined, after further statistical analysis, "that for school year 2010-2011, of all available out-of-district placements, there was a statistically significant disproportionate number of non-white disabled students placed [in the District's program] (101 of 119 or 84.9%), as compared to white disabled students (64 of 151 or 42.4%)." *Id*. OCR examined the placement of students identified as having particular disabilities within a three-year period. For example, "OCR determined that white students classified with an intellectual disability were in out-of-district placements at a statistically significantly higher rate than non-white students for all three year school years [examined]." *Id*. at 4. OCR asked District officials to explain the reason for its differential treatment of certain similarly situated white and non-white students. According to the letter, "[t]he District did not provide documentation to OCR to support" its asserted distinctions. *Id*. at 5. The letter further explains that OCR reached a

resolution agreement that required the District to implement a remedial plan that OCR would monitor. *Id.* at 5-6.

20. Regarding the second complainant's allegations of national origin discrimination in the provision of ELL services, the letter explains that OCR found evidence of disparate treatment of Yiddish-speaking students as opposed to Spanish-speaking students. For instance, in August 2013, the District invited parents of Yiddish-speaking students to an open house for bilingual special education programs, but did not conduct a similar open house for the parents of students in Spanish bilingual special programs. *Id*. at 8. OCR also found that while students in the Spanish bilingual classes in public elementary schools were integrated with non-ELL students "in gym and activities outside of classroom instruction such as lunch, recess, and library time," the students in Yiddish bilingual classes in the same public elementary school were not integrated with other students in any classes or activities and actually arrived and left school at different hours than other students in the school. *Id*. at 9. OCR reported that the separation of the Yiddish speaking students from the rest of the students "was not specified or otherwise required" in the Individual Education Plans of the Yiddish speaking students. *Id*. The letter explains that OCR reached a resolution agreement that required the District to implement a remedial plan that OCR would monitor. *Id*.

### *The District's Lack of Minority Officials, Teachers, and Staff*

21. The Spring Valley NAACP has also engaged in advocacy efforts to bring to the Board's attention the lack of minority staff and teachers in the District. The teaching staff of the East Ramapo public schools is predominantly white although the percentage of white students has been decreasing from already low numbers for years. The Spring Valley NAACP has recommended to the District methods for recruiting staff of color, but the Board has not responded to these proposals. One major example of the Board's failure to engage the Spring Valley NAACP

on hiring practices was with regard to the hiring of a new superintendent in 2011. After the Board abruptly demoted the East Ramapo Superintendent, Ira Oustacher, it elevated Dr. Joel Klein, a white man and the Assistant Superintendent of Special Education, to the role of Interim Superintendent. The Spring Valley NAACP asked the Board if it and other community organizations would be provided an opportunity to participate in the search process. The Board never responded to the NAACP's questions and never incorporated community members in the hiring process. Instead, it made Dr. Klein the permanent Superintendent.

22. Similar to their conduct in hiring Superintendent Joel Klein, the Board failed to consider replacing a Board member who resigned before the end of his term in July 2016 with a person of color. Jean Fields, a black woman who had recently run and lost a Board election and who was well-qualified to fill the vacancy given her lengthy tenure as an educator and principal in East Ramapo schools, expressed interest in the position. Despite her extensive experience and her support from the community, the Board selected Joe Chajmovicz, a white male with children in private schools, no professional background in education, and no apparent relationship to the black and Latino communities. Shortly after Mr. Chajmovicz's appointment, public school students and parents raised concerns that Mr. Chajmovicz was not a resident of the District. After Mr. Chajmovicz resigned in February 2017, the District reported that Mr. Chajmovicz had moved and was no longer eligible to serve. No one was appointed to fill the remaining months of the term of that vacant seat. In May 2017, Joel Freilich defeated Chevon Dos Reis, a Latina parent of public school students, in a contest to fill that seat.

### *Recent District Policy on Metal Detectors in Public Schools*

23. In February 2017, the Board approved a policy authorizing the use of metal detectors in the District's public schools, including elementary schools. The policy was introduced

and approved without a process for participation from parents, students, community members, and community organizations. The Spring Valley NAACP complained to the District because the Board's decision to implement this policy without investigation and process further indicated a disconnect from the community. The Spring Valley NAACP feared that the introduction of this policy could harm the psychological and emotional well-being of the students affected. East Ramapo is the District with the highest percentage of black and Latino students and, to my knowledge, is now the only district in the county with a metal detector policy.

### *The Board's Participation in Voting-Related Discrimination in East Ramapo*

24.     The Board has taken steps that resulted in discouraging the public school parents from participating in Board elections. In 2011, the District discontinued its longtime practice of distributing voter registration forms and voter information sheets to public school parents at parent-teacher meetings and other school events and prohibited public school staff from distributing voting and election information. In an April 11, 2011 letter to the President of the Board, the Spring Valley NAACP explained how this new prohibition discouraged the participation of public school parents, most of whom are people of color. The Board never responded and never changed its prohibition.

25.     In March 2012, I received a letter from a public school parent who is active in the community complaining about the voting practices in East Ramapo budget and Board member elections. This letter outlined various complaints about disparate treatment of white voters and voters of color. For example, voters of color reported being asked for identification, although white voters were not similarly asked for identification. A true and correct copy of this letter is attached hereto as Exhibit 5.

26.     In 2015, the State appointed monitors to oversee the Board. As part of their task, the monitors wrote a report on the District called "Opportunity Deferred.," a copy of which is attached as Exhibit 6 hereto. The report stated that "the election process in the District is viewed with suspicion and Monitors have heard from many District residents that they lack confidence in the process." Exhibit 6 at 12. This report also recommended that New York State appoint an independent election monitor for Board elections, highlighting the need for "additional processes for voter notification of upcoming elections to better ensure broad, representative community participation," and recommending a "review [of] underused polling sites and identify[ing] new sites for the 2016 election to ensure greater accessibility to voting locations." *Id.* at 12-13.

27.     In 2017, the Board undertook an examination of data for the purposes of redistricting the District's election polling sites. After examining the proposed new sites, the Spring Valley NAACP noted the changes alleviated overcrowding, an issue particular to majority white polling sites, but did not make any proposal to increase minority participation. The Board also proposed an approval timeline that would have left inadequate time for sufficient community participation. Following advocacy from the Spring Valley NAACP and the minority community, the Board postponed any changes to the polling sites, but has not yet implemented the monitors' suggestion to review "underused" polling sites or to make polling sites more accessible.

### *Forums Held for School Board Elections*

28.     As the President of the Spring Valley NAACP, I am involved in encouraging candidates who support the public schools to run for the Board. Our organization works to educate voters about candidates running for the Board, and to allow the community to question candidates about their educational concerns. The Spring Valley NAACP regularly holds candidate forums, to which we invite all candidates who have filed a nominating petition, including candidates

backed by the white, private school community. I can recall only one instance in which a Board candidate backed by the white, private school community conducted any campaign activities within the minority, public-school community. During the 2016 election, Pierre Germain attended a candidate forum at St. Paul's Church, along with all of the candidates on the slate backed by organizations and leaders within the largely minority, public-school community, but he left the forum early.

I declare under penalty of perjury that the foregoing is true and correct.

Dated:    Spring Valley, New York
          December 4, 2017.

_____
WILLIE J. TROTMAN