# EXHIBIT 3

**PARTY FILING COMPLAINT:**

SPRING VALLEY BRANCH OF THE NATIONAL
ASSOCIATION FOR THE ADVANCEMENT OF
COLORED PEOPLE O/B/O NAACP YOUTH COUNCIL,
AND MEMBERS OF THE SPRING VALLEY NAACP,

**PARTIES COMPLAINED AGAINST:**

EAST RAMAPO CENTRAL SCHOOL DISTRICT and
EAST RAMAPO CENTRAL SCHOOL DISTRICT BOARD
OF EDUCATION

## COMPLAINT SEEKING INVESTIGATION AND PROACTIVE REVIEW

The Spring Valley Branch of the National Association for the Advancement of Colored People hereby brings this Complaint Seeking Investigation and Proactive Review on behalf of its Youth Council and Branch Members, and in support thereof hereby states and alleges as follows:

## PARTIES

1. The National Association for the Advancement of Colored People (hereinafter, the "NAACP" or "Plaintiff"), is a National Civil Rights Association whose mission is to ensure the political, educational, social, and economic equality of rights of all persons and to eliminate race-based discrimination. The vision of the NAACP is to ensure a society in which all individuals have equal rights without discrimination based on race.

2. East Ramapo Central School District (hereinafter, the "District") is a public school district whose stated mission is to "make our district more child-centered in an environment of excellence for students and staff, marked by high expectations through an open

team approach involving teachers, administrators, support staff, parents, and students in a process that will identify the goals and develop strategies to meet them in our schools."[1]

3. East Ramapo Central School District Board of Education (hereinafter "the Board" and together with the "District," the "Defendants") is a group of nine elected officials tasked with the responsibility of governing the District through the administration of certain designated actions.

## BACKGROUND

4. The District serves areas in Rockland County, New York. Specifically, the District serves the eastern areas of the Town of Ramapo, which includes the villages of Chestnut Ridge, New Hempstead, New Square, Spring Valley, Wesley Hills, and a portion of Airmont, Pearl River and Pomona, as well as the hamlets of Hillcrest and Monsey, and also the western area of the towns of Clarkstown and Haverstraw. The population of the district is approximately 40% people of color.[2] In the District's classrooms, the population is approximately 90% students of color.

5. The Board's makeup is significantly less diverse than the population it serves. Seven of the nine current board members are White males, even though 90% of the public school students in the district are children of color. Since 2005, over half of the Board members making decisions for public school students have been from the Orthodox Jewish community, almost all of whom have had their children enrolled in private religious schools. This would not be an issue if not for the Board making decisions at the expense of students of color—decisions that evidence an unreasonable and discriminatory focus on the extension of public services to private

---

[1] *See* The District's website: *http://eram.k12.ny.us/education/components/scrapbook/default.php?sectionid=1*
[2] The Fiscal Analysis and Resource Unit.

religious school students rather than on serving the needs of the students enrolled in East Ramapo public schools.[3] The drastic and detrimental impact on the students of color attending public schools in the District forms the basis of this Complaint Seeking Investigation and Proactive Review.

6. The Board has clearly violated its fiduciary duty, and the Defendants' discriminatory practices have had a disparate impact on the public school students educated within the District. For example, the overwhelming majority of private religious school placements for special education have been limited to White, Jewish Orthodox children leading to de facto segregation of special education students in the District. Disproportionate amounts of special education funds have been funneled towards private religious school programs (including funds for transportation) leaving public school special education and regular education programs (and students receiving services thereunder) with reduced resources. Public participation at Board meetings (where concern over the disparate impact on children of color is often discussed) has been discouraged and at times, prohibited by the actions of the Board. The Board has made many of its decisions without adequate consideration of the needs of the students attending public schools in the District under the guise of making fiscally conservative financial decisions in a suffering economy. The impact of these decisions has been separate, unequal education for the students attending public school in the District—90% of whom are students of color—in direct violation of Title VI of the Civil Rights Act of 1964, 42 U.S.C. § 200d et seq. ("Title VI").

7. Title VI, and the regulations issued by the U.S. Department of Education thereunder prohibit discrimination on the basis of race, color, and national origin in programs and activities receiving federal financial assistance. Specifically, the Board's decisions have resulted in disproportionate representation of racial and ethnic groups in special education and

---

[3] This article appeared in *The Advocate* in May, 2010.

related services as a result of inappropriate policies, practices and procedures established by the Board and supported by the District. This rash of violations involves inappropriate and irresponsible use of local, state and federal funds and must be remedied immediately.

### FIRST CAUSE OF ACTION
*(Discriminatory Intent and Disparate Impact on Students of Color in the Special Education Program)*

8. The District has caused a disproportionate number of private religious school placements of special education students both in and outside of the District for White Jewish Orthodox students without equal placements for students of color.[4] This indiscriminate placement of White special education students into private religious schools violates Section 504 of The Rehabilitation Act of 1973, 29 U.S.C. § 794 ("Section 504"), which is designed to protect the rights of individuals with disabilities in programs and activities that receive Federal financial assistance from the U.S. Department of Education (ED). Section 504 specifically provides: "No otherwise qualified individual with a disability in the United States . . . shall, solely by reason of her or his disability, be excluded from the participation in, be denied the benefits of, or be subjected to discrimination under any program or activity receiving Federal financial assistance . . . ."

9. Section 504 regulations also require a school district to provide a "free appropriate public education" ("FAPE") to each qualified student with a disability who is in the school district's jurisdiction, regardless of the nature or severity of the disability. Under Section 504, FAPE consists of the provision of regular or special education and related aids and services designed to meet the student's individual educational needs as adequately as the needs of

---

[4] The Final Report Narrative issued by the New York State Education Department after a Special Education Quality Assurance Monitoring Review (attached hereto as Exhibit A) found non-compliance in 90% of records reviewed. They also found that "the district has engaged in a practice of placing students with disabilities in private schools when appropriate placements were available in public facilities." *See* pg. 2, ¶ 3.

nondisabled students are met. It is undisputed that a free and appropriate education exists at public schools within the District. Yet, the District taxpayers are made to shoulder the cost of educating students qualifying for special education who are being sent to private schools outside of the District.

10. The District's placement of a majority of students of color with disabilities in special education classes within the District essentially segregates those students from their White Jewish Orthodox counterparts who are disproportionately placed outside of the district. Indeed, the majority of White Jewish Orthodox special education students living in the District are receiving education in special programs outside of the District while nearly 100% of the students of color living in the District are enrolled in special education programs in public schools within the District.

11. The result of these placements is an unbalanced distribution of education funds for special education services. The District has not been forthcoming with information regarding the cost per student but, on information and belief, the amounts allocated to private religious schools, are disproportionately higher than the funds being allocated to in-district special education services, which violates the constitutional right to equal educational opportunities of students of color with special education needs in the District. The District continually refuses to provide a requested detailed cost comparison per student for those in special education programs in private religious schools versus those in public school.

12. Additionally, the District has not been forthcoming regarding the NAACP's requests for data indicating the ethnicity and race of children certified for special education placement, number of impartial hearings disaggregated by race and ethnicity and other relevant data to determine the extent, if any, the District segregates children in special education

programs based on race and ethnicity. On information and belief, the District has proposed setting up "kosher" classes for White Jewish Orthodox students in special education programs within the District that would segregate these children from other students within the same school. This type of dual school system violates Title VI, which, as previously stated, prohibits discrimination on the basis of race, color, and national origin in programs and activities receiving federal financial assistance.

13. This problem is further compounded by the cost of transportation for students who have received out of District placements. Specifically, bussing students on days when public schools in the District are closed costs $1.1 million per year and only a portion of that is reimbursed.

14. Community activists, including the NAACP, have responded to these violations of Section 504 and FAPE by submitting requests for data related to the special education status of students of color, including costs, transportation, related services and hiring practices to the District and the Board pursuant to the Freedom of Information Laws ("FOIL"). Neither Defendant has responded adequately to these requests. The failure to comply with reasonable data requests and this violation of FOIL requirements it is both unlawful and evidences a discriminatory intent to cover up discriminatory actions and to avoid responsibility for the disparate impact of services on children of color in the District.

15. An influential member of the Orthodox Jewish community recently wrote in a well-publicized newspaper that "in East Ramapo, where almost all the students are in private schools, the board needs to be held accountable for them first."[5] Both the NAACP and the Anti-Defamation League ("ADL") have asked the Board to respond to this outrageous statement and

---

[5] This statement was made by Mendel Hoffman who is the Chief Executive Officer of the Ben Gilman Clinic (a satellite center of Community Medical and Dental Care, Inc. of Monsey (also headed by Hoffman). Nathan Rothschild, President of the Board, is also the President of the Ben Gilman Clinic's board.

to clearly state that has not and does not encourage or agree with this position. Neither organization has received any response to its request. This lack of response from the Board to NAACP and ADL inquiries regarding their opposition to this statement suggests that the Board does concur that the needs of children of color attending public schools should be subordinate to those children attending private, religious schools. The continued segregation of students of color and their White Jewish Orthodox counterparts violates both Title VI, and Section 504.

## SECOND CAUSE OF ACTION
*(Discriminatory Impact of Financially Irresponsible Decisions)*

16. Two schools serving mostly students of color in the District have recently—and without sufficient explanation—been closed and leased to private parties or religious groups or sold by the Board. After protest by the community, it was revealed that the Board made these decisions without accounting for physical space needed for the students that would be shifted to new buildings. The Board also lacked data on the cost of renovating buildings to accommodate these students or the income and overhead generated by leasing a school. In short, there had been no true cost-benefit analysis before making these decisions.

17. Many of the students from the closed schools will be attending Ramapo High School as of the start of the 2010-2011 academic year. This school was categorized as a "school in need of improvement" under the No Child Left Behind Act this year after failing to meet Adequate Yearly Progress ("AYP")[6] in the previous two years. Several schools are failing to meet the AYP mandates. After a third year on the list, the school will lose portions of its funding. To date, the Board has not offered a solution for this issue or outlined a plan for funding the schools on this list in the event they lose funding.

---

[6] AYP is a measurement defined by the No Child Left Behind Act, which allows the U.S. Department of Education to determine how public schools are performing academically. AYP is measured by standardized test results.

18.     The Board's irrational and discriminatory actions continued with their decision to sell Hillcrest Elementary School. Initially, the Board received an appraisal for $5.9 million on May 4, 2010.[7] They opened the market for bids from the public and failed to receive any close to the original appraised value. On July 23, 2010, the Board got a second appraisal for a significantly lower amount (just over $3.2 million dollars).[8] The first appraisers recommended that the Board allow 12 months to market the school's sale. There was no logical reason to seek and obtain a new appraisal just two months later. Prior to reviewing this appraisal, however, the Board accepted a bid of $3.1 million from Yeshiva Avir Yakov, a New Square religious congregation, despite their own $5.9 million appraisal and the $10.2 million value assigned to the 12-acre property by the Clarkstown Assessor's Office. Outrage over this gross underselling of the property led to an administrative appeal filed by Steve White, a parent of children attending public school in the District, to the State Commissioner of Education, David Steiner (the "Commissioner"). On August 1, 2010, the Commissioner ordered the District to halt the sale of Hillcrest Elementary School pending his decision on the appeal.

19.     Late last year, amidst the announcement by the Board of a lower budget and the sale or closure of several schools, the Board replaced its legal counsel of thirty-five years without explanation and hired Albert D'Agostino in his place. Despite engaging in a competitive bid process to find the most appropriate fees for counsel, Mr. D'Agostino was hired at four times the fees of the Board's previous counsel. On information and belief, the Defendants' sole reason for hiring Mr. D'Agostino at such an inflated price was because of his experience in facilitating the referral of children to private religious schools at taxpayer expense. This occurred while the Board was drastically reducing costs because of cuts in state aid in critical educational areas such

---

[7] The first appraisal was prepared by Valuation Plus, Inc. and resulted in a market value of $5,900,000.
[8] The second appraisal was prepared by Appraisal Group International and resulted in a market value of $3,240,000.

as cutting honors and Advanced Placement classes resulting in making less available to students in public schools in the District—90% of whom are students of color.

20. Additionally, there has been a drastic budget "cut" in the District, which disparately impacts students of color. Opportunities for Advanced Placement and Honors courses have been reduced. The number of sections has been restricted and has resulted in students having to choose, for example, between Advanced Placement Math and Advanced Placement Science. It has also resulted in a limited number of available slots for students who have qualified to enroll in the program.[9] The first come, first served nature of the classes has forced some students to take courses that are below their education level. This type of system is detrimental to the public school students in the District during their high school years and also reduces college opportunities for students applying to the nation's top schools.

21. The funding used to support these programs has been funneled to pay tuition for White, Jewish Orthodox children to attend special education programs in public and private schools, which are often out of the District. Further, there has been a lack of referrals to the Boards of Cooperative Educational Services ("BOCES") Career and Technical Education ("CTE") programs for students who are not on the college track. Historically, enrollment in these programs has been largely by students of color.[10]

22. Additionally, the District has ceased hard copy distribution of the "East Ramapo Insider" a newsletter for public school families. The East Ramapo Insider is a critical piece of communication between District schools and parents, is now available exclusively

---

[9] This system also affects students who are not permitted to enroll in certain courses needed to qualify for an Advanced Regents Diploma resulting in the loss of opportunity for obtaining such a Diploma after years of working towards that end.

[10] As an example, only 50% of Hispanic males graduate from District High Schools with their classmates. These students may benefit from the BOCES CTE program, but may not be aware of it because of the lack of referrals referenced herein.

online[11] for the parents of the 8,000 public school students. Yet, the parents of the 18,000 private school students continue to receive a copy of "Education Matters" a newsletter for private school families[12] by regular mail in addition to having the newsletter published online. This expense totals at least $89,760 per year. Further, there is a tremendous disparity in the content and the number of times the newsletters are published per year. Between July 2009 and August 2010, the public school news letter was published only twice. During the same period, the private school letter was published 10 times.

23. Finally, after terminating several educators and administrators and eliminating or cutting the budget for programs, the Board recently announced that it "found" $17 million in surplus funds. The 'found' funds emerged after a tumultuous budget debate and they were 'discovered' well after voters approved the budget (on a second vote) based on the District's apparent lack of money. Due to budgetary reductions, course offerings were restricted, depriving students access to appropriate classes. Clearly, it is the board members responsibility to have knowledge of the amount of funds available, and to make responsible decisions based on accurate financial information. The Board's decisions to close schools and cut programs and services for the public school students who are overwhelmingly children of color without fulfilling basic fiduciary obligations to understand the basis of the budget they are adopting is a further example of the callous, discriminatory manner in which this board approaches its responsibilities to the public school students in the district.

24. These fiscally irresponsible decisions have had the effect of further segregating students receiving special education services in and out of the District according to race.

---

[11] This new system of publishing the newsletter does not take into account the families who do not have computers at home and are, as a result, deprived access to the "East Ramapo Insider."
[12] "Education Matters" is paid for with Title I funds available to the District.

### THIRD CAUSE OF ACTION
*(Change in Board Meetings and Disparate Impact on Students of Color)*

25. The Board's recent decision to delay parent and community participation at Board meetings only after all other business is concluded, which is often after midnight on a weekday when most parents have to get up early to meet their children's needs and to get to work, reverses a forty year practice of allowing public comment at the onset of Board meetings. It is also a unique position in the county, where other school boards reserve time for public comment at the opening portion of their meetings. On information and belief, this decision was made to discourage parent participation at board meetings, and occurred in response to a recent trend of a significant increase in parent participation at board meetings out of concern for the poor management and discriminatory actions being taken by the board as set forth in the preceding paragraphs.

26. The rescheduling of public comment to the end of Board meetings disproportionately impacts the parents of students of color from participating fully in their children's education. On information and belief, this action constitutes a deliberate attempt to dissuade parents of students of color from participating in their children's education. Further, having parents comment after decisions impacting their children have already been made, renders their comments moot and, in essence, denies them their right to express their views and have their views taken into account in the Board's decision making.

### FOURTH CAUSE OF ACTION
*(Discriminatory Hiring Practices)*

27.     Despite the fact that the public school population of the District is 90% students of color, the District currently has two Central School District Administrator of color.[13] The Defendants' discriminatory practices include a failure to widely post job opportunities and to publicize openings in places where qualified candidates of color can learn of these openings. Indeed, recruiting is only done through On Line Application System for Educators ("OLAS"), which ignores well established tools and publications recognized for recruiting people of color.[14]

28.     Concerns over discriminatory hiring and promotion practices prompted the NAACP to complain to the Board regarding this issue. The Board never responded, and the NAACP turned to the Human Rights Commission for assistance. The Complaint filed with the Human Rights Commission is attached hereto as Exhibit B.

## CONCLUSION

**WHEREFORE**, the NAACP, on behalf of its Youth Council and Branch Members, requests that: (i) the Office of Civil Rights of the Department of Education investigate the practices of the Board and the District for purposes of determining whether they are engaged in discriminatory practices which have a disparate impact on students of color attending public schools in the District; and (ii) grant relief in accordance with the results of said investigation; and (ii) grant all other relief that is just and proper under the aforementioned circumstances.

---

[13] The NAACP recognizes that there are several principals of color in the District's public schools. These hirings were a direct result of a complaint previously filed by the NAACP regarding discriminatory hiring practices.

[14] There are key ways to recruit diverse employees including, but not limited to, establishing networks with minority colleges such as those that are part of the Historically Black Colleges and Universities ("HBCUs") or the Hispanic Association of Colleges and Universities, sponsoring job fairs in communities that are largely populated by people of color (such as East Ramapo), posting jobs with community organizations known for working with people of color such as the NAACP, or posting jobs with area colleges and universities with educational leadership programs focusing on underserved communities, e.g. Teachers College Columbia University, Hunter College and New York University. At present, the District turns a blind eye to such recruiting efforts.

Respectfully submitted,

| Date: 11/9/2016 | Date: 11/9/2016 |
|---|---|
| By: *[signature]* | By: *[signature]* |
| Spring Valley NAACP<br>Willie J. Trotman, President<br>P.O. Box 156<br>Spring Valley, New York 10977 | Wilbur Aldridge, Mid-Hudson/Westchester<br>Regional Director, NAACP<br>6 Campbell Court<br>West Haverstraw, NY 10993 |