EXHIBIT 4



UNITED STATES DEPARTMENT OF EDUCATION
OFFICE FOR CIVIL RIGHTS
32 OLD SLIP, 26TH FLOOR
NEW YORK, NEW YORK 10005

TIMOTHY C. J. BLANCHARD
DIRECTOR
NEW YORK OFFICE

October 27, 2015

Willie Trotman
President
Spring Valley National Association for the Advancement of Colored People
P.O. Box 156
Spring Valley, New York 10977

Re:    Case Nos. 02-11-1091 & 02-15-1140
       East Ramapo Central School District

Dear Mr. Trotman:

This letter is to notify you of the determination made by the U.S. Department of Education, New York Office for Civil Rights (OCR), regarding the allegations listed below that were raised in the above-referenced complaints filed against the East Ramapo Central School District. With respect to OCR Case Number 02-11-1091, the Spring Valley National Association for the Advancement of Colored People (Complainant 1) alleged that the District discriminated, on the bases of race and national origin, by offering out-of-district placements to white disabled students at a higher rate than to similarly situated non-white disabled students (Allegation 1); offering a "white only" general education kindergarten class at one of the District's elementary schools (Allegation 2); and failing to recruit and hire a sufficient number of non-white teachers and district-wide administrators, such as assistant superintendents (Allegation 3). With respect to OCR Case No. 02-15-1140, the complainant (Complainant 2) raised two allegations. This letter addresses only one: that the District discriminated, on the basis of national origin, by failing to provide Spanish and Creole-speaking English Language Learner students in the District with an appropriate amount of English as a Second Language instruction (addressed as Allegation 4, for ease of reference).[1]

OCR is responsible for enforcing Title VI of the Civil Rights Act of 1964 (Title VI), as amended, 42 U.S.C. § 2000d et seq., and its implementing regulation at 34 C.F.R. Part 100, which prohibit discrimination on the basis of race, color or national origin in programs and activities receiving financial assistance from the U.S. Department of Education (the Department). The District is a

---

[1] In OCR Case No. 02-15-1140, Complainant 2 also alleged that the District discriminated, on the basis of race, by treating the exclusively white students enrolled in the District's Yiddish-English bilingual special education classes at Elmwood Elementary School differently from the non-white students enrolled in all other special education elementary classes in the District, by providing the white students with access to private bathrooms and better equipment. OCR will continue to investigate this allegation under OCR Case No. 02-15-1140.

recipient of financial assistance from the Department. Therefore, OCR has jurisdictional authority to investigate these complaints under Title VI.

With respect to Allegation 1, Complainant 1 alleged that the District discriminated, on the bases of race and national origin, by offering out-of-district placements to white disabled students at a higher rate than to similarly situated non-white disabled students. The regulation implementing Title VI, at 34 C.F.R. § 100.3(a), provides that no person shall, on the ground of race, color, or national origin, be excluded from participation in, be denied the benefits of, or be otherwise subjected to discrimination under any program operated by a recipient. Section 100.3(b)(1) prohibits a recipient, on the ground of race, color, or national origin, from denying an individual a service or benefit of a program; providing different services or benefits; subjecting an individual to segregation in any matter related to the receipt of a service or benefit; restricting an individual in any way in receiving a service or benefit; treating an individual differently in determining whether he satisfies any admission or eligibility requirement for provision of a service or benefit; and, denying an individual an opportunity to participate in a program or affording him an opportunity to do so which is different from that afforded to others. Section 100.3(b)(2) prohibits a recipient from utilizing criteria or methods of administration that have the effect of subjecting individuals to discrimination because of their race, color, or national origin.

Title VI prohibits schools from intentionally treating students differently based on race or national origin. Enforcement or application of a rule in a discriminatory manner is prohibited intentional discrimination. When similarly situated students of different races or national origins are treated differently, OCR assesses the recipient's explanation for the differences in treatment to determine if the reasons were legitimate and nondiscriminatory or were a pretext for unlawful discrimination. Additionally, OCR examines whether the recipient treated a student in a manner that was inconsistent with its established policies and procedures, or whether there is any other evidence of race or national origin discrimination. Intentional discrimination can take many forms, and can be proven even without the existence of a similarly situated student. Additionally, a school's adoption of a facially neutral policy with an invidious intent to target students of certain races or national origins is prohibited intentional discrimination. Whether OCR finds a violation of Title VI will be based on the facts and circumstances surrounding the particular situation.

In addition to different treatment of students based on race or national origin, schools violate Federal law when they evenhandedly implement facially neutral policies or practices that were not adopted in order to discriminate, but the implementation of which nonetheless has an unjustified effect of discriminating against students on the basis of race or national origin. The resulting discriminatory effect is commonly referred to as "disparate impact." Facially neutral processes that result in an adverse impact on students of a particular race or national origin will be evaluated against the disparate impact standard to ensure that these are not discriminatory. In examining the application of a facially neutral policy, OCR will consider whether the policy results in an adverse impact on students of a particular race or national origin as compared with students of other races and national origins; whether the applicable policy is necessary to meet an important educational goal; whether the proffered justification is a pretext for discrimination; and even in situations where the policy is necessary to meet an important educational goal, whether there are comparably effective alternative policies available that would meet the stated

Page 3 of 12 – Mr. Willie Trotman

educational goal with less of a burden or adverse impact on the disproportionately affected racial or ethnic group.

OCR began its investigation during school year 2010-2011. OCR first obtained and analyzed the number of in-district and out-of-district special education placements, by race and national origin, for school year 2010-2011. During school year 2010-2011, 1,503 of the District's 8,118 enrolled students (18.5% of the total District enrollment) were in special education programs, either in in-district programs or out-of-district programs.

Of the 1,503 disabled students, 270 were placed in out-of-district special education programs (18.0% of the 1,503 disabled students); including 165 students placed in Boards of Cooperative Education (BOCES) schools,[2] and 105 placed in private schools[3] or out-of-district public schools.[4]

OCR determined that for school year 2010-2011, 151 of 381 (39.6%) white disabled students were placed out-of-district; compared to 92 of 725 (12.7%) black disabled students, 21 of 349 (6.0%) Latino disabled students, 6 of 42 (14.3%) Asian disabled students, 0 of 4 (0%) Native American students, and 0 of 2 (0%) Native Hawaiian students. OCR conducted Chi Square statistical analysis, and determined that there was a statistically significant disproportionate number of white disabled students placed out-of-district in school year 2010-2011, as compared to non-white disabled students.

OCR also conducted a Chi Square or Fisher's Exact statistical analysis on each type of out-of-district placement, and determined that for school year 2010-2011, of all available out-of-district placements, there was a statistically significant disproportionate number of non-white disabled students placed in BOCES (101 of 119 or 84.9%), as compared to white disabled students (64 of 151 or 42.4%). In contrast, there was a statistically significant disproportionate number of white disabled students placed in out-of-district public schools (36 of 151 or 23.8%), as compared to non-white disabled students (0 of 119 or 0.0%); and, a statistically significant disproportionate number of white disabled students placed in private schools (51 of 151 or 33.8%), as compared to non-white disabled students (18 of 119 or 15.1%).

OCR disaggregated the out-of-district special education program placements by disability category to determine whether there was a particular disability category in which the

---

[2] BOCES schools were established by the State of New York to enable small rural school districts to combine their resources. There are currently 37 BOCES systems in New York, providing educational programs and related services to students with disabilities, career and technical programs for high school students, and adult literacy and job training programs. For the purposes of this analysis, OCR considered BOCES placements to be out-of-district placements.

[3] Private schools include Ohr V'Daas, otherwise known as the Rockland Institute for Special Education (RISE), an Orthodox yeshiva; Association for Metroarea Autistic Children; Andrus Children's Center; Biondi Education Center; Birchwood School; Blythdale School; Center for Discovery; Community School; Crotched Mountain Rehabilitation Center; Devereux-Millwood Learning Center; Green Chimneys School; John Coleman School; Lavelle School for the Blind; New York School for the Deaf; St. Dominic's School; Summit School; Sunshine Rehabilitation Center; The Forum School; The New York Institute for Special Education; and Woods Services.

[4] Out-of-district public schools include the Nanuet Union Free School District, the Haverstraw-Stony Point School District and the Kiryas Joel Union Free School District, a special act district that serves only special education students in a manner consistent with Hasidic doctrine.

Page 4 of 12 – Mr. Willie Trotman

disproportionality was occurring. OCR reviewed the following disability categories identified by the District: autism, deafness, emotional disability[5], emotional disturbance, hearing impairment, mental retardation[6], intellectual disability, learning disability, multiple disabilities, orthopedic impairment, other health impairment, speech or language impairment, traumatic brain injury, and visual impairment. Utilizing the Chi Square and Fisher's Exact statistical tests, OCR determined that there were a statistically significant disproportionate number of white students with classifications of intellectual disability and emotional disturbance in out-of-district special education programs.

OCR analyzed three years' worth of data (school years 2011-2012, 2012-2013, and 2013-2014) of students classified with an intellectual disability and emotional disturbance, by race and national origin, who were in out-of-district placements.[7] Utilizing the Fisher's Exact statistical test, OCR determined that white students classified with an intellectual disability were in out-of-district placements at a statistically significantly higher rate than non-white students for all three school years. OCR determined that there was a statistically significant disproportionate number of white students classified with an emotional disturbance in out-of-district placements for school years 2011-2012 and 2013-2014, but not for school year 2012-2013.[8]

OCR reviewed the files of students the District classified in the intellectual disability and emotional disturbance categories for the first time during school years 2010-2011, 2011-2012, and 2012-2013, to determine whether there was evidence of different treatment on the basis of race or national origin regarding out-of-district placements.

OCR determined that during school years 2010-2011, 2011-2012, and 2012-2013, the District initially classified a total of 16 students (11 non-white and five white students) as having an intellectual disability. Of these, the District placed one white student (Student 1) in an out-of-district school in the Kiryas Joel Union Free School District. OCR determined that during its initial classification of Student 1 during school year 2010-2011, the District determined that she should receive classroom instruction in a 12:1:1 setting and receive small group speech therapy in a 5:1 setting twice a week.

OCR compared Student 1's placement with those of other students initially classified with an intellectual disability during school years 2010-2011, 2011-2012, and 2012-2013 whom the District determined should receive classroom instruction in a 12:1:1 setting and small group speech therapy in a 5:1 setting twice a week. OCR determined that there were three such

---

[5] For school year 2010-2011, the District had separate disability classifications for "emotional disability" and "emotional disturbance." Beginning with school year 2011-2012, the District eliminated its "emotional disability" category and included students with this classification with its "emotional disturbance" category.

[6] For school year 2010-2011, the District had separate disability classifications for "mental retardation" and "intellectual disability." Beginning with school year 2011-2012, the District eliminated its "mental retardation" category and included students with this classification with its "intellectual disability" category.

[7] As discussed above, for the purposes of its analysis, OCR considered BOCES placements to be out-of-district placements. When BOCES placements are considered to be in-district placements for students classified with an intellectual disability or an emotional disturbance, the disparity between the number of non-white students in out-of-district and in-district placements becomes even greater.

[8] For school year 2012-2013, white students classified with an emotional disturbance were placed in out-of-district schools at a higher rate than non-white students, but this difference was not statistically significant.

students who were similarly situated to Student 1; one of whom is black (Student 2), and two of whom are Latino (Students 3 and 4). OCR determined that the District placed Students 2, 3 and 4 in District schools.

OCR asked the District to explain why it placed Student 1 in an out-of-district school, while it placed Students 2-4 in District schools, when it identified the same setting for all four students. The District stated that Student 1 had limited language skills and significant cognitive delays. The District also stated that Student 1 had previously attended a full-day special education program in Israel; and, the District placed Student 1 in the Kiryas Joel Union Free School District because it was a setting most similar to the setting she received in Israel. The District did not provide documentation to OCR to support this assertion.

OCR determined that as with Student 1, English was not the first language for Students 2-4. With respect to Student 2, the District stated that he was in an English Language Learner class prior to being placed in a special education placement. With respect to Student 3, the District informed OCR that she was a Spanish-speaking student who was evaluated in Spanish by the District. The District informed OCR that the language acquisition skills and cognitive ability of Student 4 was limited, and that he was an English Language Learner who spoke Spanish. The District informed OCR that it determined that placement in in-district special education classes was appropriate for Students 2, 3 and 4, as such classes were able to "support their academic achievement," whereas such classes were not appropriate for Student 1. The District did not provide documentation to OCR to support this assertion.

OCR determined that during school years 2010-2011, 2011-2012, and 2012-2013, the District initially classified a total of 30 students (19 non-white and 11 white students) in the emotional disturbance category. OCR determined that out of these 30 students, one white student was placed in a residential facility (Student A) and one non-white student (Student B) was placed in a public school in a different district (the Greenburg-North Castle Union Free School District).[9] Of the remaining 28 students, eight white students and two non-white students were placed in a BOCES school, and two white students and 16 non-white students were placed in a District school.

On September 8, 2015, the District agreed to implement the enclosed resolution agreement without further investigation of Allegation 1.[10] OCR will monitor implementation of the

[9] Student B moved to the District from the Haverstraw-Stony Point School District, and the Haverstraw-Stony Point School District had already placed the student in the Greenburg-North Castle Union Free School District. When Student B moved to the District, the District retained his placement in the Greenburg-North Castle Union Free School District.
[10] During its investigation, OCR also observed some anomalies with respect to the procedures used to place disabled white students into Yiddish-speaking special education schools. OCR later determined that the New York State Education Department (NYSED) had already investigated these issues. On April 27, 2010, NYSED issued the District a letter stating its findings that the District failed to document appropriate justifications for the private school placements of certain students by failing to provide sufficient prior written notice to parents and lacking the appropriate documentation when requesting state reimbursement. NYSED ordered the District to implement corrective actions. On December 19, 2012, NYSED issued the District a follow-up letter, in which it stated its determination that the District engaged in "patterns and practices... inconsistent with both federal and New York State law and regulation governing the education of students," by allowing one district representative unilaterally to place students in out-of-district Yiddish bilingual special education programs, even though the students' individual

Page 6 of 12 – Mr. Willie Trotman

resolution agreement. If the District fails to comply with the terms of the resolution agreement, OCR will resume its investigation.

Allegations 2 and 4 concern aspects of language services, so they are addressed together. With respect to Allegation 2, Complainant 1 alleged that the District discriminated, on the bases of race and national origin, by offering a "white only" general education kindergarten class at the District's Early Childhood Center during school year 2010-2011. OCR determined that during school year 2010-2011, the District offered a half-day special education kindergarten class that was taught primarily in Yiddish by a Yiddish-speaking teacher and teaching assistant. The District informed OCR that it developed this class in response to requests from families of Yiddish-speaking special education students. OCR determined that six students were enrolled in this class, all of whom were white. The District did not offer any other kindergarten classes that were conducted in a language other than English.

After OCR initiated the investigation, the District discontinued offering the class beyond school year 2011-2012; however, beginning with school year 2013-2014, the District began offering other classes tailored to Yiddish-speaking students, all of whom were white. OCR determined that these classes were also developed for special education students. The District advised OCR that it began offering the Yiddish bilingual special education classes because it was ordered to do so by the New York State Education Department (NYSED) Hudson Valley Regional Office of Special Education Quality Assurance (SEQA). OCR determined that in January 2013, SEQA directed the District to develop "in-district special education programs to meet the needs of the students who have been placed in public and private, out-of-district programs for the purpose of providing the students with Yiddish bilingual special education programs . . . for the start of the 2013-2014 school year" (the January 2013 NYSED Directive).[11]

OCR determined that at the same time, the District created Spanish bilingual special education classes.[12] The District informed OCR that three Yiddish and four Spanish bilingual special education classes for grade levels kindergarten through second were in place as of the beginning of school year 2013-2014. All three Yiddish classes and one Spanish class were located at Elmwood Elementary School, which houses general education students in grades 4-6. The other three Spanish classes were located at Grandview Elementary School, which houses general education students in grades 1-3.[13]

_____

education programs did not indicate a need for bilingual services. NYSED ordered the District to immediately cease and desist from engaging in this practice. In 2013, the District sued NYSED in New York State Supreme Court, alleging that its letter of December 19, 2012, incorrectly interpreted the Individuals with Disabilities Education Act. On December 30, 2013, the Supreme Court of New York, Albany County, upheld NYSED's determination. On June 4, 2015, the Supreme Court of New York, Appellate Division, Third Department, upheld the lower court's determination.

[11] Students in the Yiddish bilingual special education program in school year 2013-2014 had previously attended preschool in the District; Kiryas Joel; state-approved private placements with Yiddish speaking programs (e.g., RISE, the Hebrew Academy for Special Children); or yeshivas.

[2] Students in the Spanish bilingual special education program in school year 2013-2014 had previously attended an in-district school and received resource room or pull-out services; but not ELL or bilingual services.

[1] The first Yiddish class included four students, ages five and six years old, who were functioning at a pre-kindergarten level. The second Yiddish class included six students ranging in age from five to seven years old, who were functioning at a kindergarten to first grade level or below. The third Yiddish class included seven students ranging from ages six to seven years old, who were functioning at the kindergarten level or above. The first Spanish

With respect to Allegation 4, on January 7, 2015, OCR received another complaint against the District (Case No. 02-15-1140), in which Complainant 2 alleged that the District discriminated on the basis of national origin by failing to provide Spanish and Creole-speaking ELL students in the District with an appropriate amount of English as a Second Language (ESL) instruction. A district will be in compliance with Title VI when it has adopted an alternative educational program that, when viewed in its entirety, effectively teaches language minority students English, and moves them into the regular educational program within a reasonable period of time. OCR looks to local school officials to monitor the effectiveness of their programs, to determine what modifications may be needed when the programs are not successful after a reasonable trial period, and to implement such modifications. A school district's continued or consistent failure to improve an ineffective alternative program for language minority students may lead to a finding of noncompliance with Title VI. It is expected that a sound educational program will include the maintenance of reasonably accurate and complete data regarding its implementation and the progress of students who move through it.

The regulation implementing Title VI, at 34 C.F.R. § 100.3(a) and (b)(1)(i)-(ii), provides that a recipient may not, directly or through contractual or other arrangements, on the ground of race, color, or national origin, exclude persons from participation in its programs, or provide any service or benefit which is different or provided in a different manner from that provided to others. Section 100.3(b)(2) provides that in determining the types of services or benefits that will be provided, recipients may not utilize criteria or methods of administration which have the effect of subjecting individuals to discrimination because of their race, color, or national origin.

On May 25, 1970, pursuant to its authority under Title VI, the Department issued a memorandum entitled "Identification of Discrimination and Denial of Services on the Basis of National Origin," 35 Fed. Reg. 11595 (May 1970 Memorandum). The May 1970 Memorandum clarifies OCR policy under Title VI on issues concerning the responsibility of school districts to provide equal educational opportunity to English Language Learner (ELL) students. It states that school districts must take affirmative steps to address the language needs of ELL students. In 1974, the Supreme Court upheld this requirement to take affirmative steps in the Lau v. Nichols decision, 414 U.S. 653 (1974). The May 1970 Memorandum also provides that school districts must adequately notify national origin minority group parents of information that is called to the attention of other parents, and that such notice may have to be provided in a language other than English in order to be adequate.

School districts must ensure that all students who are ELL students and who may have a disability, like all other students who may have a disability and need services under IDEA or Section 504, are located, identified, and evaluated for special education and disability-related services in a timely manner. When conducting such evaluations, school districts must consider the English language proficiency of ELL students in determining the appropriate assessments

---

class included 15 students ages eight and nine years old, who were functioning at a third grade level. The second Spanish class included 16 students ranging from ages seven to nine years old, who were functioning at a second to third grade level. The third Spanish class included 15 students ranging from ages six to eight years old, who were functioning at a first to second grade level. The fourth Spanish class included 14 students ranging in age from nine to eleven years old, who were functioning at a fourth grade level.

and other evaluation materials to be used. School districts must not identify or determine that ELL students are students with disabilities because of their limited English language proficiency.

The District informed OCR that information about the Yiddish and Spanish bilingual special education program was not disseminated to the public. The District also informed OCR that the parents of Yiddish speaking students having limited or no proficiency in English, who received special education and related services or early intervention services during school year 2012-2013, were invited to attend an open house for the bilingual special education program in August 2013. Rabbis in the community were also invited to attend. The District did not conduct an open house for the Spanish bilingual special education program.

The District advised OCR that it provided information about the Yiddish and Spanish bilingual education program to its Committee on Special Education (CSE), school psychologists, teachers, and principals. Recommendations for placement in the program were made by CSE chairpersons, who included the Supervisor for Case Management; case managers for out-of-district placements; and members of the District's CSE. In the CSE meetings to develop IEPs for school year 2013-2014, CSE chairpersons identified students eligible for placement in the Yiddish and Spanish bilingual special education programs.

OCR reviewed the IEPs for the students in the Yiddish and Spanish bilingual special education programs for school year 2013-2014, and found no support to indicate that any of the students were identified as English Language Learners, or that they were screened for English proficiency using a diagnostic evaluation. While some of the IEPs for the students in the Yiddish bilingual special education classes included a reference in the narrative section to placement in a bilingual special education program, there was no explanation of the reasons for the District's determinations to place the students in such a program. Further, six of the IEPs of students in the Yiddish bilingual special education program did not include any reference to the need for bilingual special education, much less indicate how the student's language needs related to the IEP. None of the IEPs of the students in the Spanish bilingual special education classes indicated any need for bilingual education. Even assuming that the students were properly identified as ELL students, there was no indication that the CSE considered the language needs of each student with limited English proficiency as those needs related to the student's IEP. Further, the IEPs of some of the students placed in the Yiddish and Spanish bilingual special education programs stated that English was, in fact, their native language. Specifically, the IEPs of five of the 17 students in the Yiddish bilingual special education class identified their native language to be "Yiddish/English", and the IEP of one of these 17 students identified that student's native language to be English. The IEPs of six of the 60 students in the Spanish bilingual special education classes identified their native language to be "Spanish/English", and the IEP of one of the students in these classes identified that student's native language to be English.

OCR determined that the students in the Spanish bilingual classes at Elmwood Elementary and Grandview Elementary were integrated with non-ELL students in gym and activities outside of classroom instruction such as lunch, recess, and library time. In contrast, the students in the Yiddish bilingual classes at Elmwood Elementary School did not interact with students in the general education program or non-ELL students in any academic or non-academic subjects (e.g.,

physical education) or activity periods outside of classroom instruction (e.g., lunch, recess, and extracurricular activities).[14] The Yiddish bilingual classes also did not follow the same schedule as the general education students who attended Elmwood Elementary. The District informed OCR that the students in the Yiddish bilingual classes did not attend classes or activities with other students in the school, and arrived and left earlier than the other students in the school, because of their medically fragile conditions and because they are much younger than the rest of the school population; however, this is not specified or otherwise required in the IEPs of these students.[15]

The teachers of the Yiddish and Spanish bilingual special education programs were not aware of the program's stated educational goals, and were unable to identify the educational theory underlying the District's language assistance program. Indeed, OCR found no evidence that the District identified any educational theory that is recognized as sound by some experts in the field, or is considered a legitimate experimental strategy.[16] OCR did not find any evidence to indicate that the teachers received any guidance on how to develop and implement a bilingual education curriculum or about the exit requirements for the bilingual program. Further, OCR determined that the teachers had no or limited contact with the District's English as a Second Language department.[17]

On September 8, 2015, the District agreed to implement the enclosed resolution agreement, without further investigation of Allegations 2 and 4. OCR will monitor implementation of the resolution agreement. If the District fails to comply with the terms of the resolution agreement, OCR will resume its investigation.[18]

With respect to Allegation 3, Complainant 1 alleged that the District discriminated, on the bases of race and national origin, by failing to recruit and hire a sufficient number of non-white teachers and district-wide administrators, such as assistant superintendents. The regulation

[14] The teachers of the Yiddish bilingual special education classes informed OCR that their students sometimes attended general assemblies with the larger school community and also participated in a program in which students in a higher grade visit their classrooms to read to their students.

[15] In investigating whether ELL students are segregated, OCR examines whether the district has carried out its chosen program in the least segregative manner consistent with achieving its stated goal and whether the degree of segregation in the program is necessary to achieve the program's educational goals.

[16] In determining whether a recipient's program for ELL students complies with Title VI of the Civil Rights Act of 1964, OCR has used the standard set forth in Castaneda v. Pickard, 648 F. 2d 989 (5th Cir. 1981). Under this standard, a program for ELL students is acceptable if: (1) "[the] school system is pursuing a program informed by an educational theory recognized as sound by some experts in the field or, at least, deemed a legitimate experimental strategy;" (2) "the programs and practices actually used by [the] school system are reasonably calculated to implement effectively the educational theory adopted by the school;" and (3) the school's program succeeds, after a legitimate trial, in producing results indicating that the language barriers confronting students are actually being overcome." Id. at 1009-10. OCR adopted the Castaneda standard for determining whether recipients' programs for ELL students complied with the Title VI regulation in a policy memorandum issued on December 3, 1985, "The Office for Civil Rights' Title VI Language Minority Compliance Procedures" (December 1985 Memorandum).

[17] Districts are expected to carry out their programs effectively, with appropriate staff (teachers and aides), and with adequate resources (instructional and equipment). The appropriateness of staff is indicated by whether their training, qualifications, and experience are consonant with the requirements of the program. For example, their appropriateness would be questioned if a district has established an ESL program, but the staff had no ESL training and there was no provision for ESL teacher training.

[18] As stated previously, OCR will continue to investigate a separate allegation under OCR Case No. 02-15-1140.

Page 10 of 12 – Mr. Willie Trotman

implementing Title VI, at 34 C.F.R. §100.3(c)(3) states that where a primary objective of the federal financial assistance is not to provide employment, but discrimination on the ground of race, color or national origin in the employment practices of the recipient tends, on the ground of race, color, or national origin, to exclude individuals from participation in, to deny them the benefits of, or to subject them to discrimination, to the extent necessary to assure equality of opportunity to, and nondiscriminatory treatment of, beneficiaries, a recipient may not (directly or through contractual or other arrangements) subject an individual to discrimination on the ground of race, color or national origin in its employment practices.

OCR determined that the District posts vacancies on the Lower Hudson Valley On-Line Application System (OLAS), and in newspapers and internal publications. The hiring of teachers is handled by the building principal of the respective schools, and the hiring of district-wide administrators is handled by the Assistant Superintendent for Personnel. Both teachers and district-wide administrators apply for positions through OLAS, and building principals conduct résumé searches on OLAS to select applicants for interviews for teaching positions. From that point, the hiring process varies by school. For district-wide administrator positions, a committee reviews applications submitted through OLAS to determine which applicants meet the requirements for such a position and should be interviewed. There are typically three rounds of interviews for such a position, and the superintendent and the person responsible for supervising the position at issue conduct the third round interview. The Board must then approve the decision to hire an applicant for any particular position.

OCR conducted a labor market analysis to determine whether minority teachers and district-wide administrators were underrepresented among teachers and district-wide administrators hired by the District. OCR compared the percentage of minority teachers and district-wide administrators in the relevant labor market, to the percentage of minorities in those classifications hired by the District during school years 2008-2009, 2009-2010, 2010-2011, 2011-2012, and 2012-2013. During these school years, Rockland, Orange, and Westchester Counties were the counties that were most represented in the applicant pools for teacher and district-wide administrator positions; therefore, OCR analyzed U.S. Census data from 2010[19] for the labor pools of those three counties.

With respect to teachers, U.S. Census data from 2010 shows that 20.9% of kindergarten, elementary school, middle school, secondary and special education teachers living in Orange, Rockland and Westchester Counties; and 18.5% of kindergarten, elementary school, middle school, secondary and special education teachers working in Orange, Rockland and Westchester Counties were minorities. The chart below provides the percentage of individuals the District hired for teaching positions who were minorities, for school years 2008-2009, 2009-2010, 2010-2011, 2011-2012, and 2012-2013.

---

[9] This is the most recent employment data available from the U.S. Census.

Page 11 of 12 – Mr. Willie Trotman

| School Year | Percentage Hired for Teacher Positions Who Were Minorities |
|---|---|
| 2008-2009 | 40.0% |
| 2009-2010 | 16.7% |
| 2010-2011 | 26.7% |
| 2011-2012 | 32.5% |
| 2012-2013 | 44.5% |

Accordingly, for school years 2008-2009, 2010-2011, 2011-2012, and 2012-2013, the percentage of minorities the District hired for teacher positions exceeded the percentage of minorities living and working in the relevant labor market. For school year 2009-2010, the percentage of minorities hired for teacher positions was 4.2% to 1.8% less than the percentage of minorities living and working in the relevant labor market, respectively.

With respect to administrators, U.S. Census data from 2010 shows that 27.1% of administrators living in Orange, Rockland and Westchester Counties; and 20.2% of administrators working in Orange, Rockland and Westchester Counties were minorities. The below chart provides the percentage hired for district-wide administrative positions who were minorities, for school years 2008-2009, 2010-2011, and 2012-2013; there were no district-wide administrators hired in school years 2009-2010 and 2011-2012.

| School Year | Percentage Hired for District-Wide Administrator Positions Who Were Minorities |
|---|---|
| 2008-2009 | 50.0% |
| 2010-2011 | 16.7% |
| 2012-2013 | 43.3% |

For school years 2008-2009 and 2012-2013, the percentage of minorities hired for district-wide administrator positions exceeded the percentage of minorities living and working in the relevant labor market. For school year 2010-2011, the percentage of minorities hired for district-wide administrator positions was 10.4% to 3.5% less than the percentage of minorities living and working in the relevant labor market, respectively.

Based on the foregoing, for school years 2008-2009, 2009-2010, 2010-2011, 2011-2012, and 2012-2013, assuming no major changes in local demographics since the 2010 U.S. Census, minorities were adequately represented among those hired for teacher and district-wide administrator positions. Therefore, OCR determined that there was insufficient evidence to substantiate Complainant 1's allegation that the District discriminated, on the bases of race and national origin, by failing to recruit and hire a sufficient number of non-white teachers and district-wide administrators, such as assistant superintendents. Accordingly, OCR will take no further action with respect to Allegation 3, and has closed this allegation as of the date of this letter.

This letter should not be interpreted to address the District's compliance with any other regulatory provision or to address any issues other than those addressed in this letter. This letter

Page 12 of 12 – Mr. Willie Trotman

sets forth OCR's determination in an individual OCR case. This letter is not a formal statement of OCR policy and should not be relied upon, cited, or construed as such. OCR's formal policy statements are approved by a duly authorized OCR official and made available to the public. Complainants 1 and 2 may have the right to file a private suit in federal court whether or not OCR finds a violation.

Please be advised that the District may not harass, coerce, intimidate, or discriminate against any individual because he or she has filed a complaint or participated in the complaint resolution process. If this happens, Complainants 1 and 2 may file another complaint alleging such treatment.

Under the Freedom of Information Act, it may be necessary to release this document and related correspondence and records upon request. In the event that OCR receives such a request, it will seek to protect, to the extent provided by law, personally identifiable information, which, if released, could reasonably be expected to constitute an unwarranted invasion of personal privacy.

If you have any questions about OCR's determination, please contact Coleen Chin, Senior Compliance Team Attorney, at (646) 428-3809, or Coleen.Chin@ed.gov; or Gary Kiang, Senior Compliance Team Attorney, at (646) 428-3761, or Gary.Kiang@ed.gov.

Sincerely,

Timothy C. J. Blanchard

Enc.