EXHIBIT 6

# <u>Opportunity Deferred:</u>

## *A Report on the East Ramapo Central School District*

**Dennis M. Walcott,** *Monitor*

**Monica George-Fields,** *Monitor*

**John W. Sipple,** *Monitor*

**Opportunity Deferred:**

*A Report on the East Ramapo Central School District*

| SECTION | PAGE |
|---|---|
| Executive Summary | 2 |
| The History – A District in Crisis | 4 |
| Commissioner's Charge to the Monitors | 5 |
| Actions and Recommendations of the Monitors | 9 |
| Conclusions – Next Steps for the Districts | 26 |
| Monitors' Biographies | 27 |

Executive Summary

On August 13, 2015, Commissioner of Education MaryEllen Elia ("the Commissioner") appointed a team of monitors to serve the East Ramapo Central School District ("East Ramapo" or "the District") in an advisory capacity in order to ensure that the District is better able to provide an appropriate educational program and properly manage and account for state and federal funds received.  The appointment came after the Commissioner, in her first month in office, recognized the critical situation facing the students in the District.  In particular, the Commissioner was troubled by the consistent reports of the District's educational decline, and the very deep rifts within the community.

From the findings reported in *East Ramapo: A School District In Crisis* in November 2014 by Henry M. Greenberg ("Greenberg report") and the extensive media coverage of the crisis in East Ramapo, to the findings detailed in the oversight reports issued by the New York State Education Department's ("SED" or "the Department") offices of accountability, special education and bilingual education, there was clear evidence that the District has not supported the educational needs of its public school students.  Addressing the situation in the District became one of the Commissioner's top priorities, reaffirming the Board of Regents' commitment to safeguarding the educational rights of the District's students.

In an announcement at Rockland County Community College open to the community, the Commissioner – in conjunction with Board of Regents Chancellor Merryl H. Tisch and Regents Judith Johnson, Betty Rosa and Josephine Finn – announced the appointment of Dennis M. Walcott to serve as Monitor for the District, and Dr. Monica George-Fields and Dr. John W. Sipple as Monitors to provide specific expertise in the areas of educational practice and finances, respectively.

All Monitors came to their role with extensive experience.  Mr. Walcott served from 2011-2013 as Chancellor of the New York City Department of Education, following

2

more than eight years as Deputy Mayor for Education and Community Development. As Chancellor, Mr. Walcott led a system of more than 1,800 schools with 1.1 million students, 136,000 employees, and a $24 billion budget.  Dr. George-Fields is an expert in teaching and learning and school turnaround, and brought to the position 28 years of experience as a district-level leader, a turnaround school principal and educator, and a leader of school innovation policy for the Department, prior to founding REACH, an organization dedicated to increasing student achievement.  Dr. Sipple is a Professor in the Department of Development Sociology at Cornell University, after having spent 13 years in the University's Department of Education.  Dr. Sipple's work focuses on the response of public school districts and communities to changes in state and federal policy, and he serves as Director of the New York State Center for Rural Schools and Cornell's Community and Regional Development Institute.

<u>The History – A District in Crisis</u>

Today, more than 32,000 children attend school in East Ramapo.  Approximately 8,500 of those children attend the East Ramapo public schools, and roughly 24,000 attend private schools – mainly Orthodox Jewish Yeshivas.  Since 2004-2005, the private school population in East Ramapo has increased by 43% and continued growth is projected.  Of current public school students, 39% are African-American, 50% are Hispanic or Latino, 84% are economically disadvantaged, and 29% are English language learners.  Since 2004-2005, the District has seen a 164% increase in its English language learner population, and a 40% increase in the number of public school students eligible for free and reduced price lunch.

These rapidly changing demographics reflect not only the great diversity of East Ramapo but also underlie enduring tensions between the private and public school communities.  Indeed, since 2005, members of the private school community have gained a majority of seats on the nine-member Board of Education, and with control of the Board, have remade the District.  Today, six board members come from the private school community.

As illuminated by the Monitors' work since August 2015, as reported in Mr. Greenberg's November 2014 report, as documented in the press, and as experienced and voiced by public school families, educators, and community members, the East Ramapo Board of Education has persistently failed to act in the best interests of public school students.  And the crisis in East Ramapo has only been exacerbated by the economic challenges that have faced school districts statewide, including the impact of the 2008 recession and cuts in State aid.  It should also be noted that, during this period, the State's property tax cap law was enacted.  As a result of this confluence of factors, the tensions in East Ramapo have grown into a chasm, full of anger and mistrust, and the District's students have continued to suffer the effects.

4

Commissioner's Charge to the Monitors

In order to protect the District's students and to address the District's failing educational and operational infrastructures, as well as the total breakdown of community trust facing the school community in East Ramapo, the Commissioner sought to provide the District an accountability structure that would provide oversight of fiscal and operational management, educational programming, and to provide guidance, recommendations and propose actions for improvement to the District, as well as to the Department, to ensure that students have access to adequate and appropriate programs and services and that the District is on a path to fiscal and programmatic stability.  To accomplish this goal, the Monitors were given four key charges to guide their work over the course of their appointment:

> **Maintain a regular presence in the District:** Based on Mr. Greenberg's report and the fact that the situation in the District continued to decline in the face of legislative inaction, Commissioner Elia directed the team to be regularly present in the District to meet with stakeholders, District leadership and educators, and to observe the operations of the District.  The goal of this charge was to allow the Monitors to provide on-demand feedback and guidance to the District where it was warranted, and to provide real time accountability and oversight to report findings to the Department.

> **Maintain a cooperative and collaborative relationship with the board of education:**  The Commissioner specifically charged the Monitors with maintaining a functioning working relationship with the board of education so that the Monitors could be in better position to assist the District in improving educational and operational outcomes.  Because New York State law provides broad authority over a school district's operation to the locally-elected school board, the Monitors' ability to effectuate change was greatly improved by being able to work collaboratively with the board of education wherever possible.  However, the Monitors were also directed to keep the District accountable based

5

on their findings. Where areas of improvement were identified, it was the Monitors' charge to work with the District to implement needed changes and to report to the Department where further action was needed.

➢ **Communicate extensively with and be responsive to the community:** The Monitors' ability to effectuate change in the District depended on hearing from members of the community about areas of concern within the District, and to be able to understand the concerns of the community, the Monitors were expected to be in regular contact with and be available to groups, parents, educators, and advocates.

➢ **Provide regular updates and reports on findings to the Department, including a final report in December:** The Monitors were charged with reporting regularly to the Commissioner and her staff on findings so that the Department could receive real-time information about the activities of the District and so that it could be determined if further oversight actions were required by the Department based on the findings of the Monitors.

From the outset, the president of the District's board of education, Mr. Yehuda Weissmandl, pledged cooperation and collaboration with the Monitors, stating, "The Board and I are eager to begin our work with Mr. Walcott and the monitoring team to identify and implement improvements in the District's educational programs and services." Throughout the past 17 weeks, Mr. Weissmandl has been an active partner with the Monitors: he has been accessible at all hours and has listened and implemented suggestions to improve Board practices.

Every week since their appointment in August, the Monitors have been consistently and regularly present in the District, during all times of day from early morning to late at night, both during the week and on weekends. Below is a summary of key actions taken by the Monitors to meet the goals of their appointment.

6

| Charge | Highlights of Actions |
|---|---|
| Maintain a regular presence in the District | ➢ Announced and unannounced visits to every school in the District.<br>➢ Attendance and participation at nearly all board meetings held since their appointment.<br>➢ Community presence by at least one monitor at least two days every week since August. |
| Maintain a cooperative and collaborative relationship with the board of education | ➢ The Monitors maintained a working relationship with the board president, including regular formal and informal communications throughout the appointment.<br>➢ The Monitors were invited to join executive sessions of the board, except for discussions related to personnel and litigation.<br>➢ The Monitors worked closely with the board during the transition to the new Interim Superintendent.<br>➢ The Monitors have regularly met with the Superintendent and members of the cabinet, as well as key District staff to discuss issues as they were brought to the Monitors' attention. |
| Communicate extensively with and be responsive to the community | ➢ The Monitors hosted a community forum in Spring Valley and heard and responded to public comment from numerous members of the community.<br>➢ The Monitors met formally and informally with a broad representation of stakeholders and advocate groups from the public and private school community, including the local NAACP chapter, Rockland County Clergy for Social |

| | |
|---|---|
| | Justice, representatives from the Orthodox community, Padres Unidos, the Rockland County School Boards Association, and other organized groups.<br>➤ The Monitors established a blog to update the community periodically about their activities within the District.<br>➤ The Monitors met with and were in regular communication with elected state and federal representatives of the community.<br>➤ The Monitors published their email addresses in order to be more responsive to community members seeking to contact them. |
| Provide regular updates and reports on findings to the Department, including a final report in December | ➤ The Commissioner provided dedicated staff support to the Monitors, including representatives from the Commissioner's Office, Office of Counsel, and the Office of P-12 Education.<br>➤ The Monitors made a public presentation to the Regents at the Board's September 2015 meeting to discuss their charge, strategies and actions to that point.<br>➤ The Monitors identified and developed a plan for the use of facilities funding.<br>➤ The Monitors reported to the Department concerns regarding the use of Title I funds. |

<u>Actions and Recommendations of the Monitors</u>

East Ramapo has been in a state of distress for years.  In just over 17 weeks, the Monitors have learned that the overarching effect of this distress has been a wearing away of the fundamental building blocks the District needs to successfully educate its students – competent leaders who support teaching and learning in the District and understand and respect community needs; fiscal stability; and community confidence and support.  Lacking these fundamentals, the District requires substantial care and attention to be able to effectively serve the needs of its students and families.  Since August, the Monitors have begun this process by providing intense, on-the-ground oversight of a District in which a deep community rift has made progress of any sort nearly impossible.  The Monitors recognize that the progress made, and the District itself, are both fragile and delicate and that a crisis of this magnitude, years in the making, will not be resolved in 17 weeks.  However, while much work remains to make sure that East Ramapo provides a public education program that its students deserve, there has been more progress made in the last 17 weeks than in the last several years. Highlights of the Monitors' work include:

> In perhaps the most significant shift in the District since their appointment, the Monitors worked with the board president to identify, recruit and hire an Interim Superintendent, signaling the end of Superintendent Joel Klein's tenure.   In October 2015, Dr. Deborah Wortham was appointed Interim Superintendent by the board.   Following numerous unfortunate comments by the prior Superintendent that contributed to the ongoing distrust between the District leadership and the public school community, the change in leadership signaled a new direction and a commitment by the board to move the District forward.

> After observing practices at board meetings, the Monitors recommended steps to ensure greater public trust in the board by recommending a response timeline to ensure that the board addresses questions from the public in a timely manner.

> At the recommendation of the Monitors, the board altered the process at board meetings so that executive sessions are now held at the end of meetings, rather

9

than at the beginning, so that the public does not have to wait numerous hours before having the opportunity to comment.  In addition, the Monitors were allowed to attend executive sessions of the board and overall the length of time the board spends in executive session has decreased.

➢ When a vacancy was created on the board, the Monitors recommended an inclusive, transparent process to ensure that the community had an opportunity to participate in the selection process.  Following this process, the board selected a public school parent to fill the unexpired term.

➢ Following identification of additional capital funding available to the District, the Monitors helped to ensure that the District would be able to best leverage the funding to make necessary capital improvements.

➢ Over the course of the 17 weeks since their appointment, the Monitors have met, individually or as a group, with numerous stakeholders, often multiple times.  This has included formal meetings as well as informal conversations with members of the community.

➢ The District made its key staff available to the Monitors and the Monitors have worked directly with members of the District administration regarding the fiscal, operational and educational issues facing the District.

➢ The Monitors have conducted analyses of District resources and practices to identify areas where efficiencies may be identified in order to repurpose resources for educational programming.

➢ On a regular basis, the Monitors worked directly with educators – including teachers, principals, and support staff – to provide instructional guidance and to better understand the conditions of teaching and learning in individual schools.

The Monitors' work to date illustrates the need for immediate and urgent action to alleviate the crisis in East Ramapo as well as the necessity of longer-term system-wide reform in the District. Based on their work, the Monitors make the following comprehensive set of recommendations for the District, the Department, the Governor's office and the Legislature to protect the rights of students in the District and to ensure

that immediate action is taken wherever possible and that integrity of the public educational system in East Ramapo is rebuilt on a strong and sustainable foundation.

**Governance and Rebuilding Community Trust**

1. **Continue Monitors in the District.** It is evident from the actions of the board and the positive changes experienced in the District since the appointment of the Monitors that the presence of independent Monitors in the District has helped produce change in the right direction in East Ramapo. From the appointment of a new Interim Superintendent, to changes in the manner that board meetings are conducted, and responsiveness to the Monitors' assistance in improving professional development, the District's leadership has demonstrated an ability to accept constructive advice and technical assistance to facilitate implementation of best practices. However, in order to ensure that this progress is continued, sustained and leveraged to rebuild the integrity of the District and the services it provides, the Monitors believe that the continued presence of Monitor(s) in the District is necessary. It is therefore recommended that the Governor and Legislature revisit a legislative codification that provides any such Monitor(s) with increased authority to ensure that they have the necessary tools, including the power to veto board decisions where necessary, to effectuate change in the District.

   In the meantime, it is recommended that the Commissioner continue to use her existing authority to ensure that the District has on-going on-the-ground support to ensure that the gains made so far – while leaving much work still to be done still in the District – are not lost and that progress continues to be made. The Commissioner should determine the construct and duration of the appointment of a Monitor(s), but it is recommended that the structure include a requirement that any appointed Monitor(s) spend significant time in the District during the course of the appointment and provide regular reports to the Commissioner, Board of Regents and the East Ramapo community on progress,

11

findings and recommendations.  The board, Superintendent and community should continue to work with the Monitors to oversee and coordinate on programmatic and fiscal (both micro and macro) concerns of the District.

It must be noted that this recommendation is not based on issues of religion, race or ethnicity and is not based on the debate about "public versus private" – rather, it is about the critical need to rebuild a District that by all accounts is broken and is not serving its students; it is about the stark reality that the District has experienced tremendous decline over a period of years and that extraordinary measures are now required to restore it to the success it once was. The Monitors recognize that the District is fragile, as are the successes gained in the past 17 weeks, and are making this recommendation to ensure that the District stabilizes and grows stronger over time, regardless of the particular composition of the Board.

2. **Appoint an independent election monitor for school board elections.**  New York State's educational system has long been one of local control, and the typical "check and balance" on locally elected boards of education is the election process itself.   However, based on the crisis in East Ramapo, the election process in the District is viewed with suspicion and the Monitors have heard from many District residents that they lack confidence in the process.   In order to address significant trust issues within the District, the Monitors recommend that the District engage an independent election monitor, recommended by the Monitor(s) to, among other duties:

   ➤ Observe final tabulation of school board election results;
   ➤ Work in conjunction with the district clerk when the District is preparing for elections;
   ➤ Recommend additional processes for voter notification of upcoming elections to better ensure broad, representative community participation;
   ➤ Establish forums with candidates to inform the community about the process and the positions of the candidates; and

➢ Because voter populations have changed since the last time the District designated polling sites, review underused polling sites and identify new sites for the 2016 election to ensure greater accessibility to voting locations.

3. **Create a comprehensive and community inclusive process to develop a new bond issue for purposes of making much needed capital improvements.** Due in part to a pervasive distrust and suspicion between the public and private school communities, a $40 million bond issue that would have provided much needed funding to make critical capital improvements was defeated in 2015. The Monitors recommend the creation of a District-wide committee that includes the Superintendent, a board member, and representatives from each school chosen by parents. The committee would review the $40 million bond, propose changes, and commit to a use of the funds. The revised bond should be put back before the voters following agreement by the District-wide committee. In addition, the District-wide committee should review and approve use of newly identified EXCEL funds to supplement work accomplished through the bond. The continued presence of Monitors in the District will serve as a critical "check and balance" for this process to ensure both that these funds are spent on needed capital improvements and that the public has confidence in the process.

4. **Ensure representation of public school concerns on the board of education by providing that in each election cycle, all the candidates for at least one of the seats must be parents of children attending public schools selected in a local process by other public school parents.** There is a strong tradition across the State of locally-elected boards of education. In most places, the persons elected to local boards of education are committed to the improvement of the public schools that the boards oversee. Due to the unique demographics of East Ramapo, the majority of the members of its board are more representative of the families who send their children to private schools and may

13

not be motivated by the same focus on the public schools as a traditional school board member.  The Monitors recommend that the Legislature and Governor enact State law to provide for a unique mechanism for the East Ramapo school district to ensure that the public school community has representation on the board, without hindering the democratic process.

5. **Expand required training for the District's board members.**  Pursuant to State law, all elected or appointed board members are required to complete six hours of training in the areas of fiscal oversight, accountability and fiduciary responsibilities, as well as a training course in the powers, functions and duties of boards of education and other government and administrative agencies affecting public education, within the first year of their term of office.  The Monitors recommend that the Legislature and Governor enact State law to require members of the District's board of education to receive additional training regarding their fiduciary and fiscal responsibilities, school district governance and the roles and responsibilities of District leadership.  This training should be provided by experts on the role of board members and best practices in New York State school districts.

6. **Convene meetings with a human rights expert.** Due to the history in the District of contentious interactions between members and representatives of the board of education and the community, the Monitors recommend that the members of the board of education and community members seek the counsel and advice of a human rights expert to address and intervene on sensitive community issues that may arise.

*Teaching and Learning*

7. **Rethink use of Title I resources.**  Allow reading teachers to have full reading and intervention schedules and provide schools with appropriate preparation coverage.  Deploy Title I reading teachers to the middle schools to allow them to

provide services to students eligible for services.  Convene a Title I committee that includes an administrator, two Title I teachers, parent representation, and District staff to create the current and future Title I plan.  This includes the Monitors' recommendation to better integrate the District's "Funded Programs" office into the core instructional and fiscal programming and accountability.  The Monitors also call for enhanced District communication and interaction with the CEC, which is contracted to oversee Title I services in the non-public schools, as well as the Yeshivas themselves.

8. **Provide students with full-day kindergarten classes.**  Due to reductions in educational programming, students in the District are not afforded the opportunity to develop early literacy and numeracy skills because the half-day kindergarten program limits the number of hours students are in school.  With the exception of two kindergarten classes, all students are attending half-day kindergarten programs.  This has been a disappointing revelation to parents who were promised that pooling the students in one school for kindergarten would allow the students to stay for a full day.  The Monitors recommend that with any funds that become available from the State or from efficiencies, the District establish a full-day kindergarten program.

9. **Continue investigating the feasibility of streamlining grade configurations and start times.**  The District's current grade configuration requires multiple transitions for students to new school environments.  As a result, students typically have to acclimate to five different school settings.  The Monitors recommend that the District continue exploring the feasibility of restructuring the use of facilities to minimize these disruptions and to achieve efficiencies and cost savings.

10. **Continue progress towards enrichment of academic options for all students.**  The Monitors found that the District does not offer adequate arts, music or other enrichment opportunities – there are currently no art and music

teachers assigned to the District's K-6 schools. Students in K-5 do not receive any art or music services after school and no students in K-6 in the public schools receive dedicated art and music instruction during the school day. Rather, sixth-grade students can sign-up to participate in band, chorus, orchestra, and drama, which meet once or twice a week. The Monitors further found that the District has made large cuts to the school library program, including salaries, books, materials, and AV materials: 2008-2009 - $1.7 million in cuts; 2013-2014 - $595,000 in cuts; and 2015-2016 - $765,000 in cuts. The District also does not offer students programs that provide enriching and engaging educational experiences, and is devoid of intensive programs that acknowledge students' gifts and potential to excel. At the high school level, teachers have very high student loads, which impedes some students' ability to have enrichment and advanced classes. Schedules for some high school students indicate multiple lunch periods or study halls. While positive steps have been taken, the Monitors recommend that the District continue to investigate the feasibility of implementing a plan to create the arts and music magnet school, the dual language magnet school, and the District-wide gifted and talented programs. This plan was recommended by the Monitors as a way to establish the District's commitment to providing students with enrichment opportunities and fostering their special abilities. The District should gradually hire arts and music teachers to work directly with students in the K-6 continuum. The District should adopt a plan to provide the high schools with more personnel and lower the student load and afford students with more meaningful programs.

11. **Reform and enhance professional development opportunities for staff.** The Monitors found that the District's spending on professional development has decreased markedly from more than $250,000 in 2006-2007 to a projected total of under $50,000 in 2015-2016. In addition, the Monitors consistently found the professional development opportunities currently made available to the District's professional staff to be underwhelming and underused. Instruction was found to be misaligned with the State's standards and well below the expected rigor.

School leaders were found to be unfamiliar with rubric expectations of the Department's Diagnostic Tool for School and District Effectiveness. In other instances, where tools were being used for professional development, the Monitors observed that teachers were not using the strategies with fidelity or effectiveness. Teachers and principals would in general benefit from visiting model schools outside the District to identify and adopt best practices. The Monitors have several recommendations to address the professional development gap in the District, including:

> ➢ Contracting an outside professional development organization to develop a professional development plan that provides extensive in-class coaching and professional development sessions;
> ➢ Allowing, encouraging and supporting school leaders and teachers to attend professional development workshop, conferences, and seminars;
> ➢ Contracting with an outside educational expert to conduct the annual District-led school reviews and provide professional development to the District and staff targeted towards unpacking the language in the rubric and protocols; and
> ➢ Providing teachers with intensive professional development that is not turn-key, but provided directly to teachers and includes in-class coaching.

12. **Create a hiring protocol that includes specific departments in the hiring process to ensure that there is a screening process of credentials and appropriate placement for new hires.** The Monitors found that vacancy hiring practices lead to teachers who are not highly qualified teaching in bilingual programs. Teachers hired to service English language learners were not certified bilingual teachers, leaving students to receive services from educators that were not equipped to address specific student needs. The Monitors recommend that the Superintendent review practices to ensure that hires of staff reflect the needs of the student population.

*Fiscal Management*

13. **Streamline school district operations to encourage efficiency and transparency.** The Monitors found that the District uses several outdated, inefficient, or unique organizational practices that lack transparency and could contribute to inefficient use of limited resources. For example, the District maintains silos between the funded programs office (grants) and the Assistant Superintendents for Instruction and Business. This is a model that the Monitors have not seen in other districts and may contribute to uncoordinated use of funding and disconnected educational programming. In addition, the Monitors observed an inefficient student registration process that operates out of both the transportation and central offices, leading to unnecessary administration and paperwork. This was further observed in the bilingual services sector, where student registration and vetting of English language learners led to incorrect identification of student placement and classification. Furthermore, the Monitors found that the bid process used for transportation contracts could be updated to provide increased transparency and increased competition. The Monitors recommend that the new Superintendent conduct a top-to-bottom review of the District's organization to ensure the most strategic and transparent use of District funds. The Monitors recommend that the District explore, consistent with procurement requirements, whether it is possible to engage the Superintendent search firm with which it is currently contracting to assist in conducting such a review.

14. **Explore longer term transportation contracts with public approval.** The Monitors found that the District tends to use short term contracts, which generally have the effect of limiting the number of bidders due to the short-term commitment of the contracts. The District should explore Requests for Proposals that provide for longer-term contracts (up to five years) that can over time enhance public transparency and scrutiny and reduce transportation costs in the District which could then be repurposed to educational programming.

18

Transportation costs, in the aggregate, are not out of line with other districts' per-pupil costs and in fact are slightly below average. However, with the sheer size of the transportation system responsible for transporting 32,000 students, it is wise to continue to examine areas in which efficiencies can be found. The District operates the State's second largest school transportation system (behind New York City).

15. **Explore changes to bus routes and policies to maximize efficiency.** The District's transportation costs have increased dramatically in the past two decades: from $10 million in 1993-1994, to $16.3 million in 2003-2004, to $26 million in 2013-2014. Transportation costs for 2015-2016 are expected to be approximately $28 million. However, the growth in transportation costs is largely due to the 27% increase in total enrollment (public and non-public; 43% growth in non-public alone) between 2004-2005 (the year of the first budget failure) and the 2014-2015 school year, which now totals 32,000 students in kindergarten through grade 12 who are bussed (approximately 2,000 prekindergarten students are not bussed).

The Monitors found that the District could identify efficiencies in the transportation system by working with private schools to synchronize bell times to allow for use of single buses for more routes, or to limit and/or eliminate gender segregated busing. Even where efficiencies may not be garnered from reduction or modification of gender-segregated bussing, the legal and constitutional implications of such bussing practice paid for with public funds should be examined. The Superintendent should convene leaders of the private schools to identify where changes can be made in this regard so that savings can be repurposed to educational programming. The Monitors also recommend (related to recommendation #9 above) a full examination of the implications and potential efficiencies found in reconfiguring the grade configurations of the District's various public schools. The Monitors further recommend that the District explore potential cost savings to be realized from modifications to its current system of

19

"universal busing" whereby all students receive transportation to and from school even if they live less than two miles (K-8) or three miles (9-12) from the school they attend (see Education Law §3635[1][a]).  Approved by the District's voters years ago, the system universally busses nearly 32,000 students in kindergarten through grade 12, regardless of how close they live to the school they attend.  Of this number, 3,972 students (both public and nonpublic) are bussed less than 0.5 miles.  However, the distribution of public and nonpublic students bussed 0.5 miles is not proportional.  Only 284 public school students are bussed less than 0.5 miles (attributable to weak adherence to the neighborhood school attendance boundaries; e.g., the District allows children to be bussed to a child's original school if the family moves to another part of town) while 3,688 nonpublic students are bussed less than 0.5 miles.  For example, if the voters were to approve the provision of bussing only at 0.5 miles and above, cost savings of more than $2 million could be realized per 180 days (assuming a conservative $3 per student per day cost) but the actual net savings would be less due to the subsequent reduction in state reimbursement aid (the district is reimbursed at a rate of 73% for its transportation expenses minus the non-allowable pupil ratio for children within the statutory mileage limit).

The Monitors also recommend that the Superintendent examine the District's mobility policy, which allows students to be bussed to their original school for multiple years if the family moves to another part of town.  While this may be a popular service, it may also be an inefficient use of resources that could be repurposed to educational programming.

16. **Review policies and procedures for special education and English language learner (ELL) programs.**  The Monitors believe a full scale review is required for the District's English language learner programs and its public and nonpublic special education procedures.  In October 2015, in response to complaints by the Spring Valley NAACP that the District, among other things, engaged in discrimination based on race and national origin in its special

education programs, the United States Department of Education's Office for Civil Rights (OCR) determined that a disproportionate number of out-of-district special education placements went to white students.  OCR also found deficiencies in the District's ELL program, including the District's process of evaluating students' for eligibility for ELL services.  While the District has agreed to a 12-point plan to address special education placement procedures as well as its policies and procedures regarding programs for ELLs, it is recommended that the Monitors continue to assist the District in its implementation of such plan and in a review of its special education and ELL policies and procedures.

17. **Reinstate support services for all students where needed.**  The Monitors' review found that the District's cuts to student support services provided by guidance counselors (reduced), social workers (eliminated), elementary art and music teachers (eliminated), teacher aides (reduced), and in-service training for teachers (reduced), is likely increasing the identification rate of public school students as students with disabilities.  None of these reductions came from mandated services and hence were cut in favor of other mandated and preferred programs and services: e.g., special education (which increased by over $18 million/year from 2009-2010 to 2015-2016), healthcare and retirement costs ($14 million/year) or other services such as transportation ($8.6 million/year). Transportation can be considered a mandated cost, but the local policy decisions around transportation can impact expenditure levels (e.g., the District's universal bussing and mobility policy). Importantly, the elimination of art and music "specials" in the elementary grades resulted in Title I teachers being pressed to provide coverage for the regular education teachers while they had their contractual preparation periods during the day.  This practice replaces the desired supplemental reading instruction by Title I teachers with whole class instruction by a single Title I teacher.  The reduction of the typical support structure surrounding elementary children can lead to increased identification of special education services.

Moreover, the cost of the increased reliance on special education services has risen substantially.  The cost of special education teachers alone (not counting benefits) has risen from $23.4 million/year in 2009-2010 to $38.7 million in 2014-2015 (a 77% increase in just five years) and is anticipated to be $41.3 million by the end of 2015-2016.  The rate of identification of students with disabilities has also grown.  Between 2003-2004 and 2009-2010, there were 1.1% annual increases in special education identification; between 2009-2010 and 2013-2014, the annual increases were 7.2%.  In 2003-2004, 1,600 students were identified for special education services, which represented 17% of the District's total public school population of 9,370 students.  By 2013-2014, the number of students identified for special education services had increased to 2,202, which represented 26% of the District's 8,493 public school students.  Of the 2,202 students identified in 2013-2014, 1,700 were public and 500 were "parentally-placed" in non-public settings. There are another 150 tuition-placed special education students (public and non-public) with about 60 at Kiryas Joel.

Other factors contributing to the total special education costs include increases in teacher salary costs, requisite benefits costs, speech and psychology services, BOCES services, and tuition paid to other public schools in NYS for special education services. In the 2014-2015 academic year, a careful estimate of total costs of special education was $54,675,000. The District's special education costs are increasing much faster than the District can currently support and the District should make every effort to restore support services for students in an attempt to contain rising special education costs.

18. **Ensure responsible local contributions in the District budget.**  The Monitors recommend that the District's board of education and Superintendent develop the District budget at the maximum levy allowed by the state's property tax cap. Currently, the District's tax rate is the lowest among neighboring districts, including Clarkstown, South Orangetown, Newburgh and Greenwood Lake. However, since the community is experiencing growth in the housing market, this

22

enhances property values and its ability to levy local taxes. In terms of actual tax levy increases, the District has averaged a 2.54% increase in its local tax levy each year since the 2008-2009 school year. This compares favorably to Clarkstown, but is behind other local districts including South Orangetown, Greenwood Lake, Newburgh, and Haverstraw. Put another way, the District ranks 341st among all NYS school districts in its annual average tax levy increases since 2008 and 19th out of 25 school districts in Rockland and Orange Counties.

19. **The State needs to provide dedicated support to the District.** Contingent upon the District maximizing local effort (e.g., tax levy in light of tax cap constraints) in the proposed and adopted budgets, the State should establish a grant to provide direct additional resources to the District. It is clear to the Monitors that the costs incurred by the District to fully educate 8,500 public students and provide the legally-required services to the 24,000 (and growing) non-public school students outstrip available revenues. In part, this is due to the $8.67 million lost to five budget failures between 2004-2005 and 2011-2012 (the 2012-2013 budget failed but was later approved at the original budget total), the recession, state aid cuts, and the fact that expense driven aids (e.g., textbooks, transportation) in this District do not cover the enhanced administrative costs associated with such an unusually large non-public school population. For example, while in most school districts the marginal cost of providing non-public services is small (at times negligible), in this District with 300% more non-public than public school students, these marginal costs are substantial. The $56 the District receives for instructional materials for each student in the district (public or private) is used for the actual cost of the books/software, but cannot be used for the administration of the procurement, storage, or delivery of the instructional materials. Managing the instructional materials costs the District proportionally more dollars than other districts of similar size with substantially smaller non-public obligations. Similar arguments can be made for transportation and special education services.

The Monitors recommend that $12-$15 million dollars be granted to the District. This can be implemented in 2016-2017 with veto power granted to a fiscal monitor or could be phased-in over three years with an initial $4 million investment from the State.  The allocation would grow by $4 million per year until the $12 million level is reached. As the District (board and Superintendent) demonstrates sufficient fiduciary responsibility and restoration of cuts specifically outlined by the Monitors to public school programming, the additional aid would be received.  The Governor and the Legislature must provide the Monitors with more time to provide oversight and must enhance the oversight authority, including veto power, over any new additional funds provided to the District through this mechanism.

The $12-$15 million dollar figure is based on the size of the actual cuts to the District's public school academic and support programs over the past decade.  When examining where the District's budget was decreased and increased over this time period (due to a variety of factors), the Monitors found reductions in multiple areas directly related to student learning and experience: regular education teacher costs ($6 million per year), occupational education ($1.5), extra- and co-curricular activities ($0.8 million), social workers ($1 million), in-service training ($0.2 million), building maintenance ($4 million), and libraries and AV ($1 million).  Together, these reductions in annual expenditures total more than $14 million. This number actually underestimates the replacement costs due to inflation and benefit costs (add 29% to the teacher salaries).

It is important to note that these reductions were offset with other expenditure increases across a number of categories. The largest growth area during this time period has been special education ($18 million and increasing), legal fees ($4 million, though this figure has begun to decrease in 2015-2016, a year in which the District engaged new counsel), transportation ($8.6 million and increasing), health and retirement benefits to staff ($14 million and increasing),

24

principal and debt service ($5.2 million). The major categories of expenditures increased a total of $50 million per year. This roughly matches the increase in $50 million of additional revenues over the same time period. So, all told, the recommendation is for the District to receive $12-$15 million, maximize the local effort, and possibly prepare for a tax cap override in 2017-2018 once enhanced trust has been earned in the broader community.

<u>Conclusions - Next Steps for the District</u>

The task of the Monitors over the past 17 weeks was clear: work with the District to help improve outcomes for the students attending East Ramapo's public schools. In that span, the Monitors have identified multiple areas where improvement was needed – and the review focused on both day-to-day needs of the District – such as whether a teacher was implementing a strategy from a professional development training – to the long-term, big picture questions, such as how the District can maximize available resources to make needed facilities improvements.

Since August, there has been progress in the District, but after years of challenges, including fiscal distress and a failure of public confidence in the public education system in the District, much more time is needed for the District to overcome years of mismanagement and decline. The recommendations contained within this report offer a blueprint that would not only continue the progress that was made and maintain the sense of urgency that is necessary to address the District's current crisis, but also offers specific and tangible actions for a long-term, sustainable reform effort that will help the District address its three key challenges moving forward:

➢ Improving teaching and learning to ensure that all students graduate from the District with the opportunity to succeed;

➢ Bringing the District's fiscal house in order so that the community and state can be confident that funding and new investments are prudently and efficiently used to the benefit of students; and

➢ Healing the deep rifts in the community that have unfortunately contributed to an environment of paralyzing mistrust.

The recommendations here are not specific to or dependent on the disposition or presence of any given individual – they are recommendations aimed at ensuring that the institutions in the District are in a better position to serve the entire community now and in the years ahead so that all students can succeed.

26

Monitors' Biographies

*Dennis M. Walcott*

Dennis M. Walcott currently serves as an adjunct professor at Fordham University's Center for Nonprofit Leaders, and recently served as an Honorary Distinguished Fellow at the University of the West Indies.  Prior to that, Walcott served as Chancellor of the New York City Department of Education from 2011 through 2013, following more than eight years as Deputy Mayor for Education and Community Development. As Chancellor, Walcott led transformational change across a system of more than 1,800 schools with 1.1 million students, 136,000 employees, and a $24 billion budget. Chancellor Walcott prioritized cultivating teacher talent; expanding school choices; creating strong partnerships with parents; and preparing students to graduate from high school ready to succeed in college and careers. Over the course of Walcott's tenure as Deputy Mayor and Chancellor, the high school graduation rate soared to an all-time high, the dropout rate fell by half, and college and career readiness had more than doubled.

Initiatives led by the Chancellor included: the Middle School Quality Initiative, which strives to dramatically increase the number of students entering high school reading on or above grade level;  the expansion of career and technical education (CTE) schools and programs, including a partnership with the City University of New York (CUNY), that has led to the groundbreaking models of the Pathways in Technology Early College High School (P-TECH) and the Academy for Software Engineering (AFSE); and, the creation of the Division of Equity and Access within the Department of Education to help address the achievement gap. As a result of multiple initiatives, the Department of Education has aimed to increase the percentage of Black and Latino students taking and passing the Advanced Placement exam; and has provided support to underrepresented students to prepare for admission to specialized high schools.

Prior to his appointment as Chancellor, Walcott served as Mayor Bloomberg's Deputy Mayor for Education and Community Development, overseeing and coordinating the operations of the Department of Education, the New York City Housing Authority, the

27

Department of Youth and Community Development and the Mayor's Office of Adult Education. Walcott was responsible for collaborating with community-based organizations citywide and coordinating policies concerning youth programs and adult education.

As a kindergarten teacher in the childcare center where he began his career, Walcott recognized many children's need for a male role model, and in 1975, he founded the Frederick Douglass Brother-to-Brother program, a mentoring program for young boys. He went on to serve as the Executive Director of the Harlem Dowling Westside Center, where he expanded services to children and families, and was the President and Chief Executive Officer of the New York Urban League. At the Urban League, Walcott developed a number of youth-based programs, including Jeter's Leaders, which focused on healthy lifestyles, and Bridge to Brotherhood, in which he worked with youth in the African-American, Hispanic and Jewish communities.

Walcott graduated from New York City public schools.  A lifelong Southeast Queens resident, Walcott graduated from the University of Bridgeport in Connecticut with a bachelor's degree and a master's in education in 1973 and 1974, respectively. In 1980, he received his master's in social work from Fordham University. Walcott and his wife Denise have four children and nine grandchildren.

### *Monica George-Fields*

Monica George-Fields brings 28 years of experience as a district-level leader, a turnaround school principal and an educator to the efforts of leading School Innovation policy in the New York State Education Department.

George-Fields is the President and Chief Education Officer of Reimagine Excellence and Achievement Consulting House (REACH).  REACH is dedicated to increasing student achievement by coaching school communities through their school improvement and sustaining efforts.

28

As a Senior Fellow for School Innovation for the Regents Research Fund, George-Fields was the architect of the state's Diagnostic Tool for School and District Effectiveness (DTSDE), a school and district review tool used to evaluate the practices of all federally identified schools and districts.  She also led the charge to convert required annual School Comprehensive Education Plans to 3-year strategic plans, which resulted in the adoption and implementation of the Strategic Plan for School Excellence for all 700 Focus and Priority Schools.

Prior to becoming a senior fellow, she held  positions at the New York City Department of Education, including Deputy Senior Supervising Superintendent, Deputy Chief Education Officer for Cluster Three, Senior Director of Policy and Strategic Planning for the Division of School Support, and Director of Curriculum for Empowerment Schools. In these roles, she supported schools and was the Department's point person for Principal Performance Review evaluations, providing professional development workshops to over 900 principals, superintendents, and network team members.

Earlier, George-Fields served for six years as principal of Adam Clayton Powell Jr. Elementary School (Public School 153 in Harlem), with an enrollment of over 1,800 students, 90 percent of whom were eligible for free and reduced lunch and 45 percent of whom were English Language Learners.  She successfully worked with the faculty and private corporate partners to dramatically increase student English Language Arts and math scores to remove the school from the state's failure list.  During George-Fields's final year in Public School 153, the school was one of 14 in New York City to receive a Quality Review designation of Outstanding.

Prior to successfully turning around Public School 153, George-Fields served as an assistant principal, staff developer, and teacher.  She currently teaches at The College of St. Rose and served for several years as an adjunct professor for Fordham University Graduate School of Education.

George-Fields holds a Bachelor of Science degree from Florida A&M University in Political Science, a Master of Science in Education in Educational Leadership from Bank Street College of Education, a Master of Education in Organization & Leadership from Teachers College, Columbia University and a Doctorate of Education from Teachers College, Columbia University concentrating in Urban Education and Leadership.

### John W. Sipple

Dr. John W. Sipple joined Development Sociology in the summer of 2011 after 13 years in Cornell's Department of Education. He has focused his research interests on the responses of public school districts and communities to changes in state and federal policy. Central to his work are issues of community and organizational change and how they relate to fiscal, demographic, and learning opportunities for students across racial, socioeconomic, and geographic lines. He teaches courses on the organizational, social, and political contexts of community vitality and the U.S. educational system.

Dr. Sipple's research analyzes the implementation of education and social policies on local communities and their public schools. Ranging from changing high school graduation requirements and state standards, the integration of school leaders in their communities, and early childcare and education in rural communities.

Recently, Dr. Sipple has begun to more formally analyze the use of publicly available data. Through new technology, he has established a demonstration site of how state data can be accessed in usable and productive ways by general citizens of New York State. Through the creation of a RESTful web service, web and mobile-based applications are being developed to draw on the data in real time using the creativity and diffuse expertise of application developers across the university and world. The goal is to demonstrate for NYS how useful data can be to citizens and local leaders when hosted and displayed in useful and novel ways.

Finally, Dr. Sipple is engaged in a new research project investigating the use of shared service agreements (formal and informal. This work, in collaboration with Prof. Mildred Warner, City and Regional Planning, is in collaboration with the County, Mayor, Towns, Planners, and School Superintendent Associations and will be a source of knowledge on the obstacles and value of shared municipal and interagency services.

Dr. Sipple`s primary focus of outreach is in his capacity as Director of the New York State Center for Rural Schools which was established in September 2008. In this position, he works in support of the Rural Schools Association (RSA) of New York State, the state legislature, Governor's office, and the State Education Department. He has a lengthy and productive relationship with the RSA and serves as the research arm of the organization. The work of the Center emphasizes building connections between key constituents, capacity of local school districts as well as the state of NY, and research in support of all its activities.

Dr. Sipple has a program of outreach that builds off his research program and focusses on the intersection of community development and the $600 Billion/year Educational System ($60 Billion in New York State). This work includes the sharing of strategies municipalities and schools use to share services. It also focusses on the public policy issues of closing/merging schools and their impact on educational opportunity and community vitality.

**A10723** Rules (Jaffee)  Same as <u>S 8131</u>  CARLUCCI
Appropriations
TITLE....Relates to supplementary funding for dedicated programs for public school students in the
East Ramapo Central School District
06/13/16  referred to ways and means
06/15/16  reported referred to rules
06/16/16  reported
06/16/16  rules report cal.483
06/16/16  substituted by s8131
   **S08131  CARLUCCI**
   06/13/16   REFERRED TO RULES
   06/16/16   ORDERED TO THIRD READING CAL.1893
   06/16/16   PASSED SENATE
   06/16/16   DELIVERED TO ASSEMBLY
   06/16/16   referred to ways and means
   06/16/16   substituted for a10723
   06/16/16   ordered to third reading rules cal.483
   06/16/16   passed assembly
   06/16/16   returned to senate
   06/28/16   DELIVERED TO GOVERNOR
   06/30/16   SIGNED CHAP.89

---

RULES COM (Request of Jaffee, Zebrowski, Brabenec, Seawright)
Relates to supplementary funding for dedicated programs for public school students in the East
Ramapo Central School District; appropriates funds therefor.

---

# STATE OF NEW YORK

10723

# IN ASSEMBLY

June 13, 2016

Introduced by COMMITTEE ON RULES -- (at request of M. of A. Jaffee, Zebrowski) -- read once and referred to the Committee on Ways and Means

AN ACT relating to supplementary funding for dedicated programs for public school students in the East Ramapo central school district; providing an appropriation therefor; and providing for the repeal of such provisions upon expiration thereof

**The People of the State of New York, represented in Senate and Assembly, do enact as follows:**

```
1    Section  1.  Legislative  intent. The legislature finds and determines
2  that over the course of many years there have been dramatic  changes  in
3  the  demographics  in the town of Ramapo, Rockland county. The number of
4  residents in the town has dramatically increased, swelling the  size  of
5  the  East Ramapo central school district to over 30,000 students. Nearly
6  2/3 of those students do not, however, attend the public school  system.
7  In  2015  the  state  education  department, pursuant to its powers and
8  duties, appointed three monitors to  the  district,  led  by  the  former
9  chancellor  of  the  New  York City school district.  The legislature
10  further finds and determines  that  in  order  to  continue  moving  the
11  dialogue in the right direction, with the ultimate goal of improving the
12  outcomes  of  all students within the district, the appointment of moni-
13  tors should continue. This  legislation  continues  the  appointment  of
14  monitors in the East Ramapo central school district. Finally, the legis-
15  lature finds that this legislation has received general support from the
16  school board and the community as a whole.
17    § 2. Definitions. As used in this act:
18    (a) "commissioner" shall mean commissioner of education;
19    (b) "department" shall mean state education department;
20    (c)  "board of education" or "board" shall mean the board of education
21  of the East Ramapo central school district;
22    (d) "school district" or "district" shall mean the East Ramapo central
23  school district; and
24    (e) "superintendent" shall mean the superintendent of the East  Ramapo
25  central school district.
```

EXPLANATION--Matter in **_italics_** (underscored) is new; matter in brackets
[-] is old law to be omitted.

LBD15839-03-6

A. 10723                           2

```
 1    (f) "comptroller" shall mean the state comptroller.
 2    § 3.  (a)  Appointment of monitor team. In accordance with the powers
 3  and duties of the board of regents and the commissioner pursuant to
 4  subdivision 2 of section 305 of the education law, section 308 of the
 5  education law, and section 215 of the education law, the commissioner
 6  shall appoint up to 3 monitors to carry out the provisions of this act
 7  including but not limited to providing oversight, guidance and technical
 8  assistance related to the educational and fiscal policies, practices,
 9  programs and decisions of the East Ramapo central school district, the
10  board of education and the superintendent.
11    (b) The monitors shall be non-voting ex-officio members of the  school
12  board. The monitors shall be individuals who are not residents or
13  employees of the school district and to the extent practical, shall have
14  experience in one of more of the following areas:
15    (i) school district finances;
16    (ii) elementary and secondary education;
17    (iii) the operation of school districts in New York;
18    (iv) educating students with disabilities; and/or
19    (v) educating English language learners.
20    § 4. The monitor or monitors shall be entitled to attend all  meetings
21  of the board, including executive sessions; provided however, such moni-
22  tor or monitors shall not be considered for purposes of establishing a
23  quorum of the board, provided further that the monitors may be excused
24  from executive sessions when privileged issues are being discussed.  The
25  East Ramapo central school district shall fully cooperate with any moni-
26  tor or monitors appointed by the commissioner, including but not limited
27  to providing such monitor or monitors with access to any necessary docu-
28  ments and records of the district including access to electronic infor-
29  mation systems, databases and planning documents, consistent with all
30  applicable state and federal statutes including but not limited to Fami-
31  ly Educational Rights and Privacy Act (FERPA)(20 U.S.C. §1232g) and
32  section 2-d of the education law.
33    § 5.  (a) The sum of one million dollars ($1,000,000) is hereby appro-
34  priated for the 2016--2017 school year to the state education department
35  out of moneys in the state treasury in the general fund to the credit of
36  the local assistance account, not otherwise appropriated, for reimburse-
37  ment to the East Ramapo central school district to support students
38  attending public schools in such district, provided that the district is
39  in compliance with the requirements set forth in this act. Provided
40  further that funding appropriated in this paragraph shall only be made
41  available after the director of the budget has certified that the sum of
42  two million dollars ($2,000,000) has been made available to the East
43  Ramapo central school district from available appropriations within
44  chapter 53 of the laws of 2016, provided that such funds are only made
45  available for purposes set forth in this act.
46    (a-1) The East Ramapo central school district shall be eligible to
47  receive reimbursement from such funds made available pursuant to para-
48  graph (a) of this section for its approved expenditures on services to
49  improve and enhance the educational opportunities of students attending
50  the public schools in such district. Such services shall include, but
51  not be limited to, reducing class sizes, expanding academic and enrich-
52  ment opportunities, establishing and expanding kindergarten programs,
53  expanding extracurricular opportunities and providing student support
54  services, provided, however, transportation services and expenses shall
55  not be eligible for reimbursement from such funds.
```

A. 10723                          3

1  (b)  In  order to receive such funds, the school district in consulta-
2  tion with the monitor or monitors shall develop a  long  term  strategic
3  academic  and fiscal improvement plan within 6 months from the enactment
4  of this act. Such plan  shall  be  submitted  to  the  commissioner  for
5  approval  and  shall  include a set of goals with appropriate benchmarks
6  and measurable objectives and identify strategies to address areas where
7  improvements are needed in the district, including but  not  limited  to
8  its  financial stability, academic opportunities and outcomes, education
9  of students with disabilities, education of English  language  learners,
10  and  shall  ensure compliance with all applicable state and federal laws
11  and regulations.  This improvement plan shall also include a  comprehen-
12  sive expenditure plan that will describe how the funds made available to
13  the  district pursuant to this section will be spent.  The comprehensive
14  expenditure plan shall  ensure  that  funds  supplement,  not  supplant,
15  expenditures  from  local, state and federal funds for services provided
16  to public school students.  Such expenditure plan shall be developed  in
17  consultation with the monitor or monitors appointed by the commissioner.
18  The  board  of education of the East Ramapo central school district must
19  conduct a public hearing on the expenditure plan and shall consider  the
20  input  of the community before adopting such plan. Such expenditure plan
21  shall also be made publicly available and shall be submitted along  with
22  comments made by the community to the commissioner for approval once the
23  plan is finalized.  Upon review of the improvement plan and the expendi-
24  ture  plan,  required  to  be  submitted pursuant to this subdivision or
25  section seven of this act, the commissioner shall approve or  deny  such
26  plan  in writing and, if denied, shall include the reasons therefor. The
27  district in consultation with the monitors may  resubmit  such  plan  or
28  plans with any needed modifications thereto.
29  (c) The commissioner shall disburse the funds appropriated pursuant to
30  this  section after receiving satisfactory evidence from the East Ramapo
31  central school district that the district has complied with the approved
32  comprehensive expenditure plan and spent  such  funds  pursuant  to  the
33  approved expenditure plan.
34  (d)  The commissioner of education shall have 30 days from the receipt
35  of such evidence to confirm whether the  school  district  has  complied
36  with the requirements of this act and shall determine whether such funds
37  were  spent  in conformance with the provisions of this act. Upon finding
38  compliance and determining that the funds were properly expended,  the
39  commissioner  shall  certify  the amount of the approved expenditures to
40  the state comptroller for payment no  later  than  60  days  after  such
41  determinations.  The  East  Ramapo  central  school  district  shall not
42  receive reimbursement for funds authorized pursuant to this act that are
43  not spent for the direct benefit of students attending public schools in
44  such district in a manner consistent  with  its  approved  comprehensive
45  expenditure plan or prior written approval from the commissioner.
46  § 6. Fiscal and operational oversight by the commissioner. During the
47  effective period  of  this  act  the  commissioner  shall  undertake  an
48  enhanced review of the district budget.
49  (a)  The  board of education in consultation with the monitor or moni-
50  tors shall annually submit the school district's proposed budget for the
51  next succeeding school year to the commissioner no later  than  45  days
52  before  the  date  scheduled  for the school district's budget vote. The
53  commissioner shall review the budget to ensure that it, to the  greatest
54  extent  possible, expands educational programming for students including
55  but not limited to extracurricular activities,  course  offerings,  non-
56  mandated  support services, non-mandated art and music classes, programs

A. 10723                          4

```
 1  and services for English language learners and students  with  disabili-
 2  ties, and maintaining class size. The commissioner shall also review the
 3  proposed  budget  to  ensure  that  it is balanced within the context of
 4  revenue and expenditure estimates and mandated programs. The commission-
 5  er  shall present his or her findings to the board of education no later
 6  than 30 days prior to the date scheduled for the school district's budg-
 7  et vote. The board of education shall make adjustments to  the  proposed
 8  budget consistent with any recommendations made by the commissioner. The
 9  school  district  shall  make  available  on the district's website: the
10  initial proposed budget, the commissioner's findings,  and  the  final
11  proposed budget prior to the date of the school district's budget vote.
12    (b)  The monitor or monitors appointed by the commissioner shall quar-
13  terly, and the district  shall  annually  provide  to  the  commissioner
14  reports  on  the fiscal and operational status of the school district to
15  ensure compliance with subdivision (a) of  this  section.  In  addition,
16  monitors  shall  provide  an annual report to the commissioner and comp-
17  troller on contracts that the district entered into throughout the year.
18  All reports shall be subject to review by the comptroller at the request
19  of the commissioner.
20    § 7. To ensure compliance with the comprehensive expenditure plan,  in
21  the  event  the  district  plans  to  reduce  budget  appropriations for
22  programs restored or created under the comprehensive expenditure plan or
23  the strategic academic and fiscal improvement plan as well as  the  sale
24  of  school  buildings  or  other  real  property and capital improvement
25  contracts in excess of one  hundred  thousand  dollars  ($100,000),  the
26  district shall submit a plan to the commissioner for approval.
27    § 8.  This act shall take effect July 1, 2016 and shall expire and be
28  deemed repealed June 30, 2017.
```

**NEW YORK STATE ASSEMBLY**
**MEMORANDUM IN SUPPORT OF LEGISLATION**
**submitted in accordance with Assembly Rule III, Sec 1(f)**

BILL NUMBER: A10723

SPONSOR: Rules (Jaffee)

TITLE OF BILL: An act relating to supplementary funding for dedicated
programs for public school students in the East Ramapo central school
district; providing an appropriation therefor; and providing for the
repeal of such provisions upon expiration thereof

PURPOSE OR GENERAL IDEA OF BILL:

This bill would appoint up to 3 state monitors to the East Ramapo
Central School District and provide supplementary funding for the public
school students.

SUMMARY OF SPECIFIC PROVISIONS:

Section 1: Legislative intent

Section 2: Definitions

Section 3: Requires the Commissioner of Education to appoint up to 3
state monitors for the East Ramapo Central School District

Section 4: Describes the duties of the monitors

Section 5: Appropriates $1 million for the 201647 school year; Describes
the long term strategic improvement plan and comprehensive expenditure
plan that the East Ramapo Central School District must complete in order
to be eligible to receive funds from the State Education Department for
the reimbursement of approved expenditures on services to improve and
enhance the educational opportunities of students attending the public
schools in the school district

Section 6: Describes the fiscal and operational oversight duties of the
commissioner

Section 7: Describes the process of complying with the comprehensive
expenditure plan in the event of a reduction in budget appropriations

Section 8: Effective date

JUSTIFICATION:

"Over the course of many years there have been dramatic changes in the
demographics in the Town of Ramapo, Rockland County. The number of resi-
dents in the town has dramatically increased, swelling the size of the
East Ramapo Central School District to over 30,000 students.  Nearly,
2/3 of those students do not, however, attend the public school system.
In 2015, the State Education Department, pursuant to its powers and

duties, appointed three monitors to the East Ramapo School District. In order to continue moving the dialogue in the right direction, with the ultimate goal of improving the outcomes of all students within the district, the appointment of monitors should continue. This legislation, which has received general support from the school board and the community as a whole, continues the appointment of monitors in the East Ramapo Central School District."

**PRIOR LEGISLATIVE HISTORY:**

New bill.

**FISCAL IMPLICATIONS:**

Appropriates $1 million for the 2016-17 school year

**EFFECTIVE DATE:**
This bill takes effect July 1, 2016 and shall expire and be repealed June 30, 2017.