UNITED STATES DISTRICT COURT FOR THE
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| NATIONAL ASSOCIATION FOR THE ADVANCEMENT OF COLORED PEOPLE, SPRING VALLEY BRANCH; JULIO CLERVEAUX; CHEVON DOS REIS; ERIC GOODWIN; JOSE VITELIO GREGORIO; DOROTHY MILLER; HILLARY MOREAU; and WASHINGTON SANCHEZ,<br><br>               Plaintiffs,<br><br>    v.<br><br>EAST RAMAPO CENTRAL SCHOOL DISTRICT and MARYELLEN ELIA, IN HER CAPACITY AS THE COMMISSIONER OF EDUCATION OF THE STATE OF NEW YORK,<br><br>               Defendants. | 17 Civ. 8943 (CS) (JCM) |

## DECLARATION OF STEPHEN G. PRICE

STEPHEN G. PRICE, pursuant to 28 U.S.C. § 1746, declares under penalty of perjury as follows:

### *Background*

1. I am a United States citizen. I am 61 years old. I am a white man.

2. I live in Chestnut Ridge, New York, and I am a registered voter.

3. I was elected to seven terms to a seat on the East Ramapo Central School District ("East Ramapo" or "the District") Board of Education (the "Board"), and served between 1992 and 2013.

### *Experience With Education in the District's Public Schools*

4. I received a great education in East Ramapo public schools from 3rd grade through high school. I graduated from Columbia University with a Bachelor's degree in

Engineering in 1978, and I currently work as a civil engineer, engaged on large infrastructure projects.

5. I have three children. Scott is 36; Michelle is 34; and Taryn is 30. All three of my children attended public schools in East Ramapo from kindergarten through high school. As a member of the Board, I had the honor of handing all three of my children their high school diplomas.

6. I was very satisfied with my children's public education in East Ramapo, and my wife and I never considered sending them to private schools.

7. My children received a well-rounded education in a diverse community, making them well-adjusted and prepared for college. All three had college credits before beginning their freshman year, thanks to a District program that allowed high school students to earn college credits through a Syracuse University program and through our local community college. My children also played sports, participated in yearbook, joined honor societies, and helped with school plays.

### *Experience as a Candidate for a Seat on the Board*

8. In 1992, my neighbor, who was a member of the Board at the time, decided to step down at the end of her term. I ran for her seat and won the election.

9. In my first campaign and subsequent campaigns, I ran to ensure that programs that made East Ramapo public schools well-regarded—for example, a full slate of Advanced Placement classes, extra-curricular activities, and other courses where students could earn college credits—were maintained and supported. I also campaigned on providing small class sizes and increasing one-on-one instruction in the early grades. As a parent of East Ramapo public school students, I wanted my children to have a great education and, after they graduated,

I continued to serve on the Board because I wanted to ensure that other children would have the same opportunities my children had.

10. Even during my early campaigns for the Board, the schools and Board politics in East Ramapo were generally segregated, although less so than they are now. Private schools in the District were mostly attended by white students, while the public schools—although more integrated than they are today—had a very large population of students of color. Typically, elections featured candidates from two slates running against each other: the community of white voters whose children attended private school backed one slate, and the more integrated but largely minority community of voters whose children attended public schools backed the other slate. In each of my elections, I ran as part of the public school community's slate.

11. When I was running for the Board, I posted flyers, knocked on doors, and talked with voters in both white and minority neighborhoods. I made an effort to reach out to the white, private school community. Other Board members supported by the private school community facilitated my meetings with white community leaders.

12. Conversely, I rarely saw candidates backed by the private school community campaign in minority neighborhoods. In 2007 and prior years, I recall Nathan Rothschild, Aron Wieder, and Richard Stone made some efforts to reach out to the public school community. But with the exception of Mr. Stone, whom I recall also made an appearance at a public school community event at some point, I do not recall seeing candidates backed by the private school slate campaigning in minority neighborhoods in the period between the May 2007 election and the end of my tenure on the Board in January 2013.

13. The schools and politics in the District became increasingly segregated during my tenure on the Board. The public school student body became increasingly black and Latino, and the private school population became increasingly white.

14. In the 2005 election, candidates supporting the interests of the private school community gained a majority on the Board. In the period between 2005 and my resignation in 2013, the Board maintained policies that expended substantial District resources for services that benefitted white students in private schools at the expense of public school students.

### *Expenditures for Private School Transportation*

15. One major strain on the District's budget was the provision of universal busing for all students and gender-segregated transportation services for private school students.

16. Under state law, the District is required to provide transportation to students attending private schools who live within certain mileage limits from school. The District maintained a transportation system that provided busing with no low mileage limitation and provided gender-segregated busing to nearly 150 school locations.

### *Expenditure on Private Special Education Placements*

17. Shortly after the 2005 election, special education became a frequent point of contention between Board members backed by the private school community and the public school community and a source of significant strain on the District's budget.

18. To the best of my knowledge, state and federal laws require that special education students be placed in the least restrictive environments. On some occasions, placement in private school environments may be appropriate, but only where appropriate public school placements are unavailable, and the private school special education program is compliant with applicable laws regarding the placement of special education students in the least restrictive environment.

The District's committee on special education would make decisions regarding the proper placement of special education students. The law provides a procedure for parents to file formal complaints contesting those decisions and to receive a hearing before a hearing officer, who decides whether the District staff's placement recommendation is appropriate.

19. Parents from the private school community frequently disputed the placements of special education students in public schools, seeking to have their children placed in private schools for special education services. But rather than allow the formal process for resolving disputes about special education placements to take its course, the District and the Board took steps to acquiesce to parent demands for private placements without ensuring that those placements were compliant with applicable laws. The New York State Education Department ("NYSED") repeatedly cited the District for violations of applicable laws regarding special education placements. Consistent with my recollection, a judicial decision in the matter of *East Ramapo Central School District v. King* recounts some of these citations that occurred between 2010 and 2013. *See* No. 2185-13, 2013 WL12198825, at *2-3 (N.Y. Sup. Ct. Dec. 30, 2013). Among other consequences, the District's noncompliance with applicable law resulted in NYSED's withholding reimbursement for payments that the District made for certain private placements.

### *The District's Property Sales and Excessive Expenditures on Legal Representation*

20. The Board members backed by the private school community undertook a long-term program of selling the District's real property with ostensible purpose of reducing taxes. For example, in 2007, the Board decided to sell an approximately 6-acre parcel of land owned by the District. The Board used the proceeds of the sale to reduce taxes and not to make any meaningful investments in the public schools.

21.     In 2008, the Board hired a new superintendent, Dr. Ira Oustatcher. Dr. Oustatcher was amenable to the Board's plan to close a school. In late 2008, Dr. Oustatcher recommended at least one school closure and raised the possibility of a second school closure. I have reviewed the minutes of the December 3, 2008 Board meeting, which I attended and in which this matter was discussed, and the minutes accurately reflect my recollection. The minutes of the December 3, 2008 Board meeting are publicly available on the District's web site at http://www.ercsd.org/pages/East_Ramapo_CSD/Board_of_Education/Minute_Archive.

22.     Numerous members of the public school community—including principals, teachers, students, and parents—opposed the recommendation to close schools and spoke publicly about their objections at several Board meetings. Members of the private school community spoke in favor of closing multiple schools in order to keep taxes as low as possible.

23.     The Board retained the Long Island-based law firm of Minerva & D'Agostino, known for having represented a school district on Long Island that closed a public school and sold it to a private school. Among other reasons, the Board retained Minerva and D'Agostino to enable the sale of District property to reduce taxes.

24.     Mr. D'Agostino's firm replaced the District's longtime counsel, a local lawyer who had competently represented the District for more than twenty years. Mr. D'Agostino's firm billed the District at a rate that was approximately double the rate at which our longtime counsel had billed the District. At a November 18, 2009 Board meeting, I voted against the motion to appoint Minerva & D'Agostino as attorneys for the District, as did Mimi Calhoun and Suzanne Young-Mercer, the other Board members backed by the public school community. All of the Board members backed by the private school community voted in favor of retaining Minerva & D'Agostino. The minutes of the November 18, 2009 Board meeting are publicly

available on the District's web site at http://www.ercsd.org/pages/East_Ramapo_CSD/Board_of_Education/Minute_Archive.

25. Because Mr. D'Agostino and other lawyers from his firm were based in Long Island and billed the district an hourly rate for travel time, the District was also billed for substantial travel expenses to and from Rockland County.

26. Mr. D'Agostino and other lawyers at his firm were very hostile to members of the public school community who were critical of the Board. For example, during a meeting I attended in March 2010, a recent graduate of East Ramapo public schools, a student of color who was then a freshman at Yale University, spoke during the public comment period regarding the importance of preserving the Advanced Placement curriculum, which he explained had helped him get into Yale and succeed there. When the student criticized the Board for expending scarce resources on a high-priced lawyer instead of preserving important curricular functions, the Board's lawyer, Mr. D'Agostino, interrupted the former student and berated him publicly for criticizing Mr. D'Agostino's rates. The following link contains video footage of the incident, which is consistent with my recollection: https://www.youtube.com/watch?v=yypeWR-h1oU. I appear in this video beginning approximately at the 3:34 mark.

27. During another meeting I attended, Mr. D'Agostino threatened to sue a member of the audience who criticized him and the Board. The following link contains video footage of that incident, which is consistent with my recollection: https://www.youtube.com/watch?v=vnn5u1luoSE. I appear in this video beginning approximately at the 2:26 mark. These outbursts by Mr. D'Agostino and his firm against members of the public who were critical of him or the Board were illustrative of many similar incidents that occurred subsequent to hiring Minerva & D'Agostino in 2009.

28. In April 2010, without my prior knowledge, other members of the Board proposed a resolution to declare Hillcrest Elementary School "surplus property," close the school, and have it appraised for sale or lease. Mr. D'Agostino, drafted the resolution without my prior knowledge and, to the best of my knowledge, without the prior approval of the Board. The majority on the Board backed by the private school community passed the resolution without any further information, discussion, or consideration. This worried me and other Board members supported by the public school community because we did not have information on how this closure would affect the District and its students. I voted against the resolution. I have reviewed the minutes of the April 19, 2010 Board meeting, and they are consistent with my collection. The minutes of the April 19, 2010 meeting are publicly available on the District's web site at http://www.ercsd.org/pages/East_Ramapo_CSD/Board_of_Education/Minute_Archive.

29. In May 2010, the Board voted on a motion to sell Colton Elementary School. I voted against the motion. I believed that selling District property was not a sustainable way to address the budget problems caused by the Board's financial mismanagement. In July 2010, the Board voted on a motion to sell Hillcrest Elementary School. I was not present at that meeting to vote on the motion; however, I had similar objections to the sale of Hillcrest that I had for the sale of Colton.

30. These property sales and other "one off" financial solutions did little to address the District's significant budget problems. During the 2009-2010 school-year, the District began running a deficit, and between 2009 and 2012, the District cut nearly 400 jobs—including many teachers, all social workers, all deans, all department chairpersons, assistant principals in elementary school, and some guidance counselors among other school and district staff. During this time, the District also reduced kindergarten from full-day to half-day, curtailed art and music

programs, and eliminated or significantly reduced high school elective courses, transportation for field trips, and athletics, among other programs. The District also made cuts to custodial staff and maintenance budgets that allowed public school physical plants to deteriorate significantly.

31. While the public schools were undergoing extensive cuts to personnel, programs, and facilities maintenance, the Board did not impose any cuts of similar magnitude on the District services provided to private school students.

### *Declining Transparency and Responsiveness*

32. Beginning around 2009, complaints from parents and advocates within the public school community about the Board's stewardship of the public schools and its budget markedly increased. Members of the public school community would often voice these concerns during the public comment period of Board meetings.

33. In 2010, the Board implemented policies that made it increasingly difficult for the public to have a say in Board meetings. Historically, the public comment period took place at the beginning of school board meetings. But in 2010, the private school majority on the Board moved the public comment period to the end of the meetings, which frequently ended after midnight. I objected to this proposed change because I was concerned that it would decrease public input to the Board. Initially, the Board wanted to move comments from all public speakers, including students, to the end of the meeting, but in response to my objection the Board then revised its approach to allow student comments to occur earlier in the meeting, while relegating all other public comments to the end. A video recording of the Board's consideration of the motion to move public comment to the end of the meeting is available at the following web site: https://www.youtube.com/watch?v=-XQTB2sL7vw. I appear in this recording from the beginning, and this recording is consistent with my recollection of the event.

34. Around 2012, the Board became less transparent in its decision-making and more hostile to public comment. The Board sometimes discussed financial matters in private "executive sessions" that I believed were not proper topics for executive session and should have been addressed in public in a transparent fashion. When I raised objections to what I understood to be the improper use of executive sessions, other Board members and the Board's lawyers dismissed my concerns. On some occasions, these executive sessions lasted until very late into the night, which meant that most members of the public left before the public comment period even started.

35. When public school parents did stay late to speak at meetings, Board members backed by the private school community would sometimes walk out of the meeting, causing the Board to go below the requisite attendance for a quorum, which would force adjournment of the meeting.

36. On numerous occasions, the Board members backed by the private school community were hostile to members of the public school community who attended Board meetings. One particularly memorable moment occurred during a meeting that I attended in May 2012, when Mr. Daniel Schwartz, a Board member backed by the private school community, addressed criticism from members of the public school community regarding the Board's extensive cuts to the public school budget by stating: "To suggest that we lack the moral authority to sit in these seats, let me tell you right now—you don't like it, find yourself another place to live because this is the United States of America."

### *Resignation*

37. In 2013, frustrated by the years of neglect or outright hostility to the needs of the public school community and the lack of transparency in the way that the District and other

Board members conducted business, I called Ms. Young-Mercer, who was also serving on the Board at the time, and told her I felt it was time for me to resign. She told me that she felt the same way. We resigned from the Board before the end of our three-year terms.

I declare under penalty of perjury that the foregoing is true and correct.

Dated:    Chestnut Ridge, New York

_December 4TH, 2017_

_____
Stephen G. Price