UNITED STATES DISTRICT COURT FOR THE
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| NATIONAL ASSOCIATION FOR THE ADVANCEMENT OF COLORED PEOPLE, SPRING VALLEY BRANCH; JULIO CLERVEAUX; CHEVON DOS REIS; ERIC GOODWIN; JOSE VITELIO GREGORIO; DOROTHY MILLER; HILLARY MOREAU; and WASHINGTON SANCHEZ,<br><br>      Plaintiffs,<br><br>   v.<br><br>EAST RAMAPO CENTRAL SCHOOL DISTRICT and MARYELLEN ELIA, IN HER CAPACITY AS THE COMMISSIONER OF EDUCATION OF THE STATE OF NEW YORK,<br><br>      Defendants. | 17 Civ. 8943 (CS) (JCM) |

## DECLARATION OF SUZANNE YOUNG-MERCER

SUZANNE YOUNG-MERCER, pursuant to 28 U.S.C. § 1746, declares under penalty of perjury as follows:

### *Background*

1. I am a United States citizen. I am 65 years old. I am a black woman.

2. In 1990, my family and I moved to Spring Valley, New York, and I have resided at my current address for the past 27 years.

3. I reside within the East Ramapo Central School District ("East Ramapo" or the "District"), and I am a registered voter.

4. I earned a B.S. in Business Administration from Baruch College in 1988 and an M.B.A. from the University of Phoenix in 2005.

5.     I currently work as Director of Administrative Services in the Emergency Department at Mount Sinai Hospital.

6.     From 2007 until 2013, I served as a member of the East Ramapo Board of Education (the "Board").

7.     In 2015-16, I was the President of the Board of Directors of the Jamaican Civic and Cultural Association of Rockland ("JAMCCAR").  Since 2013, I also have been President of the Rockland Branch of the American Association of University Women.

### *My Son's Education in the District*

8.     I moved to Spring Valley from the Bronx in part because I wanted my child to be able to attend the excellent public schools in East Ramapo at that time.

9.     My son, Eric, attended East Ramapo public schools from 1st grade through 12th grade, and he graduated from Spring Valley High School in 2006.

10.    I thought Eric received an excellent education.  In particular, I liked how engaged principals, teachers, and school staff were in day-to-day interactions with students and their families.  Throughout Eric's education, I was in constant contact with his teachers, and I knew all of his principals.

11.    Among other attributes of East Ramapo public schools that made my son's education so valuable, his schools offered a wide variety of rigorous academic programming and sufficient faculty and staff to give meaningful attention to student needs.  As an example, when my son was in high school, his science teacher felt he should be in Advanced Placement courses.  I went to the school and discussed this opportunity with my son's guidance counselors, who agreed.  My son then enrolled and succeeded in several AP classes.  As a result, he was able to skip several introductory courses during his freshman year at Howard University.  This kind of

proactive assessment of student needs and capabilities was possible because the school had the capacity, in terms of teachers, guidance counselors, social workers, and administrators, to assess student strengths and weaknesses on a personal level and to prevent students from falling through the cracks.

### *Campaigns for School Board*

12. In 2006, I ran for a seat on the Board. I ran because I believed that as a member of the Board, I could ensure that all children in East Ramapo would continue to receive access to the same kind of quality education that my son had received from East Ramapo public schools.

13. East Ramapo is a generally segregated school system. The private schools serve white children almost exclusively. The public schools serve children of color almost exclusively.

14. In my race for a seat on the Board, black and Latino voters, whose children make up the vast majority of East Ramapo public schools, supported my candidacy. When I campaigned in black and Latino neighborhoods, many black and Latino voters told me they would vote for me. Leaders in the black and Latino communities, including various public school advocacy organizations, strongly supported me and my slate.

15. I lost the election in 2006. To the best of my knowledge, I did not receive the support of a large portion of the white community. The three candidates who ran against me and my slate were all white men. In 2006, the South East Ramapo Taxpayers Association was one of the organizations that endorsed the slate of candidates who ran against me and my slate. I am not and was not aware of how to contact that organization, and I was never offered the opportunity to compete for a position on that slate. I do not know which, if any, other organizations or leaders endorsed the candidates on the opposing slate.

16. In 2007, I ran again. I campaigned at nearly every black church in East Ramapo, and I worked hard to build strong relationships with the Latino community. In 2006, I was not yet a well-known candidate among the Latino community because I had not previously been involved in public life across the District. Nonetheless, in 2006, the black and Latino communities came together to support the pro-public school candidates, including myself. My 2006 campaign generated recognition and support for me in 2007 in the black and Latino communities. I also had the benefit of running on a slate with two incumbents, Steve Price and Mimi Calhoun, who were also supported by black and Latino voters. My slate won election in 2007.

17. In 2010, I ran for re-election. I ran on a slate with Steve Price and Antonio Luciano. Mr. Price and I, who were both incumbents at that time, ran unopposed. Mr. Luciano was opposed in his race and lost narrowly to a candidate backed by the private school community.

18. In my campaigns for the Board, I was not invited to attend candidate forums in the predominantly white, private school communities within East Ramapo, including New Square, Kaser, and Monsey. I did not campaign in those and other predominantly white areas where most children attended private schools because, as a woman of color, I did not expect to have any support there. Steve Price, who ran on a slate with me in both 2007 and 2010, told me that he was invited at times to meet with leaders in the white, private school community, but I never received a similar invitation.

19. In the three elections in which I ran for a seat on the Board, I recall only one occasion when a member of an opposing slate attended a candidate forum where I was also in attendance—in 2006, when I saw Richard Stone at a candidate forum that was primarily attended by members of the public-school community. In 2009, I heard that Mr. Stone again engaged with the public-school community in a limited way. Otherwise, I do not recall seeing or hearing of my

opponents or other members of their slates campaigning in black or Latino neighborhoods in East Ramapo or other neighborhoods where the children primarily attend public schools.

### *Non-Mandated Transportation and Private Placement Special Education*

20. I first became aware of problems with East Ramapo's ability to provide quality public education services in 2008, after I had spent a year on the Board. The District had maintained certain policies that expended substantial resources to provide services that chiefly benefitted white students in the private schools. For example, although state law requires that school districts provide some transportation for students within certain mileage limits, the District offered transportation with no mileage limits to all students. In addition, the District also provided gender-segregated busing for private school students, which is not required by state law and placed significant strain on the District's budget.

21. Parents from the private school community frequently disputed the placements of special education students in public schools, seeking to have their children placed in private schools for special education services. But rather than allow the formal process for resolving disputes about special education placements to take its course, the District and the Board took steps to acquiesce to parent demands for private placements without ensuring that those placements were compliant with applicable laws. The New York State Education Department (NYSED) repeatedly cited the District for violations of applicable laws regarding special education placements. Consistent with my recollection, a judicial decision in the matter of *East Ramapo Central School District v. King*, recounts some of these citations that occurred between 2010 and 2013. *See* No. 2185-13, 2013 WL12198825, at *2-3 (N.Y. Sup. Ct. Dec. 30, 2013). Among other consequences, the District's noncompliance with applicable law resulted in NYSED withholding reimbursement for payments that the District made for certain private placements.

22. On certain occasions, I voted against a private special education placement where a public school placement was available and recommended by the District's committee on special education. I voted against these private placements because I mostly trusted the recommendations of the committee and because I saw the toll on the District's budget that unnecessary private placements were taking.

### *Property Sales and Excessive Expenditures on Legal Representation*

23. The Board members backed by the white, private school community not only drove up the District's expenses in ways that benefited the private schools, they also used the budget process to shrink the funds available for the education of public school students, ostensibly to reduce taxes. To make up for the shortfalls or to further reduce taxes, the Board members backed by the white, private school community advocated for the sale or lease of District property.

24. The first sale of District property that I recall was a parcel of open land adjacent to a public school. Members of the public-school community, including myself, wanted the area to be kept as open space and used as a park or outdoor science classroom. That kind of educational resource used to be common in East Ramapo, which is part of the reason why I moved to the District. The Board members backed by the white, private school community wanted to use the sale of the land to lower residents' tax burden. I recall that Steve Price pointed out at a Board meeting that selling off property was not a long-term solution for the District's revenue issues—selling a single piece of land cannot result in sustained tax cuts. The land was sold anyway.

25. In 2008, the Board hired a new superintendent, Dr. Ira Oustatcher. Dr. Oustatcher was amenable to the Board's plan to close schools and sell District property. In late 2008, Dr. Oustatcher recommended at least one school closure and raised the possibility of a second school closure, based on projections of declining enrollment and changing demographics. I have

reviewed the minutes of the December 3, 2008 Board meeting, which I attended and in which this matter was discussed and they accurately reflect my recollection. The minutes of the December 3, 2008 Board meeting are publicly available on the District's web site at http://www.ercsd.org/pages/East_Ramapo_CSD/Board_of_Education/Minute_Archive.

26. Numerous members of the public school community—including principals, teachers, students, and parents—opposed the recommendation to close schools and spoke publicly about their objections at several Board meetings. Members of the private school community spoke in favor of closing multiple schools in order to keep taxes as low as possible.

27. In 2009, after a study projecting school enrollment that assessed the impact of school closure on the District, the superintendent at the time, Dr. Oustatcher, recommended that the District close Colton Elementary School based on projections of declining student enrollment. At an April 1, 2009 Board meeting, I voted against the closure of the Colton Elementary School. I did so because, among other reasons, I doubted the accuracy of the student enrollment projections. My vote is recorded in the minutes of the April 1, 2009 Board meeting, which are publicly available on the District's web site at http://www.ercsd.org/pages/East_Ramapo_CSD/Board_of_Education/Minute_Archive.

28. To enable the sale of District property to reduce taxes, the Board retained the Long Island-based law firm of Minerva & D'Agostino, known for having represented a school district on Long Island that closed a public school and sold it to a private school.

29. Mr. D'Agostino's firm replaced the District's longtime counsel, a local lawyer who had competently represented the District for years. To the best of my recollection, Mr. D'Agostino's firm billed the District at a rate that was approximately double the rate at which our longtime counsel had billed the District. At a November 18, 2009 Board meeting, I voted against

the motion to appoint Minerva & D'Agostino as attorneys for the District, as did Mimi Calhoun and Steve Price, the other Board members backed by the public school community. All of the Board members backed by the private school community voted in favor of retaining Minerva & D'Agostino. The minutes of the November 18, 2009 Board meeting are publicly available on the District's web site at http://www.ercsd.org/pages/East_Ramapo_CSD/Board_of_Education/Minute_Archive.

30. In addition, because Mr. D'Agostino and other lawyers from his firm were based in Long Island and billed the district an hourly rate for travel time, the District was billed for substantial travel expenses, which further diminished the District's dwindling financial reserves.

31. Mr. D'Agostino and other lawyers at his firm also contributed to an environment on the Board and at Board meetings that was hostile to people who were critical of the Board and its lawyers. For example, at one Board meeting that I attended in December 2009, when a member of the public school community spoke critically of Mr. D'Agostino's conduct and the Board's decision to hire Mr. D'Agostino at a rate higher than that charged by local attorneys, D'Agostino actually got up from the dais and confronted the speaker, jabbing a finger in his face. My recollection of this incident is consistent with video footage that is available at the following link: https://www.youtube.com/watch?v=XRZFko12dEA.

32. In April 2010, the Board unexpectedly proposed a resolution to declare Hillcrest Elementary School "surplus property," to close the school, and have it appraised for sale or lease. Mr. D'Agostino had drafted the resolution without my knowledge. The majority on the Board backed by the private school community passed the resolution without any further information, discussion, or consideration. This worried me and other Board members supported by the public school community because we did not have information on how this closure would affect the

8

District and its students. I voted against the resolution. I have reviewed the minutes of the April 19, 2010 Board meeting, and they are consistent with my collection. The minutes of the April 19, 2010 meeting are publicly available on the District's web site at http://www.ercsd.org/pages/East_Ramapo_CSD/Board_of_Education/Minute_Archive.

33. In a July 28, 2010 meeting, the Board voted on motions to sell Hillcrest Elementary School and to authorize the sale of Colton Elementary School. I voted against both motions. I had heard people from the public school community speak at numerous Board meetings against closing and selling schools. I objected to the sales because I believed that selling District property was not a sustainable way to address the budget problems caused by the Board's financial mismanagement and because I continued to doubt the accuracy of projections of declining public school enrollment. My doubts about the accuracy of declining public school enrollment have been proved right, and East Ramapo is now experiencing overcrowding in public elementary schools. I have reviewed the minutes of the July 28, 2010 Board meeting, which are publicly available on the District's web site at http://www.ercsd.org/pages/East_Ramapo_CSD/Board_of_Education/Minute_Archive, and they are consistent with my recollection.

34. At a May 25, 2011 Board meeting, I voted against the sale of the Colton Elementary School. My vote is recorded in the minutes of the May 25, 2011 Board meeting, which are publicly available on the District's web site at http://www.ercsd.org/pages/East_Ramapo_CSD/Board_of_Education/Minute_Archive.

35. Although the Board voted to sell Hillcrest Elementary School, that sale was annulled by the State Education Commissioner because the Board attempted to sell the school building below market value to a group seeking to use the building as a private school. It is my

understanding that one of the appraisers used by the Board pled guilty to a fraud-related crime in connection with that sale.

### *Cuts to Public School Personnel, Programming, and Infrastructure Maintenance*

36. Beginning in 2009, the District laid off hundreds of teachers, administrators, and support staff. The District laid off all social workers, deans, department chairpersons, and all assistant principals in elementary schools. The District also laid off several guidance counselors and some assistant principals in the high schools. The District also reduced administrative staff, leaving just one secretary in each school, instead of a robust front-office staff capable of responding promptly to the needs of faculty, administration, staff, parents, and students.

37. As a result of the personnel cuts, there were also major programmatic cuts. Kindergarten was reduced from full-day to half-day, which meant that kindergarteners received less than three hours a day of school. High school electives of the kind that had made my son's educational experience so valuable were dramatically cut. There were major cuts to art, music, and extra-curricular activities. The Board members backed by the private school community consistently pushed to shrink the budget further and further, regardless of the toll on public schools.

38. As a result of the budget cuts, the school buildings also fell into disrepair, and supply budgets for the schools were slashed. I remember seeing and hearing about leaky roofs at schools and mold in the buildings.

### *Declining Transparency and Responsiveness*

39. Beginning around 2009, complaints from parents and advocates within the public school community about the Board's stewardship of the public schools and its budget markedly increased. Members of the public school community would often voice these concerns during the public comment period of Board meetings.

40. In 2010, the Board implemented policies that made it increasingly difficult for members of the public—including students, parents, and community members—to voice their concerns about the District and its schools to the Board. When I first joined the Board, the public comment period occurred early in Board meetings. However, in 2010, the Board voted to move public comment to the end of the meeting, calling public comments disruptive. Steve Price and I objected to this change. I thought it was particularly illogical to move comments to the end of the meeting because if the public wanted to comment on a matter that was up for a vote, the vote would take place before the public had a chance to comment on it.

41. After moving the public comment period to the end of meetings, the Board members took measures to prolong meetings in a way that made the public comment period prohibitively late for most members of the public. The Board would frequently go into private, executive sessions and remain in executive session for long periods of time, often discussing matters that I thought were more properly addressed in public or engaging in discussion that I felt was intended only to prolong the duration of the executive session.

42. During my last year on the Board, I was frustrated by the rapid decline in the quality of the public schools, and the Board's increasing lack of civility towards me, Steve Price, and the public. For example, when the Board was looking for a new superintendent, Daniel Schwartz, the President of the Board at the time, publicly berated me for my vote for Pedro Santana, the candidate strongly supported by the public school community, including ad hominem attacks on my integrity. The following link contains video footage that is consistent with my recollection: https://www.youtube.com/watch?v=gT3WufMRYUg. In the past, I had also seen Mr. Schwartz admonish Steve Price in an insulting and profane way.

11

43. Mr. Schwartz also regularly accused Steve Price and me of "leaking" information discussed in the Board's executive sessions. At one point, I noticed that the packets of information that I received in advance of Board meetings were getting slimmer and included less material than required for participation in executive sessions. Eventually, Mr. Schwartz told Steve Price and me that he refused to send certain information related to Board business in our packets for meetings because he claimed that we would "leak" it. He told us that we could only view the information in-person at the District's offices. Mr. Schwartz never circulated a memo or other written policy document that would have applied these restrictions on access to information to other Board members. I do not know if Mr. Schwartz ever placed similar restrictions on other Board members.

44. For most of my last year on the Board, Steve Price and I were the only members of the Board backed by the public-school community. As the only woman and person of color on the Board at that time, I found it difficult to make my voice heard, but having a second Board member backed by the largely black and Latino public school communities facilitated my ability to speak out on issues of concern. It was invaluable to have an ally on the Board, who could corroborate my experiences and observe the other Board members' mismanagement of the District firsthand. With Mr. Price on the Board, I was in a stronger position to advocate on behalf of the District's public-school community, in particular the District's black and Latino students, parents, and residents. Having a second representative from the public school community on the Board made me a substantially more effective Board member. If the Board had contained more members representing the interests of the public-school community, I believe I would have been an even more effective advocate for those interests because the presence of more allies would have created more space and support for our positions and ideas.

45. The hostility of the Board members backed by the white, private school community to the concerns of the public school community and their lack of civility towards me, Mr. Price, and the students, parents, and advocates for the public school community made it difficult for me to remain on the Board. I was willing to stay on the Board just to bear witness to the Board's mismanagement of the District, but I felt as though I was just trying to stop budget cuts instead of building the programs that once made the District well-regarded. Ultimately, however, the environment became too toxic, and in 2013, Mr. Price told me he was going to resign. I also resigned because I could not bear to stay on the Board as the only woman, person of color, and member of the public school community without any allies. In 2013, I resigned from the Board, during the last year of my term.

46. Before I served on the Board, I used to attend Board meetings regularly. Now, due to the Board's hostility and non-responsiveness to public-school community concerns, I no longer call, write, visit with, or otherwise contact Board members. I expect such contacts would be futile.

### *Experience as an East Ramapo Voter*

47. For the last 10 years, I have voted in every Board election. None of the candidates I have voted for have won a contested election for a seat on the Board since my slate won in 2007.

48. Since 2008, the only public school candidates who won their elections are Steve Price and myself in 2010; JoAnn Thompson in 2011, and Sabrina Charles-Pierre in 2016. In all of these races, the public school candidates ran as unopposed incumbents.

49. Except for Ms. Charles-Pierre, I do not recall any current Board members campaigning in my neighborhood.

50. As the President of the Board of JAMCCAR, I was involved in encouraging candidates to run for the Board. Among other activities, JAMCCAR works to educate voters about

candidates for the Board, and to allow the community to question candidates about their educational concerns. JAMCCAR regularly holds candidate forums together with the Spring Valley Branch of the NAACP, to which we invite every candidate who has filed a nominating petition, including candidates backed by the white, private school community. I have also attended community candidate forums hosted by Power of Ten, a local public school advocacy group and web-based publication.

51. In 2016, I attended a candidate forum in which I saw Pierre Germain as well as candidates on the slate backed by organizations and leaders within the largely minority, public school community. Mr. Germain was the only candidate from the slate backed by the private school community to attend this forum and he left this forum early. In 2006 and 2009, I also recall a Board member named Richard Stone, whose children had attended public school for some time before moving over to private schools, campaigning in minority neighborhoods or attending candidate forums held by organizations in the minority communities. These are the only instances I recall of a Board candidate backed by the white, private school community conducting campaign activities within the minority, public school community. With the exceptions of Ms. Charles-Pierre and this one brief appearance by Mr. Germain, I am not aware of any current Board member participating in campaign activities in the District's minority areas.

52. Candidates emerging from the public school community routinely have had campaign web pages. On some occasions, candidates or slates have published their own web sites. On other occasions, Power of Ten, a local web-based publication addressing public education issues, has published a web page promoting the candidates backed by the public school community. To the best of my knowledge, I do not recall any current Board members other than

Sabrina Charles-Pierre featured on their own campaign web pages or web pages hosted by community organizations or leaders.

53. Although there are currently three black members of the Board, I only voted for Ms. Charles-Pierre. I did not vote for Mr. Charles or Mr. Germain. I do not know of any black or Latino voters who voted for Mr. Charles or Mr. Germain. I do not recall Mr. Charles campaigning in minority neighborhoods or making any effort to appeal to black and Latino voters. Although I did see Mr. Germain at the candidate forum described above, I am not otherwise aware of him campaigning in any other minority neighborhood or publishing campaign materials widely.

54. If a ward system with majority-minority districts were used for Board elections, I would encourage candidates preferred by the minority community to run for seats on the Board because I expect that they would have a real chance to win those elections and to serve with allies from the public school community on the Board. I also expect that a ward system with majority-minority districts would encourage more members of the minority community to vote and to increase their participation in District affairs.

I declare under penalty of perjury that the foregoing is true and correct.

Dated:   Spring Valley, New York
         December 6, 2017

_____
Suzanne Young-Mercer