**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

---

NATIONAL ASSOCIATION FOR THE
ADVANCEMENT OF COLORED PEOPLE,
SPRING VALLEY BRANCH; JULIO
CLERVEAUX; CHEVON DOS REIS; ERIC
GOODWIN; JOSE VITELIO GREGORIO;
DOROTHY MILLER; HILLARY MOREAU;
and WASHINGTON SANCHEZ,

               Plaintiffs,

     v.

EAST RAMAPO CENTRAL SCHOOL
DISTRICT and MARYELLEN ELIA, IN
HER CAPACITY AS THE
COMMISSIONER OF EDUCATION OF
THE STATE OF NEW YORK,

               Defendants.

---

17 Civ. 8943 (CS) (JCM)

**MEMORANDUM OF LAW IN SUPPORT OF PLAINTIFFS'**
**MOTION FOR A PRELIMINARY INJUNCTION**

# Table of Contents

| Contents | Page |
|---|---|

I.     Preliminary Statement ...............................................................1

II.     Background ...........................................................................2

     A.     The District's Demographics ............................................2

     B.     Procedures for District Elections ......................................3

     C.     Voting Behaviors for Board Elections ...............................3

         1.     Racial Polarization and Bloc Voting in Board Elections ............................3

         2.     Candidate Slating Processes Exacerbate Racially Polarized Voting ...........5

     D.     The Board is Unresponsive to the Needs of Minorities in the District ...................7

         1.     The Board Enacted Policies Detrimental to the Minority Community ...............7

         2.     The Board Refused to Listen to the Minority Community ........................10

     E.     Discrimination in the Board's Political Process ....................................12

III.     Argument .............................................................................13

     A.     Preliminary Injunctions Are Appropriate in Section 2 Cases ...............13

     B.     Plaintiffs Are Likely To Succeed On Their Claim ...............................13

         1.     Legal Standards in Section 2 Claims .......................................13

         2.     The *Gingles* Preconditions Have Been Satisfied ......................................15

             a.     The Population of Black and Latino Voters Is Sufficiently Numerous and Geographically Compact to Constitute Several Majority-Minority Districts ...............................15

             b.     The Minority Community Is Politically Cohesive .........................16

             c.     The Minority Community's Preferred Candidates Are Usually Defeated by White Bloc Voting .......................................17

3. Under the Totality of Circumstances, the At-Large Election Scheme in the District Violates Section 2...................................................18

    a. Factor 1: Official History of Discrimination in Voting ................18

    b. Factor 2: The Extent of Racially-Polarized Voting .......................19

    c. Factor 3: Discrimination Enhancing Practices.............................20

    d. Factor 4: Access to Candidate Slating Processes..........................21

    e. Factors 5 and 8: Ongoing Effects of Discrimination and the Board's Lack of Responsiveness to Minority Needs....................22

    f. Factor 7: Extent to Which Minority-Preferred Candidates Have Been Elected .......................................................................23

C. Absent An Injunction, Plaintiffs and Other Minority Voters in the District Will Suffer Irreparable Harm..................................................................25

D. The Public Interest Strongly Favors Granting a Preliminary Injunction ..............25

IV. Conclusion .....................................................................................................25

<u>**TABLE OF AUTHORITIES**</u>

**Page(s)**

**CASES**

*Arbor Hill Concerned Citizens Neighborhood Ass'n v. Cty. of Albany*,
    2003 WL 21524820 (N.D.N.Y. 2003) ....................................................................25

*Bartlett v. Strickland*,
    556 U.S. 1 (2009)..................................................................................................15

*Bone Shirt v. Hazeltine*,
    461 F.3d 1011 (8th Cir. 2006) ..............................................................................16

*Bridgeport Coal. for Fair Representation v. City of Bridgeport*,
    26 F.3d 271 (2d Cir. 1994), *rev'd on other grounds*, 512 U.S. 1283 (1994)....................13, 16

*Buckanaga v. Sisseton Indep. Sch. Dist.*,
    804 F.2d 469 (8th Cir. 1986) ................................................................................20

*Campaign for Fiscal Equity, Inc. v. State*,
    100 N.Y.2d 893 (2003) .........................................................................................22

*Coleman v. Bd. of Educ. of Mount Vernon*,
    990 F. Supp. 221 (S.D.N.Y. 1997).........................................................................25

*Matter of East Ramapo Cent. Sch. Dist. v. King*,
    2013 WL 12198825 (N.Y. Sup. Ct. Dec. 30, 2013) ................................................9

*Friends of the E. Hampton Airport, Inc. v. Town of E. Hampton*,
    841 F.3d 133 (2d Cir. 2016).................................................................................13

*Goosby v. Town of Hempstead*,
    180 F.3d 476 (2d Cir. 1999).............................................................................21, 22

*Goosby v. Town of Hempstead*,
    956 F. Supp. 326 (E.D.N.Y. 1997) .....................................................................19, 24

*Jenkins v. Red Clay Consol. Sch. Dist. Bd. of Educ.*,
    4 F.3d 1103 (3d Cir. 1993)...................................................................................17

*Missouri State Conference of the NAACP v. Ferguson-Florissant Sch. Dist.*,
    201 F. Supp. 3d 1006 (E.D. Mo. 2016)..............................................................17, 18

*Montes v. City of Yakima*,
    40 F. Supp. 3d 1377 (E.D. Wash. 2014) ...............................................................20

iii

*NAACP v. City of Niagara Falls*,
   65 F.3d 1002 (2d Cir. 1995) .................................................................... 15

*Pope v. Cty. of Albany*,
   2011 WL 3651114, at *2 (N.D.N.Y. Aug. 18, 2011) .............................. 13

*Pope v. Cty. of Albany*,
   687 F.3d 565, 582 (2d Cir. 2012) ............................................................ 17

*Pope v. Cty. of Albany*,
   2014 WL 316703 (N.D.N.Y. Jan. 28, 2014) ....................................... 16, 17

*Pope v. Cty. of Albany*,
   94 F. Supp. 3d 302 (N.D.N.Y. 2015) ....................................................... 19

*Reed v. Town of Babylon*,
   914 F. Supp. 843 (E.D.N.Y. 1996) .......................................................... 18

*Reynolds v. Sims*,
   377 U.S. 533 (1964) ................................................................................. 25

*Rogers v. Lodge*,
   458 U.S. 613 (1982) ................................................................................. 20

*Sch. Dist. of Abington v. Schempp*,
   374 U.S. 203 (1963) ................................................................................. 22

*Teague v. Attala Cty.*,
   92 F.3d 283 (5th Cir. 1996) ..................................................................... 22

*Thornburg v. Gingles*,
   478 U.S. 30 (1986) ........................................................................... *passim*

*United States v. Charleston Cty.*,
   316 F. Supp. 2d 268 (D.S.C. 2003) ......................................................... 24

*United States v. Vill. of Port Chester*,
   2008 WL 190502 (S.D.N.Y. Jan. 17, 2008) ............................................ 20

*United States v. Vill. of Port Chester*,
   704 F. Supp. 2d 411 (S.D.N.Y. 2010) ..................................................... 14

*Uno v. City of Holyoke*,
   72 F.3d 973 (1st Cir. 1995) ...................................................................... 19

*Westwego Citizens for Better Gov't v. City of Westwego*,
   946 F.2d 1109 (5th Cir. 1991) ................................................................. 21

## STATUTES

52 U.S.C. § 10301(a) ...............................................................................1, 13

N.Y. Educ. Law § 2017(1)..........................................................................3

N.Y. Educ. Law § 2022(1)........................................................................3, 4

## OTHER AUTHORITIES

*East Ramapo Board's Wieder Faces Election Charge, Accused of Blocking Poll Entrance*, The Journal News, May 20, 2011 ..........................................................19

Henry M. Greenberg, "*East Ramapo: A School District in Crisis*"...................................... *passim*

Kimberly Redmond, *Bill Passed to Restore 2-Year Term of East Ramapo Trustee*, The Journal News, Jan. 18, 2017 ...............................................9

Kimberly Redmond, *Cuomo Restores Term of E. Ramapo School Board Member*, The Journal News, Feb.1, 2017 ...............................................9

Mareesa Nicosia, *East Ramapo sells Hillcrest*, The Journal News, Nov. 25, 2014 .......................8

Michael Powell, *A School Board That Overlooks Its Obligations to Students*, N.Y. Times (Apr. 7, 2014)...............................................11

Rev. Weldon McWilliams IV, et al., *East Ramapo Metal Detectors Perpetuate Stereotypes: Letter*, The Journal News, Mar. 21, 2017 ...........................................10

S. Rep. No. 417 (1982) ...............................................................................15

Walcott et al., "*Opportunity Deferred*"..........................................................5, 12, 13, 23

Plaintiffs submit the following memorandum of law in support of their motion to enjoin Defendants from holding Board elections under an at-large system until its voting system no longer violates Section 2 of the Voting Rights Act, 52 U.S.C. § 10301(a) ("Section 2").[1]

## I.     PRELIMINARY STATEMENT

This case is a textbook example of a vote dilution claim under Section 2 in a jurisdiction using an at-large method of election with persistent racially-polarized voting.  The East Ramapo school system, its Board politics, and campaigns are racially segregated.  The Black and Latino communities vote together to support candidates who favor investment in the public schools, while a large White bloc votes for candidates who favor public spending on private schools.  Although the public school student population is 90% Black and Latino, only one out of nine Board members has ever run for election as the candidate of choice of Black and Latino voters.

This racial polarization in schooling and politics has led to a Board that has been unresponsive to the needs of the District's minority voters and their children who attend public schools.  For many years, East Ramapo was a racially diverse and well-regarded school district.  But beginning in 2009, after years of increasing racial polarization, the Board began closing public schools and making deep budget cuts that laid off hundreds of teachers; reduced or eliminated art, music, and extracurriculars; and caused school buildings to fall into disrepair.  At the same time, the Board made no meaningful cuts to public funding for private schools.  When students, parents, and advocates within the minority, public school community spoke out, the Board responded by conducting business in private, limiting opportunities for public comment, berating speakers, and

---

[1] Terms not defined herein have the same definitions as in the Complaint, a copy of which is attached as Ex. 1 to the Decl. of Claudia T. Salomon ("Salomon").  *See* Appendix A for a list of defined terms and abbreviations.  All internal citations and quotations are omitted unless otherwise noted.

ignoring the public. The situation became so dire that the State appointed Monitors to assess the damage and make recommendations. In December 2015, the Monitors concluded that the Board had failed to act in the best interests of public school students.

Because Whites are a majority of District voters, no minority-preferred candidate has won a contested election in ten years. Eight of nine current Board members were elected as White-preferred candidates who defeated minority-preferred candidates. The only Board member to run as a minority-preferred candidate was appointed under pressure from the Monitors.

The totality of the circumstances makes clear that the District's Black and Latino voters have less opportunity than White voters to elect their candidates of choice under the at-large system. Absent a preliminary injunction requiring Defendants to comply with the VRA, Black and Latino voters will continue to be irreparably harmed and denied a voice in the education of their children. The public interest favors preventing further dilution of minority voting strength in East Ramapo by enjoining the May 2018 election until a ward system can be implemented.

## II.     BACKGROUND

### A.     The District's Demographics

East Ramapo has a population of approximately 113,000. *See* Report of William S. Cooper ("Cooper") ¶ 13. East Ramapo's total population is 65.7% White, 19.1% Black, 10.7% Latino, and 3.3% Asian. *Id.* ¶ 21. The District's citizen voting age population ("CVAP") is 60.5% White, 24.1% Black, 9.4% Latino, and 4.5% Asian. *Id.* Together, Black and Latino voters constitute 33.5% of the CVAP in the District. *See id.*

According to Plaintiffs' expert demographer, William S. Cooper, "there is a high degree of residential segregation in the District." *Id.* ¶ 33. The minority population is concentrated in a central geographic area where Blacks and Latinos live "side-by-side in the same neighborhoods." *Id*. ¶¶ 28, 32. The White population is concentrated in areas that surround the minority

neighborhoods.  *Id.*  In minority neighborhoods, the minority population averages over 80%, while in the White neighborhoods, the minority population averages under 20%.  *Id.* ¶¶ 28-29.

East Ramapo schools are also segregated.  Students attending the District's public schools are 90% Black or Latino and 96% non-White overall, while approximately 99% of students attending private schools affiliated with East Ramapo are White.  *Id.* ¶¶ 39-40; Report of Dr. Steven Cole ("Cole") ¶¶ 7, 36, n.36.

### B.  Procedures for District Elections

State law gives the District responsibility for running its own elections.  N.Y. Educ. Law § 2017(1).  The Board is comprised of nine members elected in staggered cycles of three members at a time for terms of three years.  *See* District Policies ("Policies"), § 2120 (Board Member Elections), Salomon Ex. 2.  Although members are elected according to numbered posts, that is, each candidate runs for one particular seat, each seat is elected at-large.  *See* Policies, § 2120.1 (Candidates and Campaigning); Salomon Ex. 3.  There is no requirement that candidates reside in any particular area of the District.  *See* Policies, § 2121 (Board Member Qualifications), Salomon Ex. 4.  Pursuant to state law, elections take place on the third Tuesday of May and are not held with other local, state, or federal elections.  N.Y. Educ. Law § 2022(1).

### C.  Voting Behaviors for Board Elections

#### 1.  <u>Racial Polarization and Bloc Voting in Board Elections</u>

East Ramapo's Black and Latino voters on one hand and White voters on the other hand demonstrate sharply polarized voting behaviors.  Plaintiffs' expert in the analysis of racial bloc voting, Dr. Steven P. Cole, used three separate, well-accepted quantitative methods to measure each group's voting preferences in the past 12 contested Board races.  Cole ¶¶ 22-29.  Dr. Cole found strong evidence of racially polarized voting, that is, very large majorities of Black and Latino voters prefer the same candidates, and those candidates are consistently defeated by candidates

receiving the support of a very large majority of White voters. *Id.* ¶ 5.

The District's Black and Latino voters exhibit strong political cohesion both within each group and across the two groups, i.e., very large majorities of Black and Latino voters in the District vote for the same candidates. *Id.* ¶¶ 4-5. Using King's Ecological Inference ("EI"), a methodology that estimates the percentage of votes from each racial group that each candidate receives, Dr. Cole found that in all nine Board contests between 2015 and 2017, at least 60% of Black and Latino voters voted for the same candidate. *Id.*, Table 2. Black and Latino political cohesion is also increasing. In five out of the six most recent contests, over 90% of Black and Latino voters voted for the same candidate. *Id.* For the nine most recent contests, Dr. Cole's EI analysis and his other methods of analysis were consistent on this point. *Id.*, Table 3.

A cohesive White voting bloc also invariably defeats the preferred candidates of Black and Latino voters. In all 12 contests between 2013 and 2017, Dr. Cole's EI analysis found that at least 68% of White voters supported the same candidates. *Id.*, Table 2. White political cohesion also appears to be increasing. In the six most recent contests, 77% and more of White voters supported the same candidates. *Id.* In every one of the nine most recent contests, all three methods of analysis showed that the White-preferred candidate defeated the minority-preferred candidate. *Id.*, Tables 2, 3. Dr. Cole concluded that the six most recent contests in particular demonstrate "an extreme degree of racial polarization." *Id.* ¶ 5.

Dr. Cole's analysis also shows that of the nine current Board members, only Sabrina Charles-Pierre ran as a minority-preferred candidate—a 2015 contest in which she received 64% of Latino voters and 75% of Black votes, but lost to a White candidate who received 75% of the White vote. *Id.* ¶ 50. After a Board member resigned in 2015, Ms. Charles-Pierre was appointed to the vacancy under the scrutiny of state monitors. *Id.* ¶ 9; *See* Walcott et al., "*Opportunity*

*Deferred*" (hereinafter "Walcott"), attached as Ex. 6 to the Decl. of Willie Trotman ("Trotman"), at 10. Ms. Charles-Pierre ran unopposed to finish the duration of the term. *Id.* ¶ 42.

Contemporaneous news reports and witness testimony showing that minority-preferred candidates have not won a contested election in ten years due in part to segregated slating processes buttress Dr. Cole's analysis. *See e.g.*, Decl. of Dorothy Miller ("Miller") ¶ 9; Decl. of Suzanne Young-Mercer ("Young-Mercer") ¶ 47; Decl. of Jean Fields ("Fields") ¶ 43. In 2014, a slate of candidates from the White, private school community ran uncontested. According to one report, "[a]fter years of not winning a single race, the public school crowd failed to recruit anybody to run." Cole ¶ 58. In 2013, a slate of candidates endorsed by the South East Ramapo Taxpayers' Association ("SERTA"), a group that "campaigns for lower school taxes" and whose leaders support private schools, won election. *Id.* ¶ 65. After the election, Peggy Hatton, a public school advocate, wrote a letter to the editor of the *Rockland County Times* noting that the winning candidates barely campaigned and skipped important events with minority groups in favor of events in the private school community. *Id.* Board President Yehuda Weissmandl replied with his own letter to the editor, writing: "[i]n what has now become a yearly dance, Hatton and [other public school activists] search for and promote a slate of candidates for available seats on the East Ramapo School Board, and then Hatton and her "activist" friends campaign for her candidates on a promise of change and of a renewed commitment to the educational well-being of the school system. Her candidates routinely lose." *Id.*

### 2. Candidate Slating Processes Exacerbate Racially Polarized Voting

The closed process of slating candidates in the White, private school community stands in stark contrast to the open process in the largely minority, public school community. Organizations in the public school community publish an open call for candidates, who are invited to fill out a questionnaire and attend a public forum to discuss their qualifications and vision for District

schools.  *See, e.g.* Decl. of Chevon Dos Reis ("Dos Reis") ¶ 19; Decl. of Eric Goodwin ("Goodwin") ¶ 18; Decl. of Alexandra Manigo ("Manigo") ¶ 16.  After candidacies are formalized, organizations like the NAACP and the Jamaican-American Cultural and Civic Association of Rockland ("JAMCCAR") invite all candidates who have filed petitions to candidate forums.  *Id*.

The candidate slating process of the White, private school community is a black box.  For example, one key organization is SERTA, whose leader, Kalman Weber, wrote in a letter to *The Journal News*: "As the head of South East Ramapo Taxpayers Association, I can tell you we bring out the bloc vote[.]"  Cole ¶ 64.  Unlike organizations in the minority, public school community, SERTA is an opaque organization by design, according to Mr. Weber, who has said that SERTA is "intentionally not registered anywhere. . . .  We don't want any people checking up on us."  *Id.*

This difference in transparency is reflected in the way in which White-preferred and minority-preferred candidates campaign for office.  For example, in 2017, Plaintiffs Dos Reis and Goodwin, along with Alexandra Manigo, ran on the public school slate and created a campaign web page, flyers, yard signs, and t-shirts.  Goodwin ¶ 19; Dos Reis ¶ 20; Manigo ¶ 18.  They attended the NAACP/JAMCCAR candidate forum.  *Id.*  They held a Get-Out-the-Vote rally, which they advertised in both Spanish and English.  *Id.*  Black and Latino people volunteered for, donated to, and supported their campaign.  But Goodwin, Manigo, and Dos Reis were not aware of the organizations and leaders within the white-preferred community who slated or endorsed candidates, let alone offered an opportunity to seek those endorsements.  Goodwin ¶¶ 19-25; Dos Reis ¶¶ 21-25; Manigo ¶¶ 19-23.  Instead, one leader from the White community, a former Board president, told Goodwin not to "waste [his] time" campaigning in predominantly White neighborhoods.  Goodwin ¶ 21.

At the same time, candidates from the White community do not campaign in the minority

community. Appearances by white-preferred candidates at forums or other events in minority neighborhoods have been exceptionally rare since 2007. Dos Reis ¶ 10; Goodwin ¶ 8; Fields ¶ 37; Manigo ¶ 18; Young-Mercer ¶ 18; Decl. of Stephen Price ("Price") ¶ 12. Those candidates generally do not canvass in minority neighborhoods, make campaign literature widely available, or otherwise make efforts to appeal to minority voters. Dos Reis ¶¶ 24, 25; Goodwin ¶¶ 24, 25; Manigo ¶ 22. And yet they dominate elections year after year, without support from minority voters. Cole ¶¶ 5, 65.

### D. The Board is Unresponsive to the Needs of Minorities in the District

Elected without having to appeal to minority voters, the Board has consistently enacted policies at odds with the needs of the minority, public school community and stifled their efforts to communicate their concerns.

### 1. The Board Enacted Policies Detrimental to the Minority Community

The Board's neglect of an overwhelmingly minority public school population is extensively documented. *See generally* Walcott; Henry M. Greenberg, "*East Ramapo: A School District in Crisis*" (hereinafter "Greenberg"); attached as Ex. 1 to the Decl. of Oscar Cohen ("Cohen"). In the five years prior to the State's intervention in East Ramapo in 2014, the Board made extraordinary cuts to the public school budget, eliminating nearly 450 positions, including over 200 teaching positions, all social workers, elementary school assistant principals, deans, and department chairpersons, among others. Greenberg at 30, 34. Full-day kindergarten programs were cut to half-day, and English as a Second Language programs were cut in spite of an influx of non-English speakers in the public schools. *Id.* at 30. Summer school, many high school electives, funding for field trips and more than 50% of athletic and extra-curricular programs in the public schools were slashed. *Id.* Cuts also were made to core administrative services including maintenance and custodial services, transportation, and security. Fields ¶ 21. The Board also

voted to close and sell two public elementary schools—Colton and Hillcrest—over the strong objections of the public school community. Decl. of Margaret "Peggy" Hatton ("Hatton") ¶ 25. The State Education Commissioner annulled the sale of Hillcrest after a challenge by parents, and an appraiser later pled guilty to a fraud-related misdemeanor. Mareesa Nicosia, *East Ramapo sells Hillcrest*, The Journal News, Nov. 25, 2014, Salomon Ex. 5.

The cuts had significant negative consequences for public school students. Students were unable to fill their schedules, which sometimes contained multiple lunch period and study halls. Decl. of Olivia Castor ("Castor") ¶ 19, Ex. 2; Fields ¶ 15. The loss of teachers and advanced classes coincided with a decline in college competitiveness. Fields ¶¶ 15, 20. School supply shortages were routine. Fields ¶ 22. School equipment and books were outdated. Castor ¶ 18. Classes became overcrowded. Castor ¶ 11, Ex. 1. School buildings were poorly maintained. Castor ¶ 16, Ex. 1. Students became discouraged, and morale fell. Castor ¶ 23; Fields ¶ 22.

As a result, student outcomes have declined and remain relatively poor. *See* Report of Amy Stuart Wells ("Wells"), ¶ 8, 65-114. The percentage of District students earning the diplomas necessary to become competitive applicants for top colleges has been cut in half since 2009. *Id.* ¶ 114. The percentage of District students matriculating to four-year colleges declined substantially. *Id.* Performance remains poor at lower grade levels too, indicating that the District may be producing fewer graduates ready to become active civic participants in the future. *Id.* ¶ 113.

At the same time, the Monitor observed that while "public school budgets were slashed, spending on programs benefitting private schools increased" with "[n]o meaningful effort made to distribute [the] pain of deep budget cuts fairly among private and public schools." Greenberg at 33. As the public schools laid off teachers, cut programming, and let buildings fall into disrepair, the Board approved large-scale increases in the amount of money the District spent on private

school students, primarily in the form of funding for transportation and special education. *Id.* at 11-13. Although some increases were due to the growing number of private school students, some were also due to the Board's failure to reduce premium transportation services or to impose discipline on its serially non-complaint special education practices. *Id.* at 17-19.

The Board's decision to continue funding universal, gender segregated busing to over 140 private schools exacerbated increasing transportation costs. *Id.* at 19. The Board's practice of placing and subsidizing student attendance in private school without ensuring those placements were compliant with applicable laws exacerbated increasing special education costs. *Id.* at 17-19. NYSED found that the District's practices "evidenced a 'clear intent and pattern to circumvent,'" federal laws governing special education, and refused to reimburse the District for certain private-school placements. *See Matter of East Ramapo Cent. Sch. Dist. v. King*, 2013 WL 12198825, at *2-3 (N.Y. Sup. Ct. Dec. 30, 2013); Price ¶¶ 17-19. Thus, even though the District's special education costs were rising, reimbursement rates for those costs remained well-below state average reimbursement rates. Greenberg at 19. The District's challenge to NYSED's enforcement action was dismissed. *King*, 2013 WL 12198825, at *5.

The Board's non-responsiveness to minority concerns has continued since the arrival of the Monitors. For one example, after Charles-Pierre was elected to continue the remainder of the term she was initially appointed to fill, the Board failed to administer the oath of office in a timely fashion and then voted to cut her term in half. Kimberly Redmond, *Bill Passed to Restore 2-Year Term of East Ramapo Trustee*, The Journal News, Jan. 18, 2017, Salomon Ex. 6. An act of the State legislature, signed by the Governor, restored the full duration of Charles-Pierre's tenure. Kimberly Redmond, *Cuomo Restores Term of E. Ramapo School Board Member*, The Journal News, Feb. 1, 2017, Salomon Ex. 7. Second, in July 2016, when a vacancy on the Board

opened due to a resignation, the Board did not appear to consider anyone from the minority, public school community, including Jean Fields, a Black woman and former principal who expressed an interest for the position, and instead appointed Joe Chajmovicz, a White man with children in private schools and no education experience.  Fields ¶ 40; Trotman ¶ 22.  Third, in February 2017, the Board made East Ramapo the only district in Rockland to permit the use of metal detectors in public schools, which drew objections from Rockland Clergy for Social Justice, who wrote that the policy "perpetuates stereotypes and further marginalizes our students."  Rev. Weldon McWilliams IV, et al., *East Ramapo Metal Detectors Perpetuate Stereotypes: Letter*, The Journal News, Mar. 21, 2017, Salomon Ex. 8.

## 2.      The Board Refused to Listen to the Minority Community

As the Board enacted policies that damaged the District's public schools, the Board also resisted efforts by minority residents to communicate their concerns to the Board.  After receiving a spate of criticism over public school budget cuts and its decision to close and sell schools, the Board voted to move public comment to the end of meetings.  Hatton ¶ 19; Trotman ¶ 11.  The Board would then spend long periods in private, executive sessions, which would delay public speaking for many hours.  Greenberg at 35.

The Monitor also reported that "Board meetings degenerate into verbal brawls, with the Board's attorneys berating students and parents" and that "public protests and rallies [were] commonplace."  *Id.* 20.  Mr. Greenberg further observed that "District leaders respond poorly to criticism" and "frequently resort to name-calling, attacking others' motives and integrity, when responding to criticism."  *Id.* 36.  For example, after a period of public criticism, then Board president Daniel Schwartz threatened to eliminate the public comment portion of Board meetings altogether, characterizing members of the public school community who had been vocal critics of the Board as a "group of miscreants" and referring to the public school community as "errant

children." Michael Powell, *A School Board That Overlooks Its Obligations to Students*, N.Y. Times (Apr. 7, 2014), Salomon Ex. 9. On several occasions, the Board's lawyers erupted at speakers during Board meetings, including students, using profanity and threats. Hatton ¶ 24.

The Board has exhibited a particular lack of responsiveness to the needs of the Latino community. East Ramapo has a large Latino community, but the District failed to provide any Spanish interpretation at Board meetings until December 2014 and did so only after months of protests in response to insensitive remarks about immigrant students by the Superintendent. Trotman ¶ 13. Since acquiring translation technology in April 2015, some Board members have removed the necessary earpiece during public comments by Latino parents that were critical of the Board. Trotman ¶ 14. But most often, communication from the minority community has fallen on deaf ears as the Board persistently ignored their concerns. Miller ¶ 14; Dos Reis ¶ 17; Decl. of Washington Sanchez ("Sanchez") ¶ 21; Hatton ¶ 17; Wells ¶¶ 44-47. Minority residents of the District report that they have been discouraged from further communication with the Board. Miller ¶ 15; Wells ¶¶ 51, 52.

Although the Board's dismantling of the public schools prompted an initial surge in turnout for candidates backed by the public school community between 2009 and 2011, since reaching a peak in 2011, turnout in support for those candidates has declined consistently and significantly. Voter Turnout Chart attached hereto as Appendix B. By 2017, turnout for candidates preferred by the largely minority, public school community had decreased by almost 40% since 2011 peak, in spite of vigorous campaign efforts. *Id.*; Goodwin ¶ 19; Dos Reis ¶ 20; Manigo ¶ 18. This electoral futility has discouraged minorities from running for office or encouraging others to run. Goodwin ¶ 28; Dos Reis ¶ 28; Fields ¶ 41; Young-Mercer ¶ 54. During the same time, turnout for candidates from the White, private school community dipped temporarily before rebounding to near-peak

levels.  Appendix B.

### E.     Discrimination in the Board's Political Process

As the Monitors reported in December 2015, "the election process in the District is viewed with suspicion and the Monitors have heard from many District residents that they lack confidence in the process."  Walcott at 12.  Over the years, the District has engaged in practices that encourage the White, private school community to vote in Board elections while negatively impacting political participation by the minority, public school community.  For example, poll workers have often asked voters of color for identification, but did not do the same to White voters and are generally less helpful to voters of color.  E-mail from E. White ("E.W. Letter"), attached as Ex. 5 to Trotman.

Second, the District failed to provide adequate election information to communities of color.  Prior to 2011, the District would send monthly newsletters to both private and public school households.  Hatton ¶ 28.  In December 2011 the Board voted to have two separate newsletters— one for public schools and the other for private schools.  These newsletters included information about upcoming Board elections and voter registration.  After the Board voted to separate the newsletters, the District stopped sending newsletters to the public school community, but continued to send newsletters to the private school community.  *Id.*

Third, before 2011, both public and private school staff and teachers would distribute voter registration cards in advance of upcoming elections.  However, in 2011, the Board prohibited the public school staff and teachers from distributing voter registration cards or any information about the upcoming elections.  Trotman ¶ 24.

More recently, in 2015, the Monitors recommended that the District "review underused polling sites and identify new sites . . . to ensure greater accessibility to voting"—a recommendation apropos the decline in minority turnout.  Walcott at 13.  But when the Board

proposed a new plan for poll sites in 2017, it proposed new polling sites in White communities to alleviate overcrowding, but no changes to increase minority turnout. Trotman ¶ 27. After the NAACP's advocacy efforts, the Board postponed adoption of its proposed plan. *Id.*

## III. ARGUMENT

### A. Preliminary Injunctions Are Appropriate in Section 2 Cases

The Court may issue a preliminary injunction in a Section 2 case applying the usual standards, but with one modification. *See Bridgeport Coal. for Fair Representation v. City of Bridgeport*, 26 F.3d 271, 274 (2d Cir. 1994), *rev'd on other grounds*, 512 U.S. 1283 (1994). "When, as here, a preliminary injunction 'will affect government action taken in the public interest pursuant to a statute or regulatory scheme,' the moving party must demonstrate (1) irreparable harm absent injunctive relief, (2) a likelihood of success on the merits, and (3) public interest weighing in favor of granting the injunction." *Friends of the E. Hampton Airport, Inc. v. Town of E. Hampton*, 841 F.3d 133, 143 (2d Cir. 2016). In other words, the moving party must demonstrate likelihood of success on the merits rather than a balance of hardships tipping in the moving party's favor. *See Pope v. Cty. of Albany*, 2011 WL 3651114, at *2 (N.D.N.Y. Aug. 18, 2011).

As discussed below, the Court should issue a preliminary injunction here because (1) Plaintiffs are substantially likely to prevail on the merits of their claim; (2) Plaintiffs and other minority voters in the District will suffer irreparable harm absent an injunction; and (3) the public interest weighs strongly in favor of granting a preliminary injunction.

### B. Plaintiffs Are Likely To Succeed On Their Claim

#### 1. Legal Standards in Section 2 Claims

Section 2 prohibits any voting practice or procedure that "results in a denial or abridgement of the right . . . to vote on account of race or color . . . ." 52 U.S.C. § 10301(a). The essence of a Section 2 claim is that an "electoral law, practice, or structure interacts with social and historical

conditions to cause an inequality in the opportunities enjoyed by [minority] and white voters to elect their preferred representatives." *Thornburg v. Gingles*, 478 U.S. 30, 47 (1986). There is a two-step process for determining whether a Section 2 violation exists.

First, the Court must determine whether three preconditions to establishing a claim, as laid out in *Gingles*, have been met: (1) whether the minority group is able to demonstrate that it is sufficiently large and geographically compact to constitute a majority in a single-member district; (2) whether the minority group is able to show that it is politically cohesive; and (3) whether the minority group is able to demonstrate that the white majority votes sufficiently as a bloc to enable it—in the absence of special circumstances, such as the minority candidate running unopposed— usually to defeat the minority's preferred candidate. *Id.* at 50-51. "No specific showing of discriminatory intent is required to prove a Section 2 violation." *United States v. Vill. of Port Chester*, 704 F. Supp. 2d 411, 418 (S.D.N.Y. 2010).

Second, upon a finding that these preconditions have been satisfied, the Section 2 inquiry considers the "totality of the circumstances" and determines "whether the political process is equally open to minority voters." *Gingles*, 478 U.S. at 79. The *Gingles* Court described this inquiry with reference to the following nine factors: (1) whether there is a history of official discrimination; (2) whether voting is racially polarized; (3) whether current electoral mechanisms enhance vote dilution; (4) if there is a candidate slating process, whether access to such a process is denied to minorities; (5) the extent to which members of the minority group bear the effects of discrimination in education, employment, and health, that hinder their ability to participate in the political process; (6) whether racial appeals have formed part of political campaigns; (7) whether minorities have been elected to public office in the jurisdiction; (8) whether elected officials have failed to respond to minority needs; and (9) whether the policy underlying the contested practice

or structure is tenuous. *Id.* at 44-45 (citing S. Rep. No. 417 (1982)). The Court need not find that all or even any particular number of factors have been met or that a majority of the factors point "one way or the other." *Id.* at 45. Although the Court must perform the totality of the circumstances analysis, the Second Circuit has noted that "it will be only the very unusual case in which the plaintiff can establish the existence of the three *Gingles* factors but still have failed to establish a violation of [Section] 2 under the totality of circumstances." *NAACP v. City of Niagara Falls*, 65 F.3d 1002, 1019 n.21 (2d Cir. 1995).

Here, the at-large method of electing Board members results in the dilution of minority voting strength in violation of Section 2. Plaintiffs meet the three *Gingles* preconditions, and the totality of the circumstances shows that the District's at-large method of election does not afford Plaintiffs an opportunity to participate in the political process equal to their White counterparts.

### 2. The *Gingles* Preconditions Have Been Satisfied

#### a. The Population of Black and Latino Voters Is Sufficiently Numerous and Geographically Compact to Constitute Several Majority-Minority Districts

The *first Gingles* prong is satisfied where the hypothetical minority-majority district contains a population majority—anything over 50 percent—of citizens of voting age. *Bartlett v. Strickland*, 556 U.S. 1, 19-20 (2009). The District can be divided into nine election wards—one for each Board seat—of which four are majority-minority districts ("MMDs"). Cooper ¶¶ 65-67. These four wards have a combined Black and Latino CVAP of 69.33% (District 1); 62.93% (District 2); 57.64% (District 3); and 54.54% (District 4). *Id.* ¶ 69. Even considering only Black CVAP, the District can be divided, so three of the nine wards are MMDs with a CVAP population of 59.16% (District 1); 51.40 % (District 2); and 50.91% (District 3). *Id.* ¶¶ 51-52.

The four-district plan utilizes Black-Latino coalition districts, which the Second Circuit has stated complies with Section 2. *See Pope v. Cty. of Albany*, 2014 WL 316703, at *6 (N.D.N.Y.

Jan. 28, 2014) (noting the Second Circuit "previously upheld a Section 2 violation where the plaintiffs were a mixed group of black and Hispanic voters") (citing *Bridgeport Coalition for Fair Representation*, 26 F.3d at 275-76). The three-district plan illustrates that even relying solely on the Black CVAP, it is possible to draw three majority-minority districts with a Black CVAP ranging from 62.83% to 76.63%. Cooper ¶ 53. Mr. Cooper's analysis thus shows that the minority groups at issue are sufficiently numerous and geographically compact to warrant at least three majority-minority districts, demonstrating likelihood of success as to the first *Gingles* precondition.

**b.      The Minority Community Is Politically Cohesive**

The *second Gingles* precondition is satisfied when minority groups are politically cohesive—*i.e.* when a "significant number of minority group members usually vote for the same candidates." *Gingles*, 478 U.S. at 56. In the analysis of racially-polarized voting, endogenous races, i.e., elections for the specific office and district at issue, are more probative than exogenous elections, i.e., elections for other offices. *See Bone Shirt v. Hazeltine*, 461 F.3d 1011, 1021 n.8 (8th Cir. 2006). Further, "[t]he more recent an election, the higher its probative value." *Id.* at 1021. As described, *supra*, Dr. Cole's EI analysis shows clearly that large majorities of both Black and Latino voters have voted for the same candidates in the nine most recent contested Board elections. As an exogenous check on political cohesion and racial bloc voting, Dr. Cole also analyzed the results of the 2012 general presidential election—an interracial contest between Barack Obama and Mitt Romney—and found that very large majorities of both Black and Latino voters supported Obama. Cole ¶¶ 73-74, Tables 4a & 4b. As such, Mr. Cole's analysis clearly shows cohesion among Black and Latino voters and also across groups, demonstrating a strong likelihood of success as to the second *Gingles* precondition.

### c. The Minority Community's Preferred Candidates Are Usually Defeated by White Bloc Voting

The third *Gingles* prong requires that plaintiffs demonstrate that the White majority votes sufficiently as a bloc to enable the White majority—in the absence of special circumstances, such as the minority candidate running unopposed—to usually defeat the minority's preferred candidate. *Gingles*, 478 U.S. at 50-51. A consistent pattern of defeat of minorities' preferred candidates is evidence of bloc voting. *See Jenkins v. Red Clay Consol. Sch. Dist. Bd. of Educ.*, 4 F.3d 1103, 1123 (3d Cir. 1993). Proving a consistent pattern of defeat of minority-preferred candidates does not require a showing of universal hostility to minority candidates by the White bloc, rather, "[t]he correct question is not whether white voters demonstrate an unbending or unalterable hostility to whoever may be the minority group's representative of choice, but whether, as a practical matter, the usual result of the bloc voting that exists is the defeat of the minority-preferred candidate." *Id.* at 1123.

Moreover, while evidence of Black candidates' electoral successes may be probative of a general willingness of White voters to vote for Black candidates, such evidence does not necessarily negate a finding of bloc voting. *See Pope v. Cty. of Albany*, 687 F.3d 565, 582 (2d Cir. 2012). This is particularly true where elections are shown usually to be polarized, or the success of minority candidates in particular elections can be explained by special circumstances, "such as the absence of an opponent or incumbency." *Id.*; *Missouri State Conference of the NAACP v. Ferguson-Florissant Sch. Dist.*, 201 F. Supp. 3d 1006, 1040 (E.D. Mo. 2016) ("contested elections have much more probative value than uncontested elections").

Dr. Cole's analysis of the nine most recent contested Board elections demonstrates that the preferred candidates of Black and Latino voters have been consistently defeated by candidates supported by a large White voting bloc. Cole ¶ 5. First, Dr. Cole's Homogenous Precinct Analysis

demonstrates a strong White racial bloc, finding that in every contested race for a Board seat, the winning candidate has been supported by a minimum of 79% of White votes. *Id.* Table 2. Next, Dr. Cole's EI analysis shows that this strong White voting bloc consistently defeats minority-preferred candidates. *Id.* The EI analysis demonstrates that in five out of the six most recent contests, candidates supported by over 90% of both Black and Latino voters were defeated by candidates receiving over 77% of the White vote. *Id.* According to Dr. Cole, these results exhibit "an extreme degree of racial polarization." *Id.* ¶ 5. In all of the nine most recent contests, the EI analysis shows candidates receiving a minimum of 60% of Black and Latino votes being defeated by candidates receiving at least 68% of White votes. *Id.* Table 2. Dr. Cole's correlation analysis is also consistent with these results. *Id.* Table 3. Evidence from the 2012 presidential election is less probative, but confirmatory of longstanding, strong racial polarization. *Id.* Tables 4a & 4b.

In sum, the voting pattern for Board elections in the District demonstrates that the White majority sufficiently votes as a bloc to consistently defeat the minority-preferred candidates, demonstrating likelihood of success as to the third *Gingles* precondition.

### 3. <u>Under the Totality of Circumstances, the At-Large Election Scheme in the District Violates Section 2</u>

Considering the totality of the circumstances, Plaintiffs are able to demonstrate a likelihood of success in establishing a Section 2 claim. Even at this early stage, Plaintiffs have adduced evidence to support strong findings under most of the Senate Factors.

### a. Factor 1: Official History of Discrimination in Voting

In order to make a showing of official discrimination in voting, "a plaintiff must . . . establish that the particular jurisdiction challenged has a history of officially restricting, directly or indirectly, [minority] access to the political process." *Reed v. Town of Babylon*, 914 F. Supp. 843, 885 (E.D.N.Y. 1996). Official practices that have a "discriminatory impact" on the ability of

minority citizens to vote, even without any official intent to discriminate, are probative in this inquiry. *Goosby v. Town of Hempstead*, 956 F. Supp. 326, 338 (E.D.N.Y. 1997).

The District, which is responsible for running its own elections, has engaged in practices that have had a disparate negative impact on minority voters, including (1) poll workers asking voters of color for identification, but not doing the same to White voters, E.W. Letter; (2) poll workers being disproportionately hostile to minority voters, (3) sending election information to families in the White, private school community through newsletters that were not distributed to the minority, public school community, Hatton ¶¶ 28, 29; (4) prohibiting the public school employees from distributing voter registration cards or any information about the upcoming elections, Trotman ¶ 24; and (5) ignoring a recommendation by the Monitors to improve poll access for minority voters, Trotman ¶¶ 26, 27. In addition, in 2011, then Board President, Aaron Wieder, engaged in behavior that was sufficiently concerning that he was arrested and charged with violating Section 17-152 of N.Y. Election Law, after a poll watcher accused him of photographing and otherwise intimidating voters, and blocking the entrance to the school that was being used as a poll site. *East Ramapo Board's Wieder Faces Election Charge, Accused of Blocking Poll Entrance*, The Journal News, May 20, 2011, at 3A attached as Salomon Ex. 10.

**b.      Factor 2: The Extent of Racially-Polarized Voting**

Courts have held that, by proving the *Gingles* preconditions, plaintiffs have offered evidence that "give[s] rise to an inference that racial bias is operating through the medium of the targeted electoral structure to impair minority political opportunities." *Pope v. Cty. of Albany*, 94 F. Supp. 3d 302, 343 (N.D.N.Y. 2015) (citing *Uno v. City of Holyoke*, 72 F.3d 973, 983 (1st Cir. 1995)). Dr. Cole has demonstrated racial bloc voting in nine recent, endogenous contests, including an "extreme degree of racial polarization" in the most recent and most probative contests. Cole ¶ 5. Dr. Cole's opinions are consistent with the testimony of minority voters in the District

that their preferred candidates have been consistently defeated.  Miller ¶ 9; Dos Reis ¶ 8; Goodwin ¶ 7; Decl. of Julio Clerveaux ¶ 7.

### c.     Factor 3: Discrimination Enhancing Practices

In this inquiry, courts look to "the extent to which the state or political subdivision has used unusually large election districts, majority vote requirements, anti-single shot provisions, or other voting practices or procedures that may enhance the opportunity for discrimination against the minority group."  *Gingles*, 478 U.S. at 37, 45.  The Supreme Court "has long recognized that . . . at-large voting schemes may 'operate to minimize or cancel out the voting strength of racial [minorities in] the voting population.'"  *Id.* at 47.

Additionally, courts have found staggered elections and off-cycle voting to likewise present opportunities to enhance discrimination against minorities.  *See Buckanaga v. Sisseton Indep. Sch. Dist.*, 804 F.2d 469, 475 (8th Cir. 1986) ("The discriminatory effect of staggered terms was specifically considered by Congress in the enactment of § 2"); *United States v. Vill. of Port Chester*, 2008 WL 190502, at *28 (S.D.N.Y. Jan. 17, 2008) ("[H]olding local elections at a time when only the most engaged and politically astute citizens—those citizens who feel the most enfranchised—are likely to vote will almost certainly result in the diminished influence of groups who feel generally excluded from the political fabric of the community.").  The use of numbered posts, i.e., electing candidates to specific seats in an at-large election system, also "enhances [a minority group's] lack of access because it prevents a cohesive political group from concentrating on a single candidate." *Montes v. City of Yakima*, 40 F. Supp. 3d 1377, 1411 (E.D. Wash. 2014) (quoting *Rogers v. Lodge*, 458 U.S. 613, 627 (1982)).

Here, such practices and procedures are present; the District uses an at-large voting system, and elections are held off-cycle in May, instead of with general elections in November.  Cole ¶ 31. Adding to the confusion, the polling sites for Board elections are not the same as for other federal,

state, or local offices. *Where to Vote*, East Ramapo Central School District, Salomon Ex. 11. Candidates are elected by numbered posts. Cole ¶ 31.

### d. Factor 4: Access to Candidate Slating Processes

For Senate Factor 4, the Court may look to see "if there is a candidate slating process, [and] whether the members of the minority group have been denied access to that process." *Gingles*, 478 U.S. at 37. "The term 'slating' is generally used to refer to a process in which some influential non-governmental organization selects and endorses a group or 'slate' of candidates, rendering the election little more than a stamp of approval for the candidates selected." *Westwego Citizens for Better Gov't v. City of Westwego*, 946 F.2d 1109, 1116 n.5 (5th Cir. 1991). Whether a slate actually selects minority candidates is less important than whether minority-preferred candidates have access to the slating process. *See, e.g.*, *Goosby v. Town of Hempstead*, 180 F.3d 476, 496-97 (2d Cir. 1999) (finding a lack of access to slating procedures where the only black candidate selected was "a black crony" of the local Republican Party chair, but not the preferred candidate of black Republicans).

Minorities do not have access to slating, and the endorsement process within the White, private school community in East Ramapo is opaque. The most visible organization, SERTA, which "bring[s] out the bloc vote," remains intentionally opaque. Cole ¶ 64. Organizations and leaders within the White community do not make general invitations to candidates to compete for endorsements. Young-Mercer ¶ 15. Although those organizations and leaders have at times endorsed minority candidates, there is no evidence that the process by which those minority candidates were selected for endorsement was open to any other minorities. Dos Reis ¶ 23; Goodwin ¶ 23; Fields ¶ 36; Manigo ¶ 21; Young-Mercer ¶ 18. Candidates who participated in candidate forums in the minority community report not receiving similar invitations from SERTA or other organizations and leaders in the White community. Dos Reis ¶¶ 20-21; Goodwin ¶¶ 19-

20; Fields ¶¶ 34-35; Manigo ¶¶ 18-19; Young-Mercer ¶¶ 18-19.  One former Board member, Stephen Price, a White man, recalls that other White Board members invited him to meet with leaders in their community regarding Board politics, but Suzanne Young-Mercer, a Black woman who served on the Board with Price did not receive a similar invitation.  Price ¶ 11; Young-Mercer ¶ 18.  Since 2008, no candidate has won a contested Board election without the endorsement of SERTA or other organizations within the White community.  Appendix B.

e.    **Factors 5 and 8: Ongoing Effects of Discrimination and the Board's Lack of Responsiveness to Minority Needs**

The Senate Factors counsel courts to consider as part of the totality of the circumstances analysis "the extent to which members of the minority group bear the effects of discrimination in areas such as education, employment, and health, which hinder their ability to participate effectively in the political process'" and "evidence demonstrating that elected officials are unresponsive to the particularized needs of the members of the minority group."  *Goosby*, 180 F.3d at 491-92 (citing *Gingles*, 478 U.S. at 45).  If plaintiffs can demonstrate that minorities bear the effects of discrimination and that their participation in politics is depressed, they need not show a causal nexus between the two.  *See Teague v. Attala Cty.*, 92 F.3d 283, 294 (5th Cir. 1996).  Discrimination in public education is particularly pernicious because "the public schools [are] a most vital civic institution for the preservation of a democratic system of government."  *Sch. Dist. of Abington v. Schempp*, 374 U.S. 203, 230 (1963) (Brennan, J., concurring).  There is a critical link between public education and civic participation—and, in particular, voting.  *See Campaign for Fiscal Equity, Inc. v. State*, 100 N.Y.2d 893, 905 (2003) (holding New York Constitution guarantees an education that prepares students to "eventually function productively as civic participants capable of voting").

As two sets of Monitors found, between 2009 and at least 2014, the Board engaged in a

pattern of decision making that discriminated against the mostly minority, public school community by drastically cutting the public school budgets and closing and selling public schools while failing to distribute the burden of those budget cuts on services provided to the White, private school community. Greenberg at 30-33; Walcott at 4; Wells ¶¶ 53-64. Following these cuts, public school student achievement, including post-secondary outcomes have suffered. Wells ¶¶ 112-13. East Ramapo public schools are now among the poorest performing schools in Rockland County. Salomon Ex. 2, Compl. ¶ 52; Wells ¶ 120; Greenberg at 7-9. Furthermore, the Board's repeated resistance to the public school community's efforts to hold the Board accountable for providing a quality education has alienated the minority community and left them feeling powerless. Wells ¶¶ 33-52.

Coinciding with the decline in the quality of public education in East Ramapo and the unresponsiveness of the Board to minority needs is a decline in political participation on the part of the minority community. East Ramapo has seen a precipitous decline in voter turnout for public school candidates, who have been the candidates of choice for minority voters. Appendix B; *see also* Cole Table 2. Meanwhile, the East Ramapo electorate is less able to hold the Board accountable for the fact that the quality of public education and student performance, including factors demonstrating readiness for college and work, has declined. The result is that voter turnout and the mechanism for holding Board members accountable for minority needs will continue to remain depressed, perpetuating the unfortunate state of education in East Ramapo. Had the community been able to elect more Board members representative of its interests, it may have been able to prevent the Board's discriminatory actions towards it over the past eight years.

### f. Factor 7: Extent to Which Minority-Preferred Candidates Have Been Elected

Courts have discounted the election of minority candidates in analyzing this factor where

the candidate was "emphatically not the candidate of choice of the [minority] voters." *United States v. Charleston Cty.*, 316 F. Supp. 2d 268, 279 (D.S.C. 2003). Courts and Congress have acknowledged the risk that "the majority citizens might evade the [VRA], e.g., by manipulating the election of a 'safe' minority candidate." *Goosby*, 956 F. Supp. at 344.

The election of every minority candidate to win a contested election in the past ten years raises precisely this risk. Contemporaneous reports demonstrate that organizations and leaders within the White, private school community endorsed each of those minority candidates, who did not campaign in the minority community. Cole ¶¶ 9, 40, 41, 52, 61, 65; Dos Reis ¶¶ 24, 25; Goodwin ¶¶ 24, 25; Fields ¶ 37; Manigo ¶ 22; Young-Mercer ¶ 19.

Dr. Cole's analysis demonstrates that the minority candidates who have won contested elections were not minority-preferred. Dr. Cole's correlation analysis and supplemental evidence indicate that Germain and Charles were not minority-preferred candidates in 2013; however, the EI analysis leaves open the possibility that those candidates received support from Black voters. Cole ¶ 78. But even if the 2013 data are unclear, data from the 2015 and 2016 elections are unambiguous, as Germain, Charles, and Juan Pablo Ramirez were all elected by a large White voting bloc and few Black and Latino votes. Cole ¶¶ 9, 40, 41, 52.

Although three other minorities have won election since 2008—Young-Mercer in 2010, Thompson in 2011, and Charles-Pierre in 2016—each of them ran unopposed as incumbents, making those results less probative. *See* Cole ¶¶ 20, 42, Table 2. Moreover, the Board has recently declined to consider qualified minority candidates to fill vacancies on the Board. For example, when the Board had an opportunity to fill a vacant seat in July 2016, the Board chose a White male whose children attended private schools, when a Black woman and long-time public school principal had expressed interest in the position. Fields ¶ 40; Trotman ¶ 22; Cohen ¶ 29.

### C. Absent An Injunction, Plaintiffs and Other Minority Voters in the District Will Suffer Irreparable Harm

The "right to vote freely for the candidate of one's choice is of the essence of a democratic society, and any restrictions on that right strike at the heart of representative government." *Reynolds v. Sims*, 377 U.S. 533, 555 (1964). Consequently, "[t]he deprivation or dilution of voting rights constitutes irreparable harm." *Coleman v. Bd. of Educ. of Mount Vernon*, 990 F. Supp. 221, 226 (S.D.N.Y. 1997). The Court should enjoin the May 2018 elections absent of a method of election that complies with the VRA. If the Court permits elections to continue under the current scheme, a new group of Board members will be elected to three-year terms under this noncompliant system. Given the recent history of strong racial bloc voting that leads to the consistent defeat of minority-preferred candidates by White-preferred candidates, any further elections will perpetuate an electoral system that violates federal law.

### D. The Public Interest Strongly Favors Granting a Preliminary Injunction

Further, the Court should enjoin the Board elections because the public interest strongly favors granting a preliminary injunction in cases where a method of election dilutes minority voting strength. *See Arbor Hill Concerned Citizens Neighborhood Ass'n v. Cty. of Albany*, 2003 WL 21524820, at *18 (N.D.N.Y. 2003) (finding public interest "weighs strongly in favor of granting a preliminary injunction" where method of election diluted minority voting strength).

## IV. CONCLUSION

For the foregoing reasons, Plaintiffs respectfully request that the Court enjoin Defendants from holding May 2018 elections or subsequent elections under an at-large system until a ward system for electing Board members that does not violate the VRA is implemented.

Dated: December 8, 2017
      New York, New York

Respectfully submitted,

<u>/s/ Claudia T. Salomon</u>
Claudia T. Salomon
Corey A. Calabrese
Elizabeth A. Parvis
Claudia.Salomon@lw.com
Corey.Calabrese@lw.com
Elizabeth.Parvis@lw.com
Latham & Watkins LLP
885 Third Avenue
New York, NY 10022
Phone: (212) 906-1200

Arthur Eisenberg
Perry Grossman
Kevin Jason
aeisenberg@nyclu.org
pgrossman@nyclu.org
kjason@nyclu.org
New York Civil Liberties Union Foundation
125 Broad Street
New York, NY 10004
Phone: (212) 607-3329

*Attorneys for Plaintiffs*