# UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF NEW YORK

**NAACP, SPRING VALLEY BRANCH,** *et al.*,

      **Plaintiffs,**

   **v.**

**EAST RAMAPO CENTRAL SCHOOL
DISTRICT,** *et al.*,

      **Defendants.**

**ECF CASE**

**Case No. 7:17-cv-08943**

**DISTRICT JUDGE
CATHY SEIBEL**

**MAGISTRATE JUDGE
JUDITH C. MCCARTHY**

---

**DEFENDANT EAST RAMAPO CENTRAL SCHOOL DISTRICT'S COMBINED BRIEF
IN OPPOSITION TO MOTION FOR PRELIMINARY INJUNCTION
AND IN SUPPORT OF CROSS-MOTION TO DISMISS**

**MORGAN, LEWIS & BOCKIUS LLP**

David J. Butler
Randall M. Levine
101 Park Avenue
New York, NY 10178
T: (212) 309-6000
F: (212) 309-6001
-and-
1111 Pennsylvania Avenue, NW
Washington, DC 20004
T: (202) 739-3000
F: (202) 739-3001
david.butler@morganlewis.com
randall.levine@morganlewis.com

*Counsel for Defendant
East Ramapo Central School District*

## TABLE OF CONTENTS

**Page**

I.   SUMMARY OF THE ARGUMENT ............................................................... 1

II.  FACTS RELEVANT TO THE MOTION FOR PRELIMINARY INJUNCTION .......... 4

   A.  The District's Unique Demographics Generate Political Conflicts ..................... 5

   B.  The "Private School Community" and the "Public School Community"
       Typically Support Competing Candidates for the Board of Education ................ 7

III. BACKGROUND ON SECTION TWO OF THE VOTING RIGHTS ACT .................... 8

IV.  ARGUMENT ....................................................................................... 9

   A.  State Law Mandates "At-Large" Elections ......................................... 10

   B.  Plaintiffs Have No Evidence of Legally Significant Racially Polarized
       Voting ................................................................................ 11

       1.   Dr. Cole's Flawed Statistical Analysis Should Be Disregarded ............. 13

            a.   Dr. Cole's failure to calculate and disclose confidence
                 intervals renders his estimates unreliable .................................... 15

            b.   Dr. Alford's EI analysis diverges from Dr. Cole's ...................... 17

            c.   Dr. Alford's EI analysis demonstrates that Dr. Cole's EI
                 analysis is unreliable and should be given no weight ................ 19

            d.   Dr. Cole's other statistical exercises do not measure racial
                 polarization and add nothing to the analysis ............................... 21

       2.   Dr. Cole's EI Estimates for the 2013 Election Refute Plaintiffs'
            Racially Polarized Voting Claim ......................................... 23

            a.   Bernard Charles and Pierre Germain's 2013 campaign
                 platform appealed to all East Ramapo communities ................... 23

            b.   Dr. Cole's disavowal of his EI estimates is not credible and
                 his supplemental evidence may not be considered ...................... 25

   C.  White Voters' Consistent Support for Minority Candidates Is Dispositive ........ 28

   D.  The Totality of the Circumstances Does Not Evidence a Violation ................... 31

       1.   There is No Evidence of Racial Polarization in the District ................... 31

       2.   Minority Candidates Have Had Remarkable Electoral Success ............. 32

       3.   There Is No History of Official Discrimination Relevant to Voting ....... 33

       4.   There Is No Candidate Slating Process and Minorities are Not
            Excluded from the Informal Candidate Selection Processes ................. 36

       5.   Minorities Do Not Bear Effects of Past Discrimination in any Way
            Relevant to Voting or Elections in the District ....................................... 37

E.      The 2018 Election Will Not Cause Irreparable Harm ......................................... 38

V.    CONCLUSION............................................................................................................ 40

# TABLE OF AUTHORITIES

**Page(s)**

**FEDERAL CASES**

*Arbor Hill Concerned Citizens Neighborhood Ass'n v. Cnty. of Albany*, 281 F.
  Supp. 2d 436 (N.D.N.Y. 2003) ......................................................................................33, 39

*Baird v. Consolidated City of Indianapolis*, 976 F.2d 357 (7th Cir. 1992) ...................................10

*Benavidez v. City of Irving*, 638 F. Supp. 2d 709 (N.D. Tex. 2009).............................................20

*Cardona v. Oakland Unified Sch. Distr.*, 785 F. Supp. 837 (N.D. Cal. 1992) .............................39

*Congregation Rabbinical College of Tartikov, Inc. v. Village of Pomona*, No. 07–
  CV–6304, 2017 WL 6206193 (S.D.N.Y. Dec. 7, 2017)....................................................6

*Cottier v. City of Martin,* No. 02–5021–KES, 2005 WL 6949764 (D.S.D, Mar. 22,
  2005), *rev'd and remanded*, 445 F.3d 1113 (8th Cir. 2006).......................................20

*Dabney v. Christmas Tree Shops*, 958 F. Supp. 2d 439 (S.D.N.Y. 2013) ....................................34

*Diaz v. Silver*, 932 F. Supp. 462 (E.D.N.Y. 1996)........................................................................39

*Fabela v. City of Farmers Branch*, No. 10–CV–1425–D, 2012 WL 3135545
  (N.D. Tex., Aug. 2, 2012) ............................................................................................15, 20

*Goosby v. Town Bd. of Hempstead*, 180 F.3d 476 (2d Cir. 1999) ........................................ *passim*

*Goosby v. Town Bd. of the Town of Hempstead*, 956 F. Supp. 326 (E.D.N.Y.
  1997), *aff'd* 180 F.3d 476 (2d Cir. 1999)......................................................................31

*Govern v. Connolly*, 637 F. Supp. 111 (D. Mass. 1986)...............................................................39

*In re Mirena IUD Prod. Liab. Litig.*, 169 F. Supp. 3d 396, 433 (S.D.N.Y. 2016) .......................17

*Jeffers v. Beebe*, 895 F. Supp. 2d 920 (E.D. Ark. 2012)...............................................................21

*Large v. Fremont Cnty.*, 709 F. Supp. 2d 1176 (D. Wyo. 2010) ..................................................20

*LeBlanc-Sternberg v. Fletcher*, 67 F.3d 412 (2d Cir. 1995)...........................................................6

*Lowery v. Governor of Georgia*, 506 Fed. Appx. 885 (11th Cir. 2013) ........................................11

*Mo. State Conference of the Nat. Ass'n for the Advancement of Colored People v.
  Ferguson-Florissant Sch. Dist.*, 201 F. Supp. 3d 1006, 1042 (E.D. Mo. 2016)...............15, 16

*Montano v. Suffolk Cnty. Legislature*, 268 F. Supp. 2d 243 (E.D.N.Y. 2003) .............................33

*Mosdos Chofetz Chaim, Inc. v. Village Of Wesley Hills*, 701 F. Supp. 2d 568 (S.D.N.Y. 2010) (Karas, J.) ................................................................................6

*Mullins v. City of New York*, 634 F. Supp. 2d 373 (S.D.N.Y. 2009) ...........................................34

*N.A.A.C.P., Inc. v. City of Niagara Falls,* 65 F.3d 1002 (2d Cir. 1995)................................ passim

*Nipper v. Smith*, 39 F.3d 1494 (11th Cir. 1994) ........................................................................31

*Overton v. Austin*, 871 F.2d 529 (5th Cir. 1989) ......................................................................22

*Pope v. Cnty. of Albany*, 687 F.3d 565 (2d Cir. 2012).........................................................9, 21, 39

*Reed v Town of Babylon*, 914 F Supp. 843 (E.D.N.Y. 1996) ................................................31, 33

*Rodriguez v. Pataki*, 308 F. Supp. 2d 346 (S.D.N.Y. 2004).......................................11, 12, 20, 21

*Terrebonne Parish Branch NAACP v. Jindal*, 274 F. Supp. 3d 395, 433 (M.D. La. 2017). ................................................................................................................20

*Thornburg v. Gingles*, 478 U.S. 30 (1986) ..........................................................................8, 9, 31

*United States v. Alex. Brown & Sons, Inc.*, 963 F. Supp. 235 (S.D.N.Y. 1997)...........................11

*Vecinos De Barrio Uno v. City of Holyoke*, 72 F3.d 973, 981–83 (1st Cir. 1995) .................28, 31

*White v. Regester*, 412 U.S. 755 (1973).........................................................................................4

**OTHER CASES**

*Matter of Phillips v Maurer*, 67 N.Y.2d 672 (1986)....................................................................35

**FEDERAL: STATUTES, RULES, REGULATIONS, CONSTITUTIONAL PROVISIONS**

52 U.S.C. § 10301(a) ................................................................................................ *passim*

S. Rep. No. 97–417, at 28 (1982) ...............................................................................................31

**OTHER: STATUTES, RULES, REGULATIONS, CONSTITUTIONAL PROVISIONS**

Ed. Dept. Rep., Decision No. 14868, 2003 WL 26094999 (May 12, 2003)................................35

NY Educ. Law § 2018(a) .............................................................................................................10

**OTHER AUTHORITIES**

Charles A. Szuberla, Jr. & John W. Sipple, *A New Beginning: A Report on the East Ramapo Central School District* (Jan. 24, 2017).........................................................3, 5

Geo L.J. 881, 882 n. 1 (2014) ..........................................................................................14

*Kim Wins Re-election with 99.9% of the Vote*, N.Y. Times, March 9, 2009 .................................14

*Syrian President Easily Wins Referendum*, May 29, 2007,
    http://www.washingtonpost.com/wp-
    dyn/content/article/2007/05/29/AR2007052900471.html ......................................................14

I.     **SUMMARY OF THE ARGUMENT**

Plaintiffs, the National Association for the Advancement of Colored People, Spring Valley Branch, Julio Clerveaux, Chevon Dos Reis, Eric Goodwin, Jose Vitelio Gregorio, Dorothy Miller, Hillary Moreau, and Washington Sanchez, (together "Plaintiffs") have moved this Court for a preliminary injunction to halt the upcoming May 2018 election for three open seats on Defendant East Ramapo Central School District's ("the District") board of education. Plaintiffs' motion should be denied and their claim under Section 2 of the Voting Rights Act alleging unlawful vote dilution by the use of "at-large" voting should be dismissed.

Plaintiffs' Section 2 claim has no likelihood of success on the merits. Plaintiffs do not allege that the District has prevented anyone from registering to vote, voting, or running for office. Nor do they claim that minorities are unable to win election to the school board, which presently has three minority members (two Black men and one Black woman), and has always had substantial minority representation. According to Plaintiffs, the District's politics are divided between the "private school community," meaning Orthodox and Hasidic Jews who prefer private school education, and the "public school community," meaning everyone else.

This political divide is not about *race*. It is driven by fundamental disagreements over tax and education policy. The "public school community" favors increasing property taxes to fund improved services for students attending public schools. The "private school community" favors lower property taxes and education spending that benefits both public and private school students. The policy disagreement plays out in elections for the board in which both sides field competing candidates. No one contends that candidates are elected to the board on the basis of their race, and it is undisputed that the "private school community" supported and elected minority candidates to office in 2013, 2015, and 2016. Thus, the crux of Plaintiffs' case is not that "at large voting" prevents minority candidates from winning elections—it is that Plaintiffs

don't like the minority candidates that have won elections and they want the Court's help to replace them. That is not a Section 2 claim. Plaintiffs' Motion should be denied.

*First*, the District lacks statutory authority to change from an "at large" election system to a "ward system," as Plaintiffs request. A change in state law would be required. Plaintiffs have not named the correct parties as defendants to obtain the relief they seek.

*Second,* Plaintiffs have not satisfied the second or third *Gingles* preconditions because they have no reliable evidence of cohesion or racially polarized voting. Plaintiffs rely on the opinion of their expert, Dr. Steven Cole, but his statistical analysis is clearly flawed and his estimates are unrealistic. The District's expert, Dr. John Alford, performed the same statistical analysis as Dr. Cole with the same data and substantially different results, which suggests that Dr. Cole's unrealistic estimates are unreliable. Dr. Cole also failed to report standard statistical measurements of uncertainty (called "confidence intervals"), so there is no way to gauge the reliability of his estimates. Even Dr. Cole admitted that he lacks confidence in his analysis.[1]

*Third*, even if Dr. Cole's analysis is considered, his conclusions do not support Plaintiffs' Section 2 claim—they refute it. According to Dr. Cole, the White, "private school community" supported and voted overwhelmingly for Black and Latino candidates in six of the twelve elections he considered. Dr. Cole admits that this voting pattern shows that the "private school community" supports Black, White, and Latino candidates equally, "regardless of their race."[2] That admission is dispositive, because it demonstrates that election results in the District are driven by non-racial concerns. *See Goosby v. Town Bd. of Hempstead*, 180 F.3d 476, 496 (2d

---

[1] Dr. Steven P. Cole Deposition Transcript ("Cole Tr."), attached as Ex. 5 to the Declaration of David J. Butler ("Butler Dec."), at 85:6-9 ("Q: [Y]ou are not confident in your EI estimates for the 2013 election; is that right?  A. That's right.").
[2] Cole Tr. 157: 5-8.

Cir. 1999) (where white voters support "minority candidates … at levels equal to or greater than those of white candidates," it is "proper to conclude" that "divergent voting patterns among white and minority voters are best explained" by non-racial factors (quoting *League of United Latin American Citizens ("LULAC") v. Clements*, 999 F.2d 831, 861 (5th Cir. 1993) (en banc))).

*Fourth*, Plaintiffs' showings under the "totality of the circumstances" factors are unpersuasive because they primarily argue that the District's public schools are substandard due to budget cuts.[3]  The quality of public education in the District is irrelevant here.  In any event, Plaintiffs' grievances are outdated, as the budget cuts they decry ended years ago.  Since then, the District has improved its financial and educational condition by every measure, and the programs that were cut in past years have either been restored or are on track to be restored.[4]

Because the Plaintiffs focus on irrelevant education matters, they have little to say that is relevant to the inquiry under the Voting Rights Act.  They produce no admissible evidence of any prior history of discrimination related to voting.  There is no claim that electoral campaigns are marred by racial appeals.  The assertion that minorities are excluded from a candidate "slating" process in the "private school community" erroneously presumes that such a "slating" process exists when, in fact, it does not.[5]  The slating argument is also illogical, considering that Plaintiffs themselves allege that the "private school community" consistently supports slates of minority candidates.[6]  No Section 2 violation is apparent from the totality of these circumstances.

---

[3] *E.g.,* Plaintiffs' Memorandum of Law in Support of Motion for a Preliminary Injunction ("Pl. Br."), Docket No. 35, at 10-1; *id.*at 22-23; *see generally* Declaration of Amy Stuart Wells, Docket Number 34.
[4] Charles A. Szuberla, Jr. & John W. Sipple, *A New Beginning: A Report on the East Ramapo Central School District* (Jan. 24, 2017) ("2017 Monitor Report"), attached as Ex. 9 to Butler Dec., at 7-9.
[5] Pl. Br. at 21.
[6] *Id.*

*Finally*, even if Plaintiffs had a likelihood of success on the merits, preliminary relief is unnecessary here. No irreparable harm would result from the 2018 election because the Court could always order a special election if a violation were found on a fully developed record.

Moreover, the requested injunction is not in the public interest and would be anything but equitable. Plaintiffs' claim is at odds with the fundamental purposes of the Voting Rights Act. Plaintiffs admit that the White, "private school" community votes for White, Black, and Latino candidates without regard to race. This is what the Voting Rights Act was intended to achieve, and it is only possible *because* of "at large" voting. Plaintiffs' demand for a "ward voting" system asks the Court to create racial polarization where none currently exists. Imposing a "ward system" would prevent District residents from voting for candidates outside of their ward. That would make it nearly impossible for many residents to vote for anyone except members of their own race. A "ward system" would thus *prevent* White voters from voting for Black candidates who live in different parts of town, and vice-versa. That perverse result is directly at odds with the aim and purpose of the Voting Rights Act, and the Court should have no part in it.

For all these reasons, Plaintiffs have no likelihood of success on the merits of their claim. The Motion should be denied and, since Plaintiffs have so failed to meet their burden of proof on the likelihood of success of their claim, and there is no reason to believe their case would somehow benefit from further discovery, the entire case should be dismissed with prejudice.

## II.    FACTS RELEVANT TO THE MOTION FOR PRELIMINARY INJUNCTION

Determining whether an at-large election scheme violates the Voting Rights Act's prohibition against excluding minorities "on account of race or color" requires "an intensely local appraisal" of the impact such a voting scheme has "in the light of past and present reality, political and otherwise." *White v. Regester*, 412 U.S. 755, 769–70 (1973). A searching, comprehensive analysis of the broader factual context is required here to assess Plaintiffs' claim

that East Ramapo's politics are racially polarized and that minority voters are excluded from the

political process on account of their race.

      **A.      The District's Unique Demographics Generate Political Conflicts.**

      The District is an urban/suburban school district that serves over 35,000 students from 47

countries and various socio-economic backgrounds.[7]  It serves students in the Towns of Ramapo,

Clarkstown and Haverstraw.[8]  The District operates 14 public schools serving 8,650 public

school students.[9]  The public school student population is overwhelmingly children of color—

almost 90% of students attending public schools in the District are Black or Latino.[10]

      At the same time, 24,700 students attend approximately 140 private schools in the

District.[11]  These are mainly Orthodox and Hasidic Jewish yeshivas, serving students from

several Orthodox and Hasidic Jewish neighborhoods located within the District.[12]  These

neighborhoods include, for example, New Square, an all (or nearly all) Hasidic village in the

town of Ramapo.[13]  Both Kaser and Mosney are located in the town of Ramapo, and a substantial

portion of both neighborhoods are comprised of Orthodox or Hasidic Jews.[14]

      The rapid growth of the Hasidic and Orthodox Jewish communities in the District and

surrounding areas has led to well documented legal and political conflicts, some of which have

centered around public education policy and property tax rates.  The Second Circuit has held, for

example, that several municipalities in and around East Ramapo were incorporated out of sheer

---

[7] *See* http://www.ercsd.org/pages/East_Ramapo_CSD/District_Pages/About_East_Ramapo
[8] *Id.*
[9] *Id.*
[10] *Id.*
[11] 2017 Monitor Report at 14.
[12] *Id.* at 7-9.
[13] Declaration of Aron Wieder ("Wieder Dec."), attached as Ex. 3 to Butler Dec., ¶ 11.
[14] Wieder Dec. ¶¶ 10, 12.

"animosity toward Orthodox Jews as a group." *LeBlanc-Sternberg v. Fletcher*, 67 F.3d 412, 431 (2d Cir. 1995) (quoting the leader of the incorporation movement of the Town of Airmont, which is partially located in East Ramapo, as stating that "the reason [for] forming this village is to keep people like you [i.e., Orthodox Jews] out of this neighborhood").

That animosity appears to have worsened as the Orthodox Jewish population has continued to grow. This is evident in *Congregation Rabbinical College of Tartikov, Inc. v. Village of Pomona*, No. 07–CV–6304, 2017 WL 6206193 (S.D.N.Y. Dec. 7, 2017), where Judge Karas held that the Village of Pomona (which is located in East Ramapo) enacted zoning laws with the specific intent "to prevent the spread of the Orthodox/Hasidic community into the Village." *Id.* at *10. Plaintiffs have similarly accused the towns of New Hempstead, Wesley Hills, and Chestnut Ridge (all in East Ramapo) of "promulgat[ing] 'zoning regulations inconsistent with the religious practices of the Orthodox and Hasidic Jewish communities'" to "keep out ultra-religious and Hasidic people." *Mosdos Chofetz Chaim, Inc. v. Village Of Wesley Hills*, 701 F. Supp. 2d 568, 576 (S.D.N.Y. 2010) (Karas, J.).

The point of presenting these cases is not to suggest that Plaintiffs are motivated by animus. It is to make express the broader social and political context that Plaintiffs seek to obscure. This case cannot be evaluated without understanding the ongoing social and political conflict surrounding the growth and political participation of the Orthodox and Hasidic Jewish communities of East Ramapo. If there is polarization in East Ramapo, it flows from the fact that Orthodox and Hasidic Jews have firmly held political views and preferences about education policy and property taxes that differentiate them from other communities in East Ramapo. Plaintiffs' characterization of these substantive debates over public policy and cultural values as a *racial conflict* deliberately ignores the more complex reality.

**B.    The "Private School Community" and the "Public School Community" Typically Support Competing Candidates for the Board of Education.**

Plaintiffs describe themselves as representatives of the District's "public school community," and they describe their slates of candidates for the District's school board as "public school candidates."[15]  The phrase "public school community" says nothing about race, and Plaintiffs admit that the "public school community" includes White, Black, and Latino voters without limitation.  As opposed to race, "public school community" speaks to preferences for increased funding for public education, increased property taxes to fund public education programming, and decreased publicly funded programs for students that attend private schools.

According to Plaintiffs, members of the "public school community" historically had no difficulty getting elected and"[t]hrough 2004, representatives from the public school community constituted a majority of the Board."[16]  Plaintiffs allege that this changed in or around 2005, when for the first time "White voters organized successfully to elect a slate of candidates" that did not share the "public school community's" unqualified support for public education spending.[17]  Throughout their Complaint, Plaintiffs refer to those "White voters" as members of the "private school community" or as residents of the "predominantly white communities" of "New Square, Kaser, or Monsey."[18]  But regardless of the specific terms they use to describe those voters, it is clear that Plaintiffs are referring to Orthodox and/or Hasidic Jews.[19]

---

[15] Complaint, Docket No. 1, ("Compl.") ¶ 10
[16] Compl. ¶ 25
[17] Compl. ¶ 27.
[18] *E.g.*, Compl. ¶¶ 10, 11, 26, 27, 29, 30, 41, 48, 61, 64, 68, 69; Goodwin Dec. ¶ 20.
[19] Cole Tr. 92:8-11 (Q: When you say 'private school community,' you mean mainly Orthodox and Hasidic Jewish people?" A: I'd go along with that."); Chevon Dos Reis Deposition Transcript ("Dos Reis Tr."), attached as Ex. 6 to Butler Dec., at 50:7-11 ("Q: [W]hen you use the phrase 'White, private school community,' specifically you're referring to members of the Hasidic community? A: In this case, yes."); Jean Fields Rough Draft Deposition Transcript ("Fields Tr."), attached as Ex. 7 to Butler Dec., at 24:20-24.

According to Plaintiffs, the "private school community" candidates for the board from the Orthodox and Hasidic Jewish communities have "favored lowering the taxes that funded the District's budget," *i.e.,* property taxes, and prioritized education services used equally by public school students and private school students, such as bussing, textbooks, and special education.[20]

## III.    BACKGROUND ON SECTION TWO OF THE VOTING RIGHTS ACT

"[A] violation of the Voting Rights Act must be based on proof of the following elements in combination: (1) a voting standard, practice, procedure, qualification or prerequisite (2) imposed by a State or political subdivision (3) in a manner that denies or abridges the right of any citizen to vote (4) on account of race [or] color ... ." *Goosby,* 180 F.3d at 491 (citing 52 U.S.C. § 10301(a) ("Section 2")).  Plaintiffs must also prove that "(1) the political processes for nomination and election (2) are not equally open to participation by members of the protected [racial] class (3) because the [racial] class members have less opportunity than others to participate and elect their representatives of choice." *Id.* (citing 52 U.S.C. § 10301(b)).

Section 2 plaintiffs must also make three preliminary showings, called the "*Gingles* preconditions." *Thornburg v. Gingles*, 478 U.S. 30, 50–51 (1986).  Only the second and third *Gingles* preconditions are contested here, which require Plaintiffs to prove cohesiveness and "legally significant racially polarized voting." *Id.* at 56.  While "racially polarized voting" does not have a fixed definition, racially polarized voting generally is present when voters of different races vote differently. *Id.* at 53 n.21 (racial polarization exists when "black voters and white voters vote differently").  For racially polarized voting to be "legally significant," Plaintiffs must prove that a White majority "votes sufficiently as a bloc usually to defeat black voters'

---

[20] Compl. ¶¶ 27, 30.

candidates of choice." *N.A.A.C.P., Inc. v. City of Niagara Falls,* 65 F.3d 1002, 1008 (2d Cir. 1995) (citing *Gingles*, 478 U.S. at 51). Since voters do not identify themselves by their race at the polls, courts use statistical analyses to assess whether minority-preferred candidates are usually defeated by White voters as a bloc. *See, e.g.*, *id.* at 1009 & n.11

If the *Gingles* preconditions are satisfied, courts must then undertake a multi-factor "totality of the circumstances" analysis. In that analysis, courts must consider, among other things, the extent to which minorities have been elected in the jurisdiction, and whether divergent voting patterns are caused by non-racial motivations, such as partisanship or substantive policy disputes. The Voting Rights Act only regulates elections that impair voting rights "on account of race or color," and is therefore not implicated where minority-preferred candidates lose elections because they hold unpopular political positions. Any other rule would be mere "interest-group politics rather than a rule hedging against racial discrimination." *Gingles*, 478 U.S. at 83 (White, J., concurring). Accordingly, where White voters have "supported minority candidates elected by their parties at levels equal to or greater than those of white candidates," no violation of Section 2 can be established. *Goosby*, 180 F.3d at 496.

## IV.    ARGUMENT

Where, as here, a plaintiff seeks a preliminary injunction against government action taken in the public interest pursuant to a statutory scheme, the plaintiff must demonstrate: that (1) plaintiff is likely to succeed on the merits of the underlying claim, (2) plaintiff will suffer irreparable harm absent injunctive relief, and (3) the public interest weighs in favor of granting the injunction. *Pope v. Cnty. of Albany*, 687 F.3d 565, 570 (2d Cir. 2012).

Plaintiffs' motion should be denied because they have no possibility of success on the merits of their vote dilution claim. Plaintiffs fail to carry their burden to prove the presence of cohesiveness and legally significant racially polarized voting because there is no reliable

evidence that the "public school community" candidates were the candidates of choice of minority voters.  Even if there were such evidence, it would not establish a violation of Section 2 because it is undisputed that elections in the District are driven by differences over education and tax policy—not by race.  *See Baird v. Consolidated City of Indianapolis*, 976 F.2d 357, 361 (7th Cir. 1992) ("The Voting Rights Act does not guarantee that nominees of the Democratic Party will be elected, even if black voters are likely to favor that party's candidates.").

A.      **State Law Mandates "At-Large" Elections.**

As a matter of State law, board members are elected "at-large" because "[e]ach vacancy upon the board of education to be filled shall be considered a separate specific office," NY Educ. Law § 2018(a), and all qualified voters are "entitled to vote at any school meeting or election for the election of school district officers ... ."  *Id*. § 2012.  In other words, all qualified voters of a school district have a right to vote for all open district offices.  Boards of education have no authority to change how school district officers are elected.  *See id.* §§ 1709, 1805.  No State law authorizes boards of education to limit qualified voters' right to vote to just one open board seat representing a single "ward."  Nor does any State law authorize boards of education to require candidates for the board to reside in any particular "ward."

Plaintiffs' complaints about election administration also are directed at State law requirements.  Absentee ballots are governed by State law.  *Id.*  § 2018-a.  Yearly "staggered" elections occur on the third Tuesday of every May as a function of State law, not District policy. *See id.* §§ 1702(1), 2022(1).  Thus, Plaintiffs' case is an as-applied challenge to State law. Accordingly, for essentially the same reasons stated by the Commissioner, Plaintiffs' case should

be dismissed.[21]  Neither the District nor the Commissioner has the power to provide Plaintiffs the relief they seek.  *See Lowery v. Governor of Georgia*, 506 Fed. Appx. 885, 886 (11th Cir. 2013) (holding that because "the Governor of Georgia has no power to provide any of the relief requested in this case … the Governor is not the proper party defendant.").[22]

> **B.    Plaintiffs Have No Evidence of Legally Significant Racially Polarized Voting.**

Plaintiffs' voting behavior expert, Dr. Steven Cole, analyzed contested elections in 2013, 2015, 2016, and 2017 using King's Ecological Inference ("EI") technique of statistical analysis.[23]  Ecological inference generally refers to the statistical process of drawing inferences about individuals from aggregate data.  In the context of Voting Rights Act cases, EI is used to generate estimates of the true value of a racial group's support for a candidate in a given election, *i.e.*, the actual percent of Black voters who voted for the candidate.  EI is widely used by expert witnesses in assessing racially polarized voting.

When performed correctly and with adequate data sets, EI is regarded as the best available statistical method for estimating the proportion of racial groups' support for candidates. *See Rodriguez v. Pataki*, 308 F. Supp. 2d 346, 388 (S.D.N.Y. 2004) (recognizing that EI is "generally considered to be the most accurate method of calculation") (quotation omitted). However, EI is not appropriate for all types of elections.  EI works best when used to analyze elections with large Citizen Voting Age Populations ("CVAP"), large total numbers of voters,

---

[21] The Commissioner errs in pointing out that plaintiffs have named school districts as defendants in Section 2 cases outside of New York.  *See* Commissioner of Education's Memorandum of Law in Support of Motion to Dismiss, Docket No. 73, at 15-16.  New York law is different, and those cases were not as-applied challenges to state law.
[22] For the same reasons, the District lacks authority to resolve this case by consent decree.  *See United States v. Alex. Brown & Sons, Inc.*, 963 F. Supp. 235, 240 (S.D.N.Y. 1997) ("Generally speaking, parties to a consent decree cannot 'consent' to disregard otherwise valid law, or 'consent' to enlarge their own legal rights.").
[23] Preliminary Report of Steven P. Cole, Ph.D ("Cole Rep."), Docket No. 32-1, at 38-40.

large numbers of polling places, and high minority voter turnout.[24]  Courts recognize that EI generally will not produce reliable estimates if it is used to analyze elections characterized by small numbers of total votes, low minority voter turnout, a small number of polling places, and relatively small CVAP.  *See id.* at 382 (concluding that "[t]he turnout rate for and number of Hispanic voters was too low to make reliable statistical estimates for black and Hispanic cohesion" using EI).[25]  All of these conditions are present in East Ramapo, which used only ten polling sites in the relevant years and which had less than 15,000 voters.[26]  Such small numbers do not provide an adequate data set for EI.

For similar reasons, the Court in *United States v. Village of Port Chester* declined to consider whether school board elections were racially polarized.  704 F. Supp. 2d 411, 429 (S.D.N.Y. 2010).  In that case, the Court concluded that "it is not possible to perform the same types of statistical analysis for [] School Board elections" because there was only one polling place.  *Id.*  The Court explained that the school district's elections "could not be analyzed statistically" and that the plaintiffs' other evidence of racial polarization amounted to no more than "conflicting, and unverifiable, opinions about which candidates had the support of which communities."  *Id.*  As explained below, the same problems apply here.  Dr. Cole's EI analysis appears to be fatally flawed and unreliable due to these recognized problems.

---

[24] Declaration of Dr. John Alford ("Alford Dec."), attached as Ex. 4 to Butler Dec., ¶ 20.
[25] Dr. Cole agrees: "[I]ndeterminate votes are likely with smaller numbers of vote totals." Cole Tr. 131:18-20.
[26] *See* Cole Rep. at 37-38.

1.      **Dr. Cole's Flawed Statistical Analysis Should Be Disregarded.**

Dr. Cole's EI estimates are reproduced in the table below:[27]

| Candidate | Election Date | Race | White Vote % | Black Vote % | Latino Vote % | Number of Votes |
|---|---|---|---|---|---|---|
| Mark Berkowitz* | 5/16/17 | W | 77.4% | 36.5% | 0.5 | 9,075 |
| Alexandra K. Manigo | 5/16/17 | W | 23.5% | 68.8% | 99.5 | 4,922 |
| Harry Grossman* | 5/16/17 | W | 77.7% | 7.6% | 0.4 | 9,055 |
| Eric Goodwin | 5/16/17 | B | 22.5% | 94.2% | 99.4 | 4,871 |
| Joel Freilich* | 5/16/17 | W | 79.0% | 3.4% | 0.5 | 9,441 |
| Chevon Dos Reis | 5/16/17 | L | 20.8% | 99.4% | 99.8 | 4,470 |
| **Candidate** | **Election Date** | **Race** | **White Vote %** | **Black Vote %** | **Latino Vote %** | **Number of Votes** |
| Bernard L. Charles, Jr.* | 5/17/16 | B | 77.2% | 1.4% | 1.2 | 7,973 |
| Kim A. Foskew | 5/17/16 | W | 23.0% | 99.6% | 99.1 | 3,972 |
| Pierre Germain* | 5/17/16 | B | 77.0% | 0.9% | 0.4 | 7,860 |
| Jean E. Fields | 5/17/16 | B | 23.4% | 99.2% | 99.5 | 4,137 |
| Yehuda Weissmandl* | 5/17/16 | W | 78.0% | 0.6% | 0.5 | 7,626 |
| Natashia E. Morales | 5/17/16 | L | 24.4% | 99.2% | 99.2 | 4,401 |
| Sabrina Charles-Pierre | 5/17/16 | B | N/A | N/A | N/A | 5,014 |
| **Candidate** | **Election Date** | **Race** | **White Vote %** | **Black Vote %** | **Latino Vote %** | **Number of Votes** |
| Jacob L. Lefkowitz* | 5/19/15 | W | 75.0% | 36.2% | 0.7 | 6,380 |
| Sabrina Charles-Pierre | 5/19/15 | B | 23.5% | 74.6% | 64.2 | 4,600 |
| Alan Keith Jones | 5/19/15 | B | 2.6% | 3.6% | * | 468 |
| Yonah Rothman* | 5/19/15 | W | 72.1% | 40.0% | 0.5 | 6,523 |
| Natasha Morales | 5/19/15 | L | 28.1% | 59.9% | 99.4 | 4,864 |
| Juan Pablo Ramirez* | 5/19/15 | L | 68.0% | 26.5% | 0.3 | 6,293 |
| Steve D. White | 5/19/15 | W | 25.2% | 69.7% | 99.4 | 4,615 |
| Yisroel Eisenbach | 5/19/15 | W | 6.0% | 5.0% | * | 556 |
| **Candidate** | **Election Date** | **Race** | **White Vote %** | **Black Vote %** | **Latino Vote %** | **Number of Votes** |
| MaraLuz Corado* | 5/21/13 | L | 69.2% | 73.9% | 0.5 | 6,806 |
| Margaret Tuck | 5/21/13 | B | 30.5% | 29.3% | 99.6 | 5,244 |
| Pierre Germain* | 5/21/13 | B | 69.0% | 91.8% | 0.4 | 6,899 |
| Eustache Clerveaux | 5/21/13 | B | 30.2% | 7.6% | 99.5 | 5,085 |
| Bernard L. Charles, Jr.* | 5/21/13 | B | 68.7% | 89.7% | 0.6 | 6,833 |
| Robert Forest | 5/21/13 | B | 31.6% | 10.6% | 99.4 | 5,175 |

Based on his EI estimates purportedly showing large percentages of Black and Latino voters' support for the unsuccessful candidates who ran on the "public school community" slates, Dr. Cole opines that the 2015, 2016, and 2017 elections were racially polarized and that the minority-preferred candidates of the "public school community" slate were defeated by the

---

[27] The candidate's race is denoted as "W" for White, "B" for Black and "L" for Latino.  Winning candidates are listed with a "*" next to the candidate's name.

White, "private school community" voting as a block.[28]  With respect to the 2013 election, however, Dr. Cole's EI estimates show that large majorities of Black voters supported the successful candidates who ran on the "private school slate."  Dr. Cole nevertheless states that his EI estimates for the 2013 elections are "inconclusive"[29] and opines that the "weight of evidence indicates that the winning candidates, who were endorsed by the private school slate and the preferred candidates of White voters, were not minority-preferred candidates."[30]

In addition to Dr. Cole's lack of confidence in his own EI estimates for the 2013 election, which is addressed further below, there are several apparent problems with Dr. Cole's EI analysis.  The most obvious of these is that Dr. Cole's point estimates consistently show unrealistically extreme degrees of Black and Latino voter support for "public school community" candidates—often exceeding 99%.  For example, Dr. Cole estimates that in 2017 the "public school community" candidate Ms. Dos Reis, a Latina, received *99.4%* of the Black vote.  That seems unlikely.  In comparison, President Obama managed just 93% of the Black vote in 2008.[31]  Similarly, Dr. Cole estimates that in eleven of the twelve individual races analyzed, about *99.5%* of Latino voters supported the "public school community" candidates.  That too seems improbable.  Dictators like North Korea's former leader Kim Jong Il and Syria's Bashar Assad may reliably win 99% of the "vote" year after year, but results like that are unexpected in the context of a school board election.[32]  When EI estimates seem as far-fetched as Dr. Cole's, there

---

[28] Cole Rep. ¶ 9.
[29] Cole Rep. ¶ 71.
[30] Cole Rep. ¶ 9.
[31] John M. Powers, *Statistical Evidence of Racially Polarized Voting in the Obama Elections and Implications for Section 2 of the Voting Rights Act*, 102 Geo L.J. 881, 882 n.1 (2014).
[32] *See Kim Wins Re-election with 99.9% of the Vote*, N.Y. Times, March 9, 2009, http://www.nytimes.com/2009/03/09/world/asia/09iht-north.1.20696199.html; Albert Aji, The Associated Press,

are usually ways to independently assess the estimates' uncertainty.  Dr. Cole, however, has

provided no way to independently assess the reliability of his estimates, as explained below.

<strong>a.    Dr. Cole's failure to calculate and disclose confidence intervals<br>renders his estimates unreliable.</strong>

EI estimates typically are expressed by a "point estimate" and a "confidence interval."

"The confidence interval is a measure of uncertainty."  *Mo. State Conference of the Nat. Ass'n*

*for the Advancement of Colored People v. Ferguson-Florissant Sch. Dist.* ("*Ferguson*"), 201 F.

Supp. 3d 1006, 1042 (E.D. Mo. 2016).  Confidence intervals are usually set to 95 percent, which

means they are a "range of estimates within which we can be 95 percent confident, statistically,

that the true value of a group's support for a candidate falls."  *Fabela v. City of Farmers Branch*,

No. 10–CV–1425–D, 2012 WL 3135545, at *9 (N.D. Tex., Aug. 2, 2012).[33]

The "point estimate" is a number at or near the center of the confidence interval.  For

example, if Candidate A has received a point estimate of 75% of the votes cast by Latinos with a

confidence interval of 60% to 90%, then one can be 95% confident that Candidate A received

between 60% and 90% of the Latino votes.  Narrower confidence intervals indicate a more

reliable estimate and, conversely, wider confidence intervals indicate a less reliable estimate.

Confidence intervals that are too wide (*e.g.,* a range of 10%-90%) indicate estimates that are too

unreliable to be given any evidentiary weight.

Accordingly, courts in Section 2 cases recognize that "*EI estimates must include a*

*confidence interval to determine whether the difference in the estimated support among*

---

*Syrian President Easily Wins Referendum*, May 29, 2007, http://www.washingtonpost.com/wp-dyn/content/article/2007/05/29/AR2007052900471.html.

[33] "A statistical estimate with a 95% degree of confidence employs the level of statistical certainty that is consistent with generally accepted standards for EI in the field of political science, and is consistent with peer-review standards for research in that field."  *Ferguson*, 201 F. Supp. 3d at 1042.

15

*candidates can be considered statistically significant*." *Ferguson*, 201 F. Supp. 3d at 1042 (emphasis added). This is because Section 2 requires courts to compare the estimated proportions of minority voters' support for competing candidates to determine which candidate was "minority-preferred." Without a confidence interval, "one cannot say that there is a statistically significant difference between the two candidates." *Id.*

Dr. Cole does not report confidence intervals for his point estimates, despite testifying that he was able to do so.[34] This is a serious deficiency. When pressed to explain the omission during his deposition, Dr. Cole stated that confidence intervals "are not required." [35] In lieu of confidence intervals, Dr. Cole testified that he had instead considered "standard error" values for his EI estimates and on that basis he had confidence in his estimates.[36] That explanation makes little sense, because a "standard error" value represents a measure of variance in a data set, not a measure of uncertainty in a statistical methodology. Standard error is not a substitute for a confidence interval. However, since Dr. Cole had not disclosed the "standard error" values he purportedly relied on with his report, he could not be cross-examined about them.

After his deposition, Dr. Cole belatedly produced supplemental materials purporting to disclose the "standard error" values that he relied on.[37] It is not clear how the "standard errors" were determined or what they reflect, and there is no support for the purported "standard error" values. *See In re Mirena IUD Prod. Liab. Litig.*, 169 F. Supp 3d 396, 433 (S.D.N.Y. 2016)

---

[34] Cole Tr. 80:5-8 ("Q: So you could generate an approximate confidence interval for your estimates for the 2013 election? A: Yes.").
[35] Cole Tr. 77:3-6 ("Q: Why did you not calculate confidence intervals? A: They're not required as part of a report of this nature.").
[36] Cole Tr. 73:6 – 75:3; 80:9-15 ("Q. But you did not generate approximate confidence intervals for the 2013 election, correct? A. I reviewed the standard errors that were produced by EI and determined that they were small enough to have confidence in these estimates.").
[37] Excerpt from Dr. Cole's Supplemental Production, attached as Ex. 10 to Butler Dec.

(opinion unreliable where error calculations did not "appear in his report nor were they apparent during his deposition" and because the calculations were not based on supported information).

### b.    Dr. Alford's EI analysis diverges from Dr. Cole's.

The District retained its own expert—Dr. John Alford—to conduct an independent EI analysis, the results of which are reproduced below:[38]

| Candidate | Election Date | Race | White Vote % | Black Vote % | Latino Vote % |
|---|---|---|---|---|---|
| Mark Berkowitz* | 5/16/17 | W | 86% (75, 95) | 54% (12, 90) | 73% (40, 95) |
| Alexandra K. Manigo | 5/16/17 | W | 14% (5, 25) | 46% (10, 88) | 27% (5, 60) |
| Harry Grossman* | 5/16/17 | W | 86% (75, 96) | 53% (10, 89) | 26% (5, 60) |
| Eric Goodwin | 5/16/17 | B | 14% (4, 25) | 47% (11, 90) | 74% (40, 95) |
| Joel Freilich* | 5/16/17 | W | 87% (77, 96) | 59% (14, 92) | 31% (7, 65) |
| Chevon Dos Reis | 5/16/17 | L | 13% (4, 23) | 41% (8, 86) | 69% (35, 93) |
| Candidate | Election Date | Race | White Vote % | Black Vote % | Latino Vote % |
| Bernard L. Charles, Jr.* | 5/17/16 | B | 85% (74, 95) | 59% (13, 91) | 34% (7, 69) |
| Kim A. Foskew | 5/17/16 | W | 15% (5, 26) | 41% (9, 87) | 66% (31, 93) |
| Pierre Germain* | 5/17/16 | B | 85% (74, 94) | 58% (14, 92) | 32% (6, 66) |
| Jean E. Fields | 5/17/16 | B | 15% (6, 26) | 42% (8, 86) | 68% (34, 94) |
| Yehuda Weissmandl* | 5/17/16 | W | 84% (73, 94) | 56% (11, 92) | 27% (5, 60) |
| Natashia E. Morales | 5/17/16 | L | 16% (6, 27) | 44% (8, 89) | 73% (40, 95) |
| Sabrina Charles-Pierre | 5/17/16 | B | N/A | N/A | N/A |
| Candidate | Election Date | Race | White Vote % | Black Vote % | Latino Vote % |
| Jacob L. Lefkowitz* | 5/19/15 | W | 82% (70, 93) | 42% (6, 81) | 17% (3, 43) |
| Sabrina Charles-Pierre | 5/19/15 | B | 16% (6, 29) | 53% (15, 89) | 75% (45, 92) |
| Alan Keith Jones | 5/19/15 | B | 1% (0, 3) | 5% (1, 16) | 8% (2, 20) |
| Yonah Rothman* | 5/19/15 | W | 82% (69, 94) | 48% (8, 86) | 20% (3, 52) |
| Natasha Morales | 5/19/15 | L | 18% (6, 31) | 52% (14, 92) | 80% (48, 97) |
| Juan Pablo Ramirez* | 5/19/15 | L | 78% (65, 89) | 47% (8, 84) | 21% (4, 50) |
| Steve D. White | 5/19/15 | W | 17% (6, 30) | 49% (12, 87) | 74% (43, 93) |
| Yisroel Eisenbach | 5/19/15 | W | 6% (3, 8) | 5% (0, 15) | 5% (1, 14) |
| Candidate | Election Date | Race | White Vote % | Black Vote % | Latino Vote % |
| MaraLuz Corado* | 5/21/13 | L | 84% (67, 96) | 50% (10, 87) | 23% (4, 54) |
| Margaret Tuck | 5/21/13 | B | 17% (4, 33) | 50% (13, 90) | 77% (46, 96) |
| Pierre Germain* | 5/21/13 | B | 80% (67, 92) | 52% (11, 88) | 26% (5, 59) |
| Eustache Clerveaux | 5/21/13 | B | 20% (8, 33) | 48% (12, 89) | 74% (41, 95) |
| Bernard L. Charles, Jr.* | 5/21/13 | B | 80% (66, 92) | 52% (11, 89) | 25% (5, 57) |
| Robert Forest | 5/21/13 | B | 20% (8, 34) | 48% (11, 89) | 75% (43, 95) |

---

[38] Alford Dec. ¶ 42.

Dr. Alford used the same data as Dr. Cole—official election results and estimates of racial population proportions of CVAP for each of the District's ten polling sites, as generated by Plaintiffs' demography expert Dr. William Cooper.[39]  Dr. Alford and Dr. Cole also used the same statistical analysis technique—King's EI.[40]  Dr. Alford performed his EI analysis the same way that he has before in dozens of Voting Rights Act cases, using the most recently updated version of King's EI software program.

Dr. Alford's EI estimates differ substantially from Dr. Cole's EI estimates.  In marked contrast with Dr. Cole's unrealistically extreme estimates, Dr. Alford's point estimates for the proportion of Black voter support for "public school community" candidates tend to hover between 40% and 55% in all the years analyzed.  Common sense suggests that Dr. Alford's estimates are probably closer to reality than Dr. Cole's.

But the most important difference between Dr. Alford's and Dr. Cole's estimates is that Dr. Alford calculated and reported his confidence intervals (appearing in parenthesis next to the point estimate).  As Dr. Alford explains in his declaration, the confidence intervals for his estimates of White voter support are reasonably narrow, with ranges of +/- 10% from the point estimates.[41]  According to Dr. Alford, this is a function of the District's relatively large White voter population and comparatively higher rates of White voter turnout, which provide an adequate data set from which to generate reasonably reliable EI estimates.[42]  Dr. Alford's confidence intervals for the proportions of Black and Latino voter support, however, have extremely wide confidence intervals—as much as 10%-90%.  Such wide confidence intervals are

---

[39] Id. ¶ 41.
[40] Id. ¶ 38.
[41] Id. ¶ 48 n.15.
[42] See id. ¶ 49.

18

likely a function of the District's relatively small minority voting age population, relatively few polling sites (10), and modest minority voter turnout.[43]

An example from Dr. Alford's EI analysis illustrates the significance of such wide confidence intervals.  Dr. Alford reports a 47% point estimate for the proportion of Black voters who voted for "public school" candidate Eric Goodwin in the 2017 election.  If only the point estimate is considered, Dr. Alford's estimate would compel the conclusion that Mr. Goodwin was not the Black voters' candidate of choice in 2017.  Instead, Mr. Goodwin's successful opponent from the "private school community" slate, Harry Grossman, would be the minority-preferred candidate with 53% of the Black vote.  In fact, if the Court were to limit its consideration to Dr. Alford's point estimates, it would have to conclude that majorities of White and Black voters preferred the same, successful, candidates from the "private school community" slates in 2013, 2016 and 2017—dooming Plaintiffs' case.

Unfortunately—at least for the District—that is not necessarily the correct conclusion. Dr. Alford does not opine that only 47% of Black voters cast their votes for Mr. Goodwin in 2017 because the confidence interval ranges from 11% to 90%.  According to Dr. Alford, given the available data, nothing more definitive can be said using EI analysis.[44]  The same holds true for all of Dr. Alford's estimates of the proportions of Black and Latino voter support.

### c.    Dr. Alford's EI analysis demonstrates that Dr. Cole's EI analysis is unreliable and should be given no weight.

Two experts using the same data and statistical analysis should not reach such widely divergent results.  Both sides' experts typically agree on the EI estimates in Section 2 cases, and

---

[43] *Id.* ¶¶ 44-48.
[44] *Id.* ¶ 50.

if there is disagreement, it generally relates only to the *interpretation* of the EI results. For example, in *Terrebonne Parish Branch NAACP v. Jindal*, both sides generated "*virtually identical*" EI results. 274 F. Supp. 3d 395, 433 (M.D. La. 2017) (emphasis added). The results should at least be "sufficiently similar" to each other. *E.g, Cottier v. City of Martin,* No. 02–5021–KES, 2005 WL 6949764, at *17 (D.S.D, Mar. 22, 2005), *rev'd and remanded on other grounds*, 445 F.3d 1113 (8th Cir. 2006), *set aside on reh'g en banc*, 604 F. 3d 553 (8th Cir. 2010) (recognizing, in a case where Dr. Cole served as an expert, that "all three methods employed by the parties' experts in this case generated sufficiently similar results"); *Large v. Fremont Cnty*., 709 F. Supp. 2d 1176, 1193 (D. Wyo. 2010) (recognizing, in a case where Dr. Cole served as an expert, that "both parties concede that the Court need not choose between statistical methods because the results of each are so similar."); *Fabela*, 2012 WL 3135545, at *9 (concluding, in a case where Dr. Alford served as an expert, that both sides' experts' "mathematical analysis [were] not significantly different." (quotation omitted) (alteration in original)); *Benavidez v. City of Irving*, 638 F. Supp. 2d 709, 724 (N.D. Tex. 2009) ("Dr. Alford agreed generally with Dr. Engstrom's [EI] figures ... ."); *Rodriguez*, 308 F. Supp. 2d at 388 (parties' experts agreed on a single EI analysis). That Dr. Cole and Dr. Alford have reached such widely disparate EI estimates here means that something is very wrong.

Dr. Alford's confidence intervals were so wide that he does not regard his point estimates as reliable indicators of the actual proportions of Black and Latino voters' support for candidates. That makes Dr. Cole's decision *not to calculate* and report his confidence intervals highly suspect. These questions about the reliability of Dr. Cole's EI estimates are sufficiently serious that the Court should decline to credit Dr. Cole's opinions. *See Jeffers v. Beebe*, 895 F. Supp. 2d 920, 935 (E.D. Ark. 2012) (finding expert's EI analysis unreliable and concluding, as a result,

that plaintiffs could not meet their burden of proof.)  "A factfinder may certainly consider the bases for an expert's opinion and may accord the opinion less, or even no, weight if the record suggests that the bases are defective, incomplete, or questionable."  *Pope*, 687 F.3d at 581; *City of Niagara Falls*, 65 F.3d at 1020 (concluding that district court was entitled to find plaintiffs' expert unpersuasive because her analysis covered only portion of relevant timeframe and she relied heavily on interviews with plaintiffs).

It is especially appropriate to discount expert analysis that omits confidence intervals in Voting Rights Act cases, where the entire case can ride on the reliability of statistical analysis. For example, in *Rodriguez v. Pataki*, a three-judge panel comprised of judges from the Southern District and the Second Circuit unanimously found an EI "electability" analysis unreliable because the expert "did not produce confidence intervals and provide standard errors for his electability analysis although he testified it would have been possible to do so."[45]  308 F. Supp. 2d at 400 ("The reliability of the analysis is doubtful, and the plaintiffs simply failed to perform analyses that might have produced more probative results.").  While courts sometimes consider EI point estimates without confidence intervals, *e.g., Pope*, 94 F. Supp. 3d at 337 (N.D.N.Y. 2015), they have not done so in cases where, as here, the available data suggests confidence intervals so wide that estimates would be nearly meaningless.

d.    **Dr. Cole's other statistical exercises do not measure racial polarization and add nothing to the analysis.**

The two additional statistical analysis techniques Dr. Cole purports to perform are irrelevant and should be disregarded.  Neither can be used to measure racially polarized voting. First, Dr. Cole purported to perform a "homogeneous precinct analysis," or "HPA," which uses

---

[45] The panel included Chief Circuit Judge Walker, and district judges Koeltl and Berman.

polling places that are "overwhelmingly composed of members of the same race" to estimate voting behavior of members of that group in those polling places.[46] Dr. Cole admits, however, that there are "no homogeneous Latino or Black polling places in elections for Board seats."[47] Therefore HPA cannot be used to estimate Black and Latino voters' preferences.

Second, Dr. Cole states in his report that he performed a "Goodman Single-Equation Ecological Regression" analysis, which is another technique that can be used to measure for racially polarized voting.[48] But Dr. Cole admitted that he *did not* perform a "Goodman Single-Equation Ecological Regression" analysis. Instead, he performed a "correlation analysis," which is not used to measure racially polarized voting and is therefore irrelevant.[49] Even if the "correlation analysis" were relevant, Dr. Cole admits that it yielded no statistically significant results as to Black voter preferences anyway.[50]

As a result, Plaintiffs' only quantitative analysis of racially polarized voting is Dr. Cole's EI, and it is fatally flawed. The Court should therefore find that Plaintiffs have failed to carry their burden of proof on the second and third *Gingles* preconditions and deny the Motion. *See Overton v. Austin*, 871 F.2d 529, 539 (5th Cir. 1989) (plaintiff held unable to prove racially polarized voting due to statistical deficiencies).

---

[46] Cole Rep. ¶ 23.
[47] *Id.*
[48] Cole Rep. ¶ 27.
[49] Cole Tr. 105:5-7 ("You can also use the regression to get estimates of racial bloc voting. I did not do that."); *id.* 112:14-16 ("I did not use the single regression to generate racial bloc voting estimates.").
[50] *E.g.,* Cole. Tr. 102:19-103:21 ("Q. Did you obtain statistical significance for the percentage of non-Hispanic Black voters voting for the candidate for the seat of Moses Friedman?  A: No.").

2.    **Dr. Cole's EI Estimates for the 2013 Election Refute Plaintiffs'
Racially Polarized Voting Claim.**

Even if the Court considers Dr. Cole's EI estimates, Plaintiffs still fail to carry their

burden of proof because the 2013 election results are inconsistent with Plaintiffs' claim.  Only

minority candidates ran for the board in 2013.  Accordingly, all of the winning candidates were

minorities—two Black men (Bernard Charles, Jr. and Pierre Germain) and one Latina (Maraluz

Corado).  Dr. Cole's EI estimates of voter preference by race for the 2013 school board elections

are reproduced below:

| Candidate | Election Date | Race | White Vote % | Black Vote % | Latino Vote % | Number of Votes |
|---|---|---|---|---|---|---|
| MaraLuz Corado* | 5/21/13 | L | 69.2% | 73.9% | 0.5 | 6,806 |
| Margaret Tuck | 5/21/13 | B | 30.5% | 29.3% | 99.6 | 5,244 |
| Pierre Germain* | 5/21/13 | B | 69.0% | 91.8% | 0.4 | 6,899 |
| Eustache Clerveaux | 5/21/13 | B | 30.2% | 7.6% | 99.5 | 5,085 |
| Bernard L. Charles, Jr.* | 5/21/13 | B | 68.7% | 89.7% | 0.6 | 6,833 |
| Robert Forest | 5/21/13 | B | 31.6% | 10.6% | 99.4 | 5,175 |

Dr. Cole's EI estimates show that the 2013 election's winning candidates were preferred

by both Black and White voters by huge margins, which is significant because the winning

candidates were, according to Plaintiffs, the "private school community" supported slate.  If Dr.

Cole's estimates are reliable, these results belie the central thesis of Plaintiffs' complaint that the

"public school community" candidates invariably are the preferred candidates of minority voters.

a.    **Bernard Charles and Pierre Germain's 2013 campaign
platform appealed to all East Ramapo communities.**

Even setting aside Dr. Cole's unreliable estimates, there is other evidence that Mr.

Charles's slate of candidates was minority-preferred in 2013.  The winning slate in 2013 was

independently organized by Bernard Charles, Jr., a longtime resident of the District who has

been active in local politics much of his adult life.[51]  Mr. Charles's father was one of the original

founders of the NAACP of Spring Valley, his children attended the District's public schools, and

he ran for the board with the goal of advocating for the interests of public school students.[52]

He was joined on the slate by Mr. Pierre Germain, a Black man originally from Haiti who

immigrated to New York and started a business as a building contractor.[53]  Like Mr. Charles, Mr.

Germain became interested in school district politics out of concern for, and a desire to help, the

District's public school students.[54]  However, even though Mr. Charles and Mr. Germain

generally agreed with the "public school" slate on most education policy positions, their

campaign messages differed materially.[55]

Mr. Charles and Mr. Germain perceived the "public school" slate to be running on a

policy of hostility toward the District's Hasidic and Orthodox Jewish communities and the

representatives elected to the board from those communities.[56]  In contrast, Messrs. Charles and

Germain's campaign message emphasized willingness to reach out to the Orthodox and Hasidic

Jewish communities to negotiate compromises.[57]  For this reason, the NAACP of Spring Valley

did not support their candidacy.[58]

Mr. Charles and Mr. Germain campaigned door-to-door in all of the District's

neighborhoods.[59]  That included their own neighborhoods in Spring Valley, the District's

minority neighborhoods, and, unlike the candidates on the "public school" slate, the Hasidic and

---

[51] Declaration of Bernard Charles ("Charles Dec."), attached as Ex. 1 to Butler Dec., ¶¶ 2, 6, 12
[52] Charles Dec. ¶¶ 1-8.
[53] Declaration of Pierre Germain ("Germain Dec."), attached as Ex. 2 to Butler Dec. ¶¶ 1-5.
[54] Germain Dec. ¶ 8.
[55] Charles Dec. ¶¶ 17-18; Germain Dec. ¶¶ 15-16.
[56] *Id.*
[57] Charles Dec. ¶ 9, 13-14, 18, 20; Germain Dec. ¶ 8, 11-12, 16, 18.
[58] Charles Dec. ¶ 15.
[59] Charles Dec. ¶ 14; Germain Dec. ¶ 10.

Orthodox Jewish neighborhoods, too. They hoped their platform emphasizing compromise would resonate – and it did. Eventually, Mr. Charles and Mr. Germain met with community leaders from the Orthodox and Hasidic Jewish communities and obtained their support.[60]

**b.    Dr. Cole's disavowal of his EI estimates is not credible and his supplemental evidence may not be considered.**

If Dr. Cole's estimates are to be believed, the winning candidates' message of cooperation made a significant impact on both Black and White voters, who overwhelmingly voted for Ms. Corado, Mr. Germain, and Mr. Charles. According to Dr. Cole, Ms. Corado won 73.9% of the Black vote and 69.2% of the White vote; Mr. Germain won 91.8% of the Black vote and 69% of the White vote; and Mr. Charles won 89.7% of the Black vote and 68.7% of the White vote.[61] Dr. Cole admitted at his deposition that if these EI estimates are reliable, then the victorious slate of candidates was preferred by both Black and White voters, negating any inference of racial polarization.[62]

Because these results are potentially fatal to their case, Plaintiffs and Dr. Cole contend that "Black and Latino voters preferred the losing candidates" from the "public school community" slate in 2013 despite Dr. Cole's EI analysis to the contrary.[63] Dr. Cole even goes as far as abandoning his own analysis and asserting instead that so-called "supplemental evidence" is more probative of minority voters' preferences than his statistical analysis.[64] The "supplemental evidence" on which Dr. Cole relies consists of the opinion of a White, "public school community" activist named Peggy Hatton. Specifically, Ms. Hatton wrote in a letter to

---

[60] Charles Dec. ¶ 14; Germain Dec. ¶ 11-12.
[61] Cole Rep. at 40.
[62] Cole Tr. 129:8-130:4.
[63] Pl. Br. at 24 ("Dr. Cole's analysis demonstrates that the minority candidates who have won contested elections were not minority preferred."); Cole Rep. ¶ 68.
[64] Cole Rep. ¶ 68.

25

the editor of the Rockland County Times that she thought Black voters in the 2013 election must
have been confused and voted for the "private school community" slate by mistake.[65]

One White person's self-serving statements of opinion are not a credible source of
information about District-wide Black and Latino voters' preferences.  Dr. Cole made no
apparent effort to seek out viewpoints from Black and Latino voters.  Had Dr. Cole done so, he
may have found evidence that Mr. Charles, Mr. Germain, and Ms. Corado in fact were the
minority preferred candidates in 2013.  But Dr. Cole engaged in no good faith effort to seek out
genuine evidence of minority voter preferences.  Instead, Dr. Cole testified that he lacks
confidence in his own EI estimates for the 2013 election on the basis of Ms. Hatton's
uncorroborated speculation:

> Q. Okay. With specific reference to your estimate that 91.8 percent
> of non-Hispanic Black voters voted for Pierre Germain in 2013,
> are you confident in that estimate?
> A. Given that the estimate is disparate from the other pieces of data
> and results, I'm not confident. […]
> Q: So you used the same sort of data for the 2013 EI estimate that
> you used for the other years, correct?
> A. Correct.
> Q. But you are not confident in your EI estimates for the 2013
> election; is that right?
> A. That's right.[66]

Dr. Cole used the same data and methodology for each year's election.  Yet, Dr. Cole
confirmed that "the only set of EI estimates that [he] generated in which [he] was not confident"
were the "percentage of Black voters who voted" in the 2013 election.[67]  The only apparent
reason that Dr. Cole lacks confidence in his 2013 EI estimates is that they are plainly

---

[65] Cole Rep. ¶ 69.
[66] Cole Tr. 84:11-85:9.
[67] Cole Tr. 163:24-164:5.

inconsistent with Plaintiffs' claims. Dr. Cole's strategic disavowal of his own EI estimates for

2013 confirms the conclusion that Dr. Cole's report should be disregarded.

Dr. Cole's effort to discredit his own opinion based on "supplemental evidence" is

wasted in any event and must be rejected as a matter of law. The Second Circuit has articulated

a bright-line rule for assessing whether candidates are minority-preferred:

> For purposes of analyzing the third prong of *Gingles*, in § 2 cases in which the
> plaintiffs seek to replace an at-large, multimember electoral system with a series
> of single-member districts of which one or more would be a so-called majority-
> minority district, *a candidate cannot be "minority-preferred" if that candidate
> receives support from fewer than 50% of minority voters*. When a candidate
> receives support from 50% or more of minority voters in a general election, a
> court need not treat the candidate as minority-preferred when another candidate
> receiving greater support in the primary failed to reach the general election.

*City of Niagara Falls*, 65 F.3d at 1019 (emphasis added). The Second Circuit thus prohibits

courts from considering "supplemental evidence" like Dr. Cole's letters to the editor. Courts

may not consider "subjective indicators such as 'anecdotal testimonial evidence'" of minority

voter preference because such an exercise can "degenerate into racial stereotyping of a high

order." *Id.* "Questions such as whether a candidate, in a campaign, 'addressed predominately

minority crowds and interests' suggest the existence of a racial political orthodoxy that courts

should not legitimate, much less profess or promote." *Id.* Accordingly, Dr. Cole's opinion based

upon the statements of "public school community" activists must be rejected.

Nevertheless, Dr. Cole's decision to disavow his own EI estimates has consequences.

The Court may (but should not) find Dr. Cole's EI estimates reliable, in which case the winning

slate of Mr. Charles, Mr. Germain, and Ms. Corado was preferred by both White and the Black

voters in 2013. In that scenario, Plaintiffs' repeated assertions that "no minority-preferred

candidate has won a contested election in ten years" are contradicted by their own expert.[68]
Alternatively, the Court may (and should) find that Dr. Cole's EI estimates are not reliable across
the board given his unwillingness to defend his own estimates for the 2013 election and
disregard his report entirely.  Either way, even Plaintiffs appear to appreciate that the 2013
election is fundamentally inconsistent with the core premise of their entire case.

      **C.**      **White Voters' Consistent Support for Minority Candidates Is Dispositive.**

      Even if the Court were to credit Dr. Cole's EI estimates and find that elections were
racially polarized, Plaintiffs' Section 2 claim fails nevertheless.  Section 2 prohibits only
electoral structures that result in denial or abridgement of the right to vote "on account of race or
color."  52 U.S.C. § 10301(a); *see Vecinos De Barrio Uno v. City of Holyoke*, 72 F.3d 973, 981–
83 (1st Cir. 1995) ("[E]ven under the 1982 amendment, a lack of electoral success *unrelated to
race* is not a proxy for a lack of opportunity to succeed.").  Plaintiffs therefore cannot prevail if
their preferred candidates failed to win election for reasons other than race.

      For this reason, courts look "beyond the statistical voting patterns of whites and blacks to
see *who* is actually running—whites or blacks" in order to determine "whether the majority is
voting against candidates for reasons of race" or for some reason not regulated by Section 2.
*City of Niagara Falls,* 65 F.3d at 1015 (emphasis in original); *Goosby*, 180 F.3d at 493 (whether
elections are driven by partisanship or by racial considerations should be considered as part of
inquiry into totality of circumstances).  "It is only upon concluding that a minority group's
failure to prevail at the polls ... was the 'result' or 'function' of 'racial vote dilution' or 'built-in

---

[68] Pl Br. at 2, 5.

bias,' that a court may find that minority plaintiffs have suffered 'a denial or abridgement of the right ... to vote on account of race or color.'" *LULAC*, 999 F.2d at 853–54.

The White, "private school community" consistently has endorsed, supported, and elected minority candidates to the same extent and degree that they have supported White candidates.  Assuming it is reliable, Dr. Cole's EI analysis shows that the minority candidates who won in 2013, 2015, and 2016 received the same degree and proportion of support from White voters as did White candidates, without variation according to race.[69]  White voters also voted for Black and Latino candidates in the same proportion and without variation when the Black and Latino candidates were opposed by White candidates, as in the Ramirez v. White race in 2015 and the Charles v. Foskew race in 2016.  As Dr. Cole testified, these results show that minorities "supported by private school interests, were supported regardless of their race."[70]  By the same token, Dr. Cole's EI analysis shows that the "public school community's" minority candidates "lost without regard to their race[.]"[71]

The Second Circuit was unequivocal about the consequence of such findings.  Where, as here, "white voters … [have] supported minority candidates elected by their parties at levels equal to or greater than those of white candidates, it [is] proper to conclude … 'that divergent voting patterns among white and minority voters are best explained'" by factors *other* than race, such as differences on matters of policy.  *Goosby,* 180 F.3d at 496 (quoting *LULAC,* 999 F.2d at 861).   The District's elections fit this pattern.

---

[69] Cole Tr. 156:12-15 ("Q: And there is no variation according to race, is there? A: That's correct.").
[70] Cole Tr. 156:25-157:21.
[71] Cole Tr. 157:10-14 ("Q: And the three candidates who ran, to use your term, with the support of the publci school community, lost without regard to their race, right? A: That's correct.").

Plaintiffs agree that they did not lose their elections on account of their *race*.[72]  Indeed, Plaintiffs explicitly acknowledge—and thus judicially admit—that race is not the issue driving election results in the District every time they refer in their Complaint to the District's voting coalitions as the "public school community" and "private school community" rather than the "White community" and the "minority community."  Public schools and private schools do not connote racial categories, but they *do* reflect competing sets of public policy preferences.

These facts are dispositive.  Minorities are not excluded from the political process in East Ramapo—unpopular politicians have lost elections, irrespective of their race.  "Absent evidence that minorities have been excluded from the political process, a 'lack of success at the polls' is not sufficient to trigger judicial intervention."  *LULAC*, 999 F.2d at 853; *Reed v Town of Babylon*, 914 F Supp. 843, 877, 883 (E.D.N.Y. 1996) (deeming evidence of white bloc voting legally insignificant because "white voters supported minority candidates slated by a political party at levels at least equal to the support enjoyed by the white candidates of that party").  "Unless the tendency among minorities and white voters to support different candidates, and the accompanying losses by minority groups at the polls, are somehow tied to race, voting rights plaintiffs simply cannot make out a case of vote dilution."  *Nipper v. Smith*, 39 F.3d 1494, 1523–24 (11th Cir. 1994); *City of Holyoke*, 72 F.3d at 981 ("[P]laintiffs cannot prevail on a VRA § 2 claim if there is significantly probative evidence that whites voted as a bloc for reasons wholly unrelated to racial animus.").  Dismissal is required.

---

[72] Dos Reis Tr. 95:19-21 ("Q: Do you think that you lost the election in 2017 because of your race? A: Not because of my race, no."); Eric Goodwin Rough Draft Deposition Transcript, attached as Ex. 8 to Butler Dec., at 82:13-16 ("Q. Do you think that you lost your election for the school board because of your race? A: No."); Fields Tr. 67:16-19 ("Do you think you lost the election because you're Black? A: No, I think I lost the election because someone else got more votes.").

**D.    The Totality of the Circumstances Does Not Evidence a Violation.**

The Court's assessment of the totality of the circumstances requires a "searching practical evaluation of the past and present reality." *Gingles,* 478 U.S. at 45 (internal quotations omitted). The keys to this inquiry are the seven factors listed in the Senate Judiciary Committee Report accompanying the 1982 amendments to the Voting Rights Act, the so-called "Senate factors." *See* S. Rep. No. 97–417, at 28 (1982) (the "Senate Report").

Not all Senate Factors are entitled to equal weight. "Under the functional view of the political process mandated by Section 2, the most important factors bearing on a challenge to a multimember system are the extent of racial polarization and the extent to which minority group members have been elected to public office in the jurisdiction." *Goosby v. Town Bd. of the Town of Hempstead*, 956 F. Supp. 326, 343 (E.D.N.Y. 1997), *aff'd* 180 F.3d 476 (2d Cir. 1999). In contrast, "[t]he Senate Report makes clear that the issue of a political subdivision's responsiveness has little probative value." *Village of Port Chester*, 704 F. Supp. 2d at 446. Consequently, the Second Circuit considers the "responsiveness" Senate Factor with "some reluctance, as it entails [] deciphering what policy steps qualify as responses to the 'needs of members of the minority community.'" *City of Niagara Falls*, 65 F.3d at 1023 n.24. Plaintiffs have made no persuasive showing under the totality of the circumstances.

**1.    There is No Evidence of Racial Polarization in the District.**

The two most important factors weigh decisively in favor of the District. As to the "extent of racial polarization," as discussed above, Plaintiffs have produced no reliable evidence that the District's elections are affected by racial polarization to any degree. Dr. Cole's EI estimates (assuming they can be relied upon) show that the 2013 elections were not racially polarized because Black and White voters overwhelmingly supported the same candidates. And

31

the White, "private school community" majority has endorsed and elected minority candidates in subsequent elections, which should negate any inference that elections are polarized by race.

### 2.    Minority Candidates Have Had Remarkable Electoral Success.

As to the other most important factor, the "extent to which minority group members have been elected to public office in the jurisdiction," Black and Latino candidates have won six of the twelve contested elections analyzed by Dr. Cole: Charles, Corado, and Germain won in 2013, Ramirez won in 2015, and Charles and Germain won again in 2016. The success of minority candidates distinguishes this case from every prior Voting Rights Act case in the Second Circuit.

In *Goosby,* for example, the Town of Hempstead had *never* elected a Black candidate to the Town Board, Black candidates were excluded from the party slating process, and "a majority of white voters in Hempstead had never supported a black candidate for the Board." *Goosby,* 180 F.3d at 503. In *City of Niagara Falls*—where racially polarized voting was found but no Voting Rights Act violation established—only one Black candidate had ever been elected. 65 F.3d at 1009. District court cases in the Second Circuit exhibit the same pattern—either no or virtually no minority candidates had ever been elected under the challenged electoral schemes. *See e.g., Village of Port Chester*, 704 F. Supp. 2d at 438 ("[N]o Hispanic candidate had ever been elected to public office in Port Chester-not Mayor, not to the Board of Trustees, and not to the School Board."); *Arbor Hill Concerned Citizens Neighborhood Ass'n v. Cnty. of Albany*, 281 F. Supp. 2d 436, 449 (N.D.N.Y. 2003) ("[N]o minority candidate has ever been nominated to run for County-wide office[.]"); *Reed*, 914 F. Supp. at 890 (finding "that no African–American has ever served on the Town Board or as Town Supervisor" and that evidence of Black candidate success in other positions was inconclusive); *Montano v. Suffolk Cnty. Legislature*, 268 F. Supp. 2d 243, 266 (E.D.N.Y. 2003) (finding that only "one Hispanic legislator in Suffolk County" but not racially polarized voting).

In the face of the District's remarkable record of minority electoral success, Plaintiffs argue that the successful minority candidates were not the candidates of choice of minority voters and insinuate that minority candidate victories were the products of "manipulation" by the White majority to create "safe minority candidates."[73]  Plaintiffs have no evidence of such "manipulation" and the suggestion is just the sort of "degenerat[ion] into racial stereotyping" and assumption of "racial political orthodoxy" that "courts should not legitimate, much less profess or promote." *City of Niagara Falls*, 65 F.3d at 1018 (prohibiting district courts from "assess[ing] candidates' authenticity in matters racial.").

More importantly, that is not the relevant test.  The Senate Factors ask the Court to consider "the extent to which *members of the minority group* have been elected to public office in the jurisdiction."  Senate Report at 207 (emphasis added).  They do not ask the Court to consider the extent to which minority *preferred* candidates have been elected, which would just duplicate the racial polarization analysis.  Plaintiffs' attempt at diversion highlights the obvious conclusion that the most important Senate Factor weighs decisively for the District.

### 3.     There Is No History of Official Discrimination Relevant to Voting.

Plaintiffs do not have a shred of evidence of anything approaching "official discrimination" relevant to voting or elections.   *First,* they assert that discrimination occurred when "poll workers have asked voters of color for identification" but not White voters, and when "poll workers have been "disproportionately hostile to minority voters."[74]  These vague contentions are based on a copy of an email from a person named Emilia White, which purportedly was sent to declarant Mr. Willie Trotman in 2012, and which he now attaches to his

---

[73] Pl. Br. at 24.
[74] Pl. Br. at 19.

declaration.[75]  In Ms. White's email, she purports to relay problems with elections she has learned about by "speaking with students, parents, teachers, and concerned individuals in our community and beyond. . . ."[76]  Since Plaintiffs rely on this as "evidence" for the truth of the matters asserted—i.e., that discrimination by poll workers in fact occurred—the hearsay within hearsay (within hearsay, etc.) problems are daunting.  While the Court has discretion to consider hearsay in a preliminary injunction hearing, the Court should "weigh evidence based on whether such evidence would be admissible" at trial.  *Mullins v. City of New York*, 634 F. Supp. 2d 373, 384 (S.D.N.Y. 2009).  As "[n]o first-hand or even second-hand specifics of any such conduct are provided," there is not enough substance here to carry Plaintiffs' burden.  *Dabney v. Christmas Tree Shops*, 958 F. Supp. 2d 439, 451 (S.D.N.Y. 2013) (Seibel, J.).

*Second*, Plaintiffs assert that in past years the District sometimes provided newsletters to parents in the private school community that were not provided to public school parents, sometimes the District provided newsletters to both communities, and sometimes, but not always, the newsletters contained information about elections.[77]  Plaintiffs do not explain how the District's occasional newsletters constitute "discrimination" relevant to elections.

*Third,* Plaintiffs contend that the District once distributed voter registration cards and information about elections at parent-teacher meetings and school events, and then at some point changed the policy.[78]  Plaintiffs do not explain how this change in practice constitutes "discrimination" relevant to voting, as the blanket cessation of a policy applies equally to everyone.  In any event, while boards of education may allow the distribution of limited

---

[75] Docket Number 25-5 at 2.
[76] *Id.*
[77] Pl. Br. at 25 (citing Hatton Dec. ¶¶ 28-29).
[78] *Id.* (citing Trotman Dec. ¶ 24).

34

information about elections on school property, doing so brings with it legal risk because the use of district resources to distribute materials designed to solicit favorable votes violates the constitutional prohibition against use of public funds to promote a partisan political position. *E.g., Matter of Phillips v Maurer*, 67 N.Y.2d 672, 674 (1986). School districts are well advised to keep tight control over any practice that could be interpreted as "using public funds to promote a partisan position." *Appeal of Thomas C. O'Brien*, 42 Ed. Dept. Rep., Decision No. 14868, 2003 WL 26094999, at *3 (May 12, 2003).

*Fourth*, Plaintiffs accuse the District of "ignoring a recommendation by the Monitors to improve poll access for minority voters."[79] In fact, Mr. Trotman's declaration makes clear that the District has *not* ignored the Monitors' recommendation, which was to undertake a "review [of] underused polling sites and identify new sites for the 2016 election to ensure greater accessibility to voting locations."[80] Mr. Trotman states in his declaration that the District undertook the review and proposed changes, which the NAACP asked the District to postpone.[81] It did. Plaintiffs fail to explain how these events constitute "discrimination" relating to voting.

*Finally*, Plaintiffs argue that "official discrimination" occurred when, in 2011, then-Board President Aron Weider purportedly "was arrested and charged" with a crime "after a poll watcher accused him" of conduct that interfered with a polling site.[82] In fact, the anecdote is nearly all untrue. As Mr. Weider explains in his declaration: (a) there was, in fact, a brief altercation with a poll watcher at a polling place in 2011; (b) no one was arrested; (c) no one was

---

[79] Pl. Br. at 18 (citing Trotman Dec. ¶¶ 26-27).
[80] Trotman Dec. ¶ 26 (quoting Dennis M. Walcott et al., *Opportunity Deferred: A Report on the East Ramapo Central School District* (2015) at 12-13).
[81] *Id.* ¶ 27.
[82] Pl. Br. at 19.

charged with a crime; and (d) no one was prevented from voting as a result.[83]  However, even if Plaintiffs' far more salacious version were true—and it is not—Plaintiffs have not explained how an incident between two individuals at a polling site in 2011 can amount to evidence of "official discrimination" relevant to voting.

### 4. There Is No Candidate Slating Process and Minorities are Not Excluded from the Informal Candidate Selection Processes.

The Senate Factors ask the Court to consider "if there is a candidate slating process, whether the members of the minority group have been denied access to that process."  Senate Report at 206.  School board elections are non-partisan, thus anything that might be characterized as a "slating process" is necessarily informal.  Mr. Weider avers in his declaration that, to his knowledge, no organization in the Orthodox and Hasidic Jewish communities has a candidate "slating process,"[84] and Mr. Charles and Mr. Germain both aver that they independently formed their own "slates" in 2013 and 2016 without the help of any organization.[85]  Plaintiffs have no contrary evidence that a secret "private school community" slating process exists.  Minorities cannot be excluded from a slating process that does not exist.  But even if there were something for minorities to be excluded from, they obviously are not, considering that Mr. Germain and Mr. Charles were supported by the "private school community" in 2013 and 2016.  This factor strongly favors the District.

Undeterred, Plaintiffs try to make something from nothing with this factor by slipping the concept of "minority-preferred" candidates into the analysis where, once again, it does not

---

[83] Wieder Dec. ¶¶ 38-44.
[84] Wieder Dec. ¶ 30.
[85] Charles Dec. ¶¶ 12-22; Germain Dec. ¶¶ 8-22.

belong.[86]  According to Plaintiffs "[w]hether a slate actually selects minority candidates is less important than whether minority-preferred candidates have access to the slating process."[87]  This assertion has no support in the Senate Report or the *Goosby* case to which it is misattributed.

Plaintiffs appear to be arguing that Section 2 is implicated here because *public school community* candidates do not have access to (non-existent) slating and endorsement opportunities from their political rivals in the *private school community*—the people with whom they fiercely disagree over education and tax policy.  The Second Circuit has never adopted such a self-evidently silly rule.  The problem in *Goosby* was that Black *Republicans* were barred from the *Republican* slating process, freezing Blacks out of politics entirely.  *Goosby*, 180 F.3d at 496.  Plaintiffs' argument assumes that under *Goosby* Section 2 could be violated if *Democrats* were excluded from the *Republican* slating process.  That is not the law.

### 5.    Minorities Do Not Bear Effects of Past Discrimination in any Way Relevant to Voting or Elections in the District.

The Senate Factors ask the Court to consider "the extent to which members of the minority group in the state or political subdivision bear the effects of discrimination in such areas as education, employment and health, which hinder the ability to participate effectively in the political process.  *See* Senate Report at 206.  This Senate Factor is as inhospitable to Plaintiffs as its predecessors, because Plaintiffs have not shown—and cannot show—that members of any minority group in the District have been "hinder[ed]" in their "ability to participate effectively in the political process."  *Id.*  Any suggestion along those lines immediately is negated by the fact that Blacks and Latinos in the District have experienced consistent electoral success for years.

---

[86] Pl. Br. at 21.
[87] *Id.*

Plaintiffs instead attempt to use this Senate Factor and the "Responsiveness" Factor to shoehorn into this case all of the well-worn allegations of the *Montesa v. Schwartz* case, including the familiar charge of discrimination in the way budget cuts were allocated.[88]  This Court knows how the battle lines have been drawn over those issues, and there is little utility in manning them again here.  For present purposes, it is sufficient that Plaintiffs make no effort to tie anything relating to the quality of the District's public education in any concrete way to voting, elections, or anything else relevant to the Voting Rights Act.  Plaintiffs' arguments relating to the quality of public education in the District are irrelevant and should be disregarded.

**E.    The 2018 Election Will Not Cause Irreparable Harm.**

Finally, Plaintiffs fail to explain how holding the May 2018 election as planned would cause any person to suffer irreparable harm.  Even if Plaintiffs had met their burden to show that they have a likelihood of success on the merits of their claim (and they have not), that is not a sufficient basis to grant the requested preliminary relief.  No irreparable harm can result from an election because the Second Circuit has held that "[i]t is within the scope of [a federal court's] equity powers to order a governmental body to hold special elections to redress violations of the VRA." *Arbor Hill*, 357 F.3d at 262.  "Implicit in the power to order special elections is the authority to void elections conducted in violation of the VRA." *Pope*, 687 F.3d at 569.  Thus, if the Court were to find a violation of the VRA even after the May 2018 election has been held, the Court would still have ways to remedy any harm that resulted from the faulty election.

Moreover, courts recognize that it is generally against the public interest to interfere with upcoming elections unless absolutely necessary. *See Diaz v. Silver,* 932 F. Supp. 462, 468–69

---

[88] Pl. Br. at 23.

(E.D.N.Y. 1996) (denying motion for a preliminary injunction seeking to prevent elections under challenged congressional redistricting plan); *Cardona v. Oakland Unified Sch. Distr.*, 785 F. Supp. 837, 842 (N.D. Cal. 1992) ("The strong public interest in having elections go forward, for example, weighs heavily against an injunction that would delay an upcoming election."); *Govern v. Connolly*, 637 F. Supp. 111, 116 (D. Mass. 1986) (same).  As Plaintiffs have not explained any reason why irreparable harm would result from the May election, the Motion should be denied.

Finally, the relief Plaintiffs seek is inequitable and contrary to the purposes of the Voting Rights Act.  There is no evidence of racial polarization here.  White voters cast their votes for Black, Latino, and White candidates solely on the basis of their politics, not their race.  There is nothing wrong with that.  A "ward system" would create racial polarization where none exists. The result would be to prevent the District's White voters from casting their votes for the Black or Latino candidates they support.  *City of Niagara Falls*, 65 F.3d at 1016.  Imposing wards on the District's would be tantamount to "electoral apartheid" because it would restrict the people's right to vote for whomever they choose on the basis of race.  *Id.*  That is not merely inequitable and contrary to public policy, it is "inconsistent with our people's aspirations for a multiracial and integrated constitutional democracy."  *Id.*  Plaintiffs' motion should be rejected.

~      ~      ~

## V.      CONCLUSION

For all the all foregoing reasons stated herein, the Court should deny Plaintiffs' Motion

for Preliminary Injunction and their Complaint should be dismissed, with prejudice.


Dated: February 19, 2018                                    Respectfully Submitted,

                                                            MORGAN, LEWIS & BOCKIUS LLP

                                                            /s/David J. Butler
                                                            David J. Butler
                                                            Randall Levine
                                                            101 Park Avenue
                                                            New York, NY 10178
                                                            T: (212) 309-6000
                                                            F: (212) 309-6001
                                                                -and-
                                                            1111 Pennsylvania Avenue, NW
                                                            Washington, DC 20004
                                                            T: (202) 739-3000
                                                            F: (202) 739-3001
                                                            david.butler@morganlewis.com
                                                            randall.levine@morganlewis.com

                                                            *Counsel for Defendant*
                                                            *East Ramapo Central School District*

<u>**CERTIFICATE OF SERVICE**</u>

I hereby certify that on, February 19, 2018, a true and correct copy of the foregoing was

served by the ECF e-filing system on the following:

Perry Grossman
pgrossman@nyclu.org
Kevin Eli Jason
kjason@nyclu.org
New York Civil Liberties Union
125 Broad Street
New York, NY 10004

Corey Anne Calabrese
corey.calabrese@lw.com
Elizabeth Anna Parvis
elizabeth.parvis@lw.com
Claudia Theda Salomon
claudia.salomon@lw.com
Latham & Watkins LLP (NY)
885 Third Avenue
New York, NY 10022

*Counsel for Plaintiffs*

William James Taylor, Jr.
william.taylor@ag.ny.gov
Office of Attorney General (NYS)
120 Broadway
New York, NY 10271

Elyce Noel Matthews
elyce.matthews@ag.ny.gov
New York State Office of the Attorney
General (NYC)
120 Broadway
New York, NY 10271

Monica Anne Connell
Monica.Connell@ag.ny.gov
New York State Office of the Attorney
General (24th Floor)
120 Broadway, 24th Floor
New York, NY 10271

*Counsel for Defendant MaryEllen Elia*

*s/ David J. Butler*
David J. Butler