# EXHIBIT 3

UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| NATIONAL ASSOCIATION FOR THE ADVANCEMENT OF COLORED PEOPLE, SPRING VALLEY BRANCH, *et al.*,<br><br>Plaintiffs,<br><br>v.<br><br>EAST RAMAPO CENTRAL SCHOOL DISTRICT, *et al.*,<br><br>Defendants. | ECF CASE<br><br>Case No. 7:17-cv-08943<br><br>DISTRICT JUDGE<br>CATHY SEIBEL<br><br>MAGISTRATE JUDGE<br>JUDITH C. MCCARTHY |

## DECLARATION OF ARON WIEDER

Pursuant to 28 U.S.C. § 1746, Aron Wieder declares under penalty of perjury as follows:

### *Background*

1. I am an adult resident of Spring Valley, New York, and live in the East Ramapo Central School District.

2. I have lived in Rockland County since 1993.

3. I presently serve in government as a Rockland County legislator.

4. I was elected to serve on the Board of Education of the East Ramapo Central School District ("the District") in 2008. I served as vice-president and then president of the Board of Education during my three-year tenure on the Board. I decided not to run for reelection after the completion of my term.

5. The following paragraphs are stated based upon my own personal knowledge and perceptions and reflect my best understandings and recollections of past events as of the time I affixed my signature to this declaration.

### *General Information about the Orthodox and Hasidic Jewish Communities of the District*

6. I am a Hasidic Jew and an active member of the Orthodox and Hasidic Jewish communities in the District.

7. The majority of residents in my neighborhood are Orthodox and Hasidic Jews.

8. All or nearly all children in the Orthodox and Hasidic Jewish communities attend private schools, which are known as yeshivas. Orthodox and Hasidic Jews send their children to private yeshivas for secular education and to learn about the Jewish religion and adhere to Jewish laws and practices. Yeshiva education is not considered optional for Orthodox and Hasidic Jews.

9. Spring Valley is not the only community located in the District with large Orthodox and Hasidic Jewish communities. In particular, there are three Hasidic Jewish communities located within the District's boundaries: Kaser, Monsey, and New Square.

10. Kaser has a population of several thousand people. Geographically, Kaser is completely surrounded by Monsey. As far as I know, everyone or almost everyone who lives in Kaser is Hasidic.

11. New Square also has a population of several thousand people. As far as I know, everyone or almost everyone who lives in New Square is Hasidic.

12. Monsey is much larger than both Kaser and New Square. Tens of thousands of people live in Monsey. Orthodox and Hasidic Jews make up a substantial proportion of Monsey's population.

13. While Kaser, Money, and New Square are comparatively small communities in terms of overall population, they are among the largest Hasidic Jewish communities in the United States.

## *Perceived Political Disenfranchisement of the Orthodox and Hasidic Community*

14. There have been Orthodox and Hasidic Jewish communities in the District for many years. Over the past ten to fifteen years, however, the communities have grown exponentially. Many Orthodox and Hasidic Jews, felt that they were disenfranchised and their interests were not adequately represented in local politics.

15. For example, when I moved to the District, it was very difficult for members of the Orthodox and Hasidic Jewish communities to obtain building permits and other permissions needed to open schools, build synagogues, and provide adequate housing for communal needs.

16. There was a sense in the Orthodox and Hasidic Jewish communities that their interests were not being adequately represented by local elected officials and that local policies were consistently being deployed to make them unwelcome in the District.

17. As a community, they felt disenfranchised – particularly with respect to the lack of representation on the District's Board of Education.

18. The Orthodox and Hasidic Jewish communities have intense personal and financial interests in management of the District. For one thing, as a matter of New York law, public school districts are required to provide certain education services to all students in the district—both public school students and private school students. These include bussing to school, providing free textbooks for loan to private school students, special education services, and school nursing services, just to name a few. Many in the Orthodox and Hasidic Jewish communities perceived that their children were not receiving all of the mandated services to which they were entitled, because they attend private schools instead of public schools.

19. Property taxes are another reason why the Orthodox and Hasidic Jewish communities are interested in District politics. Because Orthodox and Hasidic Jewish parents pay private school tuition for their children's yeshiva education, their budgets are spread thin. High property taxes are financially devastating.

20. Eventually, the Orthodox and Hasidic Jewish communities reached the conclusion that the only way to protect their interests would be to participate actively in local government—both by running for office and by voting. Since that time, the Orthodox and Hasidic Jewish communities have had an extremely high level of civic participation, including very cohesive, issues focused voting, and a high voting rate.

### *Orthodox and Hasidic Jewish Voters care about Public Education Policy, Spending and Taxes*

21. I first became interested in local politics in 2007. At that time, there was a growing feeling in my community that the School Board (and others in Rockland County), were becoming overtly hostile to the growth of the Orthodox and Hasidic Jewish communities. In connection with the School Board, Orthodox and Hasidic Jews perceived that they were being deliberately short-changed, because their children were not receiving all of the mandated education services to which they were entitled.

22. The Orthodox and Hasidic Jewish communities grew even more dissatisfied with their representation on the Board because, in addition to perceptions that the District refused to provide their children with complete mandated services, the District consistently raised property taxes without regard for the interests or financial well-being of the Orthodox and Hasidic Jewish communities.

23. Many in the Orthodox and Hasidic Jewish communities felt they were not getting any return on their investments in the public school system. Voters in the Orthodox and

4

Hasidic communities came to believe that changes to the Board were necessary to control spending, keep property taxes low, and ensure that mandated services were provided to all children in the District, including private school students.

24. Sometime during 2007, I was approached by the late Rabbi Yakov Horowitz, a well-respected leader in my community. Rabbi Horowitz encouraged me to run for a seat on the Board. He expressed the view, and I agreed, that part of the problem our community was experiencing with the District grew from a lack of understanding, interaction, and dialogue between the various communal interest groups, and that if members of our community could obtain a seat on the Board, those people could work to increase dialogue, understanding and trust between the broader community and the growing Orthodox and Hasidic Jewish populations.

25. Following my discussion with Rabbi Horowitz, I agreed to run for a seat on the Board, and qualified for the May 2007 election. I had no prior political experience. I ran a slap-dash campaign with no organized support. I campaigned within the Orthodox and Hasidic Jewish communities, and I did some limited campaigning in other neighborhoods. For example, during the 2007 campaign, I responded to questions from the Journal News editorial board relating to education policy issues. I also met with members of the public school PTA, and several non-Hasidic voters.

26. I lost the 2007 election to Suzanne Young-Mercer, a black woman.

27. After the 2007 election, I continued to hear from members of my community about difficulties they were having with District policies and practices. Many asked for my help. Many of the complaints I received related to difficulties and frustrations of parents in connection with efforts to address the special education needs of their children – with

5

complaints ranging from a lack of responsiveness and concern, to instances of intimidation, where District representatives supposedly threatened to refer parents to Child Protective Services if they refused to accept a District special education plan for their children. Those conversations motivated me to run again for a seat on the Board in the 2008 election.

28. I campaigned more actively and more effectively in the 2008 election. I was successful. My opponent in the 2008 election was Steven White – one of the most vocal advocates against the education-related priorities of the Orthodox/Hasidic community. In 2008, I went from losing to Ms. Young-Mercer by less than 150 votes to beating Mr. White by more than 3,800 votes. Although I was not the first Orthodox Jew to be elected to the East Ramapo Central District's School Board, I believe that I was the first Hasidic Jew to do so.

### *Candidate Race is Irrelevant to Orthodox and Hasidic Jewish Voters*

29. In all of my time as a resident, candidate, board member, and former board member of the School Board, I have <u>never</u> heard anyone mention the race of a candidate as a reason for supporting or not supporting a candidate for the Board. Instead, all of the conversations have focused on candidates' policy positions and on candidates' willingness to engage with, cooperate with, and otherwise work with all elements of interest in the District, including the growing Orthodox and Hasidic Jewish populations in the District.

30. To my knowledge, the Orthodox and Hasidic Jewish communities do not use a formal slating process. Instead, Orthodox and Hasidic Jewish voters generally support candidates based upon the recommendations and endorsements of community leaders and

6

community organizers. The community leaders and community organizers tend to conduct their own evaluations of candidates to decide whom to endorse, and once they are satisfied with the views of and positions taken by a candidate, spread the word among the community orally or with fliers. Support for a candidate does not depend on whether the candidate is an Orthodox or Hasidic Jew. I, and other members of my community, regularly support and vote for non-Orthodox and non-Hassidic candidates, and will continue to do so.

31. Our primary concern is that we be treated fairly by our elected officials, and that our community be shown the proper respect and accommodation whenever possible.

## *Eric Goodwin*

32. I have reviewed the declaration of Plaintiff Eric Goodwin, submitted in connection with this litigation. Mr. Goodwin asserts in paragraph 21 of his declaration that I "approached" him after he announced his candidacy for the school board, and told him that it would be "a waste of time" to reach out to members of the Hasidic community or to campaign in "predominantly white neighborhoods." That statement is untrue.

33. The first time I met Mr. Goodwin was in the parking lot of the District's offices, on or about March 28, 2017. That evening, I was returning to my car from a wedding hall across the street, and saw Dr. Deborah Wortham, the School District's Superintendent, talking with a gentlemen that I didn't know. As they were standing near my car, I greeted them. Dr. Wortham introduced me to Mr. Goodwin, who told me that he was running for a seat on the School Board.

34. Mr. Goodwin told me that he was different from the other School Board candidates who were being promoted and supported by the "public school community." He said he is not

7

a "hater," and that it was his intention to work with the private school community to make things better for the District, rather than focusing on things that tear us apart. He pledged to do what he could to help bridge the gap between the two communities over policy issues being addressed by the School Board.

35. I was impressed by what Mr. Goodwin said, and told him that I wished him success, and looked forward to working with him.

36. Mr. Goodwin then told me that he intended to bring his message of goodwill and cooperation to the Hasidic community, and that he was planning to campaign there. I told him that in my experience, the two things that candidates need most are money and time. I asked him if he had money to support his campaign. He said that he didn't. I then told him that since he had never run for office before, and people outside of his community didn't know him, the best use of his time would be to campaign in his community, where he was known, and where he could encourage those who know him and are attracted by his message of cooperation to come out to vote.

37. I never told Mr. Goodwin not to campaign in the "predominantly white neighborhoods" of the District, and I never told Mr. Goodwin that it would be "a waste of time" to reach out to members of the Hasidic community. Indeed, I told him that his message of cooperation and bridge building would be welcome news to the Hasidic community.

### *Alleged "Discrimination in Voting"*

38. I have reviewed the portion of Plaintiffs' Memorandum of Law in Support of their Motion for Preliminary Injunction in which they claim that while I was President of the

Board of Education I somehow participated in activity that constitutes "discrimination in voting." This claim is false.

39. In 2011 I was involved in an unfortunate incident at the Hillcrest Elementary School, which was being used as polling place for a District election. Though I was the President of the Board at the time, I had decided not to run for office again and I was not on the ballot. I went to the polling station because I had received complaints from my constituents. Several people told me that "poll watchers" were preventing mothers from bringing baby carriages into the polling area and were demanding to scrutinize the signatures of Orthodox and Hasidic Jewish voters.

40. I went to the polling station to investigate further and when I arrived I was confronted by a "poll watcher," who accused me of trying to intimidate voters and to block the entrance of the polling place. After I left of my own accord, the "poll watcher" called the police and accused me of misconduct.

41. To be clear, "poll watchers" have no official government status. A "poll watcher" is just a private person who acts as a representative of a candidate or political party who observes the election to confirm its fairness and get early unofficial results. It is my belief that the "poll watcher" who made accusations against me was a representative of one of the candidates that lost the 2011 election and was not acting in good faith.

42. When I found out that the "poll watcher" had formally charged me with interfering with the election, I met with the Clarkstown police to explain my side of the story.

43. District Attorney Thomas Zugibe later said in an official statement: "Neither the facts or circumstances of the alleged incident support the prosecution of the charge." That was the end of the incident.

9

44. I did not prevent any person from voting in the 2011 election or any other election. I did not intimidate any person or otherwise attempt in any way to interfere in the 2011 election or any other election.

I declare under penalty of perjury that the foregoing is true and correct.

Dated:     Spring Valley, New York

February 11, 2018.

_____
Aron Wieder

10