# EXHIBIT A

201839nat i c

```
 1   UNITED STATES DISTRICT COURT
     SOUTHERN DISTRICT OF NEW YORK
 2   ------------------------------------x

 3   NATIONAL ASSOCIATION for the
     ADVANCEMENT of COLORED PEOPLE,
 4   SPRING VALLEY BRANCH, et al.,

 5               Plaintiffs,

 6
                 v.                      17 Civ. 8943(CS)
 7

 8   EAST RAMAPO CENTRAL SCHOOL
     DISTRICT, et al.,
 9
                 Defendants.
10
     ------------------------------------x
11

12

13
                                     United States Courthouse
14                                   White Plains, N.Y.
                                     March 9, 2018
15                                   10:30 a.m.

16

17

18

19   Before:  THE HONORABLE CATHY SEIBEL,

20                                   District Judge

21

22

23

24

25
```

```
 1                        APPEARANCES



 3

      NEW YORK CIVIL LIBERTIES UNION
 4         For Plaintiffs
      PERRY GROSSMAN
 5


 6

      LATHAM & WATKINS, LLP
 7         Attorneys for Plaintiffs
      SERRIN ANDREW TURNER
 8    COREY ANNE CALABRESE
      ELIZABETH ANNA PARVIS
 9    JENNIFER J. MATYSTIK


10


11    MORGAN, LEWIS & BOCKIUS, LLP
           Attorneys for Defendant East Ramapo Central School
12    RANDALL M. LEVINE
      DAVID J. BUTLER
13


14

      ERIC T. SCHNEIDERMAN
15         Attorney General for the State of New York
      ELYCE MATTHEWS
16         Assistant Attorney General for the State of New York

17

18

19

20

21

22

23

24

25
```

1          THE DEPUTY CLERK:  In the matter of National

2     Association for the Advancement of Colored People, Spring

3     Valley Branch against The East Ramapo Central School District,

4     et al.

5          Will counsel please note their appearance for the

6     record.

7          MS. CALABRESE:  Corey Calabrese from Latham & Watkins

8     for the plaintiffs.

9          MR. TURNER:  Good morning, your Honor.  Serrin Turner

10    from Latham & Watkins for the plaintiffs.

11         MR. GROSSMAN:  Good morning, your Honor.  Perry

12    Grossman from the New York Civil Liberties Union for the

13    plaintiffs.

14         MS. MATYSTIK:  Good morning, your Honor.  Jennifer

15    Matystik for the plaintiffs.

16         MS. PARVIS:  And Elizabeth Parvis of Latham & Watkins

17    for the plaintiffs.

18         THE COURT:  Good morning to you all.  Have a seat.

19         MR. BUTLER:  Good morning, your Honor.  David Butler,

20    Morgan Lewis, for the defendant District.

21         MR. LEVINE:  Good morning, your Honor.  Randall

22    Levine from Morgan Lewis for the defendant District.

23         MS. MATTHEWS:  Elyce Matthews from the Attorney

24    General's Office for Commissioner Elia.  Good morning, your

25    Honor.

1          THE COURT:  Good morning to all of you.  Have a seat.

2          I've got letters.  I've got Mr. Butler's letter of

3     March 1st, and I guess Ms. Salomon wrote to me on March 7th for

4     plaintiffs.

5          The application was to, I guess, not make a motion in

6     limine, but let me know about an intended motion in limine, and

7     the plaintiffs raise the issue that that is not the proper

8     mechanism for deciding the issue that the defendants want me to

9     decide.  And I suppose, technically, that's correct, but this

10    is clearly an issue that needs to be tee'd up for purposes of

11    discovery, and, while, technically, this may not have been the

12    way to go about it, I think it makes sense for me to deal with

13    it, because if it were to come up through discovery disputes

14    and Judge McCarthy made the decision, one or the other of you

15    would appeal it to me anyway.

16          So I'm happy to sort of address the overarching issue

17    without having a specific motion in limine in front of me

18    because plaintiffs are right that a motion in limine has to be

19    directed toward something in particular, but the overall issue

20    here, as I see it, is one of relevance.

21          And if I understand the state of play correctly, the

22    plaintiffs are arguing that the evidence they've been seeking

23    essentially relating to how the Board has been running the

24    district goes to the responsiveness factor in Gingles, or in

25    the Senate Report that's quoted in Gingles.

1      Seems to me, here, the responsiveness issue is

2  actually a lot easier than it sometimes is in these cases

3  because you've got a situation where 90 -- I forget exactly the

4  numbers, but something like 99 percent of the private school

5  students are white and a similar percentage, maybe it's 95 or

6  96 percent, of the public school students are black and

7  Hispanic, and so it's not much of a leap to say that that if

8  the School Board is not responsive to the needs of the kids in

9  the school, that the School Board is not responsive to black

10  and Hispanic voters.

11      So why, Mr. Butler, wouldn't it be relevant for the

12  plaintiff to show that the Board is not responsive to the

13  parents of public school kids who want good public schools and,

14  instead, is responsive to other people who want lower taxes or

15  other things that benefit their families and not public school

16  families?  Or Mr. Levine.

17      MR. LEVINE:  Well, I mean, I think it's very

18  important to just understand what the Senate factor is

19  referring to when it talks about responsiveness.  And what the

20  Senate factor describes is a particularized inquiry dealing

21  with discrete requests or discrete needs of particular members

22  of a minority group.  It is not referring to broad, generalized

23  disputes over public policy where there are legitimate views on

24  both sides of what tax rates should be or what education

25  policies should be.  That's not what the Court is asked to

```
1    decide because it has no connection with elections or voting or

2    anything that's relevant under the Voting Rights Act.

3            That's not say to say responsiveness, as a general

4    matter, is never relevant to any case under the Voting Rights

5    Act, but the Senate Report itself says that it's only in some

6    cases when it may have some limited probative value, and that's

7    really --

8            THE COURT:  Why isn't this one of those cases?

9            MR. LEVINE:  Well, because those cases are cases

10   almost always where the plaintiffs are alleging intentional

11   discrimination.  And the way they want to prove intentional

12   discrimination is that these same government officials that are

13   not responding to their requests for, you know, garbage pickup

14   in the minority neighborhoods are the ones who are in control

15   of how the elections are run.  And so that's where that factor

16   comes into play, and it's where it came into play historically.

17           The Senate Report itself says this is not an

18   essential factor, it's not probative in most cases.  And, here,

19   the plaintiffs don't make any effort to connect it in any way

20   to actual things that are relevant under the Voting Rights Act.

21   It does not show in any way and they haven't articulated any

22   reason why it shows that minorities are not -- are excluded

23   from the political participation in the district on account of

24   race.  Their disagreement with --

25           THE COURT:  Well, it shows that the people who got
```

1  elected don't care about the opinions of these voters.  Isn't

2  that a relevant factor?

3          If you're on the school board and there's block

4  voting, as the plaintiffs have to show, and the white people

5  are voting to give benefits to private schools and to keep

6  taxes down and to decimate the public schools -- let's say they

7  can prove that -- doesn't that show that the people on the

8  school board don't care about the votes of the minority

9  families and that, therefore, the people who are elected are

10  responsive only to the white voters?  Isn't that something

11  that's helpful to their case?

12          MR. LEVINE:  Well, so I think it's useful to break

13  that up a little bit because there's a lot going on in there,

14  for one thing, right?

15          What you're describing is an inherent consequence of

16  any system of electoral politics, right?  Where the people who

17  get elected are going to have policies that they're going to

18  pursues because that's what they were elected to do, and the

19  fact that they don't do the things that the other people who

20  lost the election want them to do, that can't be what

21  responsiveness means because that's a consequence of every

22  single election.  It's not like, you know, I get to bring a

23  Voting Rights Act claim because I don't like the things that

24  Donald trump is doing.  Right?  That's not the way that works,

25  right?

1          THE COURT:  Well, it certainly wouldn't be enough,

2    but is it completely irrelevant that the way the elections work

3    in this municipality is that a large portion of the public,

4    specifically the constituents in the schools, are unrepresented

5    in the schools?

6          You know, we're not talking about a legislator in

7    Congress here.  We're talking about people who are elected to

8    run the schools, which are essentially black and Hispanic

9    schools, and a situation where the votes of black and Hispanic

10   people are irrelevant.  Maybe.  If they can show it.

11          And I think some of the cases you quote, or

12   Mr. Butler quoted in his letter, including Martinez, on

13   responsiveness are not really relevant because they're talking

14   about Congress, and Congress is really different in terms of

15   responsiveness.  When you're talking about the local level on

16   the street, you know, the responsiveness means something a lot

17   more concrete than just, you know, I think NAFTA is or is not

18   good or bad.  It's talking about the services that you're

19   getting on a day-to-day basis.

20          MR. LEVINE:  In some ways, yes; in some ways, no.

21   You're absolutely right about that.  And a school board is

22   actually an interesting case because it's a hybrid in some

23   ways, right?  But it can't be the case that politicians who are

24   elected on a platform of maintaining property tax rates can be

25   accused of not being responsive to minority voters because the

1    minority voters wanted them to increase taxes instead.  Right?

2    What would be the point of elections if that was a Voting

3    Rights Act violation?  That's not what responsiveness means.

4           It is also not what they're trying to show for

5    purposes of responsiveness.  When you look at the evidence that

6    they want to put in, there is no rational limitation whatsoever

7    to an effort to show that this particular school board is just

8    not listening and doesn't care about minority voters.  They

9    want to put on evidence of everything.  They want to try

10   everything that was in the Montesa case.  They want to try

11   electives.  They want to try transportation funding.  They want

12   to try everything.  I mean, they want to try special education.

13   There's nothing I can think of that would not come in under

14   their view of what responsiveness is, and that just can't be

15   right.  There's no cases out there that have ever done anything

16   like that.  Right?

17          Sometimes you will see an analysis of responsiveness

18   in a case, even a case involving a school board.  In fact, the

19   Ferguson case that was recently decided is a pretty good

20   example because, there, the plaintiffs made a few very, very

21   discrete showings of what they characterized as a lack of

22   responsiveness by the school board, things that individual

23   members of the minority group asked for, wanted and won't

24   addressed, but that opened it up for the school board to come

25   back and say, well, you know, there are other times when we did

1   respond to it, and it ended up making the factor a wash, and it

2   ended up being irrelevant at the end of the day.

3        THE COURT:  Well, I don't know what they plan to

4   prove.  Right now, they're just asking for discovery.

5   Obviously, at the PI hearing, we're going to have to have some

6   limitations, but, ultimately, if they want to prove up that the

7   defendants are looting the school budget to the benefit of the

8   white community and to the detriment of the black and the

9   Hispanic community, I don't see why they wouldn't --

10        MR. LEVINE:  There would be no nexus whatsoever with

11  any of the elements of a Voting Rights Act claim.  That's not a

12  Voting Rights Act claim.

13        THE COURT:  Well, responsiveness is one of them.  And

14  they're saying, oh, if what the plaintiffs allege is true and

15  the school board is saying, gee, we would love to give you

16  electives, we would love to give you music and art, we would

17  love to give you sports, but we just have no money, and it

18  turns out there is money, but it's being syphoned into places

19  where it doesn't belong, that suggests a lack of

20  responsiveness.

21        MR. LEVINE:  But it does not suggest anything about

22  the electoral system that's being challenged.

23        THE COURT:  Well, it suggests that the --

24        MR. LEVINE:  The power of the votes is --

25        THE COURT:  It suggests that the way the system is

1   set up, it permits the votes of the families who are in the

2   schools to be essentially irrelevant.

3           MR. LEVINE:  The Court does not need to decide any of

4   those things to conclude one way or another whether or not the

5   Voting Rights Act has been violated.  And, in fact, it will not

6   help you decide one way or another whether the Voting Rights

7   Act has been violated, because even if you find exactly what

8   you just described, even if you find that they've been

9   siphoning money out of the school district, as plaintiffs like

10  these have been alleging for years and never been able to prove

11  despite all their efforts, even if you find that, it will not

12  show a Voting Rights Act violation.  It simply doesn't move the

13  ball forward because there are specific things that need to be

14  found to show a Voting Rights Act violation.  There are

15  elements of a claim that are different from the allegations

16  that were made in the Montesa case.  They're completely

17  distinct.

18          THE COURT:  Look, I recognize this case is completely

19  distinct in many respects, which is why maybe it poses a bigger

20  challenge to the defendants than the last time around.  But let

21  me ask the plaintiffs.

22          You know, Mr. Levine says responsiveness doesn't mean

23  that the policies the losing party prefers aren't getting

24  implemented.  That always is the case.  And in every town, in

25  every school board election, there are people who want lower

1  taxes versus the people who want better schools, and whoever

2  wins gets their way.  So why is it relevant that, here, like in

3  any other election, the people who lost aren't getting their

4  way?

5       MR. GROSSMAN:  So, your Honor, I can connect this to

6  the Voting Rights Act, and I believe the Gingles case does and

7  other cases in which school boards have litigated do as well.

8  The fact is when you have, as you identified, racial block

9  voting and you have private schools that are white and public

10  schools that are minority, the minority voters have a

11  particularized need for services to the public schools.  This

12  is not going to exist in every school district.  There is not

13  necessarily racial block voting in every single school

14  district.  Not every issue is going to be won where there are

15  particularized needs of a minority community, but where, as you

16  identified, you have a clear racial demarcation between two

17  sets of schools, the fact that the school board is making

18  judgments that favor white schools over minority schools is

19  going to show that, whatever the wisdom of the Board's

20  judgments, it is not electorally accountable to those minority

21  voters and can effectively ignore what it is they want.

22       THE COURT:  But how do I know if the reason they're

23  not accountable is because there's just more white voters or

24  the white voters are more organized or the lower tax people are

25  more passionate or because there's some violation going on?

1            MR. GROSSMAN:  So that is to say that, one, the

2     districts, of course, are able to put in evidence of

3     responsiveness in order to rebut evidence of unresponsiveness.

4     But it's part of the totality of the circumstances that exist,

5     right?  The primary and weightiest factors in the Voting Rights

6     Act inquiry are the Gingles factors and the existence of

7     racially polarized voting.  What the responsiveness inquiry and

8     other parts of the Senate factors show is what are the

9     consequences for minority voters in terms of that racial block

10    voting.

11            So, here, and in other similar cases, where there are

12    particularized needs of the minority community that the board

13    is not responding to, whether they are individualized inquiries

14    of the kind Mr. Levine suggested might be relevant or broader

15    sort of policy issues where there are, as you suggested, the

16    Board is looting the public schools in order to pay for private

17    schools, it just shows that there is a lack of any sense of --

18    that the at-large system makes these elected officials so

19    secure as to make any appeal to these minority interests

20    unnecessary.  If they want to rebut that, they can, but it

21    certainly is relevant to show that minority voters don't have

22    sway here.

23            And what we've alleged is that, in an at-large

24    system, white block voting can always out-vote minority block

25    voting, and so they have, effectively, nine -- a veto over

1    every seat on the board.  And when you look at the potential

2    consequences of a Voting Rights Act violation and an award

3    system were implemented, then you might see minority preferred

4    legislators elected from those districts who can at least

5    represent the interests of the minority community and add some

6    input in order to make sure that those policy decisions are

7    made in the way that do favor sort of political interests as

8    opposed to simply a lack of responsiveness to the needs of the

9    minority community.

10          MR. LEVINE:  Let's assume for a second that maybe

11   there is some shred of relevance to actual patterns of voting

12   and whether the electoral system that's in place has a

13   discriminatory effect.  There have to be some practical

14   considerations made here.  And so if we take it out of the 402

15   world and put it into the 403 world, they are going to put on

16   almost their entire case on a factor that the Senate Report

17   itself says is not essential and has little probative value.

18   Every court that looks at it says it has little probative

19   value.  They're going to impose enormous burdens on the Court

20   and on the District and on the State to rebut this evidence.

21          THE COURT:  Where does the Senate Report say it's of

22   little probative value?

23          MR. LEVINE:  The Senate Report says --

24          THE COURT:  I thought it said responsiveness doesn't

25   have much probative value, but unresponsiveness does.

1          MR. LEVINE:  Well, what it says is additional factors

2     in some cases have had probative value, such as whether there

3     is a significant lack of responsiveness.  So it's already

4     acknowledging that, only in some cases, but not in all, is it

5     going to have any probative value.  And then it says

6     unresponsiveness is not an essential part of plaintiff's case.

7          THE COURT:  True.  That means plaintiffs can win

8     without proving it, but it doesn't mean that it doesn't help

9     them win if they do prove it.

10          MR. LEVINE:  Well, right, but it also means that even

11     if they do prove it, even if we stipulate, okay, fine, fine,

12     nonresponsive, fine, you win, they still lose this case.

13          THE COURT:  Maybe so.  And maybe you want to

14     stipulate to it because maybe the discovery is so burdensome

15     and the facts so obvious that you want to stipulate to it.  I

16     don't know.

17          But I do think it is fair to say, in the unique

18     situation we have here, where, essentially, the public schools

19     are minority and the private schools are white and that it is

20     fair to say the Board's responsiveness to public school needs

21     is synonomous with its responsiveness to minority needs and it

22     seems like, based on what I know about this community -- and

23     I've never seen evidence; I've only seen allegations -- but it

24     does seem like there are a bunch of things going on that

25     suggest that the members of the Board have no concern about

1    the -- at least some of them -- about losing the votes of the

2    public school families.  I don't think that that's going to

3    drive a decision either way, but I don't think it's irrelevant,

4    either.  I mean, the Supreme Court said it's a factor in some

5    cases, and I can't tell you ahead of time whether it is or

6    isn't in this case.  I can tell you it sounds like it is.  And

7    this is a very -- no pun intended -- black-and-white situation

8    where this case lacks some of the complications you see in

9    other cases because, here, the schools are black and

10   Hispanic -- the public schools are black and Hispanic and the

11   private schools are white and the white people are voting for

12   Board members who are not prioritizing public education.  If

13   they can show that.

14            So it seems -- I'm reaching no conclusions at all

15   about what effect any such evidence might have, but I'm

16   certainly not in a position now to say that I can tell that

17   it's not going to be relevant.  So I think it is a proper

18   subject for discovery.  The extent to which what plaintiffs are

19   asking for is proportional and reasonable and all that I will

20   leave to Judge McCarthy.  I do think that some of the things

21   that plaintiffs have asked for are more targeted than others.

22   For example, things like staffing levels, class sizes, extra

23   curricular, academic offerings, all that seems more relevant to

24   me than things like what contractors are chosen.

25            MR. LEVINE:  I'm sorry, your Honor.  Staffing levels

1    in the public schools are relevant to whether the election

2    system violates the Voting Rights Act?

3              THE COURT:  Yes.  Because if the black and Hispanic

4    kids are in classes of 40 because they won't hire enough

5    teachers, that goes to responsiveness.

6              MR. LEVINE:  Well, to use your own words, maybe it's

7    a crummy school district, but what does that have to do with

8    the Voting Rights Act?

9              THE COURT:  But, you know, you quoted a sliver of

10   that argument, at the end of which I concluded it did have to

11   do with the Voting Rights Act.

12             We are here because you guys wanted all plaintiffs'

13   records of any complaints they made to the school district

14   because it related to responsiveness, and I gave it to you

15   because it relates to responsiveness.

16             MR. LEVINE:  Well, not because it related to

17   responsiveness.  Right?  I mean, that's actually one of the

18   interesting sort of problems we have here.

19             THE COURT:  You know, you're in this district and

20   you're complaining to the Board my kid's been in school for 14

21   years now and can't graduate because there's not enough Regents

22   math classes and he has to take four study halls a day because

23   there aren't enough teachers and there aren't enough offerings,

24   and my kid wants to go to college and can't go to college, and

25   whether the Board responds to that sounds to me like it's

1  relevant to responsiveness.  So that's why I required them to

2  give you all that stuff.

3          MR. LEVINE:  So what does respond mean in that

4  context?  Are you saying that they do what the person is asking

5  them to do regardless of anything else or what?  I mean, if

6  that's the thing, I don't understand.

7          THE COURT:  If they can show a pattern over time of

8  the Board not giving a darn about the concerns of the minority

9  voters, that's one of the factors under the test.  I don't know

10  if it's going to have any ultimate effect or not, but it

11  certainly is something the Supreme Court said can be relevant.

12  I see absolutely no basis at this point to say that this is one

13  of the cases where it's not relevant.  Like I said, certain

14  things seem more on point than others.  Selection of

15  contractors, I'm not sure how that relates to responsiveness at

16  all, unless there's some scheme to overpay contractors or

17  something like that, to loot the schools.  I don't know.

18          I'm going to leave it to Judge McCarthy to decide

19  what is or is not reasonable and proportionate under the

20  discovery rules, but I am saying that the extent to which the

21  School Board responds to the concerns of the public school

22  parents, which is the same as the minority parents, at this

23  stage, is relevant.  Whether it ultimately carries the day, I

24  don't know.

25          And I certainly am not going to tell you how to do

1    your job, but it may be the kind of thing where it makes sense

2    to stipulate to it.  Maybe the Board is of the view that it's

3    their obligation to disregard the wishes of the people who

4    didn't vote for them and they will have no hesitation in

5    saying, yeah, we're not responsive to the people who didn't

6    vote for us, we're responsive to the people who voted for us,

7    and then you take that out of the hearing, but that's not my

8    issue.

9              Anything else you --

10             MR. LEVINE:  Would that take the issue out of the

11   hearing?

12             THE COURT:  If you stipulated to one of the factors,

13   I would imagine.  You could stipulate to any of the factors.  I

14   don't remember what they all are, but I think there was one --

15   at one of our first meetings, there was talk that you might

16   stipulate to one of the factors.  Maybe it was the compactness.

17             MR. LEVINE:  Right.  The first of the Gingles

18   preconditions, sure, right.

19             THE COURT:  I mean, it's a PI hearing, so -- there is

20   case law to the effect that when you have a jury trial and

21   you're asking the jury to pull the trigger on something, the

22   defendant can't stipulate out facts that might make it morally

23   easier for the jury to pull the trigger.  So, for example -- I

24   can't remember.  The case is called Old Chief.  I think it had

25   to do with a prior conviction being some sort of element of an

1    offense -- I could be wrong about that -- but the defendant

2    wanted to stipulate to it so that the jury wouldn't hear about

3    it, and the Court said, no, the jury -- and the government

4    wouldn't let the jury not hear about it, and the Supreme Court

5    said, no, the government's allowed to insist that the jury hear

6    about it because you're asking a jury to do something difficult

7    and that has a moral dimension and they should be able to hear

8    all the facts that relate to what they're being asked to do.

9            So there are some defense stipulations, at least in

10   the jury context, that don't take the issue out of the case.  A

11   PI hearing in front of me, different, I think.  If you said you

12   were willing to stipulate to lack of responsiveness and they

13   wanted to prove up lack of responsiveness, I might say, no, you

14   know, you got that, but how you stipulate to it and all that --

15           MR. LEVINE:  Well, that's important to know the

16   Court's views on that.  Right?  Because how much do you really

17   want to hear about every budget cut for the last decade?  How

18   much do you want to hear about all the reasons why a whole slew

19   of people are unhappy with the way the school district has been

20   run?  How much does that really influence the way that you're

21   going to decide this case?

22           THE COURT:  How do I know until I hear all the other

23   evidence?  I don't know.  But maybe you want to stipulate that,

24   15 years ago, the budget was X and now it's Y; 15 years ago,

25   class size was 22 and now it's 40; 15 years ago, there were AP

1    classes and now there aren't; 15 years ago, there were sports

2    and now there aren't.  I don't know.  I mean, that sort of

3    thing seems like it would save a lot of --

4              MR. LEVINE:  Right.  That's kind of what I'm talking

5    about.  Right?  Those are all objective facts.  They're not

6    going to be disputed.  They don't need to make a showing on

7    that.  The only reason they want to make showing on it -- I'm

8    not even sure, actually, why they want to make a showing of it

9    other than that, you know, the parents of the public school

10   kids would have preferred if there hadn't been budget cuts.

11   Well, that's also hard to dispute.  It's just not relevant to

12   this analysis.

13             THE COURT:  Yes, but there is an argument that what

14   we have here is more than just budget cuts and we're going to

15   save money by removing some of the bells and whistles.

16             You know, where I live, the bells and whistles are

17   there's three kids who want to swim after school and we're

18   going to pay for a bus to take them to a neighboring town where

19   there is a pool.  That's the sort of thing that gets cut when

20   there's tax cuts.  Here, we're talking about very basic

21   educational services.  That's what they're alleging.  They're

22   not talking about luxuries being cut and bells and whistles

23   being cut.  They're talking about a school district that, at

24   least according to the State, is giving a really substandard

25   basic education.

1    MR. LEVINE:  Well, again, that gets to the point,

2    then, right?  Because, as you said, you can look at a budget

3    from one year and look at a budget from the next year.

4    Objective facts.  Right?  There's less money in the budget.

5    There's things that are cut.  Fine.  Right?  They can do that

6    if they want.  But the last point that you just made about the

7    substandard education, that actually is turning this case into

8    something else, and that's actually requiring you to decide

9    something completely different that has nothing to do with the

10   Voting Rights Act and is requiring you to make sort of

11   subjective policy judgments about whether they're doing what

12   they're supposed to do in terms of providing an education.

13   THE COURT:  I just think that if the cuts are so deep

14   that they affect -- effectively result in a substandard

15   education, that is relevant to responsiveness much more so than

16   it would be if, oh, the three kids who want to swim have to

17   carpool now instead of taking the bus.

18   MR. LEVINE:  So I disagree with that, actually,

19   because it would be the reasons why the budget cuts were made,

20   and that's the part that's hard to prove and that requires a

21   showing from both sides that actually is going to take up a ton

22   of time and energy and resources, because the reasons why are

23   what's important.  If the fact of the budget cuts is something

24   that they want to put in, well, there's no dispute.  The facts

25   are the facts.  The documents are the documents.  But if the

1    underlying reasons why is something that you're going to

2    decide, oh, they didn't have to cut the budget, but they did

3    anyway --

4         THE COURT:  I'm not going to revisit could they have

5    done a different budget.

6         MR. LEVINE:  Well, but that's what they're asking.

7    They want you to decide that the School Board made bad

8    decisions, made the wrong --

9         THE COURT:  No.  They want me to --

10         MR. LEVINE:  -- policy decisions.

11         THE COURT:  They want me to decide that what the

12    School Board did showed that it didn't care about the votes of

13    the minority members of the community.  That's, I think, what

14    they want me to decide.  If the way they want to show it -- if

15    one of the ways they want to show that is class sizes went from

16    20 to 40 and course offerings went from plentiful to

17    insufficient, that seems to be a reasonable way to do it.

18         But what I would do if I were the plaintiffs, since

19    these things probably, in many respects, are not disputed -- I

20    mean, nobody's going to say -- if there used to be AP classes

21    and now there aren't, that's a knowable fact.  If that's the

22    sort of thing you want to prove up, they used to have AP

23    classes and now they don't; they used to have 22 kids per class

24    and now it's 42; they used to have music and art and now they

25    don't; they used to have full-day kindergarten and now they

1    don't; they used to have sports and now they don't.  Make a

2    wish list.  Maybe they'll stipulate to a lot of it because

3    either it's true or not

4                MR. LEVINE:  Right, but then the question is so what,

5    right?

6                THE COURT:  And that has to await the hearing.  It

7    may turn out that it doesn't even make it into the calculus,

8    but I can't say now that I know for sure it doesn't.

9                MR. LEVINE:  Well, there are certain factors that we

10   do know for sure are going to be important.  We do know for

11   sure that they cannot win their case -- they cannot win this

12   motion for preliminary injunction because they can't show a

13   likelihood of success on the merits and if they don't satisfy

14   the last two Gingles preconditions and if they don't actually

15   meet the two most important of the Senate factors, which are to

16   the extent to which the minority group members have been

17   elected to office and the extent to which voting is racially

18   polarized.  We could have a preliminary injunction hearing

19   focused on just those absolutely essential things that

20   determine whether or not they have a likelihood of success on

21   the merits without imposing on the parties this incredible

22   burden to prove up the reasons behind policy decisions for the

23   last ten years that the Board has been making, and that would

24   be more than sufficient to resolve the motion for preliminary

25   injunction, because if they don't have those, they lose.  And

1  even if they do have responsiveness, it says nothing one way or

2  another about whether they win or lose.

3          THE COURT:  I'm all for narrowing the hearing.  And

4  if you want to agree that if they prove those two, they get

5  their PI and if they don't, they don't, that's great.  That

6  makes life a lot easier for everybody.  If you're willing to

7  take the position that they just have to prove those two

8  preconditions and then they get their PI, I can't imagine why I

9  would let them put in evidence on any other issues.  For

10 purposes of the PI.  Obviously, the case goes on.

11         MR. LEVINE:  That's not a position I'm taking.  I

12 mean, the Gingles Court says, it says that these two factors,

13 the extent to which minority group members have been elected to

14 office and the extent to which voting is racially polarized,

15 those are the factors.  All of the other factors are just

16 supportive, right?

17         THE COURT:  Okay, but I'm going to let them support,

18 if they can.  I can't say to them, in the absence of an

19 agreement between the parties, that you can't prove up what the

20 Supreme Court says is relevant.

21         MR. LEVINE:  But wouldn't it make sense on a

22 preliminary record for a preliminary injunction to limit it to

23 just the things that they absolutely have to prove to win?  And

24 if it turns out they need to prove other stuff to get over the

25 hump, well, that's what litigation is about.  We can do regular

 1    discovery according to an ordinary schedule and they can prove

 2    it up.

 3          THE COURT:  If you're okay with they just have to

 4    prove those preconditions and, therefore, they win and the

 5    other things we've been talking about aren't relevant to those

 6    preconditions, then -- I mean, you guys should have a

 7    conversation.  Maybe we can narrow it.

 8          Look, we've got a two-week hearing, so that's going

 9    to narrow what people can do.  And I think the parties should

10    negotiate on how much time each side is going to use of that

11    two weeks.  We're not going to try the whole case and we're not

12    going to try the history of everything that's ever happened in

13    the East Ramapo School District.  Obviously, there are limits,

14    because there are limits to what discovery you can get done

15    between now and April 12th.

16          MR. LEVINE:  Right.  That's exactly why we brought

17    this motion, your Honor.  That's exactly what we're trying to

18    accomplish with this, because, right now, the discovery that

19    they're seeking and the case that they want to make absolutely

20    goes to the entire history of everything that's ever happened

21    in the school district.

22          THE COURT:  Well, that's why you'll have Judge

23    McCarthy to draw some lines, but the one line that's not going

24    to be drawn is this stuff is irrelevant.  It's not irrelevant.

25    You might be able to make it irrelevant through an agreement.

 1    God bless.  I would be all for that.  But the fact that they

 2    might be able to prove their case without this or, even with

 3    this, they might not, doesn't make it irrelevant.  I can't tell

 4    that yet.  I can't tell whether this is going to help them make

 5    their case or whether they could make their case without it.

 6    So it seems relevant to me.

 7            You might want to -- you've made two -- I don't know

 8    if you intended it as a suggestion or an offer, but you made

 9    two what I think are very practical propositions.  One is

10    stipulating to the facts that the plaintiffs want to prove up

11    under the responsiveness rubric, or at least a bunch of them,

12    or stipulating that all they have to prove is A and B and then

13    they win.  Now, I don't know if all they have to -- or,

14    actually, maybe it's B and C of the three main factors.  But I

15    don't know that the latter stipulation would make this sort of

16    evidence irrelevant or not.  That's between you guys.

17            MR. LEVINE:  Well, now, just suppose, hypothetically,

18    plaintiffs are not willing to do that and plaintiffs are not

19    willing to agree to anything that prevents them from showing

20    all of the things they want to show about how bad the school

21    district is and how much they disagree with all of these

22    decisions that were made and how they think they were immoral,

23    because that's what this case is really about.  It's got

24    nothing to do with elections or voting, and, unfortunately,

25    we're not able to get there.

1         THE COURT: They're not going to win if they don't

2 prove up what the Supreme Court says they have to prove up

3 about elections and voting.

4         And if you guys can't agree, I'm going to come up

5 with a number. I'm going to say you have -- totally making

6 this up -- 25 hours. What they do with it is their problem and

7 what you do with yours is yours. As I said, totally making

8 those numbers up. So you guys should add that issue to your

9 long list of things you're negotiating or fighting about.

10         And both sides are going to have to make decisions

11 about what evidence they think is most important, but I think

12 some reasonable targeted stipulations could save both sides a

13 lot of heartburn, because if a stipulation saves them from

14 having to prove something up and it saves you from having to

15 produce discovery, seems like it's all good. Or at least for

16 now. If you can't get to yes, fine. Everybody will just prove

17 their case the old-fashioned way.

18         So I leave you to the capable hands of Magistrate

19 McCarthy.

20         Anything else we should do this morning?

21         All right. See you soon.

22

23                 - - - -

24

25