# EXHIBIT 1

180102naacpC                    Conference

1  UNITED STATES DISTRICT COURT
   SOUTHERN DISTRICT OF NEW YORK
2  ------------------------------x

3  NATIONAL ASSN. FOR THE
   ADVANCEMENT OF COLORED PEOPLE,
4  et al.,

5            Plaintiffs,

6        v.                          17 Civ. 8943(CS)

7  EAST RAMAPO CENTRAL SCHOOL
   DISTRICT, et al.,
8
            Defendants.
9
   ------------------------------x
10                                United States Courthouse
                                  White Plains, N.Y.
11                                January 2, 2018
                                  2:35 p.m.
12
   Before:
13
                    THE HONORABLE CATHY SEIBEL,
14
                                            District Judge
15
                        APPEARANCES
16
   NEW YORK CIVIL LIBERTIES UNION
17      Attorneys for Plaintiffs NAACP, et al.
   PERRY GROSSMAN and COREY ANNE CALABRESE
18        -and-
   LATHAM & WATKINS LLP
19      Attorneys for Plaintiffs
   ELIZABETH PARVIS and KEVIN JASON
20
   MORGAN LEWIS & BOCKIUS LLP
21      Attorneys for Defendant East Ramapo School District
   DAVID J. BUTLER and RANDALL LEVINE
22
   OFFICE OF THE ATTORNEY GENERAL
23      Attorneys for Defendant MaryEllen Elia, Commissioner SED
   ELYCE NOEL MATTHEWS, MONICA CONNELL and WILLIAM TAYLOR, JR.
24

25

              SABRINA A. D'EMIDIO – OFFICIAL COURT REPORTER
                          (914)390-4053

180102naacpC              Conference

1            (In open court)

2            THE DEPUTY CLERK:  NAACP v. East Ramapo Central School

3    District.

4            MS. CALABRESE:  I'm Ms. Corey Calabrese for the

5    plaintiffs.

6            THE COURT:  Okay, Ms. Calabrese.

7            And you're Mr. Grossman?

8            MR. GROSSMAN:  I am, your Honor.

9            THE COURT:  And Ms. Parvis and Mr. Jason, good

10   morning.  Good afternoon, I mean.

11           And there you are, Mr. Butler, back in your old seat.

12   And who is with you?

13           MR. BUTLER:  Mr. Levine.

14           THE COURT:  From your law firm, and then everybody

15   else is from the state?  Ms. Matthews.

16           MS. MATTHEWS:  Yes.

17           THE COURT:  Ms. Connell.

18           MS. CONNELL:  Yes.

19           THE COURT:  And Mr. Taylor.

20           MR. TAYLOR:  Yes, your Honor.

21           THE COURT:  I'm just going to draw myself a little

22   map.

23           Ms. Calabrese, you're from Latham; Mr. Grossman,

24   you're from the NYCLU; and Ms. Parvis, where are you from?

25           MS. PARVIS:  Latham.

180102naacpC                Conference

1          THE COURT:  You're Latham.

2          And Mr. Jason, you're from NYCLU also?

3          MR. JASON:  That's correct, your Honor.

4          THE COURT:  I have lots of letters.  I've got -- well,

5   in addition to the plaintiffs' motion for injunction, I have

6   Mr. Butler's letter of December 11 regarding the motion to

7   dismiss that the school district would like to make.  I have

8   Mr. Butler's December 15 letter suggesting that briefing on the

9   PI motion be stayed.  I have plaintiffs' December 15th letter

10  responding to the letter regarding the stay.  I have

11  plaintiffs' -- I have the state's the December 20th letter

12  regarding the motion the Commissioner would like to make.  And

13  then I have plaintiffs' December 26th letters responding to

14  the district's pre-motion letter regarding its motion to

15  dismiss, and the Commissioner's pre-motion letter regarding her

16  motion to dismiss.

17          And I think I let the parties know, shortly after

18  getting the letters on the stay, that I was not likely to stay

19  the briefing on the P.I. hearing unless I was convinced by the

20  pre-motion letters either that the motions to dismiss were

21  clearly meritorious, or the motion for P.I. was clearly not.

22  And I will tell you that I have not reached either of those

23  conclusions.

24          What I'd like to do, if it won't slow things down too

25  much, what I ordinarily do, which is, give the plaintiff the

180102naacpC                Conference

1    opportunity to amend, because I don't want to have to possibly

2    grant a motion and then possibly have to give leave to

3    amendment and then have another motion.

4            Part of the reason I have these pre-motion letters is

5    because I think once the plaintiff gets the idea from the

6    pre-motion letters what the motion is going to look like, if

7    there's something that the plaintiffs think they can add to the

8    complaint that would help them defeat the motion to dismiss, I

9    give them that opportunity.  I don't know if this is that kind

10   of case because the issues that the proposed motions raise are

11   more legal than factual.  Ordinarily, I do give the plaintiff

12   that opportunity.

13           We have the complication here that there's a P.I.

14   being sought.  And I gather what plaintiffs would like me to do

15   before May is not necessarily figure out the right way to have

16   that election but to enjoin the election from going forward

17   under the current system.

18           Is that accurate?

19           MS. CALABRESE:  Yes, your Honor.

20           THE COURT:  And have you had a chance to discuss with

21   the other parties whether they agree it makes sense to combine

22   any hearing on the P.I. with a trial of the merits?

23           MS. CALABRESE:  We proposed it to the defendants, but

24   we haven't reached an agreement on that.  To be clear, I don't

25   know their opinion.

180102naacpC              Conference

1          THE COURT:  Do you have an opinion, Mr. Butler or

2    Ms. Matthews?

3          MR. BUTLER:  Yes.  We don't think it's necessary in

4    this circumstance to combine the preliminary injunction with a

5    trial on the merits, particularly, since, as the Court

6    recognized, this is a two-stage process, in any event.  So for

7    purposes of going forward, we would not be in favor of

8    combining them.

9          THE COURT:  I don't think I can do it over their

10   objection, but if part of the concern is cost, which I hope at

11   least the school district has in mind, it might be something to

12   consider.

13          Let me ask some questions about the proposed motions

14   to dismiss.  It seems to me, Mr. Butler, most of what you point

15   to in your letter are statutes that don't really say anything

16   one way or the other on whether there can be wards or whether

17   it has to be at-large.  I didn't see in Sections 2018 or 2032

18   anything saying thou shall not have wards.  And the only thing

19   that you cited to which said a Board of Education has only

20   those powers expressly delegated by statute or necessarily

21   unreasonably implied therefrom is a Commissioner decision,

22   which I can't imagine would hold up if I found that there was a

23   violation of the Voting Rights Act.

24          MR. BUTLER:  Were you to find a violation of the

25   Voting Rights Act, you're correct, you could order whatever is

SABRINA A. D'EMIDIO – OFFICIAL COURT REPORTER
(914)390-4053

180102naacpC                Conference

1    necessary under the circumstances.  But in the absence of some

2    authorization from the legislature, the district can't simply

3    do something by itself, and that is not limited to voting

4    issues.  It has to do everything the district does.  Its powers

5    are delegated, and in the absence of a delegation, they don't

6    have the power.

7            THE COURT:  Doesn't it have the power to run elections

8    for the school board?

9            MR. BUTLER:  Yes.  They are --

10            THE COURT:  So what is stopping them from saying,

11    either because I pushed them to or because they think it's

12    right, that we should have --

13            MR. BUTLER:  They run the elections as -- they

14    administer the elections.  They don't decide how the election

15    is supposed to be done globally.  They don't decide upon a ward

16    district.  They don't decide on an at-large voting.  They

17    simply take what they are given and are instructed to

18    administer an election, which is what they do.

19            THE COURT:  But the basis of your motion is we're not

20    the right defendant because we couldn't do this, even if you

21    told us to.

22            MR. BUTLER:  Correct.  And we pointed out --

23            THE COURT:  I don't understand how that can be right.

24    If I tell them -- I have no idea if I would ever get there, but

25    let's say I did, and I said it's a violation of the Voting

180102naacpC                Conference

1  Rights Act for you to proceed with this election under the

2  current system, and you need to do it by ward.  And I'm going

3  to draw you a map and here are your wards.

4        What's stopping them from complying with that order?

5        MR. BUTLER:  Actually, if they're parties in this case

6  and they're instructed by you to do that, probably nothing,

7  other than someone else reviewing it.

8        THE COURT:  So, then why aren't you a proper

9  defendant?

10       MR. BUTLER:  Because, in the first instance, that

11 instruction would come down from the Commissioner, it would

12 come down from the legislature, it would come down from the

13 governor.

14       THE COURT:  If it came down from me and you could

15 implement it, what do I care about all that other stuff?

16       MR. BUTLER:  Perhaps nothing if we're properly a party

17 in the case.

18       THE COURT:  Right.

19       MR. BUTLER:  Now, if you conclude --

20       THE COURT:  It's circular to say I can't be a party in

21 the case because I wouldn't be able to implement your ruling if

22 in fact you would be able to implement my ruling.

23       MR. BUTLER:  Our position isn't that we couldn't

24 implement something you tell us to do.  Our position is, we

25 don't have the authority to set up that form of election

SABRINA A. D'EMIDIO - OFFICIAL COURT REPORTER
(914)390-4053

180102naacpC                    Conference

1   process on our own.  And in the absence of that authority,

2   we're not the proper party to be sued in this case.

3           THE COURT:  So who is?

4           MR. BUTLER:  The governor, the legislature through the

5   Secretary of State, the -- perhaps others who -- how ever one

6   normally sues in these kinds of voting cases, you go way above

7   the grade of the school district.

8           THE COURT:  I don't know.  If this were an election

9   for the town board, I would have to sue the governor to get the

10  town board to comply with the Voting Rights Act?

11          MR. BUTLER:  The town board is a different situation

12  than the school district.

13          THE COURT:  Well, why?  Why is that?

14          MR. BUTLER:  Because we are not delegated authority to

15  set up these kinds of elections by ourselves.

16          THE COURT:  But where does it say you can't do this?

17          MR. BUTLER:  Where does it say we can't do it?  It

18  goes the other way:  Where does it say we can?

19          THE COURT:  That's what I'm getting at.  The only

20  thing that you've cited to me that says we can only do things

21  we're specifically delegated is a Commissioner's decision, and

22  it didn't involve a situation where what you were doing

23  violated the Voting Rights Act.

24          So if I got there, it just seems circular to me to say

25  we're not the right defendant because we couldn't implement the

180102naacpC                    Conference

1    order that you might reach in this case; and the reason we

2    can't implement the order is because we have to be told by the

3    governor or the legislature to do something and at the same

4    time say, oh, we could implement your order, but we can't be a

5    defendant because only your order would allow us to do it.

6            I'm not following.

7            MR. BUTLER:  Well, if you'd like us to brief it, we're

8    happy to brief it.

9            THE COURT:  Of course you're going to brief it, but it

10   just seems like you're saying we're not the right defendant

11   because we can't give the relief that the plaintiffs want, but

12   you're conceding that you can if I tell you to.

13           MR. BUTLER:  If we're subject to your jurisdiction,

14   yes.

15           THE COURT:  So I don't understand why there's no

16   standing or it's not justiciable or whatever, but maybe you

17   will be able to explain it better, but I don't see it.

18           The other thing I didn't really follow was the

19   argument that election districts within the meaning of

20   Education Law 1702 aren't the same thing as ward voting.

21           You cite the *Port Chester* case and in the *Port Chester*

22   case, as a matter of fact, the election districts that have

23   been set up there weren't wards, but in that case, there's

24   nothing in that case that says when you're talking about a

25   school board.  That case involved a village board, a totally

180102naacpC                Conference

1   different animal – Education Law not even applicable.

2          But in that case, it so happened that the way the

3   village set it up is that they had election districts, which

4   basically told you which polling place to go to, but it was

5   essentially an at-large election.

6          But I didn't see anything in 1702 or the *Port Chester*

7   case that would prevent setting up wards, which the plaintiffs

8   want, if they can prove that there's a violation of the Act

9   without them.

10         MR. BUTLER:  It comes back to the same issue, your

11   Honor.  Perhaps there's nothing that says you may not do it,

12   but our point is, there's nothing that tells us that we may.

13         THE COURT:  Well, doesn't the Voting Rights Act tell

14   you you may if the Court tells you to?

15         MR. BUTLER:  Yes, but in the absence of a Court

16   telling us, this isn't something that a district does.

17         THE COURT:  Okay, but that doesn't mean you're an

18   improper defendant, does it?

19         MR. BUTLER:  Well, if there are defendants who should

20   be in the case who aren't in the case and against whom the

21   lawsuit should be directed, then, yeah, we shouldn't be here.

22         THE COURT:  Well, can't the plaintiffs decide who they

23   want to sue?  And as long as you'd be in a position to

24   implement anything you were ordered to implement, why can't

25   they sue the district directly?

180102naacpC                Conference

1          Why do they have to include the governor or the state

2   legislature if they can get what they want this way?

3          MR. BUTLER:  That's the point.  That's not the way

4   they're supposed to get it.

5          THE COURT:  Yeah, well, you're going to have to come

6   up with something more than that, like some authority for the

7   proposition that they can't get it that way, because I

8   really -- I gotta tell you, I'm scratching my head over that

9   argument.

10          MR. BUTLER:  Okay.

11          THE COURT:  And ironically, the Commissioner has taken

12   the position that she's not the right person, either, because

13   she says she can't ram a ward voting system down the district's

14   throat.  It's sort of funky that everybody's saying, Well, I

15   can't do it.

16          I don't know who wants to speak for the state, but

17   Ms. Matthews, why -- what is the -- to me, it seems like the

18   state should be or is pretty much a bystander here.  I assume

19   if I say there's a violation of the voting Rights Act, the

20   state isn't going to have any quarrel with implementing a

21   remedy.

22          Why shouldn't the Commissioner stay in the case, just

23   in her official capacity so that a remedy can be implemented?

24          MS. MATTHEWS:  In answer to your first question,

25   that's right, if the Commissioner is authorized to comply with

180102naacpC                    Conference

1  your Honor's ruling, she will do -- she will do so, but that's

2  not a basis for keeping her as a defendant in a lawsuit where

3  she's not a proper party.

4          THE COURT:  Well, how could I order her to do anything

5  if she's not a party?  What if she needs to be involved because

6  the district convinces me that, unless she blesses it, they

7  can't correct the problem here, but if she's not a party, I

8  can't just go out and start ordering her to do things.

9          MS. MATTHEWS:  Part of that is hypothetical, but to

10 the extent there is an order against the district, the

11 Commissioner will obviously comply with such an order, whether

12 she's a party in the lawsuit or not.  If her authority or --

13         THE COURT:  Let me ask plaintiffs' side,

14 Ms. Calabrese.  Are you really worried that the Commissioner of

15 Education is going to stand in the way of implementing a

16 absolution?

17         What do you need the Commissioner in here for?

18         MS. CALABRESE:  Your Honor, it's not so much that

19 we're concerned that the Commissioner would stand in the way of

20 any type of relief sought.  It's more that we believe that she

21 actually does have the authority to order the district to

22 comply with the ward system.  So we believe either defendant

23 here could give us the relief that we seek.  And she has broad

24 authority to enforce all general and special laws, that

25 includes federal laws and it includes the Voting Rights Act.

180102naacpC                 Conference

1  And in the past, she has, in fact, through her Commissioner

2  opinions, ruled on issues that would be considered Voting

3  Rights Act violations.  And so, to say that she does not have

4  that authority here or that she would be a bystander, we

5  believe that she could order the district to comply with the

6  Voting Rights Act right now if she believed the merits of the

7  plaintiffs' case.

8       THE COURT:  Well, in the meantime, the state's going

9  to have to spend a lot of money tagging along essentially on

10  this litigation.  And if, at the end, I decide there's a

11  violation, they're representing that they'll implement it.

12  They don't really care -- I mean, maybe I'm making the wrong

13  assumption, but if all they're going to be doing is sitting

14  there while you and Mr. Butler duke this out, that doesn't seem

15  like a great use of resources.

16       MS. CALABRESE:  And we agree.  And we approached each

17  defendant separately to settle the case because we believe each

18  defendant would have the authority on their own to work out the

19  ward system and get rid of this case.

20       I think it would be important if the Commissioner were

21  involved and if your Honor were to find that the Commissioner

22  has the authority to implement a ward system; this is an issue

23  in lots of other school districts across New York State where

24  minorities are not being fairly represented on the board and it

25  could have some very valuable precedential effect.

180102naacpC                Conference

1          THE COURT:  I feel like East Ramapo is somewhat

2    unique, but I haven't dug into it.  Obviously, the parties are

3    going to brief all of these issues, but I'm not going to stay

4    the P.I. motion, so we have to figure out in what order we're

5    going to do things.

6          Yes, Mr. Butler.

7          MR. BUTLER:  If that's the case, then my suggestion

8    would be that we brief both issues in a single filing, that we

9    will oppose the preliminary injunction and devote a section of

10   our brief to this motion to dismiss issue, because we're going

11   to have to do that work any how.  It makes no sense.

12         THE COURT:  That makes sense, and if you persuade me,

13   then they're not likely to succeed on the merits.

14         MR. BUTLER:  That's point one.  Point two, in terms of

15   timing, working backwards from a concern with the May date as

16   the sort of time we've got to worry about, if you will, May 15

17   is the date that the election involved is supposed to occur, we

18   would ask to have until March 9 to file our opposition papers

19   and to conduct the necessary discovery.

20         We also need to work with experts and put together an

21   appropriate response to those papers, and anything short of

22   that will actually be too short a time for us to really do the

23   proper kind of presentation on this issue.  And then,

24   plaintiffs, I would suggest, they have not agreed to this, but

25   I would suggest that they then have two weeks to reply.  And

180102naacpC                    Conference

1    then we'll have the entire month of April, if you will, to set

2    a time for a preliminary injunction hearing -- actually, the

3    entire month of April and part of May.

4             MS. CALABRESE:  Your Honor, as we stated in our letter

5    to the Court, we propose that the defendants respond to our

6    preliminary injunction motion by February 9, which would give

7    them a full two months since the date we filed to respond to

8    all of our papers and is an extensive amount of time compared

9    to other cases where there have been preliminary injunctions,

10   including cases with expert reports.

11            We would need more than two weeks to file our reply if

12   there's going to be responses to expert reports.  That would be

13   our only issue.

14            THE COURT:  I have so many letters.  I don't have --

15   what's the date of the letter where you made that proposal?

16            MS. CALABRESE:  December 15.  It's docket number

17   43. *Port Chester* is a good example.  There was a preliminary

18   injunction in that case, and the parties had five weeks to

19   respond to three expert reports and nine declarations and

20   produce three expert reports of their own in response.

21            THE COURT:  What's your best guess as to how many days

22   a hearing it would require?

23            MS. CALABRESE:  We think about two weeks.  Ten days

24   total.  That was when we were thinking about consolidation.

25            THE COURT:  I'm pretty sure I can't consolidate over

180102naacpC               Conference

1  their objection; am I right about that?  It's Rule 65.

2       MR. GROSSMAN:  Yes, your Honor.  65(a)(2).

3       THE COURT:  It doesn't say I need their consent.

4  Before or after beginning the hearing on a motion for a

5  preliminary injunction, the court may advance the trial on the

6  merits and consolidate it with the hearing.

7       The complication comes if there's a right to a jury

8  trial, I don't know if there is, but maybe that's something the

9  parties can also brief in their one omnibus submission they're

10 going to make.

11      MS. CALABRESE:  Your Honor, with respect to an omnibus

12 motion, obviously what's best for the Court, but we just wanted

13 to note, if there is a possibility that you decide one

14 defendant is the defendant in the motion to dismiss and that we

15 could reach a settlement and save everyone's time and money,

16 then that would be our only concern, is waiting for briefing on

17 the P.I. as to motions to dismiss.

18      THE COURT:  Mr. Butler, are your clients at all

19 inclined to resolve the case?

20      MR. BUTLER:  Well, the proposal we've received is

21 "give up" and "no."

22      THE COURT:  Well --

23      MR. BUTLER:  We don't believe --

24      THE COURT:  If, upon seeing the complaint and seeing

25 the affidavits, you became convinced that the plaintiffs were

180102naacpC            Conference

1    right, then maybe your clients would.

2            MR. BUTLER:  Yes, but the problem here, your Honor, is

3    that just the opposite happened.  Based upon the presentation,

4    we believe you're not going to issue a preliminary injunction.

5            THE COURT:  Well, don't hold your breath about a

6    settlement, Ms. Calabrese.

7            MS. MATTHEWS:  Your Honor, we would just note that we

8    do not intend to oppose the P.I. on the merits, though we

9    reserve our right to oppose it, that the state here is not a

10   proper party.  And the state is potentially subjecting itself

11   here to costs and fees of a tremendous amount.

12           THE COURT:  I mean, it seems like the injunction that

13   the plaintiffs are seeking would run to the school district,

14   not to the state.  So, I don't think you would be losing out on

15   anything substantive if you stood aside for the P.I. hearing,

16   but you might as well brief the motion to dismiss on the same

17   schedule.  If I agree with you, then you're out for good.

18           Did you want to add something, Mr. Grossman?

19           MR. GROSSMAN:  I did.  If the Commissioner is a proper

20   party, then she's able to, in fact, enforce the Voting Rights

21   Act as a law general and especially applicable to the education

22   system of the state, then the Commissioner should be able to

23   settle the litigation and impose upon the district a ward

24   system, regardless of the district's position on whether our

25   actions were meritorious or whether they're a proper party.

180102naacpC              Conference

1        THE COURT:  The school district seems to think that

2  the governor or the legislature have to get involved and it's

3  not just the Commissioner.  I don't know if they're right,

4  but --

5        MR. GROSSMAN:  The Commissioner has made very clear,

6  and so has the Second Circuit, that the education system,

7  including school board elections, is entirely the province of

8  the Commissioner of Education.  The governor is outside the

9  chain of command in that respect and is kept at a distance.  I

10  believe it's established in the Yonkers case from 1995 in the

11  Second Circuit.

12        So the Commissioner really is the chief law

13  enforcement authority when it comes to the education system,

14  which, as we note in our letter, encompasses the school board

15  election system.

16        THE COURT:  Ms. Matthews, I don't know if your client

17  has even dug into the merits.  Do you agree that if she became

18  persuaded by the plaintiffs' presentation, that she could put

19  us all out of our misery?

20        MS. MATTHEWS:  No, your Honor.  And the plaintiffs

21  haven't cited a single authority for the proposition they just

22  stated.  The Commissioner does not have the authority to impose

23  a ward system on the state.  I mean -- and both the governor

24  and legislature make it clear that there needs to be an act of

25  the legislature to impose this system on the state.

SABRINA A. D'EMIDIO - OFFICIAL COURT REPORTER
(914)390-4053

180102naacpC              Conference

1          THE COURT:  Well, they may think that, but part of it

2     is, I guess, a chicken-and-egg problem.  The commissioner, if

3     there were an order from me saying there's a violation of the

4     Voting Rights Act, implement these changes, says she can do it,

5     but she can't just decide herself that she thinks there's a

6     violation, and she could change --

7          MS. MATTHEWS:  To be clear, there has been no finding

8     by anyone in this case.

9          THE COURT:  No, but it's possible that you would read

10    the plaintiffs' papers - I don't expect this because I'm not

11    that lucky - but you could read the plaintiffs' papers and say,

12    wow, there is a violation here and it should be fixed and the

13    Commissioner is going to fix it.

14         MS. MATTHEWS:  But the commissioner doesn't have the

15    independent authority to make a Voting Rights Act to find a

16    Voting Rights Act violation.

17         THE COURT:  No, but the Commissioner could say not

18    under her -- she doesn't have the authority to enforce a Voting

19    Rights Act, but maybe she has the authority to impose it

20    because she's the Commissioner of Education and she thinks the

21    election should be fair.

22         MS. MATTHEWS:  But there are provisions in the

23    Education Law that provide for at-large voting throughout the

24    state and without -- I can go into --

25         THE COURT:  What are those?  Because when I looked at

180102naacpC                  Conference

1   what was cited in Mr. Butler's letter, I didn't really see

2   where it says there has to be at-large voting.

3            MS. MATTHEWS:  It's not that the statute says anywhere

4   "There is at-large voting throughout the state," but there are

5   several provisions within the Education Law, 2012, 2102, 1702.

6   And when you read them in conjunction, together they require

7   the voters in every district vote at-large in every election.

8            THE COURT:  Yes, I looked at those, and I just didn't

9   see where it said that, but you'll spell it out for me, I'm

10  sure, in your papers.

11           And believe me, I understand why you don't want to be

12  involved in this slugfest, but you're sort of in the weird

13  position of saying on the one hand, this is not our fight, we

14  don't want to be involved, and on the other hand saying we can

15  only implement a remedy if we are involved.

16           MS. MATTHEWS:  But the legislature and the governor

17  have made clear that these provisions provide for at-large

18  voting in the state, and the plaintiffs essentially --

19           THE COURT:  It may say that, but let's say I don't.

20           MS. MATTHEWS:  If there's a Court order, it's a

21  different story, but as we are right now, the provisions

22  provide for at-large voting in the state.  And the plaintiffs

23  here are asking the Commissioner to independently override the

24  democratic process here.  They're asking her to just impose a

25  system in the district here that conflicts with what the

180102naacpC                Conference

1  provisions, taken together, not -- if you read one, you may not

2  understand the full panoply here, but they're asking the

3  Commissioner here to just go in and impose her will on the

4  district when the statutory provisions don't allow for that.

5          MS. CALABRESE:  As we noted in our letter, first of

6  all, we think what we're doing is trying to ensure that the

7  democratic process is being followed appropriately.  But as we

8  noted in our letter, there is a commissioner decision, *Gravink*,

9  where the Commissioner has found that Section 2017 of the

10 Education Law permits a ward system.  And the commissioner

11 has --

12         THE COURT:  Can she ram that down the throat of a

13 district that doesn't want it?

14         MS. CALABRESE:  We believe she can through her

15 authority as the Commissioner of Education to enforce the

16 Education Laws.

17         THE COURT:  Which decision was that?

18         MS. CALABRESE:  *Gravink*, your Honor.

19         THE COURT:  Is this in your December 26 letter?

20         MS. CALABRESE:  Yes, your Honor.

21         MR. GROSSMAN:  Your Honor, it's cited in the letter

22 responding to the district, not the letter responding to the

23 Commissioner.  It's incorporated by reference, the letter

24 responding to the Commissioner, docket number 47.

25         THE COURT:  Page three?

SABRINA A. D'EMIDIO – OFFICIAL COURT REPORTER
(914)390-4053

180102naacpC              Conference

1          MR. GROSSMAN:  Yes, your Honor.

2          THE COURT:  Oh, that was the case where the school

3   district wanted to create wards because the rural people

4   weren't getting their candidates on the board.

5          MS. MATTHEWS:  That case -- first of all, the quote

6   that plaintiffs are using was in dicta, and it did not

7   establish a ward system; it established separate election

8   districts for geographical purposes.  The legislature was clear

9   in passing a bill recently that would have addressed the issue

10  of ward voting.  They were clear that they needed to pass a

11  bill specifically giving districts the opportunity to vote and

12  impose a ward system in their specific districts because there

13  was no statutory provision that provided for ward voting.

14         THE COURT:  Wasn't that legislation, which the

15  governor ended up vetoing, not really relating to this issue at

16  all?  Wasn't it relating to the -- sorry.  I'm missing it now.

17         I remember looking at it and saying, oh, this doesn't

18  relate to this issue at all, but now I don't remember what it

19  did relate to.

20         MS. MATTHEWS:  The bill would establish wards for

21  school board members to vote to impose a ward system.

22         MR. BUTLER:  It would give a district the right to

23  present by referendum in a proposal to the voters to substitute

24  a ward system for at-large voting.  That's what the bill was

25  designed to accomplish, and the governor vetoed it.

180102naacpC                Conference

1        But I think counsel is right.  In the preamble, the

2    legislature absolutely recognized that the school districts do

3    not have that authority under current law.

4        THE COURT:  I don't doubt that the legislature reads

5    the law that way, but it seems to me -- well, I would imagine I

6    have to give some deference to how the legislature interprets

7    its own legislation, maybe.  But whether you call it a ward or

8    an election district, there is a statute out there that says

9    you can have an election district, and I don't know what's out

10   there saying that an election district can't be a ward, or a

11   precinct, or whatever you want to call it, unless a federal

12   judge says otherwise.

13       MR. LEVINE:  Your Honor, the reason why the statutes

14   have been interpreted this way is that because -- in 2018 and

15   2032 of the Education Law, the way they set up the way these

16   elections work is that each district has a number of qualified

17   voters, and they have a certain number of school board seats.

18   And all of the qualified voters of the district get to vote for

19   each seat, and each seat is considered a separate office.  But

20   there's nothing that says that qualified voters can be

21   restrained or restricted from voting for other seats just

22   because they are seats that will represent some other

23   geographic subdivision of a district.  That's the piece that's

24   missing and why ward voting isn't allowed.

25           There's nothing that allows a school board to say,

180102naacpC                    Conference

1   okay, you qualified voters who live in this neighborhood, you

2   don't get to vote for these other offices, these other school

3   board seats, and that's what ward voting would require.  It

4   would require the school board to say, okay, you in this

5   neighborhood, you get to vote for this one office; you in this

6   neighborhood, you get to vote for another office; and you in

7   this neighborhood get to vote for another office.  And that's

8   where there's a gap between what the plaintiffs want and what

9   the school district is actually empowered to do.  And that's

10  one of the reasons why the school board couldn't settle this

11  case even if it wanted to, because it couldn't enact that kind

12  of policy.

13          And the problem for the Court in entering an

14  injunction along those lines would be that, yeah, the Court has

15  the preemptive power under the Supremacy Clause of the United

16  States Constitution but there are pretty serious federal

17  concerns and also separation of powers concerns if a Court is

18  going to say, all right, I'm going to superintend how the

19  elections are conducted in the school district forevermore.

20          What the plaintiffs really want is a change in the

21  law, right, the state law going forward.  And to do that, they

22  actually need to bind the state and the legislature has to pass

23  a new statute, and that's the way the remedies typically are

24  crafted in cases like this.

25          THE COURT:  Well, I now understand part of your

SABRINA A. D'EMIDIO – OFFICIAL COURT REPORTER
(914)390-4053

180102naacpC                    Conference

1    argument, which is the remedy the plaintiffs are seeking would

2    conflict with state law, assuming that state law says every

3    voter gets a vote for every seat.  If we assign seats to wards,

4    then you're only getting to vote for the seat in your ward, but

5    I didn't understand them to be asking that.  Maybe I should

6    stop right there.

7            Is that what you want?  You want a situation where we

8    whack up the town geographically and the Ward 1 only gets to

9    vote for Seat 1, and Ward 2 only gets to vote for Seat 1, etc.?

10           MR. GROSSMAN:  Yes.

11           MS. CALABRESE:  That is what we're asking.  We don't

12   believe that the sections that both defendants keep citing to

13   require a vote per person for every seat on the board.  It's

14   just not in there.

15           THE COURT:  I'm going to have to, obviously, spend

16   some quality time with these statutes and see what they really

17   say.

18           But going back to your other point, Mr. Levine, is it

19   not true that every time a federal court finds a violation of

20   the Voting Rights Act, it's using its powers under the

21   Supremacy Clause to do something that arguably raises comity

22   concerns, but it's important enough because people's votes are

23   being diluted?

24           MR. LEVINE:  Yes, absolutely.  And that's why you can

25   look at cases like the *Goosby* case, which went back and forth

SABRINA A. D'EMIDIO - OFFICIAL COURT REPORTER
(914)390-4053

180102naacpC              Conference

1    to the Second Circuit, as a good example of what happens in a

2    redistricting Voting Rights Act case, which is what this case

3    is most like, because the plaintiffs are asking for districts

4    to be established, it's a lot like redistricting.

5           And when a federal court concludes that districts are

6    necessary or redistricting is necessary, usually we'll find

7    that in the first instance and then say, okay, I'm going to

8    kick this issue back to the appropriate legislative body to

9    determine what those districts should look like because it's

10   not appropriate for a court to do that outside of a legislate

11   I've process, unless it's absolutely necessary to do so.  And

12   that's what happened in the *Goosby* case.  And that's what we

13   submit should happen in this case if it gets that far, but the

14   appropriate legislative body wouldn't be the school board.

15          MS. CONNELL:  If I may, in Voting Rights Act cases

16   involving school boards, a number of the cases cited to your

17   Honor involve cases where only the local school board and its

18   members are parties.

19          The court comes in if it finds a Voting Rights Act

20   violation, finds dilution, crafts a remedy.  It does not --

21   that's different than a constitutional challenge to a state

22   statute.  That's true even where a state statute establishes

23   at-large voting.

24          I think when you said that this SED is sort of a

25   bystander here, you were exactly right.  The SED's and the

180102naacpC                    Conference

1   Commissioner's general oversight ability doesn't mean the

2   commissioner is a proper party to every lawsuit that touches

3   upon education, and she's not a proper party here.  How ever

4   you want to read and play with the statutes, when they're taken

5   together - and granted, they're a little opaque - but when you

6   take them together and you see how SED reads them and how the

7   legislature reads them, the commissioner did not have and does

8   not have authority to impose a voting ward system that would

9   require her to set aside state laws in the absence of a finding

10  of a Voting Rights Act violation, and that she can't do.

11          That being said, she's not going to get involved in

12  whether there is voting dilution here.  She's not going to

13  oppose the plaintiffs' experts or come in with experts on her

14  own, but she wants the opportunity to show that she isn't an

15  proper party here.  And in fact, I do think the district is a

16  proper party.  And the fact is that it would subject the state

17  to significant costs and fees, and we wouldn't bring anything

18  to the table.

19          There's been no showing that we're a necessary here.

20  Plaintiffs' own complaint is utterly devoid of any allegations

21  of wrongdoing on the part of the commissioner.  And unlike some

22  other Voting Rights Act cases, there are actually allegations

23  of steps she has taken to address problems, including election

24  problems but no finding of Voting Rights Act violations in the

25  district.

180102naacpC                 Conference

1          You know, I appreciate that we'll go along with this

2     briefing schedule, but naming her because there's some idea she

3     has the ability to impose ward voting is just not legally

4     founded, and the cases plaintiffs cite don't support it at all.

5          So, I would ask if there's any way in the briefing

6     schedule to allow the opportunity for the state to sit back and

7     not take part in the hearing in trying to preserve resources,

8     that that be considered because --

9          THE COURT:  That's fine with me.  You don't have to

10    take a position on the hearing or get involved.  I understood

11    that you weren't going to.  I just thought, for management

12    purposes, you would brief your motion to dismiss on the same

13    schedule that we're going to set.

14         Mr. Grossman.

15         MR. GROSSMAN:  Respectfully, I think that the

16    commissioner's opinion construes her authority too narrowly.

17    She is given a broad grant of authority over the State

18    Education System.  She is given a specific grant of authority

19    over the State Election Law System.  She has authority to

20    ensure that elections are fair.

21         We do note in our complaint steps she has taken to

22    remedy the quality of education in East Ramapo, but we also

23    know that there are two monitor's reports, monitors appointed

24    by the commissioner, who identify serious flaws in the

25    democratic process, flaws that amount to Voting Rights Act

180102naacpC              Conference

1  violations.  And she has abdicated her responsibility under

2  Section 305 and Section 2037 to ensure that elections are fair.

3       And so, we would say that there's a level of

4  responsibility that she bears, and to carve out the Voting

5  Rights Act as a law that is not a general or special law

6  applicable to the education system of the state I think is an

7  absurd reading of the statute.

8       THE COURT:  My memory was that when the monitors were

9  put in place, it was the legislature that could have empowered

10  the monitor to impose changes, and they pulled their punches

11  and decided they were, for reasons known only to them, not

12  going to do that.

13       MS. CONNELL:  And the monitors noted, your Honor, that

14  a change -- they didn't find a Voting Rights Act violation.

15  That has not been found by anybody.  And they noted, and that's

16  not quoted about the plaintiffs, that they would recommend that

17  the legislature consider certain changes to the current voting

18  scheme to allow for ward voting because the monitor saw it was

19  not permitted.

20       Furthermore, the monitors recommended certain changes

21  and practices and have been undertaking that process.  The

22  Commissioner has been active in this district to address

23  concerns, which voting is one part of it; financial decisions

24  are another part; policy choices are another part.  That's

25  absolutely unfounded to say they made Voting Rights Act

180102naacpC                Conference

1    determinations and, based on that, the commissioner can act.

2            MR. GROSSMAN:  Respectfully, that's a

3    misrepresentation of what I said.

4            I said the monitors, who were appointed by the

5    commissioner, did find serious harms to the democratic process.

6    They've both identified that public school parents, members of

7    the public school community, were unable to elect their

8    candidates of choice in the process.  And they both recommended

9    changes, reforms to the process, that would allow for members

10   of the public school community to elect members of the board.

11           They didn't make a specific finding of a Voting Rights

12   Act violation; that's absolutely right.  What we're alleging

13   here is that when they use the words public school community

14   and private school community, they are referring to white and

15   minority, because, as we've alleged in the complaint and shown

16   in the P.I., you have a private school community that is over

17   99% white children and a public school community that is over

18   96% non-white children.

19           So, yes, we would absolutely suggest that the monitors

20   did not find a Voting Rights Act violation, and you're right,

21   that the monitors did not have authority to overrule and

22   implement a ward system on their own.  The commissioner of

23   education, however, who, again, I point to the broad grant of

24   the authority, has the authority to make sure that school board

25   elections comply with all applicable laws and regulations.  The

180102naacpC                    Conference

1    Voting Rights Act applies to school board elections.

2              And so, if the commissioner is empowered to enforce

3    other federal laws – the IDEA, the Civil Rights Act – I don't

4    understand why it would exclude only the Voting Rights Act.

5              MS. CONNELL:  And, yet the commissioner is not a

6    proper party to all IDEA lawsuits, nor is she empowered to be a

7    roving force to make Voting Rights Act determinations and

8    impose ward systems contrary to state law.  There's not one

9    authority cited to support that, and that's because the result

10   is irrational and undermines the democratic process, but we'll

11   brief it all for your Honor.

12             THE COURT:  Let's talk about some practicalities.

13             Is there anything you want to amend in your complaint?

14             MR. GROSSMAN:  Not at this time, your Honor.

15             THE COURT:  All right.  So, if we're going to need --

16   if I'm going to need to rule by May 15, which is really May 11

17   because I'm going away May 12, we need to have this hearing in

18   April; and if it's really going to be two weeks, we need to

19   have this April 9.

20             MR. BUTLER:  Is there any way we can start it the next

21   week?

22             THE COURT:  No, because that's not going to give me

23   enough time to rule before I go away.  I'm sorry, but that's

24   just the way it's got to be.  If we do it April 9 and it goes

25   two weeks, then I only have -- oh, excuse me.  Hold on.

180102naacpC              Conference

1          If we started April 16, which is what you're asking

2     for, and we finished April 27, then I would have two weeks.

3          MR. BUTLER:  That's what I'm asking.

4          THE COURT:  I'll split the baby with you.  Let's start

5     April 11, just because I think two weeks to synthesize two

6     weeks' worth of evidence might be cutting it close.

7          MR. BUTLER:  Can we start on the 12th?

8          THE COURT:  Is that really going to make a big

9     difference to you?

10         MR. BUTLER:  Yes, yes.  I'm going to be away.

11         THE COURT:  When do you get back?

12         MR. BUTLER:  The 11th.

13         THE COURT:  Okay.  Start the 12th.  And I'm really

14    going to hold everybody's feet to the fire.

15         So briefing, we're going to work backwards from there.

16    Let me think a moment.  You can all sit.  I'm sorry.

17         February 16, defendants' opposition to the P.I.

18    hearing, if any, and cross-motions to dismiss.

19         March 9, plaintiffs' reply on its P.I. motion and

20    plaintiffs' opposition to motion to dismiss.

21         March 16, defendants' reply on motion to dismiss.

22         Then, March 23rd, affidavits of direct examination

23    of those witnesses within your control.  And then the hearing

24    will be April 12, and hopefully finished no later than the

25    23rd.  And then that will give me a couple of weeks and

180102naacpC              Conference

1  change to rule, but I'll do the best I can.

2          MR. BUTLER:  Your Honor --

3          THE COURT:  Yes?

4          MR. BUTLER:  We need more time than February 16 to

5  file an opposition.

6          It might be instructive to find out how much time the

7  plaintiffs have had to work on the case, when they hired their

8  experts, when they started working on this injunction and chose

9  to file it when they did, but I don't really care.  The fact

10 is, we need more time.  We have to hire experts.  We have to

11 take discovery.  We have to prepare the appropriate papers.

12 That's not going to be -- February 16 --

13         THE COURT:  What discovery do you think you need?

14         MR. BUTLER:  I want to take the deposition of every

15 single one of their experts.  I want to take a red deposition

16 of their declarants.  There are 13 different declarants, three

17 different experts.  This is not just a simple -- I don't know,

18 I'm sure you looked at this.  This is a foot stack of documents

19 that they filed.  And there was a lot of work that went into

20 putting it together.  There's going to be a lot of work

21 necessary to prepare an appropriate response.

22         And giving us until March -- until February 16 just

23 doesn't give us time to do a proper job.

24         THE COURT:  Well, you've had the motion since

25 February -- since December 8.  I'm sure you went out and

180102naacpC                  Conference

1   immediately started working on your experts and your

2   opposition.  You've got --

3               MR. BUTLER:  No.

4               THE COURT:  -- a lot of resources.

5               MR. BUTLER:  No, it's not that simple to hire experts

6   during the Christmas and New Year's time of year, number one.

7   Number two, there are other issues that are involved.  We had

8   to assimilate.  There are issues having to do with this motion

9   to dismiss that we had to consider.

10              THE COURT:  Look, I literally can't give you anymore

11  time.

12              MR. BUTLER:  Your Honor, what's the rush?

13              THE COURT:  There's an election that may be violating

14  federal law and diluting the votes of people, and it relates to

15  the education of children.

16              MR. BUTLER:  And if you find there to be such a

17  violation, you can enjoin the election.

18              THE COURT:  Only if I do it by -- before May 15th.

19              MR. BUTLER:  Okay.

20              THE COURT:  I literally don't have any more time to

21  give you.  And right now, we have a schedule that gives me two

22  weeks to decide this issue after the close of two weeks

23  of testimony.  I can't push it any further than that.

24              MR. BUTLER:  Frankly, I'm not sure that I understand

25  what's going to involve two weeks of testimony here.  We're

180102naacpC                Conference

1  talking about --

2          THE COURT:  But you just told me they have 13

3  declarants and three experts, and you're going to have experts.

4          MR. BUTLER:  Pardon me?

5          THE COURT:  You, I assume, are going to have experts.

6          MR. BUTLER:  I want to hire them; yes.

7          THE COURT:  Yes.

8          MR. BUTLER:  But I don't know -- one of their experts

9  is an expert who is apparently talking about what wards would

10  be created.  Another expert has to do with other stuff.  And

11  then there's a statistician.

12          THE COURT:  Well, maybe you don't need to deal with

13  that expert now --

14          MR. BUTLER:  The question is, do they need to put on

15  that expert at a preliminary injunction hearing?  The answer to

16  that is no.  So I'm not sure why two weeks is necessary.  I

17  think a much shorter period of time.  In fact, you may be able

18  to rule on this based upon the papers.

19          THE COURT:  I doubt it.

20          MR. BUTLER:  Well, we're not going to be able to

21  prepare our papers properly if we are only given until

22  February 16 to file our opposition papers.

23          THE COURT:  I have a high level of faith in you.

24  We've had another case together, and I never saw one iota of

25  difficulty in your law firm spewing out stacks of papers under

SABRINA A. D'EMIDIO - OFFICIAL COURT REPORTER
(914)390-4053

180102naacpC              Conference

1    very short deadlines when it was necessary.

2              MR. BUTLER:  And, your Honor, that's true, and we

3    would do that here if we had to, but we don't have to.

4              THE COURT:  I don't see how it's avoidable if I have

5    to rule before May 15.  I mean, this is a very tight schedule.

6    I'll grant you, I'm putting myself on as tight a schedule as

7    I'm putting on you guys.

8              It was filed December 8.  There will have been about

9    two months and 10 days for you to file your opposition.

10             MR. BUTLER:  Well, two months and ten days from the

11   date it was filed, perhaps, but not the date when we could

12   actually start working on an opposition.

13             THE COURT:  I don't know why you couldn't start

14   working on an opposition on December 8.

15             MR. BUTLER:  Because we didn't.  We can't.  We

16   couldn't.  But that's not important.

17             THE COURT:  Yes.  I don't get why not.

18             MR. BUTLER:  We had to review it.  We have reviewed

19   it, and we have formulated some approaches in mind.

20             THE COURT:  Yes.  And I'm sure somebody started

21   sniffing around for experts, or, if they didn't, I can't

22   understand why.

23             MR. BUTLER:  Your Honor, you've extended three weeks

24   at the back end of this for a reply.  Why do they need three

25   weeks?  Give them two weeks.  Give us that extra week.

180102naacpC                    Conference

1          THE COURT:  Because they're replying on their motion

2     and they're opposing your motion to dismiss, --

3          MR. BUTLER:  Two weeks.

4          THE COURT:  -- both parties, motions to dismiss.

5          MR. BUTLER:  Two weeks?  What's wrong with two weeks?

6          THE COURT:  You're getting until February 16; they're

7     getting until March 9; they're going to reply in one week to

8     March 16; and we're having the hearing April 12.

9          Whoever you're calling on direct, I need the

10    affidavits of direct examination by -- I can stretch that one a

11    little bit, I guess -- by March, let's make it 26.

12         And if turns out that once you've seen each other's

13    each other's affidavits, anybody who has a different view of

14    what the hearing is going to look like, and it's not going to

15    be as long, you'll let me know and it can slip.  But right now,

16    I have a representation from plaintiffs that they think it's 10

17    trial days.  I don't think that they're making that up.

18    Hopefully, it will be shorter.  As I said, we're going to work

19    a long day, and I'm going to hold the lawyers' feet to the

20    fire.  Hopefully, it won't take a full two weeks, but if it

21    turns out that when you file your affidavits of direct

22    examination on March 26, each side is only calling two or three

23    witnesses and it's not going to take two weeks, great, I'll

24    push it off.  But I understand it doesn't leave a heck of a lot

25    of time to do papers, but there's six weeks between now and

180102naacpC                    Conference

1   February 16.  And the motion was filed almost a month ago, and

2   that's adequate time.  So that's going to be our schedule.

3          And in terms of discovery, the parties should confer

4   and propose an orderly process, because I don't want to have a

5   situation where, you know, defendants are dropping their expert

6   affidavits on March 9 and the defendants want to take

7   depositions between then and March 16.  That's not going to

8   be -- that's not going to be practical.

9          So either there aren't going to be depositions of

10  defendants' experts or they're going to have to take place

11  before March 9.

12         What I'd like you to do is confer with each other

13  about when defendants are going to serve their expert reports.

14  Obviously, the plaintiffs' experts need to be made available

15  sooner than that.

16         If you can't agree on an orderly process for

17  depositions of fact witnesses and disclosure of defendants'

18  experts and depositions of both sides' experts -- well, if you

19  can or you can't, let me know by a week from today, January 9.

20  And send a joint letter with the parties' dueling proposals,

21  and I'll either rule or get Magistrate Judge McCarthy involved

22  who was just as thrilled as I was to see the East Ramapo

23  Central School District back.

24         What are the odds that she and I would both get it in

25  round II?  All right.

180102naacpC                Conference

1          So let me say these dates.  By January 9, you're

2     either going to agree on a discovery schedule or submit dueling

3     proposals.

4          February 16, defendants' opposition to the P.I. motion

5     and cross-motion to dismiss.

6          March 9, plaintiffs' reply on the P.I. motion and

7     opposition to the motions to dismiss.

8          March 16, defendants' reply on the motion to dismiss.

9          And then March 26 for the affidavits of the

10    direct testimony; and the hearing will commence April 12.

11         Is there anything else we should do this afternoon?

12    All right.  I'll see you --

13         THE DEPUTY CLERK:  April 12 at 9:00 a.m.

14         THE COURT:  April 12 at 9:00 a.m.

15         MR. GROSSMAN:  If I can raise one thing.

16         It is our firm and fond hope that there's a way to

17    resolve this before going to the hearing.  And if a defendant

18    or defendants can be properly identified earlier, we would very

19    much appreciate a chance to settle this case so as not to waste

20    the state's and the district's money and to preserve the

21    Court's time.

22         THE COURT:  How do you think that will go?

23         MR. GROSSMAN:  I'm an eternal optimist, your Honor.  I

24    wouldn't work for the organization I do.

25         THE COURT:  I don't know if you've tangled with the

180102naacpC                    Conference

1   people that Mr. Butler represents before, but from what I've

2   heard, and you'll correct me if I'm wrong, Mr. Butler, they

3   have no interest in resolving it.

4          Am I right?

5          MR. BUTLER:  We're somewhat in the same position as

6   the Commissioner is.  We don't have the authority to do what

7   the plaintiffs are asking us to do.  The district -- and let me

8   state very clearly: the district wants to the abide by the law.

9   Period.  It believes what its doing now abides by the law.

10         If you conclude that they're doing something wrong or

11  that there isn't a violation and it's appropriate to order them

12  to do something, of course they'll do that.  But to turn to us

13  and say, Will you do what they want you to do, we can't, just

14  like the Commissioner can't.  We cannot do it.

15         THE COURT:  Well, if the school board were willing to

16  do it but for what it regards as an inability to do it because

17  of state law, you might have something to talk about, because

18  there may be - I don't know what it would be - but it sounds

19  like Mr. Grossman has some ideas as to who would have to be

20  involved to make that work.

21         But if your client's position is, We would do it but

22  for our inability to do it, but we don't think there's anything

23  wrong with the current system and have no intention of

24  cooperating and changing it, then there's no point in

25  discussing this any further.

180102naacpC                 Conference

1        MR. BUTLER:  I'm not sure exactly what the position

2    is.  I can tell you, it's not exactly how you articulated it,

3    even if they're taking the extreme position, in part because we

4    don't believe that there is a Voting Rights Act violation

5    presented by plaintiffs, and we will show you that.  We will

6    show you that in our opposition papers.

7        MS. CONNELL:  If I may.  That forecloses any

8    settlement with the state.  We've been very clear and adamant,

9    and I think we'll show you and it will be very clear to you,

10   that we have no authority to impose the ward system that

11   plaintiffs seek.  They don't even allege that in their

12   complaint.  There's no allegations against the Commissioner in

13   the complaint.  But even if we could, our investigation reveals

14   that we can't shake hands with the plaintiff and say, Hey, we

15   think this voting is not working; we're going to impose a new

16   system.

17        There would have to be specific factual agreements and

18   findings involving the district about what's going on in that

19   there's a Voting Rights Act violation that's going on; that

20   would then have to be blessed by the Court.

21        That's the only way that I could see settlement

22   happening, and if that's not going to happen with the district,

23   we can't do anything.  Our hands are tied.

24        THE COURT:  Agreed.  I don't think anything can happen

25   without the district being on board as a practical matter, but

180102naacpC                Conference

1    how do these cases -- many of them do get resolved.  How does

2    that happen?  Is it a consent decree, and then the parties

3    agree to something, and I sign off on it, and then you have an

4    order you can implement?

5              MR. GROSSMAN:  Yes, your Honor.  A consent decree

6    would resolve everything.

7              There's an official in New York State who is

8    responsible for ensuring that the election system in the East

9    Ramapo Central School District complies with the Voting Rights

10   Act.  It's either the district or it's the Commissioner.  One

11   of these two defendants, and we believe both of them, could

12   remedy this defect.

13             I believe -- well, your Honor, the plaintiffs believe

14   that the Commissioner does have the authority to agree to

15   implement a ward system to a carry out her duty to make sure

16   the election is complied.

17             THE COURT:  Could they agree to that without conceding

18   there's a violation?

19             MR. GROSSMAN:  I would have to research that and get

20   back to you, your Honor, but if plaintiffs are looking for a

21   remedy, we are not looking for any special admissions.  We are

22   not looking for any particular costs to be borne.  We're

23   looking for a remedy to make sure that the 2018 election

24   complies with the Voting Rights Act, and that is all.

25             THE COURT:  Well, I think the ball is in your court to

180102naacpC                    Conference

1   figure out how this would work and what the mechanism would be.

2   I've heard Mr. Butler say that he doesn't believe there's a

3   violation.  I've also heard him not completely rule out trying

4   to resolve the case, although, I didn't hear him rule it in,

5   either.  But I think if their position is there's no violation,

6   any remedy on consent would -- let me put it this way:  If the

7   state defendants are of the view that they can only jump in and

8   get involved if I find a violation, and the school district

9   isn't going to agree there's a violation, then there's an

10  impasse.

11          But if you think there's a way to thread that needle,

12  be creative, God bless, but prepare for the hearing, too.

13          MR. GROSSMAN:  Yes, your Honor.  Thank you.

14          THE COURT:  If you get somewhere in your conversations

15  and it would be helpful to have a magistrate or a mediator get

16  involved, let me know.  I would be delighted for that to

17  happen, but I think the ball's in plaintiffs' court.

18          Anything else?  All right.  Thank you, all.

19                  - - -

20  Certified to be a true and correct

21  transcript of the stenographic record

22  to the best of my ability.

23  _____
    U.S. District Court

24  Official Court Reporter

25

                SABRINA A. D'EMIDIO - OFFICIAL COURT REPORTER
                            (914) 390-4053