**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

---

NATIONAL ASSOCIATION FOR THE
ADVANCEMENT OF COLORED PEOPLE,
SPRING VALLEY BRANCH; JULIO
CLERVEAUX; CHEVON DOS REIS; ERIC
GOODWIN; JOSE VITELIO GREGORIO;
DOROTHY MILLER; HILLARY MOREAU;
and WASHINGTON SANCHEZ,

                    Plaintiffs,

    v.

EAST RAMAPO CENTRAL SCHOOL
DISTRICT and MARYELLEN ELIA, IN
HER CAPACITY AS THE
COMMISSIONER OF EDUCATION OF
THE STATE OF NEW YORK,

                  Defendants.

17 Civ. 8943 (CS) (JCM)

---

**REPLY MEMORANDUM OF LAW IN FURTHER SUPPORT OF**
**PLAINTIFFS' MOTION FOR A PRELIMINARY INJUNCTION**

# TABLE OF CONTENTS

**Contents**                                                                        **Page**

I.      THE DISTRICT'S FOCUS ON POLICY DISTINCTIONS—INSTEAD OF THE
        WHETHER MINORITIES HAVE AN EQUAL OPPORTUNITY TO ELECT
        CANDIDATES OF THEIR CHOICE—IS MISPLACED .................................................1

II.     THE *GINGLES* PRECONDITIONS ARE SATISFIED ..................................................2

        A.      The Second *Gingles* Precondition Is Satisfied..........................................................2

        B.      The Third *Gingles* Precondition is Satisfied.............................................................3

                1.      There Is No Dispute That The Preferred Candidates of a Large
                        White Voting Bloc Win Every Board Election in East Ramapo .................4

                2.      The Preferred Candidates of a Cohesive Minority Voting Bloc
                        Usually Lose to White-Preferred Candidates in East Ramapo ...................4

                        a.      Cole's EI Estimates Are Consistent with His Other
                                Statistical Analyses and Data on the Composition of
                                District Schools ....................................................................................4

                        b.      Cole's EI Method Is Well-Accepted .................................................5

                        c.      Cole Disclosed Standard Errors for His EI on February 8
                                and Includes Confidence Intervals in His Rebuttal Report.............6

                        d.      The Divergence of Cole's and Alford's EI Calculations
                                Only Underscore the Validity of Cole's Multiple-Method
                                Approach..............................................................................................7

                        e.      Cole's Use of HPA and Correlation Analyses Are Well-
                                Accepted by Courts as Probative of Racially-Polarized
                                Voting .................................................................................................8

                        f.      The 2013 Election Results Were Properly Analyzed and Do
                                Not Weigh Against a Finding of Racially-Polarized Voting...........9

                        g.      Alford's Conclusion—That There Is Insufficient Data—Is a
                                Cop-Out That Courts Have Rejected ...............................................10

III.    PLAINTIFFS DEMONSTRATE THAT THE TOTALITY OF
        CIRCUMSTANCES WEIGH IN FINDING A SECTION 2 VIOLATION ....................11

        A.      Disadvantaged Minority Voters Relative to White Voters (Factor 1)...................11

B.    There Is a High Degree of Racially-Polarized Voting (Factor 2)...........................12

C.    An Informal Slating Process Excludes Minority Voters (Factor 4).......................13

D.    Low and Declining Minority Turnout Reflects the Effects of
      Discrimination in Education, Employment, and Other Areas and Favors
      Plaintiffs (Factor 5) .............................................................................................14

E.    The Election of Minority Candidates Chosen Through a Closed Political
      Process by a White Voting Bloc Does Not Weigh Against Liability
      (Factor 7).............................................................................................................15

IV.    CONCLUSION.............................................................................................................16

# <u>TABLE OF AUTHORITIES</u>

**Page(s)**

## CASES

*Arbor Hill Concerned Citizens Neighborhood Ass'n v. Cty. of Albany*,
2003 WL 21524820 (N.D.N.Y. July 7, 2003) ...........................................................9

*Benavidez v. City of Irving*,
638 F. Supp. 2d 709 (N.D. Tex. 2009) ....................................................................8

*Cisneros v. Pasadena Independent School District*,
2014 WL 1668500 (S.D. Tex. Apr. 25, 2014) ........................................................6

*Citizens for a Better Gretna v. City of Gretna*,
636 F. Supp. 1113 (E.D. La. 1986) .......................................................................13

*Goosby v. Town Bd. of Hempstead*,
180 F.3d 476 (2d Cir. 1999)..................................................................1, 14, 15

*Goosby v. Town Bd. of Hempstead*,
956 F. Supp. 326 (E.D.N.Y. 1997) .................................................................12, 13

*Harper v. City of Chicago Heights*,
1997 WL 102543 (N.D. Ill. Mar. 5, 1997)............................................................13

*Kirksey v. Board of Supervisors of Hinds Cty.*,
554 F.2d 139 (5th Cir. 1977) ................................................................................15

*Luna v. Cty. of Kern*,
--- F. Supp. 3d---, 2018 WL 1064372 (E.D. Cal. Feb. 23, 2018) ...........................8

*N.A.A.C.P., Inc. v. City of Niagara Falls*,
65 F.3d 1002 (2d Cir. 1995)...................................................................................1

*Perez v. Pasadena Indep. Sch. Dist.*,
958 F. Supp. 1196 (S.D. Tex. 1997) ..............................................................8, 9, 10

*Perkins v. Matthews*,
400 U.S. 379 (1971)..............................................................................................12

*Pope v. Cty. of Albany*,
94 F. Supp. 3d 302 (N.D.N.Y. 2015)...............................................................2, 9, 12

*Rodriguez v. Pataki*,
308 F. Supp. 2d 346 (S.D.N.Y. 2004)....................................................................6

*Teague v. Attala Cty.*,
    92 F.3d 283 (5th Cir. 1996) ............................................................................8

*Thornburg v. Gingles*,
    478 U.S. 30 (1986) ............................................................... *passim*

*U.S. v. Charleston Cty.*,
    316 F. Supp. 2d 268 (D.S.C. 2003), *aff'd*, 365 F.3d 341 (4th Cir. 2004) ...............2, 12, 14, 15

*U.S. v. City of Euclid*,
    580 F. Supp. 2d 584 (N.D. Ohio 2008).......................................... *passim*

*U.S. v. Marengo Cty. Comm'n*,
    731 F.2d 1546 (11th Cir. 1984) ...................................................................13

*U.S. v. Vill. of Port Chester*,
    704 F. Supp. 2d 411 (S.D.N.Y. 2010).........................................................3, 5, 10

*Uno v. City of Holyoke*,
    72 F.3d 973 (1st Cir. 1995).......................................................................11

## STATUTES

52 U.S.C. § 10301(a) .............................................................................1, 10, 15

## OTHER AUTHORITIES

FEDERAL JUDICIAL CTR., REFERENCE MANUAL ON SCIENTIFIC EVID. (3d ed.), at
    244-46 (2011)........................................................................................6

I.    **THE DISTRICT'S FOCUS ON POLICY DISTINCTIONS—INSTEAD OF THE WHETHER MINORITIES HAVE AN EQUAL OPPORTUNITY TO ELECT CANDIDATES OF THEIR CHOICE—IS MISPLACED**

In a Section 2 claim, the fundamental inquiry is whether a method of election—in this case, the at-large method of electing the Board—affords minorities "less opportunity than other members of the electorate to participate in the political process and to elect representatives of their choice." *Thornburg v. Gingles*, 478 U.S. 30, 36 (1986). This requires the Court to examine the *effect* of an at-large election system on *minority voters*, *i.e.*, whether minority voters have an equal opportunity to elect their candidates of choice, and not whether minorities are elected. *N.A.A.C.P., Inc. v. City of Niagara Falls*, 65 F.3d 1002, 1019 (2d Cir. 1995). The District's opposition fails to refute Plaintiffs' evidence that the high and increasing levels of racially-polarized voting in East Ramapo's at large system results in the denial of that equal opportunity.

The District's effort to characterize this case as a mere policy disagreement between the public and private school communities misses the mark.[1] District Br. 1-2, 6, 28-30, Dkt. No. 29. Such race-neutral explanations for White bloc voting are "irrelevant in the inquiry into the three *Gingles* preconditions" and are considered instead as one factor in the "totality of circumstances." *Goosby v. Town Bd. of Hempstead*, 180 F.3d 476, 493 (2d Cir. 1999) ("*Goosby II*"). And even where nonracial reasons for White bloc voting exist, those findings may be overcome by other evidence showing that minorities have less opportunity than Whites to elect candidates of their choice, including the use of discrimination-enhancing electoral practices, a closed slating process, and a lack of responsiveness to the needs of the minority community—all factors clearly present here. *Id.* at 497 (affirming district court's rejection of defendant's "partisan politics argument").

Nor is the election of minority candidates to the Board "dispositive," as the District asserts,

---

[1] All terms not defined herein shall have the meaning set forth in Plaintiffs' Memorandum of Law in Support of Their Motion for a Preliminary Injunction, Dkt. No. 35.

where, as here, the elected minorities are not minority voters' candidates of choice.  *See Gingles*, 478 U.S. at 75 ("election of a few minority candidates does not necessarily foreclose the possibility of dilution of the [minority] vote" (quotation marks omitted)).  Instead, those elections are part of a practical evaluation under the respective Senate factor.  *See, e.g.*, *U.S. v. Charleston Cty.*, 316 F. Supp. 2d 268, 278-79 (D.S.C. 2003), *aff'd*, 365 F.3d 341 (4th Cir. 2004).  Plaintiffs address the *Gingles* preconditions in Section II and respond to the District's purported race-neutral justification for White bloc voting and the election of minority candidates in Section III below.[2]

## II.    THE *GINGLES* PRECONDITIONS ARE SATISFIED

The District does not dispute the first *Gingles* precondition.  The *Gingles* analysis thus turns on whether (2) minorities in East Ramapo are politically cohesive; and (3) white bloc voting is usually sufficient to defeat minority-preferred candidates.  Both are satisfied here.

### A.    The Second *Gingles* Precondition Is Satisfied

Whether minorities in the District are politically cohesive "can be demonstrated through both statistical and non-statistical evidence."  *Pope v. Cty. of Albany*, 94 F. Supp. 3d 302, 333 (N.D.N.Y. 2015) (collecting cases).  In addition to expert analysis of voting patterns, "evidence of common political interests . . . held by members of the relevant groups in the jurisdiction" is probative of minority cohesiveness.  *U.S. v. City of Euclid*, 580 F. Supp. 2d 584, 600 (N.D. Ohio 2008); *see Pope*, 94 F. Supp. 3d at 321 (considering evidence of whether minorities "unite[] behind issues such as housing discrimination [and] education" in analysis of second *Gingles* factor).

The District tries to sweep away substantial evidence of minority political cohesion by focusing exclusively on the statistical analysis of racially polarized voting ("RPV").  But it is obvious that minority voters in East Ramapo are politically cohesive, especially on matters relating

---

[2] The District has not yet responded to all of Plaintiffs' discovery requests.  Plaintiffs reserve their rights to supplement their arguments with further evidence at the preliminary injunction hearing.

to schooling. The public school student population is 90% Black and Latino, and 96% non-white overall, while private schools are over 99% White. Cooper ¶ 39, Dkt. No. 33-1; Cole ¶ 36, Dkt. No. 32-1. A "high degree of racial segregation" enhances minority cohesion, with Blacks and Latinos highly concentrated in the same neighborhoods and "only a very small percentage of . . . Whites living in predominantly minority neighborhoods." Cooper ¶ 33 & Figs. 8, 9. Cole's analysis of voting patterns, which show high and increasing levels of support for the same candidates among Black and Latino voters, are consistent with the strong common interests between these two communities. *See* Cole Report ("Cole"), Dkt. No. 32-1; Cole Rebuttal Report ("Cole II").

### B. The Third *Gingles* Precondition is Satisfied

The third *Gingles* precondition considers whether the candidates preferred by a cohesive white voting bloc usually defeat the preferred candidates of a cohesive minority-voting bloc. This analysis "requires discrete inquiries into minority and white voting practices." *Gingles*, 478 U.S. at 56. Courts generally consider multiple analytical methods to determine RPV. *See U.S. v. Vill. of Port Chester*, 704 F. Supp. 2d 411, 427, 441 (S.D.N.Y. 2010) (noting expert's use of multiple methodologies "accepted by numerous courts in voting rights cases"); *City of Euclid*, 580 F. Supp. 2d at 602 (crediting expert who "employ[ed] all three methodologies and provid[ed] points of comparison between them for the Court to consider"). Scholars also recommend using multiple analytical methods because "there is no 'silver bullet'" in RPV analysis. Cole II ¶ 2. Using qualitative data to check quantitative analysis is an accepted practice in statistical research generally and RPV analysis specifically. Cole II ¶¶ 13-14.

Cole used three statistical methodologies validated by courts and recommended by scholars — (i) King's Ecological Inference ("EI"), (ii) Homogenous Precinct Analysis ("HPA"), and (iii) correlation analysis. Cole ¶¶ 22-29. Cole then checked his quantitative analysis with

qualitative data.[3]  Cole II ¶¶ 12-15.  By contrast, the District's analyst, Alford, used only one statistical method—a method of EI different from Cole's—and cites no qualitative data.

In the two "discrete inquiries" involved in RPV analysis, (1) there is no dispute that the preferred candidates of a large White voting bloc have won every contested Board election analyzed; and (2) Cole demonstrates that the preferred candidates of a cohesive Black and Latino voting bloc usually lose to white-preferred candidates.  Alford does nothing to disprove this.

### 1. There Is No Dispute That The Preferred Candidates of a Large White Voting Bloc Win Every Board Election in East Ramapo

For every contested Board election analyzed, Cole and Alford agree that the preferred candidate of a large White voting bloc won.  Cole II ¶¶ 39-41, Table 3; Alford ¶¶ 42-43, Dkt. No. 79-4.  Alford's analysis demonstrates very high levels of white bloc voting that are more consistent with Cole's HPA, than the more conservative estimates from Cole's EI analysis.  Alford ¶¶ 42-43.  Cole's correlation analysis is consistent with strong white bloc voting.  Cole II ¶ 51, Cole Table 3.

### 2. The Preferred Candidates of a Cohesive Minority Voting Bloc Usually Lose to White-Preferred Candidates in East Ramapo

#### a. Cole's EI Estimates Are Consistent with His Other Statistical Analyses and Data on the Composition of District Schools

The District criticizes Cole's EI estimates because they demonstrate purportedly "unrealistically extreme degrees of Black and Latino voter support for 'public school community' candidates."  Dist. 14.  But the extreme levels of RPV only reflect the extreme racial segregation between East Ramapo's public schools, which are 96% non-White, and its private schools, which are over 99% White.  Cooper ¶¶ 39-40.  Cole's EI estimates and the segregation of the schools are

---

[3] The District dismisses Cole's consideration of non-statistical evidence, Dist. 25-26, but ignores that Prof. Gary King, who developed the EI technique, instructed analysts to consider "the vast array of qualitative information available," including participant observations, journalistic accounts, and historical studies, given the limitations of inferential methods like EI.  Cole II ¶ 13.

also reflected in his correlation analysis, which shows support for candidates identified with the "public school community" increasing as the percentage of Black or Latino voters in a polling place increases and decreasing as the percentage of White voters in polling places increase. Cole ¶¶ 33-36; 39-41, 43-45; 50-53; 61-65; Table 3. Cole's HPA estimate also reflects RPV by showing that a very large White voting bloc consistently supports "private school community" candidates. *Id*. Contemporaneous reports also show that each election features two sets of candidates, one endorsed by the private school community and one endorsed by the public school community. Cole ¶¶ 36, 43, 53, 64. Put in context, the extreme racial polarization makes sense.

### b.    Cole's EI Method Is Well-Accepted

The District's claim that Cole's EI method is unreliable is simply wrong. Cole's EI method has been relied upon by numerous courts in the RPV analysis, including in *Port Chester*. 704 F. Supp. 2d at 427, 441. Cole used the same software that the plaintiffs' expert in *Port Chester* used to calculate the EI estimates that the court relied upon. *Id.*; *see* Deposition of Dr. Lisa Handley, Ph.D., 2007 WL 707877 (S.D.N.Y. Jan. 17, 2007) ("I used what's called EzI, a software program developed by Gary King."). Recent peer-reviewed research that Alford ignores shows that Cole's EI methodology and software produce accurate estimates when compared against actual voting data. Cole II ¶ 18. Further peer-reviewed research shows that Alford's approach to EI yields "results [that] do not always demonstrate face validity," and recommends that RPV analysts "incorporate original EI methods," like Cole's, in their investigations. *Id.* ¶ 19. To account for EI's limitations, Cole used multiple analytical methods and drew conclusions based on whether there was consistency across methods. Alford's failure to do so calls into question the validity of his own analysis, not Cole's.

        **c.**     **Cole Disclosed Standard Errors for His EI on February 8 and Includes Confidence Intervals in His Rebuttal Report**

The District's claims that Cole did not calculate or disclose measures of reliability for his EI estimates is baseless. Dist. 15-17. The software that Cole used generates standard error, a common measure of reliability, for all of his calculations. *See Rodriguez v. Pataki*, 308 F. Supp. 2d 346, 399 (S.D.N.Y. 2004) (recognizing "standard error" as a measure of reliability in RPV). Cole reviewed the standard error for each of his calculations, and found them sufficiently small to give him confidence in the reliability of his EI estimates. Cole Dep. Tr. 77:9-11, 80:12-15, Salomon Ex. 1 ("I reviewed the standard errors that were produced by EI and determined that they were small enough to have confidence in these estimates."). Cole produced those standard errors to the District on February 8. Ex. 10 to Butler, Dkt. No. 79-10. Thus, the District has no basis to argue that Cole's analysis should be discounted based on any failure to produce this information. *Cf. Rodriguez*, 308 F. Supp. 2d at 399-400 (cited in Dist. 21) (discounting expert analysis where expert never produced standard error calculations, even at trial).

The District also criticizes Cole for using standard errors instead of confidence intervals, another measure of reliability, Dist. 15-16, but converting standard errors into confidence intervals is a straightforward process.[4] Alford himself used standard errors as measures of reliability for his EI calculations in *Cisneros v. Pasadena Independent School District*, 2014 WL 1668500, at *13 (S.D. Tex. Apr. 25, 2014). Nonetheless, Cole has reported confidence intervals for all of his EI estimates in his Rebuttal Report, which further validate his conclusion that in the last nine contested Board elections, candidates preferred by a majority of Black and Latino voters have lost to the preferred candidates of White voters. Cole II ¶ 5, 27, 50-52; Table 3.

---

[4] *See* FEDERAL JUDICIAL CTR., REFERENCE MANUAL ON SCIENTIFIC EVID. (3d ed.), at 244-46 (2011) (explaining conversion of standard errors into confidence intervals).

**d.    The Divergence of Cole's and Alford's EI Calculations Only Underscore the Validity of Cole's Multiple-Method Approach**

Contrary to the District's argument, the fact that Cole and Alford did not achieve identical results using their different methods of EI only demonstrates that Cole was right to use multiple methods of analysis to undergird his conclusions. As discussed above, courts and scholars recommend Cole's approach of using as many methods of analysis and as much data as possible to investigate RPV. *See* III.B *supra.* Cole was able to use his method of EI to generate results with sufficiently small standard errors and narrow confidence intervals to conclude that there is significant RPV in East Ramapo. Cole II Tables 3 & 4. But Cole also used two other well-accepted methods—HPA and correlation analysis—and measured their results against with his EI findings. Cole ¶¶ 23-24, 27-2929; Cole II ¶ 11. Cole checked his statistical analyses of Board elections against qualitative data and statistical analysis of the richer data set from the 2012 Presidential election. Cole II ¶¶ 12-15, 47. Cole's thorough approach yielded conclusive results.

By contrast, Alford's approach is designed to yield inconclusive results. Alford used only one method of analysis—an EI approach that he claims lacks reliability with fewer than 15 polling places in a district with only 10 polling places. Alford ¶ 20. Contrary to best practices advocated by courts and scholars described above, Alford does not report having attempted any other statistical methods to investigate voting patterns in East Ramapo. Alford also did not analyze data from the 2012 Presidential election that Cole used as an exogenous check on whether RPV exists in East Ramapo outside Board elections. Alford asserts that Board elections have too few polling places, too little minority turnout, and insufficient distribution of minorities across polling places to generate reliable results about RPV. Alford ¶¶ 15, 20, 49. But data from the 2012 Presidential election contains none of those limitations. Cole II ¶ 47. Any divergence in results between Cole and Alford only reflects the incompleteness of Alford's approach.

e.    **Cole's Use of HPA and Correlation Analyses Are Well-Accepted by Courts as Probative of Racially-Polarized Voting**

The District's criticism of Cole's use of HPA and correlation analysis to investigate RPV ignores that courts have relied on each under circumstances similar to this case.  First, the reliability and probative value of HPA in assessing RPV was established in *Gingles* and remains in use today. *See Gingles*, 478 U.S. at 53 n.20; *Luna v. Cty. of Kern*, --- F. Supp. 3d---, 2018 WL 1064372, at *20 (E.D. Cal. Feb. 23, 2018).  Courts have relied upon HPA to determine RPV where, as in Board elections, there are no minority-homogenous precincts.  *Benavidez v. City of Irving*, 638 F. Supp. 2d 709, 723, 725, 732 (N.D. Tex. 2009) (relying on HPA of only white-homogenous precincts). Moreover, Cole applied HPA to data from the 2012 Presidential election, which included homogenous black polling places, and revealed strong RPV.  Cole ¶ 73.  Cole's HPA findings are all probative of the existence of RPV.

Second, courts analyzing RPV have relied upon correlation analysis.  Correlation analysis examines whether there is a relationship between "voting behavior and the racial composition" of polling places.  *Teague v. Attala Cty.*, 92 F.3d 283, 289 (5th Cir. 1996).  "A high correlation coefficient justifies confidence in the underlying data." *Id.* at 289-90 (acknowledging correlation coefficients greater than R =0.5 as high).  Cole shows high correlation coefficients for virtually every election analyzed, reflecting strong and divergent voting patterns between voters in polling places with larger minority populations and those with larger white populations.  Cole Table 3. The District and Alford claim that these correlation coefficients are probative at a level of statistical significance less than p=.05, Dist. 22; Cole II ¶ 46, which generally results from a low number of precincts, low minority turnout, and relatively even distribution of minority voters across precincts. *See Perez v. Pasadena Indep. Sch. Dist.*, 958 F. Supp. 1196, 1220-21 (S.D. Tex. 1997).  Courts have not been deterred by these barriers and relied upon high correlation coefficients to find RPV,

even with as few as four polling places and lower turnout than here.  *See id.* at 1221-22.

> **f.    The 2013 Election Results Were Properly Analyzed and Do Not Weigh Against a Finding of Racially-Polarized Voting**

The District asserts that Cole's conclusions regarding the 2013 election undermine his credibility, but in fact, they show the necessity of using multiple statistical methods and checking those analyses against qualitative data.  Indications from Cole's EI that Charles, Germain, and Corado were Black-preferred candidates, were inconsistent with data from correlation analysis, HPA, NYSED, and contemporaneous news reports showing (1) support for those candidates decreasing as the percentage of Black voters in a polling place increased; (2) strong White support for those candidates in a close election; (3) those candidates had been publicly endorsed by private school community organizations; and (4) deep racial segregation in the schools with very few Black students attending private schools.  Cole ¶¶ 61-69, Tables 2 & 3.  Cole thus determined the evidence to be inconclusive as to whether they were Black-preferred candidates in 2013.  *Id.* ¶ 71.  This is sound analysis.  *City of Euclid*, 580 F. Supp. 2d at 602 (crediting expert who used three methodologies and only drew conclusions where all three methodologies were in general agreement).  The District criticizes Cole for not relying solely on EI, Dist. 25; however, accepting EI estimates without checking their consistency with other data is precisely what courts and scholars like Professor King have advised against.

But even if Cole had concluded that Black-preferred candidates won the 2013 election, that would not defeat Plaintiffs' claim.  "[T]he question is whether a white voting bloc *usually* defeats a minority-preferred candidate, not whether it always does so."  *Arbor Hill Concerned Citizens Neighborhood Ass'n v. Cty. of Albany*, 2003 WL 21524820, at *11 n.11 (N.D.N.Y. July 7, 2003).  Because "more recent elections are more probative," *Pope*, 94 F. Supp. 3d at 333, the defeat of minority-preferred candidates by white-preferred candidates in the last nine contested Board

elections easily satisfies *Gingles*.  Cole ¶ 70, Table 3; Cole II ¶¶ 50-52, Table 3.

> **g.    Alford's Conclusion—That There Is Insufficient Data—Is a Cop-Out That Courts Have Rejected**

Alford's analysis does nothing to disprove the existence of RPV.  Instead, Alford asserts that determining RPV in East Ramapo is impossible because there are too few polling places, too few Black and Latino voters, and too little variation in minority distribution across polling places for his chosen method to generate reliable results.  Alford Report ¶¶ 25-26, 49.  Courts have refused to let these obstacles bar vote dilution claims.  "The inability to draw statistically meaningful conclusions from [one mode of] analysis cannot end the inquiry as to whether voting dilution because of racial polarization is present."  *Perez*, 958 F. Supp. at 1221.

As the *Port Chester* court noted, "if low voter turnout could defeat a Section 2 claim, excluded minority voters would find themselves in a vicious cycle: their exclusion from the political process would increase apathy, which in turn would undermine their ability to bring a legal challenge to the discriminatory practices, which would perpetuate low voter turnout, and so on."  704 F. Supp. 2d at 440; *see also Perez*, 958 F. Supp. at 1220-21.  These circumstances emphasize the need to consider all of Cole's methodologies, as the district court did in *Perez*, where only four polling places were available and turnout for each polling place was very low.  958 F. Supp. at 1205, 1220-21, 1229.  The data set Cole examined in East Ramapo, where turnout is higher and there are ten polling places, is far richer than that available to the *Perez* court.  The District is wrong that there is insufficient data to evaluate RPV.  Dist. 19.  "To hold otherwise would allow voting rights cases to be defeated at the outset by the very barriers to political participation that Congress has sought to remove."  *Perez*, 958 F. Supp. at 1221.

Finally, even if the Court finds flaws in Cole's approach, "it does not necessarily follow that those results [are] entirely irrelevant."  *City of Euclid*, 580 F. Supp. 2d at 602.  "In other words,

an approach might yield an inexact result, . . . but could still be correlative, probative, and sufficiently accurate to bear on the ultimate issue of racial bloc voting." *Id.* "The standard of proof here is preponderance, not mathematical certainty." *Id.* Under any circumstances, Cole's analyses are correlative, probative, and sufficiently accurate for the Court to find legally significant racial bloc voting, and the District has offered no evidence to the contrary.

## III.   PLAINTIFFS DEMONSTRATE THAT THE TOTALITY OF CIRCUMSTANCES WEIGH IN FINDING A SECTION 2 VIOLATION

As explained in Plaintiffs' opening brief, the "[C]ourt must determine whether, based on the totality of the circumstances [as outlined in the Senate factors] . . . [P]laintiffs have proven that the minority group was denied meaningful access to the political system on account of race." *Uno v. City of Holyoke*, 72 F.3d 973, 983 (1st Cir. 1995). The District concedes Factor 3 (discrimination enhancing practices) and 8 (lack of responsiveness to minority needs), as it submitted no opposition to those factors. Plaintiffs thus only address Factors 1, 2, 4, 5, and 7 below.

### A.   Disadvantaged Minority Voters Relative to White Voters (Factor 1)

The District erroneously argues that Plaintiffs have not provided the Court with a "shred of evidence" of voting-related discrimination. Dist. 33. The Monitors' findings and complaints by minority voter advocates show that minority access to polling places is inadequate. Trotman ¶ 25, Dkt. No. 25; Ex. 6 to Trotman at 12-13, Dkt. No. 25-6. The District's attempt to dismiss these deficiencies by arguing that the changes to polling places were postponed ignores that the Board's proposed changes did not address increased minority participation and would have further advantaged White voters. Trotman ¶ 27. Plaintiffs have also provided evidence of other Board actions that advantage White voters relative to minority voters, including newsletters the District sent to private school communities reminding those constituents to vote, while ceasing the same practice at public schools. Trotman ¶¶ 25-27; Hatton ¶¶ 27-29, Dkt. No. 28. Such practices, which

concern "[t]he accessibility, prominence, facilities, and prior notice of [minority voters'] polling

place's location[s] all have an effect on [the District's minority voters'] ability to exercise [their]

franchise." *Perkins v. Matthews*, 400 U.S. 379, 386-90 (1971) (finding that "[l]ocations at

distances remote from black communities or at places calculated to intimidate blacks from entering

. . . might well have th[e] effect" of abridging the right to vote on account of race).

### B.    There Is a High Degree of Racially-Polarized Voting (Factor 2)

RPV is not only legally significant, but extensive. Cole ¶ 5; *Gingles*, 478 U.S. at 31; *see*

Section II.B, *supra*. Having satisfied the *Gingles* preconditions, the evidence "give[s] rise to an

inference that racial bias is operating through the medium of the targeted electoral structure to

impair minority political opportunities." *Pope*, 94 F. Supp. 3d at 343 (quoting *Uno*, 72 F.3d at

983). The District tries to downplay the extreme RPV by arguing that divergent voting patterns

are explained "by factors other than race," such as disputes over schooling and tax policy. Dist.

29 (emphasis omitted). But Plaintiffs are not required "affirmatively to disprove every other

possible explanation for racially polarized voting." *Uno*, 72 F.3d at 983. Instead, race-neutral

explanations fail where there is evidence of other "race-based ones, such as diminished access to

the slating process or insensitivity by elected officials to the particularized needs of the minority

community" or the presence of the discrimination-enhancing election practices. *Goosby v. Town

Bd. of Hempstead*, 956 F. Supp. 326, 355 (E.D.N.Y. 1997) ("*Goosby I*"). Plaintiffs have

established a likelihood of success in proving these factors.

Equally important, the District has not provided any means to disentangle the effects of

race and any purported nonracial explanations on voting patterns. Nor could it. Where "the

influence of race and [race-neutral factors] on voting patterns . . . are too closely related to isolate

and measure for effect . . . the evidence fails to demonstrate that race-neutral factors explain the

voting polarization." *Charleston County*, 316 F. Supp. 2d at 304. Ultimately, "[t]he fact that

divergent voting patterns may logically be explained by a factor other than race does not end the inquiry, nor does it require plaintiffs to prove racial bias in the community or that political [factions] in the [District] serve as 'proxies' for racism."  *Goosby I*, 956 F. Supp. at 355.

## C.    An Informal Slating Process Excludes Minority Voters (Factor 4)

Slating organizations may be "official or unofficial," and where such organizations exist, "the ability of minorities to participate in that slating organization and to receive its endorsement may be of paramount importance."  *U.S. v. Marengo Cty. Comm'n*, 731 F.2d 1546, 1569 (11th Cir. 1984).  Well-respected White members of the community, who only endorse candidates, may qualify as a slating group when it is "extremely difficult to win an . . . election without [their] endorsement."  *Citizens for a Better Gretna v. City of Gretna*, 636 F. Supp. 1113, 1123 (E.D. La. 1986).  Courts may also consider whether a slating organization has any minority members in determining whether minorities are excluded from the slating process.  *Harper v. City of Chicago Heights*, 1997 WL 102543, at *9 (N.D. Ill. Mar. 5, 1997).

The District ignores Plaintiffs' evidence of the South East Ramapo Taxpayer's Association (SERTA), an opaque organization in the White community that "brings out the bloc vote" and whose endorsement is critical to successful Board elections.  Pl. Br. 21-22.  Financial disclosures from Charles' and Germain's 2013 campaign each list *only* one contribution: $4,800 from SERTA. Salomon Exs. 2-10.  Germain's opponent was not invited to meet with or seek the endorsement of SERTA, nor have many other candidates received an invitation.  E. Clerveaux ¶ 5; Pl. Br. 21-22. There is also no evidence that minority voters can or do participate in SERTA.

In addition, the District's witnesses describe an informal process that takes place in religious institutions within all-White communities, where some candidates are invited to seek key endorsements.  Wieder ¶ 30, Dkt. No. 79-3; Germain ¶¶ 10-12, Dkt. No. 79-2; Charles ¶ 14, Dkt. No. 79-1.  These endorsements have correlated strongly with electoral success and high-levels of

13

White voter support.  Cole ¶¶ 36, 43, 53, 64, 76; E. Clerveaux ¶ 7.  Notably, the process for seeking

these endorsements is not open to all candidates.  Goodwin ¶ 23, Dkt. No. 20; Manigo ¶ 21, Dkt.

No. 29; Dos Reis ¶ 23, Dkt. No. 19; Fields ¶ 36, Dkt. No. 27; E. Clerveaux ¶ 5.  "The on-going

racial separation that exists . . . makes it especially difficult for [minority] candidates seeking office

to reach out to and communicate with the predominantly [W]hite electorate from whom they must

obtain substantial support to win an at-large elections."  *Charleston Cty.*, 316 F. Supp. 2d at 291.

The District's characterization of *Goosby* actually highlights the racial exclusivity at work

in the slating process in East Ramapo.  Dist. 37.  In *Goosby*, there was no dispute that Blacks could

and did join the Republican Party, which was the dominant political force in Hempstead, although

Blacks in Hempstead were generally Democrats.  180 F.3d at 484, 497.  The Second Circuit

nonetheless found that Blacks were excluded from the slating process because the Republican

Party lacked an open primary that would allow them to advance their preferred candidates.  *Id.* at

497-48.  Unlike in *Goosby*, there is no evidence that minorities participate in the endorsement

processes in the all-White community, let alone that minorities would have an equal opportunity

to advance their preferred candidates to seek those endorsements.  Instead, deep educational and

residential segregation are at least two high barriers for minorities to join and participate in these

influential endorsement processes.  The barriers to entry into the private school community for

minority voters and candidates are different in kind from simply joining a political party or seeking

to run for its line on the ballot.  Accordingly, Plaintiffs have shown a slating process in the District

controlled by influential members of the White community that favors White voters.

**D.    Low and Declining Minority Turnout Reflects the Effects of Discrimination in Education, Employment, and Other Areas and Favors Plaintiffs (Factor 5)**

The District ignores the evidence that minority voters have been hindered from effectively

participating in the political process.  Dist. 37.  "[D]isproportionate educational, employment,

income level and living conditions tend to operate to deny access to political life." *Kirksey v. Board of Supervisors of Hinds Cty.*, 554 F.2d 139, 145 (5th Cir. 1977). Minority turnout in Board elections has declined and remains low. Pl. Br. App'x B, Dkt. No. 35-2; Cole II Table 3. Declining minority turnout has coincided with the depressed quality of public education in the District and lack of responsiveness to the needs of its minority constituency. *See* Wells, IV.D, Dkt. No. 34-1. The District dismisses this evidence as "irrelevant," Dist. 38, but "social science literature on voter participation makes clear that educational achievement is strongly and directly correlated with voter registration and turnout." *City of Euclid*, 580 F. Supp. 2d at 609. Recent data shows that minority educational attainment has been negatively affected in the eight election cycles since the District's significant reductions in public school services. Given the link between public education and democratic outcomes, Wells ¶ 23, reduced educational opportunities correlate with depressed turnout, hindering minority political participation. *Gingles*, 478 U.S. at 45.

**E.    The Election of Minority Candidates Chosen Through a Closed Political Process by a White Voting Bloc Does Not Weigh Against Liability (Factor 7)**

The District seems to regard the election of some minorities to the Board as a silver-bullet, but courts recognize that the election of minorities who are not minority-preferred candidates is not dispositive. *See Charleston Cty.*, 316 F. Supp. 2d at 279 (discounting election of African-American who was "emphatically not the candidate of choice of the county's African-American voters"). Dr. Cole's analyses of the 2015 and 2016 elections demonstrate that Charles, Germain, and Ramirez were "emphatically not" candidates of choice for the District's minority voters. Cole II Table 3. Moreover, evidence that minority candidates have won office due to a closed slating process of the kind described by Charles and Germain also discounts this factor. *See Goosby II*, 180 F.3d at 497; Section III.C, *supra*. Any minority electoral "success" does not weigh against Plaintiffs. Section 2 is designed to protect minority voters—not minority candidates.

15

## IV.    CONCLUSION

For the foregoing reasons, Plaintiffs respectfully request that the Court enjoin Defendants from holding May 2018 elections or subsequent elections under an at-large system until a ward system for electing Board members that does not violate the VRA is implemented.

Dated: March 14, 2018
         New York, New York                              Respectfully submitted,

                                                         /s/ Claudia T. Salomon
                                                         Claudia T. Salomon
                                                         Corey A. Calabrese
                                                         Jennifer Matystik
                                                         Elizabeth A. Parvis
                                                         Claudia.Salomon@lw.com
                                                         Corey.Calabrese@lw.com
                                                         Jennifer.Matystik@lw.com
                                                         Elizabeth.Parvis@lw.com
                                                         Latham & Watkins LLP
                                                         885 Third Avenue
                                                         New York, NY 10022
                                                         Phone: (212) 906-1200

                                                         Arthur Eisenberg
                                                         Perry Grossman
                                                         Kevin Jason
                                                         aeisenberg@nyclu.org
                                                         pgrossman@nyclu.org
                                                         kjason@nyclu.org
                                                         New York Civil Liberties Union Foundation
                                                         125 Broad Street
                                                         New York, NY 10004
                                                         Phone: (212) 607-3329
                                                         *Attorneys for Plaintiffs*