# Morgan Lewis

**David J. Butler**
+1.202.373.6723
david.butler@morganlewis.com

March 19, 2018

**VIA ECF**

Hon. Judith C. McCarthy
United States District Court
Southern District of New York
300 Quarropas Street
White Plains, NY 10601-4150

Re: *NAACP, Spring Valley Branch, et al. v. East Ramapo Central School District, et al.*, Civil Action No. 7:17-cv-08943

Dear Judge McCarthy:

We submit this letter brief on behalf of eight current and one former non-party board members (the "board members") of Defendant East Ramapo Central School District (the "District") in response to Plaintiffs' March 6, 2018 letter motion (D.I. 86) to compel compliance with third-party subpoenas seeking documents and deposition testimony from each of the non-party board members. As discussed in the cover letter submitted with this letter, the urgency of Plaintiffs' motion to compel has been rendered moot (at least for now) by the stipulation entered into by the Parties limiting the evidence to be presented at the hearing on Plaintiffs' motion for a preliminary injunction. We await your guidance as to whether this issue should move forward on the basis of expedited letter briefs and argument, or whether the development of a more comprehensive record is preferred.

## BACKGROUND

This is a Section 2 Voting Rights Act action by the National Association for the Advancement of Colored People and several individuals against the District and the Commissioner of Education of the State of New York. The board members who are the subject of Plaintiffs' motion to compel are not parties to this litigation.

"[A] violation of the Voting Rights Act must be based on proof of the following elements in combination: (1) a voting standard, practice, procedure, qualification or prerequisite (2) imposed by a State or political subdivision (3) in a manner that denies or abridges the right of any citizen to vote (4) on account of race [or] color . . . ." *Goosby v. Town Bd. of Hempstead,* 180 F.3d 476, 491 (2d Cir. 1999) (citing 52 U.S.C. § 10301(a)). Plaintiffs must also prove that "(1) the political processes for nomination and election (2) are not equally open to participation by members of the protected [racial] class (3) because the [racial] class members have less opportunity than others to participate and elect their representatives of choice," *id.* (citing 52 U.S.C. § 10301(b)). Plaintiffs must also make three preliminary showings, called the "*Gingles* preconditions," to establish a likelihood of success on the merits of their claim, *Thornburg v. Gingles,* 478 U.S. 30, 50–51 (1986). The preconditions that must be met for a challenge under Section 2 of the Voting Rights Act to be successful are as follows: (1) the minority group must be sufficiently large and geographically compact to constitute a majority in a single-member district; (2) the minority group must be politically cohesive and vote as a bloc; and (3) the white majority must vote sufficiently as a bloc to enable it,

Morgan, Lewis & Bockius LLP

1111 Pennsylvania Avenue, NW
Washington, DC 20004
United States
T +1.202.739.3000
F +1.202.739.3001

Hon. Judith C. McCarthy
March 19, 2018
Page 2

in the absence of special circumstances, to defeat the minority's preferred candidate.

Analysis of the *Gingles* preconditions and whether each has been proven by a preponderance of the evidence is the first step in a two-part analysis of a vote dilution claim. The Supreme Court has found that establishment of the three *Gingles* preconditions alone is not sufficient for a Section 2 vote dilution claim to succeed and the Court must consider the "totality of the circumstances" in order to determine whether Plaintiffs have a likelihood of success on the merits of their Section 2 claim, *Johnson v. DeGrandy*, 512 U.S. 997, 1011 (1994). Judicial assessment of the totality of the circumstances involves examination of the seven factors set forth in the Senate Judiciary Committee Report accompanying the 1982 amendments to Section 2 ("Senate factors"), S. Rep. No. 97-417, 97th Cong. 2nd Sess. 28 (1982).

Here, Plaintiffs allege that "at-large" elections of board members in the District abridge Black and Latino voters' right to vote "on account of color or race" in violation of Section 2. Plaintiffs do not allege *intentional* racial discrimination. They also do not (and cannot) allege that Black and Latino candidates are unable to get elected. Rather, they claim that under the current system, candidates who campaign for increased public school funding consistently lose notwithstanding the alleged support of minority voters, and candidates who campaign on restraining property tax increases allegedly win with the support of White voters. Plaintiffs' Section 2 claim thus turns entirely on the political preferences and voting patterns of the District's electorate, not on the District's management and budgeting decisions or its provision of education services, and certainly not on the individual legislative acts or policy positions of individual board members – who have no power to change the current voting system that is the subject of the Plaintiffs' claim.

On December 8, 2017, a few weeks after filing their complaint, Plaintiffs filed a motion for preliminary injunction. That motion is scheduled for hearing on April 12, 2018. The parties have briefed the PI motion, and have supported their arguments with expert and factual declarations that are now part of the Court record.

In addition, the parties have pursued expedited discovery relating to the preliminary injunction motion. The Plaintiffs' discovery efforts have extended far beyond the scope of the relatively narrow issues necessary to determine their motion for a preliminary injunction on their Voting Rights Act claim. Plaintiffs have focused in particular on District policies and funding decisions that were the subject of a well-publicized prior action called *Montesa v. Schwartz*. In that case, the plaintiffs alleged that board members were motivated by religion to favor private schools and the public schools suffered as a result. The *Montesa* plaintiffs challenged every aspect of the District's operations and sought discovery into the District's contracts, closing and selling of school buildings, hiring and firing of employees, budgeting decisions, litigation and settlement decisions, and the board's internal policy deliberations.

This case is very different from *Montesa*, as the budget and education policy matters underlying *Montesa* have nothing at all to do with whether the District's at-large elections discriminate against Black and Latino voters on account of race. *See Thornburg v. Gingles*, 478 U.S. 30, 45 (1986). Nevertheless, Plaintiffs' discovery efforts have focused largely on District education policies and funding decisions that do nothing to move forward their claim under the Voting Rights Act.

Thus far, the parties have taken nine depositions and exchanged over 40,000 pages of documents (including nearly 18,000 pages produced by the District). That does not include thousands of pages of hard copy documents that the District made available for inspection at its offices, including hundreds of bound voting books, and tens of thousands of individual voting cards, none of which have yet been reviewed by the Plaintiffs.

Hon. Judith C. McCarthy
March 19, 2018
Page 3

As part of their discovery effort, Plaintiffs served document and deposition subpoenas on the non-party board members that sought all communications and documents relating to:

- this litigation and/or the subject matter of this litigation;

- the conduct or content of Board meetings or other District functions, District policies and practices, and any schools in the District, or elections in the District;

- the board members' candidacies for seats on the Board;

- the board members' sources of income; and

- any references to any person's racial or ethnic identification.

(D.I. 86-1).

The board members timely objected to the subpoenas based upon legislative immunity and privilege, overbreadth, relevance, and burden. (D.I. 86-2). On March 6, 2018, Plaintiffs sought to compel the non-party board members to produce non-privileged documents in response to the subpoenas. (D.I. 86).

On March 14, 2018, this Court directed Plaintiffs to amend their requests to make them more specific; directed the parties to meet and confer on the issues; and permitted the parties to submit concurrent letter briefs addressing any remaining objections to the amended requests.

On March 15, 2018, Plaintiffs amended their requests (the "Amended Requests"). (Attached hereto as Exhibit 1). For the most part, the Amended Requests simply repeat the original overbroad requests, and add illustrative (but non-exhaustive) subparts. For example, Request No. 4 from the original subpoena, which sought "[d]ocuments sufficient to show the source and quantity of all income you receive and the nature of goods delivered or services provided in exchange for that income," was replaced by Amended Request No. 3, which seeks:

> Documents sufficient to show the source and quantity of personal income received by each Board member during the relevant time period, including:
>
> a. Whether any Board Member is employed by or does contract work for the District or any public or nonpublic schools in the District;
>
> b. Whether any Board Member is employed by or does contract work for any operated business in the District;
>
> c. Whether any Board Member is employed by or receives financial support from any other public offices;
>
> d. Whether any Board Member owns or works for a business that makes financial or in-kind contributions to Board candidates or performs any paid services for candidates for political office;

In short, the Amended Requests are still harassing, unduly burdensome, seek documents that have no bearing on Plaintiffs' Section 2 Voting Rights Act claim, and seek documents that are likely protected by the doctrines of legislative immunity and/or legislative privilege.

Notwithstanding their objections to other parts of the Amended Requests, the board members agreed to search for and to produce non-privileged, responsive documents relating to Amended Request No. 1, which

seeks: Communications and Documents relating to each Board Member's candidacy or application for or receipt of any public office, specifically:

    a. Each Board Member's expression of interest in candidacy or application for any public office or any solicitation or encouragement of the Board member's interest in candidacy or application for public office by anyone else;

    b. Any expressions of interest in candidacy or application for any public office received by any Board Member or any solicitation or encouragement on the part of the Board Member for any other person's interest in candidacy or application for any public office;

    c. Each Board Member's campaign materials, including publications such as flyers, palm cards, sample ballots, advertisements, newsletters, policy statements, press releases, and web-site content for any campaign for public office;

    d. Each Board Member's solicitation, receipt, or expression of any endorsement of candidacy or application for public office by any community leaders or community organizers, or any civic, political, or religious organizations;

    e. Each Board Member's solicitation or receipt of any contributions, whether monetary or non-monetary, by any community leaders or community organizers, or civic, political, or religious organizations;

    f. Expenditures for each Board Member's campaign for a seat on the Board; and

    g. Communications and Documents relating to efforts to encourage voter turnout in support of each Board Member's election, whether on his own part or performed on his behalf by anyone else.

The board members also agreed to search for and produce non-privileged, responsive documents to Amended Request No. 3(a), seeking: "Documents sufficient to show . . . [w]hether any Board Member is employed by or does contract work for the District or any public or nonpublic schools in the District." The board members still object to the remaining Amended Requests.

The limited searches the board members have agreed to undertake will impose a heavy burden on them. In the context of this lawsuit and the issues relevant to Plaintiffs' Voting Rights Act claim, there is no good reason to impose that burden on the non-party board members.

## ARGUMENT

    **A. The District's Board Members Are Shielded From Compulsory Third-Party Discovery By Legislative Immunity And Plaintiffs' Document Requests Seek Documents That Would Be Protected By Legislative Privilege.**

All of Plaintiffs' third party discovery requests to the District's board members are precluded by legislative immunity, which protects legislators from the harassment and burden of responding to civil discovery in litigation involving the government units to which they have been elected. In addition, many – though not all – of Plaintiffs' document requests explicitly seek disclosure of information shielded by legislative privilege. Taken together, the Court should quash Plaintiffs' third party discovery requests entirely, because Plaintiffs have made no showing that they have sufficient need of the information they seek to justify breaching the protections of both legislative immunity and legislative privilege.

Hon. Judith C. McCarthy
March 19, 2018
Page 5

The related doctrines of legislative immunity and privilege derive from the United States Constitution's Speech or Debate Clause. U.S. CONST. art. I, § 6, cl. 1. The Supreme Court has construed the clause as "providing Members of Congress with two distinct, but related, absolute protections: (1) immunity from suit for their legislative acts and (2) protection from being compelled to testify in court and produce information about acts that fall within the legitimate legislative sphere." *See Citizens Union*, 269 F. Supp. 3d at 150 (collecting cases). Legislative immunity and privilege serve the important purposes of ensuring an independent legislature, reinforcing separation of powers, and preventing unnecessary distraction and inconvenience by forcing legislators to "divert time, energy, and attention from their legislative tasks." *Id.* (citing *Eastland v. U.S. Servicemen's Fund*, 421 U.S. 491, 502–03, (1975); *Gravel v. United States*, 408 U.S. 606, 616 (1972); *Sec. & Exch. Comm'n v. Comm. on Ways & Means of the U.S. House of Representatives*, 161 F. Supp. 3d 199, 235 (S.D.N.Y. 2015)). "The protections afforded by the Speech or Debate Clause are broad" (*id.* (citing *Eastland*, 421 U.S. at 501–02)), and apply to parties and non-parties alike (*E.E.O.C. v. Washington Suburban Sanitary Comm'n*, 631 F.3d 174, 181 (4th Cir. 2011) ("Because litigation's costs do not fall on named parties alone, this privilege applies whether or not the legislators themselves have been sued"); *MINPECO, S.A. v. Conticommodity Servs., Inc.,* 844 F.2d 856, 859 (D.C. Cir. 1988) ("A litigant does not have to name members or their staffs as parties to a suit in order to distract them from their legislative work. Discovery procedures can prove just as intrusive")).

Under New York law, legislative immunity applies at all levels of government and extends to any government official that performs legislative functions or acts, even if he or she is not a legislator. *See Citizens Union*, 269 F. Supp. 3d at 149-150; *Bogan v. Scott-Harris,* 523 U.S. 44, 55 (1998); *Schlegel v. Koteski,* 307 Fed. App'x 657, 660 (3d Cir. 2009). Indeed, the doctrines exist so that individuals like the board members here "can feel more comfortable volunteering to perform public-service functions, such as serving on their local school board." *Smith v. Jefferson Cty. Bd.,* 641 F.3d 197, 219 (6th Cir. 2011) (en banc). As a result, any official act that bears "the hallmarks of traditional legislation," such as discretionary judgments or policymaking decisions that implicate "budgetary priorities" or constituent services are legislative acts. *Bogan,* 523 U.S. at 55.

Under this functional test, it is unnecessary to determine whether the board members are legislators, because "immunity depends on the nature of the act itself, not the identity of the actor performing it." *Harhay v. Town of Ellington Bd. of Educ.*, 323 F.3d 206, 210 (2d Cir. 2003) (citation omitted); *Carlos*, 123 F.3d at 66 ("In determining whether absolute immunity obtains, we apply a 'functional approach,' looking to the function being performed rather than to the office or identity of the defendant."). Specifically, the immunity and privilege protects legislative acts, i.e., those that play "an integral part of the deliberative and communicative processes by which [legislators] participate in committee and [legislative] proceedings with respect to the consideration and passage or rejection of proposed legislation." *Citizens Union*, 269 F. Supp. 3d at 151 (quoting and citing *Eastland,* 421 U.S. at 504; *Gravel*, 408 U.S. at 625; *McMillan*, 412 U.S. at 313; *Bogan*, 523 U.S. at 54-55).

Such acts "may include, but are not limited to: delivering an opinion, uttering a speech, or haranguing in debate'; proposing legislation; voting on legislation; making, publishing, presenting, and using legislative reports; authorizing investigations and issuing subpoenas; and holding hearings and 'introducing material at committee hearings." *Id.* (quoting and citing *Ways & Means*, 161 F. Supp. 3d at 236; *Fields v. Office of Eddie Bernice Johnson*, 459 F.3d 1, 10–11 (D.C. Cir. 2006)). Also included are "fact- and information-gathering activities about the subject of potential legislation, as well as documents regarding or reflecting the fruits of this research," or, stated differently, any "information . . . acquired in connection with or in aid of an activity that qualifies as 'legislative' in nature, [regardless of] what the source of the information is." *Id.* (quoting and citing *Ways & Means*, 161 F. Supp. 3d at 236-37, 245; *United States v. Biaggi*, 853 F.2d 89, 102–03 (2d Cir. 1988); *McSurely v. McClellan*, 553 F.2d 1277, 1286 (D.C. Cir. 1976) (*en banc*)).

Hon. Judith C. McCarthy
March 19, 2018
Page 6

Thus, the board members, like any other government officials, enjoy immunity with respect to their legislative activity pursuant to this functional test. In determining whether legislative immunity and privilege apply to documents and information sought in discovery,

> the court may consider whether the private parties' interest in exploring the motivations and fact-finding efforts of individual legislators (1) rises to a level of public need for full development of relevant facts that is sufficient to overcome the competing public interests in ensuring that legislators devote their full efforts and attention to legislative duties; (2) outweighs the threat of chilling legislative deliberations; and (3) warrants federal intrusion into the independence of state lawmakers.

*Citizens Union*, 269 F. Supp. 3d at 155-56 (citations omitted). These "factors will weigh against disclosure and in favor of upholding the privilege in all but the extraordinary case." *Id.* at 156 (citing *Vill. of Arlington Heights v. Metro. Hous. Dev. Corp.*, 429 U.S. 252, 268 (1977); *Rodriguez v. Pataki*, 280 F.Supp.2d 89, 95–96 (S.D.N.Y. 2003).

Application of the above principles and factors to Plaintiffs' Amended Requests Nos. 2 and 4 to the board members show that they impermissibly seek information relating to the board members' legislative activity and fall squarely within the type of activity legislative immunity is intended to protect and legislative privilege shields from public view. Specifically, Amended Request No. 2 seeks: "Communications and Documents . . . relating or regarding:

 a. Inquiries, whether formal or informal, for services or benefits for the District's private schools;

 b. Complaints, whether formal or informal, regarding the quality of education, teacher and administrative staffing, school conditions, course offerings, extracurricular activities, scheduling, transportation, special education services and accommodations, and/or English Language Learner services and accommodations in the District's public schools;

 c. Statements relating to the conduct of members of the public engaged in any activities, whether formal or informal, critical of Board members or the Board or District.

 d. Statements concerning any complaints, whether formal or informal, relating to the conduct of Board meetings generally, or the conduct of individual Board members at Board meetings."

This Request goes directly to the board members' legislative activity. Through legislation, the Board provides "services or benefits" and influences academic programming. It does so, in part, based on public input, whether through inquiries, complaints, criticism, or otherwise. Along the same lines, the Board receives public comment at Board meetings, and the discourse and conduct at those meetings also factor into the legislative process. Information shared through these interactions with the public are just as much protected as any other type of information gathered for purposes of legislative activity because legislative immunity protects "information . . . acquired in connection with or in aid of an activity that qualifies as 'legislative' in nature, **[regardless of] what the source of the information is**." *Citizens Union*, 269 F. Supp. 3d at 151 (emphasis added) (quoting *Ways & Means*, 161 F. Supp. 3d at 237).

Similarly, Request No. 4 seeks, *inter alia*, "Communications and Documents sufficient to show:

 a. Policies and procedures, whether formal or informal, concerning the appointment of Board members upon a Board vacancy, including relevant

Hon. Judith C. McCarthy
March 19, 2018
Page 7

        qualifications for appointees, and how potential appointees are identified by the Board;

b.     Applications for appointments to fill Board vacancies, including resumes or statements submitted to the Board by each applicant;

c.     Endorsements or expressions of support by current Board members for any particular applicant seeking to fill a Board vacancy;

d.     Complaints from members of the public regarding the appointment of any individual to a vacant seat on the Board or the decision not to appoint any particular individual to a vacant seat on the Board, and the Board's responses to any such complaints;

e.     Positions and statements concerning the Board's relative distribution of financial resources to public and non-public schools; and

f.     Information relevant to Board positions and statements that were not distributed equally to all Board members.

The Board appoints board members to fill vacancies, and implements funding and budgetary policies through legislative action. As a result, positions and statements concerning such appointments, and concerning distribution of financial resources to public and non-public schools fall within the scope of legislative immunity. That is true regardless whether the positions or statements were shared with all or only some board members.

"Under Rule 45(d)(3), the court must modify or quash a subpoena that, *inter alia*, 'requires disclosure of privileged or other protected matter, if no exception or waiver applies.'" *Citizens Union of City of New York v. Attorney Gen. of New York*, 269 F. Supp. 3d 124, 138 (S.D.N.Y. 2017) (quoting Fed. R. Civ. P. 45(d)(3)(A)(iii)). Because Plaintiffs' Amended Request Nos. 2 and 4 seek documents and information protected by legislative privilege, and which are subject to no exception or waiver, the motion to compel should be denied on account of the burden that would result from having to collect, review, and cull out of production those documents protected by legislative privilege.

Plaintiffs also are not entitled to discovery of privileged documents and information on account of any waiver, since there has been no waiver. Plaintiffs argue that "Messrs. Charles and Germain have waived their claim of privilege through their participation in this action" by submitting declarations in support of the District's defense.[1] (D.I. 86, at 2) (quoting *Rodriguez*, 280 F. Supp. 2d at 103). But in *Rodriguez*, the court actually found that participation in the lawsuit did not result in waiver. *Rodriguez*, 280 F. Supp. 2d at 103. Mere participation in a lawsuit as to issues *unrelated to legislative activity* cannot be construed as a blanket waiver of legislative privilege over separate issues *related to legislative activity*.

---

[1] Plaintiffs' overreaching assertion that the submission of declarations by Mr. Charles and Mr. Germain somehow effected a blanket waiver of legislative privilege as to all other board members is also contrary to law. First, as discussed above, Mr. Charles and Mr. Germain did not waive legislative privilege even as to themselves, because the information disclosed in their declarations was not privileged. Second, legislative privilege is a "personal" privilege, "meaning that it can only be asserted, or alternatively, waived, by each individual lawmaker." *Citizens Union,* 269 F. Supp. 3d at 154 (citing *Favors v. Cuomo,* No. 11–cv–5632 (DLI) (RR) (GEL), 2015 WL 7075960, at *8–9 (E.D.N.Y. Feb. 8, 2015)).

Rather, waiver can occur "in the course of the litigation when a party testifies **as to otherwise privileged matters**." *Favors v. Cuomo*, 285 F.R.D. 187, 212 (S.D.N.Y. 2012) (emphasis added). In other words, in order to support a waiver claim, (at least as to Messrs. Charles and Germain), Plaintiffs must show that Messrs. Charles and Germain's respective declarations disclosed information otherwise protected by the legislative privilege. They did not. Rather, their declarations were limited to issues relating to their backgrounds as private citizens, their 2013 campaigns, the 2013 election, the 2016 election, and their views on relations between the private school and public school communities in the District, and do not concern their legislative acts as board members. (D.I. 79-1, 79-2)

### B. Amended Request Nos. 2 and 4 Would Impose An Undue Burden.

However, the burden that results from extensive legislative privilege review is not the only burden imposed by Plaintiffs' requests to the non-parties. By focusing their entire motion to compel on the board members' objections on the basis of legislative immunity, Plaintiffs ignore the eight other separate bases for the board members' objections to the subpoenas. (D.I. 86-2 at 1-2). This is particularly problematic because the objection based on legislative privilege is necessarily related to the objections based on relevance and burden.

"Under Rule 45(d)(3), the court must modify or quash a subpoena that . . . 'subjects a person to undue burden.'" *Citizens Union*, 269 F. Supp. 3d at 138 (quoting Fed. R. Civ. P. 45(d)(3)(A)(iv)).

> In assessing whether the subpoena imposes an undue burden, courts weigh the burden to the subpoenaed party against the value of the information to the serving party by considering factors such as relevance, the need of the party for the documents, the breadth of the document request, the time period covered by it, the particularity with which the documents are described and the burden imposed.

*Id.* (internal quotations omitted).[2] Courts have a lower tolerance for permitting undue burden on non-parties such as the board members:

> In performing such a balance, courts have considered the fact that discovery is being sought *from a third or non-party,* which weighs against permitting discovery. Within this Circuit, courts have held nonparty status to be a "significant" factor in determining whether discovery is unduly burdensome. Furthermore, by its terms, Rule 45(c)(2)(B)(ii) mandates that courts protect third parties from onerous discovery requests. That provision states that, when the serving party ... move[s] the issuing court for an order compelling production or inspection" from a non-party, "[t]hese acts may be required only as directed in the order, and the order *must protect a person who is neither a party nor a party's officer from significant expense resulting from compliance.*" Fed.R.Civ.P. 45(c)(2)(B)(ii) (emphasis added). Courts have relied on such language to protect non-parties from "significant expense" arising from document production.

*Tucker v. Am. Int'l Grp., Inc.*, 281 F.R.D. 85, 92-93 (D. Conn. 2012) (internal quotations and citations omitted); *see also Solomon v. Nassau Cty.*, 274 F.R.D. 455, 460 (E.D.N.Y. 2011) ("the 'undue burden' standard requires district courts supervising discovery to be generally sensitive to the costs imposed on third

---

[2] The fact that the information Plaintiffs seek from the board members is largely irrelevant to the merits of their Voting Rights Act claim also weighs heavily in favor of denying their motion to compel. Given space and time constraints of this expedited briefing process, the board members are unable to brief this threshold issue of relevance fully, but will do so if more complete briefing is permitted in the future.

Hon. Judith C. McCarthy
March 19, 2018
Page 9

parties"). And, in particular, where it comes to discovery from non-party government officials, courts "may take into account . . . the government's serious and legitimate concern that its employee resources not be commandeered into service by private litigants to the detriment of the smooth functioning of government operations." *Solomon*, 274 F.R.D. at 460.

Here, Plaintiffs' Amended Request Nos. 2 and 4 impose an undue burden on the non-party board members in part because they would force the non-parties to review a large number of documents, of questionable relevance to the Plaintiffs' Voting Rights Act claim, most of which would likely be protected from discovery by legislative immunity and privilege. In such circumstances, courts have found that requiring a non-party to collect, review, and log a large number of privileged documents only to produce a relatively small number of responsive non-privileged ones, imposes an undue burden:

> This Court accordingly finds that locating, collecting, logging, and producing the documents sought by Plaintiffs amounts to an undue burden on the Governor and is disproportional to the needs of this case considering that the discovery is of no real probative value to Plaintiffs' claims. Moreover, insofar as Plaintiffs seek to probe the files of each of the 150 Members of the Assembly and 63 Members of the Senate, this Court notes that compliance with such a request would likely require significant time and resources and would be disruptive to the workings of the State Legislature and is similarly disproportional to the needs of this case.

*Citizens Union*, 269 F. Supp. 3d at 148–49; *see also Xcentric Ventures, L.L.C. v. Borodkin*, 934 F. Supp. 2d 1125, 1147 (D. Ariz. 2013) ("Even if there was such information, requiring Borodkin to create a massive privilege log just so Xcentric can obtain the small slice of information that may be relevant and non-privileged places an undue burden on Borodkin."); *In re Skelaxin (Metaxalone) Antitrust Litig.*, 292 F.R.D. 544, 555 (E.D. Tenn. 2013) (finding that, where "the latter half of [the] request is specifically directed toward documents protected by the work product doctrine and the attorney-client privilege [and] defendants have failed to articulate the relevancy of this information[,] the burden of collecting these documents outweighs any benefit (which has not been articulated by defendants) to the case they might have"); *Nocal, Inc. v. Sabercat Ventures, Inc.*, No. C 04-0240 PJH(JL), 2004 WL 3174427, at *3 (N.D. Cal. Nov. 15, 2004) (finding undue burden where "the search for responsive documents would require hundreds of hours and thousands of dollars to review decades of documents and prepare privilege logs to ultimately produce documents which the Plaintiff already has").

That is exactly what would happen here. It would take considerable time and resources for the board members to sift through thousands of documents stored in their private email accounts and log numerous privileged documents just to produce a small number of documents that Plaintiffs could have or already have obtained from the District or other sources.

## CONCLUSION

For the foregoing reasons, the board members respectfully request that the Court deny Plaintiffs' motion to compel.

                      Respectfully submitted,

                      */s David J. Butler*