UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| **NAACP, SPRING VALLEY BRANCH,** *et al.*, | ECF CASE |
| Plaintiffs, | Case No. 7:17-cv-08943 |
| v. | DISTRICT JUDGE CATHY SEIBEL |
| **EAST RAMAPO CENTRAL SCHOOL DISTRICT,** *et al.*, | MAGISTRATE JUDGE JUDITH C. MCCARTHY |
| Defendants. | |

**DEFENDANT EAST RAMAPO CENTRAL SCHOOL DISTRICT'S
<u>REPLY IN SUPPORT OF MOTION TO DISMISS</u>**

MORGAN, LEWIS & BOCKIUS LLP

David J. Butler
Randall Levine
101 Park Avenue
New York, NY 10178
T: (212) 309-6000
F: (212) 309-6001
-and-
1111 Pennsylvania Avenue, NW
Washington, DC 20004
T: (202) 739-3000
F: (202) 739-3001
david.butler@morganlewis.com
randall.levine@morganlewis.com

*Counsel for Defendant
East Ramapo Central School District*

# TABLE OF CONTENTS

Page

I. INTRODUCTION ........ 1
II. ARGUMENT ........ 2
A. State Law Does Not Allow School Districts To Use Ward Voting ........ 2
B. Enjoining the District will not remedy any Alleged Section 2 Violation ........ 4
C. Minorities Are Not excluded From Politics "On Account of Race or Color." ........ 6
1. Plaintiffs do not dispute that non-racial factors drive election results ........ 7
2. Plaintiffs admit that White voters support minority candidates at levels equal to or greater than those of White candidates ........ 9
III. CONCLUSION ........ 10

## I.     INTRODUCTION

The Court's analysis on a motion for preliminary injunction "is not confined to the act of granting the injunctio[n], but extends as well to determining whether there is any insuperable objection, in point of jurisdiction or merits, to the maintenance of [the] bill, and, if so, to directing a final decree dismissing it." *Munaf v. Geren*, 553 U.S. 674, 691 (2008) (*quoting City and Cnty. of Denver v. N.Y. Trust Co.*, 229 U.S. 123, 136 (1913)).  "Adjudication of the merits" on motion for preliminary injunction "is most appropriate if the injunction rests on a question of law and it is plain that the plaintiff cannot prevail.  In such cases, the defendant is entitled to judgment." *Id.*  This is such a case.

The District showed in its Combined Memorandum in Opposition to Plaintiffs' Motion for Preliminary Injunction and in Support of Cross-Motion to Dismiss, Dkt. No. 76, that Plaintiffs not only have no likelihood success on the merits, their Complaint should be dismissed outright.  Plaintiffs' Complaint fails as a matter of law because: (1) the District has no power to change its election structure and therefore cannot redress Plaintiffs' alleged Section 2 injury (*id.* at 10); and (2) Plaintiffs' analysis of the District's election data, the consistent electoral success of minority candidates, and Plaintiffs' own binding admissions, all prove beyond dispute that the District's politics are driven not by *racial bias*, but by legitimate policy disagreements over property tax rates, school district budgets, and allocation of resources as between students attending public schools and students attending private schools (*id.* at 28).[1]  Both points are

---

[1] The District also showed that Plaintiffs are not entitled to a preliminary injunction as a *factual* matter because: (a) they have no evidence of racially polarized voting; (b) they make no persuasive showing under the "Senate Factors;" and, (c) the 2018 election will cause no irreparable harm.  These points preclude granting a preliminary injunction but are analytically distinct from the insuperable legal impediments that require dismissal of the Complaint.

dispositive and unrebutted. Dismissal is required.

Moreover, a plaintiff who fails to persuade a court that a preliminary injunction is appropriate "as a matter of equitable discretion" may be denied a second chance to persuade the court that a permanent injunction would be appropriate. *See Incantalupo v. Lawrence Union Free School Dist. No. 15*, 652 F. Supp. 2d 314, 328 (E.D.N.Y. 2009) ("an injunction most assuredly would not serve the public interest, as it would amount to the Court disregarding democracy and substituting its own fiscal and educational judgment for that of … elected officials."). The District has shown that the injunctive relief that Plaintiffs seek to impose on the District's voters would be inequitable from every angle. Far from remedying racial polarization, Plaintiffs seek instead to impose on the District a form of "electoral apartheid" for the express purpose of taking away the people's right to vote for whomever they choose and forcing them to vote only for candidates of their own race. *N.A.A.C.P., Inc. v. City of Niagara Falls*, 65 F.3d 1002, 1017 (2d Cir. 1995). Plaintiffs have made no effort to explain how such a retrogressive form of relief possibly could be considered equitable under the circumstances. The Complaint should be dismissed for this reason, too.

**II.   ARGUMENT**

    **A.   State Law Does Not Allow School Districts To Use Ward Voting.**

Plaintiffs argue that "nothing in Section 2012 [of the N.Y. Education Law] expressly prohibits the creation of a ward system." Dkt. No. 100 at 14. Plaintiffs are wrong. The District has shown that state law mandates the use of "at large" elections because N.Y. Education Law sections 2018(a) and 2012, taken together, grant every qualified voter of a school district the right to vote for every open seat on the board of education. To implement a ward system, a school district would have to strip away the voting rights granted to qualified voters by state law. It cannot do so. A "public school district is a creature of statute and has only such powers as are

delegated to it by the Legislature." *Cook v. Griffin*, 364 N.Y.S.2d 632, 636 (4th Dep't. 1975). No state law authorizes school districts to nullify qualified voters' right to vote for all school district officers. Plaintiffs nevertheless assert that the Education Law "as currently written permits school boards to utilize at-large *and* ward voting systems." Dkt. No. 100 at 18 (emphasis in original). That assertion is demonstrably false. All of New York's 700-plus union free and central school districts use "at-large" voting. None uses ward voting. That is not by accident.

Plaintiffs' only purported support for their argument is one out-of-context sentence taken from an administrative opinion of former Education Commissioner Mills in *Appeal of Gravnik*, 37 Ed Dept Rep, Decision No. 13888, 1998 WL 35421154 at *4. *Gravnik* refutes Plaintiffs' argument. There, the petitioners alleged that a school board had informally divided the school district into zones and encouraged residents of each zone to vote only for their neighbors—a sort of rough "ward" system. The Commissioner found the practice illegal because state law requires that "candidates residing in any part of the district may be elected to any open seat." 1998 WL 35421154 at *4. Because the Commissioner assumed that the school board was "perhaps attempting to create informal election districts," he suggested that the district should be formally divided into "election districts, provided the requirements of Education Law § 2017 can be met, if the district believes that geographic representation is necessary." *Id.*

Plaintiffs build their entire argument around this snippet of *dicta* (*see* Dkt. No. 100 at 9, 15, 16, 18), and assert that the Commissioner has "interpreted Section 2017 of the Education Law to permit school districts to form ward systems." Dkt. No. 100 at 9. Commissioner Mills said nothing about "ward systems." Section 2017 of the Education Law is functionally identical to section 4-100 of the Election Law, which empowers towns, cities, and villages to subdivide into precincts for purposes of voter registration and identifying polling sites. Such "election

3

districts" are not "wards" and "in no way correspond to any type of elected representation—voters in each of the [districts] choose from the same slate of candidates in local elections." *U.S. v. Vill. of Port Chester*, 06-cv-15173, 2008 WL 190502, at *4 (S.D.N.Y., Jan. 17, 2008).

Plaintiffs' interpretation of *Gravnik* is forced, unreasonable, and must be rejected. Any doubt on that score is dispelled by the fact that the *current* Commissioner of Education is a party to this case, and she agrees that at-large voting is required. Commissioner's Elia's interpretation is entitled to substantial deference, and refutes Plaintiffs' arguments to the contrary. *See Molinari v. Bloomberg*, 564 F.3d 587, 617 (2d Cir. 2009) (interpretation by an administrative agency "should be given considerable weight by the courts. . . .").

### B. Enjoining the District will not remedy any Alleged Section 2 Violation.

Since the District did not create its "at large" election system and has no discretion to discard it, the District is not responsible for Plaintiffs' purported injury under Section 2. This creates a serious standing problem for Plaintiffs. "To establish standing, a plaintiff must [] demonstrate a causal nexus between the defendant's conduct and the injury." *Heldman on Behalf of T.H. v. Sobol*, 962 F.2d 148, 156 (2d. Cir. 1992). "The causation requirement ensures that the injury alleged is attributable to the defendant." *Id*. Any vote dilution purportedly caused by the at-large election system is not fairly attributed to the District.

It is not enough that the District "administers" elections, because Plaintiffs' Complaint is not about election administration. As Plaintiffs make clear, "[t]his case is about the at-large method for electing Board of Education Members" in the District. Dkt. No. 100 at 1. This case is therefore an as-applied challenge to New York Education Law sections 2018 and 2012, and the relevant "conduct" that Plaintiffs challenge is the legislative enactment of those laws. Consequently, any redress of Plaintiffs' alleged injury requires sections 2018 and 2012 to be amended. That legislative fix cannot be accomplished by enjoining the District. *See generally*

4

*Ala. State Conference of NAACP v. State*, 264 F. Supp. 3d 1280, 1293 (M.D. Ala. 2017) (holding that the state was a proper party defendant in Section 2 challenge to state law).

Plaintiffs' decision to sue the District instead of a proper state defendant thus creates insurmountable justiciability and redressability problems, because even if the Court found for Plaintiffs on liability, the Court would be unable to order an effective remedy.  This is so because it is well-settled that "where a court has struck down a voting system, it must give *the appropriate elected body* an opportunity to propose a remedial plan."  *Goosby v. Town Bd. of Town of Hempstead, N.Y.,* 981 F. Supp. 751, 755 (E.D.N.Y. 1997) (emphasis added).  The District is not "the appropriate elected body" to create a new election structure for the District (nor is the Commissioner, for obvious reasons.)  If the legislature had wanted boards of education to be responsible for drawing up voting wards, it would have empowered them to do so.  It didn't.  The legislature alone therefore retains that power.  But it is not a party to this action and would not be bound by any judgment entered by this Court.  This fatal pleading defect is entirely of Plaintiffs' own making and, at this point, is incurable.

It is true that this Court has the power under the Supremacy Clause to preempt inconsistent or invalid state laws.  Arguably, the Court could use that power to require the District to implement a ward system without regard for otherwise valid state law, the state's political processes, or its ordinary legislative procedures.  Doing so, however, raises serious federalism and comity concerns that make such an order an inappropriate use of the Court's equitable jurisdiction.  As a practical matter, it also would saddle this Court with the "unwelcome obligation" of superintending the District's school board elections forever into the foreseeable future.  *Wise v. Lipscomb*, 437 U.S. 535, 539 (1978).  For these reasons, the Supreme Court has "repeatedly held that redistricting and reapportioning legislative bodies is a legislative

5

task which the federal courts should make every effort not to pre-empt." *Id.*

Here, to grant a complete remedy the Court cannot avoid the preemption that the Supreme Court has held must be used only in last resort, because the appropriate legislative body is not before it. That renders this case non-justiciable. *See Levy v. Miami-Dade Cnty.*, 358 F.3d 1303, 1305 (11th Cir. 2004) (dismissing as non-justiciable plaintiff's claim that his voting rights were violated because there was "no viable remedy under the circumstances"). And since Plaintiffs have waived their right to amend, their Complaint must be dismissed, with prejudice. *See Lowery v. Governor of Georgia*, 506 F. App'x 885, 886 (11th Cir. 2013) (dismissing Voting Rights Act claim against the Governor of Georgia because the Governor had "no power to provide any of the relief requested in this case"); *African Am. Legal Def. Fund v. NYSED*, 8 F. Supp. 2d 330, 334 (S.D.N.Y. 1998) (Section 2 claim dismissed for lack of redressability).

### C.     Minorities Are Not excluded From Politics "On Account of Race or Color."

Section 2 prohibits the imposition of a "voting qualification or prerequisite to voting or standard, practice or procedure ... which results in a denial or abridgement of the right of any citizen of the United States to vote *on account of his race or color*." 52 U.S.C. § 10301(a) (emphasis added). The federal circuit courts agree[2] that "[S]ection 2 plaintiffs must demonstrate, through the test's objective factors taken as a whole, that a voting community is *driven by racial bias* and that the challenged electoral scheme allows that bias to dilute the minority population's

---

[2] *See Askew v. City of Rome*, 127 F.3d 1355, 1382 (11th Cir. 1997) (race must play a role in the defeat of black preferred candidates before Voting Rights Act is violated); *S. Christian Leadership Conference v. Sessions*, 56 F.3d 1281, 1293-94 (11th Cir. 1995) (*en banc*) (where factors other than race are driving the election results there is no violation of the Voting Rights Act); *League of United Latin Am. Citizens v. Clements*, 999 F.2d 831 (5th Cir. 1993) (en banc) ("LULAC") (Section 2's protection extends "only to defeats experienced by voters 'on account of race or color.'"); *Baird v. Consol. City of Indianapolis*, 976 F.2d 357, 360 (7th Cir. 1992) (no Section 2 violation where elections have "more to do with politics than with race.").

voting strength." *Nipper v. Smith*, 39 F.3d 1524-25 (11th Cir. 1994) (*en banc*) (emphasis added). Conversely, a Section 2 claim must fail where the defeat of minority voters' "preferred candidates ha[s] nothing to do with the inability of [minorities] to participate fully in the political process." *Clarke v. City of Cincinnati*, 40 F.3d 807, 812 (6th Cir. 1994). In sum,

> when racial antagonism is not the cause of an electoral defeat suffered by a minority candidate, the defeat does not prove a lack of electoral opportunity but a lack of whatever else it takes to be successful in politics (say, failure to ... reflect the majority's ideological viewpoints...)...[I]t follows that … plaintiffs cannot prevail on a [Section 2] claim if there is significantly probative evidence that whites voted as a bloc for reasons wholly unrelated to racial animus.

*Uno v. City of Holyoke*, 72 F.3d 973, 981 (1st Cir. 1995).

In the Second Circuit, to determine whether non-racial concerns drive election results, courts look "beyond the statistical voting patterns of whites and blacks to see *who* is actually running—whites or blacks" in order to determine "whether the majority is voting against candidates for reasons of race" or for some reason not regulated by Section 2. *City of Niagara Falls,* 65 F.3d at 1015 (emphasis in original). Where "it could be said that white voters [have] supported minority candidates elected by their parties at levels equal to or greater than those of white candidates, it [is] proper to conclude in that case 'that divergent voting patterns among white and minority voters are best explained'" by factors other than race. *Goosby*, 180 F.3d at 496 (quoting *LULAC*, 999 F.2d at 861).

According to Plaintiffs' own allegations, their binding testimony, and their own expert's opinion—that is exactly the situation in the District.

### 1. Plaintiffs do not dispute that non-racial factors drive election results.

Plaintiffs' allegations establish that the District's elections are driven by ideology and policy disputes, not by racial animosity. They allege that the board of education is controlled by

7

a majority that "consistently advocates for the interests of private schools over public schools," and that this has resulted in a political rift between different communities.  Dkt. No. 1 ¶ 3.  They allege that since 2005 this new political majority has adopted policies designed to "lower taxes and divert public money to fund special benefits for private school students. . . ." Dkt. No. 1 ¶ 5.  Notably absent is any allegation that *racial animosity* is at work in the electorate moving votes.

In discovery Plaintiffs have only further confirmed that, in their view, this case is *not* about the exclusion of racial minorities from the political process "on account of race or color."  For example, the NAACP's Rule 30(b)(6) witness did not testify that Black or Latino *voters* are excluded from participating in the District's electoral politics.  They are not—it is indisputable that Black and Latino residents are deeply involved and influential in local politics, and that they consistently win elections for the school board.  Instead, the NAACP witness testified that "[t]he way it stands now, we don't feel that the students of East Ramapo, the students of East Ramapo, are receiving adequate education."[3]  The NAACP witness therefore agreed with the statement that "the NAACP is involved in [this] Voting Rights Act case in order to ensure that [all] students … get an adequate education[.]"[4]  Section 2 does not remedy inadequate education.

The NAACP witness's testimony is consistent with Plaintiffs' repeated references in their papers to the fact that the "public school student population is 90% Black and Latino … while private schools are over 99% White."  Dkt. No. 102, at 3.  That fact is ***irrelevant***.  It has nothing to do with voting, elections, or influence of racial bias in District politics.  Even Plaintiffs

---

[3] Declaration of Randall M. Levine, Exhibit 1, Excerpts of the Rough Transcript of the Rule 30(b)(6) Deposition of Plaintiffs, the National Association for the Advancement of Colored People, Spring Valley Branch (hereafter "NAACP Dep.") at 4-5.
[4] *Id.*

8

understand this, since they agree that their campaigns for the board of education failed because a majority of voters disagreed with their *policies*, not because of their *race*.  Dkt. No. 76 at 30.

Indeed, in the NAACP's view, race has no bearing on the District's elections because "[i]f there were seven members of the East Ramapo Central School District … who exemplified [what] we believe in education for each and every student, I wouldn't care what color they are, what religion they are, it would not matter."[5]  While that sentiment may be entirely admirable and appropriate, it is not the substance of a successful Voting Rights Act case.  Section 2 "is a balm for racial minorities, not political ones—even though the two often coincide."  *Baird*, 976 F.2d at 361.  The Voting Rights Act takes no sides in disagreements over beliefs and values.

The bottom line is that all citizens, no matter their race, religion, or political persuasion, have the inalienable right to believe whatever they want to about property tax rates and the relative merits of public and private schooling.  They also have the right to organize, run for office, and implement the policies their constituents support.  In the District, the voting majority generally favors lower taxes and private schools.  They should not be tarred as *de facto* racists and penalized just for exercising their protected rights to believe as they believe and to vote for the candidates they support.  As long as the electoral process in the District is fair—and there is no evidence it is not—there is no basis for judicial intervention in ordinary democratic politics.

### 2. Plaintiffs admit that White voters support minority candidates at levels equal to or greater than those of White candidates.

The opinion of Plaintiffs' expert, Dr. Cole, further shows that the District's voting majority supports Black, Latino, and White candidates to the same extent and degree—even when Black or Latino candidates face off against White candidates.  Dkt. No. 76 at 29-30.  Dr.

---

[5] *Id*.

9

Cole's analysis shows that the minority candidates who won election in 2013, 2015, and 2016 all received the same degree and proportion of support from White voters as did White candidates, without variation according to the race of the candidates. *Id.* No case presenting such voting patterns has ever been found to violate Section 2.

Plaintiffs do not dispute that conclusion, because they cannot do so without undermining their own expert's credibility. Instead, they seek to minimize it by arguing that any potential non-racial explanations for the defeat of minority preferred candidates may be overcome by other evidence of racial bias. *E.g.,* Dkt. 102 at 12. Plaintiffs are wrong. For that proposition they rely on *Goosby v. Town Bd. of the Town of Hempstead, N.Y.*, 956 F. Supp. at 343, without acknowledging *Goosby's* glaring distinctions from this case. Unlike here, the district court in *Goosby* found that "the Republican Party in Hempstead had never recruited an African–American candidate for the Town Board" and that "a majority of white voters in Hempstead had never supported a black candidate for the Board." *Id.* at 503. Since there was no evidence that the White majority had *ever* supported Black candidates—much less to the same degree as White candidates—the court properly concluded that Blacks were excluded on account of race.

The facts missing from *Goosby* are present here and are provided by *Plaintiffs' own expert*. It is indisputable that White voters in the District consistently support and elect Black, Latino, and White candidates, irrespective of their race, and solely on account of their political positions. That fact is dispositive and Plaintiffs' Complaint should be dismissed as a result.

### III. CONCLUSION

For all the foregoing reasons, and those stated in the District's Combined Memorandum in Opposition to Motion for Preliminary Injunction and in Support of Motion to Dismiss, Plaintiffs' Complaint should be dismissed, with prejudice.

|  |  |
|---|---|
| Dated: March 21, 2018 | Respectfully Submitted,<br><br>**MORGAN, LEWIS & BOCKIUS LLP**<br><br>*/s Randall M. Levine*<br>David J. Butler<br>Randall Levine*<br>101 Park Avenue<br>New York, NY 10178<br>T: (212) 309-6000<br>F: (212) 309-6001<br>   -and-<br>1111 Pennsylvania Avenue, NW<br>Washington, DC 20004<br>T: (202) 739-3000<br>F: (202) 739-3001<br>david.butler@morganlewis.com<br>randall.levine@morganlewis.com<br><br>*Counsel for Defendant*<br>*East Ramapo Central School District* |

11

## **CERTIFICATE OF SERVICE**

I hereby certify that on March 21, 2018, a true and correct copy of the foregoing was served by ECF and by email on the following:

Perry Grossman
pgrossman@nyclu.org
Kevin Eli Jason
kjason@nyclu.org
New York Civil Liberties Union
125 Broad Street
New York, NY 10004

Corey Anne Calabrese
corey.calabrese@lw.com
Elizabeth Anna Parvis
elizabeth.parvis@lw.com
Claudia Theda Salomon
claudia.salomon@lw.com
Latham & Watkins LLP (NY)
885 Third Avenue
New York, NY 10022

*Counsel for Plaintiffs*

Elyce Noel Matthews
elyce.matthews@ag.ny.gov
New York State Office of the Attorney General (NYC)
120 Broadway
New York, NY 10271

Monica Anne Connell
Monica.Connell@ag.ny.gov
New York State Office of the Attorney General (24th Floor)
120 Broadway, 24th Floor
New York, NY 10271

*Counsel for Defendant MaryEllen Elia*

*/s Randall M. Levine*