# **EXHIBIT 16**

Chapter 5

# An Assessment of Racially Polarized Voting For and Against Latino Candidates in California

Yishaiya Absoch
California State University, Fresno

Matt A. Barreto
University of Washington

Nathan D. Woods[1]
Welch Consulting

As the date for renewal of the Voting Rights Act ("VRA") approaches, the need for rigorous statistical analysis of voting behavior in minority communities increases, especially in those regions and among those ethnicities that were not perhaps the primary focus of civil rights legislation in 1965, but have become increasingly salient ever since.

In recent cases, the U.S. Supreme Court has begun to signal a shift in its approach to claims brought under the VRA, and if there is reason to hope that Congress may amend the law to undo any unfavorable adjudication, there is cause for concern that the Court will view such legislative rebuttals as usurpations of judicial power.

Aside from any possibility of a showdown between Congress and the Court on the meaning of the VRA, consensus on the continuing relevance and internal coherence of the law is beginning to fray. Scholars and Supreme Court justices have begun to observe "discord and inconsistency" between the antidilution goal of Section 2 and the antiretrogression goal of Section 5 (Pildes 2002; Epstein and

[1] The authors wish to thank Alan Clayton and the Los Angeles County Chicano Employees Association for permission to use the data in this research project. The findings and implications drawn here do not reflect the official position of Clayton or the LAC-CEA and are the authors' own. We also benefited from discussion and feedback on this project from Bernie Grofman, Louis DeSipio Gary Segura, Taeku Lee, and Manoj Mate.

O'Halloran 2005; *Georgia v. Ashcroft*, 539 U.S. 461 (2003) (*Kennedy, J.*, concurring in judgment)).

In order to show the need for renewal of the law and the basic coherence of its various provisions, as well as to preempt constitutional challenges to any prospective amendments, it is necessary to call attention to evidence of continuing discriminatory effects in existing electoral practices. The present study finds such evidence in the form of racially polarized voting by non-Latinos in Los Angeles County elections between 1994 and 2003.

In *Thornburg v. Gingles*, 478 US 30 (1986), the Supreme Court devised a three-prong test to identify violations of Section 2 of the recently amended VRA. Section 2 attacks the problem of qualitative vote dilution. Specifically, it prohibits any voting "standard, practice or procedure" which denies any group of citizens an equal opportunity "to elect representatives of their choice" (42 U.S.C. 1973). Following the Court's opinion in *Gingles*, plaintiffs claiming dilution under Section 2 would have to demonstrate (a) that the minority group at issue is "sufficiently large and geographically compact to constitute a majority in a single member district," (b) that the minority group is "politically cohesive," and (c) that the surrounding majority group usually votes as a bloc to defeat the minority's preferred candidate. In combination, Congress's 1982 amendments to the VRA and the Court's ruling in *Gingles* seemed to warrant, if not actually to require, the drawing of majority-minority districts.

Not surprisingly, following the 1990 census, several states redrew congressional and state legislative maps so as to maximize the number of majority-minority districts. But in a series of cases over the next several years, the Supreme Court restricted the use of such districts—invalidating nine of thirteen majority-minority House districts in the South—and articulated a more subtle approach to the problem of qualitative dilution. To avoid falling afoul of the Equal Protection Clause, and thereby triggering strict scrutiny, states and localities must not use race as the sole, or possibly even the primary, rationale for drawing districts. Race may enter into consideration, but not to the exclusion of traditional districting criteria such as compactness and respect for county or municipal boundaries (*Shaw v. Reno* (Shaw I)*, 509 US 630 (1993); *Miller v. Johnson*, 515 US 900 (1995)).

The Court's reluctance to accept majority-minority districts as tools to remedy qualitative dilution has engendered heated debate in the scholarly community over their continuing relevance. Several scholars promote "coalitional districts" as a viable alternative (Pildes 2002; 116 *Harv. L. Rev.* 2208 (2003). The claim is that coalitional districts are superior to majority-minority districts because the smaller the number of minority voters required per district, the smaller the need to disregard traditional districting principles and the less likely a newly drawn district is to be invalidated by the courts on Equal Protection grounds. As plausible as this argument may be in legal-theoretical terms, it runs into serious difficulty if polarized voting patterns persist. In other words, if racially polarized voting has not truly declined, or has not declined in all regions and with respect to all ethnicities, then the majority-minority district is not the outmoded, Republican-friendly implement its critics claim, but a still necessary tool in the fight against qualitative dilution.

In this chapter, we question whether political conditions in the state of California are ripe for a new approach to the problem of vote dilution. Specifically, we seek to demonstrate the extent to which voting in California is characterized by racial polarization between whites and Latinos, its two largest ethnic groups. By extension, this analysis should also help to assess the degree to which Latinos may be considered a politically cohesive unit in a given political district.

## The Case for California

The 2000 census revealed that Latinos comprised 46% of the population in the county of Los Angeles. Yet even as the data showed tremendous growth in the numbers and political activity of Latino voters, their representation on the board of supervisors remained unchanged. The Los Angeles County Chicano Employees Association (hereinafter LACCEA),[2] an interest group providing litigation resources for Latino public employees since 1969, sought to enhance representation of Latinos on the board of supervisors by advocating for the creation of an additional supervisorial district in the San Gabriel Valley. The board, however, rejected LACCEA's arguments and voted to approve a redistricting plan deviating only slightly from the existing arrangement. To date, only one seat in five is majority-Latino on the Los Angeles County Board of Supervisors.

This chapter examines the extent to which racial bloc voting ("RBV") prevented Latino voters from electing a candidate of their choice in the current 3rd district, one of the three *Gingles* prongs in successful voting rights cases. Although the Latino population has grown throughout Los Angeles, and the 3rd district is solidly Democratic, Latino candidates have never fared well in the district, despite strong support from Latino voters, leaving Latinos with only one representative on the Los Angeles County Board.[3]

---

[2] The LACCEA is a nonpartisan, nonprofit organization that advocates for equality for Latinos ranging from changes in countywide public policy to individual level matters before the Civil Service Commission.

[3] This chapter is not an endorsement of the LACCEA plan, and does not, by itself, make the entire case for the validity or legality of the alternative plan presented by Mr. Clayton. Rather, our effort here is to examine specifically the prevalence of racial bloc voting in elections when Latinos are seeking office. In a previous paper, we examined the ramifications for Latino voting under either plan and determined that the proposed LACCEA plan is more efficacious for Latino voters and their ability to elect candidates of choice. As such, we do not explicitly speak directly to the issues of equality of population, compactness, boundaries, geographic regions, or community of interests, except in reference to the goals of the plans in questions. We do not empirically evaluate the plans on any of these dimensions. In this analysis of RBV, we proceed from the assumption that the alternate LACCEA San Gabriel Valley district, as designed, meets all relevant federal and state requirements for districting.

New population figures from the Census Bureau report that Latinos are now the largest minority group in the United States, numbering close to forty million (U.S. Census Bureau 2004). Alongside this increase in population, more Latinos are seeking public office and winning seats at the local, state, and national level. As Latino political representation continues to increase, it is important to examine new trends in candidate preference and racial bloc voting. Gains by Latinos seeking office are most certainly losses by non-Latinos, and subsequently non-Latinos may try to keep Latinos out of office by systematically voting against Latino candidates (for a similar discussion of African Americans, see Lublin 1999).

Nowhere are these changes in population and political activity more pervasive than in California's Los Angeles County where the Latino population increased by 890,000—or 26%—between 1990 and 2000. Over the same period, the non-Latino population actually *decreased* by 4%. Not only is the population growing, but the number of immigrants choosing to naturalize is also on the rise. Between 1990 and 2000, 280,000 immigrants from Mexico, Guatemala, and El Salvador became U.S. citizens in Los Angeles County alone. Finally, Latinos as a group are more politically involved at present in Los Angeles County than they were in 1990. For example, in other work, we demonstrate that the number of Latinos registering and turning out to vote increased dramatically during the 1990s (Barreto and Woods 2005). Survey research has also demonstrated that Latino voters in California generally are becoming more engaged and more interested in political affairs. In 1996, 42% of Latinos responded that they were "very interested" in politics, and in 2000 this number had increased to 65%.[4]

Given this confluence of factors, one could anticipate that Latinos throughout the county would evidence high levels of political participation. In fact, between 1996 and 2000 the number of Latinos that voted grew by 42.5% while the non-Latino electorate grew by only 17.8%. Not only did Latino vote growth outpace that of non-Latinos countywide, but some portions of the county experienced greater increases in Latino voting. In Los Angeles County, nearly fifty communities experienced growth in the Latino vote of greater than 50%, and many of these are substantial communities located in the proposed alternative district. Cities such as Pomona, West Covina, El Monte, and Whittier, for example, experienced growth in the Latino vote numbering in the thousands. Not only are more Latinos turning out to vote, but their voter turnout rates exceed those of non-Latinos in close to eighty communities throughout the county. Indeed, a systematic analysis of voter turnout in California found Latinos were more likely to vote in majority-minority districts (Barreto, Segura, and Woods 2004). However, if non-Latino voters continue to bloc-vote against Latino candidates, these gains are for naught.

Beginning in 1994 with the anti-immigrant and possibly anti-Latino initiative Proposition 187 and extending through the antibilingual education (Proposition 209) and anti-affirmative action (Proposition 227) initiatives of 1996 and 1998 respectively, Latino politics in California has recently been a response to perceived attacks. Exit polls found that three of four Latinos turned out against the

---

[4] Tomás Rivera Policy Institute, Survey of Latinos in California 1996; 2000.

propositions, while a majority of white non-Latinos favored the propositions. We think that a clear result of this array of propositions is that Latinos are more likely to align themselves with other Latinos on matters of political significance, even ones with whom they have only the term "Latino" in common (Segura, Falcon, Pachon 1997). As such, these propositions and the political climate they engendered made Latinos more cohesive as a political force and more likely to weigh in on political issues directly affecting them.

The increase in Latino voters seems to have had a profound effect. As of the 2000 elections, over half of the 212 Latino council members and mayors in California were elected in Los Angeles County (NALEO 2002). Cities within the LACCEA proposed District 3, such as Pomona, Norwalk, and Monterey Park, have recently elected Latino mayors, and many other cities have multiple Latinos on their city councils (for example, El Monte, Pico Rivera, and Montebello). This discussion indicates that a closer look at the voting data for Los Angeles County will reveal several interesting patterns in Latino voting in Los Angeles County, many of which are specifically relevant to the question of drawing an additional supervisorial district that will enable Latinos to elect candidates of choice. Indeed, as we have found in previous work on Los Angeles County, Latinos in the proposed 3rd district are anticipated to vote at higher rates than non-Latinos, and to support Latino candidates (Barreto and Woods 2002). However, before the courts allow alternative districting plans to move forward, the first step is to demonstrate that one or more status quo districts prevent Latino representation.

Twenty years ago, Navarro (1982), in commenting on the 1981 redistricting in Los Angeles County, lamented the political prospects of Latinos residing there. He wrote, "the political challenge for the Chicano community in Los Angeles is formidable. The 1981 redistricting plans make the task of achieving a level of influence and representation for Latinos extremely difficult" (175). The redistricting he referred to limited the possibility of Latinos influencing, in any substantive way, which candidates would be elected to the Los Angeles County Board. This outcome was a result of the limited political power possessed by the Latino community in Los Angeles at the time, at least relative to that of whites and African Americans. Navarro presaged the current 2001 debate over redistricting in stating further that, "without being overly pessimistic it appears that the Latino community of Los Angeles will continue to be underrepresented for some time to come" (175).

What Navarro could not have known in 1982 is that while his sentiment still prevails—Latinos are still underrepresented—the reasons why Latinos are underrepresented today is no longer tied to a limited base of political power. In fact, as we point out above, and develop further below, the Latino community has never previously enjoyed the political weight it currently carries in Los Angeles, the state of California, or nationally. In spite of this, Latinos continue to be underrepresented on the county board. The first major stride toward increased representation on the board occurred following the 1990 census, when the Courts held that the proposed county board of supervisor districts violated the Voting Rights Act. In *Garza v. County of Los Angeles*, 918 F.2d 763 (9th Cir.

1990), the court found that Latino representation was undermined under the existing plan and that the population was sufficient to warrant the drawing of a district favorable to the election of a Latino candidate. Specifically, Federal District Court Judge Kenyon noted that the primary goal of the redistricting in question was to preserve board incumbents in office, even at the cost of fragmenting the Latino community. In the wake of this decision Gloria Molina was elected to the First District in 1992 and became the first Hispanic elected official to serve on the county board of Los Angeles. Her election was trumpeted within the Latino community and by political observers generally as a crucial step in the process of facilitating increased Latino political representation.

## The Approved 2001 Los Angeles County Board of Supervisors Plan

Recently, the issue of Latino representation and redistricting in Los Angeles County has emerged anew, as the board unanimously approved a plan that leaves existing districts essentially intact. The consensus of the board was that it was best to alter the existing arrangement as little as possible. In effect, the board voted to preserve the status quo and, perhaps not coincidentally, each individual member's base of political support.

The 2001 redistricting plan crowds a large and geographically dispersed Latino population into a single district, greatly diminishing the chances of a second Latino being elected to the board of supervisors. Figure 5.1 depicts the redistricting plan approved by the board. The First Supervisorial District currently stretches from East Los Angeles, thirty-five miles to the eastern border of the county to Pomona and dips down to include the heavily Latino areas of Whittier and Baldwin Park (see Figure 5.1). Looking more like a sand hazard in a Los Angeles Public Golf Course than a community-of-interest, the district appears to have been drawn exclusively around the heavily Latino parts of the county, thereby decreasing the percentage of Latinos found in neighboring districts.

Measured against the political landscape present in Los Angeles County in the 1970s and 1980s, such a map would make some sense. Indeed the map ultimately approved for the 1990s as part of the Garza decision has many of the same attributes. However, there are several reasons why this map is not sufficient to represent adequately Latinos and the San Gabriel Valley in the 21st century (see Figure 5.2). As important, the map as currently drawn probably does not meet constitutional muster in the aftermath of *Shaw v. Reno* (Shaw I), 509 US 630 (1993) and its progeny.

As approved by the board of supervisors, the existing map stands in sharp contrast to the alternative plan presented to the board by LACCEA, which maintains that the alternative plan will "give the residents of the County of Los Angeles new, more geographically compatible board of supervisor seats . . . without affecting the voting rights seats promulgated pursuant to the consent decree in *Garza v. County of Los Angeles Board of Supervisors*" (Clayton et al. 2002: 1).

**Figure 5.1. Status Quo Approved First Supervisorial District, Los Angeles County Board**



114     *Yishaiya Absoch, Matt A. Barreto, and Nathan D. Woods*

**Figure 5.2.  Supervisorial Districts under LACCEA Proposed Redistricting Plan, Los Angeles County Board**



The alternative plan incorporates the community-of-interest standard to keep cities, communities, and regions intact and to "ensure that the voting rights of African Americans, Latinos, and Asians are protected and that regional concerns are not neglected" (Clayton et al. 2002: 1). While the A2 plan adopted by the county divides communities, the LACCEA plan keeps "together the communities-of-interest that resulted from the demographic changes, from population movements, from extremely large increases in the number of new Latino citizens, and from the significant increase in the population and voter registration numbers in the Latino community" (Clayton et al. 2002: 2).

Figure 5.2 illustrates the alternative plan proposed by the LACCEA. The comparison is instructive: the districts in Figure 5.2 take on less bizarre shapes

than do the Status Quo Districts, and with sufficient detail this map would show there are few instances in which district lines split a city or other community.

## Polarized Voting and the VRA

Section 2 of the Voting Rights Act of 1965 forbids voting arrangements that result in dilution, or provide minorities "less opportunity than other members of the electorate to participate in the political process and elect representatives of their choice." This prohibition applies throughout the United States on a permanent basis. In contrast to Section 2, Section 5 of the VRA applies only to specific jurisdictions on a temporary basis. The difference is attributable to the uniquely intrusive character of Section 5, which requires covered jurisdictions—several entire states in the South as well as portions of states in other regions of the country—to submit all proposed changes in voting practices for "preclearance" by the Justice Department. Following several renewals for short periods, Congress decided, in 1982, to extend Section 5 for a full twenty-five years. In July 2006, Congress renewed the Voting Rights Act for an additional twenty-five years.

Jurisdictions covered by Section 5 must show that a proposed change to voting practices "does not have the purpose and will not have the effect of denying or abridging the right to vote on account of race or color" (42 U.S.C. § 1973c.). The purpose of the section is to insure that voting procedures would not be changed in such a way as to cause "a retrogression in the position of racial minorities with respect to their effective exercise of the electoral franchise" *Beer v. United States*, 425 U.S. 130, 141 (1976). Although the statutory language distinguishes purpose and effect, by the late 1990s, the conservative Rehnquist Court, generally skeptical about federal enforcement power under the Civil War Amendments (Karlan 2003), limited the scope of Section 5 by requiring a single determination that proposed changes did not result in "retrogression" (*Reno v. Bossier Parish School Board,* 528 US 320 (2000) ("*Bossier Parish II*")).

*Georgia v. Ashcroft*, the Court's most recent foray into the voting rights thicket, addresses Section 5 preclearance, but it is relevant also for the Section 2 vote dilution claims that set the legal context for the present study. The link between Sections 2 and 5 lies at the intersection of substantive and descriptive representational interests. If the standard for retrogression under Section 5 in the aftermath of *Georgia v. Ashcroft* is determined not by the number of minority officeholders but by the influence of minority voters, then what is good for the Democratic party may increasingly turn out to be bad for the enforcement of Section 2, which is to say, for the prospect of improving minorities' descriptive representation in the face of a persistently polarized electorate.

To investigate polarized voting, we examine statewide election returns during the 1990s featuring Latino candidates, as well as the three propositions mentioned above. Specifically, we investigate whether high percentage non-Latino precincts vote differently than high percentage Latino precincts. Through bivariate correla-

tion, homogenous tract analysis, Goodman's ecological regression, and King's ecological inference, we model candidate and issue preference at the precinct level, paying close attention to race and ethnicity and examining whether the voting habits of non-Latino voters within the status quo Supervisorial districts restrict the voting preferences of Latinos in such a way that a Latino candidate could not be elected. Our analysis of fifteen candidates and issues between 1994 and 2003 reveals that polarized voting does exist and that the alternative redistricting plan is a suitable mechanism for addressing this problem.

## Data and Implementation

All the data we use in the subsequent analysis is drawn from a CD-Rom provided by the Los Angeles County Internal Services Department entitled "Los Angeles County 2001 Redistricting: Final Consolidated CD." The CD is dated 8–10–2002 and contains a great deal of data and information (including geographic and mapping files and program applications), much of which was not relevant to our inquiry. Of specific use to us were data files that included statement of the vote election results for Los Angeles County for each election cycle including primary elections in the 1990s. Corresponding census data files were also included that provide relevant race/ethnicity information as of both the 1990 and 2000 census. From both census files we were able to obtain information concerning the total populations, voting age populations, and registered voter populations for both Latinos and non-Latinos.

In particular, this chapter closely examines the status quo district 3 of the Los Angeles County Board of Supervisors. District 3 is important for a number of reasons. First, this is the district that the LACCEA plan would move to the San Gabriel Valley to create a second majority-Latino district, leaving much of the other non-Latino districts unchanged. Thus, it is important to show that Latino candidates in the status quo district 3 are not able to win majority support due to racially polarized voting. Second, the status quo district 3 is a Democratically controlled, left-leaning part of Los Angeles County. Both members of Congress that represent the area are well-established Democrats, as are all state legislators that represent the area. Thus, we might expect non-Latino voters to be more open to voting for Latino candidates, than say in a conservative Republican district. However, if we find a high prevalence of RBV in status quo district 3, it is clear that Latinos will continue to need the protection of the Voting Rights Act into the future.

The data analyzed are organized at the level of the redistricting unit, labeled typically in the data as "RDU_KEY." The redistricting unit number is a combination of the Census Bureau's census tract number, the county's regional planning area number, and a part number. The redistricting unit is *very similar* in shape and size to a voting precinct and is the unit at which districts are designed in Los Angeles County following each decennial census. The redistricting units could, in theory, be linked with the precinct boundaries associated with each election if the

Case 7:17-cv-08943-CS-JCM   Document 117-17   Filed 03/28/18   Page 12 of 27

proper documentation and matching files were available. In this case, however, these matching files were either unavailable or unreliable.[5] Throughout this chapter, we use the redistricting unit as the unit of analysis.[6] While the term, "redistricting unit" may be less familiar, it does offer the benefit of being relatively smaller than census tracts. As such, estimates we derive here may be considered more reliable because they are drawn from the smallest available unit of aggregation. An additional benefit to employing the redistricting unit stems from its inclusion, as the linking mechanism, in each of the data files made available from the county. As such we were able to proceed without resorting to data compiled by sources outside this Los Angeles County redistricting process.

Because we do not have information concerning the racial and ethnic background of individual voters, we undertake an analytical approach that allows us to estimate reliably racially polarized voting using aggregate data. Individual level data could only be obtained were race/ethnicity indicators included on a person's ballot (in California it is not) or if survey data were readily available (in this case they are not). Without such information, we employ a variety of statistical methods that make it possible for us to infer from aggregate level information how individuals within given political subunits have voted and how Latinos may have voted differently from non-Latinos.

We use a number of methods, categorized in four sections of summary results, to examine the issue of racial polarization in the county. Each has been used in several previous cases and has passed judicial muster in a variety settings.[7] These methods produce statistical estimates of the level of support for Latino-preferred candidates and causes as well as a bevy of graphical representations. We use this wide array of approaches in compliance with one expert's (Grofman 2000) recommendation to use "the full range of available techniques" so as to guard against errors in interpretation. Our first method (1) is to examine a series of bivariate correlations between proportions of voter preference for a particular candidate or proposition and the proportion of relevant Latino population within the same redistricting unit. This is meant primarily to be an instructive device—as the presence of high and statistically significant correlations suggests, but may not be in isolation, conclusive evidence of racially polarized voting. Nonetheless, consistently *negative* correlations between the proportion of non-Latino voters and voter preference for Latino preferred candidates provide evidence of polarization.

---

[5] These matching files are not made available on the CD provided by the county. In an effort to replicate our analyses reported here at the precinct level we found that precinct matching files provided through other sources were not sufficiently reliable to match each redistricting unit to a precinct for each election. As a result, we undertook this analysis only at the level of the redistricting unit.

[6] Although we use the redistricting unit, we may at times refer to precincts given the common usage of the word in these types of analyses. In all cases, the analysis occurs at the RDU level, which is almost identical to a voting precinct.

[7] These include, but are not limited to, *Thornburg v. Gingles*, 478 US 30 (1986), *Ruiz v. City of Santa Maria*, 160 F.3d 543 (9th Cir. 1998), and *Gomez* v. *City of Watsonville* (9th Cir. 1988) 863 F.2d 1407.

In a second approach (2), we use a "homogenous precincts" style of analysis and look specifically at redistricting units where the percentage of Latino or non-Latino registrants are at or above 90% of the units' total registered population. Comparing the voting preferences of the most heavily Latino populated areas with the most heavily non-Latino populated areas gives some indication as to what the difference between the two groups of voters may be and is a common first step in any analysis of this kind. By comparing these two types of units, we can limit the problems associated with inferring from aggregate level data and in a straightforward manner determine polarized voting because nearly all the registered voters are of one group or the other. In general, results indicating that these two types of units are dramatically different from one another in the support they grant Latino candidates and issues provide further evidence of polarization in District 3.

Our third approach (3) is a series of straightforward bivariate ecological regressions. Here again, we examine how the size of the Latino population is related to the degree to which that population supports Latino candidates or positions. Relative to the homogenous precincts approach, this method allows us to include information for all redistricting units with every available combination of Latino and non-Latino populations. This, in a sense, accounts for the possibility that purely homogenous redistricting units of one population or the other may be different from those units that have a greater degree of variance in their population. Consistent differences between Latinos and non-Latinos in the levels of support demonstrated here would augment similar findings that emerge through the correlations and homogenous unit analysis.

Our fourth approach (4) to the issue of polarized voting uses a variety of techniques made possible through King's method of ecological inference, which offers another methodological approach to overcoming ecological data problems (King 1997). In this, our last set of results (found in the Summary Results section below), we also provide estimates of polarization derived from Goodman's ecological regression model so that the estimates derived from King's MLE procedure might be readily compared with this more commonly utilized tool for determining polarization. If these two estimates are consistent with each other then any implications derived from them may be considered to be more substantial.

It is important to note from the outset that there is often no "silver bullet" in analyses of polarization, particularly when one is looking across different elections and election years. Here, we have endeavored to look at the issue in Los Angeles County's District 3 through as many lenses as possible. For this reason, we have included a great deal of summary estimates of the degree to which polarized voting appears. If a consistent set of results shows up across the various methods employed here, then, in our view, the conclusions we derive become substantially more reliable than if we were to report the results of a single method in isolation.

Two additional notes concerning the data and approach are important to report here. First, in each analysis reported, we use the *proportion of registered Latino voters* in a given redistricting unit (or inversely the *proportion of non-Latinos*) as the key independent variable in the following tables and charts. Second, in each

election we examine, except the 1994 election, we use data derived from the 2000 census. In the 1994 contest we use data from the 1990 census.

In full, we examine fifteen election contests across the 1994 primary, 1996 general, 1998 primary, 2000 general, 2002 primary, and 2003 special elections. The common thread across these elections is the presence of a Latino candidate or an issue of particular concern to the Latino community. A summary of the elections is contained in Table 5.1.

These elections offer a nice cross-section of contests, years, and electoral settings for examination. Covering four different election years, closed primaries, open primaries, and general elections, local candidates and statewide candidates and propositions, these data offer an insight into polarization that cannot be limited to a particular set of unique circumstances. If polarization is demonstrated consistently across these very different elections, we can be fairly confident that what we capture here is not simply an artifact of the data.

To get to the heart of racial bloc voting, we offer several different approaches that each tell a remarkably similar story about the degree to which polarized voting exists in Los Angeles County. As in Justice Brennan's argument in *Gingles*, racially polarized voting can be identified as occurring when there is a consistent relationship between the race of a voter and the way in which she votes. *In every election we examine here, such a consistent pattern emerges.* Indeed, under every different method we have employed here, *this pattern remains robust and consistent*. These results demonstrate not only that Latinos are politically cohesive in their support of Latino candidates in Los Angeles County, but also that non-Latinos vote consistently against Latino candidates and issues.

Our analysis of the votes taken across these fifteen elections provides convincing evidence that racially polarized voting continues to disadvantage Latino candidates. The degree to which the polarization occurs may vary slightly between elections and with the number of Latino candidates who are involved in a contest. Nonetheless, there can be no doubt that in each of these elections non-Latinos voted substantially against the Latino preferred candidate or issue.

Such a rigorous analysis was especially relevant to deliberation over the renewal and reauthorization of the VRA in July 2006. While most research continues to focus on the VRA *vis-à-vis* African-American voters (in the South), the fastest growing segment of minority voters today is Latino. This chapter answers one question, among many, that relate to Latinos and the VRA, a growing topic of concern for scholars and policymakers alike.

## Summary of Results

As noted above, our first line of inquiry focused on determining, through simple correlation analysis, whether the data for District 3 indicated any degree

120          *Yishaiya Absoch, Matt A. Barreto, and Nathan D. Woods*

**Table 5.1. Overview of Candidates and Elections Analyzed
Los Angeles County, California**

| Election | Candidate/ Proposition | Election |
|----------|------------------------|----------|
| 1994 P | Carrillo | County Sheriff |
| 1994 P | Torres | Insurance Commissioner |
| 1996 G | Prop 209 | Affirmative Action |
| 1998 P | Prop 227 | Bilingual Education |
| 1998 P | Bustamante | Lieutenant Governor |
| 1998 P | Calderon | Attorney General |
| 1998 P | Martinez | Insurance Commissioner |
| 1998 P | Robles | State Treasurer |
| 1998 P | Baca | County Sheriff |
| 1998 P | Gomez | County Sheriff |
| 1998 P | Salazar | County Assessor |
| 2000 G | Robles | County Assessor |
| 2000 G | Garcia | County Assessor |
| 2002 P | Calderon | Insurance Commissioner |
| 2003 S | Bustamante | Recall / Governor |

Note: 1998 reflects open primary results

of polarized voting between Latinos and non-Latinos.[8] Consistent with legal research on Latinos and the VRA, we divide the population only by Hispanic origin. The non-Latino population includes whites, blacks, Asian Americans, and all other non-Hispanic persons. While subgroup analysis for each racial group is interesting, the court has generally focused its attention on the Latino/non-Latino split in cases pertaining to racially polarized voting.

---

[8] In other analysis, we replicated the findings for status quo District 3 for all five supervisor districts in Los Angeles County, as well as countywide. The patterns of RBV among Latinos and non-Latinos throughout the county were consistent with the results presented here.

## Bivariate Correlations: Race and Support of Latino Candidate or Initiative

For each contest, we correlate both the proportion of the redistricting unit that is Latino and the proportion that is white, with the proportion supporting the Latino candidate or Latino preferred position. In general, two variables may be positively correlated, negatively correlated, or be completely unrelated to one another. In our correlation estimates, the negative relationship is indicated by the negative (-) sign, and positive correlations are recorded without a sign. The larger the correlation coefficient becomes, the more robust the relationship between the variables in question (whether negative or positive). The values in parentheses found just below the correlation coefficient are p-values. Here, p-values of .00 indicate that the correlation between two variables cannot be due to chance—that is, the relationship between the two is statistically significant.

Table 5.2 presents the results for the all contests between 1994–2003 (detailed above in Table 5.1). For all fifteen elections, the strength and statistical significance of the relationship between the ethnic proportions and preference for the Latino candidate becomes immediately apparent. The two correlations are nearly diametrically opposed to one another, showing that, as the proportion of a redistricting unit becomes more Latino, support for Latino candidates increases. Likewise, as a district becomes more non-Latino white in population, the proportion of votes going to Latino candidates diminishes. Although the robustness of the correlation coefficients varies between contests, the sign associated with percent white remains significantly negative, and the sign for percent Latino remains significantly positive in each election.

Taken as a whole, across the election years and contests there is a clear pattern indicated between the race/ethnicity of a redistricting unit and the support for Latino candidates and issues within a unit. The consistently negative and significant correlation between percent non-Latino and the vote share of Latino candidates, in conjunction with the corresponding positive and significant correlation for Latinos, provides compelling evidence that voting is racially polarized in District 3. We turn next to our "homogenous precinct" style analysis.

## Examining Homogenous Redistricting Units

This method is probably the simplest method for examining polarized voting. We use redistricting units within District 3 that are either 90% non-Latino (or greater) or 90% Latino (or greater) and compare the two against each other. The ease with which this sort of comparison can be made, indeed without resorting to statistics of any kind, makes this a logical precursor to more sophisticated methods of analysis. A downside to this sort of analysis is the availability, or lack thereof, of units that are sufficiently homogenous to be compared. Also, depending on the political jurisdiction in question, there may be some issue with

### Table 5.2. Correlation: Race and Support for Latino Candidates, Los Angeles County Supervisor District 3

|  | Percent Latino | Percent White |
|---|---|---|
| % Torres (1994 P) | 0.75 | -0.77 |
| % Carrillo (1994 P) | 0.70 | -0.67 |
| % No Prop. 209 (1996) | 0.54 | -0.51 |
| % No Prop. 227 (1998 P) | 0.65 | -0.59 |
| % Bustamante (1998 P) | 0.66 | -0.53 |
| % Calderon (1998 P) | 0.90 | -0.78 |
| % Martinez (1998 P) | 0.89 | -0.80 |
| % Robles (1998 P) | 0.90 | -0.80 |
| % Baca (Sheriff - 1998) | 0.46 | -0.38 |
| % Gomez (Sheriff - 1998) | 0.89 | -0.85 |
| % Sheriff Combined (1998) | 0.84 | -0.77 |
| % Garcia (Assessor - 2000) | 0.91 | -0.85 |
| % Salazar (Assessor - 2000) | 0.91 | -0.86 |
| % Robles (Assessor - 2000) | 0.74 | -0.73 |
| % Assessor Combined (2000) | 0.93 | -0.89 |
| % Calderon (2002) | 0.84 | -0.81 |
| % Bustamante (2003 S) | 0.34 | -0.33 |

Note: all values significant at $p < .00$

assuming the patterns in more heterogenous units will reflect what we see in homogenous ones.

Our analysis is a series of t-tests that statistically measure the difference between the two types of units in the level of support granted to Latino candidates and issues. A benefit of this sort of analysis is that we report the mean (or average) support within each type of homogenous unit, the difference, and associated standard errors, which allow for a determination of whether the levels of support are statistically discernable from each other.

Table 5.3 summarizes the result for the 1994–2003 contests. Looking at the first candidate, Torres, the mean support was almost forty percentage points higher in homogenous Latino units relative to homogenous non-Latino units. These two

**Table 5.3. T-Test Difference in Mean Support for Latino Candidates, Homogenous Tracts, Los Angeles County Supervisor District 3**

|  |  | 90% Non-Latino | 90% Latino | Net Diff. |
|---|---|---|---|---|
| Torres | Mean | 29.33 | 68.75 | -39.42 |
| (1994 P) | S.E. | 0.55 | 4.39 | 2.45 |
| Carrillo | Mean | 10.26 | 36.98 | -26.73 |
| (1994 P) | S.E. | 0.27 | 3.20 | 1.34 |
| Prop 209 No | Mean | 51.63 | 79.47 | -27.84 |
| (1996) | S.E. | 0.71 | 2.30 | 2.92 |
| Prop 227 No | Mean | 39.43 | 72.07 | -32.64 |
| (1998 P) | S.E. | 0.65 | 1.94 | 2.65 |
| Bustamante | Mean | 41.85 | 70.11 | -28.26 |
| (1998 P) | S.E. | 0.59 | 2.06 | 2.42 |
| Calderon | Mean | 12.19 | 51.19 | -39.00 |
| (1998 P) | S.E. | 0.30 | 2.34 | 1.32 |
| Robles | Mean | 17.79 | 51.48 | -33.68 |
| (1998 P) | S.E. | 0.27 | 1.83 | 1.17 |
| Martinez | Mean | 22.27 | 60.11 | -37.84 |
| (1998 P) | S.E. | 0.36 | 1.90 | 1.52 |
| Baca | Mean | 30.12 | 38.79 | -8.66 |
| (Sheriff 1998) | S.E. | 0.35 | 1.79 | 1.46 |
| Gomez | Mean | 7.53 | 31.38 | -23.85 |
| (Sheriff 1998) | S.E. | 0.24 | 0.89 | 0.98 |
| Combined | Mean | 37.65 | 70.17 | -32.52 |
| (Sheriff 1998) | S.E. | 0.50 | 1.93 | 2.09 |
| Garcia | Mean | 2.36 | 14.26 | -11.90 |
| (Assessor 2000) | S.E. | 0.10 | 0.35 | 0.41 |
| Robles | Mean | 2.99 | 10.42 | -7.43 |
| (Assessor 2000) | S.E. | 0.10 | 0.81 | 0.44 |
| Salazar | Mean | 10.42 | 40.75 | -30.33 |
| (Assessor 2000) | S.E. | 0.26 | 1.43 | 1.11 |
| Combined | Mean | 15.76 | 65.42 | -49.66 |
| (Assessor 2000) | S.E. | 0.37 | 2.09 | 1.58 |
| Calderon | Mean | 14.12 | 48.51 | -34.38 |
| (2002) | S.E. | 0.01 | 0.01 | 0.01 |
| Bustamante | Mean | 36.17 | 56.41 | -20.24 |
| (2003 S) | S.E. | 0.01 | 0.01 | 0.01 |

differences are not just large; they are statistically discernable from one another as well. Like the correlations we reported above, these t-tests of support for Latino candidates and issues between homogenous Latino and homogenous non-Latino redistricting units indicate a clear pattern of polarization. Simply put, when homogenous non-Latino units are supporting Latino candidates at only half or even a quarter the rate that homogenous Latino precincts support these candidates, voting is racially polarized.

## Bivariate Ecological Regression

We pointed out above that a potential problem with the homogenous precinct style analysis is that our conclusions, by implication, must rely on what we see in only a fraction of the available redistricting units and therefore data. This does not, by any means, suggest that these conclusions are invalid, but rather that additional methods should be undertaken to augment and refine what the homogenous units analysis suggests about polarization. Our next two approaches are intended to accomplish this task. The first, bivariate ecological regression, makes use of all the available information, not just the homogenous units, and fits the best "line" to the relationships found in the data. In this case, we regress the proportion Latino in a given unit on the proportion of support for the Latino candidate in that unit. If there is a relationship between the two variables, the regression coefficient will be either positive or negative and it will register statistical significance. If there is no relationship—for example if the proportion Latino was unrelated to the vote share of Latino candidates—then the coefficient will be insignificantly different from zero (0).[9]

Several items are worth noting in Table 5.4. The first is the size and significance of the regression coefficient (each is statistically significant at well beyond two standard deviations or p<=.05, the common threshold for determining significance). The second is the value listed in the "Constant" row, as this is the estimate of the percent of non-Latinos who supported the candidate. The third is the regression coefficient for percent Latino. To calculate the percentage support for the candidate among Latinos, add the value of the constant to 100 multiplied by the coefficient for Latino (or Constant+(100*Coefficient)).[10] For example, in the following table the constant (representing non-Latino support for the Latino candidate) is 27.32 in the Torres election. The coefficient for Latino is .36. Taking 100x.36 gets a value of 36, which added to 27.32 obtains the estimate for Latino support of 63.32%. Across all fifteen elections, the slope for "% Latino" is posi-

---

[9] In Appendix 1 we provide a series of scatter-plots that show the data points along an X-Y axis to which each regression line is fitted. If the data points were not clustered together in a roughly linear fashion, the data could not be fitted this way, and the coefficients for Percent Latino would be insignificant.

[10] See Lisa Handley's report on voting in Arizona for a more detailed description of this sort of calculation (2002).

Case 7:17-cv-08943-CS-JCM   Document 117-17   Filed 03/28/18   Page 20 of 27

**Table 5.4. Bivariate Ecological Regression: Support for Latino Candidates, Los Angeles County Supervisor District 3**

|  |  | Coef. | S.E. |
|---|---|---|---|
| Torres | % Latino | 0.36 | 0.02 |
| (1994 P) | Constant | 27.32 | 0.57 |
| Carrillo | % Latino | 0.17 | 0.01 |
| (1994 P) | Constant | 8.73 | 0.32 |
| Prop 209 No | % Latino | 0.30 | 0.02 |
| (1996) | Constant | 49.65 | 0.66 |
| Prop 227 No | % Latino | 0.37 | 0.02 |
| (1998 P) | Constant | 37.39 | 0.60 |
| Bustamante | % Latino | 0.30 | 0.02 |
| (1998 P) | Constant | 39.14 | 0.48 |
| Calderon | % Latino | 0.45 | 0.01 |
| (1998 P) | Constant | 9.54 | 0.30 |
| Robles | % Latino | 0.40 | 0.01 |
| (1998 P) | Constant | 15.56 | 0.27 |
| Martinez | % Latino | 0.46 | 0.01 |
| (1998 P) | Constant | 19.75 | 0.33 |
| Baca | % Latino | 0.11 | 0.01 |
| (Sheriff 1998) | Constant | 29.84 | 0.31 |
| Gomez | % Latino | 0.31 | 0.01 |
| (Sheriff 1998) | Constant | 6.65 | 0.22 |
| Combined | % Latino | 0.42 | 0.01 |
| (Sheriff 1998) | Constant | 36.49 | 0.39 |
| Garcia | % Latino | 0.16 | 0.00 |
| (Assessor 2000) | Constant | 1.86 | 0.10 |
| Robles | % Latino | 0.11 | 0.00 |
| (Assessor 2000) | Constant | 2.81 | 0.13 |
| Salazar | % Latino | 0.40 | 0.01 |
| (Assessor 2000) | Constant | 9.17 | 0.25 |

| Combined | % Latino | 0.67 | 0.02 |
|----------|----------|------|------|
| (Assessor 2000) | Constant | 13.84 | 0.54 |
| Calderon | % Latino | 0.41 | 0.01 |
| (2002) | Constant | 11.36 | 0.07 |
| Bustamante | % Latino | 0.15 | 0.04 |
| (2003 S) | Constant | 34.79 | 0.28 |

tive and significant, indicating that a statistically noticeable gulf existed between Latino and non-Latino voting patterns. The largest gulf, for the combined Latino candidates for county assessor in 2000 is .67, suggesting Latinos preferred the three Latino candidates by sixty-seven more percentage points than non-Latinos.

Taken together, these results buttress what the correlations (across all units) and t-tests (among homogenous units) suggest with regard to the degree to which voting is polarized between Latinos and non-Latinos in District 3. To this point each analytical technique we have employed has given us an indication that polarization exists and that it is not isolated to a single election year or contest. We turn next to a final set of estimates, derived from King's (1997) ecological inference methods.

### King's Ecological Inference and Goodman's Regression

Gary King's 1997 book and the programming package that accompanies it are an effort to solve some of the more persistent problems associated with estimating individual level behavior from aggregate level information. The program offers users a variety of diagnostic tools and options to check the fit of the data and ultimately obtain the most reliable estimate of a race/ethnic group's support for a particular candidate. Some of these diagnostic tools produced the scatter-plots, floating bar charts and tomographic charts supporting these summaries, which for page considerations are not included here (but can be accessed on the online appendix). The summary statistics produced by the program are included in the next sequence of tables, along with estimates of support based upon Goodman's regression. In both cases, the columns headed with "Beta B" indicate the proportion of Latino support for the candidate or proposition listed to the left hand side. "Beta W" on the other hand, is the estimate of non-Latino support for the candidate or proposition listed. Both can be interpreted as percentages.

As should be immediately clear, in virtually every contest both sets of estimates are remarkably similar. All of the races detailed here show quite a bit of polarized voting, and in most, the Latino candidate was clearly the most preferred candidate among Latino voters.

While each of the techniques we have employed has served some purpose in assessing the degree to which polarization is occurring in District 3, perhaps the most compelling is found in Table 5.5. In all the elections considered, we obtain remarkably similar estimates of the proportion of support for Latino candidates by Latinos and non-Latinos. Even the bivariate regression found in Table 5.4—the least refined of the estimates included—shows similar differences between Latinos and non-Latinos. The King estimate and the Goodman's regression are nearly identical and together may be taken as reliable indicators of the degree to which polarization exists in District 3.

## Discussion

We have offered several different approaches that each tell a remarkably similar story about the degree to which polarized voting exists in Los Angeles County Board of Supervisors District 3. Recall that, paraphrasing Justice Brennan's opinion in *Gingles*, racially polarized voting can be identified as occurring when there is a consistent relationship between the race of a voter and the way in which she votes. *In every election we examined here, such a consistent pattern emerges.* Indeed, under every different method we have employed here, *this pattern remains robust and consistent*. These results demonstrate that not only are Latinos politically cohesive in their support of Latino candidates in Los Angeles County, but also that non-Latinos vote consistently against Latino candidates and issues.

It is worth noting that even in the elections that are not marked by extreme levels of polarization there are still differences. For example, in the 1998 Baca primary election, the support he received among non-Latinos is only between six and eight percentage points (Table 5.5) lower than the support he receives from Latinos. However, the other Latino candidate in the race (Gomez) polled nearly as well as or better than Baca among Latinos and received only a small fraction of the non-Latino vote. A similar picture emerges in the 2000 assessors race (Table 5.5). In a crowded field of candidates the clear Latino favored candidate was Salazar, who polled between 48.9% and 50.3% among Latinos and received only 12% of the non-Latino vote.

The Bustamante election also provides a case in point. A moderate candidate, Bustamante was running against an opponent who spent very little and yet Bustamante only received about 40% of the non-Latino vote in District 3, relative to the 57% he received among Latinos (see Table 5.5). This brings to light a key point—in each of the elections we considered, which include local county elections as well as elections for statewide office and statewide propositions, no Latino candidate was the most preferred candidate of non-Latinos. In fact, in every case but the Bustamante and Baca elections, no candidate included in this analysis went on to be elected.

Our analysis of the votes taken across these fifteen elections provides convincing evidence that racially polarized voting has occurred in every election. The

**Table 5.5. Ecological Inference & Goodman's Regression
1994–2003 Elections, District 3**

|  | King's EI | | Goodman Reg | |
| --- | --- | --- | --- | --- |
|  | **Beta B (Latino)** | **Beta W (Non-Latino)** | **Beta B (Latino)** | **Beta W (Non-Latino)** |
| Torres (1994 P) | 0.736 | 0.279 | 0.745 | 0.277 |
| Carrillo (1994 P) | 0.296 | 0.093 | 0.327 | 0.087 |
| Prop 209 (1996) | 0.801 | 0.504 | 0.795 | 0.499 |
| Prop 227 (1998 P) | 0.748 | 0.378 | 0.737 | 0.377 |
| Bustamante (1998 P) | 0.712 | 0.390 | 0.697 | 0.390 |
| Calderon (1998 P) | 0.531 | 0.100 | 0.541 | 0.096 |
| Robles (1998 P) | 0.557 | 0.159 | 0.561 | 0.156 |
| Martinez (1998 P) | 0.658 | 0.200 | 0.658 | 0.198 |
| Baca (Sheriff 1998) | 0.402 | 0.299 | 0.412 | 0.298 |
| Gomez (Sheriff 1998) | 0.378 | 0.067 | 0.374 | 0.067 |
| Combined |  |  |  |  |
| (Sheriff 1998) | 0.775 | 0.367 | 0.785 | 0.365 |
| Garcia (Assessor 2000) | 0.199 | 0.015 | 0.183 | 0.019 |
| Robles (Assessor 2000) | 0.151 | 0.026 | 0.135 | 0.028 |
| Salazar (Assessor 2000) | 0.504 | 0.091 | 0.489 | 0.093 |
| Combined |  |  |  |  |
| (Assessor 2000) | 0.850 | 0.132 | 0.808 | 0.139 |
| Calderon (2002) | 0.511 | 0.118 | 0.519 | 0.114 |
| Bustamante (2003 S) | 0.487 | 0.347 | 0.492 | 0.348 |

degree to which the polarization occurs may vary slightly between elections and with the number of Latino candidates who are involved in a contest. Nonetheless, there can be no doubt that in each of these elections, non-Latinos voted substantially against the Latino-preferred candidate or issue.

Under Section 2 of the VRA, jurisdictions faced with persistent, racially polarized voting patterns, such as those we find in California, are obligated to seek a remedy. In the past, the preferred remedy entailed maximizing the number of majority-minority districts. Proponents of this remedy are currently fighting on two fronts. On the side of constitutional law, the Supreme Court has issued a number of rulings in which majority-minority districts drawn to satisfy Section 2 are invalidated as violations of the Equal Protection Clause. On the side of empirical

social science, a number of studies suggest that voting in some areas of the country may not be as racially polarized as it once was and that equalizing minority groups' opportunity to elect candidates of their choosing may no longer require the drawing of majority-minority districts.

We think the present study has something to offer on both fronts of the war over majority-minority districts. On the constitutional law front, *Georgia v. Ashcroft* presented the same dire threat and mobilizing opportunity that *City of Mobile v. Bolden* did in 1980. Just as the *Bolden* Court's negation of the intent element of a Section 2 action inspired civil rights advocates to lobby successfully for the 1982 amendments to the VRA, the risk to an anti-dilution agenda from *Ashcroft*'s weakening of the preclearance regime raises the salience of studies such as ours for efforts to renew or to amend the VRA or defend its constitutionality. On the empirical social science front, our findings suggest that recent interest in coalitional approaches to qualitative dilution, an interest largely driven by the Court's hostility towards majority-minority districts, must be tempered by evidence of continuing polarization.

130       *Yishaiya Absoch, Matt A. Barreto, and Nathan D. Woods*

# References

Arteaga, Luis. 2000. "Are Latinos Pro-Democrat or Anti-Republican? An Examination of Party Registration and Allegiance in the 2000 Election and Beyond." *The California Latino Vote 2000.* Latino Issues Forum.

Barreto, Matt A., and Nathan D. Woods. 2002. "Packing and Cracking? Assessing Latino Voting Strength Under Alternative Districting Plans in Los Angeles County." Paper presented at the 2002 American Political Science Association.

———. 2005. "The Anti-Latino Political Context and Its Impact on GOP Detachment and Increasing Latino Voter Turnout in Los Angeles County." In *Diversity in Democracy: Minority Representation in the United States,* ed. Gary Segura and Shawn Bowler. Charlottesville: University of Virginia Press.

Barreto, Matt, Gary Segura, and Nathan Woods. 2004. "The Effects of Overlapping Majority-Minority Districts on Latino Turnout." *American Political Science Review.* 98 (February): 65–75.

Barber, Mary Beth. 1994. "The Race for Insurance Commissioner." *The California Journal. October.*

Bathen, Sigrid. 1998. "California Journal Analysis of the 1998 California Primary Races and Measures." *The California Journal.* May.

Benson, Jocelyn. 2004. "Turning Lemons into Lemonade: *Making Georgia v. Aschcroft* the *Mobile v. Bolden* of 2007," 39 *Harv. C.R.-C.L. L. Rev.* 485.

Boyer, Edward. 2000. "Local Elections/County Assessor: With a Field of 16 Candidates, It's Anybody's Race." *The Los Angeles Times.* November 4.

Clayton, Alan, Fernando Oaxaca, and Armando Duron. 2002. "LACCEA, Protect Communities of Interest, Alternative Plan to the Adopted Redistricting Committee Plan A2: (The Redistricting Committee's Submittal to the Los Angeles Board of Supervisors)." Report submitted to the U.S. Department of Justice. May 20.

Epstein, David L., and Sharyn O'Halloran. 2005. "Adding Substance to Section 5: Incorporating *Georgia v. Ashcroft* into the Voting Rights Act." A paper presented at the 2005 annual meeting of the American Political Science Association.

Estrada, Leo. 2001. "Response to Proposed Redistricting Plan Prepared by LACCEA." Letter to the Los Angeles County Redistricting Boundary Committee. June 8.

Ethington, Philip J. 2001. "Percent Hispanic: Los Angeles County, 1940–2000." Race Contours 2000 Project. <Http://www.usc.edu/sppd/census2000>

Grofman, Bernard. "A Primer on Racial Bloc Voting Analysis" in *The Real Y2K Problem: Census 2000 Data and Redistricting Technology*, ed. N. Persily. Brennan Center for Justice, New York University School of Law.

Grofman, Bernard, Lisa Handley, and Richard G. Niemi. 1992. *Minority Representation and the Quest for Voting Equality.* Cambridge University Press. New York.

Handley, Lisa. 2002. "Voting Patterns by Race/Ethnicity in Arizona Congressional and Legislative Delegations" Preliminary Report.

*Harvard Law Review.* 2003. "Note: The Future of Majority-Minority Districts in Light of Declining Racially Polarized Voting." 116 *Harv. L. Rev.* 2208.

Hayden, Grant M. 2004. "Resolving the Dilemma of Minority Representation," 92 *California Law Review* 1589.

Karlan, Pamela S. 2003. "*Georgia v. Ashcroft* and the Retrogression of Retrogression," No. 69, *Stanford Public Law and Legal Theory Working Paper Series.*

King, Gary. 1997. A Solution to the Ecological Inference Problem: Reconstructing *Individual Behavior from Aggregate Data.* Princeton, N.J.: Princeton University Press.

Leighley, Jan E. 2001. *Strength in Numbers? The Political Mobilization of Racial and Ethnic Minorities*. Princeton, N.J.: Princeton University Press.

Lublin, David. 1999. "Racial Redistricting and African-American Representation: A Critique of "Do Majority-Minority Districts Maximize Substantive Black Representation in Congress?" *American Political Science Review* 93:1 183–86.

Navarro, Charles. 1982. "California Redistricting and Representation: Los Angeles County's Chicano Community." Doctoral Dissertation. Claremont, Calif.: Claremont Graduate University.

Pachon, Harry. 1999. "California Latino Politics and the 1996 Elections: From Potential to Reality." In *Awash in the Mainstream* ed. Rodolfo O. de la Garza and Louis DeSipio. Boulder: Westview Press.

Pachon, Harry, Matt A. Barreto, and Frances Marquez. 2002. "Latino Politics Comes of Age in the Golden State." In *The Latino Electorate in 2000* ed. Rodolfo O. de la Garza and Louis DeSipio. Boulder: Westview Press.

Pantoja, Adrian D., and Nathan D. Woods. 2000. "Latino Voter Turnout in Los Angeles County: Did Interest Group Efforts Matter?" *American Review of Politics*.

Pildes, Richard H. 2002. "Is Voting-Rights Law Now at War with Itself? Social Science and Voting Rights in the 2000s," 80 *North Carolina Law Review* 1517.

Presto, Jennifer. 2004. "The 1982 Amendments to Section 2 of the Voting Rights Act: Constitutionality after City of Boerne," 59 *N.Y.U. Ann. Surv. Am. L.* 609.

Ramírez, Ricardo. 2002. "Getting Out the Vote: The Impact of Non-partisan Voter Mobilization Efforts in Low Turnout Latino Precincts." Paper presented at the 2002 American Political Science Association Conference.

Segura, Gary M., Denis Falcon, and Harry Pachon. 1997. "Dynamic of Latino Partisanship in California: Immigration, Issue Salience, and Their Implications." *Harvard Journal of Hispanic Politics*. 10:62–80.

## Cases

Garza v. Los Angeles County, 918 F.2d 763 (9th Cir. 1990)

Gingles v. Thornburgh, 478 U.S. 30 (1986) 106

Gomez v. City of Watsonville 863 F.2d 1407 (9th Cir. 1988)

Shaw v. Reno (Shaw I), 509 US 630 (1993)

Shaw v. Hunt (Shaw II), 517 US 899 (1996)

Hunt v. Cromartie, 526 US 541 (1999)

Bush v. Vera, 517 US 952 (1996)

Miller v. Johnson, 515 US 900 (1995)

Presley v. Etowah Co., 502 US 491 (1992)

Georgia v. Ashcroft, 539 US 461 (2003)

Reno v. Bossier Parish School Board, 528 US 320 (2000)

Ruiz v. City of Santa Maria, 160 F.3d 543 (9th Cir. 1998)