# EXHIBIT 3

18c3natMS

1    UNITED STATES DISTRICT COURT
     SOUTHERN DISTRICT OF NEW YORK
2    ------------------------------x

3    NATIONAL ASSOCIATION FOR THE
     ADVANCEMENT OF COLORED PEOPLE,
4    SPRING VALLEY BRANCH, et al.,

5              Plaintiffs,

6         v.                          17 Civ. 8943(CS)(JCM)
                                        Status conference
7    EAST RAMAPO CENTRAL SCHOOL
     DISTRICT, et al.,
8
               Defendants.
9
     ------------------------------x
10
                                    White Plains, New York
11                                  December 3, 2018

12   Before:

13             THE HONORABLE JUDITH C. McCARTHY,

14                                  Magistrate Judge

15                     APPEARANCES

16   LATHAM & WATKINS
          Attorneys for Plaintiffs
17   RUSSELL D. MANGAS
     MICHAEL FARIS
18   ELIZABETH A. PARVIS

19   ADVOCATES FOR JUSTICE, CHARTERED ATTORNEYS
          Attorneys for Emilia White and Steven White
20   LAURA D. BARBIERI

21
     MORGAN, LEWIS & BOCKIUS LLP
22        Attorneys for Defendant
     DAVID J. BUTLER
23   RANDALL M. LEVINE

24

25   Digital recording.

1                    APPEARANCES;   (Continued)

2    Also Present:

3    TROUTMAN SANDERS LLP
          Attorneys for Community Connections
4    AVI SCHICK

5                              -   -   -

6              THE DEPUTY CLERK:   In the matter of the NAACP versus

7    East Ramapo Central School District.

8              Counsel, please state your appearances for the record.

9              MR. MANGAS:   Russell Mangas, Latham & Watkins, on

10   behalf of the plaintiffs.

11             MR. FARIS:   Michael Faris, on behalf of plaintiff.

12             MS. PARVIS:   Good morning, your Honor.

13             Elizabeth Parvis for the plaintiffs.

14             THE COURT:   I'm just going to -- because of this

15   wonderful sound that we're having, I'm going to ask everybody

16   to really speak up, because I think we're going to have a hard

17   time getting this on the microphone.   In fact, if could pull

18   the microphones forward.

19             So I'm going to ask you to say your name again.

20             MS. PARVIS:   Certainly.

21             Elizabeth Parvis, also with Latham & Watkins, for

22   plaintiffs.

23             THE COURT:   Okay.  And then --

24             MR. FARIS:   Michael Faris.

25             THE COURT:   Thank you.

```
 1                 MR. BUTLER:  Good morning, your Honor.
 2                 David Butler on behalf of the defendant.
 3                 THE COURT:  Good morning.
 4                 MR. LEVINE:  Good morning, your Honor.
 5                 Randall Levine for the defendant.
 6                 THE COURT:  I also understand --
 7                 Hi, Ms. Barbieri.
 8                 We've got Ms. Barbieri here in the courtroom.
 9                 And, Mr. Schick, are you here?
10                 MR. SCHICK:  Yes, your Honor.
11                 THE COURT:  Okay.  Great.
12                 At some point when we get to the motions that deal
13   with your client, I'll ask you to come up to the podium so you
14   can be heard also.  Okay?
15                 MR. SCHICK:  Thank you.
16                 THE COURT:  So everybody can be seated.  And as you
17   know, just stand when addressing the Court.
18                 So I have several outstanding motions made by all
19   parties.  I'm going to go through -- I believe I've got them
20   categorized in five.  I'm just going to summarize that when we
21   start, and then I'm going to address each one individually.
22                 So I have plaintiffs' motion to quash the subpoenas
23   served on Steve White and Catalist.  That is Docket Number 206.
24                 There's plaintiffs' letter, District's response to
25   Steve White's subpoenas, Docket Number 210.
```

 1           District's response to Catalist subpoenas, Docket

 2    Number 215.

 3           Mr. White's response to the District is Docket

 4    Number 217.

 5           Plaintiffs' response to Docket Number 215 is Docket

 6    227.

 7           I also have the District motion to quash subpoenas to

 8    Mr. Butler, Docket Number 208, Docket Number 219 and Docket

 9    Number 223.

10           I have the District's motion to compel nonparty JAMCAR

11    to comply with a subpoena.  JAMCCAR is J-A-M-C-C-A-R.  That's

12    Docket Number 213.  I did not see a response filed to that.

13           Then I have the District motion for Ms. White to show

14    cause why she failed to appear at a deposition, Docket

15    Number 214, and Docket Number 217.

16           And plaintiffs' motion to compel nonparty Community

17    Connections, which is Docket Number 226, 237 and 238.

18           Okay.  We're going to deal with these all in whatever

19    random order I deem worthy.

20           We're going to start with what I hope is going to be

21    easiest, the District motion to compel nonparty JAMCCAR to

22    comply with the subpoena.

23           Mr. Butler or Mr. Levine, I don't see any response to

24    that.  have you seen any response to that?  Have you heard

25    anything?

1       MR. BUTLER:  No, your Honor.

2           And when your order was issued, you directed us to get

3   in touch with JAMCCAR.  We sent them the copy of the order by

4   FedEx and by regular U.S. Mail.  We haven't heard a word from

5   them.  And you've got it all in our letter as to what other

6   efforts we undertook.  They've ignored us.

7           THE COURT:  Okay.  Plaintiffs, have you heard from

8   them?

9           MR. MANGAS:  Your Honor, we have not heard from them.

10  We don't represent JAMCCAR.

11          THE COURT:  No, I know you don't.  I just thought in

12  case they reached out to someone else before I ruled on this, I

13  wanted to make sure they hadn't reached out to you for some

14  reason in this case.

15          MR. MANGAS:  They have not.

16          We did a little bit of research on our own, and

17  recognized that the address that's publicly listed on the

18  JAMCCAR Web site is a different address than where defendants

19  served them and sent the letter.  So it's not clear to us that

20  JAMCCAR is even aware that they've been served a subpoena.

21          THE COURT:  Okay.  Mr. Butler.

22          MR. BUTLER:  That's the address that they listed with

23  the Secretary of State, as we showed in our papers.  That is

24  the address where someone signed and acknowledged receipt, and

25  as we've shown you in our papers.  So, you know, what are we

1   supposed to do?

2           THE COURT:  I'm granting this motion to compel as

3   unopposed.

4           So we can do it a couple of ways.  You can send me in

5   a subpoena that I can so order to be served upon them, or just

6   a proposed order attached to their prior subpoena.  I'm going

7   to defer to you, Mr. Butler, on what's the best way to do it.

8   And whether you want to issue a new subpoena with my signature

9   on it, or you just want to put in an order that I attach to the

10  prior subpoena proposed order to me, we'll do it that way.

11  Okay?

12          MR. BUTLER:  Thank you, your Honor.

13          THE COURT:  Okay.  So the second one I want to deal

14  with is the District's motion to quash the subpoena to

15  Mr. Butler.  This is docket Number 208, District's letter,

16  Docket Number 219 and Docket Number 223.

17          I'm going to ask the District to very briefly —-

18  because I have read everything on this, and we do have a lot to

19  deal with today —- very briefly to summarize why you want the

20  Court to quash the subpoena.  And then I'll allow plaintiffs to

21  briefly respond.  And then I'll rule.

22          MR. LEVINE:  Thank you, your Honor.

23          As you have said, it is all laid out in the letters

24  that we filed with the Court.  The long and short of it is that

25  to depose opposing counsel, opposing litigation counsel, in the

1    case is extremely disfavored.  The plaintiffs would have to

2    make a serious showing as to why they absolutely need to do

3    that, why opposing counsel, Mr. Butler, would have information

4    that they can't get anywhere else.  And that would be

5    information that he would have in some way outside of his role

6    as litigation counsel for the District in this case.

7            They haven't shown that they have any such need.  The

8    only thing that they have shown is one text message out of

9    17,000 pages of text -- or 1700 pages of text messages in which

10   Mr. Butler is purportedly giving some advice to his client

11   about what to do for this case, which necessarily means that

12   it's in his role as litigation counsel.

13           There is no evidence that they've pointed to

14   whatsoever that Mr. Butler has any role outside of his role as

15   litigation counsel.  And there is no reason whatsoever to

16   impose a burden on the District to require him to appear for

17   deposition or produce documents that are all going to be

18   privileged or attorney work product.

19           THE COURT:  So just that it's very clear, that one

20   text message is not from Mr. Butler.

21           MR. LEVINE:  Correct.

22           THE COURT:  It's from another individual who is

23   relaying what he believes is a message from -- or advice,

24   rather than a message, an advice from Mr. Butler.

25           MR. LEVINE:  Correct.

1              That individual is Perry Grossman, the president of

2     the school board.  And he was relaying a message to another

3     third party as he sat in his desk.

4              THE COURT:  Okay.  Thank you.

5              Who's going to be heard on this?

6              MR. MANGAS:  Russell Mangas, your Honor.

7              THE COURT:  Thank you, Mr. Mangas.

8              And, also, Mr. Mangas, before you proceed, I realize

9     because this is on a court reporter, I should have said -- this

10    is on a court transcript, and a reporter at some point is going

11    to probably have to transcribe this, please identify who's

12    speaking first for the ease of the reporter.

13             Thank you.

14             You can proceed, Mr. Mangas.

15             MR. MANGAS:  Your Honor, there is a couple of things

16    that we all agree on here.

17             The first is that there's evidence that Mr. Butler,

18    the attorney for the District, asked the president of the

19    school board, Perry Grossman, to convey to an influential

20    member of the Jewish community, Hersh Horowitz, that it would

21    be good if the community replaced --

22             THE COURT:  I don't think we can all agree on that.  I

23    think we can all agree that there is a text message from

24    Mr. Grossman relaying a message that he believes he was given.

25    We don't -- we can't say that that message was given.  Do you

1    have -- what proof do you have, other than the person saying

2    that?  You don't have Mr. Butler, and this is his client.

3    Isn't this privileged information?

4              MR. MANGAS:  There's no indication that's been

5    provided that Mr. Grossman made that up.  We have that piece of

6    evidence, and that's all we've heard, is the piece of evidence

7    from Mr. Grossman says --

8              THE COURT:  From an attorney, information he got from

9    an attorney, his attorney.

10             MR. MANGAS:  That his attorney asked him to convey to

11   Mr. Horowitz --

12             THE COURT:  Yes.  Okay.  Keep going.

13             MR. MANGAS:  -- that it would be good if the community

14   placed Sabrina Charles Pierre with a minority candidate who the

15   Jewish community could support.

16             The other thing that we'd certainly agree on, because

17   the District said it in their letter, is that that

18   communication was not privileged.

19             There is some other facts that are --

20             THE COURT:  No.  That's not what the District said.

21   Be very careful here.  The District said that they produced

22   that because that communication was relayed to another

23   individual, that that communication between Mr. Grossman and

24   that third party was not privileged because it was conveyed.

25   They never said that the communication between Mr. Butler and

1  Mr. Grossman was not privileged.  That was not said.  They have

2  not even said that that privilege was waived.  They simply said

3  they produced that because they could not claim a privilege

4  when that information was shared to another.

5           MR. MANGAS:  And, your Honor, that's what I was

6  referring to, is the communication that's been produced in this

7  case.  All sides have agreed that is not a privileged

8  communication, the communication from Mr. Grossman to

9  Mr. Horowitz relaying what Mr. Grossman states is Mr. Butler's

10  advice.

11           THE COURT:  And I have ruled that you can take their

12  depositions, and therefore find out more about that

13  communication between them, those two individuals.  So why do

14  you need Mr. Butler's.

15           MR. MANGAS:  Well, your Honor —

16           THE COURT:  Why are you turning this — I'm not happy

17  with this motion, as you can see.  I just — I read this, and I

18  was shocked.  Shocked.  I expect a lot more from Latham &

19  Watkins than going kind of in this — you know, taking an

20  attorney who's been working on this case and trying to turn

21  them into a fact witness and trying to say that you should be

22  allowed to take their deposition because one of their clients

23  relayed a message that they allegedly said to another person.

24  That doesn't make an attorney into a fact witness.

25           You give your client all the time advice, all the

1    time.  If that person goes and tells someone else that piece of

2    advice, does that make you a fact witness?  Does that make you

3    now part of this case?  Does that allow the other attorney to

4    come in and ask you questions under oath?  Should that happen?

5    Should they be allowed, if one of your witnesses, one of your

6    experts, one of your consultants that you've hired goes and

7    says something, should they then turn in and say, "Okay.

8    You've advised them to do something a certain way," and they

9    should be allowed to put you under oath and take questions?

10            MR. MANGAS:  If I'm providing nonlegal advice that I'm

11    asking be conveyed to a third party who is not a client, then

12    yes.

13            And, your Honor, we agree this isn't a typical

14    situation.  And then, as your Honor described it:  Shocking.

15    But it's not our actions that have led to this.  Whether —— the

16    fact that Mr. Butler ——

17            THE COURT:  I think you're making too much of a simple

18    statement you read.  And I think you're trying to breach an

19    attorney—client privilege based on that in an inappropriate

20    way.  And I think part of it is the fact that —— on both

21    sides —— there is a scorched earth mentality in this case.  And

22    so you will go until there is no earth left.

23            I don't believe that a third —— a statement that is

24    from someone that may or may not be an accurate reflection of

25    what Mr. Butler said is going to allow you to open the door and

1    ask Mr. Butler questions.  I don't think there is any evidence

2    that supports your arguments that Mr. Butler is involved in the

3    slating process.  I think he's involved in being a zealous

4    advocate on behalf of his client and providing advice to his

5    client under the attorney-client privilege.

6         And I am denying this.  I'm not -- we have so much to

7    do, I'm not going to hear further argument on this.  I don't

8    think the evidence that you have submitted before me supports

9    your arguments at all.  And I am granting District's motion to

10   quash the subpoena, and I'm not allowing you to depose

11   Mr. Butler on this issue.

12         MR. MANGAS:  Can I be heard briefly for the record,

13   your Honor?

14         THE COURT:  Yes.

15         MR. MANGAS:  I'll keep it short.

16         In terms of the relevance of this communication, it is

17   almost impossible to imagine that it would not be highly

18   probative for the finder of act in this case, Judge Seibel, to

19   know that one of the District's own agents -- in this case,

20   Mr. Butler -- suggested advice to be conveyed to an influential

21   member of a slating organization in a like community that they

22   should replace a minority-preferred board member with a safe

23   high-preferred candidate.  That goes to, one, whether there's

24   an exclusionary mechanism in the District operating in East

25   Ramapo, and two, the District itself discouragement of

1   responsiveness to the minority community.

2                 And briefly, your Honor, in terms of the privilege

3   issue that's obviously at the heart of that, the District isn't

4   saved by the fact that it was Mr. Butler giving the

5   communication or -- in the first instance, or that he appended

6   the magic words that it would be good for the case in his

7   advice to replace Ms. Pierre Charles.

8                 Of course, it would be good for the District's case if

9   they could continue arguing to Judge Seibel, "Look.  There are

10   minority candidates on the school board," while obscuring the

11   reality that there is a lot of work behind the scenes to make

12   sure that the only candidates that can make it to the school

13   board are safe candidates acceptable to the white community.

14                 And the fact that it may be good for the case doesn't

15   make that legal advice.  An attorney defending a "price fixing"

16   claim could tell his or her client it would be good for the

17   case to convey to competitors that one should raise their price

18   and one should lower it.  But that wouldn't convert it into

19   legal advice.

20                 And likewise, here, we've cited -- I won't rehash.  I

21   know your Honor doesn't want much argument on the topic, but we

22   cited the Chevron case that says when you're providing

23   political advice or other advice that's nonlegal, regardless of

24   whether --

25                 THE COURT:  I just don't think you factually have made

1    it here at all.  You have not met the standards in the Chevron

2    case in this case at all.  You've taken a statement by an

3    individual about another person and about advice.  The facts

4    are not here to support it.  You are going to be allowed to

5    depose these individuals.  At least I have ruled that you can

6    depose these individuals.  I believe Judge Seibel has affirmed

7    my ruling that you can depose these individuals.  Whether

8    that's appealed and changed by the Circuit, you know, that's

9    not here.  But in my opinion, you know, to take the deposition

10   of an attorney who's been an attorney on this case from its

11   inception, when you have other means in which you can get

12   information regarding the slating process, regarding, you know,

13   the minority candidates put up, regarding why they put up

14   certain candidates and why they supported others, I don't think

15   you have met what I believe is a higher burden that needs to be

16   met that's sets forth in the case law to take the deposition of

17   an attorney on the case.

18              So we're going to move on to the next issue.

19              MR. MANGAS:  Thank you, your Honor.

20              THE COURT:  The next issue is plaintiffs' motion to

21   compel nonparty Community Connections, which is Docket

22   Numbers 226, 237 and 238.

23              Mr. Schick, you're going to have an opportunity to

24   respond to this.  I'm going to ask -- I don't know who for the

25   plaintiffs' side is to go to be heard on this, but I'm going to

1    ask plaintiffs to tell me a little bit more about why they want

2    to get these records.  And I specifically want to understand

3    everything you've gotten so far, the nature of this

4    publication, because it's not completely clear to me from

5    reading it -- I have a sense of what it might be -- and what it

6    is that's remaining and why you need it.

7              MR. MANGAS:  Certainly, your Honor.  And if it's

8    helpful, we've gotten -- we've handed copies to Mr. Schick and

9    the District's attorneys the most recent publication of the

10   community group.

11             THE COURT:  Thank you.

12             (Pause)

13             MR. MANGAS:  And essentially, to your question --

14             THE COURT:  And just for the record, this is

15   Mr. Mangas.

16             MR. MANGAS:  I'm sorry.  Russell Mangas on behalf of

17   the plaintiff.

18             Thank you, your Honor.

19             To answer your Honor's question, the Community

20   Connections is essentially an advertising circular on -- as far

21   as we can tell from reviewing episodes, there's no editorial

22   comment, there's no reporting.  It's a several hundred page

23   circular of advertisements.

24             THE COURT:  Is this -- because you've handed me a

25   document.  Is this one, or is this like, you know -- how would

1  this come in?  Would this come in this thick?  Is this multiple

2  ones?  Does this come in as individual pages?

3       MR. MANGAS:  Your Honor, our understanding is that

4  that is a circular that's circulated on hard copy throughout

5  the Monsey community, I think to 12,000 or so Orthodox families

6  in the community.

7       The version that you're looking at is the PDF version

8  of that to make available for download on the Community

9  Connections Web site.

10       THE COURT:  Okay.

11       MR. MANGAS:  I'm happy to have Mr. Schick pose today

12  if there is more -- if there are more facts to be had, but

13  that's our understanding.

14       In terms of your Honor's first question, what has been

15  produced, one of the things that we asked for were political

16  advertisements placed on behalf of candidates for the District

17  School Board, and Community Connections has produced 28 such

18  advertisements which represents the advertisements in its

19  possession, custody or control responsive to that request since

20  2010.

21       The information that we are continuing to seek is

22  two-fold.  Number one is information sufficient to identify the

23  individuals who placed and paid for those 28 advertisements;

24  and number two, information as to whether Community Connections

25  has rejected requests for advertisements relating to a

1    candidate running for the school board.

2            A bit of nuance to that second request, we had

3    initially asked for documents or information related to any

4    advertisements that have been rejected for school board

5    candidates.  Through the meet-and-confer process, we were told

6    that it would be very onerous to review all of the advertising

7    requests and records.  We agreed that we would be satisfied if

8    Community Connections went to whatever individuals had the

9    knowledge of advertisements, entities seeking to place

10   advertisements, and they could talk to those individuals and

11   tell us, in the first instance, whether or not Community

12   Connections has, indeed, rejected any advertisements.

13           So those are the two things that we currently seek

14   today.

15           Community Connections -- the information we seek is

16   relevant, because, as I said, Community Connections is a weekly

17   circular.  But it has included advertisements for school board

18   candidates.  It goes to, I would believe, 12,000 families in

19   the Monsey area targeted towards the Orthodox community, which,

20   as your Honor is aware, are almost exclusively white

21   individuals.

22           We recently deposed Kalman Weber, a member of that

23   community, who runs an organization and is the sole member of

24   an organization called the Southeast Ramapo Taxpayers'

25   Association, or SERTA.  Mr. Weber's had involvement in several

1    board elections supporting candidates through financial

2    contributions or placing advertisements on their behalf,

3    providing them with SERTA endorsement.  And Mr. Weber testified

4    at his deposition that one of the ways that he sought to bring

5    out the vote for school board elections was to place

6    advertisements in the Community Connections magazine.

7              Notwithstanding that, we showed Mr. Weber somewhere in

8    the neighborhood of 15 or so advertisements that bore either

9    his name or the name of the Southeast Ramapo Taxpayers'

10   Association endorsement, and he disclaimed that those were

11   actually his advertisements, and testified that there must be

12   others in the community that are placing advertisements for

13   school board candidates and using his name.

14             So it's not as simple --

15             THE COURT:  And using his name?

16             MR. MANGAS:  Using his name or using the name of his

17   organization.  He testified to both instances.

18             THE COURT:  Okay.  So he testified that he has placed

19   ads in this circular.

20             MR. MANGAS:  That's correct.

21             THE COURT:  But that the ones you showed him were not

22   ads that he had placed.  They were ones placed using his name

23   or his organization's name, but they were replaced by him.

24             MR. MANGAS:  That's correct, with one refinement on

25   that, which is not all the advertisements we showed him were

1    Community Connections advertisements.  We had a whole series of

2    campaign advertisements and endorsements and --

3            THE COURT:  But some that were in Community

4    Connections that has his name or his organization's name were

5    not placed by him.

6            MR. MANGAS:  According to him.

7            THE COURT:  Yes.  You would think he might know.

8            MR. MANGAS:  We would hope so.

9            And so that's why a lot of these advertisements, 28

10   advertisements that have been produced, many of them, indeed,

11   say Southeast Ramapo Taxpayers' Association, or have Kalman

12   Weber's name.  But as he himself has testified, that doesn't

13   mean that he funded or placed all those advertisements.

14           And so that's the information that we are still

15   seeking.  The bases of relevance is -- and I'll quote from

16   Community Connections letter to the Court, which I believe is

17   Docket --

18           237?

19           -- Docket 237.  It's relevant to the slating process.

20   They quote a case, Community Connections has in its letter, at

21   Docket 237, where they say, "The candidate slating inquiry

22   focuses on whether there is a process in which some influential

23   nongovernment organization selects and endorses a group or

24   slate of candidates, rendering the election little more than a

25   stamp of approval for the candidate's selection."

1          We have no quibble with that case cite, and that's

2     exactly what we're seeking here.

3          THE COURT:  Can you -- I have the document in front of

4     me.  Can you direct me to the right page?

5          MR. MANGAS:  I believe it's on Page 2 of Docket 237.

6     The case is Pope versus City of Albany.

7          THE COURT:  Okay.  Thank you.

8          MR. MANGAS:  And so our position, your Honor, is that

9     we're entitled to that information and to understand who was

10    involved in the slating organization and how it works.  And if

11    there are influential members of the white Orthodox communities

12    who are financing campaigns or making endorsements or placing

13    campaign advertisements that for the last several years have

14    helped ensure that the white preferred candidates have been

15    elected, plaintiffs are entitled to that information.

16          Likewise, if Community Connections is lending its

17    support to the slating organization by advertising for white

18    preferred candidates, but refusing to place advertisements or

19    allow circulation of advertisements in their magazines to the

20    12,000 or so families in the Monsey community, that is highly

21    probative information as to not only the existence of a slating

22    organization, but the effectiveness.

23          THE COURT:  Can't a paper refuse to run certain ads?

24    Don't they have that prerogative?

25          MR. MANGAS:  Your Honor, we're not arguing that

1    they're required to run the ads, only that it's probative if

2    they're running ads exclusively for white preferred candidates

3    and refusing to run ads for minority preferred candidates.  But

4    as far as I know, your Honor, no, they are not required to run

5    a particular advertisement.

6             THE COURT:  Is there -- because -- and then I'm going

7    to let Mr. Schick respond to some of these questions that I'm

8    asking.

9             Is there -- I think you might have answered this at

10   the beginning, but remind me.  There was a burdensome argument

11   being made by Mr. Schick.

12            How have you dealt with that on the issue of any

13   rejection of ads?

14            MR. MANGAS:  So -- right.  There are two burden

15   arguments that Mr. Schick makes, one that it would be too

16   burdensome to tell us who paid for the 28 advertisements they

17   did produce, and then second, that it would be too burdensome

18   to tell us whether or not they rejected ads for other

19   candidates for school board.

20            Initially, we requested documents related to the

21   rejection of any advertisement for campaign for school board.

22   We were told that that was too burdensome.  And so we agreed

23   that we would be satisfied with an interim step, which is to

24   talk to whoever it is at Community Connections that's

25   responsible for receiving advertisement requests, and would be

1    knowledgeable about those types of requests and the documents,

2    and to interview that person and ask them, "Do you -- have you

3    rejected in the past any advertising requests?"  and if the

4    answer is "No," represent that to us in writing, and that will

5    end the issue.  And they've continued to maintain that that's

6    too burdensome to engage in.

7              THE COURT:  Okay.

8              MR. MANGAS:  The only other point I wanted to make,

9    your Honor, if your Honor is so inclined, is the First

10   Amendment arguments that have been made with respect to the

11   journalistic privilege.  That does -- the journalistic

12   privilege does not apply to Community Connections here for two

13   reasons.

14             Number one, it's not a newspaper.  It's a weekly

15   savings guide.  We cite a case, Bulow versus -- Von Bulow by

16   Auersberg versus Von Bulow, a Southern District of New York

17   case, in our paper for the proposition that the journalistic

18   privilege only applies to a professional journalistic effort in

19   news reporting; and second, and very related, the

20   advertisements themselves, even if Community Connections were a

21   journalistic enterprise, which it's not, even if it were, the

22   advertisements themselves are not reporting.  And

23   advertisements are not protected by any journalistic privilege

24   that requires -- I mean we're, all familiar with the archetype

25   of protecting your sources in reporting, and the reasons for

1   why you wouldn't compel a journalist to disclose sources and

2   means and methods, et cetera, because it could put a real chill

3   on that type of reporting.  That concern doesn't exist here.

4   We've cited the case, Chevron versus Berlinger in our papers

5   for that proposition.

6           And, indeed, your Honor, the type of disclosures that

7   we're asking for, who paid for political advertisements, are

8   the type of information that's commonly compelled in the

9   "campaign finance" context.  And we cite Citizens United for

10  that proposition.

11          Unless your Honor has further questions, I'll cede the

12  mike.

13          THE COURT:  Do you want to address the other First

14  Amendment issue they have which sounds like a --

15          MR. MANGAS:  Right.  So they make a --

16          THE COURT:  That makes the chilling and freedom of

17  association type --

18          MR. MANGAS:  A "right to association" argument, yes.

19  Right.

20          And they claim -- both Community Connections and the

21  defendants claim in their letters that are subpoenas, quote,

22  targeting people because of their associations with political

23  advocacy organizations, and that we're asking for compelled

24  disclosure of affiliation with groups engaged in advocacy.

25  Community Connections letter goes on, on Page 4, Footnote 3, to

1    claim that if they were somehow required to disclose who paid

2    for these advertisements, that any entity that publishes

3    endorsement of a political candidate could be required to

4    disclose its donor and volunteer lists, enforced to divulge who

5    it met and consulted with in deciding to make an endorsement.

6         Your Honor, that's not correct.  We're not asking for

7    that information.  We're asking very simply to identify who

8    paid for 28 political advertisements that Community Connections

9    has already produced.  And those political advertisements are

10   for candidates who exclusively have been the white preferred

11   candidate of choice under our racially polarized voting

12   analysis, and who have won.

13        It's highly relevant information.  They don't cite a

14   single case that says you can't be required to disclose who

15   paid for a political advertisement.

16        THE COURT:  Okay.  Thank you very much, Mr. Mangas.

17        Okay.  Mr. Schick, I'll let you speak.

18        MR. SCHICK:  Thank you, your Honor.

19        Good morning.

20        Avi Schick on behalf of nonparty Community

21   Connections.

22        I want to start by just briefly responding to several

23   things that Mr. Mangas said, but even before that, to just talk

24   about the reason we're here today on the subpoena that we

25   received in August is because the subpoena itself was wildly

1      overbroad.  It was not at all focused on the school board

2      elections.  In fact, your Honor, it sought every political ad

3      regarding every election going back well over a decade.  And

4      unfortunately, it took us weeks and months of back-and-forth

5      and expense to get plaintiffs to finally agree that their

6      subpoena in this case should be limited to the school board

7      elections that is the focus of this case.  And we reached out

8      to them in August when we got the subpoena.  We spoke with them

9      in a meet-and-confer September 7th about that issue.  I think

10     none of the lawyers who have ever spoken with me bothered to

11     should show up today.  But that's the reality here.  So we had

12     weeks and weeks of e-mails, phone conferences, and

13     correspondence just to understand that -- to get them to

14     understand and to get them to explain to us why this case --

15     why this subpoena would involve anything beyond the school

16     board elections.

17              So when they finally agreed to limit it to the school

18     board elections, we promptly, as they acknowledge, produced all

19     the ads going back to 2010 -- they also agreed to a time

20     limitation -- regarding the school board election.  But, of

21     course, as everybody has acknowledged this morning, this is a

22     "scorched earth" case.  And so the question is:  If they get to

23     go beyond the advertisements and they get -- and again, their

24     subpoena is not limited to who paid for it, but it's broader

25     than that.  If they get to go beyond the advertisements, your

1   Honor, to the question of who had any involvement with respect

2   to the placing of the payment of the ad, there's no -- that may

3   end Community Connections' involvement with this, but there's

4   no doubt they'll be back in front of you, your Honor, "We want

5   to subpoena that person.  We want to depose that person."

6           THE COURT:  Well, you know they already have

7   subpoenaed or are trying to depose that person.

8           MR. SCHICK:  It may be.  But there's a "scorched

9   earth" approach here, your Honor, which puts a chill on any

10  interaction with any entity, even a newspaper, that, you know,

11  somehow touches on this election.

12          And I want to address:  Is Community Connections a

13  newspaper?  It surely is.  Do they run editorials?  They surely

14  occasionally do.  The fact -- I don't know on what basis

15  Mr. Mangas said to this Court in his first words that they

16  deliver it to Orthodox Jewish homes.  I don't believe there's

17  any truth to that assertion.  I am sure that the distribution

18  is geographically limited.  But the idea that they pick out

19  Orthodox Jewish homes, which what plaintiffs' attorney just

20  told this Court, is almost surely false.

21          THE COURT:  Are you telling -- are you telling me that

22  this is going to more than Orthodox Jewish communities?

23          MR. SCHICK:  I believe its distribution is geographic,

24  so within geographic bounds, your Honor –

25          THE COURT:  Mr. Schick --

1          MR. SCHICK:  -- within geographic bounds --

2          THE COURT:  Mr. Schick, you're not answering my

3     question.

4          One can, in certain communities, if one is

5     geographically limiting where something is sent, one can be

6     sending it to only the Jewish communities.  And so my question

7     to you -- and it may be geographically bound, but is it only

8     sent to the Jewish communities?

9          MR. SCHICK:  I believe the question is:  Is it only

10    sent to Orthodox Jewish homes?  The answer would probably be

11    no.

12         THE COURT:  Do you believe -- has your client told you

13    that this publication is --

14         What is the target audience of this publication?

15         MR. SCHICK:  It's people who live within a certain

16    geographic area who presumably would then shop at stores that

17    service that geographic area, which would help solicit

18    advertisements from businesses that want to obtain customers

19    within that area.

20         But, your Honor --

21         THE COURT:  Half of this publication is -- I'm not

22    sure.  Is it considered Hebrew, or Yiddish?

23         MR. SCHICK:  Well, the letters used -- the letters are

24    the same.  The alphabet used is the same, your Honor.

25         THE COURT:  Okay.  The pictures are all showing

1    Orthodox Jewish community.

2    MR. SCHICK:  Your Honor, I'm not disputing that the

3    overwhelming majority of people within that geographic area are

4    going to be members of that community.  I'm just pointing out

5    that Mr. Mangas said straight out they deliver it to Orthodox

6    Jewish homes.  I don't believe that's correct.

7    But if we can move beyond that, your Honor.

8    THE COURT:  Yes, I think he should.

9    MR. SCHICK:  If we can move beyond that, your Honor.

10    There is no doubt that they're a publication that's

11    entitled to whatever First Amendment privileges exist.

12    Plaintiffs first took the position that because it's an online

13    publication -- I'm sorry -- that because it's a publication

14    that is supported by advertisements and not subscriptions, it's

15    not entitled to any such protections.  We went back and forth

16    with them on that.  They sort of withdrew that argument, and

17    now said because it's, you know, primarily advertisements.  I

18    don't think -- we don't think any of those things matter.

19    With respect to the two issues, two outstanding

20    issues, that they're seeking to compel, starting with the last

21    one with respect to rejected ads, we asked them, quite

22    specifically, "Do you have any information that would help us

23    to search for this?"  In other words, information could be

24    placed by or on behalf of a specific candidate or organization

25    or with respect to a specific school board election.  We said,

1    "Do you have any such information that would allow us to go

2    back and say, 'Okay.  There's an allegation that in the 2013

3    election or that this particular candidate or this particular

4    organization put in ads or sought to put in ads'?"  And they

5    said that's not their job, and so they came back with nothing

6    on that.

7              And again, with respect to the ads themselves, I know

8    that plaintiffs today lean quite heavily on Mr. Weber.  We were

9    not provided, of course, with the entire transcript of

10   Mr. Weber, but plaintiffs did append literally two pages as

11   Exhibit J of their letter.  And what I see there is a question

12   on Page 161, which is one of the pages they provided, a

13   question by a Ms. Elsner that says on Line 9, "Mr. Weber, today

14   we have gone through approximately 10 advertisements.  And you

15   testified that you weren't responsible for any of them.

16   Correct?"  and his answer appears on Line 13, and it says, "I

17   don't know.  I wasn't responsible for any of them?"  Question

18   mark.  "I don't remember."  Period.  "There was nothing that I

19   have done there?"  Question mark.  "the ones that you showed

20   today" -- comma -- "yes, that's correct.  I didn't do any of

21   them."

22             Now, I don't think that that snippet of testimony,

23   which in one paragraph of an answer goes back and forth between

24   what he remembers or doesn't remember with respect to any

25   particular ad and whether those ads were Community Connections

1    ads, when Mr. Mangas represented today that Mr. Weber

2    testified, again in the transcript that they didn't provide me,

3    but Mr. Mangas –– but Mr. Weber testified that he did use, and

4    his organization, Southeast Ramapo Taxpayers' Association, did

5    use –– did place ads in Community Connections.

6             And going beyond that, your Honor, this does raise the

7    issue, we're not involved in this case.  We're Docket Number

8    230-something, so there's a lot that's transpired before us,

9    and there's a lot that will transpire after us.  So these are

10   not our issues.

11            But it does seem that the idea of an advertisement

12   that's placed the week of the election by a candidate who's

13   decided to run or not to run, who's on the ballot already in

14   which there's an advertisement that says, "Vote for this

15   candidate" or "not vote for this candidate," whatever the

16   advertisement might say, and you know, it represents that it's

17   sponsored by a particular organization, if it's so represented

18   or not, that's all the information that's necessary for this

19   case.  It's hard to see how it involves slating, when it only

20   involves candidates who have already been chosen.

21            The ads say what they say.  Whether or not –– and I

22   have no idea what's beyond the ads.  We have not gone to look.

23   But whether or not a third party, whoever that may be, helped

24   pay for the cost of the ad says nothing to any message that a

25   voter received, says nothing to anything of any super secret

1      organization here.  A voter getting a message gets the message

2      in the ad that we have been produced -- that we have already

3      produced.  There is nothing that's communicated to a voter by a

4      credit card number that was offered after the election to pay

5      for the ad that was placed the day before the election.

6              So it really goes to none of the issues involved in

7      slating or anything else.  It is protected.  Community

8      connections is a publication.  They are trying to go into our

9      confidential files which will result a chilling effect

10     ultimately with respect to the communities, whoever it is,

11     interaction with this publication.

12             THE COURT:  Okay.  Let me just say something,

13     Mr. Schick.

14             I read the questions that were posed to Mr. Weber.

15     the question starts at 9 and the answer starts at 13, and the

16     following question at 18 and the answer that starts at 22, as

17     Mr. Weber saying that the ones that he was showed today he does

18     not know who's responsible for putting -- that he did not do

19     any of them, and that although they said they were sponsored by

20     him or his organization, they weren't.  So I think he's pretty

21     clear about what he's saying, that there are some of the ads

22     that he was shown that were not sponsored by him.

23             Now, we do have Mr. Mangas saying that not all those

24     ads were in Community Connections, but some were.

25             MR. SCHICK:  Well, if I could say, your Honor, if some

1   were, let them -- let them produce to us --

2          THE COURT:  Well, they have.  They've got -- they have

3   28 ads that they have from you.  And they want to know -- so

4   you're saying --

5          MR. SCHICK:  Let them ask Mr. Weber.

6          THE COURT:  -- if they ask for only Mr. Weber's ad

7   information, you would give that to them?

8          MR. SCHICK:  I'm saying, your Honor, if they said,

9   "Look.  We showed these three ads to Mr. Weber."  They don't

10  tell us how many of the ads.  We had produced -- I'm not sure

11  what date this deposition was.  Somebody can probably enlighten

12  us on that.  It does say the 15th of November.  I think we had

13  produced our ads by then.  So they have all of our ads.  If

14  they didn't show him all of the ads, that's on them.  They had

15  all of the, all 28 ads.  They had Mr. Weber I don't know for

16  how many hours.  I guess I could see what time it started.

17         THE COURT:  But how burdensome is it to give them this

18  information?

19         MR. SCHICK:  It's quite burdensome.  They have to go

20  back to 2010 to try to find through records.  So it's

21  burdensome just as a straight-up matters of figuring out what

22  payment was associated with what ad going back more than eight

23  years.  This goes back to, I think, May 2010.  So just straight

24  up on us, it's burdensome.

25         THE COURT:  So tell me about the rejection.  How is it

1    burdensome to ask whoever might have knowledge of it what --

2    "Had you rejected any ads?"

3            MR. SCHICK:  Your Honor, it's very hard to come with a

4    definitive response to, you know, sort of a hypothetical

5    negative.  You know, do I know if they're going to say --

6    because my concern here, given the "scorched earth" nature of

7    this, is, they're playing a game with us here.  Because I've

8    asked them, if they have somebody or some time frame or some

9    election or some candidate or some entity that tried to place

10   an ad.  And they said, "Not telling you."

11           And then I say, so I go back and I say, "Does anybody

12   remember, you know, rejecting an ad?"  Now, I don't know what

13   "rejecting an ad" means.  Right?  But let's say they're going

14   to come up with somebody who's going to say, "Oh, Ms. So-and-so

15   says she called one day, and she said, 'Will you take my ad,

16   you know, that says "Don't vote for Jews"? or something.  And

17   they hung up, or they didn't follow up.'"  I don't know.  So

18   without -- it's easy for me to ask that simple question, your

19   Honor.  But, of course, they don't want the question.  They

20   then want a legal representation that for a period of almost a

21   decade, nobody who worked there ever interacted with somebody

22   and rejected an ad for whatever reason.  Maybe the person said

23   they couldn't pay.  Maybe the person said they wanted to say

24   nasty things.  I don't know.

25           So if they would give me something to work with, it

1    would be easier.  But my fear is, given the way this case has

2    been litigated, that this is the beginning.  While they

3    represent as the end, "All we want is a representation from

4    Mr. Schick that there's no such rejection," what they really

5    want is us to say that, and then litigate further.

6                 THE COURT:  Okay.  Thank you, Mr. Schick.

7                 Mr. Butler or Mr. Levine, do you want to be heard?

8                 MR. BUTLER:  Just very briefly, your Honor.

9                 In our letter, we lay out --

10                David Butler for the District.

11                Your Honor, in our letter, we lay out the legal

12   argument.  And the reason why we're even entering into this

13   particular debate, the distinction that the plaintiffs ignore

14   between minority groups and minority-preferred candidates, as

15   set out in the case law, is just important for purposes of this

16   entire case.  And we lay that out in our papers.  I'm not going

17   to expand upon that now.  You've read it.  You understand that.

18                The other issue that I did want to talk about, though,

19   is one that really hasn't been addressed by either the

20   plaintiffs and, therefore, not by Mr. Schick, and that's the

21   issue of racial appeal.  It is alleged in plaintiffs' papers

22   with respect to ads that appear in Community Connections.

23                They try to bootstrap an argument that somehow because

24   certain ads allegedly make certain racial appeals, that is the

25   basis upon which they say it will be relevant and necessary and

1    appropriate for them to take discovery from Community

2    Connections, because they want to look into that further, see

3    who's doing it, who's sponsoring it, who's saying it, and so on

4    and so forth.  there's nothing that they have shown you,

5    nothing in any of the papers that they have appended to their

6    letter, that reflects a racial appeal.

7              We set out in our papers at Page 3 of our letter the

8    instances where "the other" is discussed, or where a particular

9    candidate is identified as being somehow wrong or improper or

10   against the Torah or against the Jewish people.  And we explain

11   exactly what it is.  And you know what?  Plaintiffs know that.

12   They know that full well.

13             They know that, for example, the Moster family, which

14   is an Orthodox Jewish family in Ramapo, is opposed, very

15   publicly, to certain aspects of Jewish communal education.

16   That's an open issue.  It's the subject of litigation in the

17   courts.  It's the subject of discussion in the District.

18   Everyone knows about this.  And for someone to put an ad that

19   says that the candidacy of Mrs. Moster is opposed by certain

20   aspects of the Jewish community, that has nothing to do with

21   race.  Nothing at all.  And for the plaintiffs to come into

22   court and say that those kinds of statements are reflective of

23   racial bias, racial appeal, and therefore in support of their

24   argument that somehow, there's a Voting Rights Act violation,

25   when members of the Orthodox Jewish community support certain

1    principles on policy, on tax and other issues, with not a

2    stitch of evidence to show anything racial, it's just

3    unacceptable.

4                    THE COURT:  Thank you, Mr. Butler.

5                    Counsel, do you want to respond?

6                    Hold on one second.

7                    (Pause)

8                    THE COURT:  Do you want to respond?

9                    MR. MANGAS:  Thank you, your Honor.

10                    Russell Mangas on behalf of the plaintiffs.

11                    Your Honor, I'll respond briefly to a couple of points

12    Mr. Butler made, and then a couple of other points that

13    Mr. Schick made.

14                    Starting with the issue of minority candidates versus

15    minority-preferred candidates, it's important, your Honor, to

16    take a step back.  And all of us understand that the Voting

17    Rights Act is intended to ensure that minority voters -- not

18    minority candidates, but minority voters -- have a fair

19    opportunity to vote for and elect representatives of their

20    choice.  Clearly, if the white community is able to identify

21    safe candidates that happen to be black or Latino and put them

22    up and deny minority voters, as opposed to candidates, the

23    opportunity to vote for someone else that they prefer, that's a

24    violation of the Voting Rights Act.  That's the issue that

25    permeates this entire case.  That's the issue that is a focus

1    of plaintiffs.

2            With respect to racial appeals in advertisements;

3    again, I'm going to take a step back.  And today, we spent most

4    of our time -- and I think the -- it's not the only basis for

5    the relevance of discovery.  The main basis, which we've talked

6    about extensively, is the issue of slating.  But in terms of

7    racial appeals, I'll point out two -- and then there's case

8    law -- we didn't have a reply on this, but there's case law

9    that says setting up an "us versus them" or a "that candidate

10   is not one of us," those are racial appeals -- those can be

11   racial appeals.

12           There are two in particular -- and I apologize,

13   because I don't have pen cites in front of me, but there's an

14   advertisement placed in Community Connections relevant to this

15   case that says, quote, "We must all come out and vote for our

16   community's candidates."  Full stop.  There's another that

17   says, "Do you know that as soon as the" -- quote -- "'preserve

18   Ramapo' candidates are elected" -- and those are referring to

19   minority-supported candidates -- "'preserve Ramapo' will try to

20   obtain all of your (unintelligible) information."  Question

21   mark.  Question mark.  Question mark.  And a graphic of a white

22   man watching his home being demolished.

23           But the important thing to keep in mind, your Honor,

24   is, we don't have to decide today whether that's a racial

25   appeal or whether that's admissible.  The issue today is

1    whether it's likely to lead to admissible evidence, and we've

2    certainly met the discovery standard.

3              Turning from those issues --

4              THE COURT:  I'm struggling with understanding the

5    relevance of the rejected ones.

6              MR. MANGAS:  The relevance of the rejected ones goes

7    to knowing whether a slating organization exists, but how it

8    works and who's involved.  And if you have a community circular

9    that reaches a large proportion of the white electorate, an

10   electorate which we can go back, you know, at least over the

11   last five years, and say has been sufficient to elect a

12   candidate.

13             THE COURT:  But a community circular, a newspaper,

14   they're allowed to, you know -- they don't have to put every ad

15   that comes before them.  They don't have to accept every ad

16   that comes before them.  So how is the ones rejected -- well, I

17   know it supports your argument that it's a -- you know, it's

18   only going to do the, you know, religious ads from -- you know,

19   that are going to target the candidates that are going to

20   support the community.  But if this circular rejects some of

21   them, so let's say they did.  You know, I still am struggling

22   with:  What does that really show you?  Why can't they do that?

23             MR. MANGAS:  Well, your Honor, just to be clear, our

24   argument is not that they can't do that, or that they're

25   legally --

1      THE COURT:  Okay.  So if they do do that, why is that

2   a problem?

3      MR. MANGAS:  Because that's evidence of not only is

4   there a slating organization, but this community circular is a

5   part of it.  So if you have a group of --

6      THE COURT:  But aren't you going to be able to get

7   that more through depositions of people in the organization?

8   You know, that's where you're going to find this information

9   out, you know.  Do you have evidence that they've rejected

10  anything?

11     MR. MANGAS:  Your Honor, I'm not aware of any evidence

12  that they've rejected an advertisement.

13     And just to correct the record, I don't believe that

14  my colleague, Ms. Elsner, told Mr. Schick that she's not

15  telling him of any.  I believe what she told him was that "We

16  don't have evidence of rejected advertisements to provide you

17  with."

18     The relevance of it, your Honor, is, if there is --

19  and we know for a fact that -- we want to call it a "slating

20  mechanism" or just -- whatever you want to call it, it's been

21  highly effective in mobilizing the vote for white-preferred

22  candidates.  I mean, across the board, the slate of

23  white-preferred candidates every year, each one of those people

24  gets almost exactly the same number of votes, with very little

25  variation.

1          So there is some mechanism in the community that's

2    enabling that and facilitating that.  It's a very abnormal

3    thing to happen in an election.  And it happens here in East

4    Ramapo every single year.

5          And so, your Honor, if there are a group of members of

6    the community who are responsible for vetting and selecting

7    acceptable candidates, and there is a circular who -- we have

8    testimony from Mr. Weber who believes is a very effective way

9    of mobilizing the vote and telling that community, whether you

10   want to call it the "Orthodox community" or the "white

11   community," they're all white, they're almost all Orthodox,

12   telling them, "Here's the candidates that you should go vote

13   for," and refusing to provide information or advertisements for

14   the minority-preferred candidates, it's highly probative of a

15   slating organization and its effectiveness.

16          THE COURT:  So how do you address Mr. Schick's concern

17   that, you know, it's overburdensome to find the rejected ones,

18   and he's concerned if -- you know, that you know, he's going to

19   ask someone, and they're going to say, "We haven't rejected

20   any," and then you're come up, you know, in the course of this

21   case, finding someone, who said, "Oh, yes.  I called, and they

22   said they wouldn't take my advertisement," and you know, then

23   they're like, "Ah-ha.  You withheld information," which is, I

24   think, a legitimate concern Mr. Schick has.  So how do you

25   address that issue?

1              MR. MANGAS:   So to the end, it's a burden portion of

2       that argument.   There's only one school board election a year.

3       We're not asking them to determine whether they've ever

4       rejected an advertisement --

5              THE COURT:   Yes, but I'm looking at a flyer that has a

6       tremendous amount of advertisements in it that -- .

7              How often is this produced?

8              MR. SCHICK:   Weekly, your Honor.

9              MR. MANGAS:   I believe it's every weekly.

10             THE COURT:   Every week.   That means the records that

11      they have ever things that, you know, might come in or might

12      not come in for this is probably large.   And I'm hearing from

13      an officer of the Court that -- and you heard during the

14      meet-and-confer that the records that they have, the way they

15      can do it, they don't have the ability to do it easily, that it

16      is too burdensome for them.

17             So I appreciate the fact that you have narrowed down

18      your request to try to make it less burdensome, but Mr. Schick

19      has a concern still, because he's worried about talking to

20      someone who may say to him, "No," and then there may have been

21      someone else who answered the phone and said something

22      different.

23             MR. MANGAS:   Well, your Honor, with all due respect to

24      that argument, I mean, these are -- this is clearly a very

25      hot -- the school board elections are a "hot button" issue in

1    the District and in the Orthodox community.  And I don't think

2    it is at all outlandish to expect that if whoever is in charge

3    for placing the advertisements at Community Connections got a

4    call from a candidate who is not one of the slate, who is

5    outside of the Orthodox community, and said, "Hey, I'd like to

6    place an advertisement for my own campaign" or "against the

7    campaign of the candidate you're advertising for," that

8    someone -- that would be burdensome to them.  I believe that

9    would be a fairly easy --

10              THE COURT:  Do you know if there is such a person

11    who's responsible for that?

12              MR. MANGAS:  We don't.  We haven't been provided that

13    information.

14              THE COURT:  Mr. Schick, how does the organization --

15              Mr. Levine, if you could put the microphone in front

16    of Mr. Schick.

17              No, you can stay there.

18              MR. SCHICK:  I'm sorry, your Honor.

19              I don't think there's any such single person.

20              And beyond that, Mr. Mangas in three moments said two

21    entirely contradictory things.  On the one hand, he's

22    essentially trying to make Community Connections at least a

23    part of the slating organization.  That's what he said.  On the

24    other hand, he's saying, people outside the slate are trying to

25    work with it.  We can't be both.  We're not either, candidly.

1    We're not either.  But everything I heard from Mr. Mangas gets

2    me more concerned, because that's what he said, we are part of

3    the slating process, you know.  And there's no basis for that.

4              And just to go one step beyond that, your Honor, each

5    of the ads that we produced, each of the ads, 28 ads, I

6    believe, was run the week of the school board election in May,

7    which means that the candidates had all been -- decided to run,

8    got themselves on the ballot.  The idea that an ad that

9    Community Connections ran in the several days leading up to the

10   election when the candidates had been chosen, that that somehow

11   deprived any candidate of the ability to run for office cannot

12   be true.  They had all decided whether to run, got their names

13   on the ballot or not, and then we decided -- you know, someone

14   ran an ad, either opposing -- somebody ran an ad in favor of

15   several candidates.  There's no way that that Community

16   Connections ad deprived anybody of any right.

17             And beyond that, more importantly in this case, since

18   we produced all the ads, there's no way that if there was a

19   third-party sponsor of the ad that was run in third-party

20   Community Connections newspaper, that that somehow would have

21   any impact on the slating process.

22             THE COURT:  You want to respond to that, Mr. Mangas?

23             MR. MANGAS:  Yes, your Honor.

24             I think that's actually very helpful information,

25   which is that the ads for the school board run during one week

1   in May prior to the elections.  So it's not a burdensome task

2   to say, you know, produce advertisements since 2010, go back

3   for the week before the school board elections for each of

4   those years that there's a school board election, inquire as to

5   whether there were any political advertisements for school

6   board that were rejected.  The notion that --

7              THE COURT:  I'm concerned.  I have the same concern

8   that Mr. Schick has.  You know, we're asking now for a memory

9   that goes back ten years, where if they don't have records of

10  rejection, if they don't keep the rejection records, I think

11  the memory is not reliable.

12             MR. MANGAS:  Your Honor --

13             THE COURT:  They're concerned that they may say "No,"

14  and then find out that you found someone who called and they

15  said "Yes," that they did tell them not to send it in, you

16  know, that there was a rejection.

17             MR. MANGAS:  So two things on that point, your Honor.

18             I mean, first, the notion that we've got someone who

19  called up and as part of the litigation strategy tried to place

20  some filthy ad or --

21             THE COURT:  No one's accusing you --

22             MR. MANGAS:  I can represent --

23             THE COURT:  I didn't say that.  Mr. Schick didn't say

24  that.  They're saying that you may have -- you have not come

25  across a fact witness yet that has said they have been

1    rejected.  But they're concerned, what if you bump into

2    someone -- you take a deposition of someone who says, "My ad

3    was rejected"?

4             MR. MANGAS:  Well, I can --

5             THE COURT:  And they don't have any recollection of

6    that, and it's a "he said, she said."

7             Now, they aren't saying you're creating that

8    information, but they're concerned with the reliability of

9    someone's memory.

10            MR. MANGAS:  So, your Honor, we would be satisfied if

11   instead of -- if they're not comfortable relying on the

12   institutional memory of the people that work there, if they

13   want to go back -- and we're willing to make it very narrow --

14   to a week or, say, two weeks before the school board

15   election --

16            THE COURT:  How many years are you willing to go back?

17   Ten is too many.

18            MR. MANGAS:  Why don't we say eight.

19            THE COURT:  For the rejections.

20            MR. MANGAS:  I would say eight for the advertisements

21   they've produced.

22            I mean, if there's a year they haven't produced an

23   advertisement, we could agree they don't need to do it for that

24   year.  But for the 28 they produced for those years --

25            THE COURT:  We're talking about rejections.  How

1  far —— I want to narrow the rejections.  I want to give you a

2  sampling.  Because I think it is burdensome.  I don't know what

3  kind of records they keep.  It doesn't sound like, you know,

4  they have these records easily accessible.  Or otherwise,

5  Mr. Schick would have said that you could get them.  On the

6  rejections alone —— that's all I'm focusing on right now —— I

7  want to do a narrow sampling of whether in that period they

8  rejected.

9          MR. MANGAS:  How about we go back to the five most

10  recent elections.  So it would be '13, '15, '16, '17, and '18.

11  And the two weeks leading up to the election, search the

12  documents and produce anything relevant to whether they've

13  rejected an advertisement.

14          THE COURT:  So what years do you want to go back?

15          MR. MANGAS:  '13, '15, '16, '17, and '18.

16          THE COURT:  And why did you skip '14?

17          MR. MANGAS:  There wasn't a contested election in '14.

18          THE COURT:  Okay.

19          MR. MANGAS:  And, your Honor, just to correct the

20  record, Mr. Schick made an argument that why we had their

21  advertisements before we deposed Mr. Weber, we could have put

22  those advertisements in front of him and we chose not to.

23  That's incorrect.  In fact, we deposed Mr. Weber on the morning

24  of November 15th.  Community Connections did not produce

25  advertisements until later that evening, after the deposition

1    was closed.  Mr. Weber was gone.

2             MR. SCHICK:  I'll just say two points on that, your

3    Honor.

4             The first is, they asked us to produce the documents

5    by the 15th, which is when we produced it.

6             The more important point --

7             So if they needed it that morning, they should have

8    told us, your Honor, because we weren't playing that kind of

9    game here.  They asked us for the 15th.  All the correspondence

10   shows that.  We produced it when they asked us.

11            More importantly, your Honor, what they're now saying

12   is, turns out they had Community Connections advertisements for

13   the school board all while they're litigating this, because

14   they had, they say, I don't know how many, they haven't said,

15   to put before Mr. Weber.

16            So again, it goes --

17            THE COURT:  Well, I'm sure if they spent the time

18   looking through the Community Connections book during that,

19   they might have been able to get them on their own.  This is

20   not private.  But we don't need to address that, because I'm

21   not getting involved in that.  You know, I'm not -- I see no

22   nefarious motives on malfeasance on anybody's side here.  I

23   think everybody is just zealously representing their client.

24            Here's what we're going to do.  I do believe, although

25   the -- I don't -- I don't know whether any of this evidence

1    will be admissible in the long run.  I do believe there's

2    enough relevance that I can deal with some of the

3    burdensomeness on the 28 ads that have been produced.  I'm

4    going to direct that Community Connections provide the

5    plaintiffs -- and, of course, the District, also -- with

6    information on who paid for and placed that ad.

7             MR. SCHICK:  Your Honor, if I can ask, limited to paid

8    for?  To go beyond -- again, I have no idea.  To go into

9    correspondence, again, of who might have placed means -- I

10   think if you look at their most recent letter, they limit it to

11   who paid for the ad.

12            THE COURT:  Yes, who paid for the ad.

13            MR. SCHICK:  Okay.

14            THE COURT:  And then on the rejections, if there's any

15   rejections, we're going to narrow that.  We're not going to go

16   back to '13.  We're going to '15 through '18, so '15, '16, '17,

17   and '18.  If there are any ads rejected for that week prior to

18   the election, when you typically -- you know I'm going to week

19   to two weeks, those ads you typically put in relating to the

20   school board, if there are any ads rejected.  And then whatever

21   information you can provide for leading to that -- I'm not sure

22   what you have, but if you have information that shows that

23   something was rejected, some correspondence or anything like

24   that, I'm going to ask you to produce that.  But if it's simply

25   a yes-or-no answer, as long as it's given by someone who has

1    knowledge and knows and can answer that question.  Okay?

2              MR. MANGAS:  Thank you, your Honor.

3              MR. SCHICK:  Your Honor, we'll look for any ads that

4    were sent in that might have rejected.  And I'll certainly ask

5    my client to look for them.  I don't know when that -- you

6    know, given their production schedule -- in fact, for the time

7    that I'm going to the West Coast, but I will ask them to look

8    for any ads that were submitted that were ultimately not run.

9    And then I will get back to counsel for both parties.

10             THE COURT:  What kind of time do you need?

11             MR. SCHICK:  I assume two weeks, just given my own --

12             THE COURT:  Yes.  No, that's I think reasonable.

13   Today is the 3rd.  To December 7th -- 17th.

14             MR. SCHICK:  If you make it the 18th, just get it in

15   on the schedule.

16             THE COURT:  Yes.  December 18th.

17             Thank you, Mr. Schick.

18             MR. SCHICK:  Thank you, your Honor.

19             (Pause)

20             THE COURT:  Okay.  The next issue is plaintiffs'

21   motion to quash subpoenas to Steve White and Catalist.

22             Is there anyone here on behalf of Catalist?

23             MR. MANGAS:  I don't believe so.

24             THE COURT:  And I don't believe I received any

25   separate objections on behalf of Catalist, just the District's

1   response.

2          Let's deal with Catalist first, because Catalist is

3   actually, I think, pretty easy.

4          The Catalist subpoena had a return to D.C.  I'm Just

5   going to ask the plaintiffs to address one thing.  Why do I

6   have jurisdiction?

7          MR. MANGAS:  Your Honor, Russell Mangas on behalf of

8   the plaintiffs.

9          Your Honor has jurisdiction to control discovery in

10  this case.  I think, in the interests of full disclosure, a

11  motion to quash was the wrong way to style the Catalist motion

12  initially.  We have since styled that as a motion for a

13  protective order.  And there is case law — and I can cite it

14  for you — that says your Honor has the ability to — in a

15  protective order, prohibiting discovery via subpoena in other

16  districts, and particularly in cases where it's important that

17  there be a consistent rule.  And the case I'm referring to is

18  another one of the Chevron cases, and it was privilege in that

19  instance, too.  And the Court issued an order prohibiting the

20  defendants from getting evidence via subpoena in other

21  jurisdictions.

22         THE COURT:  In my experience, I don't have

23  jurisdiction.

24         MR. MANGAS:  I would ask your Honor, to the extent

25  you're inclined to (unintelligible) it today that we get an

1    opportunity to brief that issue, because it would have been an

2    additional reply to some of their arguments.

3              THE COURT:  Mr. Butler or Mr. Levine?

4              MR. LEVINE:   This is Randall Levine for the District.

5              I agree with the Court that the Court does not have

6    jurisdiction to quash a subpoena issued from the District of

7    Columbia, where compliance is required in the District of

8    Columbia.

9              However, we don't want to undertake the additional

10   burden of opening a new matter in the District of Columbia any

11   more than the plaintiffs do.  There may be a way to cut to the

12   chase, which is that the plaintiffs have admitted in their

13   papers that they have the documents that we are seeking.  They

14   are simply withholding them on the basis of a privilege or

15   "work product" protection, that they have not explained.  And

16   they also have not served us a privilege log setting out

17   whatever documents they are that they say are privileged and

18   explaining the basis for withholding them.

19             So one way, perhaps, to avoid dealing with the

20   out-of-circuit subpoena would be for the Court to compel the

21   plaintiffs to produce the documents that they're withholding

22   or, at the very least, to compel them to produce a privilege

23   log so those documents can be reviewed in camera by the Court

24   to determine whether there is any sound basis to withhold them.

25             And Catalist can stay in Washington, D.C.  And if we

1    need to enforce the subpoena against them at some point later,

2    maybe we can.  But if we can get the documents directly from

3    the plaintiffs, that seems to be the faster way to do it.

4         THE COURT:  Okay.  Mr. Mangas, I want to hear from you

5    on it.

6         Because we have to deal with Mr. White, I think this

7    is what I'm going to do.  I am going to deny plaintiffs' motion

8    to quash, without prejudice, and — or here's what I'm going to

9    do.  I'm going to grant your request to withdraw this motion,

10    and I am going to allow you to move forward —- because I do not

11    have jurisdiction.  And I work very well with other magistrate

12    judges in other jurisdictions on these types of issues, where

13    it goes before them and we work together to get things quickly

14    done and back to where it belongs.  But in my experience, I do

15    not have jurisdiction over a motion to quash.

16         But since it sounds like you might have these records,

17    and it's really a privilege issue, I'm going to allow you to

18    make a motion for a protective order.  And I do believe I'm

19    probably going to have to look at the documents, too.

20         So I'm going to give you a briefing schedule on this,

21    because I want to also — one of the things that happens when

22    I'm looking to evaluate whether something is —- whether someone

23    is working in a capacity as a consultant or an agent or an

24    expert, is the relationship, because that's really what —- it's

25    very fact-specific, and letter briefs usually can't give me

1    enough factual information to make the determination.  Because

2    the first thing have I to do is determine what the relationship

3    is, and I have to determine what would be privileged in that

4    relationship.

5              So I'm going to give you a briefing schedule on the

6    protective order.

7              When do you think -- how much time do you --

8              MR. MANGAS:  Next Monday?

9              THE COURT:  That is --

10             MR. MANGAS:  And I have my phone on me.  I will tell

11   you.

12             THE COURT:  The 10th.

13             MR. MANGAS:  The 10th?

14             THE COURT:  December 10th.  Will that be enough time

15   for you to make sure that I have all the information I need,

16   you know, the motion and whatever affidavits you need in

17   support of that?  I don't want to hold this one up, because I

18   also know this is going to go and have some effect on expert

19   depositions which are coming up, I think, not this month, but

20   next month.  So we have a little bit of time, but I want to get

21   it briefed before maybe -- because I have a huge docket that

22   I'm dealing with.

23             MR. MANGAS:  Well, given that your Honor mentioned

24   affidavits at the end, that's a good point.  Could it be the

25   following week, 12/17?

1          THE COURT:  I'm fine with that.

2          Mr. Butler?

3          MR. BUTLER:  Can we respond by January 3?

4          THE COURT:  Yes.

5          MR. MANGAS:  Your Honor, will that cover the Steve

6    White?

7          THE COURT:  No.

8          MR. MANGAS:  Okay.

9          THE COURT:  No, we're going to deal with that in a

10   second.  It may, depending on how I rule on Steve White.  But I

11   want to deal with Steve White separately, and I want

12   Ms. Barbieri to have an opportunity to talk.  This is right now

13   just for Catalist.

14         MR. MANGAS:  Okay.

15         MR. BUTLER:  Your Honor?

16         THE COURT:  Yes.

17         MR. BUTLER:  I apologize for interjecting.

18         THE COURT:  No.

19         MR. BUTLER:  This is David Butler.

20         I just want to understand.  The brief that's coming in

21   from the plaintiffs, that's going to be their brief, their

22   affidavit and the privilege log?

23         THE COURT:  What I'm going to ask — yes, because I

24   can't decide privilege without a privilege log.  Because they

25   also, you know, need to understand what is being withheld.

1            What's your position on the privilege log?

2            MR. MANGAS:  Well, your Honor, I think that's quite a

3    burden to impose on a party for -- strictly for communications

4    with a consulting expert that postdate the filing of the

5    litigation.  I can't tell you off the top of my head today

6    exactly what that volume is.

7            THE COURT:  So this is what I'm going to do.  I'm not

8    going to require a privilege log in this case, because it's

9    consulting expert.  But if I should find that I don't believe

10   it's consulting expert --

11           And I do want you to produce the documents to me.  How

12   many are there?

13           MR. MANGAS:  You're asking me how many?  Your Honor, I

14   don't know.

15           THE COURT:  Give me inches.  Less than a box, please.

16           MR. MANGAS:  So a stack like that.

17           THE COURT:  Okay.  I'm going to ask that you produce

18   that ex parte to me.  Now, you're going to have to be very

19   thorough on the grounds in which you are withholding documents

20   so that the defendants can have a meaningful opportunity to

21   respond to that.  If I find, one, that he's not a consulting

22   expert around, or two, that there are documents in there that I

23   need a more specific type of analysis from the defendants, I

24   will then ask for a privilege log.  But on the first step, I'm

25   going to say no, given the fact that he was retained after, and

1    sounds like he may be a consulting expert.

2         But you need to give me enough of the facts for both

3    sides so that Mr. Butler and Mr. Levine really understand, you

4    know, the grounds.  Because these are very fact-specific

5    analyses that have to be done to determine whether documents

6    should remain attorney work product or not.

7         MR. MANGAS:  Understood, your Honor.

8         And I want to be very clear for the record.  While

9    Catalist is a consulting expert that was engaged by plaintiffs

10   to help them understand voter data and the racially polarized

11   voting analysis, they have provided one file, a 2017 voter file

12   with race data appended, to plaintiffs' experts in this case.

13   That file was disclosed to defendants.

14        THE COURT:  No, I understand that.

15        MR. MANGAS:  And that's the only file that --

16        THE COURT:  That you believe is fact-specific, and,

17   therefore they rest --

18        MR. MANGAS:  And that the testifying experts

19   considered and relied on.

20        THE COURT:  Yes.

21        MR. MANGAS:  So I actually want to be very clear.  I

22   don't want to misrepresent to your Honor --

23        THE COURT:  No.

24        MR. MANGAS:  -- that there's not any information

25   they've provided that's discoverable as a consulting expert.

1          THE COURT:  No, no.  You have —— you produced what you

2    believe is the factual basis, the factual data in which they

3    produced to the expert for the expert to rely on.  But there

4    are other things you have withheld that you believe are

5    attorney work product.  And that's what I wanted to focus this

6    motion on.

7          So Catalist —— this will be on Catalist only.

8    Plaintiffs' motion for protective order is due 12/17.

9    Defendant, the District's response is January 3rd.  The reply

10   is January 10th by the plaintiffs.  And I do want the ex parte

11   documents to come in on 12/17.  Okay?

12          MR. MANGAS:  Thank you, your Honor.

13          THE COURT:  Okay.  So now let's deal with Steve White.

14          So I did get them to stop doing their work for a

15   little over an hour, so I appreciate that.  But I don't think

16   we're going to get any longer.  But I think if it becomes truly

17   problematic, we'll call again.

18          So tell me, why are you withholding Steve White's

19   documents?

20          MR. MANGAS:  So just to be very clear, your Honor, we

21   are not taking the position that the District is prohibited

22   from getting discovery from Mr. White on who he's talked to,

23   what they said, what he said, events that have occurred in the

24   District.

25          Our objection is solely based on the communications

1    between Latham and the New York Civil Liberties Union and

2    Mr. White.  And also, I believe there may be -- I don't believe

3    any documents exist, but to the extent there are documents

4    within the control group of the plaintiffs and their attorneys

5    and Mr. White.  As your Honor is aware, the community and the

6    District have some fairly unique attributes, demographics,

7    issues that underlie these Voting Rights Act issues and the

8    school board elections, and might include to a certain

9    extent -- and Latham certainly is coming into that -- community

10   in that district uninformed about those dynamics and who the

11   players are and how they work and what the history is.

12          And so the plaintiffs, prior to filing the lawsuit,

13   engaged Mr. White as a consulting expert, to help them work

14   through some of that stuff and to understand the dynamics in

15   the District and who the different players were, and how these

16   elections operate and who participated in the slating

17   organizations, what kind of forms existed in the District, and

18   to get an understanding --

19          THE COURT:  I didn't see any letter attached that

20   retained Mr. White or showed the relationship that you have

21   with Mr. White.  How come you didn't attach that?

22          MR. MANGAS:  We have a consulting agreement, our copy

23   consulting agreement, that was given -- to provide to your

24   Honor.

25          THE COURT:  Why didn't you include that?

1          MR. MANGAS:   Because we didn't think we would have to
2    produce it.

3          THE COURT:   Why?

4          MR. MANGAS:   And we don't think -- see how it's
5    relevant.

6          THE COURT:   See.   Honestly, why is it not relevant?
7    Why wouldn't it be relevant, when I have to determine what kind
8    of relationship that it's had, whether it's truly a consulting
9    relationship with someone who has clearly been -- was a
10   plaintiff in another case, is clearly, you know, akin to a fact
11   witness, who -- you know, I don't see -- what is the difference
12   between going out and chatting with any other person in the
13   community to find out what they know and doing your due
14   diligence and the investigation, pre-investigation, on this?
15   You know, Mr. White -- I don't have a CV on him.   I don't have
16   a résumé on him.   I don't have --

17          Did you pay him?   I don't have any invoices?   Did you
18   pay Mr. White?

19          MR. MANGAS:   I'm not positive about that.

20          Do you know?

21          No, he's not paid.

22          THE COURT:   So I have to tell you that there's some
23   concern with this consulting agreement put into place in order
24   to protect the communications you have with him when he's not
25   really an expert.   What is he interpreting that your plaintiffs

1   can't tell you themselves?  Like what is he giving you that

2   makes him truly an expert?  Has he ever been an expert,

3   declared an expert?

4           MR. MANGAS:  Not to my knowledge, your Honor.  But to

5   be clear, he's not a testifying expert.  He is a consulting

6   expert --

7           THE COURT:  Doesn't matter.

8           MR. MANGAS:  -- in this case.  But no, he's not a --

9           THE COURT:  What makes him an expert?  What makes him

10  different than just someone in the community who has knowledge?

11          MR. MANGAS:  For all the reasons the defendants cite

12  in their brief.  He is one of the prime activists and been

13  members involved in the school board elections.

14          THE COURT:  Fact witness.  Sounds a lot like a fact

15  witness.

16          MR. MANGAS:  Your Honor, they're entitled to depose

17  him as a fact witness.  But if they want -- what they're trying

18  to do here is just --

19          THE COURT:  But how does every conversation you have

20  with him get protected?  Just because you have a paper saying

21  he's going to be a consultant?

22          MR. MANGAS:  Because we engaged him as a consultant to

23  help us understand and to inform our litigation strategy.

24          THE COURT:  Yes.  Okay.  There was what -- we're

25  not -- because we have been here a long time.  I have serious,

1    very serious doubts.  I do not want to support law firms on

2    basically limiting the amount of discovery an opposing party

3    can get by simply finding someone in the community who has

4    previously been an advocate or a, you know, concerned citizen,

5    and basically saying, any conversations you have with them

6    become privileged, simply by signing a consulting agreement

7    with them.

8              But I firmly believe that this goes in the same

9    category as anything with attorney client to be work-product

10   privileges which I believe are very fact-specific.  And I don't

11   believe -- this is the one area that I do not usually decide on

12   letter motions, because I don't believe the letter motions can

13   give me enough information, enough factual information.  I

14   don't believe that if I denied or, you know, granted their

15   ability to -- or deny your motion to quash, that I would have a

16   sufficient record before Judge Seibel to do so.

17             So to answer Mr. Levine's question, that schedule now

18   will include -- and if we need to adjust it -- need to include

19   Mr. White, because I need to examine the relationship and the

20   agreement and the case law on whether this is truly a

21   relationship that would warrant the protections of the

22   "attorney work product" privilege as it relates to having

23   consulting experts.  I certainly do not want to -- I respect

24   that privilege.  I think it's an important one to have.  But

25   it's important -- it's not -- it's a qualified privilege.  It's

1    not absolute.  And it's also important not to extend it more

2    than it needs to be.

3              Mr. Levine.

4              MR. LEVINE:  Yes.

5              Your Honor, there's another practical issue that I

6    just wanted to make sure was addressed, which is that there was

7    a document collection from Mr. White and from his wife,

8    Mrs. White, ongoing, though stopped in the middle, so nothing

9    was obtained.  However, the plaintiffs now have sort of

10   injected themselves into the discovery process, and are

11   undertaking that collection from Mr. and Mrs. White themselves.

12             Are we going to get those documents?  Are we going to

13   get a privilege log of documents that are withheld?  How is

14   this supposed to work practically, and when can we expect to

15   see these documents?

16             It's especially important also, because I'll note,

17   while they have their claims of privilege and work product

18   associated with their communications with Mr. White, they have

19   none whatsoever with respect to Mrs. White.  And there's no

20   reason at all why they should be inserting themselves into that

21   process.

22             I mean, we'd also like to take a look at the

23   consulting agreement, as well.

24             THE COURT:  Well, I'm assuming it's going to be

25   part —

1          MR. MANGAS:  We'll attach it to our brief.

2          THE COURT:  -- of the papers.  If it's not, they're

3    going to have a problem supporting their argument.

4          I want to let Ms. Barbieri, who has just stood up, to

5    also respond to this.

6          But if you could respond to Mr. Levine's question.

7    Because I'm sure there are records that are not protected by

8    the privilege.

9          MR. MANGAS:  Sure, your Honor.  And then, I'll turn

10   over to Ms. Barbieri for the bulk of that.

11         What I can say is that we were concerned when we found

12   out the District had gone in and grabbed some portion of

13   documents that may contain our privileged -- our work product

14   that we're asserting privilege over.  And so we asked -- and

15   it's one thing we haven't discussed today -- that they either

16   return or destroy what they've presently collected.  And we've

17   agreed to -- we've collected the ESI now from the Whites, and

18   we've agreed to process it on their behalf and turn it over to

19   Ms. Barbieri so that she can review and produce.  The only

20   thing that we're asking is that we have a chance to maintain

21   our work-product privilege while that occurs.

22         My understanding is that the search terms that the

23   defendant asked for included things like the name White, and so

24   it was returning hundreds of thousands of documents.  I know

25   that there's been some conversation to whittle that down, but

1    I'll turn that over to Ms. Barbieri and let her discuss that.

2              THE COURT:  So let me just ask Mr. Levine one quick

3    question.

4              Do you — in the aborted discovery retention process

5    that had begun, do you have documents?

6              MR. LEVINE:  No.  And they know we don't.  They said

7    so in their letter, that, you know, the vendors that were sent

8    to the Whites have told the Whites that there was some

9    technical problem.  This hasn't worked.  We're going to have to

10   come back later.  And that's when they got kicked out.

11             THE COURT:  So it's not an issue I have to deal with.

12             MR. MANGAS:  We're willing to accept the

13   representation the note that he is referring to as a note

14   that's specific to Emilia Whites' computer.  Our understanding

15   from the Whites was that there was some portion of information

16   that the vendor had managed to capture an image and then taken

17   with him.  If that's not the case, then there's nothing to

18   decide here, but that was our understanding.

19             THE COURT:  Mr. Levine?

20             MR. LEVINE:  To use the technical term, the vendor got

21   bupkis.

22             THE COURT:  All right.  Okay.  Ms. Barbieri, if you

23   could come up.

24             MS. BARBIERI:  Good afternoon, your Honor.  Nice to

25   see you.

1           THE COURT:  Nice to see you again, too.

2           So I know that you had been working with plaintiffs to

3    gather together the documents, and then to produce those that

4    were deemed nonprivileged.

5           MS. BARBIERI:  Yes.

6           THE COURT:  Is that process still ongoing?

7           MS. BARBIERI:  Yes, it is, your Honor.

8           As Mr. Levine represented, we did start with the

9    District.  The District was extremely generous in allowing us

10   to collect that information.  We got waylaid in the process

11   because of the type of collection the District wanted to do.

12   We had a misunderstanding with that process.  I believe my

13   e-mails laid out that misunderstanding fairly well, so I won't

14   belabor that point.

15          So my e-mails with Randy Levine laid out that

16   misunderstanding.  And I will say, from the Whites'

17   perspective, they were extremely upset at that process, because

18   their computers were taken apart.  They were put to a five-hour

19   ordeal.  And now I will say, Mr. White's computer does not

20   work.  And he is very concerned that that process had something

21   to do with his hard drive now not working, and does not know

22   what happened, whether the taking apart is in part responsible

23   for his hard drive not working now, or whether the Latham &

24   Watkins process is responsible for his hard drive not working

25   now.  But his hard drive is not working now, and he feels

1     completely victimized by this entire ordeal, being a

2     third-party witness and not having what he considers to be

3     sufficiently probative information to be subjected to this

4     entire process.  But he did want me to relay that to the Court.

5             THE COURT:  Well, he must have enough probative

6     information if he was being retained by plaintiffs' counsel as

7     a consulting expert.

8             MS. BARBIERI:  Yes.  Some information, yes.  I

9     suspect --

10            THE COURT:  They deemed him valuable.

11            MS. BARBIERI:  Yes.  Some information, yes.

12            So the process, as Mr. Mangas has represented, is now

13    in Latham & Watkins' hands.  We have -- we have the e-mails of

14    both Mr. White and Mrs. whites have been searched.  That

15    process has been accomplished.  And we have 99,000 documents,

16    both for Mr. and Mrs. White that have been isolated.

17            And as Mr. Mangas had represented, 55,000 documents of

18    Mr. White have come back with the term "White" as a result.

19    And so we have not with the District had an opportunity to meet

20    and confer about this issue.  And I'm confident, actually, that

21    the District and I will be able to work out how we're going to

22    modify those search terms accordingly, so that we can reach an

23    agreement as to further drilling down on the search terms, so

24    that we can get a reasonable number of hits and figure out how

25    we're going to work out "White."

1          THE COURT:  Who's going to produce the privilege log?

2          MS. BARBIERI:  What is going to happen is, Latham &

3   Watkins will review their privilege information with their

4   attorney-client privilege and work product under their name.

5          THE COURT:  Has that been culled out yet?

6          MS. BARBIERI:  Their name and their documents has been

7   separately searched.  My name, Laura Barbieri, Advocates, has

8   also been separately searched.  Although the District did not

9   ask for that term to be searched, I inputted it because of

10  Montesa.  And so we did Schwartz, as well, Mr. Schwartz's name,

11  as well.  And so we separately searched that name so that I

12  could more easily do a privilege log with respect to that

13  information.

14         I am also going to review Latham & Watkins'

15  information.  And I hope that, together, we will agree on what

16  is privileged and what is not privileged.

17         Ultimately, it's my responsibility to produce the

18  privilege log to the District, since it's our documents that

19  are being produced.

20         So although Latham & Watkins will have the first cut

21  of those documents, I'm hoping that we don't have any

22  disagreement with respect to the ultimate production.

23         THE COURT:  So what do we -- because we really

24  can't --

25         MS. BARBIERI:  What we're --

1    THE COURT:  I can't review a motion until I have a

2  privilege log.

3    MS. BARBIERI:  Understood.

4    THE COURT:  So was kind of type frame?  I know you

5  need to meet and confer again with the District.  What kind of

6  time frame are we looking at?

7    MS. BARBIERI:  And again, this is just with the

8  e-mails.  We still have the hard drives to be searched of both

9  Mrs. White and Mr. White.  And we have expedited the hard drive

10  search of Mrs. White, because as Mr. Levine has said, and as we

11  had previously agreed, Mrs. White's search is going to be much

12  smaller.  So we wanted to try to get Mrs. White's documents

13  produced to the District in a much expedited way.

14    In terms of time, just for the e-mails, I need to

15  consult with the Latham & Watkins, but I don't believe that

16  will be too much longer in order to expedite it with

17  meet-and-confer.  So I'm anticipating maybe --

18    THE COURT:  I'm sorry.  I didn't mean to interrupt.

19  Go ahead.  Anticipating maybe?

20    MS. BARBIERI:  -- two weeks.

21    THE COURT:  And what's the time frame on the hard

22  drives?

23    MS. BARBIERI:  The hard drive is a terabyte hard

24  drive.  And so we have identified the files that are going to

25  be searched.  We did that I want to say last Friday.  So once

1    those searches are run, then it's going to be document review.

2    The documents are quite numerous.  I'm thinking a month.  And

3    then the privilege log will have to be produced after that.

4         (Pause)

5         THE COURT:  Okay.  So counsel, what are your thoughts

6    on timing for that motion?

7         MR. MANGAS:  So my only concern, your Honor, is that I

8    know the hit counts for documents, I'll --

9         Oh, I should also say Russell Mangas on behalf of the

10   plaintiffs.

11        Your Honor, my only concern is, I know, it's an

12   enormous e-mail system.  And we mentioned there are

13   approximately a hundred thousand hits.  My understanding -- and

14   I can be corrected, because this process goes on -- is that

15   there are 1500 or so that hit on attorney names from either

16   Latham & Watkins or the New York Civil Liberties Union.  And so

17   I just want to make clear.  Is your Honor requiring us to do

18   that review and produce a privilege log of all those documents

19   along with the motion?

20        THE COURT:  Yes.  I mean, because we can't -- I can't

21   decide a motion and they can't, you know, oppose the motion

22   without seeing a privilege log.  So what do you think timing?

23   It's less than the other.  I mean, did Ms. Barbieri say they

24   were?

25        MR. MANGAS:  It's less than Ms. Barbieri asked from

1    you, that's correct.

2            THE COURT:  99,000 documents?

3            MS. BARBIERI:  We had -- I will say that we had

4    discussed with the District in the meet-and-confer potentially

5    narrowing the time frame for the review.  We originally had

6    reviewed a time frame from 2005 to 2018, and thought about

7    narrowing the time frame to 2012 to 2018, and the District

8    didn't say no, so . . .

9            THE COURT:  I'm not going to get involved in --

10           MS. BARBIERI:  Before we meet and confer.

11           THE COURT:  Yes.

12           MS. BARBIERI:  I understand.

13           THE COURT:  I want you guys to continue on in the

14   meet-and-confer process.  Understand that the nonprivileged

15   documents need to be produced.

16           MS. BARBIERI:  Understood.

17           THE COURT:  And you need to work together on --

18           MS. BARBIERI:  I appreciate that.

19           THE COURT:  -- pulling that stuff together.  And then

20   once -- and I think your privilege log on your documents

21   relating to your prior representation of Mr. White -- you need

22   to do a privilege log, but I also think that --

23           And I look to Mr. Levine and Mr. Butler.  Just nod

24   your head one way or the other.

25           -- that that, on a priority schedule, goes lower than

1  the production of the documents --

2          MS. BARBIERI:  Understood.

3          THE COURT:  -- and the privilege log for Latham &

4  Watkins.

5          Is that fair, counsel?

6          MR. MANGAS:  Yes.  We agree.

7          MS. BARBIERI:  Yes.

8          THE COURT:  So that needs to be done, but I don't want

9  that to hold up the production of the documents --

10          MS. BARBIERI:  Understood.

11          THE COURT:  -- or the production of the Latham &

12  Watkins privilege log.

13          MS. BARBIERI:  Understood.

14          THE COURT:  So continue on with that process.

15  Continue on this week with that process.  You know, continue to

16  make as much headway as you can.

17          MS. BARBIERI:  Yes, will do.

18          THE COURT:  And don't produce as many -- you know,

19  especially because the ESI may require either a process where

20  you have to kind of try some different words to see if you can

21  narrow the ESI.

22          MS. BARBIERI:  Absolutely.  We can do that.

23          THE COURT:  Okay.  Great.

24          So Mr. Mangas.

25          MR. MANGAS:  So I mean, a lot of this, I think, will

1   depend on these negotiations on the ESI and the size that set

2   ultimately is.  But (unintelligible) will take a significant

3   amount of time.  We're talking about just, you know --

4           THE COURT:  I'm just talking about your Latham &

5   Watkins ones.  Because that's your only one -- any documents

6   from Latham & Watkins are truly the only ones that you probably

7   can claim any kind of privilege to.

8           MR. MANGAS:  And my understanding, again, just

9   briefly, was informed on the initial set of doc counts, is that

10  it's well over a thousand documents to have.  It's not just

11  Latham, but also the New York Civil Liberties Union.

12          THE COURT:  Yes.  And I assume it's time frame.

13  Because you didn't retain him until 2017.  When was it?  Was

14  it -- we were speaking in May.  I don't know if the retention

15  was in May or later.

16          MR. MANGAS:  May, we began discussing the retention.

17  We signed the formal agreement in August.

18          I believe that's correct, your Honor.  I mean, I

19  haven't seen the date range of the documents, but I can't

20  imagine why there would be documents predating that.

21          THE COURT:  And maybe they didn't name the NAACP.

22          MR. MANGAS:  Could be with the NAACP or the New York

23  Civil Liberties Union.  I'm not positive.

24          THE COURT:  Yes.  So that may narrow -- I'm surprised

25  to hear there's a thousand.

1          (Pause)

2          MR. MANGAS:  Your Honor, I mean, I would ask for three

3    weeks to get those documents to you, because I think,

4    unfortunately, that puts us right past Christmas and we have a

5    bunch of people on the case that have travel plans and holiday

6    plans.  But if we could get three weeks, we will do our very

7    best to get it within three weeks.

8          THE COURT:  Okay.  This is what we're going to do.  On

9    Mr. White's documents, I want you to get the privilege log to

10   the District by January 2nd.  I'm going to request that the

11   parties meet and confer in the next week on that privilege log,

12   2nd to the 9th, to discuss, you know, if there's — if there

13   are documents that the District believes, you know, are not

14   privileged, or they need follow up questions, I want to give

15   you guys a week after getting it to have that discussion.

16         And then, do you want to set the motion schedule now

17   for this?  Because I know we're going to have to get a motion

18   for me to decide this, unless you can convince --

19         Mr. Butler, if you saw the consulting retainer

20   agreement, or Mr. Levine, would that be enough for you to

21   determine that this was a consulting expert, and you just want

22   to make sure that the documents that were being withheld were

23   truly privileged, or are you still going to want to have the

24   Court decide this issue?

25         MR. BUTLER:  We don't know.

1              THE COURT:  Okay.  This is what you're going to do.

2     You're going to produce them the consulting agreement.

3              MR. MANGAS:  We can do that today.

4              THE COURT:  Yes.  You're going to do it this week.

5              And then you're going to have the privilege log to

6     them on January 2nd.  By January 9th, you will have met and

7     conferred.  By January 11th, you're going to write to me and

8     let me know if you guys need this issue to be tee'd up to the

9     Court, and you're going to put in that letter a proposed

10    briefing schedule on it.  You're either going to tell me the

11    issue is moot and — or "We need to brief this."

12             MR. MANGAS:  Thank you, your Honor.

13             THE COURT:  Okay?

14        (Pause)

15             THE COURT:  Okay.  The final issue that I have on the

16    pre-motion letters deals with the District's motion for

17    Mrs. White's — to show cause why she failed to appear at a

18    deposition.  Can we get — can we deal with this quickly?

19             MR. BUTLER:  I think so, your Honor.

20             David Butler for the District.

21             If this issue was uncertain enough for Ms. Barbieri to

22    have to call Mr. Levine to say something, and she left a

23    message, "Call me," it was important enough or uncertain enough

24    for her to have to tell us that Mrs. White was not going to be

25    showing up for a deposition the next day.  Instead, nobody told

1   us.  We showed up.  We had a court reporter.  We expended time.

2   And she doesn't show up.  And then afterwards, we find out,

3   "Oh, you never returned my call, so I never told you that she

4   wasn't going to show up."

5          Our request here is not scorched earth.  It is very

6   modest.  We ask only to be reimbursed for the cost of the court

7   reporter having shown up and being sent home.

8          THE COURT:  What was the bust fee?

9          MR. BUTLER:  $178.  And that's all we're asking for.

10         And, of course, we also want an order directing her to

11  show up for a deposition.  But in terms of —

12         THE COURT:  I don't think you're going to need that.

13  She's going to show up once the documents are produced.

14         MR. BUTLER:  Okay.

15         THE COURT:  Ms. Barbieri, while you're here, do you

16  want to give a response to this?

17         MS. BARBIERI:  Yes, your Honor.

18         At no time did we ever agree to a deposition that was

19  before documents were to be produced.  At no time.  And Randy

20  Levine and David Butler knew this.  Every single one of my

21  e-mails was contingent on documents being produced.  And I

22  produced, I think, nine e-mails.  I can go through each of

23  those e-mails where every single one of them says, "Contingent

24  upon documents being produced, we will schedule that

25  deposition."  And even my e-mails say, "Tentatively, the 12th

1    of November.  Tentatively, the 12th of November, dependent on

2    documents being produced."  And when I called Randy Levine on

3    the 9th of November, I said, "Please call me about" --

4              THE COURT:  When was the deposition scheduled for?

5              MS. BARBIERI:  It was scheduled for -- originally, it

6    was --

7              THE COURT:  When did the bust happen?

8              MS. BARBIERI:  -- scheduled for the 16th of October.

9    And we had postponed that, because we were going to produce

10   documents.  And then thereafter, we had scheduled documents to

11   be produced contingent upon the deposition.

12             THE COURT:  What was the bust date?  What was the date

13   they showed up and paid --

14             MS. BARBIERI:  Say it again.

15             THE COURT:  What was the date they showed up and

16   Ms. White did not?

17             MS. BARBIERI:  November 12th.  That was Veterans' Day.

18             So in my e-mail --

19             Should I wait for you or --

20             THE COURT:  No.

21             MS. BARBIERI:  -- should I talk?

22             Okay.  So in my e-mail, which is the first e-mail that

23   I have appended to my letter, the e-mail on October 13th, which

24   is my first conversation recapping our conversations together,

25   I say, "We agree that it's likely that Emilia White's

1   deposition may precede Steve's, because the documents that are

2   going to be produced will be easier and faster."  That's Item

3   Number 7 on my October 13th e-mail.

4          Then, on my second e-mail that I appended, I say again

5   that "The collection process has been frustrated," that we

6   again are appending that e-mail, because we need the collection

7   to go first before any depositions are going to be taken.

8          We're arguing about collection again.  And collection

9   is going to precede depositions.  We're arguing about

10  collection before depositions.

11          And then, in Exhibit 5 regarding depositions, "As I

12  might have mentioned, Emilia White is off on Mondays.  It would

13  be a tremendous hardship for her to be deposed" --

14          THE COURT:  Which -- can you?  Which docket?  It's

15  217-1.

16          MS. BARBIERI:  Yes.  I am referring to my letter on --

17  to the District that is in response to -- it's dated

18  November 14th, 2018.

19          THE COURT:  That's fine.  Thank you.  Thank you.

20          MS. BARBIERI:  And so my Exhibit 5, which is the

21  November 2nd e-mail, I'm saying regarding depositions, "As I

22  might have mentioned, she's off on Mondays, so it would be

23  extremely hardship of hers to be deposed on any other day.  So

24  I propose the 12th, assuming documents can be reviewed and

25  produced in time."

1          And that e-mail goes on to say, "Laura, from Randall.

2    We will get back to you once we connect with our vendor and

3    check everyone's calendars regarding the suggested depositions

4    dates."  I'm sorry.  That was David.  "Let's tentatively

5    reserve 11/12 for Emilia, and 12/14 for Steve."

6          And then I respond, "Okay.  Assuming document

7    production and all, these dates are acceptable."

8          Again, my responses are always contingent on document

9    production.

10          And then with William Craven's e-mail on November 2nd,

11    after our meet-and-confer, which we had an extensive

12    meet-and-confer on document productions, he outlines our

13    meet-and-confer.  And on the date, Number 5 -- this is

14    Exhibit 6, dates for document production and depositions.  We

15    agreed that "The production of documents responsive to

16    subpoenas and depositions of your clients must be completed

17    before November 5th -- 19th."  That's when the Court's schedule

18    had been that all depositions had been -- had to occur before

19    the 19th.  So we were operating under that deadline.  So that

20    was the Court's schedule for the parties' depositions.

21          "You provided us with potential deposition dates for

22    your clients' depositions as soon as possible.  And if anything

23    in these e-mails does not accurately reflect our agreement,

24    please let us know."  So I wrote that.

25          Item Number 5 in my e-mail writing back, "These are

1    the Court's deadlines to the parties, as you have indicated. I

2    am out of the country on November 19th. I will endeavor to

3    complete document review as quickly as humanly possible, but

4    I'm not super human. I do have other obligations. I will try

5    to adhere to the schedule you are proposing as fast as

6    possible."

7            I also had put before that, "Should I" —- I was asking

8    whether I should bring a motion to quash based on the timing of

9    everything.

10           So I had decided not to do that, but I said, "I will

11   try to get this by October —- by November 19th as best as

12   possible." And that was with respect to the deposition dates,

13   as well as the document review.

14           I had made the same point —-

15           THE COURT: So this is —- this is what I'm going to do

16   on this one. I'm going to deny it. I believe that this was a

17   miscommunication. So I'm going to deny the District's motion

18   for the fee. But I am going to direct that Ms. White has to

19   appear for deposition after the production of her documents,

20   which I think was —- is your intention.

21           MS. BARBIERI: Thank you. Thank you, your Honor.

22           THE COURT: Okay. Anything further we need to deal

23   with today? Otherwise, I would like to look at a calendar and

24   schedule —- ask you when you think you need to come back.

25           (Pause)

1            MR. BUTLER:  Your Honor, this is David Butler.

2            In light of the fact that we have some scheduled

3    activity at the beginning of January, maybe it makes sense to

4    schedule something in the middle of January, just to see where

5    we're up to?

6            THE COURT:  I was thinking after the Catalist is fully

7    briefed by January 10th.  I'm looking at my calendar for

8    something.  I would say --

9            Ms. Hummel, how bad is the week of the 21st for me?

10           MR. BUTLER:  Can we do it the earlier week, your

11   Honor?

12           THE COURT:  The problem on that earlier week on the

13   14th, is, I don't know if I have any time.

14           Ms. Hummel, looking at the 14th or 16th, do I have --

15   or the 16th, do I have --

16          (Pause)

17           THE COURT:  And when you're looking at the afternoon,

18   you're looking at 2:00 p.m, or later?

19           Okay, counsel.

20           MR. BUTLER:  Seems to work for everyone here, your

21   Honor.

22           THE COURT:  2:00 p.m., on the 16th?

23          (Pause)

24           THE COURT:  Okay.  So we will meet on January 16th.

25           I may have questions for you on the motions if I have

1    a chance to at least quickly look at it prior to that, because

2    we'll get them in on the — post them in on the 10th.  So keep

3    that in mind.  Okay?

4              ALL COUNSEL:  Thank you, your Honor.

5              THE COURT:  Have a good day.

6                        –   –   –

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25