# Exhibit 3

**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

NATIONAL ASSOCIATION FOR THE
ADVANCEMENT OF COLORED PEOPLE,
SPRING VALLEY BRANCH; JULIO
CLERVEAUX, CHEVON DOS REIS; ERIC
GOODWIN; JOSE VITELIO GREGORIO;
DOROTHY MILLER; HILLARY MOREAU;
AND WASHINGTON SANCHEZ,

                Plaintiffs,

    v.

EAST RAMAPO CENTRAL SCHOOL
DISTRICT AND MARYELLEN ELIA, IN
HER CAPACITY AS THE
COMMISSIONER OF EDUCATION OF
THE STATE OF NEW YORK,

                Defendants.

17 Civ. 8943 (CS) (JCM)

## EXPERT REBUTTAL REPORT OF
## MATTHEW A. BARRETO, PhD. & LOREN COLLINGWOOD, PhD.

## EXPERT REBUTTAL REPORT OF
## MATTHEW A. BARRETO, PhD. & LOREN COLLINGWOOD, PhD.

### I.     SCOPE OF WORK

1.     We filed our Preliminary Expert Report on July 29, 2018 (the "Preliminary Expert Report") and our Expert Report on September 14, 2018, which incorporated the opinions expressed in our Preliminary Expert Report in the Appendix B.  We refer to all of our prior opinions in this case as they were set-forth in in the September 14, 2018 Expert Report ("September 14 Report").

2.     On October 26, 2018, Defendant East Ramapo Central School District (the "District" or "East Ramapo") submitted the Expert Report of Dr. John Alford ("Alford Report"), which readopted and reaffirmed and include as exhibits (a) the February 19, 2018 Declaration of John Alford ("Alford Report, Ex. A"), and (b) the March 28, 2018 Affidavit of Direct Examination of Dr. John Alford ("Alford Report, Ex. B").

3.     We submit this report in rebuttal to Dr. Alford's October 26, 2018 submission and in supplement of the opinions expressed in September 14 Report.

### II.    SUMMARY OF REBUTTAL TO ALFORD

4.     In Dr. John Alford's report of October 26, 2018 he summarizes his conclusions as three main points: (1) First that the evidence does not support a conclusion of Black and Hispanic voter cohesion per the second *Gingles* precondition[1]; (2) Second the evidence does not support a finding of legally significant racially polarized voting in the District per the third

---

[1] *Thornburg v. Gingles*, 478 U.S. 30, 51 (1986).

*Gingles* precondition[2]; and (3) Third, that White voters are cohesive in their voting patterns, and that they have supported candidates who are racially White, Black, and Hispanic.

5.      Dr. Alford's report also offers a cursory response to the parts of our analysis that address several of the factors identified by the Supreme Court in *Thornburg v. Gingles* as relevant to the totality of the circumstances analysis in assessing a vote dilution claim. Across each of the factors that we document, Dr. Alford generally asserts that either there is insufficient data available for us to draw conclusions or that our analyses do not contain enough data specific to East Ramapo to support our conclusions. Dr. Alford does not draw any contrary conclusions—he only suggests that it is not possible to draw conclusions based on the available data. For example, we conclude in our September 14 Report (and reaffirm in this report), that there is racially-polarized voting in East Ramapo, in that Black and Latino voters are politically cohesive both within and across groups and their preferred candidates are usually defeated by a large White voting bloc. In contrast, Dr. Alford concludes only that it *is not possible to determine* whether racially polarized voting exists in East Ramapo, and makes no finding that it does not exist.[3] We disagree and we rebut each of his points in detail below.

6.      We and Dr. Alford agree that White voters in East Ramapo are cohesive and vote as a unified bloc. All of the analyses from Plaintiffs' and Defendant's experts conclude that White voters, who represent a majority of voters, vote together at very high rates, and have voted

---

[2] *Id.*

[3] *See, e.g.,* Alford Report Ex. A, ¶ 50 ("The wide confidence intervals associated with my EI estimates make it impossible to use the EI analysis to draw any conclusions relating to racially polarized voting.")

in support of every single candidate who has been successfully elected to the East Ramapo Central School District Board of Education (the "Board").

7.    Given the high degree of cohesiveness among White voters, we can conclude with statistical certainty that non-White voters are providing majority support to the candidates that have lost every single election since 2013. Looking at the official tallies of how many votes the winning candidates received, and given the majority support among Whites for those candidates, it is mathematically impossible that non-Whites also voted in majority support for those same candidates.

8.    Dr. Alford agrees with us that using CVAP data can be less reliable to estimate Black and Latino voting patterns than using data on people who actually voted. Using data that allows us to more precisely estimate the number of Black and Latino voters who actually voted in each election, we find conclusive evidence that both Blacks and Latinos consistently vote cohesively both within and across these minority groups in support of candidates who have lost every single contested election since 2013. Moreover, since we submitted our September 14 Report, we have received voter history data on 2015 that has allowed us to analyze data on actual turnout for that election, as well. As we explained in paragraph 7 of our September 14 Report, voter history data for 2015 were not available at that time due to an error in the 2015 voter file received from the District.

9.    Dr. Alford does not perform any statistical test to determine if the vote choice estimates for Latinos and Blacks were statistically different from Whites. Instead, he only points to the confidence intervals for these estimates to assert that the estimates are unreliable. But drawing attention to the confidence intervals alone does not prove that the estimates are

unreliable, as the confidence intervals simply provide a probability distribution for the estimates. Across the 14 District election contests that we have analyzed for Black and Latino voters, all 14 contests yield vote estimates of majority-support both within and across these minority groups for candidates who lost.

10.     With regard to the opinions we expressed regarding Senate Factors 3, 4, 5, and 7, evidence that has become available since we submitted our September 14 Report only reinforces our conclusions on each of these factors. To begin, Dr. Alford admits: "I did not perform an independent analysis of the Senate Factors," but asserts that he "did review [our] analysis of those factors," and disagrees with our conclusions regarding Senate Factors 3, 5, and 7.[4]  On Senate Factor 4, Dr. Alford did conduct analysis of the slating process; however, that independent analysis appears to be his review of the complaint and a report submitted by Dr. Steven Cole earlier in this case.[5]

●     On Senate Factor 3, Dr. Alford does not dispute the presence of discrimination
       enhancing election practices in District elections.  Instead, he only claims that
       there is insufficient evidence to assess the impact of those practices on Black and
       Latino voters.  Although the academic literature is clear that the practices we
       identify negatively affect minority voters, that conclusion is supported by the low
       minority turnout and lack of success of minority preferred candidates in the
       District that we demonstrate in our September 14 Report, as well as evidence that
       has become available since we submitted that report on the lack of Spanish-

---

[4] Alford Report, p. 28.

[5] Alford Report, p. 26-28, nn.35-36.

language election assistance and on the relative inconvenience of polling places for minority voters.

- On Senate Factor 4, whether minorities are excluded from the candidate slating process, as we stated in our September 14 Report, evidence from nominating petitions and campaign finance disclosures, of two-candidate elections and repeat voting patterns in the District make clear that minorities are generally excluded from the District's dominant candidate slating process, which ensures the election of White-preferred candidates in every election.  In addition, evidence that has become available since we submitted our September 14 Report, including deposition testimony from several current and former Board members and candidates for the Board, is also consistent with our conclusion.  Specifically, depositions of current and former Board members and candidates for the Board, which shows that the minorities who have been elected to the Board are "'safe' minority candidates" as described by the Supreme Court in *Gingles*.

## III.   DATA ON RACE OF ACTUAL VOTERS IS THE MOST PROBATIVE AVAILABLE DATA FOR ANALYZING RACIAL VOTING PATTERNS IN THE DISTRICT

11.   Dr. Alford agrees that CVAP estimates of Black and Latino voters are not as reliable as using data on the actual people who voted.  In a prior report, labeled Exhibit B, Dr. Alford writes: "The problem with [using CVAP to analyze racially polarized voting] is that it assumes, without justification, that racial groups vote in proportion to their size—i.e., that if Blacks comprise 30% of the voting age population, then 30% of the votes cast in the election will

be cast by Black voters. In fact, studies have disproven that assumption."[6] He continues in the next paragraph of his earlier report that the problems and solutions to the CVAP issue are outlined in a published research study that we contributed to: "The problems associated with using CVAP as a proxy for turnout are well recognized in the literature. The problem, as well as potential solutions, are described in considerable detail in Bernard Grofman & Matt A. Barreto's *A Reply to Zax's (2002) Critique of Grofman and Migalski*."[7]

12. Dr. Alford agrees that a solution to obtain more reliable vote estimates for minority voters is to use surname matching, when he writes that researchers studying ecological inference "could have estimated voter turnout by race using surnames and voter sign-in records, rather than CVAP estimates. Any of these methods would help account for the flaw in CVAP data."[8] In his most recent report, Dr. Alford further agrees stating that "a Spanish surname list produced by the Census Bureau can be used to code registered voters as Hispanic or non-Hispanic."[9]

13. There is no requirement to use CVAP data to produce vote choice estimates. It is widely accepted that social scientists should use the most accurate population measure available to approximate the actual population that voted.[10] As Dr. Alford and many others have noted, CVAP includes all potential eligible voters, which in the case of East Ramapo includes over

---

[6] *See* Alford Report, Ex. B, p.7, ¶ 25

[7] *See* Alford Report, Ex. B, p. 7, ¶ 26 (emphasis added).

[8] *See* Alford Report, Ex. B, p.8, ¶ 26.

[9] *See* Alford Report, p. 9.

[10] Grofman, Bernard and Matt Barreto. 2009. "A Reply to Zax's (2002) Critique of Grofman and Migalski (1988): Double Equation Approaches to Ecological Inferences" *Sociological Methods and Research*. 37 (May)

60,000 total people.[11]  However, in the District elections we analyzed, only around 9,000-14,000 people voted.  As a social scientist, Dr. Alford agrees that CVAP is not as useful or reliable for accurately measuring racial voting choice as data on people who actually voted.

14.    Whether or not Dr. Alford is *aware* of any other experts who have relied on BISG, Catalist data, or surname analysis in voting rights cases to ascertain more accurate data on the race or ethnicity of voters is immaterial to whether or not the data are more accurate.  They are.  Social science is always improving and making advancements in our ability to understand and quantify voting patterns by race and ethnicity. Indeed, a critique that Dr. Alford repeatedly leveled against Dr. Cole in his initial report was that Dr. Cole's EZI technique for measuring racial voting choice was "outdated" and that newer methods of ecological inference are now used.[12]  Throughout his report, Dr. Alford fails to point to any quantitative evidence that the BISG or Catalist data are incorrect or inaccurate, only that he is not aware of another vote dilution case using them—with the exception of a case brought by the United States Department of Justice against the at-large method of election in the City of Eastpointe, Michigan.[13] However, Dr. Alford's role is that of a social scientist, and he agrees that within social science these techniques are commonly used and held in high regard.[14]

---

[11] *See* Alford Report, p. 8, Table 1.

[12] *See* Alford report, Ex. A, ¶¶ 15, 25, 27, 28.

[13] *See* Alford Report, p. 13; *see United States v. City of Eastpointe*, 4:17-cv-10079-TGB-DRG (E.D. Mich.).

[14] In previous cases, Dr. Alford has been complimentary of ecological inference techniques that relied upon matched surname data to data on actual voter turnout to estimate racial vote choice. *See, e.g.,* Expert Report of Dr. John Alford in *Perez v. Perry*, 5:11-cv-00360-OLG-JES-XR, ECF No. 223-2, at 11 (S.D Tex. Aug. 11, 2011) (referring to plaintiff's expert's analysis as "us[ing] the best combination of modern statistical techniques and quality data" where expert "obtained

15.     While it is true that we have relied on CVAP data in previous research for both academic and legal purposes, our goal as social scientists is to conduct our analyses with data that most closely approximate the "real world" of how voters of each race actually voted in each precinct based on the *available* data that are most accurate and provides the necessary precision to the researcher doing the analysis. In instances where there are many more data points available, or before BISG techniques had been developed, scholars may have had to rely on CVAP data because CVAP may have been the only data available. Additionally, if the dataset is large and contains considerable variation, CVAP can be appropriate for providing those estimates.

16.     As social scientists, we understand that the type of data and analysis that are most appropriate to a particular case study will vary based on the quality and quantity of the available data in the circumstances of the particular jurisdiction we are studying. In this specific instance, because East Ramapo has consolidated precincts from over 70 in use during general elections run by the Rockland County Board of Elections, to only 10 or 13 in school board elections run by the District, we have fewer data points to work with, and thus we seek more precise data on the race or ethnicity of the voters in each precinct through BISG. Dr. Alford does not provide any statistical analysis or evidence that the use of a more precise variable on the race/ethnicity of voters in each precinct is wrong or inaccurate.

17.     Estimating individual-level racial background using the BISG approach requires relying upon the Bayes statistical theorem. This theorem lets us update our initial race prediction

_____

data on the percentage of turned out vote with Spanish surnames . . . to deal with the problem that the turned out voting population does not equal the registered population").

9

– based on surname – with additional information (geographic location).  BISG relies on Census surname lists – which assign probabilities that any one individual is of a certain race based on their surname.[15]  We also know the racial demographics of an individual's Census location (i.e., block), that update our initial racial estimate based on surname.

18.    Research into the accuracy of surname matching and BISG is well established in a wide array of disciplines, ranging from health services research, epidemiology, to political science.[16]  While surname matching alone can perform well amongst populations of people with surnames that almost entirely relate to a particular group (e.g., for Hispanics and many Asian nationalities)[17], the combination of surname with geography vastly improves the accuracy for racial group identification overall (Imai and Khanna 2016; Edwards, Esposito, and Lee 2018).

---

[15] *See* Word, David L and Colby Perkins. 1996. "Building a Spanish Surname List for the 1990s – A New Approach to an Old Problem." Technical Working Paper No. 13. U.S. Bureau of the Census.

[16] Elliott, M.N. Freemont, A, Morrison, P.A., Pantoja, P, and Lurie, N. 2008. "A new method for estimating race/ethnicity and associated disparities where administrative records lack self-reported race/ethnicity." HSR: Health Services Research, 43(5).; Elliott, M. N., Morrison, P. A., Fremont, A., McCaffrey, D. F., Pantoja, P., and Lurie, N. 2009. "Using the Census Bureau's surname list to improve estimates of race/ethnicity and associated disparities." Health Services and Outcomes Research Methodology 9(2): 69–83;. Imai, Kosuke  and and Kabir Khanna. 2016. "Improving Ecological Inference by Predicting Individual Ethnicity from Voter Registration Records." Political Analysis. 24(2).; Adjaye-Gbewonyo, Dzifa, Robert A. Bednarczyk, Robert L. Davis, and Saad B. Omer. 2014. "Using the Bayesian Improved Surname Geocoding Method (BISG) to Create a Working Classification of Race and Ethnicity in a Diverse Managed Care Population: A Validation Study" HSR: Health Services Resaerch. 49(1)

[17] Perkins, R.C. 1993. "Evaluating the Passel-Word Spanish surname list: 1990 decennial census post enumeration survey results." US Bureau of the Census.; Abrahamse, Allan F, Peter A. Morrison, and Nancy Minter Bolton. 1994. "Surname analysis for estimating local concentration of Hispanics and Asians" Population Research and Policy Review. 13(4).; Lauderdale, Diane S., and Bert Kestenbaum. 2000. "Asian American ethnic identification by surname." Population Research and Policy Review. 19(3).; Choi, Bernard, J. G. Hanley, Eric J. Holowaty, and Darlene Dale. 1993. "Use of Surnames to Identify Individuals of Chinese Ancestry." American Journal of Epidemiology. 138(9); Morrison, P. A. and C. D. Coleman. 2001. "Using first names to estimate racial proportions in populations." Paper Presented at the Population Association of America Annual Meeting, Washington D.C.

Adding geography to race prediction can be effective because people of the same race/ethnicity tend to live near one another. By combining geographic data from the lowest possible unit of analysis (Census block), we can more accurately classify people who we might have otherwise classified incorrectly based on surname alone[18]. Overall, the findings indicate BISG is the best available method for estimating individuals' race/ethnicity. For example, Elliot et al. (2008) find that BISG is "74 percent more efficient than geocoding alone…and 56 percent more efficient in estimating the prevalence of racial/ethnic groups, outperforming the non-Bayesian hybrid on both measures (p. 1722)."

19.    Research indicates that BISG-backed ecological inference is more accurate than CVAP EI analysis. This is because BISG-backed EI estimates voting behavior among people who actually voted, where CVAP estimates voting behavior among people who are merely eligible to vote. For example, using a voter file that reports race in Florida elections, Imai and Khanna (2016)[19] show how BISG reduces overall error rates relative to using CVAP by comparing EI estimates to the actual counts. Their R package wru, which we use, has now become widely used in political science as the go-to technology for voter file/candidate race estimation.[20]

---

[18] Shah, Paru and Nicole Davis. 2017. "Research Note: Comparing Three Methods of Estimating Race/Ethnicity." Journal of Race, Ethnicity, and Politics.; Fraga, Bernard. 2018. *The Turnout Gap: Race, Ethnicity, and Political Inequality in a Diversifying America*. New York: Cambridge University Press.; Imai and Khanna 2016.

[19] Imai and Khanna, 2016

[20] Fraga 2018; Shah and Davis 2017; Henninger, Phoebe and Meredith, Marc and Morse, Michael. 2018. "Who Votes Without Identification? Using Affidavits from Michigan to Learn About the Potential Impact of Strict Photo Voter Identification Laws." Available at SSRN: http://dx.doi.org/10.2139/ssrn.3205769; Einstein, Katherine, Palmer, Maxwell, and Glick, David. 2018. "Racial Disparities in Housing Politics: Evidence from Administrative Data"; Crabtree, Charles and Chykina, Volha. 2018. "Last Name Selection in Audit Studies." Sociological Science.

11

## IV.   CLEAR EVIDENCE OR RACIALLY POLARIZED VOTING

### A.   *GINGLES* PRECONDITION 3: WHITE VOTERS ARE COHESIVE

20.     We start with *Gingles* precondition 3 and work backwards because Dr. Alford's analysis and our analysis are in clear agreement that White voters in the District vote cohesively at a high rate in every election. In every single table produced by Dr. Alford in his prior report, and in this more recent report, he concludes that all analysis points to cohesive bloc voting by the White majority, writing: "All of the results from all of the data sources and all of the methods show the same stable level of 70-80% white support for one candidate in each contest."[21]

21.     This establishes an important baseline for analyzing voting patterns in the District. If we take the White vote choice as accurate and reliable, we have an indisputable basis for estimating minority vote choice.  Dr. Alford agrees that the White vote choice estimates produced by the ecological analyses are reliable and contain narrow confidence (or credible) intervals.  Given White voting patterns, we can turn back to what Dr. Alford calls the "Election Algebra."  While Dr. Alford calls this technique "novel" for a voting rights case, the Election Algebra is a very simple, straightforward, and useful calculation to gain more information about minority vote choice.  Dr. Alford does not dispute any of the calculations or formulas we provide—he only points out that he has not personally seen them used before in a voting rights case.[22]

22.     To further illustrate why the Election Algebra is so valuable, we summarize the major implications using Dr. Alford's own EI RxC estimates of White voter cohesion in one

_____

[21] Alford Report, p. 23.
[22] Alford Report, p. 15.

example here. In the 2017 contest between Joel Freilich and Chevron Dos Reis, Dr. Alford
estimates that 87% of White voters supported Freilich and 13% of White voters supported Dos
Reis. Dr. Alford does not dispute our method of estimating of how many total White voters
participated in the 2017 election and how many non-White voters participated, as described in
our original expert report. Thus, we can simply plug in Dr. Alford's vote choice estimates for
Whites into our basic Election Algebra table to "solve" the unknown of how non-Whites voted.

**Table 1: Election Algebra vote totals by race of Freilich vs. Dos Reis 2017 election
using Dr. Alford EI RxC vote choice estimates for Whites**

|  | Among white voters | | | Among non-white voters | | |  |
|---|---|---|---|---|---|---|---|
|  | RxC results | total voters | raw votes for each | estimated results | total voters | raw votes for each | Total |
| Freilich | 0.87 | 10,428 | 9,072 | 0.13 | 3,617 | 458 | 9,530 |
| Dos Reis | 0.13 | 10,428 | 1,356 | 0.87 | 3,617 | 3,147 | 4,503 |

23.     We first start with the quantities that are known and cannot be disputed, the
official results of the Tuesday, May 16, 2017 elections for the East Ramapo Central School
District Board of Education. In that election, Freilich received a total of 9,530 votes and Dos
Reis received a total of 4,503 votes and 12 votes went to write-in candidates for a total of 14,045
votes cast. Given the higher voter turnout among Whites, as reported in our original expert
report, there were 10,428 White votes cast out of the total 14,045, which leaves 3,617 votes cast
by non-Whites. These numbers are not disputed. Turning to Dr. Alford's own vote choice
estimates of 87% of Whites voting for Freilich, that results in exactly 9,072 Whites who voted
for Freilich (10,428 $x$ .87 = 9,072). Given that Freilich received a total of 9,530 votes and 9,072
came from White voters, the only mathematical result is that Freilich received 458 votes from

non-Whites $(9,530 - 9,072 = 458)$. Finally, some simple division tells us that the 458 non-White

votes for Freilich represent 13% of all non-White votes cast. $(458 \div 3,617 = .1266)$.

24.     Using Alford's own vote choice estimates, there is a zero percent chance that

Freilich was the minority preferred candidate. Indeed, mathematically, it was only even

theoretically possible for him to tally 13% vote support from minorities, given his very large

87% vote share from Whites. Indeed, White voters provided Freilich with over 95% of the votes

he received on election day $(9,072 \div 9,530 = .9519)$. Even if we set the White vote choice for

Freilich to Dr. Alford's lowest possible estimate in his confidence interval of 77%, we are left

with the same conclusion, that Whites provided Freilich with 84% of his total votes, and that

there is no mathematical possibility that a majority of non-Whites supported Freilich. Instead,

we can say with virtual certainty that minority voters supported Dos Reis.

25.     While Dr. Alford claims he has not seen this approach employed before, it is

nonetheless a very helpful metric by which to evaluate voting patterns between Whites and

minorities in a circumstance of limited data. Rather than saying the confidence intervals for

minority voters are too large to be able to make any conclusions, using this Election Algebra,

which relies on the actual vote totals, we can be statistically certain of how Whites and non-

Whites voted, and the estimates never cross the so-called "50% threshold," to which Dr. Alford

gives an unjustified amount of weight in his report.

26.     Across every election that we analyze through the lens of Election Algebra, we

come to the same conclusion, i.e., the very high degree of White voter cohesiveness guarantees

that White-preferred candidates are winning elections on the sole basis of White vote support,

and that non-White voters are voting cohesively for candidates who have lost each election.

14

There is no question that White voters are cohesive and that they are bloc-voting against minority-preferred candidates.

## B. *GINGLES* PRECONDITION 2: BLACK AND LATINO VOTERS ARE COHESIVE BOTH WITHIN EACH GROUP AND ACROSS GROUPS

27.     Dr. Alford does not offer any analysis of evidence rebutting our estimates of Black and Latino vote choice using the more precise analysis of actual turnout that we perform by applying BISG to voter history data using Imai and Khanna's publicly available, widely-used, and well-regarded wru package. Dr. Alford states that he is not able to precisely replicate the vote choice numbers in our report for Catalist, however we provided our full replication code and script, which should have enabled Dr. Alford to perform the analysis. He does not point to any errors or questions in our data, code or script, and our approach comes from our eiCompare package, which is peer-reviewed and published in a methods journal.[23] Across both our original analysis using the BISG method for assessing the race of those who voted, as well as the Catalist race model—which has been used and accepted in voting rights litigation[24]—as a means to

---

[23] In our published piece on EI comparisons, we sought to compare EI methods versus EI RxC methods with normal regression. We presently have research under review that addresses other EI, RxC comparisons, finding consistent results.

[24] Catalist's race model has used and accepted in at least two voting rights cases, *Veasey v. Perry*, Civil Action No. 2:13-cv-291 (NGR) (S.D. Tex.), and *One Wisconsin Institute v. Thomsen*, Case No. 15-cv-324 (W.D. Wisc.), as well as used in in peer-reviewed scholarly articles such as Bernard Fraga, "Candidates or Districts? Reevaluating the Role of Race in Voter Turnout," American Journal of Political Science 60(l), 2016; Eitan Hersh and Brian Schaffner, "Targeted Campaign Effects and the Value of Ambiguity," Journal of Politics 75(2), 2015; and Ryan Enos and Anthony Fowler, "Aggregate Effects of Large-Scale Campaigns on Voter Turnout," Political Science Research and Methods (2016). Unlike Catalist's race models, which are proprietary and for which Catalist charges fees for use, Imai and Khanna's wru package, which is based on their peer-reviewed and published methodology, is freely and publicly available.

validate the predictions of voter race we derived from applying Imai and Khanna's wru package, we find strong and consistent evidence of political cohesion for Black and Latino voters.

28.    Across the 14 District elections examined for 2013, 2015, 2016, 2017, 2018 using the eiCompare package for R, our vote choice estimates report a majority of Blacks voted cohesively for the candidate who ultimately lost the election.

29.    Likewise, across the 14 District elections examined for 2013, 2015, 2016, 2017, 2018 using the eiCompare package for R, our vote choice estimates report a majority of Latinos also voted cohesively for the candidate who ultimately lost the election.

30.    Finally, there is evidence of Black and Latino voters supporting the nominating petitions of these same minority-preferred candidates at the outset of the election. The nominating petitions are important because candidates cannot get access to the ballot without a valid nominating petition,[25] and thus the signatures on nominating petitions reflect the foundational support for a potential candidacy. Analyzing the race of voters who sign a candidate's nominating petition provides information on the extent to which candidates are attempting to appeal to White or minority voters. Black and Latino residents of East Ramapo are significantly more likely to have signed the nominating petitions of minority-preferred candidates who went on to lose the elections.[26] Candidates who ultimately prevailed received an

---

[25] *See* East Ramapo Policies §2120.1 ("Candidates for the office of Trustee of the Board of Education shall be nominated by petition. Such petition shall be directed to the District Clerk and shall contain the signatures and addresses of at least 25 qualified voters of the school district or 2 percent of the voters who voted in the previous election, whichever is greater.")

[26] *See* September 14 Report ¶¶ 40-41, Table 6.

overwhelming percentage of their nominating signatures from White residents, and very few signatures from either Blacks or Latinos.[27]

31.     Evidence from the 2015 election further confirms a consistent pattern of racially polarized voting.  Using the more precise measures of each voter's race from the BISG method, we report vote choice estimates for Whites, Blacks, and Latinos in the 2015 Board contests below.  The results of the 2015 election show that White-preferred candidates were elected to the Board, and that Latino-preferred and Black-preferred candidates lost all three elections.

32.     TABLE 2: 2015 VOTE CHOICE ESTIMATES USING VOTER RACE (BISG)

|                | White vote | | | Black vote | | | Latino vote | | |
| --- | --- | --- | --- | --- | --- | --- | --- | --- | --- |
|                | EI | RxC | | EI | RxC | | EI | RxC | |
| Lefowitz       | 74 | 67 | Won | 2  | 25 |         | 24 | 18 |         |
| Charles-Pierre | 20 | 31 |     | 96 | 71 | Blocked | 95 | 61 | Blocked |
| Rothman        | 76 | 70 | Won | 5  | 13 |         | 7  | 30 |         |
| Morales        | 23 | 30 |     | 97 | 87 | Blocked | 88 | 70 | Blocked |
| Ramirez        | 73 | 65 | Won | 3  | 22 |         | 10 | 35 |         |
| White          | 19 | 31 |     | 95 | 76 | Blocked | 88 | 55 | Blocked |

## V.     ALFORD GREATLY EXAGGERATES THE MATERIALITY OF CONFIDENCE INTERVALS

33.     Dr. Alford does not perform any statistical test to determine if the vote choice estimates for Latinos are statistically "insignificant."  Instead, he claims that they are unreliable because the confidence intervals for our estimates of Latino vote choice "cross 50%."[28]  Dr. Alford focuses on confidence intervals around the vote choice estimates in an attempt to create

---

[27] *Id.*

[28] Alford Report p. 17.

17

uncertainty over our calculations and opinions, but drawing attention to the full bounds of the 95% confidence interval does not deprive the point estimate of probative value.

34.      Dr. Alford's criticism is contrary to generally accepted principles of statistical analysis and greatly overstate the impact of confidence intervals.[29] In our September 14 Report, we reported the standard deviation or standard error for each estimate, and specifically that the King's ecological inference represent the full range of the 95% confidence interval estimate for the White, Black, and Latino estimates.

35.      The primary focus in determining racially polarized voting is in examining support for the minority-preferred candidate among White and minority voters.  On this point, Dr. Alford has no objections about confidence intervals or uncertainty in his examples about White voters.  That is, Dr. Alford agrees that Whites as a bloc voted against and invariably defeated the preferred candidates of minority voters.  For the purposes of illustration, we focus on one example in Dr. Alford's report, the election between Rothman and Morales in 2015, detailed in his Table 6.[30] Even though Dr. Alford's own analysis suggests that Latinos actually preferred Morales ahead of Rothman by a wide margin (80% to 20%),[31] he says that statistically

---

[29] Fienberg, S. E., & Kadane, J. B. (1983), "The presentation of Bayesian statistical analyses in legal proceedings," *The Statistician*, 88-98.

Timmer, S. T., Meyer, J. J. C., Prakken, H., Renooij, S., & Verheij, B. (2015, June), "A structure-guided approach to capturing Bayesian reasoning about legal evidence in argumentation," *Proceedings of the 15th International Conference on Artificial Intelligence and Law* (pp. 109-118), ACM.

Fenton, N., & Neil, M. (2011), "Avoiding probabilistic reasoning fallacies in legal practice using Bayesian networks," *Austl. J. Leg. Phil.*, *36*, 114.

[30] Alford Report, p. 20.

[31] *See* Alford Report, p. 22.

these estimates are indistinguishable because the confidence intervals cross the 50% point. Dr. Alford's analysis is inaccurate and misleading. We can still assess the probability that Latinos preferred Morales over Rothman.

36.     Dr. Alford claims that it is not possible to arrive at a specific percentage point estimate, such as 80%, but rather one can only think about the full range of the confidence interval and not the specific point estimate. This statement ignores basic probability distribution theory. Dr. Alford is making what is known as a "frequentist" approach, which does not consider where in the interval the point estimate is more or less likely to occur. As a matter of basic statistics, this is not *all we can say*. We can assign specific probabilities that the true fraction is either at the low end of the estimate, the high end of the estimate, or right in the middle of the uncertainty estimate. To suggest that all we can really say is that the actual value is likely somewhere in this interval is off base. To illustrate this, we can use Dr. Alford's own estimates for the 2015 election between Morales and Rothman, found in his Table 6.

37.     To measure whether the estimates of Hispanic vote choice for Morales and Rothman are actually different from one another, Dr. Alford employs the wrong scientific test. He compares the confidence interval for each estimate to see if they overlap. He writes "an estimate is regarded as statistically significant where the 95% confidence or credible interval does not cross 50%,"[32] and goes on to state that "this indicates that at the 95% confidence level used in social science research, we cannot be confident about which candidate, if any, received the most Hispanic votes."[33]

---

[32] Alford Report, p. 17.

[33] Alford Report, p. 22.

19

38.     Here, Dr. Alford is using individual Bayesian credible intervals—one for each candidate—when he should be using the posteriors to calculate the probability of preference ordering.  Meaning, Dr. Alford should be using more information than only looking at the tail end of the confidence band to check if it crosses 50%.  <u>Specifically, Alford should have calculated the probability that the difference between Morales and Rothman is greater than zero, or less than zero.</u>  He did not do this, and thus he cannot and does not state with statistical certainty that he has proved Blacks and Latinos are not cohesive.  In Dr. Alford's analysis, the asymmetry and multimodality of the posterior distributions, and the different variances, means that the overlap of 95% credible intervals is not an especially informative feature.  This is to say, the "overlap" component of the interval is only one small part of the distribution, and pointing to it, does not prove anything statistically.  Additionally, there is covariance between the estimates that is not appropriately accounted for in just examining interval overlap.  Thus, Dr. Alford is relying on the wrong test to determine if Morales and Rothman are different from one another.  <u>The proper analysis would be to distinguish the credible intervals for the difference in proportion from zero</u>, rather than looking at the overlap between the two confidence intervals which does not adjust for the covariance between the two estimates, which in this case is substantial.

39.     Using the same approach as Dr. Alford, we have calculated the <u>confidence interval for the difference</u>, and the probability that the difference between the Morales and Rothman vote shares among Latinos is not zero—meaning there is a real statistically significant difference.  They key question here is whether or not the difference is 0 (meaning they are the same) or if we can reverse the expectation (i.e., "did Rothman win more Latino votes than Morales?").  The question of interest is the value of $P\left(\lambda^L_{Rothman} - \lambda^L_{Morales} > 0\right)$.  This is

estimated directly by calculating the proportion of draws from the posterior distribution for which this inequality holds. We can graph the distribution of this difference, which is especially informative, since we may examine not just whether Morales is likely preferred, but also by what degree. The estimate is $P\left(\lambda^{L}_{Rothman} - \lambda^{L}_{Morales} > 0\right) \approx 0.178$, just under 18% probability that Latino voters preferred Rothman to Morales in 2015. In fact, the probability of Latino voters favoring Morales by more than 10 pts is 0.606, around 61%. The median value of our posterior distribution over $\lambda_{diff} = \lambda^{L}_{Morales} - \lambda^{L}_{Rothman}$ is very far from zero; in fact, it is a quite robust 0.131 (and mean = 0.121).

40.     What we are showing here is that the evidence is far more tilted to demonstrating polarized voting, than not. The most likely scenario is that Morales was favored by a margin of 13% among Latinos casting votes. The chance that Morales actually did *not* win more Latino votes than Rothman is about the same as the chance of rolling a six on one toss of a fair six-sided die, while the chance that Morales won more Latino votes is akin to the chance of rolling a one, two, three, four, or five on a single toss of the die. Once one examines these probabilities on candidate after candidate, year after year, it is reasonable to come to the conclusion that probabilistically, there is almost no chance that the point estimates of minority vote cohesion are wrong.

41.     Even if we examine the confidence intervals that Dr. Alford created for purposes of evaluating overlap—which we have just established is the incorrect way to test if the Hispanic vote choices for Morales and Rothman are statistically different—we still find that Dr. Alford is not accounting for the probability of overlap at all. For example, with a basic probability distribution, we have the absolute most confidence in the specific point estimate reported by the

21

ecological inference; in this case, Dr. Alford reports 80% of Latinos supported Morales in 2015.[34]  He claims the uncertainty range around the Morales estimate goes from a possible low of 48% to a possible high of 97%.[35]  However, the probability that an estimate is at the very extreme tail end of an uncertainty distribution is very, very low.

42.     To illustrate this, we have placed a normal probability distribution around the Morales estimate of winning 80% of the Latino vote in Figure 1.  As the figure demonstrates, the most likely outcome—where the curve is at its highest point—is right at the center of the distribution of the estimate of 80% produced by the EI RxC.  Beyond this, we expect there is a 68% probability that the estimate of Morales support is within one standard deviation lower or higher than the estimate, illustrated in Figure 1 as between 64% ~ 89%.  We can further assign different probabilities that Morales actually received a different share of the vote.  For example, there is a 13.59% probability that Morales won between 48% and 64% of the Latino vote.  There is a 2.27% probability that Morales won 48% or less. More importantly, we can assess the probability that Morales won 50% or less support from Latinos—the level of support Dr. Alford estimates signifies a lack of cohesiveness.  Looking to Figure 1, it is clear that the probability that Morales won 50% or less, and was not minority-preferred is just 3.5%.

---

[34] *See* Alford Report, p.  18, Table 3; p. 20, Table 6.

[35] *See* Alford Report, p.  18, Table 3; p. 20, Table 6.

**Figure 1**



43.     We can just as easily apply the same normal probability distribution around the

vote estimate for Rothman, as seen in Figure 2. Here, we are interested in the probability that

Rothman won 50% or more of the Latino vote.  In fact, there is just a 3.5% probability that

Rothman won over 50% of the Latino vote, and a 97% probability that Rothman won less than

50%.

**Figure 2**



44.     In addition to assessing if the 95% confidence interval of one candidate

(Morales), overlaps with the upper bound of the estimate of the second candidate (Rothman), Dr.

Alford incorrectly compares how both confidence intervals overlap.  Despite this being the

wrong approach, we can still use the probability distribution to compare both confidence

23

intervals at the same time, and to determine the exact probability that the two estimates overlap, and the exact probability that the two estimates are in fact different from each other.  While Dr. Alford asserts that he "would not be able to conclude" that there is a difference between the Latino support for Morales and Rothman,[36] we can provide precise probabilities that the estimates are different and determine that these estimates are, in fact, meaningfully different from one another. Below in Figure 3, we find that there is a 7% probability that the two confidence intervals overlap, while Figure 4 depicts that there is a 93% probability that the two estimates are distinct and do not overlap.

**Figure 3: Comparison of confidence intervals for Latino vote 2015**



*Amount of the probability distributions that overlap is 7%, shaded in red*

---

[36] Alford Report, p. 10.

**Figure 4: Comparison of confidence intervals for Latino vote 2015**



*Amount of the probability distributions that do not overlap is 93%, shaded in blue*

45.     Finally, it is well established in the social sciences that the most reliable and credible value within a confidence interval is the point estimate in the middle. In fact, other voting rights cases have relied on the point estimates, even when confidence intervals appear to be large and overlap, to establish trends of minority cohesion.[37]

46.     However, it is important to note that our BISG vote choice estimates for Blacks do not overlap 50% and are evidence of minority cohesiveness even according to Dr. Alford.[38] He writes that the "BISG data produced in the Collingwood and Barreto report" provide

---

[37] *See, e.g., Fabela v. City of Farmers Branch, Tex.*, No. 3:10-CV-1425-D, 2012 WL 3135545, at *11 (N.D. Tex. Aug. 2, 2012). As Dr. Alford acknowledges, and similar to the case in *Farmers Branch*, Texas, in which he testified for the defendant, the confidence intervals are a function of the relatively small number of precincts in East Ramapo and the level of concentration of Latino voters in each precinct. Alford Report, Ex. A, ¶ 49 ("While I cannot offer a definitive explanation for the wide confidence intervals, I think it is likely that the EI analysis yielded wide confidence intervals because of the relatively low number of Black and Latino voters and because of the relatively low number of voting precincts in the District.") Also, similar to his testimony in *Farmers Branch*, Dr. Alford asserts only that these limitations on the available data prevent him from drawing *any conclusions* about Latino voting cohesion in East Ramapo, not that there is, in fact, no racially-polarized voting in East Ramapo. *Id.* at *10.

[38] *See* Sept. 14 Report at ¶ 8, Table 1A;, ¶ 10, Table 2A; ¶ 12, Table 3A;

25

evidence of "moderate levels of Black cohesion."[39] Dr. Alford also admits that these estimates

for Black vote choice do not cross the 50% threshold, suggesting even by his own standard that

there is consistent evidence of Black political cohesion in multiple East Ramapo elections across

2013, 2016, 2017.[40] As we note above, although Dr. Alford questions the reliability of the peer-

reviewed BISG methodology that we use for our analysis, he offers no contrary research or

analysis of his own to give any substance to his critique, nor does he attempt to replicate our

analysis. Dr. Alford does not and cannot refute that BISG is widely used in a variety of contexts,

including in predicting the race of voters. Instead, Dr. Alford asserts only that the methodology

is novel in the very specific context of racially polarized voting analysis in Voting Rights Act

cases, but he also acknowledges that the United States Department of Justice has submitted

expert testimony on racially-polarized voting in another vote dilution brought against a local

government entity under Section 2 of the Voting Rights Act.[41] Neither Dr. Alford's assertions

about BISG's novelty nor his unsubstantiated questions about the methodology's reliability

disprove our finding of Black political cohesiveness.

## VI.   WHICH CANDIDATES ARE RELEVANT?

47.     Since *Gingles* itself, the Supreme Court has expressly rejected a key assumption

underlying much of Dr. Alford's report, namely, that the District's at-large system should be

immunized from liability because a White voting bloc has engineered the election of a few

minority candidates—namely, Bernard Charles, Pierre Germain, Maraluz Corado, and Juan

Pablo Ramirez. As the Court stated: "the election of a few minority candidates does not

---

[39] Alford Report, p. 21.

[40] *Id.*

[41] Alford Report, p. 13.

'necessarily foreclose the possibility of dilution of the black vote.'"[42]  Moreover, the Second

Circuit has clarified this point by noting that the question is not simply whether candidates of

minority race have been elected under at-large election system, but whether "minority-

preferred," candidates have been elected.[43]  Dr. Alford's report does not consider either (a)

whether the minority candidates who have won election in East Ramapo are minority-preferred;

or (b) whether and to what extent the success of the few minority candidates who have won

elections in East Ramapo is attributable to the fact they were "'safe' minority candidates," whose

success was ensured through a slating process that excluded minority participation and/or whose

campaign was marked by a conspicuous lack of appeals to minority voters.  Based on our further

analysis of the Senate Factors below, in particular Factors 4 and 7, we conclude that the minority

candidates who have been elected recently in East Ramapo are "'safe' minority candidates," as

evidenced by their selection through a slating process that excludes minority voters and their

relative lack of effort to appeal to the District's minority voters.

## VII.   SENATE FACTORS

### A.   Senate Factor 3: Discrimination-Enhancing Practices.

48.   Dr. Alford asserts that: "In evaluating Senate Factor 3, Collingwood and Barreto

mostly rely on a series of studies that identify general patterns associated with a variety of

electoral policies and practices," and it "may or may not be true" that these practices have

---

[42] 478 U.S. 30, 75 (1986) (brackets in original).

[43] See N.A.A.C.P., Inc. v. City of Niagara Falls, N.Y., 65 F.3d 1002, 1022–23 (2d Cir. 1995) (noting in context of Factor 7 analysis: "We recognize the admonition in Zimmer—one of the cases from which the Senate Report factors were derived, S.Rep. at 28 n. 113, 1982 U.S.C.C.A.N. at 206 n. 113—that the success of a Black candidate (or, more generally, a minority-preferred candidate) is not dispositive.")

27

similarly negative effects on minority turnout in East Ramapo as observed elsewhere.[44]  But Dr. Alford claims: "we have no know way to know whether" election practices generally accepted as discrimination-enhancing by courts and scholars have a negative effect on minority turnout in East Ramapo "because there is no data presented in [our] report to demonstrate that any of these general trends would hold in East Ramapo."[45]  However, our approach and analysis is consistent with political science research that encourages relying on the extant published literature in our field to draw inferences about specific voting practices.  What's more, Dr. Alford fails to recognize that there is substantial evidence regarding minority turnout and the electoral success of minority-preferred candidates in our September 14 Report that is consistent with our opinion that discrimination-enhancing practices negatively affects turnout in East Ramapo.

49.     In our September 14 Report, we identified the presence of the long list of discrimination-enhancing practices in District elections—including at-large elections, off-cycle elections, staggered terms, numbered posts, a de facto majority vote requirement, and a lack of Spanish language election materials.[46]  Our analysis also demonstrated that the presence of these discrimination-enhancing practices correlates with (a) significantly depressed turnout among minority voters compared to White voters,[47] (b) a total lack of success for candidates preferred by Black and Latino voters since 2013,[48] and (c) an overall lack of success for minority candidates dating back to the 2005.[49]  Moreover, our analysis of the 2012 Presidential election,

---

[44] Alford Report, pp. 28-29.

[45] *Id.* at 29.

[46] Sept. 14 Report, ¶¶ 20-35

[47] *id.* ¶ 57

[48] *id.* ¶¶ 8-14

[49] *id.* ¶¶ 60-64

which covers the same electorate, but took place on-cycle, in November, and concurrent with other races, used more than double the number of polling places used in District elections, and with Spanish language-assistance available to all voters in Rockland County,[50] also reinforces our conclusion.[51] Dr. Alford ignores all of this critical evidence when he claims "there is no data presented in [our] report demonstrate" that these discrimination-enhances practices negatively affect turnout in minority voters in East Ramapo.[52]

50.    In asserting that "we have no way to know" whether discrimination enhancing practices in East Ramapo negatively affect minority turnout, Dr. Alford also fails to consider further evidence that has become available since our opening report, which is also consistent with our conclusions on this Factor, including the lack of minority-language materials and polling place consolidation.

51.    *Further evidence of the lack of Spanish-Language Materials.* The District has confirmed that it does not offer any ballots in Spanish and has no plans to offer ballots in Spanish.[53] Although the District provides an Internet-based portal that allows voters to look up their polling places, that portal is not available in Spanish.[54] The District does offer any

---

[50] *See In Matter of Rockland County Board of Elections*, Memorandum of Agreement (MOA) Concerning Minority Language Access, N.Y. Atty. Gen. Civ. Rights Bureau, Sept. 12, 2012, https://ag.ny.gov/sites/default/files/pdfs/bureaus/civil_rights/voting-rights/Rockland%20County%20Final%20MOA%20signed%20by%20all%20parties.pdf (last visited Nov. 10, 2018).

[51] September 14 Report ¶ 29, App'x B ¶¶ 33-34.

[52] Alford Report pp. 28-29.

[53] October 31, 2018 Videotaped 30(b)(6) Deposition of Defendant East Ramapo Central School District ("District 30(b)(6) Dep.") 22:2-6; 42:23-25.

[54] *Id.* at 148:17-149:4.

29

materials on becoming a candidate in Spanish, including any information on nominating petitions or policies related to the qualifications for candidacy.[55]  There is only one election-related item that is translated into Spanish—a budget newsletter—and the Spanish-language version is only available online, while the English language version is also made available in hard copy.[56]  The lack of language accessible materials is especially critical for Latinos in the District because (a) 53.6% of Latinos speak English "less than very well," compared to only 27.8% of non-Hispanic Whites,[57] and (b) Latinos constitute approximate 56% of the public school student population.[58]  The District's deficits in providing Spanish-language election materials are similar to its deficits in providing election-related materials in Haitian Creole, a language spoken widely in the District's large Haitian community.[59]  The effect of the lack of language assistance for Haitian voters would have the same negative impact as the effect of the lack of language assistance on Spanish-speaking voters, which is widely-discussed in academic literature.[60]

52.      ***Further evidence that minorities are disadvantaged compared to Whites by the District's polling places***.  There is also evidence that the District's polling places scheme is

---

[55] *Id.* at 105:3-106:22.

[56] *Id.* at 137:20-138:4.

[57] Sept. 14, 2018 Expert Report of Williams S. Cooper ("Cooper Report"), Ex. E-1, p. 24

[58] *See* New York State Education Department, East Ramapo CSD (Spring Valley) Enrollment (2016-17, https://data.nysed.gov/enrollment.php?year=2017&instid=800000039112 (last visited Nov. 13, 2018).

[59] *See, e.g.*, District 30(b)(6) 42:23-3 (ballots not available in languages other than English); 105:16-25 (materials on candidate qualifications not available in languages other than English); 137:20-138:4 (budget newsletter translated into Creole, but only available online); 150:12-151:10 (polling place signage not printed in languages other than English).

[60] Sept. 14 Report ¶¶ 34-35.

generally more convenient for White voters than for Black and Latino voters. The District runs its own elections and provides East Ramapo voters fewer and different polling places than provided to East Ramapo voters in elections run by the Rockland County Board of Elections, i.e., all other elections.[61] As noted in our September 14 Report, the use of fewer polling places reduces turnout,[62] and the District confirms our opinion that the change in polling location creates confusion for voters.[63] New York Education Law expresses a preference for school districts to use public school buildings for polling places;[64] however, school districts, including East Ramapo, can and do use non-public school buildings as polling places. Among the three polling places that are were used in both School Board and Rockland County elections between 2013 and 2017,[65] two are in areas that are over 90 percent White, and one is in an area that is 60 percent White.[66] In contrast, the polling place in the most heavily minority area is not a public school building or a polling place used in Rockland County elections.[67] In addition, it is a benefit for the District and for voters to use polling places that are also used by the Rockland County Board of Elections because, as the District acknowledged, those sites "are used to having people come there to vote."[68] This makes sense: Voters are more likely to turnout when their

---

[61] District 30(b)(6) 62:9-13; 62:23-63:16.

[62] Sept. 14 Report ¶¶ 29-31,

[63] *See, e.g.*, District 30(b)(6) 60:22-61:25 (noting that the District receives approximately 75-100 calls on Election Day asking about polling places)

[64] District 30(b)(6) 47:7-15.

[65] *See also* District 30(b)(6) Dep. 50:3-10.

[66] Alford Report, p. 8, Table 1

[67] District 30(b)(6) 52:7-19; Alford Report, p. 8, Table 1.

[68] District 30(b)(6) 59:20-60:9

31

polling places are located in buildings that are familiar to them and even more so when the buildings are the places where they are used to voting (Barreto, Marks and Woods 2008).

53.     For the 2018 election, the District adopted new three new polling places for the 2018 election, which likely had a net effect of advantaging the District's White voters.  Two polling places, 229 Maple and Elmwood Elementary School—were intended "to alleviate overcrowding at Kakiat, Ramapo, and Spring Valley High School,"[69] poll sites that disproportionately served White voters, as noted above.  All three of the new polling sites were also Board of Elections poll sites.[70]

**B.      Senate Factors 4: Minority Access to the Candidate Slating Process**

54.     Both Dr. Alford's report, as well as evidence that has become available since we submitted our original report, strengthen our conclusion that there exists a slating process in East Ramapo that generally prevents Black and Latino voters from electing their candidates of choice.

55.     In his report, Dr. Alford makes only two points regarding the slating process in East Ramapo.  First, Dr. Alford asserts (1) that the slating process is in East Ramapo is merely reflective of interest group politics between "public school" and "private school parents," without any exclusion of minorities or other racial influence; and (2) that the election of minority

---

[69] District 30(b)(6) 59:12-19.

[70] District 30(b)(6) 64:6-17.; County of Rockland Polling Places—2018, http://rocklandgov.com/files/7415/2959/7185/2018_COUNTY_OF_ROCKLAND_POLLING_P LACES_BY_LOCATION_2docx.pdf (last visited Nov. 14, 2018).

candidates by the White voting bloc that corresponds with the "private school slate" is clear cut proof that there is no minority exclusion from the slating process.[71]

56.     Dr. Alford's conclusions about the nature of the slating process in East Ramapo ignores several important points, namely, (a) the extent to which minorities are able to participate in the District's dominant slating process; (b) the extent to which minority-preferred candidates are able to participate in the District's dominant slating process, and (c) whether and to what extent the minority candidates who have been elected are "'safe minority candidates." We also show why evidence that has become available since we submitted our September 14 Report is consistent with our conclusions and shows why Dr. Alford's analysis of the slating process in East Ramapo is incomplete and wrong.

57.     Candidate slating within the meaning of Senate Factor 4 has long been understood as "a process in which some influential non-government organization selects and endorses a group or 'slate' of candidates, rendering the election little more than a stamp of approval for the candidates selected." *Westwego Citizens for a Better Government, et al v. City of Westwego, et al.*, 946 F.2d 1109, 1116 n.5 (5th Cir. 1991). As Davidson and Fraga (1988)[72] demonstrate, to constitute a slating organization, the organization does not need the formal organizational structure of a political party, and such organizations tend to be more exclusive of minorities

---

[71] Alford Report, pp. 26-28. In offering his opinion on "public school" and "private school" factions, Dr. Alford purportedly reviewed sections of Plaintiffs' complaint (Alford Report, p. 27, n.35), but conspicuously ignores racial demographic data in those sections showing District public school students to be almost exclusively racial minorities and the private school students to be almost exclusively White. *See* Complaint ¶ 17 (citing New York State Education Department enrollment data).

[72] Davidson and Fraga 1988 Davidson, Chandler and Fraga, Luis R. 1988. "Slating groups as parties in a "nonpartisan" setting". Western Political Quarterly. 41(2): 373-390.

when they lack such structures.[73]  But whether and to what extent a slating or endorsement process dominates elections in this way is an important feature of the inquiry into whether its exclusion of minorities is significant.  Where such a slating process exists, minorities are denied access to the slating process when minorities lack the opportunity to participate in determining what candidates should or should not be endorsed.[74]  In assessing whether a slating process exists and whether it excludes minorities, Davidson (1984)[75] identified two inquiries of near-equal importance: (1) "the number of minority candidates who are interviewed or nominated" by the slating organization, and (2) "the composition of the slating organization itself."

58.    In East Ramapo, the available evidence demonstrates that there is a dominant, informal slating process and its endorsement triggers a flow of support to candidates that has been dispositive in ensuring the election of White-preferred candidates in every contest analyzed. In addition to the evidence discussed above and in our September 14 Report, depositions of two current and one former member of the Board, a former candidate for a seat on the Board, as well as the District's 30(b)(6) witness, indicate a slating process involving influential leaders and organizations who stand as gatekeepers to electoral success and possibly even to ballot access. Moreover, the available evidence is consistent with a slating process that vetted and approved "'safe' minority candidates," without the involvement of minority voters in the candidate selection process, and without granting broad access to minority candidates generally.

---

[73] *Id.* at 382.

[74] *Id.* at 379; *see also Citizens for a Better Gretna v. City of Gretna, La.,* 636 F. Supp. 1113, 1123 (E.D. La. 1986).

[75] Davidson, Chandler. 1984. Minority Vote Dilution: An Overview. Washington: Howard University Press.

59.     The two current Board members whose depositions we were able to review in time for this report were Bernard Charles and Pierre Germain, both Black candidates who ran for election in 2013 and 2016 and won both times with overwhelming support from White voters and little support from Black and Latino voters.[76]  Mr. Charles confirmed that candidates in East Ramapo tend to run as a "slate" and running "as an independent" is unusual and not likely to be successful.[77]  In 2013, Mr. Charles testified that before signatures were gathered for his nominating petition[78]—a prerequisite for ballot access, he had to be "vetted" by a person named Rabbi Rosenfeld,[79] and that he "needed Rabbi Rosenfeld's approval" to add to his slate the two candidates Mr. Charles ran with—Mr. Germain and Ms. Corado.[80]  Mr. Germain also testified that he met with the rabbis to get approval to join Mr. Charles' slate.[81]  According to Mr. Charles, the meeting at which Rabbi Rosenfeld vetted Mr. Germain and Ms. Corado included only "four or five" other people, all of whom were members of the Orthodox and Hasidic Jewish community, and thus almost certainly White.[82]  Mr. Charles also testified that in 2015, Juan

---

[76] Sept. 14 Report ¶¶ 8-11, Tables 1A, 1B, 2A, 2B.

[77] October 22, 2018 Videotaped Deposition of Bernard L. Charles ("Charles Dep.") 141:4-13.

[78] Charles Dep. 173:15-174:9.

[79] Charles Dep. 130:25-132:6

[80] Charles Dep. 142:3-143:3.

[81] October 18, 2018 Deposition of Pierre Germain ("Germain Dep.") 99:13-21

[82] Charles Dep. 98:9-14 ("Q, And is it fair to say that all or almost all of the members in the Orthodox and Hasidic community in East Ramapo are white? A. I -- I don't say "all" to anything. Q. Almost all? A. Yes."); Germain Dep. 100:17-101:18 (Germain testifying that he met with "four or five" rabbis in Monsey, which Germain agreed was a predominantly White neighborhood").

35

Pablo Ramirez, a Latino candidate, also "had to be approved by Mr. Rosenfeld" to run for school board.[83]

60.    Mr. Charles and Mr. Germain both testified that the endorsement of Rabbi Rosenfeld and his group of leaders ensured their own election and Ms. Corado's election as well.[84]  According to Mr. Charles, the support of Rabbi Rosenfeld and leaders from the Orthodox and Hasidic Jewish community was not only necessary for him to win in 2013, but "to win any election their support is necessary."[85]  Mr. Germain also confirmed a statement he made in an interview with Tablet Magazine in 2014 that he believed he received approximately 90% of his support from Jewish voters, and estimated that he received only about 10% of his support from Haitian votes.[86]  (Mr. Germain's statement is also consistent with our racially polarized analysis, which shows Mr. Germain receiving a small percentage of minority votes in his 2013 election.[87])

61.    This evidence is consistent with our conclusions that minority candidates have only been able to win contested elections when they receive the support of the District's dominant slating process.  Every minority candidate to have won a contested election in the District since 2013—that is, Mr. Charles, Mr. Germain, and Ms. Corado in 2013, Mr. Ramirez in

---

[83] Charles Dep. 365:20-22.

[84] Charles Dep. at 179:14-180:16 ("Q. And how did these leaders support your campaign? A. They got us elected two to one."); Germain Dep. 109:4-6 ("Q. So do you think your success in the election was tied to your support from the rabbis?  A. I get the votes, yes.")

[85] Charles Dep. 182:7-11.

[86] Germain Dep. 173:21-175:17 & Germain Dep. Ex. 6 (Batya Ungar-Sargon, *The Blame Game*, Tablet, Sept. 8, 2014).

[87] *See* Sept. 14 Report, ¶ 8, Tables 1A, 1B.

2015, and Messrs. Charles and Germain in 2016—received the endorsement and campaign apparatus of Rabbi Rosenfeld and community leaders associated with him.

62.     Second, it is clear from these depositions and other sources that these slating processes have erected barriers to participation in the endorsement process from members of the Black and Latino community. As we noted our opening report, seminal research on this topic by Davidson and Fraga (1988) found that exclusive slating organizations erected barriers to participation by holding meetings at inconvenient times, vesting authority in a handful of community leaders who were largely unaccountable to others in the organization, failing to follow parliamentary rules for their endorsement process, or even maintain consistent procedures from year to year.[88] These barriers are consistent with the available evidence described above, as well as descriptions of the nomination and endorsement process provided by current and former Board members. Aron Wieder, a former Board member and current Rockland legislator testified that the process by which community leaders and activists in the Orthodox and Hasidic Jewish communities select candidates for endorsements was not open to public participation.[89] Mr. Wieder's description of selection process closed to public input is also consistent with the testimony of Mr. Charles, who described receiving the endorsement of Rabbi Rosenfeld and associated leaders (whose names he did not know and could not recall) at a meeting with four or five community leaders in Monsey, a predominantly White part of the District; and that he didn't know if the meeting was publicized or whether any other candidates were invited to attend.[90] In

---

[88] Sept. 14 Report ¶ 38 (citing Davidson and Fraga, at 381-82).

[89] October 10, 2018 Deposition of Aron Wieder ("Wieder Dep.") 94:15-95:4 & Wieder Dep. Ex. 3 (Declaration of Aron B. Wieder), ¶ 30

[90] Charles Dep. 173:15-174:9.

addition, a 2014 article published by Tablet Magazine, reports that the author asked Pierre

Germain "if specific rabbis endorsed him, and Germain said, "I cannot tell that, that's my secret.

Why you want me to tell you my secrets?"[91]  The current and former Board members'

description of a process for endorsing candidates that is delegated to community leaders and

closed to the public is consistent with Davidson and Fraga's finding that the nominating

committees of the exclusive nonpartisan slating organizations they investigated "met in private

and did not reveal their deliberations to the press."

63.    Finally, Board members have expressly acknowledged that the slating mechanism

wielded by the District's White voting bloc is so dominant that it can and does block the ability

of minority voters to elect their candidates of choice to the Board.  As Mr. Charles testified in

response to being asked whether the District's Orthodox and Hasidic Jewish voters could replace

him and Mr. Germain if they resigned: "They can replace me in the next election if they want to.

They can put two more candidates against me and Pierre to replace us, if that's what they want to

do."[92]  Asked directly, whether, under those circumstances, "people of color will not be able to

put a candidate on the board?", Mr. Charles answered: "No."[93]

64.    Mr. Charles' testimony indicates that not only does he view himself as a "'safe'

minority candidate," but that he views himself and Mr. Germain as possibly the *only* safe

minority candidates available.[94]

---

[91] Germain Dep. Ex. 6 (Batya Ungar-Sargon, *The Blame Game*, Tablet, Sept. 8, 2014).

[92] Charles Dep. 389:11-390:3.

[93] Charles Dep. 390:4-6.

[94] Charles Dep. 387:11-390:6.

Q. And what did you mean that if you and Pierre Germain resigned, that you -- you will have a full Board again of Hasidic Jewish members?

A. Exactly what I said. That's what it is. If we resign, who's going to replace us?

Q. Who is going to replace you?

A. I just -- it's right there. They will put two more Hasidics on that – on the board to replace us. Then you will have nine.

Q. And what is your basis for your opinion that if you resign, there will be nine Hasidic members of the Board?

A. Because there's nobody else to replace else.

Q. Can you explain what you mean?

A. There's – there's no one to replace us. They're not going to go with the opposition with their members, and they have no one to replace us. If we leave, they will have to put somebody else on their – from their community onto the Board."[95]

65.     Mr. Charles' testimony strongly indicates that the only minority candidates who

can get elected to the Board are those who acceptable to the District's White, Orthodox and

Hasidic Jewish voters and that those voters will not be amenable to electing minority candidates

if those minority candidates oppose the interests of the private school community.  The upshot

of Mr. Charles' testimony is that minority voters cannot elect their candidates of choice to the

Board if the interests of minority voters conflict meaningfully with the interests of White

voters.[96]  The choice Mr. Charles presents to the District's minority voters is to accept the "'safe'

minority candidates" chosen by the dominant slating organization and supported by a large

White voting bloc, or to live with a Board of exclusively White candidates chosen by the

District's White voters.  In either event, these are not candidates preferred by minority voters.

---

[95] Charles Dep. 388:2-23.

[96] Charles Dep. 389:24-390:6.

39

# # #

We reserve the right to continue to supplement our rebuttal report in light of additional facts, testimony and/or materials that may come to light through the course of discovery or otherwise.

Pursuant to 28 U.S.C. § 1746, we declare under penalty of perjury that the foregoing is true and correct.

Executed on November 16, 2018
Los Angeles County, California


MATTHEW A. BARRETO


LOREN COLLINGWOOD

## Appendix – full results of 2015 BISG ecological analysis

| Candidate | RxC: Hispanic | RxC: Black | RxC White |
|---|---|---|---|
| Charles-Pierre | 60.76 | 71.34 | 30.89 |
| 2.5 | 39.46 | 50.42 | 27.26 |
| 97.5 | 78.67 | 91.59 | 35.25 |
| Lefowitz | 17.96 | 24.61 | 67.43 |
| 2.5 | 3.54 | 6.89 | 62.14 |
| 97.5 | 37.08 | 46.24 | 71.27 |
| Jones | 21.28 | 4.06 | 1.68 |
| 2.5 | 6.39 | 1.02 | 0.86 |
| 97.5 | 34.07 | 8.32 | 4.12 |

| Candidate | EI: Pct Hisp | EI: Pct Black | EI: Pct White |
|---|---|---|---|
| Charles-Pierre | 95.49 | 96.58 | 20.12 |
| se | 6.50 | 3.62 | 1.11 |
| Lefowitz | 24.70 | 1.61 | 74.33 |
| se | 14.70 | 2.06 | 1.12 |
| Jones | 24.70 | 11.87 | 2.30 |
| se | 14.70 | 0.37 | 0.01 |

| Candidate | RxC: Hispanic | RxC: Black | RxC White |
|---|---|---|---|
| Rothman | 29.66 | 13.09 | 70.41 |
| 2.5 | 7.34 | 2.34 | 66.95 |
| 97.5 | 58.57 | 27.89 | 73.63 |
| Morales | 70.34 | 86.91 | 29.59 |
| 2.5 | 41.43 | 72.11 | 26.37 |
| 97.5 | 92.66 | 97.66 | 33.05 |

| Candidate | EI: Pct Hisp | EI: Pct Black | EI: Pct White |
|---|---|---|---|
| Rothman | 7.39 | 4.59 | 76.18 |
| se | 6.64 | 5.17 | 0.97 |
| Morales | 88.38 | 97.16 | 23.48 |
| se | 9.39 | 3.76 | 0.82 |

41

| Candidate | RxC: Hispanic | RxC: Black | RxC White |
|---|---|---|---|
| White | 55.26 | 76.49 | 30.40 |
| 2.5 | 29.66 | 53.84 | 25.27 |
| 97.5 | 81.35 | 94.26 | 36.35 |
| Eisenbach | 10.00 | 1.69 | 4.82 |
| 2.5 | 1.73 | 0.10 | 3.99 |
| 97.5 | 20.42 | 4.69 | 5.81 |
| Ramirez | 34.75 | 21.82 | 64.79 |
| 2.5 | 9.71 | 3.93 | 58.71 |
| 97.5 | 60.51 | 44.24 | 69.77 |

| Candidate | EI: Pct Hisp | EI: Pct Black | EI: Pct White |
|---|---|---|---|
| White | 87.78 | 95.03 | 19.37 |
| se | 21.61 | 4.83 | 0.10 |
| Eisenbach | 8.37 | 2.06 | 6.11 |
| se | 0.47 | 0.26 | 0.24 |
| Ramirez | 10.36 | 2.87 | 73.23 |
| se | 8.13 | 3.98 | 0.97 |