UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| NATIONAL ASSOCIATION FOR THE ADVANCEMENT OF COLORED PEOPLE, SPRING VALLEY BRANCH, et al., | ECF CASE |
| | Case No. 17 Civ. 8943 (CS)(JCM) |
| Plaintiffs, | DISTRICT JUDGE CATHY SEIBEL |
| v. | |
| EAST RAMAPO CENTRAL SCHOOL DISTRICT, et al., | MAGISTRATE JUDGE JUDITH C. McCARTHY |
| Defendants. | |

DEFENDANT EAST RAMAPO CENTRAL SCHOOL DISTRICT'S
MEMORANDUM OF LAW IN SUPPORT OF MOTION FOR SUMMARY JUDGMENT

## TABLE OF CONTENTS

TABLE OF CONTENTS.................................................................................................... i

TABLE OF AUTHORITIES ........................................................................................... ii

I.     INTRODUCTION .......................................................................................... 1

II.    SUMMARY OF THE UNDISPUTED MATERIAL FACTS ........................................... 4

     A.    Undisputed Facts Regarding the Demography and Socioeconomics of the District's Population ..................................................................... 4

     B.    Mechanics of School Board Elections Under State Law ...................................... 6

     C.    Undisputed Facts About Candidate Slating and Political Campaigns ................. 7

          1.    Steve White's "Power of Ten" Candidate Slating Process ...................... 8

          2.    There Is No Evidence of Any Slating Organization or Consistent Slating Process in the Orthodox Community............................................ 10

     D.    School Board Candidates and Election Results 2013 Through 2018 ................. 11

III.    LEGAL STANDARD ON MOTION FOR SUMMARY JUDGMENT ........................ 15

IV.    LEGAL BACKGROUND ON SECTION 2 OF THE VOTING RIGHTS ACT ........... 16

V.    ARGUMENT ............................................................................................... 17

     A.    Plaintiffs Have No Evidence of Racially Polarized Voting................................ 18

     B.    Minorities in the District Are Not Excluded from the Political Process "On Account of Race or Color." ..................................................................... 18

     C.    The "Safe Candidate" Doctrine Is Inapposite. ................................................. 21

     D.    Consideration of the Senate Factors Does Not Alter the Conclusion that Summary Judgment Should Be Granted. .......................................................... 23

VI.    CONCLUSION............................................................................................. 25

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Aldasoro v. Kennerson*,
    922 F. Supp. 339 (S.D. Cal. 1995) ............................................................... 22

*Anderson v. Liberty Lobby, Inc.*,
    477 U.S. 242 (1986) ..................................................................................... 16

*Baird v. Consol. City of Indianapolis*,
    976 F.2d 357 (7th Cir. 1992) ................................................................... 1, 18

*Celotex Corp. v. Catrett*,
    477 U.S. 317 (1986) ............................................................................... 15, 16

*Clarke v. City of Cincinnati*,
    40 F.3d 807 (6th Cir. 1994) ..................................................................... 1, 4

*France v. Pataki*,
    71 F. Supp. 2d 317 (S.D.N.Y. 1999) ...................................................... 3, 24

*Goosby v. Town Bd. of Hempstead, N.Y.*,
    180 F.3d 476 (2d Cir. 1999) ............................................................... *passim*

*Goosby v. Town Bd. of Hempstead, N.Y.*,
    956 F. Supp. 326 (E.D.N.Y. 1997) .............................................................. 22

*Johnson v. De Grandy*,
    512 U.S. 997 (1994) ....................................................................................... 1

*League of United Latin Am. Citizens v. Clements*,
    999 F.2d 831 (5th Cir. 1993) (en banc) ........................................ 1, 2, 17, 20

*Montano v. Suffolk Cnty. Legislature*,
    268 F. Supp. 2d 243 (E.D.N.Y. 2003) ........................................................ 24

*N.A.A.C.P., Inc. v. City of Niagara Falls, N.Y.*,
    65 F.3d 1002 (2d Cir. 1995) ...................................................... 2, 16, 17, 25

*Nipper v. Smith*,
    39 F.3d 1494 (11th Cir. 1994) (en banc) ................................................ 1, 18

*Reed v. Town of Babylon*,
    914 F. Supp. 843 (E.D.N.Y. 1996) ....................................................... 19, 20

*Ruiz v. City of Santa Maria*,
    160 F.3d 543 (9th Cir. 1998) ...................................................................... 23

*S. Christian Leadership Conference v. Sessions*,
    56 F.3d 1281 (11th Cir. 1995) (en banc) ............................................................. 1

*Thornburg v. Gingles*,
    478 U.S. 30 (1986) ...................................................... 16, 17, 23, 24

*United States v. Vill. of Port Chester*,
    704 F. Supp. 2d 411 (S.D.N.Y. 2010) ................................................... 25

*Uno v. City of Holyoke*,
    72 F.3d 973 (1st Cir. 1995) ........................................................ 17, 18

**Statutes**

52 U.S.C. § 10301(a) .......................................................................... 1, 16

N.Y. Educ. Law § 1805 ........................................................................ 6

N.Y. Educ. Law § 2012 ........................................................................ 6

N.Y. Elec. Law § 5-100 ........................................................................ 7

N.Y. Elec. Law § 5-102 ........................................................................ 7

NY Educ. Law § 2018(a) ....................................................................... 6

**Other Authorities**

N.Y. Const. art. II .............................................................................. 7

Fed. R. Civ. P. 56(a) .......................................................................... 15

S. Rep. No. 97–417 (1982) ................................................................ *passim*

I.      **INTRODUCTION**

This case is unlike any other Section 2 case in this or any circuit.  The undisputed facts show that minorities are disproportionately active and successful in District politics.  Black residents make up only about 20% of the District's population, but 33% (three of nine) of the current school board members are Black.  In the last five years, more than *half* of all candidates in contested elections for the school board were minority candidates.  These minority candidates often are successful, and they have been for years.  Three minority candidates were elected in 2013, one minority candidate was elected in 2015, three minority candidates were elected in 2016, and one minority candidate was elected in 2018.  It is undisputed that many of these minority candidates were elected with the endorsement and consistent support of a majority of White voters, without regard to their races.

Section 2 of the Voting Rights Act prohibits the "denial or abridgement of the right of any citizen of the United States to vote *on account of race or color*."  52 U.S.C. § 10301(a) (emphasis added).  Section 2 is "not a guarantee of electoral success for minority-preferred candidates of whatever race." *Johnson v. De Grandy*, 512 U.S. 997, 1014 n.11 (1994).  Every federal court of appeal to consider the question agrees that for any Section 2 claim to succeed, "[S]ection 2 plaintiffs must demonstrate … that a voting community is *driven by racial bias* and that the challenged electoral scheme allows that bias to dilute the minority population's voting strength." *Nipper v. Smith*, 39 F.3d 1494, 1524–25 (11th Cir. 1994) (en banc) (emphasis added).[1]

---

[1]      *Accord S. Christian Leadership Conference v. Sessions*, 56 F.3d 1281, 1293–94 (11th Cir. 1995) (en banc) (no Voting Rights Act violation where factors other than race drive election results); *League of United Latin Am. Citizens v. Clements*, 999 F.2d 831, 850 (5th Cir. 1993) (en banc) ("LULAC") (Section 2's protection extends "only to defeats experienced by voters 'on account of race or color'"); *Baird v. Consol. City of Indianapolis*, 976 F.2d 357, 361 (7th Cir. 1992) (no Section 2 violation where elections have "more to do with politics than with race").

1

Conversely, a Section 2 claim fails when the electoral defeat of minority voters' "preferred candidates ha[s] nothing to do with the inability of [minorities] to participate fully in the political process." *Clarke v. City of Cincinnati*, 40 F.3d 807, 812 (6th Cir. 1994). In other words, even where minority voters are "unable to elect minority-preferred candidates," ECF No. 304 at 5, that does not prove the existence of a Section 2 violation *unless* the lack of success at the polls is attributable to racial bias. The distinction is *critical*. "For courts to find violations and invalidate elections and election procedures in the absence of any racial motivation, merely because a protected class can show it has had little success electing candidates, could produce enormous disruptions in the political process." *Goosby v. Town Bd. of Hempstead*, 180 F.3d 476, 501 (2d Cir. 1999) (Leval, J., concurring). Caution is warranted.

In the Second Circuit, courts look "beyond the statistical voting patterns of whites and blacks to see *who* is actually running—whites or blacks" in order to determine "whether the majority is voting against candidates for reasons of race" or for some other reason—like political or policy differences. *N.A.A.C.P., Inc. v. City of Niagara Falls*, 65 F.3d 1002, 1015 (2d Cir. 1995). Where "white voters [have] supported minority candidates … at levels equal to or greater than those white candidates, it [is] proper to conclude … 'that divergent voting patterns among white and minority voters are best explained'" by non-racial concerns. *Goosby*, 180 F.3d at 496 (quoting *LULAC*, 999 F.2d at 861). That is the situation in the District.

This Court correctly observed that the election of minorities to the Board does not dispose of Plaintiffs' claim by itself because "[t]he election of a 'safe' minority candidate does not establish that there is no Section 2 violation." ECF No. 304 at 5. The "safe candidate" concept is inapplicable here because it only protects against the concern that "majority citizens" might try to avoid liability "by manipulating the election of a 'safe' minority candidate" to procure dismissal

of a Section 2 lawsuit. S. Rep. No. 97–417, at 29 n.115 (1982) (the "Senate Report"). If a minority candidate had only ever been elected in the District after Plaintiffs filed this lawsuit, then the "safe candidate" doctrine would be implicated. But here it is undisputed that minority candidates have been elected with majority White support as far back as 2013—long before any Section 2 concerns were raised. Moreover, for the "safe candidate" doctrine to work here, the Court would have to find that the election of "safe candidates" had been engineered at least *eight times*. That's implausible. When multiple minority candidates win multiple elections over the course of a decade, they aren't "safe candidates." They're popular candidates. The "safe candidate" doctrine does not save Plaintiffs' Section 2 claim from summary judgment.

Analyzing the other Senate Factors does not alter the analysis. As argued in the District's accompanying *Daubert* motion (ECF No. 354-1), Plaintiffs have no evidence of racially polarized voting (and summary judgment is warranted for this reason, too). There is no evidence in the record of any history of "official discrimination" touching on voting, and none exists. There is no evidence that "members of the minority group" in the District "bear the effects of discrimination in such areas as education, employment and health" in ways that "hinder their ability to participate effectively in the political process." To the contrary, Blacks in the District are doing significantly better than Whites. There is no evidence that campaigns in the District are marred by "racial appeals" of any sort. And while the evidence of candidate slating processes in the District is somewhat tangled, no *material* facts are genuinely in dispute because the "key slating inquiry is whether minorities have been able to get on the ballot," and they have been here—with impressive regularity. *France v. Pataki*, 71 F. Supp. 2d 317, 331 (S.D.N.Y. 1999).

On these undisputed facts, Plaintiffs cannot show that any lack of electoral success suffered by minority-preferred candidates occurred "on account of race or color." That disposes of the

3

case. Section 2 "guarantees to racial minorities an equal *opportunity* to elect candidates of their choice, not a floor on the success rates of those candidates. When, in the competition inherent in the democratic process, a racial group's preferred candidates are defeated despite the ability of its members to participate fully in that process, the Voting Rights Act should not provide that group with a remedy which is unavailable to other supporters of defeated candidates." *Clarke*, 40 F.3d at 812 (6th Cir. 1994). Summary judgment should be granted in the District's favor.

## II.    SUMMARY OF THE UNDISPUTED MATERIAL FACTS

The undisputed material facts are set out in full in the District's separate Statement of Undisputed Material Facts ("SMF").[2] The undisputed material facts are summarized below.

### A.    Undisputed Facts Regarding the Demography and Socioeconomics of the District's Population

The District is an urban/suburban school district that serves over 35,000 total students and encompasses the Towns of Ramapo, Clarkstown, and Haverstraw, including several villages like Spring Valley and Pomona, in addition to unincorporated residential areas.[3] Plaintiffs' demography expert (William Cooper) reports that, according to census data, Whites represent a majority 58.55% of the total population in the District, and Blacks represent the largest minority group (22.07%), followed by Latinos (15.44%), who may be of any race, and Asians (4.92%).[4] With specific reference to the population of *eligible voters* for District elections for the school board, Whites make up the majority of the eligible Citizen Voting Age Population ("CVAP") at

---

[2]    The District submits this Motion for Summary Judgment with some reservation because discovery is not yet complete and critical documents and witness testimony remain outstanding. However, the Court would not extend the filing deadline for this motion to accommodate outstanding discovery. The District therefore reserves the right to supplement this motion with additional facts if necessary. Moreover, having steadfastly opposed the District's requests to extend the deadline to file this motion on the basis of outstanding discovery, Plaintiffs are judicially estopped from arguing that summary judgment is improper here on the basis of any outstanding discovery.

[3] SMF ¶ 1.

[4]  *Id.* ¶ 2.

61.4%, followed by Blacks (24.1%), Latinos (9.1%), and Asians (4.5%).[5]

The District operates fourteen public schools serving approximately 8,600 public school students.[6]  More than 90% of the students attending the District's public schools are children of color.[7]  The District's school board also is responsible for providing mandated education and education-related services to approximately 26,900 students who attend approximately 140 private schools within the District.[8]  These services include, *e.g.*, the purchase and loan of approved textbooks, provision of school bussing, and special education services.[9]  Private schools include secular private schools and Catholic schools, but the overwhelming majority are Orthodox yeshivas.[10]

The District's public school student population is one of the poorest in the entire state.  "Of the public student population, 84% are economically disadvantaged and 30% are English Language Learners (ELL)."[11]  This places "the District in the top decile of the poorest New York State school districts."[12]  However, unlike most places in New York, Black residents of the District are at the top of the socioeconomic ladder.  According to Plaintiffs' expert demographer, "Blacks and Latinos in the District generally outpace their statewide counterparts" according to socioeconomic measures like income and education.[13]

By contrast, the District's "Whites significantly underperform their statewide counterparts across nearly all measures of socioeconomic well-being."[14]  "Whites trail Blacks across key

---

[5] *Id.*
[6] *Id.* ¶ 4.
[7] *Id.*
[8] *Id.* ¶¶ 5, 6.
[9] *Id.*
[10] *Id.*
[11] *Id.* ¶ 7.
[12] *Id.*
[13] *Id.* ¶ 3.
[14] *Id.*

socioeconomic measures—*e.g.*, poverty rates … median income … and per capita income."[15]
"Latinos, on the other hand, trail both [non-Hispanic] Whites and Blacks across most of these same
key socioeconomic measures, as well as educational attainment."[16]

### B.    Mechanics of School Board Elections Under State Law

School board elections are governed by State law.  *See generally* NY Educ. Law § 2018(a).
A nine-member school board oversees services provided to the 154 public and private schools
within the District.[17]    The school board's legislative responsibilities include, *e.g.*, appointing a
Superintendent of Schools to act as the District's chief executive officer, proposing a budget for
voter approval each fiscal year, setting tax rates, and providing for the maintenance, purchase, or
sale of District assets.[18]    Board members serve staggered three-year terms, such that there typically
are elections for three open seats in May every year.[19]    Occasionally, a fourth seat becomes
available because a member resigned at some point in the year.[20]

New York law requires school districts to use an "at-large" voting system.  Board members
are elected "at-large" because "[e]ach vacancy [on] the board of education to be filled shall be
considered a separate specific office," N.Y. Educ. Law § 2018(a), and all qualified voters are
"entitled to vote at any school meeting or election for the election of school district officers," *id*.
§ 2012.  Boards of education have no authority under State law to change how school district
officers are elected.[21]    *See id*. §§ 1709, 1805.  Thus, no state law authorizes boards of education to

---

15    *Id*.
16    *Id*.
17    *Id*. ¶¶ 32, 37.
18    *Id*. ¶ 37.
19    *Id*. ¶¶ 35, 36.
20    *Id*. ¶ 35.
21        For this reason, the District has argued that it lacks authority under state law to redress Plaintiffs' purported
grievance.  For the Court to grant Plaintiffs the relief they seek, the Court would have to order the New York state
legislature to make a change to state law.  Without a state defendant in this case, Plaintiffs' claim is not redressable.
They therefore lack standing, and this case should have been dismissed at the threshold.  The District reasserts its
argument and does not waive, but expressly preserves, its argument that this case should be dismissed.

institute a "ward system" for the election of board members.[22]

School board elections are nonpartisan.  Candidates may choose to run and campaign as part of a candidate "slate," but there are no District-regulated procedures for forming slates.  All candidates must be qualified voters (*i.e.*, over 18 years old and a U.S. Citizen), and must have resided within the District for an uninterrupted period of at least one year prior to the election.[23] The District has never precluded any qualified candidate—of any race—from the ballot.[24]

To vote in an election, one must be registered to vote with the District Clerk and/or registered to vote in General Elections with Rockland County.[25]  *See also* N.Y. Const. art. II; N.Y. Elec. Law § 5-100.  A voter must also be over 18 years of age, a citizen of the United States, and a resident of the "state and of the county, city or village for a minimum of thirty days next preceding such election."  N.Y. Elec. Law § 5-102.

### C.    Undisputed Facts About Candidate Slating and Political Campaigns

The District has a high voter turnout rate for school board elections compared with the turnout rates in the surrounding communities.  This is true despite the relatively large number of District residents who are not U.S. citizens.[26]  This wasn't always the case.  For example, in the 2008 election for the school board only 9,163 votes were cast.[27]  By 2017, the number of turned-out voters for the school board election had increased to 14,343—a 56.5% increase.[28]

---

[22]     It is for precisely this reason that Plaintiffs here have not alleged—and cannot in good faith allege—that the District or any member of its board of education has *intentionally* instituted any voting or election practice that results in discrimination against minority voters in violation of Section 2.  The board of education did not institute "at-large" elections and is not responsible for "maintaining" election practices required by law.

[23] *Id.* ¶ 39.

[24] *Id.*

[25] *Id.* ¶ 34.

[26] *Id.* ¶ 4.

[27] *Id.* ¶ 61.

[28] *Id.* ¶ 90.

1.      **Steve White's "Power of Ten" Candidate Slating Process**

Increased turnout for elections has tracked increases in community activism in school board politics, due in large part to one person: Steve White.[29]  A group of individuals, including Steve White[30] (a White man), his wife, and some friends came together to organize efforts to select and support slates of candidates for the school board.[31]  To do so, they co-opted the "East Ramapo Stakeholders for Public Education."[32]  Mr. White became the Stakeholders' chair in 2009 and was responsible for developing a formal process for soliciting, evaluating, and slating school board candidates.[33]  The process he developed involves, among other things, disseminating a questionnaire and vetting potential candidates.[34]

Around the same time, Mr. White created a website and e-newsletter called "Power of Ten" to disseminate his views about school district politics and policy.[35]  Mr. White also uses the Power of Ten website to solicit candidates for school board elections and to endorse slates.[36]  Approximately 6,000 people subscribe to the Power of Ten e-newsletter.[37]  When the "Stakeholders" group disbanded, Mr. White rallied other groups with the same mission to select

---

[29]     The District partially deposed Mr. White on February 25, 2019, but the deposition could not be completed and remains open because of a pending privilege dispute before Judge McCarthy.  Even though Mr. White is a critical fact witness, hundreds of his email communications with Plaintiffs and Plaintiffs' counsel have been withheld from discovery and are being reviewed by Judge McCarthy *in camera*.  We reserve the right to supplement these facts after Judge McCarthy has resolved the pending privilege dispute.

[30]     Mr. White also is a serial litigator against the District, sometimes filing suit as a plaintiff himself and other times behind the scenes through proxies.  He was the *de facto* lead plaintiff in the *Montesa v. Schwartz* case before this Court, Case No. 12 Civ. 6057 (S.D.N.Y. 2016), and he was the plaintiff and main force behind the state court action *White v. East Ramapo Central School District Board of Education*, N.Y. County Index No. 158035/2015, in connection with which this Court found Mr. White to have been apparently working through proxies, *see Montesa v. Schwartz*, 2016 WL 8140048, at *3 (S.D.N.Y., 2016).  The evidence suggests that this case may also be primarily a Steve White production, though Plaintiffs' counsel have labeled him a "consultant" and claim privilege over their extensive communications with him regarding the case.  ECF Nos. 313, 329 & 314.

[31] *Id.* ¶ 52.

[32] *Id.*

[33] *Id.* ¶¶ 54–56.

[34] *Id.* ¶¶ 54, 77, 88 & 95.

[35] *Id.* ¶¶ 49–51.

[36] *Id.* ¶ 51.

[37] *Id.* ¶ 49.

and run candidates for the school board, including groups like "Concerned Citizens for East Ramapo" and "Strong East Ramapo."[38]  Through each of these various organizations, Mr. White and a small cadre of friends solicited, selected, endorsed, and supported slates for the board in 2013, 2015, 2016, 2017, and 2018.[39]

These "Power of Ten" slates campaign on policy platforms advocating for increased funding for public school services, increased property taxes to fund those services, and decreases in publicly funded services that benefit private school students.[40]  The Power of Ten slates have included men and women; persons who are White, Black, and Latino/Hispanic; and parents of both public school and private school students, as well as candidates without children.[41]  The Power of Ten slate has successfully elected 5 candidates, assisted in 18 campaigns, and is still active.[42]

The slates of candidates selected and endorsed by Power of Ten call themselves the "public school slate" or the "public school community" candidates, and Plaintiffs here adopt that convention.[43]  There is no actual organization or political party called the "public school community," and the term lacks any precise definition.  It also can generate confusion, since the evidence shows that several sets of school board candidates have also claimed to best represent the interests of the "public school community," but they chose not to seek Power of Ten's endorsement.[44]

Since the term "public school community" is unhelpful, and it is undisputed that Steve White's Power of Ten has endorsed every single slate of candidates that Plaintiffs here refer to as

---

[38] *Id.* ¶ 57.
[39] *Id.* ¶ 54–56, 66, 69, 72, 75, 78, 84, 92 & 95.
[40] *Id.* ¶ 58.
[41] *Id.* ¶ 54–56, 66, 69, 72, 75, 78, 84, 92 & 95.
[42] *Id.* ¶ 56.
[43] *Id.* ¶ 44.
[44] *Id.* ¶¶ 22, 23.

the "public school community" slates,[45] we refer to those slates as the Power of Ten slates.

**2.     There Is No Evidence of Any Slating Organization or Consistent Slating Process in the Orthodox Community.**

Plaintiffs' pleadings also refer to a "private school community," which Plaintiffs portray as a competing slating organization in opposition to the "public school community."[46] There is no actual organization or group called the "private school community," and the term also suffers from a lack of clear definition. In reality, "public school community" and 'private school community" are euphemisms. What Plaintiffs really mean when they say "private school community" is *Orthodox Jews*.[47] Plaintiffs refer to the "White community" and the "private school community" throughout their pleadings.[48]

The reason for the euphemism is that, as a general matter, Orthodox Jewish parents in the District enroll their children in private religious schools instead of public schools.[49] It is that common Jewish cultural and religious preference more than anything else that generates the conflict that energizes the District's elections for the school board. Specifically, the Orthodox community generally favors school board policies that control costs and keep real estate taxes in check.[50] The Orthodox community also favors prioritizing public funding for services that benefit both public and private school students—bussing, special education, and approved purchase and loan of textbooks.[51] These preferences are at odds with the policies advocated by Power of Ten.

Dispensing with the obscure "private school community/public school community" jargon makes it easier to discern the undisputed facts material to candidate slating. *First*, with respect to

---

[45] *See Id.* ¶¶ 54–56, 66, 69, 72, 75, 78, 84, 92 & 95.
[46] *See Id.* ¶ 46.
[47] *Id.* ¶ 47.
[48] *Id.* ¶¶ 43, 46.
[49] *See* ¶ 6.
[50] *Id.* ¶ 47.
[51] *Id.*

slating *organizations*, there is *no evidence* that the Orthodox Jewish community sponsors a slating *organization* at all similar to Steve White's Power of Ten. In the Orthodox community there is just no evidence of things like candidate slating "community forums," meetings, groups, websites, newsletters, or any other indicia of an organizational structure for the purpose of slating.

*Second*, whether a slating *process* exists within the Orthodox Jewish community is more unclear, but at least some facts are undisputed. Whatever else may be true, the evidence shows that any candidate slating process at work in the Orthodox community is *ad hoc*, differs year-to-year, and involves a rotating cast of characters. One thing is indisputable: minority candidates—such as Bernard Charles, Pierre Germain, Maraluz Corado, and Sabrina Charles-Pierre—have access to the Orthodox community's *ad hoc* slating process.[52] All of these minority candidates have at various times obtained endorsements and support from members of the Orthodox Jewish community and, with the benefit of that support, were elected to the District's board of education.[53]

### D.    School Board Candidates and Election Results 2013 Through 2018

Presently, three out of nine school board members are Black (Sabrina Charles-Pierre, Bernard Charles, and Pierre Germaine) and six are White (Harry Grossman, Joel Freilich, Yehuda Weissmandl, Mark Berkowitz, Yoel Trieger, and Ephraim Weissmandl). Blacks are therefore slightly over-represented on the school board (33%) relative to their proportion of the total population of the District (22%) and their proportion of the CVAP (24%). White representation on the board (66%) is roughly proportional to the White population's overall proportion of the District's population (58.5%) and the CVAP (61%). It is undisputed that the school board has always had substantial minority representation.[54]

---

[52] *See id.* ¶¶ 22, 76, 86, 94.
[53] *Id.*
[54] *Id.* ¶¶ 21–23, 66, 74, 80, 84 & 92.

11

From 2013 through 2018, there have been elections for nineteen open seats on the District's board of education. In this five-year period, there were fourteen contested elections and five uncontested elections.[55] Minority candidates were on the ballot in fourteen of the nineteen elections.[56] Of the thirty candidates who participated in the fourteen contested elections, more than half—seventeen—were minority candidates.[57]

| TABLE 1 SUMMARY OF SCHOOL BOARD ELECTIONS: 2013-1018 | | | | | | | | |
|---|---|---|---|---|---|---|---|---|
| **Yr.** | **Seat 1** | | | **Seat 2** | | **Seat 3** | | **Seat 4** |
| **2013** | Corado (L)* | Tuck (B) | | Clerveaux (B) | Germain (B)* | Forrest (B) | Charles (B)* | |
| **2014** | Hopstein (W)* | | | Grossman (W)* | | Engel (W)* | | Y. Weissmandl (W)* |
| **2015** | Charles-Pierre (B) | Lefkowitz (W)* | Jones (B) | Rothman (W) * | Morales (L) | White (W) | Eisenbach (W) | Ramirez (L)* |
| **2016** | Charles (B)* | Foskew (W) | | Germain (B)* | Fields (B) | Y. Weissmandl (W)* | Morales (L) | Charles-Pierre (B)* |
| **2017** | Manigo (W) | Berkowitz (W)* | | Goodwin (B) | Grossman (W)* | Frielich (W)* | Dos Reis (L) | |
| **2018** | Charles-Pierre (B)* | | | Trieger (W)* | Moster (W) | E. Weissmandl (W)* | Cintron (L) | |
| *Key: An * denotes the election winner.  B = Black; W = White; L = Latino/Hispanic* | | | | | | | | |

Table 1 (above) summarizes the results of each contest, with an asterisk denoting each election's winner. The race of the candidate is also included with the name of the candidate (W = White, B = Black, and L = Latino/Hispanic).

---

[55] *Id.* ¶¶ 74, 78, 80, 84, 88 & 92.

[56] *Id.*

[57] *Id.*

12

**2013 Election.**  In 2013, six candidates competed for three open seats.[58]  All of the candidates were minorities.[59]  Maraluz Corado (Latina) and Margaret Tuck (Black) competed for one seat.[60]  Black Haitian American Eustache Clerveaux ran against fellow Black Haitian American Pierre Germain.[61]  And Robert Forrest (Black) and Bernard Charles (Black) ran against each other for the final seat.[62]  It is undisputed that Ms. Tuck, Mr. Clerveaux, and Mr. Forrest ran together as part of the Power of Ten endorsed slate.[63]  It also is undisputed that they were opposed by a slate organized by Mr. Charles, consisting of himself, Ms. Corado, and Mr. Germaine.  Mr. Charles's slate ran as representative of the "public school community," but unlike their opponents, the members of Mr. Charles' slate also campaigned for and obtained support from members of the Orthodox Jewish community.[64]  Ms. Corado, Mr. Germain, and Mr. Charles were elected.[65]

**2014 Election.**  In 2014, all of the candidates ran unopposed for four open seats.[66]

**2015 Election.**  In 2015, eight candidates ran for three open seats.[67]  Sabrina Charles-Pierre (Black), Alan Keith Jones (Black), and Jacob J. Lefkowitz (White) all ran against each other for the first open seat.[68]  Yonah Rothman (White) and Natashia Morales (Latina) ran against each other for the second open seat.[69]  Steve White (White), Yisroel Eisenbach (White), and Juan Pablo Ramirez (Latino) ran against each other for the final open seat.[70]  It is undisputed that Ms. Charles-Pierre, Ms. Morales, and Mr. White ran together as part of the Power of Ten slate.[71]  Mr. Lefkowitz,

---

[58] *Id.* ¶ 74.
[59] *Id.*
[60] *Id.*
[61] *Id.*
[62] *Id.*
[63] *Id.* ¶ 76.
[64] *Id.* ¶¶ 22, 23.
[65] *Id.* ¶ 78.
[66] *Id.* ¶ 80.
[67] *Id.*
[68] *Id.*
[69] *Id.*
[70] *Id.* ¶ 82.
[71] *Id.* ¶ 87.

Mr. Rothman, and Mr. Ramirez were elected.[72]

**2016 Election.**  In 2016, seven candidates ran for four open seats.[73]  Bernard Charles (Black) ran for reelection against Kim Foskew (White).[74]  Pierre Germain (Black) ran for reelection against Jean E. Fields (Black).[75]  Natashia Morales (Latina) made a second bid for the board against Yehuda Weissmandl (White).[76]  Sabrina Charles Pierre (Black) ran unopposed.[77]  It is undisputed that Ms. Foskew, Ms. Morales, Ms. Fields, and Ms. Charles-Pierre ran together as part of the Power of Ten organized slate.[78]  It also is undisputed that they were opposed by a slate organized by Mr. Charles, comprised of himself, Mr. Weissmandl, and Mr. Germaine.[79]  It is undisputed that, once again, Mr. Charles's slate ran at least in part as representative of the "public school community," and, as before, that slate obtained support from members of the Orthodox community.[80]  Mr. Charles, Mr. Germain, Mr. Weissmandl, and Ms. Charles-Pierre were elected.[81]

**2017 Election.**  In 2017, six candidates ran for three open seats.[82]  Alexandra K. Manigo (White) ran against Mark Berkowitz (White).[83]  Eric Goodwin (Black) ran against Harry Grossman (White).[84]  And Joel Frielich (White) ran against Chevon Dos Reis (Latina).[85]  It is undisputed that Ms. Manigo, Mr. Goodwin, and Ms. Dos-Reis ran together as part of the Power of Ten organized slate.[86]  Mr. Grossman, Mr. Frielich, and Mr. Berkowitz  were elected.[87]

---

[72] *Id.* ¶ 80.
[73] *Id.* ¶ 83.
[74] *Id.*
[75] *Id.*
[76] *Id.*
[77] *Id.*
[78] *Id.* ¶ 85.
[79] *Id.* ¶ 22, 23.
[80] *Id.*
[81] *Id.* ¶ 83.
[82] *Id.* ¶ 88.
[83] *Id.*
[84] *Id.*
[85] *Id.*
[86] *Id.* ¶ 89.
[87] *Id.* 93.

**2018 Election.**  In 2018, five candidates campaigned for three open seats.[88]  Incumbent Sabrina Charles-Pierre (Black) again ran unopposed and appears to have earned communitywide support.[89]  Yoel T. Trieger (White) ran against Miriam Moster (White).[90]  Joselito Cintron (Latino) ran against Ephraim Weissmandl (White).[91]  It is undisputed that Ms. Moster, Mr. Cintron, and Ms. Charles-Pierre ran as part of the Power of Ten slate.[92]  Ms. Charles-Pierre, Mr. Trieger, and Mr. Weissmandl were elected.[93]  Despite running unopposed, Ms. Charles-Pierre received more votes than any other candidate (by more than 2,000 votes).[94]

## III.   LEGAL STANDARD ON MOTION FOR SUMMARY JUDGMENT

Summary judgment is proper where "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a); *accord Celotex Corp. v. Catrett*, 477 U.S. 317, 322–23 (1986).  The existence of a factual dispute, in and of itself, is not sufficient to defeat a motion for summary judgment.  "Only disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment."  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).

While the moving party bears the initial burden of identifying the materials that "demonstrate the absence of a genuine issue of material fact," *Celotex*, 477 U.S. at 323, summary judgment should be granted if the nonmoving party "fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial," *id*. at 322.

---

[88] *Id.* ¶ 92.
[89] *Id.*
[90] *Id.*
[91] *Id.*
[92] *Id.* ¶ 93.
[93] *Id.* ¶ 92.
[94] *Id.*

## IV.    LEGAL BACKGROUND ON SECTION 2 OF THE VOTING RIGHTS ACT

"[A] violation of the Voting Rights Act must be based on proof of the following elements in combination: (1) a voting standard, practice, procedure, qualification or prerequisite (2) imposed by a State or political subdivision (3) in a manner that denies or abridges the right of any citizen to vote (4) on account of race [or] color ... ." *Goosby*, 180 F.3d at 491 (citing 52 U.S.C. § 10301(a) ("Section 2")). Section 2 plaintiffs must also prove that "(1) the political processes for nomination and election (2) are not equally open to participation by members of the protected [racial] class (3) because the [racial] class members have less opportunity than others to participate and elect their representatives of choice." *Id.*

Section 2 plaintiffs must make three additional, preliminary showings, called the "*Gingles* preconditions." *Thornburg v. Gingles*, 478 U.S. 30, 50–51 (1986).  Only the second and third *Gingles* preconditions are at issue in this case, which require Plaintiffs to prove (1) that the minority groups of interest are politically cohesive; and (2) "legally significant racially polarized voting." *Id*. at 56. While "racially polarized voting" does not have a fixed definition, racially polarized voting generally is present when voters of different races vote differently.  *Id.* at 53 n.21 (racial polarization exists when "black voters and white voters vote differently").

For racially polarized voting to be "legally significant," Plaintiffs must prove that a White majority "votes sufficiently as a bloc usually to defeat black voters' candidates of choice." *City of Niagara Falls*, 65 F.3d at 1008 (citing *Gingles*, 478 U.S. at 51).  Since voters do not identify themselves by race at the polls, courts use statistical analyses to assess whether minority-preferred candidates are usually defeated by White voters as a bloc.  *See, e.g.*, *id.* at 1009 & n.11.  If the *Gingles* preconditions are satisfied, courts must then undertake a multifactor "totality of the circumstances" analysis.

The Voting Rights Act only regulates elections that impair voting rights "on account of

race or color" and, therefore is not implicated where minority-preferred candidates lose elections because, *e.g.*, they hold unpopular political positions.   Any other rule would be mere "interest-group politics rather than a rule hedging against racial discrimination."  *Gingles*, 478 U.S. at 83 (White, J., concurring).   To determine whether minority-preferred candidates may be losing elections for a reason *other than race or color*, courts look "beyond the statistical voting patterns of whites and blacks to see *who* is actually running—whites or blacks"—in order to determine "whether the majority is voting against candidates for reasons of race" or for some reason not regulated by Section 2.  *City of Niagara Falls*, 65 F.3d at 1015; *accord Goosby*, 180 F.3d at 493 (whether elections are driven by partisanship or by racial considerations should be considered as part of inquiry into totality of circumstances).

Where "it could be said that white voters [have] supported minority candidates ... at levels equal to or greater than those of white candidates, it [is] proper to conclude in that case 'that divergent voting patterns among white and minority voters are best explained'" by factors other than race.  *Goosby*, 180 F.3d at 496 (quoting *LULAC*, 999 F.2d at 861).  It thus follows that "plaintiffs cannot prevail on a [Section 2] claim if there is significantly probative evidence that whites voted as a bloc for reasons wholly unrelated to racial animus."  *Uno v. City of Holyoke*, 72 F.3d 973, 981 (1st Cir. 1995).

## V.   ARGUMENT

Plaintiffs' claim is that the Power of Ten slates invariably were the "minority-preferred" candidates in every election (even when they faced minority opponents) and that the Power of Ten slates' lack of success amounts to a Section 2 violation.  Even if the Power of Ten slates were minority-preferred (which is neither obvious nor admitted), Plaintiffs' claim fails.

"Unless the tendency among minorities and white voters to support different candidates, and the accompanying losses by minority groups at the polls, are somehow tied to race, voting

rights plaintiffs simply cannot make out a case of vote dilution." *Nipper*, 39 F.3d at 1523–24; *accord City of Holyoke*, 72 F.3d at 981 ("[P]laintiffs cannot prevail on a VRA § 2 claim if there is significantly probative evidence that whites voted as a bloc for reasons wholly unrelated to racial animus."). Plaintiffs here have not and cannot connect Power of Ten's electoral defeats with *race*. The Power of Ten slates lose because they advocate for public policies that are unpopular with the majority of voters in the District. It's that simple. "Section 2 of the Voting Rights Act forbids the 'denial or abridgement of the right ... to vote on account of race or color.' It is a balm for racial minorities, not political ones—even though the two often coincide." *Baird*, 976 F.2d at 361. Summary judgment is proper.

### A.    Plaintiffs Have No Evidence of Racially Polarized Voting.

At the outset, the District is entitled to summary judgment because, for all the reasons set forth in the District's contemporaneously filed *Daubert* motion, Plaintiffs' experts' opinions on racially polarized voting are based on unreliable methodologies and are therefore inadmissible under Federal Rule of Evidence 702. The District does not restate, but incorporates the arguments in its *Daubert* motion as if set forth in full. Because Plaintiffs cannot meet their burden under the *Gingles* preconditions, summary judgment should be entered for the District.

### B.    Minorities in the District Are Not Excluded from the Political Process "On Account of Race or Color."

Even assuming Plaintiffs' experts' testimony were admissible, and even assuming that Plaintiffs were correct and that the District's elections were racially polarized, summary judgment would still be proper because it undisputed (and indisputable) that *non-racial* justifications readily explain any appearance of racial polarization. This is so because minority candidates for the school board have been routinely elected with the support of a majority of White voters. As noted above, three of the school board's nine sitting members are Black: Charles, Germaine, and Charles-Pierre.

Between 2013 and 2017, Black and Latino candidates won one of every two contested elections, often defeating White opponents: Charles, Germaine, and Corado won in 2013; Ramirez won in 2015; and Charles and Germain won again in 2016.

The consistent success of minority candidates, with the unvaried support from the majority of White voters, conclusively demonstrates that: (a) minorities are not excluded from political processes in the District on account of race or color; and (b) if there is polarization in District elections, it must be driven by policy or political differences—not by racial animus.

That was Judge Seybert's conclusion in *Reed v. Town of Babylon*, 914 F. Supp. 843 (E.D.N.Y. 1996), and this Court should reach the same result. There, Black voters brought a Section 2 claim against the town's at-large system for electing the town board. The town argued that any failure of minority-preferred candidates to win election had to do with *partisan affiliation* and not racial bias. Judge Seybert carefully reviewed the law and concluded that "[t]he text of Section 2 itself supports the conclusion that differences in voting patterns between whites and African–Americans that are explainable more by partisanship than by racial bias should not give rise to a viable vote dilution claim." *Id.* at 876.

After analyzing the town's elections, Judge Seybert found that "white voters supported minority candidates slated by a political party at levels at least equal to the support enjoyed by the white candidates of that party, even where the minority candidate was opposed by a white candidate from the other party." *Id.* at 883. Judge Seybert concluded this pattern negated any inference that elections were motivated by racial concerns because, "even assuming that plaintiffs have proffered a prima facie case of bloc voting, divergent voting patterns among white and African American voters are best explained by partisan affiliation rather than race." *Id.*; *see also LULAC*, 999 F.2d at 861 (finding no Section 2 violation where "the undisputed evidence discloses

that white voters in most counties, both Republican and Democratic, without fail supported the minority candidates slated by their parties at levels equal to or greater than those enjoyed by white candidates, even where the minority candidate was opposed by a white candidate").

The same voting pattern prevails in the District and compels the same result.  While the District's elections are nonpartisan, a similar partisan dynamic is at work in the competition between the Power of Ten slates and candidates supported by the Orthodox community. The parties' experts in this case do not agree on much, but they *do agree* that the District's White voters have supported candidates of all races, without variation in the degree of support according to the race of the candidates, even when a minority candidate faces off against a White opponent.[95]  This happened, for example, when Juan Pablo Ramirez defeated Steve White, and when Bernard Charles defeated Kim Foskew.  Just as in *Reed*, this pattern of race-neutral support for candidates by White voters shows that any divergent voting between White and minority voters in the District is best explained by the underlying policy and political disputes that divide the electorate—not by racial concerns.

Everything that makes this case similar to *Reed* also distinguishes it from *Goosby*.  There, the court found that before the Section 2 case was filed against the town, White voters had never slated a Black candidate for the town board, and "a majority of white voters in Hempstead had never supported a black candidate for the Board." *Goosby*, 180 F.3d at 503 (Leval, J., concurring). The one successful Black candidate was properly disregarded in the analysis, because he had clearly been elected in response to the filing of the lawsuit.  *Id.*  The *Goosby* court therefore held that the evidence proved Blacks were excluded from the political process, and that the town's "evidence failed to demonstrate the absence of race-based intentions as a contributing cause." *Id.*

---

[95] *Id.* ¶ 94.

at 503–04.

This case could not be more different than *Goosby*. It is undisputed that in the District minority candidates routinely are slated on both sides of the divide (by Power of Ten and with support of the Orthodox community). And majorities of White voters have routinely supported and elected minority candidates. Thus, the facts that distinguish *Goosby* are the same facts that compel summary judgment. Indeed, in concurring in the judgment on appeal in *Goosby*, Judge Leval specifically stated that it was these facts that distinguished *Goosby* from the Fifth Circuit's opinion in *LULAC*, where, as in *Reed*, the court held that no Section 2 violation was shown where White voters had regularly supported minority candidates without regard to race. *Id*.

The Court should follow Judge Leval's guidance. The undisputed facts here show that if there is any polarization in the District, it is better explained by *non-racial* policy and political concerns than by concerns about race, and Plaintiffs' Section 2 claim must fail.

### C.    The "Safe Candidate" Doctrine Is Inapposite.

This Court has observed that the fact that minorities have been elected to the school board is not, by itself, dispositive of Plaintiffs' Section 2 claim, and that "[t]he election of a 'safe' minority candidate does not establish that there is no Section 2 violation." ECF No. 304 at 5. That is true. But the "safe candidate" doctrine, also sometimes called the "special circumstances" doctrine, is inapposite here and does not preclude summary judgment for the District.

The "safe candidate" or "special circumstances" doctrine addresses the concern that if the election of a few minority candidates automatically "foreclos[ed] the possibility of dilution of the black vote" then "the possibility exists that the majority citizens might evade the section, *e.g.*, by manipulating the election of a 'safe' minority candidate." Senate Report at 29 n.115. Because this concern is about preventing conspiratorial efforts to avoid Section 2 liability, courts hold that

21

the "safe candidate" doctrine "has little applicability where minorities win frequently" or were not elected until "after the initiation of a voting rights suit." *Aldasoro v. Kennerson*, 922 F. Supp. 339, 375–76 (S.D. Cal. 1995).

The *Goosby* case is a classic example of the doctrine's correct application. There, in direct response to the filing of a Section 2 lawsuit, the town's Republican leadership engineered the election of the first ever Black candidate in the town's history, in the hopes that doing so would scuttle the litigation. *Goosby v. Town Bd. of Hempstead*, 956 F. Supp. 326, 344 (E.D.N.Y. 1997). The court properly afforded the election no weight.

Here, unlike in *Goosby*, the undisputed facts show that minority candidate success in the District is the norm, and has been for years.[96] Plaintiffs cannot reasonably contend that White voters in the District supported minority candidates out of concern for Section 2 liability almost a decade before Plaintiffs even filed this case. Moreover, to prevail on any theory involving "safe candidates," Plaintiffs would have to persuade the Court to disregard *eight* minority candidate victories from 2013 to 2018.[97] The "safe candidate" theory is simply implausible here.

Considering the sustained history of minority electoral success in the District, it also would be profoundly unfair (not to mention patronizing and inappropriate) for Plaintiffs to accuse the District's present and former minority board members of being mere "safe candidates." Candidates who consistently win hotly contested elections are not "safe" candidates. They are successful, experienced, and entitled to be treated with the respect due to elected officials. *See, e.g.*, *Ruiz v. City of Santa Maria*, 160 F.3d 543, 558 (9th Cir. 1998) (rejecting, for purposes of the "safe candidate" doctrine, "any rule that would require the parties to cast aspersions on the qualifications of the victorious or defeated minority candidates"). Any argument against summary

---

[96] *Id.* ¶¶ 60–94.
[97] *Id.*

judgment premised on the "safe candidate" doctrine must be rejected.

> ### D.    Consideration of the Senate Factors Does Not Alter the Conclusion that Summary Judgment Should Be Granted.

Finally, no consideration of the remaining "Senate Factors" under the totality of circumstances overcomes the District's showing that summary judgment is proper.

*First*, Plaintiffs have no evidence of "any history of official discrimination" in the District that has "touched the right of the members of the minority group to register, to vote, or otherwise to participate in the democratic process." *Gingles*, 478 U.S. at 36–37 (quoting Senate Report at 28). Plaintiffs cannot point to any admissible evidence that shows minorities in the District were ever prevented or restrained from registering to vote or voting, or have otherwise suffered discrimination in any way relative to voting.

*Second*¸ as discussed above and in the District's *Daubert* motion, Plaintiffs have no reliable, admissible evidence that shows voting in the District is racially polarized, to any extent or degree.

*Third*, while there are disputed facts surrounding the existence and particulars of any candidate slating process that may be at work in the District's Orthodox community, those facts are not *material* and therefore do not preclude summary judgment. The Senate Report's "slating factor" asks: "if there is a candidate slating process, whether the members of the minority group have been denied access to that process." Senate Report at 29. Therefore, "[t]he key slating inquiry is whether minorities have been able to get on the ballot." *France*, 71 F. Supp. 2d at 331; *accord Montano v. Suffolk Cnty. Legislature*, 268 F. Supp. 2d 243, 265 (E.D.N.Y. 2003). As discussed at length above, because minority candidates regularly appear on the ballot (and win) in the District, Plaintiffs cannot in good faith argue that minorities are unable to get on the ballot.

*Fourth*, Plaintiffs have no evidence that "members of the minority group" in the District "bear the effects of discrimination in such areas as education, employment and health, which hinder their ability to participate effectively in the political process." *Gingles*, 478 U.S. at 37 (quoting Senate Report at 29). All indications in the record are that minority voter turnout in District elections is unusually high compared to the District's neighbors. And Plaintiffs' own expert opines that Blacks and Latinos in the District are thriving socioeconomically when compared to their statewide counterparts.[98]

*Fifth*, Plaintiffs have no evidence that political campaigns in the District—on either side— are or ever have been "characterized by overt or subtle racial appeals." Senate Report at 29. And, as the District has comprehensively shown throughout this brief, "the extent to which members of the minority group have been elected to public office in the jurisdiction" not only favors the District in the totality of the circumstances—it is case dispositive. *Id.*

In addition to the primary factors, the Senate Report contains two "additional factors": (i) "whether there is a significant lack of responsiveness on the part of elected officials to the particularized needs of the members of the minority group," and (ii) "whether the policy underlying [the contested election policy] is tenuous." *Id.* at 29. Neither alters the analysis.

As for "responsiveness," unlike the other Senate factors, "[t]he Senate Report makes clear that the issue of a political subdivision's responsiveness has little probative value." *United States v. Vill. of Port Chester*, 704 F. Supp. 2d 411, 446 (S.D.N.Y. 2010). Consequently, the Second Circuit considers the "responsiveness" Senate Factor with "some reluctance, as it entails ... deciphering what policy steps qualify as responses to the 'needs of members of the minority community.'" *City of Niagara Falls*, 65 F.3d at 1023 n.24 (quoting Senate Report at 29).

---

[98] *Id.* ¶ 3.

Plaintiffs, of course, disagree strongly over "responsiveness" and are eager to criticize countless aspects of the District's functions and to characterize each and every asserted failure as a lack of "responsiveness" to minority residents.  If forced to do so, the District would probably have to dispute all or nearly all of Plaintiffs' contentions.

But the Court can and should just avoid the morass and simply decline Plaintiffs' invitation to scrutinize and second-guess the District's last ten years' worth of budgetary and education policy decisions.  Any such exercise would be wasteful, fruitless, inconclusive, and in the end would still have insufficient weight to change the end-result of the analysis.  The "responsiveness" (or lack thereof) factor is simply not material to the outcome of the case in light of the undisputed facts and the other factors, and nothing relating to it precludes summary judgment.

Finally, the District's policy for maintaining the "contested policy" is not tenuous.  As noted above, the system of "at-large" voting for school board elections is required by state law and accordingly the same at-large system prevails in all 700 plus school districts in New York.

## VI.    CONCLUSION

For all of the foregoing reasons, and for the reasons set forth in the concurrently filed *Daubert* motion, this Court should grant summary judgment in favor of the District.


[signature on following page]

25

Dated:  March 4, 2019

Respectfully submitted,

MORGAN, LEWIS & BOCKIUS LLP

s/ David J. Butler
David J. Butler
Randall M. Levine
101 Park Avenue
New York, NY 10178
T: (212) 309-6000
F: (212) 309-6001
    -and-
1111 Pennsylvania Avenue, NW
Washington, DC 20004
T: (202) 739-3000
F: (202) 739-3001
david.butler@morganlewis.com
randall.levine@morganlewis.com

William S.D. Cravens
Stephanie Schuster
Clara Kollm
Adam Adler
1111 Pennsylvania Avenue, NW
Washington, DC 20004
T: (202) 739-3000
F: (202) 739-3001
william.cravens@morganlewis.com
stephanie.schuster@morganlewis.com
clara.kollm@morganlewis.com
adam.adler@morganlewis.com

*Counsel for Defendant East Ramapo Central
    School District*