**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| NATIONAL ASSOCIATION FOR THE ADVANCEMENT OF COLORED PEOPLE, SPRING VALLEY BRANCH; JULIO CLERVEAUX; CHEVON DOS REIS; ERIC GOODWIN; JOSE VITELIO GREGORIO; DOROTHY MILLER; HILLARY MOREAU; and WASHINGTON SANCHEZ,<br><br>                    Plaintiffs,<br><br>        v.<br><br>EAST RAMAPO CENTRAL SCHOOL DISTRICT and MARYELLEN ELIA, IN HER CAPACITY AS THE COMMISSIONER OF EDUCATION OF THE STATE OF NEW YORK,<br><br>                    Defendant. | 17 Civ. 8943 (CS) (JCM) |

**PLAINTIFFS' OPPOSITION TO DEFENDANT EAST RAMAPO CENTRAL SCHOOL**

**DISTRICT'S MOTION FOR SUMMARY JUDGMENT**

# TABLE OF CONTENTS

Page

I.    INTRODUCTION .................................................................................................1

II.   SUMMARY OF MATERIAL FACTS.................................................................5

   A.    The District Is Highly Segregated and Its Public Schools Are
         Overwhelmingly Minority .........................................................................5

   B.    The District Administers At-Large, Off-Cycle Elections for Board
         Positions, Enhancing Discriminatory Vote Dilution .................................6

   C.    Voting in the District Is Racially Polarized with the White Majority
         Defeating Minority-Preferred Candidates.................................................7

      1.    The District's Majority Votes as a Bloc to Defeat the Minority-
            Preferred Candidates.........................................................................7

      2.    Minority-Preferred Candidates Are Excluded from White Slates ..............9

   D.    The Board Fails Black and Latino Children ...........................................13

III.  ARGUMENT ......................................................................................................14

   A.    Plaintiffs Can Prove That There Is Racially Polarized Voting in the
         District......................................................................................................15

   B.    The District's Attempts to Explain Away Racial Issues Are Unavailing.............16

      1.    Plaintiffs are not required to prove racial animus.....................................16

      2.    The "policy" issues cited by the District are racial...................................17

   C.    The District Is in Violation of Section 2 Regardless of the Election of Safe
         Minority Candidates.................................................................................18

   D.    The Senate Factors Further Show That Summary Judgment Is
         Inappropriate ...........................................................................................21

IV.   CONCLUSION...................................................................................................25

# <u>TABLE OF AUTHORITIES</u>

**Page(s)**

## CASES

*Allen v. State Bd. of Elections*,
  393 U.S. 544 (1969) ..................................................................................6, 7

*Brown v. Bd. of Educ.*,
  347 U.S. 483 (1954) ..........................................................................................29

*Buckanaga v. Sisseton Indep. Sch. Dist.*,
  804 F.2d 469 (8th Cir. 1986) ............................................................................27

*Collins v. City of Norfolk*,
  883 F.2d 1232 (4th Cir. 1989) ..........................................................................24

*Goosby v. Town Bd. of Hempstead*,
  180 F.3d 476 (2d Cir. 1999) ....................................................................... *passim*

*Goosby v. Town Bd. of Hempstead*,
  956 F. Supp. 326 (E.D.N.Y. 1997) ............................................................ *passim*

*Jenkins v. Red Clay Consol. Sch. Dist. Bd. of Educ.*,
  4 F.3d 1103 (3d Cir. 1993) ................................................................................24

*Johnson v. De Grandy*,
  512 U.S. 997 (1994) ....................................................................................19, 26

*McNeil v. City of Springfield*,
  658 F. Supp. 1015 (C.D. Ill. 1987) ...................................................................28

*Montes v. City of Yakima*,
  40 F. Supp. 3d 1377 (E.D. Wash. 2014) ...........................................................28

*Montesa v. Schwartz*,
  No. 12 Civ. 6057 (S.D.N.Y.) ............................................................................25

*NAACP v. City of Niagara Falls*,
  65 F.3d 1002 (2d Cir. 1995) .............................................................................21

*New York v. U. S. Dep't of Commerce*,
  351 F. Supp. 3d 502 (S.D.N.Y. 2019) ..............................................................12

*Nipper v. Smith*,
  39 F.3d 1494 (11th Cir. 1994) ..........................................................................21

*Pope v. Cty. of Albany*,
    94 F. Supp. 3d 302 (N.D.N.Y. 2015)...................................................................21, 24, 28

*Reed v. Town of Babylon*,
    914 F. Supp. 843 (E.D.N.Y. 1996) ................................................................................22, 23

*Thornburg v. Gingles*,
    478 U.S. 30 (1986).................................................................................................. *passim*

*U.S. v. Charleston Cty.*,
    316 F. Supp. 2d 268 (D.S.C. 2003)....................................................................................30

*U.S. v. Charleston Cty.*,
    365 F.3d 341 (4th Cir. 2004) ............................................................................................22

*U.S. v. City of Eastpointe*,
    2019 WL 1379974 (E.D. Mich. Mar. 27, 2019) .......................................................7, 8, 9, 20

*U.S. v. Vill. of Port Chester*,
    2008 WL 190502 (S.D.N.Y. Jan. 17, 2008) ..............................................................8, 27, 28

*U.S. v. Vill. of Port Chester*,
    704 F. Supp. 2d 411 (S.D.N.Y. 2010).............................................................................21, 30

*Wright v. Sumter Cty. Bd. of Elections & Registration*,
    657 F. App'x 871 (11th Cir. 2016) ...............................................................................19, 26

*Zimmer v. McKeithen*,
    485 F.2d 1297 (5th Cir. 1973) .........................................................................................25

## STATUTES

52 U.S.C. § 10301(b) ...............................................................................................7, 22

## RULES

FED. R. CIV. P. 56(a) ...................................................................................................19

## OTHER AUTHORITIES

Chandler Davidson, *The Voting Rights Act:  A Brief History*, CONTROVERSIES IN
    MINORITY VOTING: THE VOTING RIGHTS ACT IN PERSPECTIVE (Grofman and
    Davidson eds., 1992)...................................................................................................6

S. REP. NO. 97-417 (1982) .......................................................................................10, 30

## I.    INTRODUCTION

The Fifteenth Amendment, as ratified in 1870, was intended to guarantee the right to vote regardless of "race, color, or previous condition of servitude."  For nearly 100 years, however, a variety of election laws and procedures designed to disenfranchise racial minorities thwarted this fundamental right.  In 1965, the Voting Rights Act ("VRA") was enacted to redress the long-deferred promise of that constitutional protection.  But, in response to the VRA and the prospect of increased black enfranchisement, many communities adopted "at-large" electoral systems whereby officials are elected by voters from the entire community, which allowed white voters in the numerical majority to out-vote black voters in the minority.[1]  The Supreme Court, in turn, found that at-large elections had the effect of "nullify[ing] [black voters'] ability to elect the candidate of their choice just as would prohibiting some of them from voting."  *Allen v. State Bd. of Elections*, 393 U.S. 544, 565-69 (1969).

The electoral system at issue here involves precisely the form of disenfranchisement by vote dilution described by the Supreme Court in *Allen*.  The East Ramapo Central School District (the "District"), a community that is highly segregated along racial lines, employs an at-large system to elect the Board of Education (the "Board").  Although white residents make up approximately 60 percent of the District's population, very few white children in the District attend public schools.  Indeed the private school population is 99 percent white.  Meanwhile, the public school population is more than 92 percent black and Latino.  Tensions between the white, private school population and the minority, public school population define Board politics.  As a result, Board elections are racially polarized: the white majority votes as a bloc such that no minority-

---

[1] *See* Chandler Davidson, *The Voting Rights Act:  A Brief History*, *in* CONTROVERSIES IN MINORITY VOTING: THE VOTING RIGHTS ACT IN PERSPECTIVE 7, 24 (Grofman and Davidson eds., 1992).

preferred candidate has won a contested election since at least 2013.[2]  The Board elections are a choice between two slates: the private school slate, preferred by the white majority whose children overwhelmingly attend private schools, and the public school slate, preferred by the black and Latino minority whose children overwhelmingly attend public schools.  An influential group of individuals within the white community selects and supports candidates for the private school slate who are invariably elected to the Board.  *Id.* at ¶¶ 105; 114-124.

Beginning in 2009, the Board began making deep cuts to the District's public school budget.  *Id.* at ¶ 138.  Those cuts resulted in firing over 500 teachers and employees, the elimination of full-day Kindergarten, and the elimination of electives, art, music, extracurricular activities, and numerous other programs.  *Id.*  At the same time, spending on programs that benefited private school students increased.  *Id.*  The Board was fully aware that its cuts to public school funding primarily affected black and Latino students.  *Id.*  The situation became so dire that the State of New York appointed a series of monitors who found that the Board had "persistently failed to act in the best interests of [black and Latino] public school students."  *Id.*

The District moves for summary judgment,[3] despite the fact that it admits there are several disputed facts crucial to an analysis under 52 U.S.C. § 10301(b) ("Section 2").  The District's admission precludes summary judgment.  *See U.S. v. City of Eastpointe*, 2019 WL 1379974 at *11 (E.D. Mich. Mar. 27, 2019).  Furthermore, the District's argument that Plaintiffs cannot prove a Section 2 violation is predicated upon four faulty arguments, none of which states a cognizable claim for summary judgment.  First, the District wrongly claims that the evidence presented by Plaintiffs' experts regarding racially polarized voting must be stricken.  Plaintiffs respond to that

---

[2] *See* Pls.' Opp. to Def.'s Statement of Undisputed Facts and Add'l Statement of Material Facts ("PSMF") at ¶¶ 63; 118-122.

[3] *See* Def.'s Mem. of Law in support of Mot. for Summ. J. at *passim*, ECF No. 356 ("Mot.").

faulty argument in full in their contemporaneously filed Response to the District's *Daubert* motion. But in sum, Plaintiffs' experts used methods that are scientifically valid, reliable, and in accordance with Rule 702. *See id.* at *15-*16 (denying defendant's *Daubert* motion to exclude expert analysis relying on the same methodology used by Plaintiffs' experts).

Second, the District incorrectly argues that Plaintiffs' Section 2 claim fails because Plaintiffs have not shown that the white "voting community is driven by racial bias." *See* Mot. at 1. Contrary to the District's argument, however, the Supreme Court, this Court, and others have held there is no requirement to show racial bias to succeed under Section 2. *See Thornburg v. Gingles*, 478 U.S. 30, 35-36 (1986) (holding that Congress amended Section 2 to clarify discriminatory intent was not required and "a violation could be proved by showing discriminatory effect alone"); *see also U.S. v. Vill. of Port Chester*, 2008 WL 190502, at *26 (S.D.N.Y. Jan. 17, 2008) ("the critical point is whether white voters are voting for other candidates to such a degree that [minority]-preferred candidates are consistently defeated . . . [t]he motivations of the white voters under such a framework are irrelevant"); *Goosby v. Town Bd. of Hempstead*, 956 F. Supp. 326, 353 (E.D.N.Y. 1997) ("[T]he existence (or non-existence) of racial bias in the community" is not "dispositive in a Section 2 case."). In fact, Congress amended the VRA to clarify that it proscribed not only intentional discrimination but also electoral practices—such as at-large voting re-enforced by practices of slating and campaigning that divide along racial lines—that disadvantage the electoral opportunities of minority voters. *Gingles*, 478 U.S. at 36.

Third, the District argues incorrectly that Plaintiffs cannot show a Section 2 violation because racially polarized voting in the District is attributable to preferred policy positions, rather than race. That argument ignores the realities of the District, where public and private schools are almost entirely segregated. Here, the so-called "policy preferences" divide along racial lines and

are simply further examples of racial polarization. Moreover, the Second Circuit has held that non-racial explanations for racially polarized voting are not legally dispositive, but rather should be considered under the fact-intensive inquiry of the "totality of the circumstances." *See Goosby v. Town Bd. of Hempstead*, 180 F.3d 476, 491 (2d Cir. 1999). While the District may contend that policy preferences rather than race best explain the racial polarization in Board elections, that fact is highly disputed and, even if true, would not be legally dispositive.

Fourth, the District erroneously asserts that the electoral opportunities of minority ***voters*** are not disadvantaged because ***candidates*** of color have been elected to the Board. This argument fails to recognize the nature of the protection afforded by Section 2. The right to vote does not merely implicate the interest in casting a ballot; it requires a fair opportunity to elect candidates of one's choice. *See Gingles*, 478 U.S. at 47 (holding that the essence of a Section 2 claim is whether there are equal "opportunities enjoyed by [minority] and white voters ***to elect their preferred representatives***"); *City of Eastpointe*, 2019 WL 1379974 at *9 (the critical inquiry "is not whether white candidates do or do not usually defeat black candidates, but whether minority-preferred candidates, whatever their race, usually lose"). The fact that a white slating organization vetted, selected, and ran "safe minority" candidates does not defeat Plaintiffs' claims.

Because Plaintiffs can present evidence to show that (1) the minority group in the District is large enough to constitute a majority in a single member district; (2) is politically cohesive; and (3) the white majority votes as a bloc such that it defeats the minority group's preferred candidates, Plaintiffs satisfy the three *Gingles* preconditions. *See Gingles*, 478 U.S. at 49-51. Therefore, the Court considers the "totality of the circumstances" which is an inherently and intensely fact-based analysis of factors laid out in the Senate Report (the "Senate Factors") and is ill-suited to summary judgment. *See Gingles*, 478 U.S. at 78 ("[T]he ultimate finding of vote dilution [is] a question of

fact."); *see also* S. REP. NO. 97-417, at 28-29 (1982) (laying out the Senate Factors). The District attempts to elide the factual disputes regarding the totality of the circumstances by either (a) denying the dispute; (b) claiming that any dispute is not material; or (c) encouraging the Court to ignore the analysis altogether. *See* Mot. at 23-25. But the evidence reveals there are disputed material facts relevant to a majority of the Senate Factors. Because Plaintiffs can show substantial evidence that the District's elections violate the VRA, the District's Motion should be denied.

## II. SUMMARY OF MATERIAL FACTS

### A. The District Is Highly Segregated and Its Public Schools Are Overwhelmingly Minority

The District, located in Rockland County, is approximately 60 percent white, 22 percent black, 15.44 percent Latino, and 3.3 percent Asian. *See* PSMF at ¶ 2. The District's citizen voting age population ("CVAP") is 61.4 percent white, 24.1 percent black, 9.1 percent Latino, and 4.5 percent Asian. *Id.* Black and Latino voters constitute 33.2 percent of the CVAP. *Id.*

The District has a high level of residential segregation with only a very small percentage of whites living in minority neighborhoods. *See* PSMF at ¶ 3. Under a ward voting system, minority voters would comprise a majority of the CVAP in four of nine single-member districts. *Id.* at ¶104. School enrollment is likewise highly segregated. *See id.* at ¶ 4. The District has approximately 8,600 public school students, 92 percent of whom are black or Latino and only 4 percent of whom are white. *See id.* On the other hand, for the 2018-19 school year, the total enrollment at private schools in the District is approximately 27,850. *See id.* at ¶6. Over 99 percent of the students attending private schools in the District are white. *See id.* at ¶43.

The New York State Education Department reports that 34 percent of the District's public school students are English language learners, 20 percent have disabilities, and 70 percent qualify for a free or reduced-price lunch. *See id.* at ¶ 7. The overall academic performance of the public

schools is worse than expected given the socioeconomic status of the minority residents in the District. *See id.* at ¶ 3. Although black and Latino residents do better than their statewide counterparts in terms of income, they lag behind white residents by most other socioeconomic measures. For example, the median value of homes in the District is significantly lower in minority neighborhoods than in white neighborhoods. *See id.* at ¶ 96. Minority residents have higher unemployment rates, while white residents occupy a disproportionally larger percentage of professional and managerial jobs and have higher educational attainment. *Id.* at ¶ 97. Finally, minorities in the District trail whites in Rockland County across numerous socioeconomic measures. *Id.*

### B. The District Administers At-Large, Off-Cycle Elections for Board Positions, Enhancing Discriminatory Vote Dilution

The District holds and administers at-large elections for Board positions. *See id.* ¶ 33.[4] The Board elections are off-cycle: they occur in May each year, rather than at the same time as elections for other local, state, or federal offices. *See id.* at ¶ 101. Because Board members have staggered three-year terms, the District holds elections for three open seats every year. *See id.* Candidates run for numbered posts, such that minority voters cannot concentrate all of their votes on a single candidate. *See id.* At-large, off-cycle elections where candidates run for numbered posts and serve on staggered terms reduce minority turnout and negatively affect minority voters' ability to elect their candidates. *See id.* Furthermore, at-large elections result in a *de facto* majority vote requirement, which exacerbates the effects of white bloc voting. *Id.* There are also far fewer, and different, polling places for Board elections than for other state and federal elections in Rockland County. *See id.* at ¶102 (also discussing evidence the District's polling places are generally more convenient for white voters than for black and Latino voters).

---

[4] New York law permits, but does not require, at-large elections. *See id.* at ¶ 33.

C.    **Voting in the District Is Racially Polarized with the White Majority Defeating Minority-Preferred Candidates**

1.    **The District's Majority Votes as a Bloc to Defeat the Minority-Preferred Candidates**

Plaintiffs' experts, Dr. Mathew Barreto and Dr. Loren Collingwood, determined that the District's elections are significantly racially polarized.  *See* Pls.' Resp. to *Daubert* Mot. ("Pls.' *Daubert*") at *passim*.  The District's expert, Dr. John Alford, was unable to draw any conclusion about whether there was minority cohesion or racially polarized voting, though he testified that Latino voters are "supporting candidates that are not gathering majority support."  Ex. 53 at 261:5-6.  Dr. Alford did, however, find "white voters in the District voted with high rates of cohesion for the winning candidate in each election."  *See* Pls.' *Daubert* at 7-8.

Dr. Alford attempted to analyze minority cohesion using a methodology known as Ecological Inference ("EI") along with CVAP data.  *See* Pls.' Ex. 41 at 1.  CVAP estimates are derived from the American Community Survey, which samples from approximately two percent of the population annually.  *See New York v. U.S. Dep't of Commerce*, 351 F. Supp. 3d 502, 520 (S.D.N.Y. 2019).  *See* Pls.' *Daubert* at 5-7.  Dr. Alford predicted white voter preference and turnout with a high level of confidence because the District's white population is large and heavily concentrated in three voter precincts that are over 90 percent white.  *See* Pls.' Ex. 41 at 8.  Indeed, both parties' experts agree that the District's white residents vote cohesively for winning candidates.  *See* Pls.' *Daubert* at 4.  However, Dr. Alford conceded that where, like here, there are a relatively small number of voting precincts, and, moreover, a lack of homogenous minority precincts, it is difficult to estimate both minority voter preference and turnout using EI analysis of CVAP data.  *See id.* at 7.  Moreover, Dr. Alford admitted that CVAP is prone to underestimating white turnout and overestimating black and Latino turnout.  *Id.* at 6-7.  Ultimately, Dr. Alford was unable to determine whether there was minority cohesion.  *See id.* at 8.

To overcome the problems faced by Dr. Alford's singular EI analysis, Plaintiffs' experts performed multiple EI analyses. *See id.* at 9. First, Drs. Barreto and Collingwood performed two types of EI using Bayesian Improved Surname Geocoding ("BISG") data, which starts with names and addresses of actual voters (unlike CVAP which only calculates eligible voters). *See id.* at 5. BISG then uses Decennial Census data about those voters' surnames and geolocation to create a more accurate prediction of their race. *See id.* at 5-8. Plaintiffs' experts' BISG/EI analysis established that minorities in the District vote cohesively, and that since at least 2013, no minority-preferred candidate has won a contested election. *See id.* at 8-9. Plaintiffs' experts compared the percentage of black and Latino votes that each Board candidate received: fewer than 50 percent of black and Latino voters voted for the successful candidates, and more than 50 percent of black and Latino voters supported the losing candidates.[5] *See id.* (and summarized in table below).

Second, to overcome the problem Dr. Alford highlighted regarding the small size and distribution of black and Latino CVAP, Drs. Barreto and Collingwood combined those voters into a "non-white" minority voting population to show that voting was racially polarized, with white-preferred candidates always winning over minority-preferred candidates. *See id.* at 9.

Third, Drs. Barreto and Collingwood used the EI with CVAP estimates of white voters to show that Dr. Alford's results could also prove minority cohesion. *See id*. Drs. Barreto and Collingwood first analyzed the EI results of white voter cohesion and determined the minimum number of white votes garnered by each candidate. *See id.* at 25. They then deducted that number from the overall total of votes received by each candidate to calculate the maximum number of minority voters who voted for each candidate. *See id.* In every contested election, minorities voted cohesively for the losing candidates. *See id.*

---

[5] Using RxC/BISG results from Pls.' Ex. 40 ¶¶ 7-14, 16; Pls.' Ex. 38 ¶¶ 31-32.

| Year | Candidate (Lost) | Black Vote (%) | Latino Vote (%) |
|---|---|---|---|
| 2013 | Corado | 15 | 34 |
| | Tuck **(L)** | **85** | **66** |
| | Germain | 26 | 39 |
| | Clerveaux **(L)** | **74** | **61** |
| | Charles | 22 | 44 |
| | Forrest **(L)** | **78** | **56** |
| 2015 | Lefkowitz | 25 | 18 |
| | Charles-Pierre **(L)** | **71** | **61** |
| | Rothman | 13 | 30 |
| | Morales **(L)** | **87** | **70** |
| | Ramirez | 22 | 35 |
| | White **(L)** | **76** | **55** |
| 2016 | Charles | 25 | 41 |
| | Foskew **(L)** | **75** | **59** |
| | Germain | 24 | 40 |
| | Fields **(L)** | **76** | **60** |
| | Weissmandl, Y. | 19 | 36 |
| | Morales **(L)** | **81** | **63** |
| 2017[6] | Berkowitz | 23 | 36 |
| | Manigo **(L)** | **77** | **64** |
| | Grossman | 23 | 36 |
| | Goodwin **(L)** | **77** | **64** |
| | Freilich | 27 | 40 |
| | Dos Reis **(L)** | **73** | **60** |
| 2018 | Trieger | 18 | 39 |
| | Moster **(L)** | **82** | **61** |
| | Weissmandl, E. | 16 | 40 |
| | Cintron **(L)** | **84** | **60** |

### 2. Minority-Preferred Candidates Are Excluded from White Slates

In the District, Board elections require a choice between two slates: the public school slate,

preferred by minority voters,[7] and the private school slate, preferred by white voters. *See* Pls.' Ex.

---

[6] The 2017 results were compared to EI results using voter race estimates from commercial vendor Catalist. The vote choice estimates were nearly identical. *See* Pls.' Ex. 40 ¶¶ 15-18.

[7] The District devotes much of its version of the facts to discussing Steve White. *See* Mot. at 8-10. Plaintiffs do not contest that Steve White is politically active in the District and that he has worked to elect candidates for the Board who support the interests of the black and Latino students

14 at 62:17-21 (Mr. Charles stating, "either you're a private school or you're a public school community"); Pls.' Ex. 24 at 49:17-51:11 (Mr. Weber stating, "It usually runs with slates. It usually goes together and it ends up being public school versus nonpublic school"). A significant portion of the white, private school community in the District—but certainly not all of that community—is Orthodox Jewish. The religious affiliation of white voters, however, is irrelevant to the VRA analysis; the key issue is that everything relating to the District's schools and Board elections breaks down along racial lines between white, private school parents, and minority, public school parents. *See Gingles*, 478 U.S. at 43-44 (holding that the "right" question in a VRA analysis is whether minorities have an equal opportunity to elect candidates of their choice). While the District takes umbrage at the supposed conflation of the white community with the Orthodox Jewish community, the fact is that a significant portion of the white community is Orthodox Jewish, the Orthodox Jewish community is almost exclusively white, and the District's residents frequently use racial and religious terms interchangeably.[8]

There is no public call or request for nominations to the private school slate. Rather, a small group of influential members of the white, Orthodox Jewish community vet and select candidates to run for election on the private school slate. *See* PSMF at ¶ 114-124. That same

---

in the public schools. But contrary to the District's representations, Mr. White does not "select" candidates for the Board elections; rather, the candidates for the public school slate are selected through a democratic process open to the general public. PSMF ¶ 40. Contrary to the District's attempt to equate the public school slate to a "Power of Ten" slate, numerous different organizations have been involved in supporting the candidates on the public school slate. Moreover, since 2013, Steve White and others who support the interests of the black and Latino voters have been unsuccessful in their attempts to elect candidates to the Board.

[8] *See* Pls.' Ex. 24 at 23:9-17 (Mr. Weber stating that "the community," means the Jewish community, and when asked if there are blacks within the community, responding, "Well, they go to their churches. It would be very interesting if they would come into a synagogue"); *see also id.* at 37:23-38:12 ("I am working for the [white, Orthodox Jewish] community. Everybody has their own interests. The African-Americans have their people working for them.").

group then works to make sure their preferred slate of candidates is elected. *See id.* In particular, Rabbi Rosenfeld, Rabbi Oshry, Rabbi Yakov Horowitz, Rabbi Hersh Horowitz, and Kalman Weber are important figures in the slating process. *See id.* Evidence shows that some combination of these individuals met with and supported all of the candidates who won election to the Board, but that the slating group did not support any of the losing candidates. *See id.*; *see also, e.g.*, Pls.' Ex. 79 at 76:12-16 (after being asked whether he had met the private school slate candidates, Rabbi Oshry responding "let me tell you, *I met everybody*"); Pls'. Ex. 44 at -1606 ███████████

████████████████████████████████████████████████████████████████

█████████████████████████████████████).

This group of white, Orthodox Jewish leaders then coordinates obtaining signatures for the candidates' nominating petitions, places advertisements for the private school slate, and organizes get-out-the-vote efforts to ensure the election of the private school slate. *See* PSMF at ¶ 114; 123; 126-29. The candidates themselves do not raise any money for the campaigns and do very little, if any, campaigning on their own. *See* Pls'. Ex. 32 at 77:14-17 (Q: "[H]ow did you campaign for the 2012 election?" Mr. Rothman: "I didn't do anything. That's what's crazy.").

Members of the slating organization boasted that they could count on several thousand votes based on their recommendation and campaigning. *See*, *e.g.*, Pls.' Ex. 24 at 74:5-9 (Mr. Weber stating, "I feel that thousands of people who believe in me, and if I say vote for somebody, they will go along with it. So that is called a bloc vote."); *see also* Pls.' Ex. 44 at -1654 (███████████

██████████████████████████████████████████████). Plaintiffs' experts have found that the election results are also consistent with the white majority having a powerful slating organization, as the winning candidates for each numbered post received similar vote totals and similar support from white voters, "which is highly unusual, except in instances of partisan

elections with two main parties." Pls' Ex. 40 at ¶¶ 44-45.

The District highlights the election of several minority candidates—Mr. Charles, Mr. Germain, Ms. Corado, and Mr. Ramirez—who have gained the support of the white community. *See* Mot. at 11. However, these candidates were selected, vetted, and run by the white, private school slate,[9] and were not supported by the minority voters in the District. *See* PSMF at ¶ 143; *see also* Pls.' Ex. 40 at *passim* (Drs. Barreto and Collingwood concluding that minority voters provide majority support to candidates that have lost every single Board election since 2013).

The evidence shows that the ***only way*** that minority candidates can win a contested election is by obtaining the support of white voters and taking part in the private school slate. *See id.* at ¶ 143; *see also* Pls. Ex. 31 at 108:20-109:6 (Mr. Germain testifying that he would not have won without the support of the private school slating organization); Pls.' Ex. 49 at 9 (Mr. Germain stating "I made 8,900 votes," he said and laughed. "And I know 8,000 come from the Jewish community."). Mr. Charles, who ran as part of the private school slate with Mr. Germain and Ms. Corado in 2013, testified that in order to run that slate, he needed the endorsement of Rabbi Bernard Rosenfeld.[10] *See* Ex. 14, 133:7-14. Notably, just before that election, after years of growing racial tensions in the District, Suzanne Young-Mercer (supported by the minority community) resigned her seat due to a lack of responsiveness from the Board to the needs of the

---

[9] *See* Pls. Ex. 25 at -757-759 (███████████████████████████████████████████████████████████ ████████████████████████████████████████████); *see also* Pls.' Ex. 14. at 388:6-11 (Mr. Charles testifying, "[i]f we resign. . . They will put two more Hasidics on that – on the [B]oard to replace us."); Pls.' Ex. 86 at -184 (███████████████████████████████ ████████████████████████  ████████████████████████████████████).

[10] Mr. Charles, Mr. Germain, and Ms. Corado also received the support of Mr. Weber in 2013. *See, e.g.,* Pls.' Exs. 75-77.

minority community, and the "toxic" environment as "the only woman, person of color, and member of the public school community without any allies."  *See* Pls.' Ex. 13 at ¶ 45.

Even after their election, the white community makes clear to these minority candidates that they only hold their position at the pleasure of the white voters.  Pls. Ex. 25 at -776 (█████

███████████████████████████████████████████████

███████████████████████████████████████████████

███████████████████████████████████████████████

███████████████████████████████████████████████

████████).

Although the District disputes that these candidates are "safe" minority candidates, its actions show otherwise.  Recently, when some members of the white community felt that a certain Board member was too responsive to the minority, public school community, members of the white community, including the District's counsel, Mr. David Butler, discussed replacing her with a "safe" minority candidate.  Specifically, ███████████████████████████████

███████████████████████████████████████████████

███████████████████████████████████████████████

███████████████████████████████████████████████

███████████████████████████████████  Pls. Ex. 43 at -499.

**D.    The Board Fails Black and Latino Children**

Responding only to the wants of the majority white community, the Board has gutted the District's public schools, which are 96 percent non-white.  *See* Pls.' Ex. 33 at 83:11-15 (former President of the Board stating that he "underst[oo]d that policies, budget cuts, or budget control of the public schools, those policies primarily impact students who are black or [L]atino").  The District laid off hundreds of teachers, cut arts, electives, and extracurricular activities, eliminated

13

full-day Kindergarten, and allowed buildings to fall into disrepair.  *See* PSMF ¶¶ 138-140; *see also* Pls.' Ex. 28 at 30-32.  And the Board made "[n]o meaningful effort made to distribute pain of deep budget cuts fairly among private and public schools."  Pls.' Ex. 28 at 33.  Faced with criticism from the District's minority residents, the Board stifled public debate and removed transparency. *See id.* at 34-35; *see also* PSMF ¶ 134.  In 2014, the monitor for the District, appointed to be a watchdog over the Board and its budgets, found that "[m]ost disturbing, Board appears to favor the interests of private schools over public schools."  Pls.' Ex. 28 at 29.  In fact, in 2014, the Board declined $3.5 million from the State of New York to restore staffing and programming because the State required members of the District's public school community to oversee the spending. *See* PSMF at ¶ 138.  The District's superintendent said that the Board refused the money because it did not want any oversight and was "insulted."  *Id.*  In 2015, monitors concluded that the District "is broken and it not serving its students;" "the stark reality [is] that the District has experienced tremendous decline over a period of years."  *See* Pls.' Ex. 29 at 12.  The monitors recommended redistricting the District to "better represent public school enrollment."  Pls.' Ex. 28 at 55-56.

## III.    ARGUMENT

Summary judgment is an onerous standard, only appropriate where "there is no genuine dispute as to *any* material fact and the movant is entitled to judgment as a matter of law."  FED. R. CIV. P. 56(a) (emphasis added).  Indeed, the fact-intensive analysis required for Section 2 claims makes these claims particularly ill-suited to a resolution on summary judgment.  *See, e.g., Johnson v. De Grandy*, 512 U.S. 997, 1020-21 (1994) (denying summary judgment and stating that "[n]o single statistic provides courts with a shortcut to determine whether [an election structure] unlawfully dilutes minority voting strength"); *Wright v. Sumter Cty. Bd. of Elections & Registration*, 657 F. App'x 871, 873 (11th Cir. 2016) (reversing a grant of summary judgment where "[g]enuine disputes of material fact remain").

A.     **Plaintiffs Can Prove That There Is Racially Polarized Voting in the District**

To establish a Section 2 violation, Plaintiffs are required to satisfy the three *Gingles* preconditions: (1) the minority group is sufficiently large and geographically compact to constitute a majority in a single-member district; (2) the minority group is politically cohesive; and (3) the white majority votes sufficiently as a bloc to enable it—in the absence of special circumstances, such as the minority candidate running unopposed—usually to defeat the minority's preferred candidate. *Gingles*, 478 U.S. at 50-51.  For the first *Gingles* precondition, Plaintiffs' expert demographer, Mr. Bill Cooper, established that there are four wards within the nine ward District in which a majority of residents are minorities.  *See* Pls.' Ex. 1 at 3, ¶¶ 68-82.  The District does not dispute this.  *See* Mot. at 16.  The parties also agree that whites in the District vote cohesively for winning candidates, satisfying the first part of the third *Gingles* precondition.  *See* PSMF at ¶ 107.  The only fact the parties dispute is whether minorities cohesively support losing candidates.

Plaintiffs' experts used peer-reviewed and scientifically valid data and methodologies to determine that minorities have consistently supported losing candidates.  *See* Pls.' *Daubert* at 11-28.  As described in Plaintiffs' Response to the District's *Daubert* motion, BISG has been scientifically validated and accepted by courts at the summary judgment stage.  *See City of Eastpointe*, 2019 WL 1379974, at *15-*16 (denying a motion to exclude expert evidence utilizing BISG in a vote-dilution case under Section 2).  However, Plaintiffs' experts did not rely solely on BISG data.  Indeed, Drs. Barreto and Collingwood used three separate datasets (CVAP, BISG, and Catalist) and three methodologies (King's EI, RxC, and algebra).  *See* Pls.' Ex. 38 at *passim*. Under all three, Plaintiffs' experts came to the same conclusion: voting in the District is racially polarized and no minority-preferred candidate won a contested election.  *Id.*; *see also* PSMF at ¶¶ 105-09.  Accordingly, Plaintiffs have satisfied the second and third *Gingles* preconditions.  As the Second Circuit has held, "it will be only the very unusual case in which the plaintiffs can

establish the existence of the three *Gingles* factors but still have failed to establish a violation of [Section] 2 under the totality of circumstances." *NAACP v. City of Niagara Falls*, 65 F.3d 1002, 1019 n.21 (2d Cir. 1995). This is not that rare case.

**B.    The District's Attempts to Explain Away Racial Issues Are Unavailing**

The District's arguments are predicated on a misrepresentation of the law and a willful ignorance of the fact that the schools are almost entirely segregated by race. First, it claims that it is absolved of any Section 2 violation because Plaintiffs do not allege racial animus. However, the law is clear: Plaintiffs are not required to prove racial bias. Second, the District argues that racially polarized voting is attributable to undefined "policy issues" that have nothing to do with race. Yet the District ignores that because of the segregated schools in the District, the racial and the political are inherently and intrinsically tied together.

**1.    Plaintiffs are not required to prove racial animus**

The key question when analyzing a potential VRA violation is whether white and minority voters have an equal opportunity to elect the representatives of their choice. *Gingles*, 478 U.S. at 47. Contrary to the District's misrepresentations, "[n]o specific showing of discriminatory intent is required to prove a Section 2 violation." *U.S. v. Vill. of Port Chester*, 704 F. Supp. 2d 411, 418 (S.D.N.Y. 2010); *see also Pope v. Cty. of Albany*, 94 F. Supp. 3d 302, 342 (N.D.N.Y. 2015) (collecting cases); *Goosby*, 956 F. Supp. at 355.

In support of its argument that Plaintiffs must prove racial animus, the District cites to a case from outside this jurisdiction, *Nipper v. Smith*. 39 F.3d 1494, 1524-25 (11th Cir. 1994); *see also* Mot. at 1. But this Circuit's precedent explicitly rejects that plaintiffs must show the white community is "driven by racial bias." *See Goosby*, 956 F. Supp. at 353 ("[N]either the existence (or non-existence) of racial bias in the community nor the strength of the correlation between partisan politics and divergent voting patterns can be dispositive in a Section 2 case."); *see also*

*Goosby*, 180 F.3d at 493 ("[I]nquiry into the *cause* of white bloc voting is not relevant to a consideration of the *Gingles* preconditions.") (emphasis added).  Plaintiffs need only show that minority voters in the District are denied an equal opportunity "to participate in the political process and to elect representatives of their choice," not that the District or the white voters are racist.  52 U.S.C. § 10301(b); *see also U.S. v. Charleston Cty.*, 365 F.3d 341, 348-49 (4th Cir. 2004) ("'Legally significant' white bloc voting thus refers to the frequency with which, and not the reason why, whites vote cohesively for candidates who are not backed by minority voters.").

### 2.    The "policy" issues cited by the District are racial

The District next wrongly claims that "***non-racial*** justifications readily explain any appearance of racial polarization."  *See* Mot. at 17-18 (emphasis added).  Instead, the District argues that its elections reflect not issues of race, but rather ill-defined policy disputes.  Mot. at 20.  But the District's position ignores reality.  The schools in the District are starkly segregated.  The policy disagreements in connection with Board elections break down precisely along racial lines and are yet another manifestation of racial polarization.  White voters in the District support reducing the portion of the school budget that is funded by property taxes, while securing a larger proportion of the remaining budget for the exclusively white private schools.  *See* PSMF at ¶ 138.  Since the Board began implementing those policies, "[p]ublic schools students and parents despair over the damage done to this once great school district."  *See* Ex. 28 at 60; *see also* PSMF ¶¶ 138-140.  Minority voters have sought desperately to elect representatives to give voice to their concerns.  There can be no good-faith claim that race is not central to the voting controversy.

The District urges that this Court "should reach the same result" as the court in *Reed v. Town of Babylon* and find that any racial polarization is due to non-racial factors.  914 F. Supp. 843, 874 (E.D.N.Y. 1996).  In *Reed*, the court found that the white majority voted as a bloc because of political partisanship rather than racial bias, and therefore, plaintiffs failed to show the third

*Gingles* precondition (whether the white majority votes as a bloc to defeat the minority's preferred candidate).[11]  *Id.*  What the District fails to mention, however, is that the Second Circuit expressly rejected the *Reed* approach, finding that "inquiry into the cause of white bloc voting is not relevant to a consideration of the *Gingles* preconditions."  *Goosby*, 180 F.3d at 492-93.  Rather, the Second Circuit held that "the political partisanship argument" may be considered, if at all, "under the 'totality of the circumstances' analysis."  *See id.* at 493.

Where political and policy differences track the racial divide, such differences frequently exacerbate the racial polarization rather than explain it away.  For example, in *Goosby* the district court rejected the Town's proffered explanation that the appearance of racial polarization was merely due to partisan politics.  *Goosby*, 956 F. Supp. at 355.  Although the Town argued that blacks could elect candidates of their choice if they voted Republican, the court focused on the lack of minority access to the Republican Party slating process and "the lack of responsiveness by the Town Board to the particularized needs of the black communities."  *Id.*  The Second Circuit affirmed, holding that "blacks should not be constrained to vote for [those] who are not their preferred candidates."  *Goosby*, 180 F.3d at 495-96.  Moreover, disputes about the role race played in denying minorities the right to vote for candidates of their choice is a fact intensive inquiry, not appropriate for summary judgment.  *See Goosby*, 956 F. Supp. at 355 (rejecting the Town's political partisanship argument after "evaluating all of the relevant facts as a whole").  Here, the same factual disputes exist, precluding the District's request for summary judgment.

### C.     The District Is in Violation of Section 2 Regardless of the Election of Safe Minority Candidates

The essence of a meritorious Section 2 claim is "an inequality in the opportunities enjoyed by [minority] and white voters to elect **their preferred representatives**."  *Gingles*, 478 U.S. at 47.

---

[11] Importantly, *Reed* was not decided on summary judgment, but after a six-day trial.  *Id.* at 848.

The key question is whether minority *voters* have the opportunity to elect their preferred candidates, not whether minority *candidates* have the opportunity to be elected. *Pope*, 94 F.Supp.3d at 346 ("[T]he pole star of the Voting Rights Act is ensuring that minority voters have an opportunity to participate equally in the electoral process."). As this Court has held, "[t]he election of a 'safe' minority candidate does not establish that there is no Section 2 violation." Order at 5, ECF No. 304; *see also Gingles*, 478 U.S. at 77.

The District concedes that the election of minority candidates is not dispositive to a VRA claim. *See* Mot. at 21 ("That is true."). However, the District now argues that the minority candidates who have been elected in the District are not "safe" candidates—an inherently fact-driven question. Courts do not presume minority candidates are necessarily the candidates of choice for minority voters, because "[a] minority candidate may have very different interests than the majority of minority voters." *Jenkins v. Red Clay Consol. Sch. Dist. Bd. of Educ.*, 4 F.3d 1103, 1126 (3d Cir. 1993). Such is the case here where successful minority candidates to the Board are consciously aware that they owe their election entirely to the white community. *See* PSMF at ¶ 143. Indeed, since 2013, not a single minority candidate elected in the District in a contested election had the support of a majority of minority voters. *See id.*

Despite the fact that only white-supported minority candidates have been able to win elections in the District, the District argues that the "safe minority" doctrine is inapplicable because minority candidates were elected prior to the present litigation. The District is wrong. While courts have invoked the "safe minority" doctrine in cases where the minority candidate was explicitly elected because of a pending VRA claim, *see Collins v. City of Norfolk*, 883 F.2d 1232, 1242 (4th Cir. 1989), neither logic nor law holds that the doctrine *only* applies to elections held after litigation was filed. Rather, courts analyze the facts to determine whether "safe minorities"

were elected due to "the work of politicians, who, apprehending that the support of a black candidate would be politically expedient, campaign to insure his election." *Zimmer v. McKeithen*, 485 F.2d 1297, 1307 (5th Cir. 1973).

Here, the evidence shows that the Board and the white community understood it would be "politically expedient" to endorse and elect minority candidates to the Board well before the filing of this litigation. Indeed, the evidence at least raises the inference that in 2013 and 2015, it was politically expedient for the private school slate to select minority candidates to try to avoid increasing state oversight over a Board controlled by white voters. In fact, the Board appointed one of the minority Board members, Sabrina Charles-Pierre, purely because of the pressure from the state monitors. *See* Pls.' Ex. 25 at -788 ██████████████████████████

████████████████████████████████████████████████████

████████████████████). And the District has also faced pressure from other lawsuits alleging similar racial issues since at least 2012. *See Montesa v. Schwartz*, No. 12 Civ. 6057 (S.D.N.Y.). As this Court has recognized, the appearance of advocacy by the District's attorney to replace a minority Board member with a safe minority candidate suggests that the District continues to embrace that strategy. *See* ECF 304 at 4 (referencing Pls. Ex. 43 at -499 (██████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████)).

In *Goosby*, the Eastern District of New York and the Second Circuit determined that the election of a "safe minority" does not rebut evidence of a VRA violation. *Goosby*, 180 F.3d at 503. The district court went beyond race of the candidate and held that the black official was likely a "safe" minority because he was unresponsive to the black community's needs. *Goosby*, 956 F. Supp. at 341, 344-45. In affirming, the Second Circuit found that while the white majority "did

choose a black candidate, [] he was not supported by the majority of blacks," and so "[h]is selection hardly eases fears, engendered by the history, that black voters in Hempstead have less political influence than similarly situated white voters." *Goosby*, 180 F.3d at 503. Here, no minority-preferred candidate has been elected to the Board in several years. The District's justification for that failure is a question of fact that requires a trial; summary judgment is inappropriate.

### D. The Senate Factors Further Show That Summary Judgment Is Inappropriate

Where, like here, a plaintiff can satisfy the three *Gingles* preconditions, the Section 2 inquiry considers the "totality of the circumstances" as to "whether the political process is equally open to minority voters." *Gingles*, 478 U.S. at 79. The "totality of the circumstances" is a "fact-intensive" inquiry and, as a result, summary judgment is rarely appropriate. *See id*. at 46; *see also Johnson*, 512 U.S. at 1020-21; *Wright*, 657 F. App'x at 873. Here, there are several disputed material facts.[12] Accordingly, summary judgment should be denied.

The analysis under the "totality of the circumstances" is holistic, and the Court need not find that all factors have been met or even that a majority of the factors point "one way or the other." *Gingles*, 478 U.S. at 45. Here, consideration of the Senate Factors confirms that Plaintiffs have sufficient evidence to show that the District's elections violate the VRA. Although all of the Senate Factors may favor Plaintiffs, for the purposes of this Opposition, Plaintiffs focus on those factors that demonstrate most clearly why summary judgment should be denied.[13]

***The extent to which voting in the political subdivision is racially polarized***: Both expert

---

[12] Furthermore, Mr. Grossman, Mr. Freilich, and Mr. Weissmandl—critical witnesses relating to political campaigns and slating—refuse to testify at depositions in defiance of court orders. Granting summary judgment without the testimony of these witnesses would be inappropriate.

[13] In addition to the factors discussed below, there is also evidence of a history of official discrimination by the Board against minorities (*see* PSMF at ¶¶ 130-32) and of racial appeals in campaigns (*see* PSMF at ¶¶ 126-29). *See Gingles*, 478 U.S. at 45.

statistical evidence and fact witnesses agree—the District's Board elections are characterized by a high degree of racial polarization, with the white majority voting as a bloc to invariably defeat the candidates preferred by minority voters.  *See* PSMF at ¶ 105-110.

*The extent to which the political subdivision has used voting practices or procedures that tend to enhance the opportunity for discrimination against the minority group*: The District's use of an off-cycle, at-large election for the Board with fewer polling places than other elections has the effect of "enhanc[ing] the opportunity for discrimination against the minority group."  *See Gingles*, 478 U.S. at 37, 45.  Courts routinely recognize that at-large voting systems can impermissibly dilute the minority vote.[14]  *See id.* at 47 ("[A]t-large voting schemes may 'operate to minimize or cancel out the voting strength of racial [minorities in] the voting population.'").

Courts have also found that staggered elections and off-cycle voting enhance discrimination against minorities.  *See Buckanaga v. Sisseton Indep. Sch. Dist.*, 804 F.2d 469, 475 (8th Cir. 1986) ("The discriminatory effect of staggered terms was specifically considered by Congress in the enactment of § 2"); *Port Chester*, 2008 WL 190502, at *28 ("[H]olding local elections at a time when only the most engaged and politically astute citizens—those citizens who feel the most enfranchised—are likely to vote will almost certainly result in the diminished influence of groups who feel generally excluded from the political fabric of the community.").  Furthermore, the use of numbered posts, *i.e.*, electing candidates to specific seats in an at-large election system, results in a *de facto* majority vote, which "enhances [the minority group's] lack of access because it prevents a cohesive political group from concentrating on a single candidate."

---

[14] Contrary to the District's claims, New York law does not require the District to use an at-large voting system.  *See* PSMF at ¶ 33.  Moreover, the District's argument that Plaintiffs' claim is not redressable and therefore Plaintiffs lack standing should be rejected out of hand because it would "defeat the purpose of Section 2 [of the VRA] to read it to exclude an entity like the District that is tasked with administering the challenged elections."  *See* Pls.' Ex. 124 at 19:21-19:25.

*Montes v. City of Yakima*, 40 F. Supp. 3d 1377, 1411 (E.D. Wash. 2014).

     ***The exclusion of members of the minority group from candidate slating process***:  Access to the white community's slating process is foreclosed to minority voters and their preferred candidates.  The term 'slating' is generally used to refer to "a process in which some influential non-governmental organization selects and endorses a group or 'slate' of candidates, rendering the election little more than a stamp of approval for the candidates selected."  *Pope*, 94 F. Supp. 3d at 343-44.  Slating organizations do not need to be official or formal, and courts have found slating organizations that "take place in a subtle and covert way."  *McNeil v. City of Springfield*, 658 F. Supp. 1015, 1030 (C.D. Ill. 1987).

     Contrary to the District's argument that the white slating organization is not exclusionary because it has supported candidates of color, the law looks past the access granted to any given minority candidate, and determines whether there is "meaningful" participation by minorities.  *Port Chester*, 2008 WL 190502, at *29 ("[A] system that provides only a theoretical avenue for minority . . . candidates to get their names on the ballot while for all practical purposes making it extremely difficult for such candidates to have a meaningful opportunity to participate does in fact contribute to a violation of Section 2.").  Here the evidence shows that a small number of influential Orthodox Jewish members of the white community have vetted and selected candidates on the private school slate for the Board.  *See* PSMF at ¶¶ 111-22.  Once they selected the candidates, this same group of individuals organized campaign efforts for the white bloc vote, and could reliably count on several thousand votes.  *See id* at 114-124.  The private school slate, on the basis of the white bloc vote, invariably defeats the minority-preferred public school slate.  *See* disc. *supra* at 7-9.  Candidates of color who have been successful are acutely aware that they owe their success to the white bloc vote.  *See* Pls.' Ex. 25 at -781-82 (███████████████████

███████████████████████████████████████████████████████

████████████████████) *see also id.* at -770; -776; Pls.' Ex. 14. at 388:6-11; Pls.' Ex. 49 at 9.

As Plaintiffs' experts found, the efficacy of the slating organization is also evident in the vote totals for the Board candidates. In every election they analyzed, "the winning candidates and losing candidates each received similar vote totals and similar degrees of support from different racial groups, which is highly unusual, except in instances of partisan elections with two main parties." Pls.' Ex. 40 at ¶ 44; *see also Goosby*, 180 F. 3d at 496 ("Without access to the Republican slating process, blacks simply are unable to have any preferred candidate elected to the Town Board, given the historical success of the Republican Party.").

***The extent to which minority group members bear the effects of discrimination which hinders their ability to participate effectively in the political process***: Minorities are disadvantaged compared to whites in the District and Rockland County across a variety of housing, employment, and educational attainment measures. *See* disc. *supra* at II.A. Moreover, since the white, private school majority began its takeover of the Board, the quality of the District's public schools, whose students are over 92 percent black and Latino, have plummeted. *See* PSMF at ¶ 138; *see generally* Pls.' Ex. 28; Pls.' Ex. 29. Courts routinely recognize that substandard education affects civic and political participation. *See Brown v. Bd. of Educ.*, 347 U.S. 483, 493 (1954) ("[Education] is the very foundation of good citizenship. . . . In these days it is doubtful that any child may reasonably be expected to succeed in life if he is denied the opportunity of an education."). Finally, minority voters in the District have experienced voter futility due to the continuous defeat of minority-preferred candidates and their voter turnout in Board elections is significantly lower than white voter turnout. *See* PSMF at ¶¶ 98; 100.

***The extent to which members of the minority group have been elected***: This factor—to

be adduced under the totality of the circumstances at trial—is where all of the District's core arguments about "safe minority candidates" and "non-racial policy justifications" really belong. And those arguments will fare no better at trial.  No minority-supported candidate has won a contested election in the District since 2013.  *See* PSMF at ¶¶105, 107-10, 111, 118-22; *see also U.S. v. Charleston Cty.*, 316 F. Supp. 2d 268, 279 (D.S.C. 2003) (election of minority candidate does not insulate defendant from a Section 2 violation where the minority candidate was "emphatically not the candidate of choice of the [minority] voters").

   ***The extent to which elected officials are unresponsive to the particularized needs of the members of the minority group***:  The District acknowledges there is a wealth of evidence regarding the Board's lack of responsiveness that "the District would probably have to dispute" at trial, but incorrectly claims that the responsiveness factor is "not probative."  Mot. at 25; *see also* PSMF at ¶¶ 133-42.  In support of that argument, the District provides citations that are misleading and out of context.  In fact, the Senate Report states that the ***defendant's proof of responsiveness***— not plaintiffs' evidence of lack of responsiveness—is of little probative value.  *See* S. REP. NO. 97– 417, at 29 n.116; *see also Port Chester*, 704 F. Supp. 2d at 446.  Where plaintiffs present evidence, like here, that the elected officials are not responsive to the needs of the minority community, it is compelling evidence under the "totality of the circumstances."  *See Goosby*, 956 F. Supp. at 346 ("[P]laintiffs have established a significant lack of responsiveness to the particularized needs of blacks in the Town.  Most significantly, they have established indifference and callousness on the part of the Town Board with respect to the issue that probably matters most to blacks.").

## IV. CONCLUSION

   For the foregoing reasons, Plaintiffs respectfully request that the Court deny the District's Motion.

Dated: April 4, 2019
      New York, New York

Respectfully submitted,

/s/ Claudia T. Salomon
_____
Claudia T. Salomon
Jason Hegt
Corey A. Calabrese
Elizabeth A. Parvis
Claudia.Salomon@lw.com
Jason.Hegt@lw.com
Corey.Calabrese@lw.com
Elizabeth.Parvis@lw.com
Latham & Watkins LLP
885 Third Avenue
New York, NY 10022
Phone: (212) 906-1200

Russell Mangas (*admitted pro hac vice*)
Kathleen Elsner (*admitted pro hac vice*)
Russell.Mangas@lw.com
Kathleen.Elsner@lw.com
Latham & Watkins LLP
330 N. Wabash Avenue
Chicago, IL 60601
Phone: (312) 876-7600

Arthur Eisenberg
Perry Grossman
Kevin Jason
aeisenberg@nyclu.org
pgrossman@nyclu.org
kjason@nyclu.org
New York Civil Liberties Union Foundation
125 Broad Street
New York, NY 10004
Phone: (212) 607-3329

*Attorneys for Plaintiffs*