**LATHAM & WATKINS LLP**

53rd at Third
885 Third Avenue
New York, New York  10022-4834
Tel: +1.212.906.1200  Fax: +1.212.751.4864
www.lw.com

FIRM / AFFILIATE OFFICES

| | |
|---|---|
| Beijing | Moscow |
| Boston | Munich |
| Brussels | New York |
| Century City | Orange County |
| Chicago | Paris |
| Dubai | Riyadh |
| Düsseldorf | Rome |
| Frankfurt | San Diego |
| Hamburg | San Francisco |
| Hong Kong | Seoul |
| Houston | Shanghai |
| London | Silicon Valley |
| Los Angeles | Singapore |
| Madrid | Tokyo |
| Milan | Washington, D.C. |

June 13, 2019

**VIA ECF AND EMAIL**

The Honorable Cathy Seibel
United States District Judge
Southern District of New York
300 Quarropas Street
White Plains, New York 10601-4150

Re:   *National Association for the Advancement of Colored People,
       Spring Valley Branch v. East Ramapo Central School District*, No. 17 Civ. 8943

Dear Judge Seibel:

Plaintiffs write in response to defendant East Ramapo Central School District's (the "District") June 6 letter, ECF No. 419 ("Letter"), regarding the recent decision in *Flores v. Town of Islip*, No. 18 Civ. 3549(ADS)(GRB), 2019 WL 2272769 (E.D.N.Y. May 28, 2019). The Court's decision in *Flores* illustrates why summary judgment is inappropriate in the instant action. Simply to resolve a motion for preliminary injunctive relief in *Flores*, it was necessary to conduct a twelve-day hearing in which sixteen witnesses testified, including numerous experts and members of the community, and both parties presented substantial documentary evidence. *Id.* at *1. Indeed, if there is one theme to the *Flores* decision, it is that Section 2 cases are localized and fact-intensive, and require a careful weighing of the evidence. *See, e.g.*, *id.* at *23, *26 & *36. Contrary to the District's repeated entreaties to this Court to exclude relevant evidence and issue a dispositive ruling on an incomplete record, the *Flores* decision provides further precedent that the District's summary judgment and *Daubert* motions should be denied.

*Response to the District's Summary Judgment Arguments*

In its June 6 letter, the District reasserts its argument that Plaintiffs' Section 2 claim "fails as a matter of law [where] … racially polarized voting in District elections … are driven by policy and political differences and not by racial animus," claiming that the Court's opinion in *Flores* provides "persuasive authority" in support of the District's position. Letter at 1. That argument misreads the *Flores* decision. The *Flores* decision makes clear that an inquiry into the cause of racially polarized voting (*i.e.*, is it "better explained by partisan affiliation than racial bias") is not appropriately considered under the *Gingles* factors, but rather "is properly examined when reviewing the totality of the circumstances," *i.e.*, the Senate Factors. *Flores*, 2019 WL 2272769, at *28. And the law is clear that summary judgment is rarely appropriate where a Plaintiff satisfies the three *Gingles* preconditions, and the Court must perform a fact-intensive

**LATHAM&WATKINS**LLP

inquiry into the Senate Factors. *Thornburg v. Gingles*, 478 U.S. 30, 46 (1986); *see also Johnson v. De Grandy*, 512 U.S. 997, 1020-21 (1994); *Wright v. Sumter Cty. Bd. of Elections & Registration*, 657 F. App'x 871, 873 (11th Cir. 2016). Because the District's purportedly race-neutral explanation for the racially polarized voting in the District is not relevant under the *Gingles* preconditions, and because Plaintiffs' claim in the instant action satisfies all three *Gingles* factors as did the plaintiffs in *Flores*, the District's explanation cannot serve as a basis for concluding, as the District contends, that Plaintiffs' "Section 2 claim fails as a matter of law." Letter at 1.

Moreover, the District's explanation for racially polarized voting in the District is factually distinct from the explanation advanced by the defendants in *Flores* and does not hold up under scrutiny. First, the explanations offered by the respective defendants are very different. The defendants in *Flores* advanced a defense that racially polarized voting was best explained by partisan affiliation. *Flores*, 2019 WL 2272769, at *10. In support of that explanation, the *Flores* Court credited the defendant's evidence that showed high numbers of "white crossover votes," indicating that people were voting more along party lines than race. *Id.* at *25, *29. The *Flores* court further observed that in the only two non-partisan elections analyzed by the plaintiffs' expert, "there was no racial polarization." *Id.* at *29. None of this evidence exists in East Ramapo.

Second, the District does not claim that political partisanship is the reason for racially polarized voting in the District, but instead claims that racially polarized voting in the District is explained by (unnamed) "policy" differences between white and minority voters. Specifically, the "policy" issues the District fails to explicitly name are all related to the allocation of resources between the District's public schools, which are 90% black and Latino, and the District's private schools, which are 99% white. Not only are those issues inherently racial due to the racial make-up of the schools in the District, but the stark racial divide between the two constituencies is a unique fact that did not exist in *Flores*.

Finally, the District failed to mention that the *Flores* court added to the long list of federal courts that have held plaintiffs in Section 2 cases are not required to prove racial animus to prevail. *See Chisom v. Roemer*, 501 U.S. 380, 394 (1991). In its June 6th Letter as in its summary judgment briefing, the District continues to argue that Plaintiffs' claim fails because Plaintiffs cannot prove that the District's unfair voting practices are motivated by racial animus. Letter at 1. Contrary to the District's argument, the *Flores* court expressly held that "[a] plaintiff is not required to prove discriminatory intent in order to prove a violation under Section Two." *Flores*, 2019 WL 2272769, at *2. For all of these reasons, the *Flores* decision is additional precedent for denying the District's motion for summary judgment.

### Response to the District's Daubert Arguments

The District also attempts to use *Flores* to rehash its arguments regarding the methodologies that Plaintiffs' experts used to analyze voting patterns in the District. The District's letter, however, does no more than point out that the parties in *Flores* used different methodologies than those used in the present action. The *Flores* decision does not endorse CVAP data over BISG or Catalist data, nor criticize BISG or Catalist data—it does not even

**LATHAM&WATKINS**LLP

address them.  That is not surprising because, as discussed above, Section 2 analyses are intensely localized, and the use of one methodology in one election district does not endorse or preclude the use of another methodology in a different election district.

In Islip, for example, there are well over 200 voting precincts that were utilized in every relevant election.  *See* Declaration of Michael D. McDonald, Ph.D. ¶ 16, *Flores*, No. 18 Civ. 03549 (ADS)(GRB) (E.D.N.Y. Mar. 1, 2019), ECF No. 37-1.  By contrast, in East Ramapo there are only 10-13 voting precincts used for school board elections.  Because of those unique, local conditions, the District's expert, Dr. Alford, opined that he was unable to form conclusions about black and Latino voting cohesion using CVAP data.  ECF No. 391 at 7-8.  The effect of this opinion is that under Dr. Alford's analysis, jurisdictions with few voting precincts could be immune from Section 2 liability, regardless of actual racial voting patterns, due only to the paucity of available data.  Plaintiffs' experts, on the other hand, employed a variety of peer-reviewed techniques to overcome that limitation.  As explained in Plaintiffs' *Daubert* briefing, Plaintiffs' experts aggregated black and Latino votes to compare white and minority voting patterns using CVAP data; they also analyzed BISG and Catalist data and determined that under a variety of independent, peer-reviewed methodologies, a consistent pattern emerged: minority-preferred candidates lost every contested election.  *Id.* at 8-9.

The District further argues that racially polarized voting analyses should be ignored if they do not meet what the District characterizes as a "standard" threshold.  Letter at 3.  That argument is in direct tension with the language in *Flores*, which found that varying local conditions would dictate different approaches to assessing the significance of racially polarized voting results.  *Flores*, 2019 WL 2272769, at *22 ("[T]he degree of bloc voting which constitutes the threshold of legal significance will vary from district to district.").

It is also worth noting that in *Flores*, the District's expert, Dr. Alford, took a position that directly contradicts his position in this case.  In *Flores*, Dr. Alford opined that members of different racial groups should be combined when analyzing majority bloc voting cohesion, and criticized the plaintiffs' expert for not doing so.  *Id.* at *25.  Here, on the other hand, Dr. Alford and the District argue that combining members of different minority groups to analyze minority voting cohesion (as Plaintiffs' experts did to analyze white vs. minority votes) somehow violates the Voting Rights Act, and has asserted that as a ground for excluding Plaintiffs' experts under *Daubert*.  ECF No. 362 at 29.  Dr. Alford and the District's inconsistent approaches further highlight the need to fully evaluate the expert opinions at trial rather than excluding them as the District asks.

LATHAM&WATKINS LLP

****

   Plaintiffs agree with the District that *Flores* provides helpful precedent for analyzing the District's outstanding motions. Contrary to the District's arguments, however, *Flores* further highlights the need for the Court to receive and evaluate the entire factual record at trial.

              Respectfully submitted,

              /s/ Claudia T. Salomon
              Claudia T. Salomon

cc: All Counsel of Record via ECF