UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
----------------------------------------------------------------x
NATIONAL ASSOCIATION FOR THE
ADVANCEMENT OF COLORED PEOPLE,
SPRING VALLEY BRANCH; JULIO
CLERVEAUX; CHEVON DOS REIS; ERIC
GOODWIN; JOSE VITELIO GREGORIO;
DOROTHY MILLER; and HILLARY MOREAU,

                              Plaintiffs,

     - against -

EAST RAMAPO CENTRAL SCHOOL
DISTRICT,

                              Defendant.
----------------------------------------------------------------x

**DECISION AND ORDER**

No. 17-CV-8943 (CS)

Appearances:

Claudia T. Salomon
Corey A. Calabrese
Andrej Novakovski
Latham & Watkins LLP
New York, New York

Marc Zubick
Russell Mangas
Latham & Watkins LLP
Chicago, Illinois

Andrew Clubok
Latham & Watkins LLP
Washington, D.C.

Arthur Eisenberg
Perry Grossman
New York Civil Liberties Union Foundation
New York, New York
*Counsel for Plaintiffs*

David J. Butler
Randall Levine
Morgan, Lewis & Bockius LLP

New York, New York
Washington, D.C.

William S.D. Cravens
Clara Kollm
Morgan, Lewis & Bockius LLP
Washington, D.C.
*Counsel for Defendant*

Seibel, J.

1.      This case involves a challenge to the election system that the East Ramapo

Central School District (the "District") uses to elect members of its Board of Education (the

"Board").  Plaintiffs allege that the election system results in vote dilution – that is, that it affords

black and Latino residents "less opportunity than other members of the electorate to participate

in the political process and to elect representatives of their choice," *Thornburg v. Gingles*, 478

U.S. 30, 36 (1986) (internal quotation marks omitted) – in violation of section 2 of the Voting

Rights Act of 1965 ("VRA" or the "Act"), which provides, in pertinent part, that "[n]o voting

qualification or prerequisite to voting or standard, practice, or procedure shall be imposed or

applied by any State or political subdivision in a manner which results in a denial or abridgement

of the right of any citizen of the United States to vote on account of race or color," 52 U.S.C.

§ 10301(a) ("Section 2").  Following a bench trial held on January 22, February 10-14, 18-21,

and 24-27, and March 3, 5, and 24, 2020, I make the following findings of fact and conclusions

of law.

## I.      BACKGROUND

### A.      Plaintiffs

2.      Plaintiff National Association for the Advancement of Colored People, Spring

Valley Branch ("NAACP") is a racial justice organization that includes District residents.

(PX 288 ¶ 3.)[1]

3.      Plaintiffs Julio Clerveaux, Chevon Dos Reis, Eric Goodwin, and Dorothy Miller are minority registered voters in the District.[2]  In 2017, Dos Reis and Goodwin ran for the Board and believe they were supported by the "public school community," a group of residents interested in improving public schools after past budget cuts.  Both lost to white candidates by a margin of approximately 5,000 votes.  (PX 279 ¶¶ 25, 64 (Dos Reis); PX 281 ¶¶ 23, 59 (Goodwin); JPTO at 10.)  Since 2008, every candidate for whom Dos Reis, Clerveaux, Goodwin, and Miller voted in a contested Board election lost.  (PX 279 ¶ 11 (Dos Reis); PX 280 ¶ 9 (Clerveaux); PX 281 ¶ 9 (Goodwin); PX 282 ¶ 11 (Miller).)

### B.      Defendant

4.      The District is a "highly segregated," (Tr. at 514:17-20 (Cooper)),[3] political subdivision of New York State located in Rockland County that in the 2017-2018 school year served approximately 8,843 public school students at fourteen schools and approximately 29,279 private school students, (JPTO at 4; PX 372 ¶ 24).[4]  The District's population is approximately

---

[1] "PX" refers to an exhibit offered by Plaintiffs and received at trial.  "DX" refers to an exhibit offered by Defendant and received at trial.  "Tr." refers to the transcript of the bench trial. "JPTO" refers to the Joint Pretrial Order.  (Doc. 458.)  For clarity and ease of reference, some record citations include the last name of the testifying witness.

[2] On November 5, 2018, Washington Sanchez voluntarily withdrew as a Plaintiff.  (Doc. 195.) Plaintiff Jose Vitelio Gregorio passed away on April 30, 2020.  (*See* Doc. 566.)  Plaintiffs designated Plaintiff Hillary Moreau as a witness, (JPTO at 18), but she did not testify, and no information about her is in the record.

[3] William S. Cooper is Plaintiffs' expert in demography and redistricting, (*see* Tr. at 498:5-10), and the author of the expert report at PX 244A through PX 244X.

[4] The District provides certain services to both public and private schools including transportation, special education, and textbooks.  (Tr. at 2380:21-2381:9, 2381:24-2382:19 (Wortham).)  Deborah Wortham is the Superintendent of the District.  (DX 173 ¶ 1.)

65.7% white, 19.1% black, 10.7% Latino, and 3.3% Asian.  (PX 244A ¶ 4.)[5]  Most white

residents live in majority-white neighborhoods, and most minority residents live in majority-

minority neighborhoods, according to data from the American Community Survey, which is a

survey of 2% of households performed by the Census Bureau every year for five years,

generating results for 10% of U.S. households.  (Tr. at 256:14-257:7 (Barreto).)[6]  Of the white

residents in the District, 69.4% live in block groups that are 80% or more white and 33.03% live

in block groups that are 95% or more white.  Of the minority residents in the District – who are

concentrated in and around Hillcrest, Spring Valley, and Nanuet – 55.7% live in block groups

that are 83.6% to 98.2% minority.  (PX 244A ¶¶ 28-29 & fig.8; *id.* ¶¶ 32-33 & fig.9; *see* Tr. at

512:7-23; 514:14-16 (Cooper).)  A "block group" is a collection of several blocks.  (*See* note 17

below.)

5.      Public school students are almost all black or Latino (92%), and students

attending private schools located in the District are almost all white (98%).  (JPTO at 4; PX 372

¶ 24.)[7]  Most witnesses acknowledged the existence of a "private school community," consisting

of white Orthodox and Hasidic Jews who educate their children in yeshivas, and a "public school

---

[5] The District's citizen voting age population ("CVAP") is 61.4% white, 24.1% black, 9.1% Latino, and 4.5% Asian.  (PX 244A ¶ 4; Tr. at 510:5-17 (Cooper).)

[6] Dr. Matthew Barreto is Plaintiffs' political science and statistical analysis expert, (*see* Tr. at 154:5-11), and the co-author of the expert report at PX 242A and the preliminary expert report at PX 242B.

[7] Defendant contends that a "non-trivial" percentage of black families in the District send their children to private schools, (*see* Doc. 555 ¶ 78 n.2), and while it is obvious that some black and Latino students attend private schools, (PX 278 ¶¶ 9-10 (Castor); Tr. at 1237:23-24 (Germain)), there is no evidence that it is more than an insignificant number, (*see* PX 372_0009 (New York State Education Department data show that 571 nonwhite students both reside and attend private schools in the District); *id.* at _0010 (no more than 813 nonwhite students reside in the District and attend private schools in New York State but outside of the District); *id.* at _0030-31 (it is not possible to calculate the number of black and Latino students residing in the District and attending private schools outside of New York State).

community," consisting of all races but primarily black and Latino persons, and virtually all witnesses involved in District elections used those terms.  (Tr. at 612:15-614:6 (Castor); *id.* at 1238:11-14 (Germain); *id.* at 2560:11-14 (Charles-Pierre); PX 257 at 191:18-192:2 (Russell); PX 286 ¶ 12 (Price); PX 279 ¶ 58 (Dos Reis); Tr. at 655:25-656:10, 657:17-20 (same); PX 283 ¶¶ 40-41, 67 (Fields); PX 281 ¶¶ 20, 62 (Goodwin); PX 282 ¶¶ 11-15 (Miller); PX 288 ¶¶ 9, 37 (Trotman); Tr. at 1373:20-22 (same); *see* Tr. at 725:5-16, 730:14-17 (Board member Joel Freilich identifying himself as member of "private school community" and someone else as member of "public school community"); *id.* at 997:1-6 (Rabbi Hersh Horowitz discussing "private" and "public school community" vote totals); *id.* at 1896:6-24 (former Board member Suzanne Young-Mercer was on "public school team" but received support from "private school community" including Orthodox and Hasidic voters); *id.* at 1942:5-21 (public school advocate Oscar Cohen identifying public school community as "people of all races" and private school community as Orthodox and ultra-Orthodox); *id.* at 1082:15-18 (Board member Yehuda Weissmandl using term "public school community"); *id.* at 1523:12-14 (Board member Harry Grossman acknowledging "public school advocates" spoke at Board meetings); *id.* at 2479:10-24 (influential community leader Rabbi Yehuda Oshry vetted candidates by ensuring they would be responsive to needs of "Jewish community besides the public school").)

6.     The District is governed by nine Board members whose responsibilities include selecting the Superintendent of Schools and approving District personnel, setting a budget and levying taxes, establishing District policies, and evaluating and communicating the "progress and needs of the District to the community, educational governing boards and legislators."  (PX 259

at 1; JPTO at 5.)[8]  To register to vote in elections for Board members and to vote on the annual school budget and other ballot referenda in the District, a person must be a United States citizen, a resident of the District for at least thirty days, eighteen years of age or older, and either registered for District elections or registered to vote in general elections in Rockland County. (JPTO at 5.)  Board elections are not held with other local, state, or federal elections (that is, they are off cycle), and they are staggered such that three seats – each having a three-year term – are open each year (although on occasion an extra seat will be open if a Board member resigns, dies, or is removed).  (*Id.*)  Each candidate runs for an individual numbered seat that is elected at large, meaning that all eligible voters in the District cast votes in each race.  (*Id.*)[9]  Candidates can reside anywhere in the District.  (PX 257 at 38:5-8.)

---

[8] As of January 6, 2020, Board members were Harry Grossman (President), Sabrina Charles-Pierre (Vice-President), Mark Berkowitz, Bernard L. Charles Jr., Joel Freilich, Ashley Leveille, Yoel T. Trieger, Ephraim Weissmandl, and Yehuda Weissmandl.  (JPTO at 6.)  On February 6, 2020, Charles resigned from the Board after pleading guilty to a misdemeanor in state court.  (Tr. at 1783:21-1784:22.)  Thereafter, Carole Anderson was appointed on an interim basis until the next election, currently scheduled for June 9, 2020.  (*See* Doc. 567; *Board Members*, E. Ramapo Cent. Sch. District, https://www.ercsd.org/Page/90 (last visited May 25, 2020).)

[9] In an at-large system, all voters vote in all contests.  In a ward system, also called a single-member district system, political subdivisions are divided into "compact, contiguous and essentially equipopulous" geographical areas, commonly referred to as wards.  *See Goosby v. Town Bd.*, 981 F. Supp. 751, 757 (E.D.N.Y. 1997), *aff'd*, 180 F.3d 476 (2d Cir. 1999).  Under a single-member district system, candidates run for a seat associated with a particular ward, and only residents of that ward vote in that contest.  *See, e.g.*, N.Y. Town Law § 85.

7.     A table summarizing the results of Board elections from 2008 through 2018 is set out below, including the year, the candidates, the candidates' races ("W" indicating white, "B" indicating black, and "L" indicating Latino), and the number of votes each received.

Table 1:  Summary of Board Elections:  2008-2018.  (JPTO at 12 tbl.1.)

| Yr. | Seat 1 | | | Seat 2 | | | Seat 3 | | | Seat 4 | TOTAL VOTE COUNT |
|---|---|---|---|---|---|---|---|---|---|---|---|
| 2008 | Aaron Wieder (W) (6,261)* | Steve White (W) (2,415) | | Moshe Hopstein (W) (6,533)* | | | **Nathan Rothschild (W) (5,103)*** | | | | 9,163 |
| 2009 | Morris Kohn (W) (8,768)* | Leonardo Vera (L) (4,548) | | Carolyn Watson (W) (566) | Margaret Hatton (W) (4,236) | Eliyahu Solomon (W) (8,578)* | Emilia White (B) (4,149) | Richard Stone (W) (9,224)* | | | 13,708 |
| 2010 | Antonio Luciano (W) (7,622) | Moses Freidman (W) (7,926)* | | **Stephen Price (W) (13,612)*** | | | **Suzanne Young-Mercer (B) (13,839)*** | | | | 16,056 |
| 2011 | **Moshe Hopstein (W) (9,904)*** | M. Hatton (W) (7,907) | | Yehuda Weissmandl (W) (9,923)* | A. Luciano (W) (7,909) | | Daniel Schwartz (W) (9,947)* | Carole Anderson (B) (7,818) | | Joanne Thompson (B) (13,958)* | 18,206 |
| 2012 | Hiram Rivera (L) (6,315) | Jacob Lefkowitz (W) (8,474)* | | Kim Foskew (W) (6,276)* | **E. Solomon (W) (8,460)*** | | Yonah Rothman (W) (8,521)* | **J. Thompson (B) (6,335)** | | | 15,091 |
| 2013 | Maraluz Corado (L) (6,806)* | Margaret Tuck (B) (5,244) | | Eustache Clerveaux (B) (5,085) | Pierre Germain (B) (6,899)* | | Robert Forrest (B) (5,175) | **Bernard Charles (B) (6,833)*** | | | 12,317 |
| 2014 | M. Hopstein (W) (2,388)* | | | Harry Grossman (W) (2,652)* | | | Yakov Engel (W) (2,381)* | | | Y. Weissmandl (W) (2,379)* | 4,998 |
| 2015 | Sabrina Charles-Pierre (B) (4,600) | **Jacob Lefkowitz (W) (6,380)*** | Alan Jones (B) (468) | **Y. Rothman (W) (6,523)*** | Natashia Morales (L) (4,864) | | S. White (W) (4,615) | Yisroel Eisenbach (W) (556) | Juan Pablo Ramirez (L) (6,293)* | | 11,694 |
| 2016 | **B. Charles (B) (7,973)*** | K. Foskew (W) (3,972) | | **P. Germain (B) (7,860)*** | Jean Fields (B) (4,137) | | **Y. Weissmandl (W) (7,626)*** | N. Morales (L) (4,401)) | | **S. Charles-Pierre (B) (5,014)*** | 12,311 |

| | | | | | | | |
|---|---|---|---|---|---|---|---|
| 2017 | Alexandra Manigo (W) (4,964) | Mark Berkowitz (W) (9,158)* | Eric Goodwin (B) (4,910) | H. Grossman (W) (9,137)* | Joel Frielich (W) (9,530)* | Chevon Dos Reis (L) (4,503) | | 14,343 |
| 2018 | S. Charles-Pierre (B) (9,180)* | | Yoel Trieger (W) (7,179)* | Miriam Moster (W) (1,996) | E. Weissmandl (W) (6,977)* | Joselito Cintron (L) (2,308) | | 9,714 |
| Key: An * denotes the election winner, **Bold** denotes the incumbent candidate | | | | | | | | |

### C.     Legal Standard

8.      "The essence of a § 2 claim is that a certain electoral law, practice, or structure interacts with social and historical conditions to cause an inequality in the opportunities enjoyed by [minority] and white voters to elect their preferred representatives."  *Gingles*, 478 U.S. at 47. To establish that the minority vote is diluted, a plaintiff must show that (1) the minority group "is sufficiently large and geographically compact to constitute a majority in a single-member district," (2) the minority group is "politically cohesive," and (3) "the white majority votes sufficiently as a bloc to enable it – in the absence of special circumstances . . . – usually to defeat the minority's preferred candidate," (together, the "*Gingles* preconditions").  *Id.* at 50-51 (citation omitted).  These "showings are needed to establish that the challenged districting thwarts a distinctive minority vote by submerging it in larger white voting population."  *Growe v. Emison*, 507 U.S. 25, 40 (1993).

9.      "Lack of electoral success is evidence of vote dilution, but courts must also examine other evidence in the totality of circumstances, including the extent of the opportunities minority voters enjoy to participate in the political processes."  *Johnson v. De Grandy*, 512 U.S. 997, 1011-12 (1994).  Thus, if a plaintiff satisfies the *Gingles* preconditions, the court must then examine the totality of the circumstances, including by assessing the following factors identified by the U.S. Senate in Section 2's legislative history:  (1) "'the history of voting-related

8

discrimination in the . . . political subdivision,'" (2) "'the extent to which voting. . . is racially polarized,'" (3) the extent to which voting practices "'enhance the opportunity for discrimination,'" (4) "'the exclusion of members of the minority group from candidate slating processes,'" (5) "'the extent to which minority group members bear the effects of past discrimination in areas such as education, employment, and health,'" (6) "'the use of overt or subtle racial appeals in political campaigns,'" and (7) "'the extent to which members of the minority group have been elected to public office in the jurisdiction,'" as well as two factors that might have probative value in some cases:  (8) the responsiveness of elected officials to the needs of the minority community and (9) whether "'the policy underlying the . . . use of the contested practice or structure is tenuous.'"  *Goosby*, 180 F.3d at 491-92 (quoting *Gingles*, 478 U.S. at 44-45).  "The list of factors is neither comprehensive nor exclusive."  *NAACP, Inc. v. City of Niagara Falls*, 65 F.3d 1002, 1008 (2d Cir. 1995) (internal quotation marks omitted). "[N]o specified number of factors need be proved, and . . . it is not necessary for a majority of the factors to favor one position or another."  *Goosby*, 180 F.3d at 492.

10.  Plaintiffs must prove the *Gingles* preconditions and vote dilution under the totality of the circumstances by a preponderance of the evidence.  *See Arbor Hill Concerned Citizens Neighborhood Ass'n v. County of Albany*, 281 F. Supp. 2d 436, 443 (N.D.N.Y. 2003). "[I]t will be only the very unusual case in which the plaintiffs can establish the existence of the three *Gingles* factors but still have failed to establish a violation of § 2 under the totality of circumstances."  *Niagara Falls*, 65 F.3d at 1019 n.21 (internal quotation marks omitted).  But Section 2 does not confer on blacks and Latinos "a right to [be] elected in numbers equal to their proportion in the population" or insulate minority candidates from defeat at the polls. 52 U.S.C. § 10301(b).

11.     In 1982, Congress amended the VRA to make clear that the Act does not require plaintiffs to show a specific intent to discriminate.  *See* S. Rep. No. 97-417, at 2, 27 (1982), *as reprinted in* 1982 U.S.C.C.A.N. 177, 179, 205.  "The amendment was largely a response to [the Supreme] Court's plurality opinion in *Mobile v. Bolden*," 446 U.S. 55 (1980), which held that "minority voters must prove that a contested electoral mechanism was intentionally adopted or maintained by state officials for a discriminatory purpose."  *Gingles*, 478 U.S. at 35.  Congress adopted the Court's "'results test,'" applied in *White v. Regester*, 412 U.S. 755 (1973), and "ma[d]e clear that a violation could be proved by showing discriminatory effect alone," *Gingles*, 478 U.S. at 35, while also establishing that the VRA did not confer on minorities the right to win elections, *see* 52 U.S.C. § 10301(b).  Accordingly, there is "inherent tension" between the results test and § 10301(b) "because any theory of vote dilution must necessarily rely to some extent on a measure of minority voting strength that makes some reference to the proportion between the minority group and the electorate at large."  *Gingles*, 478 U.S. at 84 (O'Connor, J., concurring).  But it is clear that the VRA prohibits voting practices that result in vote dilution even if such dilution was not intended.  *See id.* at 70-71 (majority opinion).

12.     "[D]iverse minority groups can be combined to meet VRA litigation requirements," *Arbor Hill*, 281 F. Supp. 2d at 445, provided they are shown to be politically cohesive, *see Pope v. County of Albany*, No. 11-CV-736, 2011 WL 3651114, at *3 (N.D.N.Y. Aug. 18, 2011), *aff'd*, 687 F.3d 565 (2d Cir. 2012); *Rodriguez v. Pataki*, 308 F. Supp. 2d 346, 374-75 (S.D.N.Y.), *aff'd*, 543 U.S. 997 (2004).

## II.     DISCUSSION

### A.     First *Gingles* Precondition

13.     The first *Gingles* precondition is satisfied because the population of black and Latino voters in the District is sufficiently large and geographically compact to constitute a

majority in at least one single-member district under a ward system.  Specifically, Plaintiffs'

demography expert William Cooper has demonstrated that the demographics of the District

allow for the creation of (1) three majority-black (or majority-minority) wards or (2) four

majority-minority wards, if the District's black and Latino voters are combined into a single

minority population.  (PX 244A ¶ 3; *id.* ¶¶ 55-67 & figs.15-16 (Cooper's illustrative plan

showing that black population is sufficiently large and geographically compact to create three

majority-minority districts); *id.* ¶¶ 68-82 & figs.17-18 (Cooper's illustrative plan showing that

population of blacks and Latinos combined is sufficiently large and geographically compact to

create four majority-minority districts).)[10]  Although Defendant stipulated only that black voters

alone are sufficiently numerous and geographically compact to constitute a majority in at least

one potential election district, (JPTO at 14), it does not provide evidence to dispute that it is

possible to create three majority-black districts, (*see* Doc. 555 ¶¶ 21-25), or four, if black and

Latinos can be combined.[11]  Further, Defendant concedes that combining minority groups is

---

[10] A summary of Mr. Cooper's redistricting experience is available at PX 244C.  Although his
testimony may have been shaky on unrelated matters such as the location of private schools
attended by District residents and the number of students of color attending private schools, (*see*
Tr. at 555:2-15, 561:1-17), his testimony and conclusions regarding redistricting – upon which
he is eminently qualified to opine – were convincing and essentially unchallenged by Defendant.

[11] Rather, Defendant contends that Plaintiffs may not assert a VRA claim on behalf of a
combined minority group because such a group would be a political rather than racial coalition.
(*See* Doc. 555 ¶ 24 (citing *Hall v. Virginia*, 385 F.3d 421, 431 (4th Cir. 2004) ("[A]ny
construction of Section 2 that authorizes the vote dilution claims of multiracial coalitions would
transform the Voting Rights Act from a law that removes disadvantages based on race, into one
that creates advantages for political coalitions that are not so defined.")).)  But Defendant's
argument is disingenuous because in *Hall*, plaintiff sought to combine black and white voters to
show vote dilution.  *See* 385 F.3d at 424-25.  The Fourth Circuit held that black and white voters
combined would form a political coalition, not a minority group.  *Id.* at 431.  *Hall* does not stand
for the proposition that minority groups cannot be combined.  To the contrary, courts "recognize
the permissibility of coalition claims under § 2, as long as plaintiffs are able to demonstrate the
political cohesiveness of the coalition."  *Ga. State Conference of the NAACP v. Gwinnett Cty.
Bd. of Registrations & Elections*, No. 16-CV-2852, 2017 WL 4250535, at *1 (N.D. Ga. May 12,

permissible "'where the statistical evidence is that the minority groups vote cohesively for the same candidates.'" (*Id.* ¶ 37 (quoting *Reed v. Town of Babylon*, 914 F. Supp. 843, 848 (E.D.N.Y. 1996)); *see id.* ¶ 25.)  As discussed below in connection with the Court's analysis of the second *Gingles* precondition, (*see* ¶¶ 26-27 below), black and Latino voters are sufficiently cohesive within and across those groups for them to be combined, (Tr. at 289:2-9; *id.* at 289:21-24 (Barreto) ("Black and Latino voters voted for the same candidates.  So it wasn't as though blacks were voting for one candidate and Latinos are voting for a third.  Black and Latino voters were also voting cohesively with each other.")).[12]  Accordingly, the population of minority voters in the District is sufficiently large and geographically compact to constitute a majority in four single-member districts under a ward system.

### B.    Second and Third *Gingles* Preconditions

14.    Where a "significant number of minority group members usually vote for the same candidates," the minority group is politically cohesive and satisfies the second *Gingles* precondition.  *Gingles*, 478 U.S. at 56.  Plaintiffs can rely on both statistical and anecdotal evidence to show political cohesion.  *Pope v. County of Albany*, 94 F. Supp. 3d 302, 333 (N.D.N.Y. 2015).

15.    Where the majority votes as a bloc and usually defeats the minority-preferred candidate absent special circumstances, the third *Gingles* precondition is satisfied.  *Gingles*, 478 U.S. at 51.  Whether a candidate is minority preferred cannot be proven by anecdotal evidence but rather only by statistical evidence showing that a candidate received support from more than

---

2017) (collecting cases); *see Bridgeport Coal. for Fair Representation v. City of Bridgeport*, 26 F.3d 271, 276 (2d Cir.), *vacated and remanded on other grounds*, 512 U.S. 1283 (1994).

[12] I need not reach whether the District's Latino voters alone are sufficiently large and geographically compact to constitute a majority, (*see* Doc. 555 ¶¶ 22-23), because I conclude that they vote cohesively with black voters.

50% of minority voters. *Niagara Falls*, 65 F.3d at 1018-19. "[E]vidence [of minority candidates' success] does not necessarily negate a finding of bloc voting, particularly if elections are shown usually to be polarized or the success of minority candidates in particular elections can be explained by special circumstances, such as the absence of an opponent or incumbency.'" *Pope*, 687 F.3d at 582 (internal quotation marks and alteration omitted). "Courts have disregarded elections won by minorities after the initiation of a voting rights suit, where Anglos preferred the minority candidate, or manipulated the election of a safe minority candidate or provided unusual organized political support or campaigned to insure the election of a minority candidate." *Aldasoro v. Kennerson*, 922 F. Supp. 339, 375-76 (S.D. Cal. 1995) (citations omitted); *see Ruiz v. City of Santa Maria*, 160 F.3d 543, 557-58 (9th Cir. 1998) (*per curiam*) ("special circumstances" include majority support for minority-preferred candidates intended to thwart litigation). "[A] pattern of racial bloc voting that extends over a period of time is more probative of a claim that a district experiences significant polarization than are the results of a single election." *Gingles*, 478 U.S. at 57.

16.     Plaintiffs contend that the District's black and Latino communities are politically cohesive and that the white majority votes as a bloc in Board elections so that no minority-preferred candidate has won a contested election since 2007. For the reasons stated below, I find that Plaintiffs are correct and that they have satisfied the second and third *Gingles* preconditions.

17.     Plaintiffs' expert in political science and statistical analysis, Dr. Matthew Barreto, (*see* Tr. at 154:5-11), used accurate and scientifically validated methods to identify and analyze racially polarized voting in the District. He is a professor of political science and Chicana/o studies at the University of California, Los Angeles, and the co-founder of a successful political and electoral consulting firm called Latino Decisions. (PX 242B at 44; Tr. at 150:1-3, 151:11-

13

14.)[13]  Dr. Barreto has published extensively and recently on voting, race, and statistical

methods, including four books and sixty journal articles and book chapters, (*see* PX 242B at 45-

48), and has been honored with research awards and fellowships, (*id.* at 49-50).  He has

published with many of the other leading experts in this field and is up to date on the newest,

most innovative methods.  He teaches courses on the VRA, racial and ethnic politics, electoral

politics, demographics, and statistical analysis.  (Tr. at 151:18-152:7.)  In sum, Dr. Barreto is

extremely well credentialed and at the leading edge of political science and statistical analysis

with respect to racially polarized voting and voting estimates.  I found him to be entirely

credible.

        18.     Defendant's political science expert, Dr. John Alford, is a professor of political

science at Rice University.  (*Id.* at 2146:9-10.)  He has testified as an expert approximately thirty

to forty times in VRA cases, primarily for defendants.  (*Id.* at 2146:19-23, 2147:4-7, 2264:23-

2265:5.)  He teaches courses on voting behavior in elections and, in those courses, covers

material on racial voting patterns, (*id.* at 2264:5-8), but he has not published a paper on racially

polarized voting, taught any courses on minority politics or voting behavior, or written about a

Section 2 case in an academic publication, (*id.* at 2263:25-2264:16).  He has not published any

peer-reviewed articles using methods of ecological inference or involving surname analysis, and

his last article on geocoding analysis was published thirty years ago.  (*Id.* at 2263:9-23.)  And he

is not (nor does he consider himself to be) an expert in the area of race and ethnicity politics.  (*Id.*

at 2264:17-19.)  His testimony, while sincere, did not reflect current established scholarship and

methods of analysis of racially polarized voting and voting estimates.

        19.     In New York, voters do not self-report their race, so voting patterns have to be

---

[13] All references to PX 242B are to the page numbers stamped at the top-center of each page.

estimated.  To perform this estimation, Dr. Barreto and his colleague Dr. Loren Collingwood

used ecological statistical models that "attempt to draw an inference regarding how groups voted

using aggregate ecological data."  (PX 242A ¶ 7.)[14]  Dr. Barreto used two ecological inference

("EI") methods to analyze various data sets.[15]  The first method, King's Ecological Inference

("King's EI"), identifies patterns between the racial make-up of voters in certain precincts and

the number of votes candidates received at the corresponding polling places.  (*See* PX 242B at 5,

10-11.)  The second method, row by column ("RxC"), is an improved EI technique that can

generate estimates for more racial groups and more candidates.  (*Id.* at 11.)  Dr. Barreto's results

were consistent across every methodology:

> Across a variety of analyses that Dr. Collingwood and I performed,
> we found strong and consistent evidence that blacks and Latinos
> are politically cohesive and that they consistently vote for the
> candidates which lose elections.
>
> We found strong and consistent evidence that white voters vote
> cohesively as a bloc[] and that they vote for candidates that have
> won every single election.

(Tr. at 155:6-12.)

    20.    Of the various data sets that could be used as EI input, Dr. Barreto primarily

relied on Bayesian Improved Surname Geocoding ("BISG") data.  "BISG is a methodology that

uses individual-level data, including a voter's surname, geographic location, and the racial

composition of the voter's census tract or block to generate the probability that an individual

belongs to a particular group where self-reported information is not available."  (PX 242B at 15.)

---

[14] I refer to Dr. Barreto alone throughout because he provided live expert testimony in this case,
but Drs. Barreto and Collingwood "work[ed] together on all of the reports and analyses," with
Dr. Collingwood serving as lead programmer.  (Tr. at 164:23-165:13.)

[15] "Generally speaking, both methods take ecological data in the aggregate – such as precinct
vote totals – and use Bayesian statistical methods to find voting patterns by regressing candidate
choice against racial demographics within the aggregate precinct."  (PX 242B at 11.)

Starting with the list of actual voters in each election (the "voter file"), Dr. Barreto used the

"Who Are You" or "WRU" software package created by scholars Kosuke Imai and Kabir

Khanna to estimate the probability that each voter was white, black, Latino, or other using a

surname list[16] and geolocation data from the decennial census.[17]  (PX 242A ¶ 7; Tr. at 166:13-20,

168-11-172:11; PX 305_0008-09; *see* PX 269 (Kosuke Imai & Kabir Khanna, *Improving*

*Ecological Inference by Predicting Individual Ethnicity from Voter Registration Records*, 24 Pol.

Analysis 263 (2016)).)[18]

       21.     The first step of the BISG analysis plugs in a race estimate based on the voter's

surname – for example, census data that shows that of individuals with the surname Jackson,

39% are white and 53% are black.  The next step looks at the voter's census block.  If, for

example, voter Jackson lives on a block that is 80% black and 20% white, that increases the

likelihood that voter Jackson is black and makes an estimation of voter Jackson as black more

reliable.  The software calculates the probability that someone with a 53%-probable black

surname who lives in an 80%-black census block is actually black.  (Tr. at 168:9-170:10, 170:24-

---

[16] For every surname that occurs at least 1,000 times, demographers at the Census Bureau have created a race probability estimate based on census respondents' self-reported race.  (Tr. at 168:16-24.)

[17] The Census Bureau collects data at various geographic levels, the smallest being a "block," which is about one city block in size, and the next smallest being a "block group," which is a collection of several blocks.  (PX 244 ¶¶ 3-4, 29.)  That data can then be aggregated to the precinct (or polling place) level.  (*See* Tr. at 2200:16-21.)

[18] In 2016, Imai and Khanna published an article in the leading political science statistics and methods journal proposing the use of surname and geocoding analysis to estimate voter preference and turnout.  (PX 269; *see* Tr. at 190:3-8.)  They validated their statistical package WRU by comparing its results to the self-reported race of 9 million Florida voters.  (PX 269 at 267.)  They concluded that BISG "enables academic researchers and litigators to conduct more reliable ecological inference in states where registered voters are not asked to report their race." (*Id.* at 271.)

172:11.)[19]

22.     After Dr. Barreto estimated voter race probabilities, he aggregated those probabilities to the precinct level to estimate the racial make-up of each precinct.  (*See id.* at 185:23-186:4.)  Through a statistical package and method called eiCompare, Dr. Barreto then used both King's EI and RxC to estimate voting preference by race and compared the results.  (*Id.* at 164:1-11, 165:5-18.)  He used both ecological inference methods because they enabled him to see if the results were consistent across the models and provided "more evidence, more data points [to] take in to draw [his] conclusion."  (*Id.* at 287:22-288:7.)

23.     The use of BISG has been extensively validated by experts.  Dr. Barreto first used surname and geocoding analysis on voter files around 2003 and has continued to use and publish about that method since.  (*Id.* at 170:16-23.)  In 2009, scientists from the RAND Corporation evaluated the census surname list and geocoding information from the census at the block level and found that the probability that self-reported race matched with a BISG race estimate (that is, "concordance") was 95% for Hispanics and 93% for blacks and whites.  (DX 101 at 70, 78.)  In 2016, RAND published a second article that describes how BISG can produce estimates of racial disparities within populations with a concordance of 90 to 96%.  (PX 274 at 2; Tr. at 181:13-24, 182:5-183:1.)  Many respected scholars have used and validated BISG in the political science context and across a variety of disciplines.  (Tr. at 192:2-14; *see* PX 269 (validating BISG with

---

[19] Dr. Barreto did not purport to have expertise on how the equation underlying Imai and Khanna's software package functions, and it appears he may not have fully understood it, (*see* Tr. at 1597:11-1607:20 (Barreto); *id.* at 2227:15-2228:21 (Alford)), but he used the software as published by Imai and Khanna without alteration, (*id.* at 1598:3, 1598:25-1599:1, 1599:20-22, 1600:7-9, 2727:23-2728:6), and his understanding of the results produced is manifest, (*see, e.g.*, *id.* at 167:3-10, 168:9-170:10, 170:24-175:8, 185:11-18).

results of Florida presidential election);[20] PX 367 (2015 article using surname and geocoding data purchased from data vendor Catalist LLC to estimate race of voting populations in nationwide elections to calculate turnout differences between racial groups); PX 369 at 223-26 (2018 book validating accuracy of Catalist data); PX 368 at 5-6, 13 (2016 article using BISG to estimate voter race and King's EI to estimate precinct-level votes and racial voting preferences); PX 370 (2020 article using BISG race estimates to estimate differences in political campaign contributions across racial groups); see also PX 274 at 1 (BISG "can produce accurate estimates of racial/ethnic disparities within populations served when self-reported data are lacking" in health-care context); id. at 5 (citing fifteen validation studies and peer-reviewed articles using surname and geocoding analysis); Tr. at 182:19-183:10, 183:20-184:6 (Barreto) (PX 274 summarized validation studies using surname and geocoding analysis); PX 305_0014 (citing peer-reviewed articles on health care and epidemiology); DX 209 at 3 (using BISG in consumer-protection context).)  The political science articles were peer reviewed and published in leading journals.  (Tr. at 189:23-191:11, 192:2-14.)  And both of Defendant's experts, Dr. Alford and demographer Dr. Peter Morrison, have advocated for the use of surname and geocoding analysis to derive racial estimates by geographic unit.  (See DX 67-02 ¶ 26 (Dr. Alford suggesting that flaws in Plaintiffs' previous expert's preliminary report could have been corrected if that expert had "estimated voter turnout by race using surnames and voter sign-in records," citing the Imai & Khanna article); DX 99 at 12 n.21 (article co-authored by Dr. Morrison noting availability of BISG to "assign a race to registrants in a voter file where this quantity is not present and then

---

[20] Dr. Barreto explained that Imai and Khanna's validation in particular supports the use of BISG in the District because Florida and the District have similar demographics, including large Latino, Haitian, and Hasidic populations.  (Tr. at 194:4-11.)

aggregate these individuals by a geographic unit such as a voting precinct").)[21]

24.     Dr. Barreto applied BISG in the manner proposed in the academic literature – not by attempting to assign individuals to racial categories, but by aggregating individual race estimates to create precinct-level demographic estimates.  (Tr. at 185:13-186:4; PX 242A ¶ 7; PX 305_0012; PX 274 at 2-3.)  He then used that data as an input to the EI models, which is "exactly the same" as how other scholars have used BISG in the health-care and campaign-donation contexts.  (Tr. at 2728:7-23.)  Defendant contends that Dr. Barreto did not identify support in the academic literature for using BISG race estimates as an EI input, (*see* Doc. 555 ¶ 107(c)), but his methodology is supported, as described in paragraph 23 above.  And Dr. Barreto did not simply estimate a probability distribution for each individual (*e.g.*, a 60% probability that voter X is white, a 30% probability that voter X is black, etc.), as Defendant suggests, (*see* Doc. 555 ¶ 107(b)); rather, he aggregated his estimations to the precinct level as described in the literature, (PX 242A ¶ 7; *see* Tr. at 187:13-21).

25.     BISG is particularly reliable for use in the District because of its unique characteristics.  BISG models work best in places "where there's more differentiation between names and more differentiation between racial populations of neighborhoods," like the District.  (Tr. at 201:18-24.)  The District has large populations of Hispanic voters with very commonly occurring Spanish surnames and large populations of white voters with very commonly occurring white surnames.  (*Id.* at 202:7-11.)  Black and Hispanic surnames rarely overlap, so BISG is still highly precise even in neighborhoods where blacks and Hispanics live together.  (*Id.* at 203:23-204:2; *see id.* at 208:5-10.)  The District's neighborhoods are racially segregated

---

[21] Dr. Morrison testified that Dr. Barreto should not have used BISG, (Tr. at 23:15-19), but this testimony was not consistent with his earlier published statement that BISG could be used in vote dilution analysis, (*see* DX 99 at 12 n.21).

to "a very high degree," (*id.* at 202:18-20), and many approach 100% white or 100% minority, (*id.* at 210:4-17, 212:20-217:5, 217:25-218:4).   And even in neighborhoods where blacks and Latinos live together in the same census block groups, census blocks are more highly segregated, lending confidence to BISG results, which rely on census block data.   (*Id.* at 1673:2-1675:19; *see* PX 300; PX 301.)   For all these reasons, BISG is likely to provide accurate, reliable estimates in the District.

26.     Dr. Barreto's King's EI and RxC analyses using BISG data showed that white voters were highly cohesive and consistently voted for the winning candidate in every election. Black and Latino voters were also highly cohesive, both as individual groups and when considered together,[22] and they consistently voted for the losing candidate.   In every contested election, "the candidates who were preferred by a cohesive white voting bloc[] beat the candidates preferred by blacks and Latinos."   (Tr. at 289:14-290:1; *see* PX 242A ¶¶ 8, 10, 12, 16; PX 243 ¶ 32.)   Dr. Alford conceded that white voters are cohesive, concluding that "[a]ll of the results from all of the data sources and all of the methods show the same stable level of 70-80% white support for one candidate in each contest" and that "it is clear that whites are voting cohesively."   (DX 13 at 23.)

---

[22] In other words, black voters tended to vote for the same candidates as each other, Latino voters tended to vote for the same candidates as each other, and both groups supported the same candidates; "it wasn't as though blacks were voting for one candidate and Latinos are voting for a third.   Black and Latino voters were also voting cohesively with each other."   (Tr. at 289:16-24.)

27.     A table summarizing Dr. Barreto's results is set out below.[23]

Table 2:  BISG Results for White, Black, and Latino Voters.  (PX 305_0049.)

| Analysis | | White, Black, Latino (BISG) | | | | | |
| --- | --- | --- | --- | --- | --- | --- | --- |
| | | White | | Black | | Latino | |
| Year | Candidate (Lost) | EI | RxC | EI | RxC | EI | RxC |
| 2013 | Corado Tuck (L) | 75 | 68 | 3 | 15 | 2 | 34 |
| | | 25 | 32 | 98 | 85 | 99 | 66 |
| | Germain Clerveaux (L) | 70 | 67 | 5 | 26 | 7 | 39 |
| | | 29 | 33 | 94 | 74 | 90 | 61 |
| | Charles Forrest (L) | 68 | 66 | 4 | 22 | 10 | 44 |
| | | 31 | 34 | 93 | 78 | 91 | 56 |
| 2015 | Lefkowitz Charles-Pierre (L) | 74 | 67 | 2 | 25 | 24 | 18 |
| | | 20 | 31 | 96 | 71 | 95 | 61 |
| | Rothman Morales (L) | 76 | 70 | 13 | 7 | 30 | |
| | | 23 | 30 | 97 | 87 | 88 | 70 |
| | Ramirez White (L) | 73 | 65 | 3 | 22 | 10 | 35 |
| | | 19 | 31 | 95 | 76 | 88 | 55 |

| Analysis | | White, Black, Latino (BISG) | | | | | |
| --- | --- | --- | --- | --- | --- | --- | --- |
| | | White | | Black | | Latino | |
| Year | Candidate (Lost) | EI | RxC | EI | RxC | EI | RxC |
| 2016 | Charles Foskew (L) | 77 | 75 | 17 | 25 | 5 | 41 |
| | | 23 | 25 | 94 | 75 | 89 | 59 |
| | Germain Fields (L) | 77 | 74 | 4 | 24 | 1 | 40 |
| | | 22 | 26 | 90 | 76 | 97 | 60 |
| | Weissmandl, Y. Morales (L) | 78 | 72 | 3 | 19 | 3 | 36 |
| | | 22 | 28 | 96 | 81 | 98 | 63 |
| 2017 | Berkowitz Manigo (L) | 72 | 73 | 10 | 23 | 5 | 36 |
| | | 28 | 27 | 93 | 77 | 94 | 64 |
| | Grossman Goodwin (L) | 72 | 74 | 2 | 23 | 5 | 36 |
| | | 29 | 26 | 91 | 77 | 91 | 64 |
| | Frailich Dos Reis (L) | 75 | 77 | 14 | 27 | 5 | 40 |
| | | 25 | 23 | 93 | 73 | 87 | 60 |
| 2018 | Trieger Moster (L) | 85 | 62 | 20 | 18 | 3 | 39 |
| | | 14 | 38 | 72 | 82 | 97 | 61 |
| | Weissmandl, E. Cintron (L) | 83 | 83 | 5 | 16 | 2 | 40 |
| | | 17 | 17 | 91 | 84 | 95 | 60 |

The numbers in the columns labeled "White," "Black," and "Latino" represent the estimated percentage of each racial group that voted for each candidate.  This analysis showed high levels of racially polarized voting in every contested election.  White support for the winning candidates ranged from 62-85%.  Black support for losing candidates ranged from 71-98%, and Latino support for losing candidates ranged from 55-99%.  (*Id.*)[24]

---

[23] The 2014 election was not analyzed because all candidates that year ran unopposed.  (*See* JPTO at 8-9; *see also* Table 1 above.)

[24] Both sides agree that white voters have supported black and Latino candidates to the same extent as white candidates, but contrary to Defendant's suggestion, (Doc. 555 ¶ 73), that does not show the absence of racial polarization or a Section 2 violation.  A minority candidate is not necessarily preferred by minority voters.  *See Goosby*, 180 F.3d at 497 (acknowledging that black candidate was not minority preferred); *see also Niagara Falls*, 65 F.3d at 1018 (cautioning against "degenerat[ing] into racial stereotyping").  And the election of a minority candidate is discounted where whites preferred the minority candidate, manipulated the election of a "safe" minority candidate, engineered the election of a minority to evade a VRA challenge, or provided unusual political support to the minority candidate or otherwise campaigned to ensure that candidate's election, *see Aldasoro*, 922 F. Supp. at 375-76, all of which occurred here (as discussed below).

28.     Dr. Barreto validated his analysis using other methodologies to "see if the data all stack[] up and point[] in the same direction," (Tr. at 162:14-16), and each method supported his conclusions.

- First, he purchased a data set from a private consulting company called Catalist LLC ("Catalist"), which provides data, analytics, and modeling to political campaigns, civic organizations, and research institutions.  (PX 258 at 21:9-17 (deposition of designated Catalist witness); *see* Tr. at 242:1-6 (Barreto).)  Catalist's database of over 240 million voters includes first name, surname, census, and self-reported data.  (PX 258 at 52:6-18, 61:19-63:7; Tr. at 245:15-246:9.)  Dr. Barreto has used the Catalist data set in the past and found it to be extremely accurate, (Tr. at 242:9-14), it has won awards for accuracy from political and commercial consulting groups, (*id.* at 252:1-3), and it is a highly successful commercial product on which campaigns and others rely, all of which suggest that its results are reliable.  Other experts have also relied on and validated Catalist's data, including in VRA cases.  (*See* PX 367 at 102; PX 369 at 223-224; *Lee v. Va. State Bd. of Elections*, 188 F. Supp. 3d 577, 598-99 (E.D. Va. 2016), *aff'd*, 843 F.3d 592 (4th Cir. 2016); *Veasey v. Perry*, 71 F. Supp. 3d 627, 661-63 (S.D. Tex. 2014), *vacated and rev'd in part on other grounds sub nom. Veasey v. Abbott*, 830 F.3d 216 (5th Cir. 2016).)  Dr. Barreto compared Catalist's estimates of voter race from the District's 2017 elections with his own results and found both methodologies produced similar results, which gave him more confidence in his conclusions.  (PX 242A ¶ 18; Tr. at 254:21-24, 291:15-24.)

- Second, he used a different data set – citizen voting age population data from the Census Bureau ("CVAP data") – to perform King's EI and RxC analyses, both of which also showed racially polarized voting with white voters always voting cohesively for the

winning candidate (and a combined "non-white" group of voters always voting for the loser).  (Tr. at 291:25-292:20, 293:16-294:9; PX 242B at 25-26.)[25]

- Third, Dr. Barreto generated white voter estimates using CVAP and subtracted those estimates from the total votes for each candidate to estimate nonwhite votes, (Tr. at 296:16-25), which also showed voter cohesion, (*id.* at 300:14-22; PX 242B at 16-25).[26]

- Fourth, Dr. Barreto examined the 2012 U.S. presidential election and concluded that it was also highly racially polarized, with whites and minorities "voting in opposite directions," (Tr. at 306:17-307:17), which further supported his conclusions.

- Fifth, as additional backup for his results, he analyzed the surnames from nomination petitions and found that white voters supported the winning candidates and black and Latino voters supported the losing candidates.  (*Id.* at 357:20-358:15.)

In sum, by performing ecological inference on BISG-generated data, Dr. Barreto proved consistent white voting cohesion for the winning candidates and consistent minority voting cohesion for the losing candidates, and the other methods he employed supported these

---

[25] In this CVAP analysis Dr. Barreto combined black and Latino voters into a single "non-white" category.  Dr. Barreto testified that he did not believe "the CVAP data was appropriate or precise" and so he "did not attempt to make CVAP estimates for Blacks or Latinos" but rather performed a white/non-white analysis of CVAP to "start to understand voting patterns.  (Tr. at 420:20-25, 421:24-422:8.)  While this might not be a reliable methodology in the first instance, (*see id.* at 2184:22-2185:11 (Alford testifying that if Barreto were concerned with reliability, he should have reported black/white/Latino results and explained them); *id.* at 2751:19-2752:4 (Barreto admitting that he was aware of Alford's CVAP results)), it is appropriately considered here because grouping the minority voters increased the sample size being analyzed, (*id.* at 284:1-14), and helped to mitigate the turnout problem, (*see id.* at 284:1-3), described below, and because Dr. Barreto used this method just as a cross-check of his BISG analysis, (*id.* at 283:20-24).

[26] Dr. Barreto used Dr. Alford's own method and conclusions in this analysis.  (Tr. at 294:20-295:14, 306:204.)  The results showed that even if every black and Latino voter voted for the losing candidate, that candidate would still lose by thousands of votes because the white voting bloc was too powerful to overcome.  (*Id.* at 304:6-19, 306:2-8.)

conclusions.  (*Id.* at 352:23-353:14.)

29.      There is also anecdotal evidence of minority cohesion under the second *Gingles* precondition that supports Dr. Barreto's conclusions.[27]  Witnesses called by both sides perceive a large white voting bloc of Orthodox and Hasidic people whose children attend private schools voting for the "private school community" slate, and black and Latino people whose children attend public schools voting for the "public school community" slate.  (*Id.* at 1238:11-14, 1849:1-4, 2560:11-14; PX 243 ¶ 55 n.71; *id.* ¶¶ 58-65; PX 257 at 191:18-192:2; PX 286 ¶ 12.) Many witnesses referred to the private and public school communities and testified that the public school community's slate always loses.  (*See* PX 279 ¶ 11; PX 280 ¶¶ 7-9; PX 281 ¶¶ 9, 60-62; PX 282 ¶¶ 11-15; PX 283 ¶¶ 67, 69-70; PX 288 ¶ 6; Tr. at 1818:5-9; *see also* ¶ 5 above.)

30.      Defendant concedes that whether Plaintiffs have satisfied the second and third *Gingles* preconditions hinges on whether BISG is a good data input.  (Doc. 555 ¶ 99 ("[T]he Court's main task is to decide whether it agrees with Dr. Barreto that using BISG generated race estimates as the demographic data input for an EI:RxC analysis is better than using . . . CVAP.").)  I find that, given the unique characteristics of the District, BISG is a better data set than CVAP for use as an input for ecological inference, and Dr. Barreto therefore used the superior methodology.  Defendant's expert Dr. Alford relied on CVAP, which is less reliable here for three reasons.

31.      First, CVAP is less precise.  BISG begins with the actual voter file – that is, the names of the individuals who actually voted – whereas a CVAP data set contains all eligible

---

[27] As noted in paragraph 15 above, anecdotal evidence is not considered in determining which candidates are minority preferred under the third *Gingles* precondition.  As to whether white voters vote as a bloc under that precondition, courts likewise rely on statistical analysis.  *See Niagara Falls*, 65 F.3d at 1012; *Pope*, 94 F. Supp. 3d at 336-37; *Rodriguez*, 308 F. Supp. 2d at 422-26.

voters in the District, whether they voted or not.  In addition, CVAP data come from the American Community Survey.  (Tr. at 255:15-21.)  Because that Survey only accounts for 2% of the population over each of five years, CVAP requires an inference to apply the 10% sample to the whole population, which can introduce bias.  (*Id.* at 256:23-257:7, 282:7-18.)  Using CVAP data, Dr. Alford was not able to draw definitive conclusions about minority voter cohesion or the existence of racially polarized voting.  (*Id.* at 2271:17-19 (Alford could neither conclude nor rule out that minorities were voting cohesively); *see id.* at 2158:2-2166:17, 2268:13-16.)

32.     Second, there is a misalignment between the voter precincts analyzed and the census block-group data from which the CVAP data set is pulled.  To analyze voters in a given precinct, experts would want data from that specific precinct.  But CVAP data provide racial proportions within census block groups, which almost never correspond to the voter precincts.  Because the BISG data set begins with the voter file, it contains the actual voters within in each precinct.  (*Id.* at 257:8-259:11.)  "CVAP has . . . 'geographic misalignment' between census boundaries and precinct boundaries, whereas BISG has the exact same alignment."  (*Id.* at 257:16-18.)

33.     Third, because CVAP data sets do not contain information on actual voters, voter turnout must be estimated, which fails to reliably produce the precinct-by-precinct estimates required for EI analysis.  (*Id.* at 264:11-19.)  Although the District has 60,000 eligible voters, only about 13,000 to 14,000 people actually vote, so using CVAP introduces "noise . . . influencing who is in a precinct."  (*Id.* at 259:20-260:1.)  Both King's EI and RxC can estimate turnout and incorporate it into the choice percentage, (PX 242B at 18), but such estimations do not produce results that are as reliable as the results produced by BISG.

- As to King's EI, Dr. Barreto testified that a double-equation approach is necessary to help

account for "turnout issues," (Tr. at 2707:13-15), such as "substantial difference in turnout across racial groups," (PX 364 at 611 (article by Dr. Barreto and Dr. Bernard Grofman explaining that double regression can mitigate turnout problem)), as there is in the District.[28]  Such an approach would estimate voter turnout and make adjustments to CVAP data before estimating voter choice.  (Tr. at 2708:19-24.)  But even using a double-equation approach would not "solve[] the problem CVAP has," and the voter file would still be the better data source.  (Tr. at 2711:8-2712:20; *see* PX 364 at 607-08.).  In other words, the turnout estimated by EI is not as accurate without a double-equation approach, and even with such an approach, is not as accurate as using the voter file, which BISG uses.

- The experts disagree about precisely how turnout is estimated by RxC.  Dr. Alford testified that RxC estimates turnout "simultaneously," (Tr. at 2209:22-2210:6), by including "a category that didn't vote," which "estimate[s] for each racial group at each precinct . . . the proportion that are not voting," (*id.* at 2208:17-22).[29]  Dr. Barreto testified that the software package that runs RxC can be programmed to estimate turnout by race at the precinct level, (*id.* at 2715:1-8), but that it would require "a formula or a model that just predicted voter turnout" using a different set of commands and specifications before candidate choice can be estimated, (*id.* at 2715:9-21).

---

[28] The turnout problem is amplified in the District.  Dr. Barreto's testimony confirms that the CVAP data set used in this case overestimates black and Latino turnout and underestimates white turnout.  (*See* Tr. at 272:11-274:10, 274:14-275:8, 275:17-276:14.)  Accordingly, EI estimates of voter preference relying on CVAP underestimate the extent of racially polarized voting.  (*Id.* at 281:15-24.)

[29] In so opining, Dr. Alford contended that PX 364 – Dr. Barreto and Dr. Grofman's article – claimed that RxC can also account for turnout, (*see* Tr. at 2208:4-15), but the article covered King's EI, not RxC, (*see id.* at 2707:21-2708:7).

In any event, it does not appear that Dr. Alford properly accounted for turnout.  It seems that he

did not perform a double-equation regression, (*id.* at 2711:3-7), or include a voter turnout model

in his RxC script, (*id.* at 2716:2-16, 2717:25-2718:5).  He variously claimed that he performed a

double regression on the CVAP data before running EI analysis, (*id.* at 2292:2-9), and that the

double regression was happening automatically within RxC to estimate turnout at the precinct

level, (*id.* at 2208:4-15).  But Dr. Barreto testified that Dr. Alford's scripts used a single-equation

approach that introduced error by mixing turnout estimates with candidate choice estimates.  (*Id.*

at 2717:25-2720:17.)  Thus, although Dr. Alford suggested that inclusion of a no-vote (or

abstained) category in RxC, rather than just estimating votes for candidate 1 and candidate 2,

would solve the problem of CVAP not accounting for turnout, Dr. Barreto explained that turnout

by racial group should be estimated first, without "mixing it with the candidate choice," (*id.* at

2720:2), and then used to adjust the input variable in the voter-choice model, (*id.* at 2720:8-11).

But Dr. Alford did not do a separate calculation.  He used unadjusted CVAP as the input variable

to estimate votes for candidate 1, candidate 2, and no-vote, and then calculated the percentage of

votes for candidate 1 and candidate 2 as a percentage of all votes.  (*Id.* at 2714:2-2723:11.)  He

did not "chang[e] the input variable . . . to account for the turnout rate.  [He] just transform[ed] it

into a share."  (*Id.* at 2721:17-19.)  For all these reasons, Dr. Alford's conclusions based on

CVAP, (*see id.* at 2158:2-2166:17), are not as reliable as Dr. Barreto's conclusions based on

BISG.

    34.    Indeed, in criticizing the methodology of Plaintiffs' previous expert, Dr. Alford

also admitted that CVAP was not a "good data set" for EI because it did not use "the number of

*actual voters* from each racial group," (DX 62 ¶ 24 (emphasis in original); *see* Tr. at 2335:4-17),

and opined (citing the Imai and Khanna article) that BISG-like analysis could correct for

CVAP's flaws, (DX 62 ¶ 26 & n.17; *see* Tr. at 2236:14- 2337:13).  He acknowledged that CVAP "assumes, without justification, that racial groups vote in proportion to their size," but black and Latino voters typically have significantly lower turnout than white voters.  (DX 62 ¶ 24.)

    35.    The District's criticisms of Dr. Barreto and of BISG are unpersuasive.  First, Dr. Alford testified that the accepted practice for political scientists is to reject results that do not report a 95% confidence interval.  (Tr. at 2169:22-2170:15.)  Dr. Alford testified that where a result has a wide confidence interval (for example, 11% to 88% support for a candidate), the likelihood of the point estimate (for example, 52%), is lower than it would be were the confidence interval narrower.  (*Id.* at 2167:6-2168:19.)[30]  He contends that such an interval means that he "can't reject the possibility that . . . the actual value [of support for a candidate] might have been 49 percent" because the confidence interval goes below 50%.  (*Id.* at 2168:4-12.)  But Dr. Barreto credibly explained why reliance on confidence intervals is not required and, moreover, why the confidence intervals he did report, (*see* PX 242B at 34-42, PX 242A at 40-47), do not undermine his conclusions.[31]  The use of 95% confidence intervals "depends entirely on the type of question you're asking and the type of research inquiry you're doing" and is more helpful when testing samples of data rather than using the voter file.  (Tr. at 347:14-348:19.)  He testified that there is no consensus around their use, and while some scholars rely on them, others

---

[30] A point estimate is the most likely outcome as generated by a statistical model such as King's EI or RxC.  (*See* Tr. at 336:5-10, 336:22-25, 337:23-338:4 (Barreto).)  The confidence interval is the rest of the distribution and shows the probability of other estimates.  (*Id.* at 336:18-21.)

[31] In his expert report, Dr. Barreto reported confidence intervals using CVAP data for the contested races in 2013, 2016, 2017, and 2018, (PX 242A at 40-44, 46-47), and 2017 King's EI and RxC analysis using Catalist data, (*id.* at 44-46).  He did not analyze the 2015 election in that report because the data contained incorrect precinct assignments.  (*Id.* ¶ 7.)  In his preliminary report, Dr. Barreto reported confidence intervals using CVAP data for the contested races in 2013, 2015, 2016, and 2017; the 2012 presidential election; and the 2017 races using BISG.  (PX 242B at 34-42.)  At the time of the preliminary report, Dr. Barreto was able to apply BISG only to the 2017 voter file, which had been produced in discovery by that point.  (*Id.* at 9, 12-13.)

provide point estimates, examine patterns, and draw conclusions from those.  (*Id.* at 348:20-349:2.)  Because Dr. Barreto's BISG scripts calculated racial probabilities rather than race predictions and error rates, based on instruction from the academic literature, (*id.* at 218:14-25), using probability terminology rather than "strict confidence interval testing" was more appropriate, (*id.* at 1683:10-1684:5).[32]  Drawing conclusions "about patterns of point estimates," as in BISG analysis, "does not require a 95 percent statistical test."  (*Id.* at 347:16-18.)  Accordingly, Defendant's argument that voters' preference cannot be determined with 95% confidence where a confidence interval goes below 50%, (*see* Doc. 555 ¶ 65; Tr. at 2167:4-2168:3), is unavailing.  Further, the reported confidence intervals for the CVAP analyses, the presidential election, and the 2017 BISG analysis do not undermine Dr. Barreto's conclusions.  None of the confidence intervals for white voters crossed 50%.  (Tr. at 1683:3-9; *see* PX 242A at 40-47; PX 242B at 34-42.)  The intervals for black voters did not cross 50% for twelve of the fourteen races, and for the other two races, the lower "tail" of the distribution that could fall below 50% is still very close to 50%, indicating that the outcome of voter support below 50% is unlikely to occur.  (Tr. at 350:20-351:2, 1679:2-21, 1681:24-1682:10; PX 242 B at 41; PX 242A at 42.) The point estimate patterns of Latino voting show preference for the losing candidate in all contests, and in the "handful of elections where the confidence intervals for Latinos did cross below 50 percent," in no instance "was there a majority probability that this event would occur," and "the most likely outcome for all of our data . . . was cohesiveness in support of the candidate

---

[32] Dr. Barreto explained that "the error rate in BISG is built into the model, . . . it is part of the probability.  And so it's not an otherwise published statistic."  (Tr. at 1578:19-21.)  In other words, "when [BISG] spits out estimates, what is the error rate on that specific estimate, and my answer to that is that it is baked into that estimate, and that's why it gives us a probability instead of an assignment.  It gives you a .83 White and a .07 Black and .05 Hispanic."  (*Id.* at 1580:6-11.)

29

who lost." (Tr. at 351:3-14; *see id.* at 1684:12-1685:9.) As Dr. Barreto explained, the better practice would be to determine the probability that any results would cross the 50% threshold rather than to reject the results out of hand. (*See id.* at 341:11-24, 343:4-11.) Indeed, Dr. Alford admitted that point estimates are the most likely outcomes, that "similar results repeating year after year" would constitute a "pattern," and that in another case, he did not rely on confidence intervals where voting patterns were consistent. (*Id.* at 2351:20-23, 2354:6-8, 2357:12-2358:9.) Dr. Barreto's results were all consistent with each other and with the anecdotal evidence year after year. For all of these reasons, I find Dr. Barreto's analyses credible and reliable.

36.    The District also contends that Dr. Barreto did not use BISG the way the literature instructs. It offered the testimony of Dr. Morrison, who contributed to the 2009 article about BISG, but his main purpose was to ensure that the demography was correct, and he did not perform any statistical analysis in connection with that article. (*Id.* at 68:19-21, 69:2-4.) Dr. Morrison is not a political scientist. (*See id.* at 10:8-17.) Accordingly, his criticism that Dr. Barreto misused BISG rings hollow because Dr. Barreto credibly explained that he applied BISG the way political scientists use it: to generate probabilities, aggregate them to the precinct level, and use those estimates as the input for EI, not to assign a race to an individual person. (*Compare id.* at 21:17-25 (Morrison's description), *with id.* at 187:13-21 (Barreto's description).)[33] Dr. Morrison also opined that BISG would not work well in the District because

_____

[33] As noted, elsewhere Dr. Morrison appeared to understand how political scientists use BISG in voting analysis. A 2017 paper co-authored by Dr. Morrison cited the Imai and Khanna article in support of the contention that "one could assign a race to registrants in a voter file where this quantity is not present and then aggregate these individuals by a geographic unit such as a voting precinct" and then use that as an EI input, (DX 99 at 12 n.21) – exactly what Dr. Barreto did, (Tr. at 201:1-12). I did not find persuasive Dr. Morrison's attempt to backtrack at trial by suggesting that he did not intend for readers to rely on the footnote where this statement was made. (*Id.* at 29:3-30:4.)

"one's immediate neighborhood location does little to improve an estimate of one's race/ethnicity." (DX 70 ¶ 35.) To whatever extent that could be true in some localities, it is not true in the District, in which housing is highly racially segregated, even at the block-to-block level, as discussed above. In sum, Dr. Morrison's critiques do not undermine Dr. Barreto's credibility or the accuracy of his results.

37.      In an attempt to attack Dr. Barreto's results based on Catalist data, the District pointed to a small percentage – about 1.4% – of names that were anomalies or appear to have been miscoded. Assuming those names were all coded in error, they would be well within validation rates for Catalist's model. (Tr. at 1685:18-1686:4.) This criticism, as well as the criticism that two people with the same last name and address were coded with different race probabilities, (*id.* at 2255:6-2257:5),[34] amount to cherry-picking and do not undermine the evidence that Catalist's database is highly reliable – as evidenced by, among other things, its success in the commercial marketplace. In any event, Dr. Barreto's Catalist-based results are a helpful cross-check that lend confidence to his conclusions, but his opinion does not rise and fall with the fidelity of every individual entry in Catalist's database.

38.      Finally, the District argues that there were problems with Dr. Barreto's scripts. As an initial matter, both Dr. Alford and Dr. Barreto relied on someone else to run the scripts – neither performed the technical analysis himself – and neither side called those individuals. As Dr. Barreto explained, Dr. Collingwood programmed the scripts according to Imai and Khanna's instructions and the code from their WRU package. (*Id.* at 237:8-19.) Drs. Barreto and Collingwood did not manipulate the scripts. (*Id.* at 1675:20-1676:17.) Dr. Alford claimed that

---

[34] This anomaly could be explained by the fact that the Catalist database incorporates first name and self-reported data, (*see* PX 258 at 52:6-21, 61:19-63:7; Tr. at 245:15-246:9, 250:8-9, 479:11-16), not just surname and geolocation data.

his assistant had difficulty getting the scripts to run, but did not offer a clear explanation of why or what happened and did not undermine Dr. Barreto's credible testimony that Defendant had "everything . . . needed to run the replication." (*Id.* at 234:15-17.)  Moreover, Dr. Alford testified that his colleague Dr. Randy Stevenson said he was able to get the scripts to run, (*id.* at 2348:4-2349:14), and the District produced the results, (*id.* at 233:19-234:6).  Accordingly, these criticisms are unpersuasive.

39.     This may be the first time that voter-preference estimates based on BISG have been admitted into evidence at a VRA trial.  But that is no reason to reject a recently developed, reliable method of analysis.  There must always be a first time.  The method has been endorsed by respected social scientists in leading publications.  At least one other court has found such evidence reliable enough to be admitted in a bench trial involving a Section 2 challenge to an at-large voting system, *see United States v. City of Eastpointe*, 378 F. Supp. 3d 589, 612-13 (E.D. Mich. 2019), although the case settled before trial, *see* No. 17-CV-10079, 2019 WL 2647355 (E.D. Mich. June 6, 2019), *motion for relief from judgment denied*, 2020 WL 127953 (E.D. Mich. Jan. 10, 2020).  And the Court is convinced that in the circumstances of this case, it is a strong and reliable method for estimating voter preference, minority-group cohesion, bloc voting, and racial polarization.  Using that method, as confirmed by a variety of other methods, Plaintiffs have proven that black and Latino voters are politically cohesive within and across those groups and that the white majority votes as a bloc to routinely defeat the minority's preferred candidates.

40.     Thus, Plaintiffs have satisfied the *Gingles* preconditions.

## III.     THE TOTALITY OF THE CIRCUMSTANCES

### A.     Senate Factor 1

41.     The first Senate Factor examines "the extent of any history of official discrimination in the state or political subdivision that touched the right of the members of the

minority group to register, to vote, or otherwise to participate in the democratic process."
*Gingles*, 478 U.S. at 36-37 (internal quotation marks omitted).  There is no evidence of official
discrimination in the District.  Accordingly, this factor favors Defendant.

**B.    Senate Factor 2**

42.    Senate Factor 2 "requires the Court to consider 'the extent to which voting in the
elections of the State or political subdivision is racially polarized.'"  *Pope*, 94 F. Supp. 3d at 342
(quoting *Goosby*, 180 F.3d at 491).  Whether a white voting bloc may be explained as "an
expression of political partisanship" is properly considered under this factor, *Goosby*, 180 F.3d at
493, but "[t]he fact that divergent voting patterns may logically be explained by a factor other
than race does not end the inquiry, nor does it require plaintiffs to prove racial bias in
community," *Pope*, 94 F. Supp. 3d at 342 (internal quotation marks omitted).

> [E]ven if proof of a race-neutral cause of divergent voting patterns
> is forthcoming, the defendant does not automatically triumph.
> Instead, the court must determine whether, based on the totality of
> the circumstances, the plaintiffs have proven that the minority
> group was denied meaningful access to the political system on
> account of race.

*Goosby v. Town Bd. of Hempstead*, 956 F. Supp. 326, 355 (E.D.N.Y. 1997) (internal quotation
marks and alterations omitted), *aff'd*, 180 F.3d 476.  Even where Senate Factor 2 favors a
municipality because of a "strong correlation between political partisanship and the voting
behavior of blacks and whites," plaintiffs can still prevail under the totality of the circumstances
where minority voters' "failure to elect representatives of their choice . . . is not best explained
by partisan politics."  *Id.*  At least one court has held that where the influence of race and of
political affiliation on voting patterns "are too closely related to isolate and measure for
effect . . . the evidence fails to demonstrate that race-neutral factors explain the voting
polarization" in the locality.  *United States v. Charleston County*, 316 F. Supp. 2d 268, 304

(D.S.C. 2003), *aff'd*, 365 F.3d 341 (4th Cir. 2004).[35]

43.     The District cites cases that hold that "[u]nless the tendency among minorities and white voters to support different candidates, and the accompanying losses by minority groups at the polls, are somehow tied to race, voting rights plaintiffs simply cannot make out a case of vote dilution."  *Nipper v. Smith*, 39 F.3d 1494, 1523-24 (11th Cir. 1994); *see Solomon*, 221 F.3d at 1225.  But that does not mean that a possible race-neutral explanation for racial polarization is dispositive.  As described above, the Second Circuit has not followed such an all-or-nothing approach but instead considers possible explanations other than race as one aspect of the totality of the circumstances.  *See Goosby*, 180 F.3d at 493.

44.     Plaintiffs have shown high levels of racially polarized voting in the District, as described above in connection with the Court's *Gingles* analysis.  (*See* ¶¶ 26-27 above.)  That showing is confirmed by witness testimony.  For example:

- Sabrina Charles-Pierre is a black woman who was appointed to fill a vacancy on the Board after the Board came under pressure from a state-imposed monitor of the District[36] to appoint a public school parent, (*see* Tr. at 2576:14-24; PX 81_0047 (Grossman told

---

[35] Defendant contends that "'[P]laintiffs cannot prevail on a VRA § 2 claim if there is significantly probative evidence that whites voted as a bloc for reasons wholly unrelated to racial animus.'"  (*See* Doc. 555 ¶ 127 (alteration in original) (quoting *Uno v. City of Holyoke*, 72 F.3d 973, 981 (1st Cir. 1995)).)  But this approach is at best an oversimplification because "it ignores language in the Senate Report which expressly states that such an inference of racial animus is unnecessary."  *See Solomon v. Liberty County*, 957 F. Supp. 1522, 1548 n.55 (N.D. Fla. 1997), *aff'd*, 221 F.3d 1218 (11th Cir. 2000); *accord Charleston County*, 316 F. Supp. 2d at 299 n.35.

[36] On June 10, 2014, the New York State Commissioner of Education appointed a fiscal monitor to oversee the District due to "the District's history of and continued signs of fiscal distress," (PX 210), and to ensure that the District provide "appropriate educational programs and services for all its students and properly manage[] and account[] for State and federal funds received," (PX 169_0001).  Thereafter, and to this day, the Commissioner has continued to appoint monitors not only to oversee District finances, but also to address the educational decline, community rifts, failures of accountability, and need for planning in the District.  (*See* PX 152; PX 156; PX 169; PX 206; PX 207; PX 208.)

Charles-Pierre that Weissmandl said, "The only reason [Charles-Pierre] is there and ran unopposed is because the board wants to do what [the state-appointed monitor] said," which was to "[h]ave at least one [public] school parent."); *see also* PX 156_0014-15 (monitor report recommending that all candidates for at least one Board seat must be parents of public school students and selected by other public school parents)), and was thereafter re-elected with the support of the private school community, (*see* PX 81_0016-18, 29, 35, 40).  According to Charles-Pierre, between 2015 and 2018, in every single contested Board election, the preferred candidates of black and Hispanics lost to the other candidates.  (Tr. at 2572:15-22.)  She also agreed that the white majority had all of the electoral power, (*id.* at 2579:11-14, 2670:12-24), which was obvious because a candidate supported by the overwhelming majority of black and Hispanic voters could still lose by 4,000 votes, (*id.* at 2571:16-22).  Other Board members and private school community leaders corroborate Charles-Pierre's observations and confirm that the white bloc is determinative of electoral success.  Former Board member Yonah Rothman wrote in a WhatsApp group chat called "School Board Support Group" that included private school advocates, "If private school really wanted [Charles-Pierre's] seat she would have lost the election like the rest of them."  (PX 80 at 427.)  Hersh Horowitz, an influential rabbi, wrote in the same chat, "I hear we had over 9000 [votes] and they under 5000."  (*Id.* at 774.)  Board President Harry Grossman repeatedly reminded Charles-Pierre that the white community could easily replace her, texting her, "If there really was any desire by anybody to remove you from the board, all that would need to be done was to run a candidate against you in May.  That candidate would have garnered 8,000 votes and you would have lost by 4,000 votes just like the other 3," (PX 81_0035), and, "[I]f people

wanted you off the board they just would have run a candidate against you and you would

have lost as [other public school candidates] Fields, Foskew, and Morales did," (*id.* at

_0040; *see* Tr. at 1534:13-21, 1536:5-1539:20, 1546:5-19).

- Private school community leaders have also acknowledged more generally that the white

   bloc vote holds all the power and controls election outcomes.  Former Board member

   Bernard Charles, who is black, agreed that the Orthodox and Hasidic community "has the

   voting power to place anyone they want on the Board," and "the leaders in the Orthodox

   and Hasidic community could replace [him] if they wanted to."  (Tr. at 1816:22-1817:3.)

   In a text with Grossman, Horowitz wrote that the public school community is "getting

   weaker," and Grossman said, "They feel disempowered because they are."  (PX 88_0002;

   *see* Tr. at 990:23-991:11.)[37]  Grossman said in the private school group chat that the

   outcome of the 2016 election would be "whatever we want it to be."  (PX 80 at 279.)  He

   also told Charles-Pierre, "Nothing can pass without [O]rthodox support."  (PX 81_0050.)

45.     Plaintiffs have made a strong showing of racially polarized voting and a white

bloc vote that controls the outcome of elections, which gives rise to an inference that the targeted

electoral process dilutes their votes, and that inference "will endure unless and until the

defendant adduces credible evidence tending to prove that detected voting patterns can most

logically be explained by factors unconnected to the intersection of race with the electoral

system."  *Pope*, 94 F. Supp. 3d at 343 (internal quotation marks omitted).  The District contends

that the polarization is best explained by policy preferences, but the record lacks sufficient

credible evidence to support such a conclusion.

---

[37] In that same text exchange Horowitz seemed to call public school advocates "haters."
(PX 88_0002.)  He testified unconvincingly at trial that he was probably talking about a few
individuals but did not know who they were.  (Tr. at 962:16-963:12.)

46.     In this unique community, policy preferences are not "unconnected" to race.  As described above, the so-called private and public school communities in the District are essentially the white and minority communities, respectively.[38]  There is nearly perfect concordance between race and the populations of public and private schools that cannot be ignored.  In the District, policies benefitting private schools or reducing expenditures on public education benefit the white community, and policies benefitting public schools or reducing expenditures on private education benefit the black and Latino communities.  Put differently, if the white community votes down a budget because the budget increases taxes, minority children lose access to services.  (*See, e.g.*, PX 76_0024-26 (Grossman advocating for voting down budget); Tr. at 1548:22-1554:2 (Grossman admitting voting down budget would result "massive cuts to the public schools"); *id.* at 1811:19-25 (Charles admitting that the Board's cuts to certain programs predominantly affected the black and Latino community); *id.* at 1177:23-25 (Former Board member Aron Wieder admitting that budget cuts for public schools primarily impact black and Latin students); *see also* PX 218A (ads in Jewish magazine telling readers to "vote no" on the budget); Tr. at 644:13-645:18 (former student explaining that policy and race are "intersectional," not "distinctive buckets," and that people supporting cuts to public schools and voting down the budget are white, and people attending public schools are black and Latino).) At the same time that public school cuts almost exclusively affect black and Latino children, any services for private schools beyond what is mandated by New York State almost exclusively

---

[38] The Court does not mean to suggest that there are no white voters in the District who support public education or that there are no minority voters whose interests correspond to those of Orthodox or Hasidic voters.  But the racial polarization in voting and in the populations attending the public and private schools is so strong that the observation in the text – shared by witnesses from both communities – holds.

benefit white children.[39]

47.     Accordingly, race and policy cannot be isolated in a community where public school students are almost all black or Latino (92%), and students attending private schools located in the District are almost all white (98%).  (*See* JPTO at 4; PX 372 ¶ 24.)  This makes it all but impossible to untangle race and policy, and thus for Defendant to show that the voting discrepancies are based on the latter and not the former.  *See Charleston County*, 316 F. Supp. 2d at 304.

48.     The District argues that the private school community supports candidates who advocate for lower property taxes and maintaining and increasing mandated services for private schools, while the public school community supports candidates who advocate for policies supporting public education.  (*See* Doc. 555 ¶¶ 154, 157.)  But the record evidence to that effect came from past and present Board members, (*see* DX 174 ¶ 70; DX 176 ¶ 68; DX 172 ¶ 41; DX 177 ¶ 68; DX 251 ¶ 56; DX 175 ¶ 31), each of whom had credibility problems.  The following is a nonexhaustive list of examples showing why their testimony is not credible.

- Grossman testified that he was not aware of any slating organization in the District, (DX 174 ¶ 34), but he clearly participated in slating with Hersh Horowitz, Yehuda Oshry, and private school advocate Shaya Glick, (*see* Tr. at 1411:8-1412:6, 1412:11-18, 1413:6-12, 1427:22-1428:6, 1436:13-19, 1437:12-1438:4, 1438:13-22, 1444:15-1446:16, 1446:18-1447:7, 1447:12-21, 1451:5-1452:19, 1453:14-1454:13, 1458:24-1459:17, 1465:24-1466:7, 1468:15-1469:2, 1477:17-25, 1485:1-5, 1485:15-1486:8, 1515:16-20,

---

[39] School services required under state law are called "mandated" services.  For example, state law requires the District to provide busing services to private schools on certain days, called "mandated" days.  The District is not required to provide private school busing on days when public school is not in session, or "nonmandated days." (*See* Tr. at 805:25-806:8 (Goodwin); *id.* at 2380:21-2384:3 (Wortham).)

1516:5-16, 1517:6-10).  He seems to have no compunction about compromising his legal obligations when it suits his purposes, as evidenced by actions that would seem to conflict with his obligations as President or Board member and harm the Board, including writing the text for a petition to be presented to the Board protesting a proposal of the Superintendent, (*id.* at 1525:23-1529:9; PX 80 at 1451-52), and advocating for, among other things, lawsuits against the District, voting down the school budget, and voting out "non-frum" Board members, (Tr. at 1549:17-1554:8; *see* PX 76_0024).[40]  He also lied to Board members of color about the purpose of a settlement conference in this case.  (*See* Tr. at 2675:23-2676:23; *see also* note 58 below.)  Plaintiffs impeached him at least three times with his prior sworn deposition testimony.  (*See id.* at 1433:1-1434:2, 1510:1-1511:12, 1511:14-1512:2; *see also* PX 339 at 8-9.)[41]  I found Grossman to be one of the more incredible witnesses I have encountered.

- In his written testimony, Weissmandl testified that "there is no 'slating' organization within the Orthodox and Hasidic Jewish communities in the District that recruits, vets or endorses candidates."  (DX 176 ¶ 16.)  Later, when confronted with evidence that he texted the private school group chat saying that he "personally got the blessing for [their] slate" for the past three years through the son of an influential Rabbi, (Tr. at 1073:1-4), he testified unconvincingly that he did not know what he was talking about, that he may have been talking about some slate other than the school board slate, and that he never went to get support from any Rabbi for Board elections, (*id.* at 1073:8-1074:25).  When

---

[40] "Frum" describes an observant Jew.

[41] At trial, Plaintiffs used video clips showing portions of certain witnesses' depositions to impeach those witnesses, and the content of those videos is not reflected in the trial transcript. PX 339 contains excerpts of the deposition transcripts that correspond to those videos.

asked at trial whether he went with Horowitz to get the "blessing" that he had mentioned in the group chat, he answered "I guess." (*Id.* at 1076:7-19.) Another chat shows that Weissmandl told Grossman to connect an interested Board candidate with Horowitz, (PX 75_0035), and when asked at trial whether that Horowitz was Hersh Horowitz, he said "[p]robably" and "I know many Horowitzes, but I would assume in this context it's . . . " before answering "I think so," (Tr. at 1077:20-1078:11). In 2016, Weissmandl forwarded an email regarding filling a Board vacancy only to the white Board members with the note, "Please respond ASAP as we discussed[. O]ne choice." (PX 73_0001.) The candidate ultimately chosen to fill the vacancy was Joe Chajmovicz, a white person with no relevant experience for the position whose application was riddled with spelling and grammatical errors. (*See* PX 167 (Chajmovicz statement); Tr. at 1853:16-1856:6 (Charles).) Weissmandl testified that he did not know what "one choice" meant, did not remember the discussion, and "might have been referring to anything." (Tr. at 1125:7-15.) He said that he did not know whether he ever spoke to the white Board members about filling the vacancy with Chajmovicz. (*Id.* at 1126:7-10.) Weissmandl also testified that he did not recall soliciting suggestions for Board candidates in 2018, (*id.* at 1079:21-1080:12), but then later admitted to doing so, (*id.* at 1081:8-14). Plaintiffs impeached him twice with his prior sworn deposition testimony. (*See id.* at 1056:10-1057:19, 1107:14-1108:14, *see also* PX 339 at 4-6.) In sum, Weissmandl's claimed lack of memory on critical topics such as slating and Board appointments was utterly unconvincing.

- Former Board member Aron Wieder submitted written testimony that he was not aware of any recognized slating organization in the Orthodox and Hasidic communities,

(DX 172 ¶ 25), but then testified that a group of people in the Orthodox and Hasidic
community select people to run for the Board, he was asked to run for the Board in 2007
by Yakov Horowitz (a leader in the Orthodox community), and community leaders
selected him as the candidate to endorse, (Tr. at 1155:6-11, 1162:8-14, 1167:15-20).  His
written testimony said that endorsement was not a guarantee of electoral success,
(DX 172 ¶ 26), but he then testified at trial that Orthodox and Hasidic Jewish voters
usually supported candidates based on community leaders' endorsement, (Tr. at 1173:6-
12).

- Former Board member Yonah Rothman also submitted written testimony that "there is no
  'slating' organization within the Orthodox and Hasidic Jewish communities," (DX 177
  ¶ 122), but his other testimony raises the opposite inference.  A private school advocate
  named Shimmy Walfish asked Rothman to run for the Board in 2012.  (*Id.* ¶ 12.)  He told
  Walfish that he did not have time to campaign, (*id.* ¶ 17), and Walfish told him not to
  worry because he would "talk to people who help organize signatures," (Tr. at 1386:6-
  22.  Thereafter, he was introduced to Wieder, Oshry, and Glick.  (*Id.* at 1387:13-25.)
  Rothman then denied knowing the first thing about how he was elected.  In 2012 he ran
  on a slate with two other candidates, (*id.* at 1388:8-19), but said he did not meet them
  until after the election, did not collect any signatures for his petition or submit it, did not
  know who did, could not explain how lawn signs bearing the three candidates' names
  appeared in the community, and did not know how he came to run for a particular seat
  against JoAnne Thompson, a black woman.  (*Id.* at 1381:21-1383:12, 1383:19-1384:8,
  1384:12-1385:10, 1388:1-4.)  Rothman testified that in 2015, Wieder either took care of
  Rothman's nominating petition or spoke to someone who did and, as in 2012, Rothman

did nothing to get elected and knew virtually nothing about how he got elected.  (*Id.* at
1391:1-1392:20, 1393:3-5.)

- Charles denied running on a private school slate, (DX 251 ¶ 26), yet admitted that "when
  it comes to running for the school board . . .you're either working with the white
  community or you're working with the other community," (Tr. at 1849:1-4).  His written
  testimony states that, although he and the other candidates on his slate met with
  "members of the Orthodox and Hasidic community," he was not aware of any slating
  organization, and that he was not "vetted" by leaders, and did not need the approval of a
  local Rabbi to become part of the private school slate.  (DX 251 ¶¶ 22, 27.)  Then, at trial,
  he admitted that he asked the Rabbi for his approval to add two people to the slate, and
  the Rabbi "indicated that he would like to vet [them] like he did me."  (Tr. at 1819:4-
  1820:13.)

- Germain, another black former Board member, also contradicted himself with respect to
  whether he received or needed the approval of private school leaders to win an election.
  (DX 175 ¶¶ 18-19; Tr. at 1242:3-4, 1243:1-11.)  He swore that no one told him he needed
  approval to run, and that he sought out Orthodox and Hasidic leaders only to receive
  support, yet he admitted that he had to meet with Rabbis and receive their approval
  before formally joining the slate with Charles.  (Tr. at 1243:1-6.)  He averred that he did
  not know what the South East Ramapo Taxpayers Association ("SERTA") is or what it
  might have done to support his candidacy, (DX 175 ¶ 21), but then spoke about its
  activities and admitted that the organization made the only contribution to his
  "campaign," (Tr. at 1248:17-24).

The Court will not attempt to apportion fault between the witnesses and Defendant's counsel for

the extent to which the witnesses' affidavits – especially Charles's and Germain's – were contradicted by their live testimony, but regardless of who is to blame, their testimony overall was so rife with dissembling that it offered scant, if any, value.

49.     The argument that private school candidates were elected because of their policy platforms is also unavailing because it is unrefuted that those candidates did not advocate policies, campaign, or spend money.  (*See id.* at 1381:12-1385:10 (Rothman did not do "anything" to get elected); *id.* at 714:22-716:7, 718:9-719:19, 720:13-724:7 (Freilich did not campaign); *id.* at 1835:3-16 (Charles did not spend any of his own money on campaign); *id.* at 384:18-23 (no campaign expenditures filed by winning candidates for 2015, 216, or 2017 elections).)[42]  The Rabbis who slated private school candidates did not ask about their policies. (*See id.* at 2578:3-23; 2587:20-2588:12 (Charles-Pierre); *id.* at 1787:20-1788:10 (Charles); DX 175 ¶ 16 (Germain).)  Although some witnesses testified that voters in the private school community wanted lower taxes, (Tr. at 725:5-8, 1012:19-1013:14), there is little evidence that the private school candidates ran on any particular platforms.  As for the policies of minority-preferred candidates, no minority-preferred candidate ran on a platform that promoted raising taxes or reducing services to private schools, although two (Young-Mercer and Dos Reis) supported a budget that would have affected taxes.  (*See* PX 343 ¶ 12 (Young-Mercer); Tr. at 1889:12-1890:14, 1891:22-1892:6 (same); PX 279 ¶¶ 32, 37, 39-41 (Dos Reis); Tr. at 661:2-662:8 (same); PX 283 ¶ 52 (Fields); Tr. at 861:19-862:3, 944:20-946:1 (same); PX 281 ¶¶ 32-36 (Goodwin); PX 286 ¶ 9 (Price); Tr. at 1208:3-11, 1211:15-22 (same); DX 253 ¶¶ 3-4, 7 (Charles-Pierre).)  Nevertheless, minority-preferred candidates – who did campaign – did not do much

---

[42] Ads placed in a Yiddish newspaper by a private school advocate warn of a tax hike, (*see, e.g.*, PX 218A_0002, 0004, 0005, 0009), but this is little support for the notion that policies advocated by the candidates drove election results.

campaigning in white neighborhoods because they knew such efforts would be fruitless or they felt unwelcome there.  (*See* PX 283 ¶ 60 (Fields); PX 281 ¶ 54 (Goodwin); Tr. at 801:3-14, 812:5-11 (same); *id.* at 1174:6-8 (Wieder admitting that he told Mr. Goodwin, a black man, "that the best use of his time was to campaign in his own community")).)  One candidate, Jean Fields, who is black, explained that sometime in the 1990s a group of white men in New Square stopped and surrounded her car and told her, "[Y]ou don't belong here, you need to leave," which is why she did not feel comfortable campaigning in white neighborhoods.  (Tr. at 950:12-951:8.)

50.     The District contends that "[t]he consistent success of minority candidates, with the unvaried support from the majority of White voters, conclusively demonstrates that . . . if there is polarization in District elections, it must be driven by policy or political differences – not by racial animus."  (Doc. 555 ¶ 137.)  But this theory is unavailing for several reasons.

- First, the District cites *Goosby* as providing that "where 'it could be said that white voters [have] supported minority candidates . . . at levels equal to or greater than those of white candidates, it [is] proper to conclude in that case "that divergent voting patterns among white and minority voters are best explained'" by factors other than race, such as partisanship or policy preferences."  (Doc. 555 ¶ 132 (alterations in original) quoting *Goosby*, 180 F.3d at 496 (quoting *League of United Latin Am. Citizens, Council No. 4434 v. Clements* (*LULAC*), 999 F.2d 831, 861 (5th Cir. 1993))).)  But this quotation, as presented by Defendant, is misleading.  It substitutes an ellipsis for the phrase "elected by their parties."  *Goosby*, 180 F.3d at 496.  *LULAC* dealt with partisan elections in which minority candidates were nominated by both sides.  *See* 999 F.2d at 861.  *Goosby* explained that *LULAC* did not control because there, "white voters, both Democrat and Republican, supported minority candidates elected by their parties," so party affiliation

best explained divergent voting patterns among white and minority voters. *Goosby*, 180
F.3d at 496. *Goosby*, too, involved partisan elections, where Republicans were
overwhelmingly white and won elections and Democrats were overwhelmingly black and
lost elections, and black voters had no access to the Republican party's slating process.
*See id.* at 482, 496-97. Accordingly, black Republicans were "unable to advance their
preferred candidates as nominees." *Id.* at 497. *LULAC* does not control here because
these are not partisan elections, and because (as discussed below) minority voters have no
access to the slating process of the overwhelmingly white private school community that
wins elections. *Goosby* is also not controlling for same reasons, but this case is more like
*Goosby* than *LULAC* because the white community's tight control of the slating process
of the dominant bloc prevents black and Latino voters from electing their preferred
candidates.

- Next, the District argues that *Reed v. Town of Babylon*, 914 F. Supp. 843 (E.D.N.Y.
1996), compels its conclusion. But that case is readily distinguishable. First, here, the
public and private school communities are proxies for race, which was found not to be
the case in *Reed*. *See* 914 F. Supp. at 883. Second, *Reed* was decided before *Goosby*
separated the *Gingles* preconditions analysis from the Senate Factor analysis, and the
point Defendant cites is now analyzed as part of the third *Gingles* precondition.

- Further, as discussed below in connection with Senate Factors 4 and 7, it is proper to
explore whether white support for minority candidates can be explained as "manipulating
the election of a 'safe' minority candidate," *Gingles*, 478 U.S. at 75, or by other special
circumstances, *Pope*, 94 F. Supp. 3d at 345-46. The issue is not simply whether a
candidate is a member of a minority community, but whether the candidate is minority

preferred.  *Cf. Goosby*, 956 F. Supp. at 340-41, 344 (black appointee "safe" where,

among other things, he was appointed over local black interest group's recommended

appointee).  If, as here, a successful minority candidate is not minority preferred, that is

evidence of racial polarization, not the lack thereof.

Accordingly, the success of minority candidates does not prove that elections were policy driven

for purposes of this factor.

51.     To the extent it is fair to infer that parents who send their children to private

schools (and other like-minded individuals) want lower taxes, and parents who send their

children to public schools (and other like-minded individuals) want more spending on public

education, that inference is not enough to tilt this factor in favor of Defendant in light of the high

racial polarization in voting, the paucity of evidence of policy-driven campaigns, and the identity

between race and politics in this community.  Cases crediting a "better explanation" defense tend

to look to something structural, like party affiliation or a superior ground organization.  *See, e.g.*,

*Uno*, 72 F.3d at 983 & n.4 (defendant must prove "detected voting patterns can most logically be

explained by factors unconnected to the intersection of race with the electoral system," such as

"organizational disarray [and] want of campaign experience"); *Flores v. Town of Islip*, 382 F.

Supp. 3d 197, 216-17 (E.D.N.Y. 2019) (party affiliation predicted outcomes better than race did).

Nothing comparable is present here.  This is not to say that the white bloc voters harbor

conscious racial animus.  But if we assume that the white "private school community" votes as it

does to reduce taxes, it would deny reality to pretend that its members were unaware that the

students to be negatively affected by their votes are overwhelmingly children of color.  Where

that is the case; where it is difficult, if not impossible, to disentangle race from school affiliation;

and where the evidence supporting the District's race-neutral explanation for divergent voting

patterns is weak, Defendant's attempt to show that policy preferences best explain divergent

voting patterns is, on balance, not sufficient to undermine Plaintiffs' strong showing of racial

polarization, and thus Senate Factor 2 favors Plaintiffs.[43]

### C.    Senate Factor 3

52.     Senate Factor 3 examines "the extent to which the State or political subdivision

has used voting practices or procedures that tend to enhance the opportunity for discrimination

against the minority group, such as unusually large election districts, majority vote requirements,

and prohibitions against bullet voting." *Gingles*, 478 U.S. at 37, 45.[44]  "Where members of a

racial minority group vote as a cohesive unit, . . . at-large electoral systems can reduce or nullify

minority voters' ability, as a group, to elect the candidate of their choice."  *Shaw v. Reno*, 509

U.S. 630, 641 (1993) (internal quotation marks omitted).  In districts where candidates run for

specific seats (that is, numbered posts), dilution is enhanced because that practice "prevents a

cohesive political group from concentrating [all of their votes] on a single candidate."  *Montes*,

40 F. Supp. 3d at 1411.  Other dilutive practices include few, inconveniently located polling

places with limited hours, *Perez v. Pasadena Indep. Sch. Dist.*, 958 F. Supp. 1196, 1222-23 (S.D.

---

[43] The outcome of the case would be the same even if Defendant had provided sufficient evidence to show that Senate Factor 2 was a wash or tilted in its favor.  As noted, even if divergent voting patterns may be explained by a factor other than race, the court must still assess the totality of the circumstances and may find – as I do – that the minority citizens' inability to elect their preferred candidates is best explained by the fact that the political processes leading to the slating and election of candidates are not equally open to them.  *See Goosby*, 956 F. Supp. at 355.

[44] Bullet, or single-shot, voting refers "to a voting practice in which a voter is allowed to cast fewer than all of his or her votes."  *Reed*, 914 F. Supp. at 849.  "An anti-single-shot provision prohibits this practice" and may "force[] minority voters to vote for white candidates whom the minority voters may not favor, thereby increasing the vote totals of those white candidates."  *Id.* at 849 n.2 (internal quotation marks omitted).  Plaintiffs here do not allege that there is an anti-single-shot-voting practice in the District, but, as discussed below, elections for numbered posts – which the District does have – effectively "neutralize[] the single-shot voting strategy." *Montes v. City of Yakima*, 40 F. Supp. 3d 1377, 1411 (E.D. Wash. 2014).

Tex. 1997), *aff'd*, 165 F.3d 368 (5th Cir. 1999), and staggered elections and off-cycle voting, *United States v. Village of Port Chester*, No. 06-CV-15173, 2008 WL 190502, at *28 (S.D.N.Y. Jan. 17, 2008).

53.    The District holds at-large, staggered, off-cycle elections with numbered posts, all of which have the effect of diluting minority votes.  (PX 242A ¶¶ 20-35; Tr. at 364:12-20, 366:6-367:19, 369:25-371:14.)  The numbered posts and one-vote-per-seat requirement prevent minorities from casting all of their votes for one candidate.  (PX 242A ¶¶ 32-33; Tr. at 369:25-371:1.)  As to off-cycle elections, Dr. Barreto explained that awareness and information is lower, (Tr. at 366:19-21 ("[T]here's just less awareness and information surrounding 'election day,' which is very high in November of even-numbered years.")), and voters who feel disenfranchised tend to stay home during off-cycle elections, so minority turnout is even lower in District elections, (PX 242A ¶¶ 25-28; Tr. at 366:6-368:19).

54.    State and federal elections have twenty-four polling places, but the District uses only thirteen for the same geographic area, which increases confusion and enhances discrimination.  (PX 242A ¶ 29; Tr. at 368:20-369:24.)[45]  The District has also failed to produce critical voting and election materials in a language other than English, although 37% of the District's public school students are English Language Learners and 53.6% of Latinos and 21.9% of blacks in the District speak English "less than very well."  (JPTO at 4-5; PX 244A ¶ 51; Tr. at 371:2-372:18.)  The District admitted that it has failed to make many of its election materials – including ballots, ballot applications, absentee ballots, information on voter registration,

---

[45] In 2018, the District increased the number of polling places from ten to thirteen.  Grossman solicited input on the location of the new polling places from white, private school activist Shaya Glick, who suggested two locations in overwhelmingly Orthodox Jewish neighborhoods, (Tr. at 1473:6-19), and said, "Great opportunity to help ourselves," to which Grossman responded, "Bingo," (*id.* at 1475:24-1476:8).

nominating petitions, and information on polling locations – available in the primary languages of many of the District's black and Latino voters, such as Creole or Spanish.  (PX 257 at 22:2-24, 41:18-20; 42:20-43:3, 105:16-25, 106:11-22, 148:17-149:4, 150:12-151:10, 152:14-153:4; PX 243 ¶¶ 49-51; PX 288 ¶ 34; Tr. at 1266:7-19.)

55.     Defendant argues that any election-practice issues that might exist were not intentional.  (*See, e.g.*, Doc. 555 ¶ 163 (at-large system required by state law); *id.* ¶ 172 (District uses fewer polling places because of lack of staffing); *id.* ¶¶ 173-174 (new polling places selected by committee that did not consider race, and preferred plan could not be implemented because fire department would not allow use of its building).)  But the third Senate Factor does not examine intent; rather, it asks whether the subdivision has used election practices "that tend to enhance the opportunity for discrimination."  *Gingles*, 478 U.S. at 37, 45.  Here, Plaintiffs have offered ample evidence showing that the District employs such practices.  Thus, Senate Factor 3 weighs in favor of Plaintiffs.

### D.     Senate Factor 4

56.     Under Senate Factor 4, courts ask, "if there is a candidate slating process, whether the members of the minority group have been denied access to that process."  *Gingles*, 478 U.S. at 37 (internal quotation marks omitted).[46]  "[A] system that provides only a theoretical avenue for minority . . . candidates to get their names on the ballot while for all practical purposes making it extremely difficult for such candidates to have a meaningful opportunity to participate . . . contribute[s] to a violation of Section 2 of the Voting Rights Act."  *United States*

---

[46] Slating is "a process in which some influential non-governmental organization selects and endorses a group or 'slate' of candidates, rendering the election little more than a stamp of approval for the candidates selected."  *Westwego Citizens for Better Gov't v. City of Westwego*, 946 F.2d 1109, 1116 n.5 (5th Cir. 1991).

*v. Village of Port Chester*, 704 F. Supp. 2d 411, 444-45 (S.D.N.Y. 2010).  Slating organizations

can be formal or informal.  *See Westwego Citizens for Better Gov't*, 946 F.2d at 1116 & n.5;

*United States v. Marengo County Comm'n*, 731 F.2d 1546, 1569 (11th Cir. 1984), *United States*

*v. City of Euclid*, 580 F. Supp. 2d 584, 608 (N.D. Ohio 2008).  Where minority voters do not

"have any choice in determining what issues or candidates should or should not be endorsed" by

the slating organization, the slating process is racially exclusive.  *See Citizens for a Better*

*Gretna v. City of Gretna*, 636 F. Supp. 1113, 1123 (E.D. La. 1986), *aff'd*, 834 F.2d 496 (5th Cir.

1987).  The process is not made inclusive by the selection and election of a few minority

candidates who may not be "true representatives of the minority population."  *Velasquez v.*

*Abilene*, 725 F.2d 1017, 1022-23 (5th Cir. 1984); *see Goosby*, 180 F.3d at 496-97; *McNeil v.*

*Springfield*, 658 F. Supp. 1015, 1031 (C.D. Ill. 1987), *appeal dismissed sub nom. In re City of*

*Springfield*, 818 F.2d 565 (7th Cir. 1987).  Thus, the question is not simply whether minority

candidates get on the ballot, but whether minorities have any "substantial input into the slating

process."  *Harper v. City of Chicago Heights*, No. 87-CV-5112, 1997 WL 102543, at *9 (N.D.

Ill. Mar. 5, 1997).

57.     Influential members of the white, private school community in the District

participate in a slating process by which they select, endorse, promote, and secure the election of

their preferred candidates, and minorities have no input into this process.  (Tr. at 372:19-374:5;

*see* PX 242A ¶ 37.)[47]  There is abundant evidence of this slating process.  Witnesses for both

sides testified that an informal organization slates the white community's candidates.  Wieder

---

[47] Slating group members include current and former Board members Aron Wieder, Harry
Grossman and Yehuda Weissmandl, community activists Shaya Glick and Kalman Weber (who
runs SERTA, an association that organizes private school voters), and influential Rabbis Yehuda
Oshry, Hersh Horowitz, and the late Rabbi Beryl Rosenfeld, as discussed further below.

admitted that "there is a group of people in the Orthodox and Hasidic community who select people to run for School Board." (Tr. at 1155:6-9.) Freilich admitted that Grossman connected him with Glick and Oshry, who were "looking for somebody to run." (*Id.* at 706:23-708:8.) Weissmandl explained that the signatures on his required nominating petition were collected by Rabbi Rosenfeld, who was his "go-to guy" for election assistance, that Weber supported his election (discussed further below), and that he never raised or spent any money in an effort to get elected. (*Id.* at 1035:4-25, 1067:12-1068:18.)[48]   Rothman testified to a similar lack of campaigning and to getting approval to run from Oshry and Glick. (*Id.* at 1381:12-1382:19, 1383:10-1388:4.) As noted earlier, Weissmandl testified unconvincingly, to be charitable, that he did not remember what he was talking about when he texted a private school group chat saying, "I personally got the blessing for our slate every year last three years through the son [of an influential Rabbi]." (*Id.* at 1072:9-1076:19.) Grossman also did not collect signatures or spend any money, and ran on a slate with Weissmandl. (*Id.* at 1420:8-1424:4.) Charles, who is black, was connected to Rabbi Rosenfeld through a friend, met with Rosenfeld twice, and said that Rosenfeld told him that Charles's proposed running mates would have to be interviewed and vetted to "see if [Rosenfeld would] accept them as part of what [he] wanted to do." (*Id.* at 1787:2-1789:16, 1819:4-1820:13.) Charles testified that he met with other Orthodox people, but could not remember their names, and that Weber spent money on his campaign and distributed lawn signs and posters. (*Id.* at 1790:7-1792:10.) He also admitted that "leaders in the Orthodox and Hasidic community could replace [him] in an election if they wanted to." (*Id.* at 1816:25-

---

[48] Candidates must submit nominating petitions with the signatures of 2% of the actual voters from the previous election to get on the ballot. (JPTO at 5.) While public school candidates find the process "daunting" and time consuming, (Tr. at 785:20-786:2 (Goodwin); *see* PX 283 ¶ 56), candidates backed by the private school slating organization could have all their signatures collected "in one morning in the synagogue," (Tr. at 2505:15-17 (Oshry)).

1817:3.)  Germain, who is also black, testified that he had to meet with and get the approval of six Rabbis before he could formally become Charles's running mate.  (*Id.* at 1241:5-1243:11.)

58.     The slating organization made no open calls for candidates, and only people with some kind of connection to the organization were introduced, vetted, and selected.  Horowitz admitted that he was not aware of any public notices welcoming candidates to meet religious leaders in open forums, and that he never introduced a public school candidate to Orthodox leaders.  (*Id.* at 1025:23-1026:7.)  Charles admitted that "when it comes to running for the school board . . . you're either working with [the] white community or you're working with the other community."  (*Id.* at 1849:1-4.)  Young-Mercer, who is black, testified that the Orthodox and Hasidic voters let her win in 2007.  (*Id.* at 1894:19-21.)  Candidates of color who lost their elections were never approached by anyone connected to the slating organization.  (PX 279 ¶ 60 (Dos Reis); PX 281 ¶ 55 (Goodwin).)

59.     The roles of the leaders of the slating organization are as follows.

- Rabbi Oshry selects and approves candidates, controls access to the slating process, and submits petitions on behalf of candidates.  He testified that he, Glick, Rosenfeld, Weber, and/or Horowitz selected candidates and that he met with and endorsed several white-preferred candidates; that he met with some non-Jewish people, but he could not remember their names; that he submitted nominating petitions; and that he "okayed" candidates.  (Tr. at 2468:23-2469:16, 2474:3-2477:13, 2479:10-24, 2483:15-21, 2487:14-2488:16, 2493:11-2494:6, 2495:12-2497:16, 2500:18-2501:24, 2502:9-2506:18; *see* PX 88_0004 (Horowitz writes regarding the 2017 candidates:  "Oshry has been busy with it, and he has 4 people for the 2 other seats.  Last I spoke he hadn't decided yet."); *id.* (Grossman:  "I know somebody who would like to run for one of the seats.  Who should I

connect him to?"  Horowitz:  "Give me his number and Rabbi Oshry will call him.").)[49]

- Glick helps select candidates, publicizes their candidacy, and organizes get-out-the-vote efforts.  (*See* Tr. at 2503:15-2506:23 (Oshry); *id.* at 1410:6-1413:15, 1427:24-1428:6, 1430:10-1431:1, 1438:13-22, 1441:3-13, 1451:12-1454:13, 1455:6-1458:12, 1458:24-1461:4, 1464:13-21, 1466:1-1467:23, 1468:15-1470:15 (Grossman);[50] *id.* at 1736:2-10 (Russell); *id.* at 1792:2-10, 1836:13-24 (Charles); *id.* at 993:9-24, 996:17-999:2 (Horowitz).)

- Horowitz connects potential candidates to Oshry and approves candidates.  (*See id.* at 1424:23-25, 1432:14-1434:2, 1436:1-19, 1437:16-1438:4, 1444:1-1447:21, 1477:8-1479:24 (Grossman); PX 339 at 8 (same).)  Charles-Pierre testified that Grossman told

---

[49] In the weeks leading up to and during trial, Rabbi Oshry went to great lengths to avoid testifying.  He ignored repeated attempts by Plaintiffs to serve a subpoena *ad testificandum*.  On February 13, 2020, Plaintiffs' agent accomplished service by alternative means ordered by the Court.  (Doc. 517.)  Rabbi Oshry did not appear as instructed on February 18, 19, 20, or 21.  On February 20, Plaintiffs filed a motion for a finding of civil contempt, (Doc. 522), which they served, along with a new subpoena, commanding Oshry to appear on February 24.  When he did not appear, the Court found him to be in contempt of court for his failure to appear and testify at trial and ordered a warrant for his arrest.  The Court issued an Order indicating that Oshry would be subject to arrest by the U.S. Marshals at any time and that, should he not appear on February 26 or 27, he risked being incarcerated for some period of time pending his testimony.  (*See* Doc. 530.)  Oshry finally appeared to testify on February 27 and, accordingly, the contempt was purged and the warrant vacated.  (Tr. at 2508:25-2509:12.)  Oshry's defiance, along with his attempts at evasion in his testimony, betray a remarkable reluctance – shared by several other witnesses associated with the private school community – to admit the obvious existence of the slating process.

[50] On the topic of slating, Grossman at times testified unconvincingly that he did not know what he was talking about in certain text messages, (*see, e.g.*, Tr. at 1448:3-1449:21, 1458:8-12), gave glib responses, (*see, e.g.*, *id.* at 1431:2-6, 1446:23-1447:7), and seemed to have a selective memory when it came to conversations he had as recently as 2019, (*see id.* at 1517:6-16).  He and several other Board members and white witnesses associated with the private school community were not credible in their claimed lack of knowledge of the slating process, and the sometimes absurd lengths to which they went to feign ignorance suggests their understanding of how that process excludes blacks and Latinos.  (*See* ¶ 48 above.)

her that Horowitz was key to her being unopposed in 2016.  (Tr. at 2575:11-14 (Charles-Pierre).)  During the course of this litigation, Grossman texted Horowitz, "Spoke to [Defendant's counsel] David Butler today.  He asked me to convey message that it would be good for the case to have a [m]inority to run against Sabrina [Charles-Pierre] that [the] community could support.  Message conveyed."  (PX 88_0010; Tr. at 972:24-975:2 (Horowitz); *id.* at 1477:17-1479:24 (Grossman).)[51]

- SERTA, Weber's organization, places ads in a local magazine and works to get out the vote.  (Tr. at 991:16-992:10 (Horowitz); *id.* at 1063:18-1067:11 (Weissmandl).)

60.     In each contested election, the slating organization helped to secure the white-preferred candidate's election.

- In 2008, the slating organization created a phone script urging support "for our Heimishe candidates."  (PX 188.)[52]

- In 2011, Rabbi Rosenfeld handled Weissmandl's nominating petitions.  (Tr. at 1035:4-25 (Weissmandl).)

- In 2012, Glick and Walfish handled everything for Rothman's election including getting all signatures on his nominating petition, and Rothman did not do anything to get elected or even meet the two other candidates on his slate.  (*Id.* at 1381:12-1389:5.)

- In 2013, Charles, Germain, and Maraluz Corado were supported by SERTA, Glick, and Horowitz, (*id.* at 1010:19-24 (Horowitz); *id.* at 1243:21-1245:6, 1247:1-1249:18,

---

[51] Grossman claimed that he inaccurately conveyed Butler's message, (Tr. at 1482:20-21), but he was impeached with his deposition testimony, in which he admitted that the text accurately conveys what Butler told him to convey, (*see* Tr. at 1511:14-1512:2; *see also* PX 339 at 9), and he never explained what was supposedly inaccurate about his text.

[52] "Heimishe" is a Yiddish term meaning homey, homegrown, or one of the group.

1251:25-1252:14 (Germain); *id.* at 1791:3-15, 1836:13-24 (Charles)), and vetted and approved by Rabbi Rosenfeld, (*id.* at 1782:2-1791:19, 1818:20-1819:21 (Charles); *see id.* at 1242:9-1243:11 (Germain); *id.* at 2503:16-2505:13 (Oshry))).

- In 2015, Rabbi Rosenfeld vetted Juan Pablo Ramirez, (*id.* at 1820:22-1821:17 (Charles)), and Weissmandl and Horowitz assisted.  (Tr. at 1024:20-1025:11 (Horowitz); *see* PX 80 at 1532.)  Rothman, who was also elected, did nothing to campaign.  (Tr. at 1391:23-1393:5.)

- In 2016, Charles, Germain, and Weissmandl, were approved and endorsed by SERTA, Oshry, Horowitz, and Glick.  (*Id.* at 1242:9-1243:11, 1246:11-1251:2 (Germain); *id.* at 1010:19-24 (Horowitz); *id.* at 1836:13-1838:6, 1846:4-1847:8 (Charles); *id.* at 1513:14-21 (Grossman); *see* PX 80 at 1532.)  The private school slating organization arranged for Charles-Pierre to run unopposed, securing her win.  (Tr. at 1395:17-1396:6 (Rothman).)[53]

- In 2017, Horowitz and Oshry endorsed Freilich at Grossman's recommendation.  (*Id.* at 706:23-709:7 (Freilich); *id.* at 1432:14-1434:2, 1434:8-15, 1436:1-19 (Grossman); PX 339 at 8 (same).)  Oshry, Glick, and SERTA supported his election.  (Tr. at 1410:6-1413:15, 1420:8-1421:22, 1427:24-1428:6, 1430:10-1431:1 (Grossman); *id.* at 994:18-995:5, 996:17-999:2 (Horowitz); *id.* at 706:23-709:7, 709:12-713:17, 720:13-724:7 (Freilich); PX 339 at 3 (same).)  Freilich did nothing in support of his own candidacy beyond once announcing at a synagogue that he was running.  (Tr. at 714:22-716:7, 718:9-719:19, 720:13-724:7 (Freilich); PX 339 at 3 (same).)

- In 2018, Ephraim Weissmandl and Yoel Trieger were assisted by Glick, Grossman, and

---

[53] That year, the minority-preferred candidates in contested races – Fields, Morales, and Foskew – lost.  (*See* Tables 1-2 above.)  Charles-Pierre admitted that "if [she] didn't have the support of the majority of the white community, [she had] basically no chance to win."  (Tr. at 2566:11-15.)

Oshry.  (PX 74_0005; Tr. at 2487:14-2488:16.)  The slating organization again arranged

for Charles-Pierre to run unopposed.  (*See* Tr. at 2569:10-2570:2 (Charles-Pierre).)

- In 2019, as discussed in detail at paragraph 76 below in connection with Senate Factor 7,

  the white slating organization engineered a minority-versus-minority race and a victory

  for the public school community candidate Ashley Leveille, (DX 12), along the lines of

  what Grossman told Horowitz would be "good for the case."[54]

61.     To the extent minority candidates have been elected with the support of the white

community, they have been chosen by the white slating mechanism (as described above), they

are often not minority-preferred, (*see* Tables 1-2 above), or special circumstances exist, (as

described below in connection with Senate Factor 7).  Accordingly, their election does not

undermine the Court's finding of the existence of a white slating mechanism into which

minorities have no significant input.  *See Velasquez*, 725 F.2d at 1022 n.1.

62.     The witness testimony corresponds with Dr. Barreto's testimony about and the

academic literature on slating.  The presence of slating is indicated by a pattern of two-candidate

elections as well as nearly identical vote totals in every contest, which are present here.

(PX 242A ¶¶ 43-44; Tr. at 377:4-383:25.)  Dr. Barreto discussed a leading article on exclusive

slating organizations and testified that, as here, such organizations refuse minority participants

access to the nominating process by "vesting authority in a handful of community leaders who

were largely unaccountable to others in the organization" and not "maintain[ing] consistent

procedures from year to year."  (PX 242A ¶ 38; *see* Tr. at 374:6-375:12.)  All slating groups in

the seminal study described in the article included "'some minority group members, but they

were often described by minority leaders not involved in the slating process as tokens, and in

---

[54] The parties did not introduce expert testimony on the 2019 election.

some cases the minority nominees were not the choice of minority voters.'"  (PX 242A ¶ 38 (quoting Chandler Davidson & Luis Ricardo Fraga, *Slating Groups as Parties in a "Nonpartisan" Setting*, 41 W. Pol. Q. 373, 382 (1988)) (PX 271)).)

63.     In sum, it is clear that a slating organization exists in the white, private school community and that it consistently guarantees election outcomes.  The organization may not be formal or official, but it need not be.  *See Euclid*, 580 F. Supp. 2d at 608; *Gretna*, 636 F. Supp. at 1123.  There is little evidence that any private school candidates created platforms or shared their views, or that the public school candidates, who did have platforms and positions, were heard within the white community.  Rather, the evidence is that blacks and Latinos did not have the opportunity to participate in the private school slating process, which was tightly controlled by a few white individuals.  Further, it is irrelevant whether there is a public school slating process.  Even though the public school community engages in traditional electioneering, its candidates always lose.  (Tr. at 2133:21-2134:6 (White); PX 279 ¶¶ 34-57 (Dos Reis); PX 281 ¶¶ 30-50 (Goodwin); PX 283 ¶¶ 53-58 (Fields); *see* PX 242A ¶ 39.)  The public school community's process is open to the public, and candidates do not need any insider information or special access to decision makers to participate.  As Dr. Barreto testified, the literature explains that frustrated communities who are "locked out" of the dominant winning slate try to form their own slates, but because they represent "a numeric minority," as here, they can never "overcome the more powerful slate" and win.  (Tr. at 379:8-14.)  For all these reasons, this factor favors Plaintiffs.[55]

---

[55] Plaintiffs made a motion for sanctions seeking an adverse inference against the District for what they argue was Defendant's failure to preserve and produce certain documents relevant to Senate Factor 4.  (*See* Docs. 518, 521 at 1.)  The motion is denied as moot, in that Plaintiffs have adduced sufficient evidence to decisively establish Senate Factor 4 without the adverse inference.

E.     **Senate Factor 5**

64.     Senate Factor 5 considers "the extent to which minority group members bear the effects of past discrimination in areas such as education, employment, and health, which hinder their ability to participate effectively in the political process." *Goosby*, 180 F.3d at 491 (internal quotation marks omitted).  "[W]here minority group members suffer effects of prior discrimination" and "the level of minority participation in politics is depressed, plaintiffs need not prove any further causal nexus between their disparate socioeconomic status and the depressed level of political participation." *Village of Port Chester*, 704 F. Supp. 2d at 445 (internal quotation marks and alteration omitted).  Rather, "the burden falls to Defendant to show that the cause is something else." *Id.*

65.     In the District, blacks and Latinos have higher unemployment rates than whites, and a higher percentage of whites work in management or professional jobs, whereas blacks and Latinos are more likely than whites to work in service occupations.  (PX 244H_0051-56.) Blacks and Latinos also trail whites in earning high school diplomas and bachelor's degrees. (Tr. at 743:25-744:17 (Cooper).)

66.     By some measures, including poverty rates, median income, and *per capita* income, the data seem to show that blacks are doing better than whites.  (*See* PX 244A ¶ 44.) But as Plaintiffs' demographer William Cooper explained, these figures do not accurately reflect the white community's wealth, because even if income is lower, a larger percentage of whites have opted out of the labor force, (Tr. at 750:23-751:1; PX 244H_0053), and the white population "has a lot of wealth built up into . . . their homes," (Tr. at 748:21-749:1; *see id.* at 745:23-747:12), which are located in higher value areas, (*see* PX 244A ¶¶ 47-48).  *See Mo. State Conference of the NAACP v. Ferguson-Florissant Sch. Dist.*, 201 F. Supp. 3d 1006, 1073 (E.D. Mo. 2016) (noting "wealth gap" in home ownership is a key driver of disparities), *aff'd*, 894 F.3d

924 (8th Cir. 2018), *cert. denied*, 139 S. Ct. 826 (2019).  Further, the unusually large average household size of whites in the District serves to depress household financial statistics. (PX 244A ¶ 43.)  Latinos lag behind blacks and whites "across most of these same key socioeconomic measures."  (*Id.* ¶ 44; *see* Tr. at 532:4-6 (Cooper).)

67.     Defendant contends that blacks and Latinos in the District do better than blacks and Latinos statewide, (*see* Doc. 555 ¶¶ 201-202), which is not relevant here.  This factor concerns how blacks and Latinos are doing socioeconomically compared to whites in the District.  Even though blacks may be doing well by some measures, the lags they experience in education and employment are consistent with their lower (and declining) turnout rates compared with whites, (PX 242A ¶ 57 & tbl.7; *see id.* ¶¶ 58-59), and their feelings of "election futility," which is one of the strongest factors correlated with low minority voter turnout rates, (Tr. at 398:10-19 (Barreto)).[56]  There is also demonstrated religious and housing segregation in the District, and those separations, along with social and economic separations, "make[] it especially difficult for [minority] candidates . . . to reach out to and communicate with the predominantly white electorate from whom they must obtain substantial support to win an at-large elections." *Charleston County*, 316 F. Supp. 2d at 291.  As Dr. Barreto explained, in the District, "there's ample evidence of election hindrance in the [m]inority community; that they don't have equal access to slating organizations and mobilizing groups which turn out the vote for candidates" and are thereby "hindered," which "limits their ability to participate in the political process."  (Tr. at

---

[56] The testimony of Charles, NAACP of Spring Valley President Willie J. Trotman, and Grossman confirms the election futility faced by the District's black and Latino voters.  Charles explained that minority voters do not turn out to vote in Board elections.  (Tr. at 1818:13-16.) Trotman testified that the NAACP works to encourage minorities to vote, even though they feel that "they don't have a voice," and if "[they] can't win[,] why bother?"  (*Id.* at 1282:14-1283:6.) Grossman texted Horowitz that public school voters "feel disempowered because they are." (PX 88_0002.)

1631:2-12.)  Accordingly, Plaintiffs need not prove any further causal nexus.  *See Village of Port Chester*, 704 F. Supp. 2d at 445.

68.     Although both sides can point to statistics in their favor on this factor, Plaintiffs have shown that blacks and Latinos in the District lag behind whites socioeconomically, and these conditions have resulted in a depressed level of participation by the minority community in the political process.  Thus, Senate Factor 5 weighs in Plaintiffs' favor, although not heavily.

### F.     Senate Factor 6

69.     Senate Factor 6 looks to "the use of overt or subtle racial appeals in political campaigns."  *Goosby*, 180 F.3d at 491 (internal quotation marks omitted).  Appeals can be racial when they operate on "heightened racial tension," *id.* at 488, or when a candidate sends campaign materials to white constituents that suggest that an opponent is a person of color, *see Charleston County*, 316 F. Supp. 2d at 295.  Racial appeals need not be permanent or pervasive. *See Euclid*, 580 F. Supp. 2d at 610.

70.     Plaintiffs have offered little evidence showing the use of racial appeals in political campaigns in the District.  Plaintiffs suggest that white candidates' targeted messaging to white voters constitutes a racial appeal, (*see* Doc. 556 ¶ 187 (citing Tr. at 719:6-17 (Freilich); *id.* at 1061:1-9 (Weissmandl))), but there is no evidence that this activity suggested that opponents were people of color or sought to capitalize on heightened racial tension.  The only evidence of a campaign activity that comes close to a racial appeal is a Yiddish phone script given to private school volunteers that translated to "the fate of Jewish money and Jewish children is in your vote."  (*See* Tr. at 1169:14-1170:8 (Wieder); PX 188.)  But there is no evidence that the script was ever used, and in any event, it hardly shows that racial appeals have formed a part of campaigns.  Accordingly, this factor favors Defendant.

### G.   Senate Factor 7

71.     Senate Factor 7 examines "the extent to which members of the minority group have been elected to public office in the jurisdiction."  *Goosby*, 180 F.3d at 491 (internal quotation marks omitted).  "[T]he election of a few minority candidates does not necessarily foreclose the possibility of dilution of the [minority] vote . . . ."  *Gingles*, 478 U.S. at 75 (internal quotation marks omitted).  "[I]f it did, the possibility exists that the majority citizens might evade § 2 by manipulating the election of a safe minority candidate."  *Id.* (internal quotation marks and alteration omitted).  "Safe" candidates have included a black man who, once elected as a town officer, was unresponsive to the needs of black constituents, *see Goosby*, 956 F. Supp. at 339-45, and a minority candidate who won an election having received only about 30.7% of the minority vote, *see Charleston County*, 316 F. Supp. 2d at 278-79, 279 n.14.  The election of a minority candidate is also discounted where whites preferred the minority candidate, engineered the election of a minority to evade a VRA challenge, or provided unusual political support to the minority candidate or otherwise campaigned to ensure that candidate's election.  *See Aldasoro*, 922 F. Supp. at 375-76.  Special circumstances surrounding minority elections, such as unopposed races and appointment prior to election, likewise weigh against a finding of minority success in elections.  *See Pope*, 94 F. Supp. 3d at 345-46.

72.     Minority candidates have won seven out of thirty-two contested races from 2005 through 2018.  (PX 242A ¶ 61.)[57]  Of the eighteen of those races in which the candidates were of different races, minority candidates won three.  (*Id.*)  Defendant argues that these victories indicate that divergent voting is best explained by policy differences rather than vote dilution.

---

[57] Dr. Barreto analyzed the voting patterns in six of the seven races.  Data for 2007 were unavailable.  (PX 242A ¶ 63.)

(Doc. 555 ¶ 233.)  But from 2008 to 2018, no minority-preferred candidate won a contested Board election, (PX 242A ¶ 64; *see* Table 1 above), and every candidate of color who won was either perceived as "safe" by the white slating organization or affected by special circumstances.

73.     Without deciding whether any particular Board member was "safe," I find that the white slating organization was certainly looking for and supporting candidates believed to be "safe."  Charles and Germain, black men who won four of the six contested elections analyzed, both admitted that they were vetted by the white slating organization, (Tr. at 1819:4-1820:3 (Charles); *id.* at 1243:1-6 (Germain)), and elected because the white community approved of their candidacy, (*see id.* at 1846:4-1847:8, 1849:1-4 (Charles's campaign materials were created and distributed by members of Orthodox and Hasidic community, with whom he was working); *id.* at 1242:9-1243:11, 1250:2-1251:2 (Germain had to meet with Orthodox and Hasidic community leaders before formally joining Charles's slate and members of that community collected signatures for his nominating petition); *id.* at 1487:20-1488:6 (Grossman referring to Charles and Germain as members of the private school slate)).  They apparently had no interest in or need for campaigning in or appealing to any other community because they knew they would win by virtue of the white slating organization's support.  (*See* Tr. at 1847:9-1848:15 (Charles admitting that he never attended public NAACP candidate forum and felt he had no reason to attend, and that in 2013, he chose to attend a campaign event with all white attendees); *id.* at 1814:10-1815:14 (Charles acknowledging that he won with support of Orthodox and Hasidic leaders); PX 339_0010 (Charles stating that support of the Orthodox and Hasidic community was necessary to win an election); PX 288 ¶ 37 (Trotman stating that Germain did not attend 2013 NAACP forum and attended 2016 forum only briefly), Tr. at 1254:18-21 (Germain testifying that he believed he received approximately 90 percent of his votes from the

Jewish community).)  And, once elected, Charles and Germain appeared to join with the white majority.  For example, they did not seem to support the addition of minority Board members and appeared determined to maintain the *status quo*.  (*See* Tr. at 1849:5-1851:19 (Charles did not support appointment of Charles-Pierre, a black woman whom he perceived to be "on the opposing side," and in an email to Grossman called her the "lamb who will certainly lead to a slaughter of this board"); *id.* at 1264:18-1265:21 (Germain supported Charles-Pierre only because he believed Board could "have better control of [her]" because she is "not . . . aggressive" like another candidate, whom he called "the Spanish girl"); *id.* at 1853:16-1856:6 (Charles "went along" with other Board members and voted for appointment of Joe Chajmovicz, an inexperienced white man with a poor command of written English, over a retired District principal with two master's degrees who is black); *see* PX 167-168 (Chajmovicz and Fields statements).)  Members of the public school community did not support Charles and Germain, (*see* PX 280 ¶ 9 (Clerveaux); PX 279 ¶¶ 12-15 (Dos Reis); PX 283 ¶¶ 43, 62, 70 (Fields); PX 281 ¶¶ 9-10, 12-13 (Goodwin); Tr. at 2565:14-23, 2567:21-24, 2598:4-7 (Charles-Pierre); *id.* at 1858:12-14 (Charles describing calls for his resignation); *id.* at 1260:25-1261:14 (Germain describing protest in front of his house that resulted in another Board member's resignation)), and some were of the view that Charles and Germain were identified with the private school community, (*see* Tr. at 841:10-25, 842:8-19 (Miller); *id.* at 1927:24-1928:10 (Cohen)).  On this evidence, I need not reach a conclusion about whether Charles or Germain were "safe" candidates to conclude that the white slating organization believed that they would go along with the white community's wishes.

74.     Other successful minority candidates won under unusual circumstances.  Corado and Ramirez won with the support of the white community in 2013 and 2015, respectively,

(PX 242A ¶¶ 8-9, 14; *see* Table 1 above), and resigned from the Board shortly thereafter, (Tr. at 1252:5-7, 1261:2-6 (Germain); *id.* at 1113:17-23 (Weissmandl)), leaving the Board to appoint Grossman and Charles-Pierre, (*see id.* at 1110:11-1111:1, 1115:7-9 (Weissmandl); PX 172). Charles and Germain were incumbent in three races, which gives an electoral advantage. (PX 242A ¶ 62.)  Young-Mercer and Thompson were unopposed incumbents, but Thompson lost to Rothman the next year and Young-Mercer resigned in frustration and because she was confident she would not be re-elected.  (*See* PX 234; PX 242A at 34-35; Tr. at 1876:2-1877:12, 1880:14-1881:15 (Young-Mercer).)

75.     Charles-Pierre was initially appointed to the Board in 2015 as a result of pressure on the Board from the state-imposed monitor to appoint a public school parent.  (*See* PX 81_0047 (Grossman told Charles-Pierre that Weissmandl said, "The only reason [Charles-Pierre] is there and ran unopposed is because the board wants to do what [the state-appointed monitor] said," which was to "[h]ave at least one [public] school parent."); Tr. at 2576:14-2577:2 (same); PX 156_0014-15 (monitor report recommending that all candidates for at least one Board seat must be parents of public school students and selected by other public school parents).)  She ran unopposed and won in 2016 because she had the imprimatur of the white slating organization.  (*See* PX 81 at 16-18; Tr. at 1009:9-1010:15, 1024:23-1025:11 (Horowitz supported Charles-Pierre in 2016 "[i]f it's the year she won"); *id.* at 2565:17-2566:23 (Charles-Pierre campaigned with other public school candidates who "worked just as hard" as she did but lost, while she won because she met with slating organization and got the majority of the white vote); *id.* at 2567:11-16 (Grossman told Charles-Pierre that he and Weissmandl convinced Horowitz that they would support Charles-Pierre and she would run unopposed).)  After she won, Grossman repeatedly reminded her that her continued presence on the Board depended on

the white slating organization's support.  (Tr. at 2582:22-2583:16 (Charles-Pierre); *see* PX 81_0029 (Grossman texted Charles-Pierre, "When you look at the vote totals from last night, you know you are on the board because the Jewish community trusted me and Yehuda [Weissmandl] not to run another candidate."); *id.* at _0035 (Grossman texted Charles-Pierre, "If there really was any desire by anybody to remove you from the board, all that would need to be done was to run a candidate against you in May.  That candidate would have garnered 8,000 votes and you would have lost by 4,000 votes just like the other 3 . . . .  Orthodox community could just have voted you out in May.  WE told them that you were good and not to run a candidate."); *id.* at _0040 (similar statements from Grossman to Charles-Pierre).)  She believed that she was kept out of important discussions and that the Board tried to placate the monitor without giving her any real power or clout.  (Tr. at 2595:17-23, 2639:14-2640:9 (Board members said they believed they could control Charles-Pierre and that she had "zero control or influence on direction"); *id.* at 2626:25-2527:7 (Charles-Pierre believed Board members were making her look "stupid" and "keeping [her] in the dark").)  Indeed, Board members limited certain discussions to white members only, including discussions on important matters such as the settlement of this litigation, (*see* Doc. 533), and the appointment of a new Board member, (*see* Tr. at 1530:24-1533:24 (Grossman testifying that Weissmandl forwarded resumes of Board candidates to white Board members with message, "Please respond ASAP as we discussed.  One choice.")).[58]

76.     Further, Leveille's election in 2019 appears to have been engineered by the white slating organization, as mentioned above, after Defendant's counsel had suggested the previous

---

[58] As to the settlement discussions, Grossman affirmatively misled Charles-Pierre by telling her that the reason for a settlement conference was "Judge wants to talk/yell at" the Board "for not doing what N.A.A.C.P. wants."  (Tr. at 2675:23-2677:1; DX 233 at 382-83.)  He sent similar messages to Ashley Leveille, another black Board member, (*see* Doc. 553-1 ¶ 9; *id.* Ex. 1), who was also not included on emails about settlement proposals, (*see* Docs. 545-2, 553-1 ¶¶ 6-8).

year that "it would be good for the case to have a minority to run against Sabrina [Charles-Pierre] that the community could support." (Tr. at 2648:22-2649:6 (Charles-Pierre); PX 88_0010.) In 2019, Pastor Joselito Cintron, who is Latino, ran for a seat to be vacated by Weissmandl, who is white. (Tr. at 1772:8-11, 1773:9-21 (Leveille); *id.* at 2590:8-12 (Charles-Pierre).) Cintron agreed to run on a ticket with Leveille and Goodwin, both of whom are black and public school advocates. (*See id.* at 792:21-24 (Goodwin); *id.* at 1773:17-20 (Leveille); PX 281 ¶¶ 3, 20, 23 (Goodwin).) Leveille was running for a different vacant seat. (*Id.* at 1773:21-1774:1.) Then, abruptly, Weissmandl apparently decided to run after all, and Cintron, rather than opposing him, chose to run for the same seat as his former ticket-mate Leveille, leaving Weissmandl rather than Leveille to run unopposed. (*Id.* at 1774:17-19 (Leveille); *id.* at 2592:9-12 (Charles-Pierre).) Because Cintron was now running for a different seat, he needed a new nominating petition. All the signatures for that petition were collected on a single day – the day petitions were due – and were collected almost exclusively from voters residing in the white areas of the District, showing that the white slating organization wanted the switch. (PX 314; PX 330; PX 341; Tr. at 1748:10-1750:10 (Russell); *see id.* at 1515:21-1516:16, 1517:6-12 (Grossman).) Cintron told Leveille that "they" were giving him the seat if he ran against her and that "the rabbis" said that that was the only way he could win.[59] (Tr. at 1775:19-1776:18

---

[59] I received this testimony not for its truth but for the fact that it was said. It is not evidence that "the rabbis" in fact said what Cintron attributed to them, but it is relevant to show that Cintron and Leveille found it entirely plausible that the white slating organization had the power to dictate who ran for what seat as well as the outcome of the election, as shown by Leveille's belief that she would lose, (*see* Tr. at 1779:17-18), and Cintron's apparent belief that he would win, (*id.* at 1778:25-1779:4 (Cintron told Leveille there was "no point" in her running); *id.* at 1779:21-1780:5 (Leveille observed Cintron on election day "walking around greeting everyone, smiling, happy, [and] cheerful" before results were announced, and she saw him sink into his seat and then leave after he lost)). This testimony also goes to minority election futility in that, once Leveille heard that Cintron had the support of the white slating mechanism, she believed that she would lose.

(Leveille).)  On election day, to her surprise, Leveille unexpectedly defeated Cintron.  (*Id.* at 1779:15-1780:2 (Leveille).)  Turnout was inordinately low at the polling places in the white areas of the District, (*see id.* at 1742:19-1743:1 (Russell); DX 252 ¶ 62(1); DX 12), suggesting that the white slating organization had pulled its support from Cintron and engineered the victory of a candidate favored by the public school community over another minority candidate. Grossman had discussed with an activist named Rivke Feiner that it would be desirable to have two minority candidates running against one another.  (Tr. at 1520:18-21 (Grossman).)  This engineering of Leveille's win, complete with double-cross by and then of Cintron, shows not only the power of the white slating organization, but also that Leveille's victory was (without any participation on her part) at least a "special circumstance," if not a naked attempt to manipulate the outcome of this case.

77.     Even before Leveille's engineered victory, the white slating organization was cognizant of appearances and aware that the white, private school community would be better off if it included minority candidates on the slate, whether to placate the monitor or the minority voters of the District.  This awareness is supported by the white slating organization's selection and endorsement of Charles and Germain, who they believed would not stand in the way of what they wanted.  Thus, the mere fact that there were some minority candidates, a few of whom were elected, does not carry a lot of weight in light of the evidence that victories were arranged for appearance's sake and/or occurred in unusual circumstances, especially considering how few people of color were ultimately elected.  Senate Factor 7 therefore weighs in Plaintiffs' favor.

**H.     Additional Factor 8**

78.     In some cases, "evidence demonstrating that elected officials are unresponsive to

the particularized needs of the members of the minority group" has probative value.  *Goosby*, 180 F.3d at 491-92 (internal quotation marks omitted).  Unresponsiveness includes failure to respond to complaints of racial discrimination, *Goosby*, 956 F. Supp. at 346; failure to identify concerns of the minority community, *see McDaniels v. Mehfoud*, 702 F. Supp. 588, 595-96 (E.D. Va. 1988), *denying amendment*, 708 F. Supp. 754 (E.D. Va. 1989), *appeal dismissed*, 927 F.2d 596 (4th Cir. 1991); scarcity of outreach sessions in the minority community, *Conn. Citizen Action Grp. v. Pugliese*, 1984 U.S. Dist. LEXIS 24869, at *12-13 (D. Conn. Sept. 27, 1984); failure to respond to unequal school resources and disparate discipline and educational opportunities, *Ferguson-Florissant Sch. Dist.*, 201 F. Supp. 3d at 1073; and failure to provide bilingual translations of official forms, *Pugliese*, 1984 U.S. Dist. LEXIS 24869, at *13.

79.    Defendants can introduce evidence of responsiveness, but overall the Second Circuit pursues the responsiveness/unresponsiveness "inquiry with some reluctance, as it entails . . . deciphering what policy steps qualify as responses to the needs of members of the minority community," and is therefore less objective than other factors.  *See Niagara Falls*, 65 F.3d at 1023 n.24 (internal quotation marks omitted).  Accordingly, I do not give this factor as much weight as I give other factors.  *See Village of Port Chester*, 704 F. Supp. 2d at 446.

80.    Plaintiffs have put forth ample evidence of the Board's lack of responsiveness to particularized needs of the black and Latino communities since 2008.  The Board has ignored concerns and numerous requests from the NAACP and others in the public school community. (*See* PX 342 ¶¶ 18-19 (Cohen); PX 288 ¶¶ 12-14, 16-18, 25, 36 (Trotman); PX 228 (letter from NAACP); PX 40 (same); Tr. at 2665:22-2266:7 (Charles-Pierre); PX 279 ¶¶ 21-24 (Dos Reis).) One former public school student of color – an impressive and thoughtful young woman – testified that when she approached the Board as a student, she was ignored or accused of lying.

(PX 278 ¶¶ 21-28 (Castor); Tr. at 590:11-24 (same).)  In an apparent effort to prevent public school parents' voices from being heard, the Board for a time moved the public comment period to the end of its meetings, and often held such long executive sessions beforehand that public comments began after 10 or 11 p.m., when most members of the public had already had to leave. (PX 152 at 35; PX 342 ¶ 13 (Cohen); PX 283 ¶ 44 (Fields); PX 286 ¶ 30 (Price).)  At times, Board members left the room to destroy a quorum and delay public comment, (PX 286 ¶ 31 (Price)), or became obviously absorbed in their phones or in side conversations while public school advocates were speaking, (Tr. at 590:17-22 (Castor); *id.* at 786:20-787:9 (Goodwin); *id.* at 820:14-16 (Miller)).  Some were so disengaged while public school advocates were expressing concerns that "[i]t looked like they were sleeping."  (*Id.* at 820:16-18 (Miller).)  The Board also enacted a rule prohibiting its members from responding when community members voiced concerns during Board meetings.  (*See id.* at 734:25-735:9 (Freilich).)  Together, these policies stifled public school advocates' ability to articulate concerns and enabled Board members to not respond.

81.     In one incident, former District Superintendent Joel Klein was discussing an influx of older students who had little education in their native Latin American countries.  He said that "we know every[ ]one of these kids are dropping out" and that, to avoid having them skew the graduation rate, the District would set up an "alternate transitional program" for students who, he said, "want to learn the language, they want free lunch, breakfast and whatever else they can get."  (DX 171 at 2:9-3:15; DX 180.)  The state monitors characterized these remarks as a "failure to understand the background and needs of [the District's English Language Learner] community," (PX 217 at 9-10); one of Plaintiffs' witnesses called them "disgusting," (Tr. at 1337:11-1338:3); and Plaintiffs call them "racially insensitive," (Doc. 556 ¶ 140).

Regardless of whether Klein was merely responding to a crisis, or intentionally hostile, or somewhere in the middle, the Board's lack of response is what matters.  Despite "numerous unfortunate comments" by Klein that "contributed to an ongoing distrust between the District leadership and the public school community," (DX 35 at 9), Klein remained in place for a year, (*see* DX 180 (comments made on August 20, 2014); DX 35 at 9 (Klein replaced in 2015); Tr. at 2410:21-25 (Wortham replaced Klein in November 2015)).  Defendant points out that Klein was replaced by Deborah Wortham, who has overseen "remarkable and steady improvement," (Doc. 555 ¶ 247), but the Board hired her only after pressure from the state monitors to replace Klein, (DX 35 at 9), so her appointment does little to show District responsiveness.  In other incidents, lawyers retained by the Board treated students and parents in a bizarrely hostile fashion but remained as Board counsel even after the public school community protested.  (PX 286 ¶ 24 (Price); PX 343 ¶ 27 (Young-Mercer); PX 278 ¶ 29 (Castor); PX 140 (letter from parent who said her son was harassed); PX 283 ¶ 47 (Fields); PX at 152 at 28 (monitor presentation).)

      82.    Current and former Board members who support public schools felt marginalized and harassed, (*see* PX 343 ¶¶ 35-38 (Young-Mercer); PX 286 ¶ 33 (Price); Tr. at 1184:8-1186:22 (same); *id.* at 2664:5-20 (Charles-Pierre)), while white Board members acknowledged that they had all the power, (PX 342 ¶ 16 (former Board President told Cohen that the Board had "all of the power"); PX 80 at 427 (Grossman:  "If private school really wanted [Ms. Charles-Pierre's] seat she would have lost the election like the rest of them."); PX 81_0050 (Grossman:  "Nothing can pass without [O]rthodox support."); PX 88_0002 (Grossman:  public school advocates "feel disempowered because they are"); PX 8 at 279 (Grossman:  the outcome of the 2016 election "will be whatever we want it to be"); *see* Tr. at 2670:12-24 (Charles-Pierre agreeing that the "white majority" "had all the real power")).  It is therefore unsurprising that the Board refused to

participate in a reconciliation process with public school community leaders.  (PX 342 ¶ 16 (Cohen); PX 288 ¶ 9 (Trotman).)

83.    This lack of concern regarding the views of the public school community seems to have allowed for numerous Board decisions privileging private school interests and/or harmful to public education.

- From 2009 to 2014, budgets were cut dramatically, and the Board eliminated hundreds of public school teaching, staff, and administrative positions and eliminated classes and programs.  (PX 152 at 30-32.)  The public school buildings fell into disrepair and custodial services were reduced.  (PX 279 ¶ 19 (Dos Reis); PX 278 ¶¶ 18-20 (Castor); PX 283 ¶ 36 (Fields); PX 288 ¶ 18 (Trotman).)  Students were given academically deficient schedules full of free time and filler.  (PX 278 ¶¶ 15-16 (Castor); Tr. at 582:12-584:25, 638:9-24 (same); PX 3B at 2, 4.)  The Board closed two public schools over minority opposition and tried to sell one of them to a yeshiva at a sweetheart price, a sale the New York State Commissioner of Education annulled.  (PX 286 ¶¶ 26-27 (Price); PX 212.)  Graduation rates and test scores sank.  (PX 283 ¶¶ 30-35 (Fields); *see* PX 204A-I.)  The Board made "no meaningful effort . . . to distribute [the] pain of deep budget cuts fairly among private and public schools."  (PX 152 at 33.)

- In the 2010-2011 and 2011-2012 school years, so many special education placements were improperly given to white children that the state refused to fully reimburse the District.  (PX 211; PX 286 ¶ 18 (Price); PX 289.)

- The state monitor found that in 2013 the Board turned down $3.5 million in advanced lottery funds that could have been used to restore programs, but which would have required the District to form an advisory committee including parents and teachers that

would direct how the money would be spent.  (*Id.* at 22, 45.)

- While the public school cuts have yet to be restored in full, (PX 108 at 5-6), nonmandated private school services have increased.  For example, the budget for the 2017-2018 school year included funds for five nonmandated days of private school transportation, and as a result, the Commissioner of Education did not approve the budget.  (PX 170.) The Board approved six days of nonmandated private school busing for the 2019-2020 school year.  (PX 262.)  In November 2019, the New York State Comptroller found that, over the preceding two school years, the District paid yeshiva private contractors to bus 1,172 more students than were registered, totaling $832,584 in unsubstantiated expenses. (PX 214 at 1.)

- The Board appointed new members seemingly without concern for candidates' qualifications or lack thereof.  (PX 172; PX 283 ¶¶ 65-66 (Fields); Tr. at 2666:21-2667:17 (Charles-Pierre).)  It also made accommodations for Yiddish-speaking parents and students that were not made for Spanish speakers.  (PX 157 at 8-9; PX 217 at 1-2.)  It remains under a corrective action plan by the New York State Education Department Office of Bilingual Education and World Languages.  (Tr. at 2418:19-2419:6 (Wortham).)

Accordingly, that cuts may, as Defendant suggests,[60] have been necessitated by the financial crisis or a state funding formula that is unfair to the District does not undermine the conclusion that the Board has not been responsive to the concerns of black and Latino persons.

      84.     Since 2015, the District has seen improvements, which are commendable, but the

---

[60] During discovery, Defendant invoked legislative privilege to shield testimony about the reasons for Board actions, so – while state funding and the financial crisis might explain certain Board actions to a certain extent – the Board's actual reasoning remains unknown.

positions that have been restored have not been restored in full, (*see* PX 208 at 5-6), and have not

kept up with a significant increase in enrollment, (*id.*).  Further, all improvements have occurred

under state supervision and with the help of a lot of state money.  For example, the District's

budgets, developed in consultation with the state monitors, must be approved by the

Commissioner before being submitted to a vote in the District, (Tr. at 2404:22-2405:4

(Wortham)), and an annual $3 million grant recommended by the monitors must be spent on

public schools, (PX 206_0007-08; PX 203; Tr. at 2431:23-2432:13 (Wortham); PX 207_0009-

10; PX 208_0010-11).  The District cannot maintain its public school program restorations

without the grant money.  (PX 206_0019.)  There is every reason to believe that the

improvements are because of the state monitors, and in spite of the machinations of some Board

members.  (*See, e.g.*, Tr. at 1525:23-1529:9, 1550:7-1554:8, 2675:23-2676:23 (Grossman urging

petitions against Board, suggesting removal of non-Orthodox Board members, and interfering

with settlement of this lawsuit).)  Even Superintendent Wortham, who has overseen many of the

positive changes, was hired by the Board in collaboration with the state monitors, who helped to

"identify, recruit, and hire" her.  (PX 156_0010.)  Accordingly, the improvements to public

education in the District do not show responsiveness by the Board, or change the facts above,

which show a lack thereof.  For these reasons, this factor favors Plaintiffs.

## I.     Additional Factor 9

85.     Under Senate Factor 9, courts consider "whether the policy underlying the . . .

political subdivision's use of . . . [the contested] practice or procedure is tenuous."  *Gingles*, 478

U.S. at 37 (internal quotation marks omitted).

86.     Defendant contends that it is required to use an at-large voting system because

under New York law, "[e]ach vacancy upon the board of education to be filled shall be

considered a separate specific office," N.Y. Educ. Law § 2018(a), and all qualified voters are

"entitled to vote at any school meeting or election for the election of school district officers," *id.*
§ 2012. Defendant's interpretation is reasonable, and may even be correct, and on this record, there is no basis for concluding that the at-large elections are a cover for intentional discrimination or a desire for discriminatory effect. But although the District has a legitimate basis for running the elections the way that it does, there is evidence that the dominant Board members and the white slating organization have a desire to adhere to the current system despite its discriminatory effect and went to extraordinary lengths to preserve that system to maintain political power. The evidence shows that, in the course of this proceeding, Board members outright lied or disingenuously claimed lack of memory;[61] the Board President and others failed to provide the Board's members of color with complete or accurate information about this lawsuit, including settlement possibilities that could have saved enormous amounts of money,[62] (*see* Tr. at 2672:10-2674:1, 2675:23-2677:1 (Charles-Pierre); Doc. 553-1 ¶ 9 (Leveille)); and one leader of the white slating organization went so far as to go into contempt of court, (*see* Doc. 530; note 49 above). The District also knew, at least as of January 30, 2020, when the Court ruled on the parties' motions *in limine*, that even if state law requires at-large elections, the Court has the power to impose a remedy if the challenged voting practice violates Section 2 and, therefore, that it would have been possible to resolve this case. Further, as discussed above, the

---

[61] Throughout this Decision and Order, I discuss credibility determinations with respect to each witness as appropriate. In the interest of brevity, I also find accurate and incorporate the details set forth in Part IV of Plaintiffs' Proposed Findings of Fact and Conclusions of Law. (Doc. 556 ¶¶ 209-216.)

[62] Plaintiffs' counsel offered to waive their fees as part of a settlement. (*See* Doc. 553.) A defendant obviously has no obligation whatsoever to settle a case, and the Court does not hold it against Defendant in any way that it put Plaintiffs to their proof. But the failure to provide Board members of color with updated and accurate information about the case, and the false, misleading, or evasive testimony of present and former Board members and their allies at trial, reveal a disturbing win-at-all-costs attitude that suggests bad motives for adhering to the challenged voting practice.

slating organization appears to have been so desperate to maintain the at-large system that it engineered Leveille's 2019 victory for purposes of appearances after Defendant's counsel suggested it would be "good for the case" to have an additional minority candidate.  (Tr. at 2648:22-2649:6 (Charles-Pierre); PX 88 at 10.)  All of these machinations show that, even if the District is justified in its belief that state law requires at-large elections, some Board members had tenuous, if not illegitimate, reasons for wanting to maintain the *status quo*.  Accordingly, this factor weighs in Plaintiffs' favor.

## IV.    FINAL CONCLUSIONS & REMEDY

87.    Balancing all of the relevant factors, I find that Plaintiffs have convincingly proven their case of vote dilution.  The three *Gingles* factors are met, and the Senate Factors weigh firmly in Plaintiffs' favor.  The at-large system of electing the Board of Education of the East Ramapo Central School District affords black and Latino residents "less opportunity than other members of the electorate to participate in the political process and to elect representatives of their choice," *Gingles*, 478 U.S. at 36 (internal quotation marks omitted), in that it "thwarts a distinctive minority vote by submerging it in larger white voting population," *Growe*, 507 U.S. at 40.  I do not address whether this result was intentional, as no such finding is required under Section 2.  The case is made by showing that people of color feel the deleterious impact of the at-large scheme employed for Board elections and white people do not, such that the challenged practice "has operated to invidiously exclude blacks [and Latinos] from effective participation in political life in violation of Section 2." *Goosby*, 956 F. Supp. at 356.

88.    Plaintiffs have proven that the at-large method of electing Board members in the District violates Section 2 of the VRA and that they are thus entitled to full relief.  This Court enjoins the District from holding any further elections under its at-large system, including the elections currently scheduled for June 9, 2020. *See Wright v. Sumter Cty. Bd. of Elections &*

*Registration*, 361 F. Supp. 3d 1296, 1305-06 (M.D. Ga. 2018) (enjoining election pending

redistricting), *modified on other grounds*, No. 14-CV-42, 2018 WL 7366461 (M.D. Ga. June 21,

2018), *reconsideration denied*, 2018 WL 7366501 (M.D. Ga. July 23, 2018); *Arbor Hill*, 281 F.

Supp. 2d at 457 (same); *cf. Reynolds v. Sims*, 377 U.S. 533, 585-86 (1964) (court not required to

enjoin imminent election where apportionment scheme found invalid, but "it would be the

unusual case in which a court would be justified in not taking appropriate action to insure that no

further elections are conducted under the invalid plan").  The District shall propose a remedial

plan that fully complies with the VRA within thirty days of the date of this Order.  *See Goosby*,

981 F. Supp. at 755 ("Where a court has struck down a voting system, it must give the

appropriate elected body an opportunity to propose a remedial plan."); *see also Pope*, 94 F.

Supp. 3d at 351 (affording defendant municipality "the first opportunity to create a remedial

plan").  Such a remedial plan shall divide the District into nine voting wards – one for each

Board seat – and require that only those residents living in a voting ward may vote for that

ward's seat.  The Court will not prescribe further details at this time except to note that as many

as four majority-minority wards appear to be possible, (*see* ¶ 13 above), and that a special

election would appear to be necessary once the remedial plan is adopted.  Plaintiffs shall respond

within thirty days of the date of Defendant's proposal.[63]  This Court shall retain jurisdiction to

ensure that the District complies fully with the VRA and implements all steps to cure its

violation.  *See New Rochelle Voter Def. Fund v. City of New Rochelle*, 308 F. Supp. 2d 152, 163-

64 (S.D.N.Y. 2003).

---

[63] As noted, before and during trial certain Board members' actions and positions taken by the District seemed to stymie resolution of this matter, but I also observed some apparently sincere attempts at agreement.  In hopes that the former will not be repeated, and encouraged by the latter, the Court urges the parties to reach agreement on the proposed remedial plan if possible.

89.     Finally, Plaintiffs are entitled to attorney's fees and costs, including expert fees, pursuant to 52 U.S.C. § 10310(e).  *See Pope*, 94 F. Supp. 3d at 351-52.  Within thirty days of the entry of this Order, Plaintiffs shall file a motion for the award of such fees and costs, unless the parties can come to an agreement on that subject.  Defendant will thereafter have thirty days to respond.

*     *     *

This ruling may or may not change the way the schools in the District are run.  But the purpose of Section 2 is not to produce any particular policy outcome.  Rather, it is to ensure that every voter has equal access to the electoral process.  For too long, black and Latino voters in the District have been frustrated in that most fundamental and precious endeavor.  They, like their white neighbors, are entitled to have their voices heard.

**SO ORDERED.**

Dated: May 25, 2020
            White Plains, New York

_____
    CATHY SEIBEL, U.S.D.J.