# UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| **NATIONAL ASSOCIATION FOR THE ADVANCEMENT OF COLORED PEOPLE, SPRING VALLEY BRANCH, et al.,** | **ECF CASE** |
| | **Case No. 17 Civ. 8943 (CS)(JCM)** |
| **Plaintiffs,** | |
| | **DISTRICT JUDGE** |
| | **CATHY SEIBEL** |
| v. | |
| | **MAGISTRATE JUDGE** |
| | **JUDITH C. McCARTHY** |
| **EAST RAMAPO CENTRAL SCHOOL DISTRICT, et al.,** | |
| **Defendants.** | |

## MEMORANDUM OF LAW IN SUPPORT OF DISTRICT'S EMERGENCY MOTION TO STAY DECISION AND ORDER PENDING APPEAL

MORGAN, LEWIS & BOCKIUS LLP
David J. Butler
Randall M. Levine
101 Park Avenue
New York, NY 10178
T: (212) 309-6000
F: (212) 309-6001
-and-
1111 Pennsylvania Avenue, NW
Washington, DC 20004
T: (202) 739-3000
F: (202) 739-3001

William S.D. Cravens
Clara Kollm
1111 Pennsylvania Avenue, NW
Washington, DC 20004
T: (202) 739-3000
F: (202) 739-3001

<u>**TABLE OF CONTENTS**</u>

INTRODUCTION ...................................................................................................1

BACKGROUND ....................................................................................................3

   I.    The Governor Issued Two Executive Orders Creating A New Temporary
       System for School District Elections in Response to the COVID-19 Pandemic.....3

   II.   The Court's May 26, 2020 Opinion and Order.......................................................5

ARGUMENT ..........................................................................................................5

   I.    This Court Should Immediately Lift Its Injunction Of The Imminent June 9,
       2020 Election. ......................................................................................................5

       A.  Federal Courts Generally Are Prohibited From Enjoining Imminent
           Elections................................................................................................5

       B.  The June 9, 2020 Election Is A Special Circumstance In Response To
           The Global Pandemic And The Court Has Made No Finding That
           The June 9, 2020 Election Procedures Would Violate The Voting
           Rights Act ............................................................................................10

   II.   This Court Should Stay Its Order Requiring A Districting Proposal And All
       Other Proceedings Pending Appeal ....................................................................12

       A.  Factor 1: The Court's Decision Presents Several Issues of First
           Impression And Diverges Substantially From Other Voting Rights
           Act Cases .............................................................................................13

       B.  Factor 2: The District Will Be Irreparably Harmed Absent A Stay ..........18

       C.  Factor 3: Plaintiffs Will Not Be Substantially Harmed By A Stay
           Pending Appeal.....................................................................................20

       D.  Factor 4: The Public Interest Strongly Favors Staying The Court's
           Directive To Propose A Remedial Plan ..................................................20

CONCLUSION......................................................................................................21

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Colon-Marrero v. Conty-Perez*,
  703 F.3d 134 (1st Cir. 2012) ...................................................................7

*Diaz v. Silver*,
  932 F. Supp. 462 (E.D.N.Y. 1996) ......................................................7, 8

*Flores v. Town of Islip*,
  382 F. Supp. 3d 197 (E.D.N.Y. 2019) ........................................... *passim*

*Goosby v. Town Bd. of Town of Hempstead*,
  N.Y., 981 F. Supp. 751 (E.D.N.Y. 1997).................................5, 9, 12, 20

*Gulino v. Bd of Edu. of City Sch. Dist. of City of New York*,
  No. 96-CV-8414 (KMW), 2019 WL 2454094 (S.D.N.Y. Jun. 12, 2019) ..................12, 18, 19

*Harper v. City of Chi. Heights*,
  223 F.3d 593 (7th Cir. 2000) ........................................................12, 18

*Hizam v. Clinton*,
  No. 11 Civ. 7693(JCF), 2012 WL 4220498 (S.D.N.Y. Sept. 20, 2012)...................................18

*Husted v. Ohio State Conf. of N.A.A.C.P.*,
  573 U.S. 988 (2014)...................................................................................6

*Jock v. Sterling Jewelers, Inc.*,
  738 F. Supp. 2d 445 (S.D.N.Y. 2010)......................................................13

*Konst v. State of N.Y.*,
  No. 92-cv-615E(H), 1992 WL 281092 (W.D.N.Y. Oct. 7, 1992) ...........................................8

*League of United Latin Am. Citizens, Council No. 4434 v. Clements* (*LULAC*),
  999 F.2d 831 (5th Cir. 1993) ..................................................................15

*Lopez v. Hale*,
  797 F. Supp. 547 (N.D. Tex. 1992) ...........................................................9

*Mac Govern v. Connolly*,
  637 F. Supp. 111 (D. Mass. 1986) ...........................................................11

*Mo. State Conf. of NAACP v. Ferguson-Florissant Sch. Dist.*,
  201 F. Supp. 3d 1006, 1042 (E.D. Mo. 2016).........................................15

*Montes v. City of Yakima*,
    40 F. Supp. 3d 1377 (E.D. Wash. 2014) ...............................................................15

*New York Life Ins. Co. v. Singh*,
    No. 14CV5726NGSMG, 2017 WL 10187669 (E.D.N.Y. July 13, 2017) ..............13

*North Carolina v. League of Women Voters of N. Carolina*,
    574 U.S. 927 (2014) .................................................................................................6

*Pope v. Cty. of Albany*,
    94 F. Supp. 3d 302, 313 (N.D.N.Y. 2015) ............................................................14

*Purcell v. Gonzalez*,
    549 U.S. 1 (2006) .....................................................................................................6

*Reed v. Town of Babylon*,
    914 F. Supp. 843 (E.D.N.Y. 1996) .......................................................................15

*Reynolds v. Sims*,
    377 U.S. 533 (1964) .................................................................................................6

*RNC v. DNC*,
    140 S. Ct. 1205 (2020) .........................................................................................1, 6

*Rodriguez v. Pataki*,
    308 F. Supp. 2d 346 (S.D.N.Y. 2004) .............................................................14, 15

*Silberberg v. Bd. of Elecs. of the State of New York*,
    216 F. Supp. 3d 411, 420–21 (S.D.N.Y. 2016) ......................................................7

*Sw. Voter Registration Educ. Project v. Shelley*,
    344 F.3d 914 (9th Cir. 2003) ...............................................................................7, 8

*Terrebonne Parish Branch NAACP*,
    274 F. Supp. 3d 395 (M.D. La. 2017) ...................................................................15

*Thornburg v. Gingles*,
    478 U.S. 30 (1986) .................................................................................................17

*U.S. Bank Nat'l Ass'n* v. *Triaxx Asset Mgmt LLC*,
    No. 16-cv-8507, 2020 WL 359907 (S.D.N.Y. Jan. 21, 2020) ..........................12, 20

*United States v. Vill. of Port Chester*,
    704 F. Supp. 2d 411 (S.D.N.Y. 2010) ..............................................................14, 17

*Veasey v. Abbott*,
    830 F.3d 216 (5th Cir. 2016) ..................................................................................7

**INTRODUCTION**

On May 26, 2020, this Court found in favor of Plaintiffs on their claim alleging that the District's at-large election system violates Section 2 of the Voting Rights Act.  Defendant, the East Ramapo Central School District ("the District"), disagrees with the Court's decision and has filed a notice of appeal with the Second Circuit.  ECF No. 569.  This Court also enjoined the District from conducting any further elections using an at-large voting system, including an express prohibition against proceeding with the imminent June 9, 2020 election for four open seats on the District's school board—less than two weeks away.  The Court also directed the District to create and propose within the next thirty days a "remedial plan," consisting of a single-member district voting system for future District elections.  The District seeks two forms of relief from the Court's May 26, 2020 Order, on an emergency basis, pursuant to Federal Rule of Civil Procedure 62.

*First*, this Court's injunction of the imminent election for open positions on the school board is contrary to controlling law, violates fundamental equitable principles, and should be immediately lifted.  The Supreme Court just recently reiterated that it "has repeatedly emphasized that lower federal courts should ordinarily not alter [] election rules on the eve of an election." *RNC v. DNC*, 140 S. Ct. 1205, 1207 (2020) (per curium).  This Court's injunction is a drastic alteration of election procedures, and nothing warrants deviating from the usual rule prohibiting such interference.  To the contrary, the unusual circumstances and procedures in place for this election especially demand forbearance.

As this Court is aware, the June 9, 2020 election is no ordinary election.  Governor Cuomo declared a state of emergency due to the ongoing COVID-19 pandemic, and by executive order required all school districts to hold elections for their school boards, budget approval referenda, and other actions requiring voter approval, exclusively by absentee ballot on June 9, 2020.  The

District has expended significant resources to comply—more than 60,000 absentee ballots have been printed, processed, and at this stage either have been mailed or will be mailed on a rolling basis. Those ballots include three separate items for the voters' consideration: (1) a vote on the District's proposed budget for the 2020–21 fiscal year; (2) elections for four open seats to the District's school board; and (3) an election for the trustee of the Finkelstein Memorial Library.

Irrespective of the Court's Order, the budget approval referendum and library election must go forward, and voters will return their absentee ballots to the District on June 9, 2020. However, continuation of the Order enjoining the election for school board members on the eve of the election will confuse voters, frustrate the Governor's orders, and alter the election beyond repair. Moreover, the injunction is unnecessary, and risks compromising the integrity of an already unprecedented pandemic election. The Court should immediately lift its injunction of the June 9, 2020 election and allow the absentee ballot process to proceed.

*Second*, the remainder of the injunctive relief ordered by the Court, along with all other proceedings in this Court, should be stayed pending resolution of the District's appeal. This case presents important, controversial, and unprecedented issues that deserve full consideration by the Second Circuit before the Court's Order should be implemented. The public interest also weighs strongly in favor of staying the Court's directive to create a new system of ward voting for District elections while the appeal is pending. The required effort to create a new voting system in an open process will be resource intensive, and as other courts in the Second Circuit have recognized, "it would be irresponsible to rush to develop a new system of town governance in a few short months." *Flores v. Town of Islip*, 382 F. Supp. 3d 197, 247 (E.D.N.Y. 2019). If the Second Circuit ultimately agrees with the District on appeal, that effort will have been wasted.

Accordingly, the District respectfully requests that this Court immediately lift its injunction of the June 9, 2020 election and allow the election to proceed without interference, and stay all other proceedings in this Court pending resolution of the District's appeal.

**BACKGROUND**

### I. THE GOVERNOR ISSUED TWO EXECUTIVE ORDERS CREATING A NEW TEMPORARY SYSTEM FOR SCHOOL DISTRICT ELECTIONS IN RESPONSE TO THE COVID-19 PANDEMIC.

On March 7, 2020, Governor Cuomo declared a state of emergency for the entire State of New York due to the ongoing COVID-19 pandemic. On March 29, 2020, the Governor issued Executive Order 202.13, which postponed certain elections, including the school district elections scheduled for May of 2020. ECF No. 565-1. On May 1, 2020, the Governor issued Executive Order No. 202.26 mandating new procedures for school district elections. ECF No. 567-1. These Executive Orders supersede the state laws otherwise governing the District's election procedures and postponed the District's election until June 9, 2020.

In addition to the four open seats on the District's school board[1], at the Annual Meeting and Election of June 9, 2020, all of the more than 60,000 eligible District voters have the opportunity vote for the District's library trustee and to approve or reject the District's proposed operating budget for fiscal year 2020–21.[2] Complete information about the June 9, 2020 process is published on the District's website.[3] If the budget is not approved by the voters on June 9, 2020,

---

[1]     The Board members whose three-year terms expire June 30, 2020 are Mark Berkowitz, Joel Freilich, and Harry Grossman. There is also a seat open to fulfill the remaining partial term, June 10, 2020 to June 30, 2022, for the seat currently filled on an interim basis by Carole Anderson.

[2]     *See* Ex. A, District Sample Ballot for the June 9, 2020 Election.

[3]     *See* https://www.ercsd.org/Page/287.

then the District may be required to operate under a significantly constrained contingency budget for the coming school year.

The Governor's Executive Orders prohibit all in-person voting at the District's thirteen polling places, and require the election to be conducted exclusively by mail-in absentee ballot. ECF No. 567-1. The Executive Orders also change the requirements for candidates seeking to run for the school board by removing any requirement for nominees to meet a minimum threshold of petition signatures to appear on the ballot as a candidate. *Id.* Nominating petitions consistent with the Executive Order's requirements were due to the District Clerk's office on May 11, 2020.[4]

Finally, the Executive Order requires the District to mail postcard notices explaining to voters the new rules for the June 9, 2020 election, the date of the budget hearing, the definition of a qualified voter, and an absentee ballot. The processes necessary to comply with the Governor's Executive Orders have been underway in the District for weeks. As of the date of this filing, more than 60,000 absentee ballots for the June 9, 2020 election—one for every eligible voter in the District—already have been printed, packaged, and have either been mailed or are in queue to be mailed to the District's eligible voters.[5]

---

[4] The following candidates have filed nominating petitions with the District Clerk and appear on the sample ballot for school board trustee: Jo-Ann Henderson, Mark Berkowitz, Joel Freilich, Sherry McGill, Harry Grossman, Kerry Victor, Ana Maeda-Gonzalez, and Carole Anderson.

[5] We understand that the District was informed by its printing vendor on May 26, 2020, that it is too late to make any alterations to the printed ballots now and that the printers are so overloaded by requests from other school districts that it is not possible in the time available to print new ballots and send them out to eligible voters in time for receipt by voters and return to the District for the June 9, 2020 election.

## II.    THE COURT'S MAY 26, 2020 OPINION AND ORDER.

This Court heard closing arguments after a bench trial on March 24, 2020.  On March 31, 2020, the Court was advised of the Governor's Executive Order No. 202.13.  ECF No. 565.  On May 4, 2020, the Court was advised of the Governor's Executive Order No. 202.26.  ECF No. 567.

On May 26, 2020, the Court entered its decision and order finding in favor of Plaintiffs on their claim that the District's at-large election system under state law violates Section 2 of the Voting Rights Act, and "enjoining the District from holding any further elections under its at-large system."  ECF No. 568 ¶ 88.  The Court's Order makes clear that its injunction applies to the June 9, 2020 school board election.  *Id.*

The Court's Order also directs the District to create and propose a remedial plan within thirty days that divides the District into nine voting wards, in which each ward will elect one person to the school board, and notes that following Court approval of a remedial plan, "a special election would appear to be necessary."  *Id.*

On May 27, 2020, the District filed a notice of appeal to the United States Court of Appeal for the Second Circuit from the Court's Order of May 26, 2020.  ECF No. 569.

## ARGUMENT

## I.    THIS COURT SHOULD IMMEDIATELY LIFT ITS INJUNCTION OF THE IMMINENT JUNE 9, 2020 ELECTION.

### A. Federal Courts Generally Are Prohibited From Enjoining Imminent Elections.

It is well-settled that "intervention by the federal courts in state elections has always been serious business, not to be lightly engaged in."  *Goosby v. Town Bd. of Town of Hempstead*, N.Y., 981 F. Supp. 751, 763 (E.D.N.Y. 1997) (citation omitted), *aff'd*, 180 F.3d 476 (2d Cir. 1999).  Indeed, Courts in the Second Circuit recognize that "[t]he decision to enjoin an impending election

is so serious that the Supreme Court has allowed elections to go forward even in the face of an undisputed constitutional violation." *Flores*, 382 F. Supp. 3d at 246 (citation omitted).

For this reason, the Supreme Court has long held that federal courts should almost never take the extraordinary step of enjoining an imminent election. Indeed, the interests in favor of allowing an imminent election to proceed are so powerful that even where "the existing [electoral] scheme was found invalid," it is almost always the case that if "an impending election is imminent and a State's election machinery is already in progress," then "withholding the granting of immediately effective relief" is necessary and in the public interest. *Reynolds v. Sims*, 377 U.S. 533, 585 (1964).

Accordingly, as the Supreme Court repeatedly has reaffirmed, when an election under state law is imminent, the federal courts generally should "allow the election to proceed without an injunction." *See, e.g.*, *Purcell v. Gonzalez*, 549 U.S. 1, 5–6 (2006) (election was imminent 18 days from the date of the Supreme Court opinion). Instead, in election cases like this one, the Supreme Court requires courts to "consider the proximity of a forthcoming election and the mechanics and complexities of state election laws," and to make every effort to avoid making "unreasonable or embarrassing demands on a State in adjusting to the requirements of the court's decree." *Reynolds*, 377 U.S. at 585; *see also, e.g.*, *North Carolina v. League of Women Voters of N. Carolina*, 574 U.S. 927, 927 (2014); *Husted v. Ohio State Conf. of N.A.A.C.P.*, 573 U.S. 988, 988 (2014).

That general rule has lost no vitality over time. In granting a stay of an injunction that would have altered the requirements of an election under state law less than two months ago, the Supreme Court once again reiterated that it "has repeatedly emphasized that lower federal courts should ordinarily not alter [] election rules on the eve of an election." *RNC v. DNC*, 140 S. Ct. 1205, 1207 (2020) (per curium) (citing *Purcell*, 549 U.S. at 1; *Frank v. Walker*, 574 U.S.

929 (2014); *Veasey v. Perry*, 135 S. Ct. 9, 9 (2014)); *accord*, *Veasey v. Abbott*, 830 F.3d 216, 243 (5th Cir. 2016) (en banc) ("[T]he district court should fashion an appropriate remedy in accord with its findings; provided, however, that any remedy will not be made effective until after the November 2016 election."); *Colon-Marrero v. Conty-Perez*, 703 F.3d 134, 139 & n.9 (1st Cir. 2012) (declining to issue injunction "eighteen days … before the general election" even though plaintiff likely to succeed because "issuing an injunction on the eve of an election is an extraordinary remedy with risks of its own"); *Sw. Voter Registration Educ. Project v. Shelley*, 344 F.3d 914, 919 (9th Cir. 2003) (refusing to enjoin impending election (two weeks away) due to material hardship suffered by both state and voters from "enormous resources already invested in reliance on the election's proceeding on the announced date").

District courts in this Circuit have consistently applied the rule against enjoining imminent elections. In 2016, for example, the Southern District declined to "grant an injunction to alter a State's established election procedures" given the severe consequences of disrupting "the election process." *Silberberg v. Bd. of Elecs. of the State of New York*, 216 F. Supp. 3d 411, 420–21 (S.D.N.Y. 2016). There, the court held that "[r]egardless of" the merits of the case, "late stage" injunctions are "a recipe for confusion and delays at the polls"—prototypical public harms the *Reynolds* rule is meant to avoid. *Id.*; *see also Diaz v. Silver*, 932 F. Supp. 462, 466–67 (E.D.N.Y. 1996) (refusing to issue injunction where there was no "effective and immediately available remedy" that would "avoid delaying" a primary that was two months away or perhaps the general election after that); *id.* at 468 (noting obvious "harm to the public in delaying either the primary or the general election or even changing the rules as they now stand"). Similarly, in another case where an upcoming election was "one month away," the court held that even if the state's apportionment plan was found to be invalid, "any injunctive relief granted with respect to the

apportionment plan would completely disrupt New York's election process," so "it would be inappropriate for a court at this late time to require the election process to begin anew." *Konst v. State of N.Y.*, No. 92-cv-615E(H), 1992 WL 281092, at *2 (W.D.N.Y. Oct. 7, 1992).

The powerful public policy justifications for the general rule against enjoining imminent elections are self-evident, but bear repeating. Where, as here, "the election machinery is already running," an injunction invalidating steps already taken—like printing absentee ballots—would pose administrative challenges and result in needless waste of scant public resources. The Ninth Circuit has articulated the immense public harm that inevitably results from federal courts canceling or postponing imminent elections:

> Time and money have been spent to prepare voter information pamphlets and sample ballots, mail absentee ballots, and hire and train poll workers. Public officials have been forced to divert their attention from their official duties in order to campaign. Candidates have crafted their message to the voters in light of the originally-announced schedule and calibrated their message to the political and social environment of the time. They have raised funds under current campaign contribution laws and expended them in reliance on the election's taking place on October 7. Potential voters have given their attention to the candidates' messages and prepared themselves to vote. . . . *These investments of time, money, and the exercise of citizenship rights cannot be returned.*

*Sw. Voter Registration Educ. Project*, 344 F.3d 914 at 919 (emphasis added). All of this is true here, even under the unusual circumstances presented by the June 9, 2020 election. The District has had to prepare voter information and print ballots, and to prepare employees and workers to receive and count absentee ballots. Likewise, candidates have submitted their names and will appear on the ballot and presumably have engaged in whatever campaigning and other activity they could consistent with the Governor's stay-at-home orders.

Moreover, canceling or altering an impending election necessarily causes "considerable confusion, inconvenience and uncertainty among voters, candidates and election officials." *Diaz,*

932 F. Supp. at 466.  Upsetting those reliance interests here will include, like in *Flores*, removing "the current set of candidates from the ballot[,]" requiring re-nominations of candidates, and "postpone[ing] the [] election until after the new system is established and able to be implemented"—a consequence that *Flores* said was "sufficient to tilt the public interest against issuing an injunction."  382 F. Supp. 3d at 247; *see also Lopez v. Hale*, 797 F. Supp. 547, 550 (N.D. Tex. 1992) (elections create "expectation interests that cannot lightly be discounted").  There is no reason for the Court to reach a different conclusion here.

The generally applicable rule against enjoining imminent elections has the same force even after trial on the merits.  For example, in *Goosby v. Town Board. of Town of Hempstead*, Judge Gleeson rejected the plaintiffs' request to enjoin an upcoming election under an "at-large system" even after the court had found that the town's at-large elections violated Section 2.  981 F. Supp. at 765.  After trial on the merits, Judge Gleeson issued his decision when the next election was only three weeks away.  *Id.*  In view of "the proximity of a forthcoming election" and the defendant's filing of a notice of appeal, Judge Gleeson refused to enjoin the upcoming election. *Id.* at 763.  In particular, he found that no irreparable harm would accrue to the plaintiffs from allowing the election to proceed, because "there is nothing to prevent a special election to remedy the Section 2 violation" if the plaintiffs ultimately prevailed on appeal.  *Id.* (staying implementation of injunction to change "at-large apportionment plan" into "six-district apportionment plan"); *see also Flores*, 382 F. Supp. 3d at 246 ("Even after a full trial on the merits and a final order declaring the system in breach of Section Two, the *Goosby* court refused to enjoin the upcoming election until after the appeal.").

This Court should adhere to *Goosby*, follow Judge Gleeson's example, and reach the same result.  Just as in *Goosby*, this Court has found a violation of the Voting Rights Act and issued its

decision mere weeks away from an imminent election. Just as in *Goosby*, the District is taking an immediate appeal of the Court's decision. And, just as in *Goosby*, Plaintiffs would suffer no irreparable harm from allowing the June 9, 2020 election to proceed as planned, because nothing would stop the Court from ordering a special election under a new election system if Plaintiffs should ultimately prevail on appeal.

**B. The June 9, 2020 Election Is A Special Circumstance In Response To The Global Pandemic And The Court Has Made No Finding That The June 9, 2020 Election Procedures Would Violate The Voting Rights Act.**

This Court has found that the at-large election procedures required by state law for school board elections in the ordinary course interact with the District's local dynamics and history to have the effect of violating Section 2 of the Voting Rights Act. ECF No. 568 ¶ 8. The Court's findings that led to this conclusion necessarily are specific to the way voting and elections historically have been conducted in the District. For instance, the Court credited Plaintiffs' argument that using different polling places for federal, state, and school district elections "increases confusion and enhances discrimination." ECF No. 568 ¶ 54. The Court similarly credited Dr. Barreto's opinion that using off-cycle elections tends to engender lower voter "awareness and information," and evidently believed this has the effect of disadvantaging the District's minority voters. *Id.* ¶ 53. And the Court found it significant to the Voting Rights Act that candidates who obtain political support from the District's Orthodox Jewish community find it substantially easier to collect the required number of signatures for nominating petitions than do candidates who reject Orthodox Jewish voters' support. *Id.* at 51 n. 48 (observing that while some "public school candidates" find collecting signatures "daunting," candidates supported by the Orthodox Jewish community are able to collect signatures "in one morning in the synagogue."). At least as to the June 9, 2020 election, where no petition signatures are necessary, no elections

10

are occurring according to ordinary schedules, and no polling places will be used, these concerns are non-existent.

The June 9, 2020 election required by the Governor's Executive Orders is *sui generis* and unprecedented in the District's history.  The District has never conducted elections by sending absentee ballots to all of the more than 60,000 eligible voters in the District.  The District has never before conducted elections in which candidates were not required to submit nominating petitions containing a specified number of signatures.  Nor has the District ever before conducted an election in a scenario where, as here, as a result of the Governor's "stay-at-home orders" and the omnipresence of an ongoing global pandemic, in-person campaigning and other ordinary political activities have been strictly prohibited.

How these unprecedented voting procedures and political circumstances may interact with local school board politics and community dynamics is anybody's guess.  It may be that the absentee ballot system results in record high voter turnout.  Or the opposite may occur, and record low numbers of voters may send their ballots back to the District by the deadline.  It may be that the temporary system results in overwhelming advantages for the District's minority voters.  The point is, nobody knows—not the District, not the Plaintiffs, and not the Court.  That uncertainty compels the conclusion that enjoining the election is inappropriate.  *See Mac Govern v. Connolly*, 637 F. Supp. 111, 116 (D. Mass. 1986) ("Equity demands that a federal court stay its hand when judicial relief makes no sense.  This action, in which the remedy sought would come at great cost and yield results that are at best uncertain and, at worst, perverse, is plainly such a case.  When the massive disruption to the political process of the Commonwealth is weighed against the harm to plaintiffs of suffering through one more election based on an allegedly invalid districting scheme, equity requires that we deny relief.").

Under these extraordinary circumstances, the Court's findings that caused it to conclude that the District's ordinary at-large elections violate Section 2 simply do not apply. The Court therefore lacks the detailed, hyper-local findings required to conclude that enjoining the June 9, 2020 election is both necessary and narrowly tailored to avoid a violation of a federal law. *See Harper v. City of Chi. Heights*, 223 F.3d 593, 601 (7th Cir. 2000) (district court may not preempt state election law "without either going through the statutorily required procedures for making such changes to electoral methods or making a judicial finding that it was necessary to make these changes in order to comply with federal law."). Accordingly, for this reason and for the equitable reasons already discussed, the Court's Order enjoining the June 9, 2020 election should be lifted and the election permitted to proceed according to the Governor's Executive Orders. After the District's appeal has run its course, the pandemic has abated, and public life has returned more or less to normal, the Court can revisit whether enjoining District elections is necessary and appropriate to ensure compliance with federal law.

## II. THIS COURT SHOULD STAY ITS ORDER REQUIRING A DISTRICTING PROPOSAL AND ALL OTHER PROCEEDINGS PENDING APPEAL.

In deciding whether to issue a stay pending appeal, district courts should generally "act and rely upon general equitable principles." *Goosby*, 981 F. Supp. at 763 (quoting *Reynolds*, 377 U.S. at 585). To guide that equitable analysis, the Second Circuit requires courts to consider four familiar factors: "(1) whether the stay applicant has made a strong showing that he is likely to succeed on the merits; (2) whether the applicant will be irreparably injured absent a stay; (3) whether the issuance of the stay will substantially injure the other parties interested in the proceeding; and (4) where the public interest lies." *U.S. Bank Nat'l Ass'n v. Triaxx Asset Mgmt LLC*, No. 16-cv-8507, 2020 WL 359907 at *1 (S.D.N.Y. Jan. 21, 2020) (citing *In re World Trade Center Disaster Site Litig.*, 503 F.3d 167, 170 (2d Cir. 2007)). When considering the above factors,

courts should implement a sliding scale, whereby "more of one excuses less of the other." *Gulino v. Bd of Edu. of City Sch. Dist. of City of New York*, No. 96-CV-8414 (KMW), 2019 WL 2454094 at *3 (S.D.N.Y. Jun. 12, 2019) (citing *Mohammad v. Reno*, 309 F.3d 95, 101 (2d Cir. 2002)).

### A. Factor 1: The Court's Decision Presents Several Issues of First Impression And Diverges Substantially from Other Voting Rights Act Cases.

The moving party may meet its burden on the first factor—likelihood of success on the merits—by showing "that the issue to be appealed is an issue of first impression in the circuit, or that district courts have disagreed on the issue." *New York Life Ins. Co. v. Singh*, No. 14CV5726NGSMG, 2017 WL 10187669, at *2 (E.D.N.Y. July 13, 2017) (citing *In re Klein Sleep Prod., Inc.*, No. 93 CIV. 7599 (CSH), 1994 WL 652459, at *1 (S.D.N.Y. Nov. 18, 1994) ("Because of the unsettled law on this issue, it is entirely possible that the Second Circuit could see fit to disagree with this Court and determine the issue differently.")); *see also Jock v. Sterling Jewelers, Inc.*, 738 F. Supp. 2d 445, 447 (S.D.N.Y. 2010) (granting stay pending appeal because "[w]hile this Court is still of the view that those asserted [precedents] were immaterial, the Court of Appeals may disagree, and for that reason alone the plaintiffs have sufficiently demonstrated a likelihood of success on the merits.").

A few examples of the ways in which this Court's decision presents issues of first impression or deviates from the holdings of other district courts in Voting Rights Act cases is sufficient to make the point that a stay is clearly warranted here.

*First*, as the Court recognized in its decision, it is the first ever in the history of the Voting Rights Act to consider expert opinion about the *Gingles* preconditions based on an analysis using Bayesian Improved Surname Geocoding ("BISG") estimates of voter race derived from surnames and addresses. ECF No. 568 ¶ 39. Not only did the Court embrace BISG despite its non-existent track record in Voting Rights Act litigation, the Court credited BISG to the complete exclusion of

13

the otherwise uniformly accepted, academically preferred method of analysis in Section 2 cases—ecological inference analysis using the United States Census Bureau's Citizen Voting Age Population ("CVAP") or Voting Age Population ("VAP") data. *Id.* at ¶¶ 30–33.

The Court afforded the traditionally accepted analysis using CVAP data absolutely *no weight* in its analysis of the *Gingles* preconditions. That is a remarkable departure from every other recent Voting Rights Act case in every jurisdiction of which we are aware. *E.g.*, *United States v. Vill. of Port Chester*, 704 F. Supp. 2d 411, 419–20 (S.D.N.Y. 2010) (requiring CVAP statistics); *Rodriguez v. Pataki*, 308 F. Supp. 2d 346, 369 (S.D.N.Y. 2004) (using CVAP data for EI); *Pope v. Cty. of Albany*, 94 F. Supp. 3d 302, 313 (N.D.N.Y. 2015) (using VAP data for EI).

Indeed, this Court's embrace of BISG was so complete, and its rejection of Dr. Alford's traditional analysis using CVAP data so unequivocal, that if the Court's analysis were to be generally accepted then no court would ever be able to rely on an expert analysis using CVAP data in any Voting Rights Act case ever again. That would make for sea-change in Voting Rights Act litigation and scholarship, and would beg the question why the United States Department of Justice and Census Bureau even bother collecting CVAP data anymore.[6] If expert analysis using BISG methodology is to be the new standard for Voting Rights Act cases, such that even its use by an expert witness who demonstrably does not understand how it works (ECF No. 568 at 17 n.19) is enough to completely negate contradictory expert opinion using the traditional method of analysis, the Second Circuit should first have an opportunity to evaluate for itself whether the BISG methodology can truly bear the full weight that this Court has placed on it.

*Second*, this Court's decision to fully adopt Dr. Barreto's heterodox views on the

---

[6]     *See*, United States Census, Citizen Voting Age Population By Race and Ethnicity, available at https://www.census.gov/programs-surveys/decennial-census/about/voting-rights/cvap.html.

unimportance of confidence intervals—to the complete exclusion and rejection of Dr. Alford's traditional approach to standards for political science research and statistical significance— similarly puts this Court at odds with literally every other court to consider the concept in a Voting Rights Act case. *Compare*, ECF No. 568 at ¶ 35 *with, e.g.*, *Mo. State Conf. of NAACP v. Ferguson-Florissant Sch. Dist.*, 201 F. Supp. 3d 1006, 1042 (E.D. Mo. 2016) ("EI estimates must include a confidence interval to determine whether the difference in the estimated support among candidates can be considered statistically significant"), *aff'd*, 894 F.3d 924 (8th Cir. 2018); *Montes v. City of Yakima*, 40 F. Supp. 3d 1377, 1404 n.5 (E.D. Wash. 2014) ("[T]he narrower the confidence interval, the more reliable the estimate; the broader the confidence interval, the less reliable the estimate."); *Terrebonne Parish Branch NAACP*, 274 F. Supp. 3d at 395, 433 n.228 (M.D. La. 2017) ("In addition to providing a point estimate, King's EI also provides a range of estimates within which one can be 95% confident that the actual value of the group's support for a candidate lies."); *Rodriguez*, 308 F. Supp. 2d at 399 (rejecting expert analysis for not reporting or relying on confidence intervals).

*Third*, the evidence at trial was undisputed that a majority of the District's white voters had regularly supported and elected minority candidates associated with the "private school" slates of candidates for the school board, to the same extent and degree as white candidates, and without variation in the amount or degree of support according to the race of the candidates. Other courts considering similar facts have held that such voting patterns negate any inference that minorities are excluded from political processes "on account of race," and that if elections are polarized, it must be caused by something other than race. *E.g.*, *League of United Latin Am. Citizens, Council No. 4434 v. Clements* (*LULAC*), 999 F.2d 831, 861 (5th Cir. 1993); *Reed v. Town of Babylon*, 914 F. Supp. 843, 876–878 (E.D.N.Y. 1996). This Court distinguished those cases on the basis

that they involved partisan elections (i.e., Democrats v. Republicans) as opposed to the non-partisan, but nevertheless politically divided elections in the District (private school v. public school). ECF No. 568 at ¶ 50.

It is not at all obvious from the Court's opinion why that difference amounts to a legally meaningful distinction, particularly given the evidence of competing slating processes at work in District politics that bear the hallmarks of traditional party affiliation. More importantly for present purposes, the Second Circuit has never had an opportunity to review a case presenting the same fact pattern presented here—*i.e.*, where minority candidates are regularly slated, supported, and elected by both competing sides in competitive elections. The issue of first impression warrants consideration by the Second Circuit and a stay pending appeal.

*Fourth*, the Court's analysis and conclusions under Senate Factor 7—"the extent to which members of the minority group have been elected to public office in the jurisdiction"—distinguish this case from any other voting rights case in this or any circuit. It was undisputed at trial that minority candidates after the 2019 election made up three of nine members of the Board (commensurate with their proportion of the population), that the board of education has always had substantial minority representation, and that minority candidates won 50% of all contested elections between 2013 and 2017. Nevertheless, the Court disregarded the election of every minority candidate, and held that Senate Factor 7 nevertheless favored Plaintiffs, because "every candidate of color who won was either perceived as 'safe' by the white slating organization or affected by special circumstance." ECF No. 568 at ¶ 72. Setting aside whether the Court's hazy presumption about the "perceptions" of nameless members of the so-called "white slating organization" have any foundation in the trial evidence (they don't), the Court's analysis reflects an unprecedented and dangerous expansion of the "safe candidate" doctrine.

The "safe candidate" doctrine reflects the concern that "majority citizens might evade § 2 by manipulating the election of a safe minority candidate" to avoid liability. *Thornburg v. Gingles*, 478 U.S. 30 at 75 (1986). That is not what the Court held happened in the District. Instead, the Court held that, for example, the repeated elections of minority candidates Bernard Charles and Pierre Germain should be disregarded, because they were "vetted" by members of the District's Orthodox Jewish community, and were elected because the Orthodox Jewish community "approved of their candidacy." ECF. No. 568 at ¶ 73. Some might call that "politics." The Court certainly did not find that any intent to avoid liability under Section 2 motivated support for Mr. Charles and Mr. Germain. In the Court's view, however, whenever in the District's history a minority candidate has earned political support from the "white community," (which in East Ramapo means Orthodox Jews) that fact by itself automatically makes the minority candidate a "safe candidate" whose electoral success can be ignored for purposes of Senate Factor 7. Indeed, the Court said so explicitly: "The election of a minority candidate is also discounted where whites preferred the minority candidate. . . ." ECF No. 568 at ¶ 71. That stunning assertion has no support in any precedent and, as an issue of first impression, clearly warrants a stay pending appeal.

*Finally*, despite acknowledging that binding precedent requires the Court to "give the Defendant jurisdiction the first opportunity to suggest a legally acceptable remedial plan, based on the theory that the judiciary should not intrude on legislative policy any more than necessary," (Jan. 30 Hr'g Tr. at 41:11–42:4), this Court ordered the District to propose only *one remedial plan*—a ward system. That does not truly give the District "the first crack at proposing a remedy," and tramples the traditional policy-making function of the legislature.[7] *See U.S. v. Vill. of Port*

_____

[7] The Court's order precludes the District from even considering, for example, widely accepted alternatives to ward voting such as cumulative voting, which courts have found viable as

17

*Chester*, 704 F. Supp. 2d 411, 448 (S.D.N.Y. 2010) ("Courts have also expressly applied deference to the defendant jurisdiction's remedial plan in cases involving local legislative bodies. Therefore, if the Village's proposal is legally acceptable remedy, the Court *must* accept it regardless of any alternative remedies proposed by Plaintiffs."); *see also Harper*, 223 F.3d at 599 ("When a Section 2 violation has been found, the district court "must, wherever practicable, afford the jurisdiction an opportunity to remedy the violation first, . . . with deference afforded the jurisdiction's plan if it provides a full, legally acceptable remedy.").

Whether the Court's Order directing the District to propose only the kind of remedial plan that Plaintiffs prefer is sustainable as a matter of law presents a question of first impression for the Second Circuit. And because the Court has ordered the District to comply with its potentially unlawful directive within just thirty days of the date of its decision, a stay pending appeal and consideration by the Second Circuit is especially appropriate here.

### B. Factor 2: The District Will Be Irreparably Harmed Absent A Stay.

Under the second factor, irreparable injury to movant must be "actual and imminent, and one that cannot be remedied if the party seeking the stay is granted relief on appeal." *Hizam v. Clinton*, No. 11 Civ. 7693(JCF), 2012 WL 4220498 at *6 (S.D.N.Y. Sept. 20, 2012). "The potential for irreparable injury should be evaluated taking into account the possibility that the ruling sought to be stayed is erroneous." *Id.* Generally, "because monetary injury can be estimated and compensated, the likelihood of such injury usually does not constitute irreparable harm." *Gulino*, 2019 WL 2454094, at *3 (citing *Centauri Shipping Ltd. v. W. Bulk Carriers KS et al.*, 528 F. Supp. 2d 186, 194 (S.D.N.Y. 2007)). "As an exception to this general rule, 'monetary injury

---

a remedy for violations of Section 2. *See, e.g.*, *Port Chester*, 704 F. Supp. at 448 ("There is no case law that rejects cumulative voting as a lawful remedy under the Voting Rights Act.").

may suffice to establish irreparable harm in situations 'where the party that might ultimately be ordered to pay the monetary damages is insolvent or facing imminent bankruptcy, or is in a perilous financial state." *Id.*

The District will be irreparably harmed absent a stay here. In order to implement the Order, the District will have to bear substantial costs and divert administrative and policy maker attention and resources, which will harm the public interest and irreparably harm the District and the school children who depend on it. *See id.* Those costs and diverted resources will be wasted if the District's appeal is successful. That is reason enough to defer the Court's Order until after the Second Circuit has spoken.

The Court in *Flores* explained that requiring a town to "develop and implement" a new voting system in approximately three and a half months would cause a massive burden— describing such an order requiring a "rush to develop a new system of town governance in a few short months" as "irresponsible." *Flores*, 382 F. Supp. 3d at 247. Just so here, where the Order requires the District to submit a remedial plan within 30 days of the May 25 Order—much less time than allotted in *Flores* (and during a national pandemic in which the District must also already administer an election). To comply, the District must hire an expert to perform studies on population demographics and redistricting proposals.[8] And it must expend considerable taxpayer resources to develop the new system—all at the opportunity cost of tending to other pressing District business, including continuing to respond to ever-changing educational circumstances wrought by the COVID-19 pandemic and State directives (like the Executive Order discussed

---

[8]      The information submitted by Mr. Cooper is hopelessly out of date and unusable to form legally supportable voting districts now that the Census Bureau's Post-2020 CVAP special tabulation has become available. *See* https://www.census.gov/programs-surveys/decennial-census/about/voting-rights/cvap/Post-2020-CVAP.html

above) in response to the public health crisis. Those opportunity costs are quintessential irreparable harms.

### C. Factor 3: Plaintiffs Will Not Be Substantially Harmed By A Stay Pending Appeal.

The third factor considers substantial harm to other interested parties, which is distinct from irreparable harm. *U.S. Bank Nat'l Ass'n*, 2020 WL 359907 at *4. Plaintiffs will not be substantially harmed if this Court imposes a stay of its order pending appeal. *Goosby* again is instructive. Despite finding that the at-large system used for electing members of the Town Board violated Section 2, the *Goosby* court refused to enjoin the upcoming election, and also granted a stay of its order directing the town to propose a new ward voting system pending resolution of the town's appeal. *Goosby*, 981 F. Supp. at 763. Judge Gleeson saw no harm to plaintiffs that would result from its stay order, explaining that "if plaintiffs prevail on appeal, there is nothing to prevent a special election to remedy the Section 2 violation." *Id.* The same is true here and the Court should reach the same result.

### D. Factor 4: The Public Interest Strongly Favors Staying The Court's Directive To Propose A Remedial Plan.

The Court has ordered the District to complete a remedial plan with nine separate wards and an undetermined amount of majority-minority districts in thirty days. This is—by far—the shortest deadline to create a Section 2 remedial plan the District has identified. *See Flores*, 382 F. Supp. 3d at 247 ("It took the *Goosby* court approximately nine months to develop and evaluate the final remedial plan. It took three months for Hempstead to submit proposals and five months for the district court to approve it."). To be able to comply with the Court's order to

complete a remedial plan within thirty days would require enormous diversion of District energy and resources at a time they cannot be spared.

The administrative burden of the Court's Order on the District had it required a *few months* to develop a remedial plan would have been steep under normal circumstances. And the current circumstances are anything but ordinary. As the Court is well aware, the COVID-19 pandemic continues to overwhelm public life: the State of New York remains under a state of emergency and the District's schools remain closed in favor of remote learning. The Court's Order, with one of the shortest deadlines for a remedial plan of which we are aware, during a national pandemic (of which the District is near the epicenter) needlessly burdens the District. The public interest thus strongly weighs in favor of staying a remedial plan until the exhaustion of the District's appellate rights.

## CONCLUSION

For all the foregoing reasons, the District respectfully requests that this Court enter an order (i) lifting the Court's Order enjoining the June 9, 2020 School Board election; and (2) staying all proceedings, including but not limited to the Court's directive to develop and implement a remedial plan, until the exhaustion of all appeals.

Dated: May 28, 2020

Respectfully submitted,

**MORGAN, LEWIS & BOCKIUS LLP**

s/ David J. Butler
David J. Butler
Randall M. Levine
101 Park Avenue
New York, NY 10178
T: (212) 309-6000
F: (212) 309-6001
         -and-
1111 Pennsylvania Avenue, NW
Washington, DC 20004

21

T: (202) 739-3000
F: (202) 739-3001
david.butler@morganlewis.com
randall.levine@morganlewis.com

William S.D. Cravens
Clara Kollm
1111 Pennsylvania Avenue, NW
Washington, DC 20004
T: (202) 739-3000
F: (202) 739-3001
william.cravens@morganlewis.com
clara.kollm@morganlewis.com

*Counsel for Defendant East Ramapo Central
School District*