UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

---

NATIONAL ASSOCIATION FOR THE
ADVANCEMENT OF COLORED PEOPLE,
SPRING VALLEY BRANCH; JULIO
CLERVEAUX; CHEVON DOS REIS; ERIC
GOODWIN; JOSE VITELIO GREGORIO;
DOROTHY MILLER; HILLARY MOREAU;
and WASHINGTON SANCHEZ,

                     Plaintiffs,

     v.

EAST RAMAPO CENTRAL SCHOOL
DISTRICT and MARYELLEN ELIA, IN HER
CAPACITY AS THE COMMISSIONER OF
EDUCATION OF THE STATE OF NEW
YORK,

                    Defendants.

17 Civ. 8943 (CS) (JCM)

---

## MEMORANDUM OF LAW IN SUPPORT OF PLAINTIFFS' OPPOSITION TO THE DISTRICT'S EMERGENCY MOTION TO STAY DECISION AND ORDER PENDING APPEAL

# TABLE OF CONTENTS

**Page**

INTRODUCTION ..................................................................................................................1

BACKGROUND .................................................................................................................3

ARGUMENT ......................................................................................................................4

I.      Legal Standard .......................................................................................................4

II.     There Is No Basis to Lift The Injunction of the June 9, 2020 Election ..............4

      A.      The Court Is Permitted To Enjoin The June 9 Election...........................6

      B.      The District's Speculation That Absentee Voting Might Mitigate Its
            Discriminatory At-Large Election Is Entitled To No Weight..............................11

III.    The Court Should Not Stay Its Order Requiring A redistricting Proposal Or Any
      Further Proceedings Pending Appeal.................................................................13

      A.      Factor 1: The District Is Not Likely To Succeed On The Merits. ........13

            1.      The District's Arguments Regarding BISG Present Factual, Not
                  Legal, Questions .......................................................................14

            2.      The District Misinterprets The Court's Findings Regarding
                  Confidence Intervals ................................................................16

            3.      The Court Correctly Determined That The Election of Minorities
                  Did Not Negate The Inference That Minorities Are Excluded on
                  Account of Race..........................................................................17

            4.      The Court Correctly Determined That Trial Evidence Showed
                  Manipulation Of Elections To Elect "Safe" Candidates..........................18

            5.      The Court's Remedy Is Appropriate........................................20

      B.      Factor 2: The District Will Not Be Irreparably Harmed Absent A Stay. ..............21

      C.      Factor 3: A Stay Would Irreparably Harm Minority Voters In The District. ........23

      D.      Factor 4: The Public Interest Weighs In Favor Of Protecting Minorities'
             Rights As Enshrined In The Voting Rights Act...................................................24

CONCLUSION....................................................................................................................25

**TABLE OF AUTHORITIES**

**Page(s)**

**CASES**

*Am. Federated Title Corp. v. GFI Mgmt. Servs., Inc.*,
716 F. App'x 23 (2d Cir. 2017) ........................................13

*Arbor Hill Concerned Citizens Neighborhood Ass'n v. Cty. of Albany*,
281 F. Supp. 2d 436 (N.D.N.Y. 2003)................................5

*Centauri Shipping Ltd. v. W. Bulk Carriers KS*,
528 F. Supp. 2d 186 (S.D.N.Y. 2007)...............................21

*" Charles H. Wesley Educ. Found., Inc. v. Cox*,
408 F.3d 1349 (11th Cir. 2005) .......................................24

*Colon-Marrero v. Conty-Perez*,
703 F.3d 134 (1st Cir. 2012)...............................................8

*Covington v. North Carolina*,
2018 WL 604732 (M.D.N.C. Jan. 26, 2018) ....................24

*Eisemann v. Herbert*,
401 F.3d 102 (2d Cir. 2005)...............................................11

*Feldman v. Ariz. Sec'y of State's Office*,
843 F.3d 366 (9th Cir. 2016) (en banc) ................5, 6, 7, 9

*Fish v. Kobach*,
189 F. Supp. 3d 1107 (D. Kan.), *aff'd*, 840 F.3d 710 (10th Cir. 2016) ............5, 25

*Flores v. Town of Islip*,
382 F. Supp. 3d 197 (E.D.N.Y. 2019) ..........................7, 8

*Frank v. Waller*,
574 U.S. 929 (2014)...........................................................8

*Georgia Coal. for People's Agenda, Inc. v. Kemp*,
347 F. Supp. 3d 1251 (N.D. Ga. 2018)............................25

*Gingles*,
478 U.S. 30 (1986)............................................................19

*Goosby*,
2000 WL 194686 (E.D.N.Y. Feb. 18, 2000)....................23

ii

*Goosby v. Town Bd. of Hempstead*,
    180 F.3d 476 (2d Cir. 1999)........................................................................18

*Goosby v. Town Bd. of Hempstead*,
    981 F. Supp. 751 (E.D.N.Y. 1997), *aff'd*, 180 F.3d 476 (2d Cir. 1999)...........................9, 23

*Goosby v. Town Bd. of the Town of Hempstead*,
    956 F. Supp. 326 (E.D.N.Y. 1997), *aff'd sub nom. Goosby v. Town Bd. of Town of Hempstead, N.Y.*, 180 F.3d 476 (2d Cir. 1999)........................................20

*Harding v. Fed. Reserve Bank of New York*,
    707 F.2d 46 (2d Cir. 1983)........................................................................23

*Harper v. City of Chicago Heights*,
    223 F.3d 593 (7th Cir. 2000) ...................................................................12

*Hilton v. Braunskill*,
    481 U.S. 770 (1987)........................................................................4, 20, 23

*Husted v. Ohio State Conf. of N.A.A.C.P.*,
    573 U.S. 988 (2014)........................................................................8

*Konst v. State of N.Y.*,
    No. 92-cv-615E(H), 1992 WL 281092 (W.D.N.Y. Oct. 7, 1992) ...........................8

*Mac Govern v. Connolly*,
    637 F. Supp. 111 (D. Mass. 1986) ...........................................................12

*Malarkey v. Texaco, Inc.*,
    794 F. Supp. 1248 (S.D.N.Y. 1992)........................................................21

*N. Carolina v. League of Women Voters of N. Carolina*,
    574 U.S. 927 (2014)........................................................................8

*New York Life Ins. Co. v. Singh*,
    No. 14CV5726NGSMG, 2017 WL 10187669 (E.D.N.Y. July 13, 2017) ...........................14

*Newsom ex rel. Newsom v. Albermarle Cty. Sch. Bd.*,
    354 F.3d 249 (4th Cir. 2003) ...................................................................24

*North Carolina v. Covington*,
    138 S. Ct. 2548 (2018)........................................................................20, 25

*NRDC v. United States FDA*,
    884 F. Supp. 2d 108 (S.D.N.Y. 2012)........................................................4, 22

*Optimum Shipping & Trading v. Prestige Marine Servs. Pte.*,
    613 F. Supp. 2d 502 (S.D.N.Y. 2009)........................................................4

*Patino v. City of Pasadena,*
    229 F. Supp. 3d 582 (S.D. Tex. 2017) ...................................................................24

*Personhuballah v. Alcorn,*
    155 F. Supp. 3d 552 .............................................................................................24

*Pope v. Cty. of Albany,*
    687 F.3d 565 (2d Cir. 2012)...........................................................................14, 16

*Pope v. Cty. of Albany,*
    94 F. Supp. 3d 302 (N.D.N.Y. 2015) .......................................................16, 20, 25

*Purcell v. Gonzalez,*
    549 U.S. 1 (2006) ...................................................................................................6

*Republican Nat'l Comm. v. Democratic Nat'l Comm.,*
    140 S. Ct. 1205 (2020) ...........................................................................................6

*Reynolds v. Sims,*
    377 U.S. 533 (1964).................................................................................6, 24, 25

*Rodriguez v. Pataki,*
    308 F. Supp. 2d 346 (S.D.N.Y. 2004)...................................................................16

*S.W. Voter Registration Education Project v. Shelley,*
    344 F.3d 914 (9th Cir. 2003) .................................................................................8

*Schoolcraft v. City of New York,*
    298 F.R.D. 134 (S.D.N.Y. 2014) ...........................................................................4

*Silberberg v. Bd. of Elections of the State of New York,*
    216 F. Supp. 3d 411 (S.D.N.Y. 2016)...................................................................7

*Terrebonne Par. Branch NAACP v. Jindal,*
    274 F. Supp. 3d 395 (M.D. La. 2017)...................................................................19

*United States v. Charleston Cty.,*
    316 F. Supp. 2d 268 (D.S.C. 2003), *aff'd sub nom. United States v. Charleston
    Cty., S.C.,* 365 F.3d 341 (4th Cir. 2004) ............................................................19

*United States v. City of Eastpointe,*
    378 F. Supp. 3d 589 (E.D. Mich. 2019)................................................................14

*United States v. Vill. of Port Chester,*
    704 F. Supp. 2d 411 (S.D.N.Y. 2010)...................................................................16

*United Union of Roofers v. A.W. Farrell & Son, Inc.,*
    547 F. App'x 17 (2d Cir. 2013) .............................................................13, 17, 18

*Veasey v. Abbott,*
    830 F.3d 216 (5th Cir. 2016) (en banc) ................................................................8

*Vt. Microsystems, Inc. v. Autodesk, Inc.,*
    88 F.3d 142 (2d Cir. 1996) ................................................................18

*Zimmer v. McKeithen,*
    485 F.2d 1297 (5th Cir. 1973) ................................................................18

## STATUTES

N.Y. Pub. Off. L. § 5 ................................................................3, 9

Voting Rights Act § 2 ................................................................ *passim*

## OTHER AUTHORITIES

Board Policy 2351 – Quorum, available at
    https://www.ercsd.org/site/handlers/filedownload.ashx?moduleinstanceid=53
    &dataid=624&FileName=2351---Quorum.pdf ................................................................3

NASSAU COUNTY BOARD OF ELECTIONS, ELECTION RESULTS,
    https://www.nassaucountyny.gov/571/Election-Results (showing election
    results for Nov. 5, 2019) ................................................................10

## INTRODUCTION

After a more than four-week trial that included testimony from thirty-one witnesses and the introduction of hundreds of exhibits, this Court found that the District's at-large election system disenfranchised minority voters in violation of Section 2 of the Voting Rights Act. The Court supported its holding with 77 pages of careful analysis, including detailed credibility findings. The District, dissatisfied with that result, asks this Court to gut its own order, allowing the District to continue holding elections under its discriminatory procedure and to relieve the District of its obligation to remedy the ongoing harm. There is no basis in the law to grant the District's requests.

First, the District asks the Court to lift its injunction of the June 9, 2020 election. But the District cannot establish a likelihood of success on the merits. Nor does the balance of harms favor the District. The Court's power to enjoin an election that violates the Voting Rights Act ("VRA") is clearly established under federal law and amply supported by the facts of this case. Although the District cites a handful of cases where courts, under peculiar facts, elected not to enjoin discriminatory laws before an imminent election, none of the concerns raised in those cases are present here. Specifically, there is no risk that the injunction will cause voter confusion or cause undue administrative burden. This Court's injunction merely maintains the status quo until the violation can be remedied. No significant confusion will result if the District conducts the election as currently planned by sending out the ballots it has already printed, counts the votes cast in the budget and the uncontested library trustee elections that are not impacted by the Court's injunction, but treats any Board votes as nullified by the injunction. In addition, it would be a simple matter to eliminate any confusion altogether by, as this Court suggests, including a postcard with the ballots informing the voters of that procedure.

Contrary to the District's claims, the real danger here is that the District be given the opportunity to count the Board election ballots and install a new Board based on an "election" that

the vast majority of residents undoubtedly already believe has been enjoined. Voters who have been made aware of the Court's widely publicized injunction may believe they should not cast ballots for Board seats. Unlike the District's speculative harm, that harm is real, and it would fall most squarely on the District's black and Latino voters, who do not share in the informational benefits of the exclusionary white slating organization. Finally, the District's argument that the absentee ballot process, mandated by the governor in response to COVID-19, might magically cure the discriminatory effect of the at-large voting system using numbered posts, years of highly polarized voting, and the dominance of an exclusive slating organization, among other factors, is unsupported by any evidence and is entitled to no weight.

Second, the District asks the Court to stay the District's obligation to begin fashioning a remedial ward plan. Once again, there is no support in the law for that request. The District's inability to show a likelihood of success on the merits is demonstrated by the District's vain attempt to recast several of the Court's factual findings—all of which involve careful weighing of the evidence and credibility determinations and are entitled to great deference from an appellate court—as novel legal matters of first impression. Moreover, the balance of harms favors Plaintiffs. The District's claim of undue expense and administrative burden if it were required to proceed with formulating a remedy does not qualify as irreparable harm under the law. In contrast, letting the District delay the remedy, perhaps for several years while it takes an appeal, would deprive Plaintiffs and the District's minority voters of their fundamental right to participate in the political process. Plaintiffs would lose the opportunity forever to have their voices heard in the next several elections. For the same reasons, the public interest weighs heavily against issuing a stay.

**BACKGROUND**

Plaintiffs filed this lawsuit, seeking injunctive relief, on November 16, 2017, *see* ECF No. 1. The Court is well aware of the District's many attempts to delay and deflect this case. For example, the District refused to provide three Board Members for a deposition for almost two years, including unsuccessfully appealing this Court's order to the Second Circuit, *see, e.g.*, ECF No. 430, and refusing to comply with discovery orders and repeatedly failing to meet discovery deadlines. *See, e.g.*, ECF No. 439. Then, at trial, the District put up a parade of witnesses with, to put it mildly, "credibility problems," including the President of the Board, who this Court called "one of the more incredible witnesses" the Court had encountered. *See* D&O ¶ 38-43.[1]

Now, rather than submit to this Court's May 26, 2020 Decision and Order (the Court's "Decision") to maintain the status quo while the case proceeds to the remedial phase to develop an election plan that will prevent further vote dilution in the future, the District makes one last desperate attempt to avoid a fair election. Under this Court's Decision, all current Board Members will remain in their seats – ensuring that Board business will proceed uninterrupted – for the brief time it will take to fashion a new electoral plan that does not violate the VRA.[2] Likewise, the District can send its already printed 2020 ballots, tabulate the results of the budget vote and the

---

[1] For ease of reference, "D&O" refers to the Court's Decision and Order filed at ECF No. 568; "Mot." refers to the District's Memorandum of Law in Support of Emergency Motion to Stay filed at ECF No. 572; "PFOFCOL" refers to Plaintiffs' Proposed Findings of Fact and Conclusions of Law filed at ECF No. 556; "JPTO" refers to the Parties' Joint Pre-Trial Order filed at ECF No. 458; and "Tr." refers to the trial transcript, excerpts of which are provided as Exhibit 2.

[2] The District posits that an election is needed to allow the Board to function in the event of a stay pending appeal. This argument is creative, but circular, since it is the District that seeks such a stay. Moreover, it is wrong. First, under state law, the incumbent Board members up for election would hold over. See N.Y. PUB. OFF. LAW. § 5. Second, even if all four Board members currently up for election were removed, the Board could continue to act with a five-member quorum. *See* Ex. 1, Board Policy 2351 – Quorum, available at https://www.ercsd.org/site/handlers/filedownload.a shx?moduleinstanceid=53&dataid=624&FileName=2351---Quorum.pdf.

uncontested vote for library trustee, and disregard any votes for the four Board seats until it has remedied the discriminatory election procedures that affect those races.

## ARGUMENT

### I.    LEGAL STANDARD

In considering a motion to stay pending appeal, courts consider the following factors: (1) whether the movant has made a strong showing of likelihood to succeed on the merits of the appeal; (2) whether the movant will be irreparably harmed absent a stay; (3) whether issuance of the stay will substantially injure the other parties interested in the proceeding; and (4) the weight of the public interest in granting or denying a stay. *See Hilton v. Braunskill*, 481 U.S. 770, 776 (1987). The movant's "burden of establishing a favorable balance of these factors is a heavy one and more commonly stay requests will be denied." *Optimum Shipping & Trading v. Prestige Marine Servs. Pte.*, 613 F. Supp. 2d 502, 503 (S.D.N.Y. 2009) (internal citations and quotations omitted). A "stay[] pending appeal … should be extraordinary." *See NRDC v. United States FDA*, 884 F. Supp. 2d 108, 124 (S.D.N.Y. 2012) (internal citations and quotations omitted). For all of the reasons below, the District has failed to demonstrate that it is entitled to a stay of the Court's injunction of the June 9, 2020 election or a stay pending appeal of the Court's decision requiring a remedial plan.

### II.    THERE IS NO BASIS TO LIFT THE INJUNCTION OF THE JUNE 9, 2020 ELECTION

In asking the Court to lift its injunction of the June 9, 2020 election, the District fails even to address – let alone satisfy – the standard for seeking a stay.[3] *See* Mot. at 1, 5-10. If it had, it

---

[3] To the extent the District seeks reconsideration of this Court's Decision, the District cannot, and indeed has not even attempted, to meet its high burden on such a motion. *See Schoolcraft v. City of New York*, 298 F.R.D. 134, 136 (S.D.N.Y. 2014) ("[T]he party moving for reconsideration [must] demonstrate[] an intervening change in controlling law, the availability of new evidence,

would have been immediately clear that each of the four equitable factors counsels ***against*** lifting the injunction.

First, the District is unlikely to succeed on the merits because the District is simply wrong when it asserts a blanket prohibition against discriminatory practices on the eve of an election. Indeed, it is entirely appropriate for a court to enjoin even statewide laws that violate the VRA in advance of imminent elections. *See, e.g.*, *Feldman v. Ariz. Sec'y of State's Office*, 843 F.3d 366, 368 (9th Cir. 2016) (en banc).

Second, as shown in more detail below, the District has identified no irreparable harm, let alone sufficient harm to outweigh "the risk of thousands of otherwise eligible voters being disenfranchised." *Fish v. Kobach*, 189 F. Supp. 3d 1107, 1151 (D. Kan.), *aff'd*, 840 F.3d 710 (10th Cir. 2016).

Third, if anyone will suffer irreparable harm, it is Plaintiffs who face irreparable injury in the event of a stay. As this Court found, Plaintiffs have endured an illegal election mechanism throughout the pendency of this case, and should not be required to endure yet another election that deprives them of their constitutional rights.

Finally, the public interest is in favor of enforcing the rights enshrined in the Voting Rights Act. *See Arbor Hill Concerned Citizens Neighborhood Ass'n v. Cty. of Albany*, 281 F. Supp. 2d 436, 456-57 (N.D.N.Y. 2003) ("[O]n balance the deprivation of the rights of blacks and Hispanics to exercise their vote and participate in the political process outweigh[s] any disruption to the electoral process").

---

or the need to correct a clear error to prevent manifest injustice. Reconsideration of a court's prior order . . . is an extraordinary remedy to be employed sparingly in the interests of finality and conservation of scarce judicial resources.") (internal citations and quotations omitted).

### A.     The Court Is Permitted To Enjoin The June 9 Election.

The District first argues that the Court should stay its injunction of the June 9, 2020 Board elections because that injunction was issued too close to the election. Mot. at 5-10. The District is wrong. "At the outset, it is important to remember that the Supreme Court in *Purcell* did not set forth a *per se* prohibition against enjoining voting laws on the eve of an election." *Feldman*, 843 F.3d at 368 (granting injunction two days before the November 2016 elections). Indeed, the Supreme Court has said "it would be the unusual case in which a court would be justified in not taking appropriate action to insure that no further elections are conducted under the invalid plan." *Reynolds v. Sims*, 377 U.S. 533, 585 (1964). Here, the District's voting system has already been adjudged illegal. As the *Reynolds* Court recognized, the appropriate remedial step is to bar any further elections until the violation has been remedied.

None of the cases cited by the District suggest otherwise. First, those cases involved circumstances that risked voter confusion, which is not a factor that is present here. In its recent decision in the *Republican National Committee* case, the Supreme Court sought to avoid "judicially created confusion" resulting from an injunction that changed the voting rules, five days before a statewide primary election, to extend the deadline by which voters were allowed to mail in their absentee ballots. *Republican Nat'l Comm. v. Democratic Nat'l Comm.*, 140 S. Ct. 1205, 1207 (2020). Unlike here, that injunction had the added problem of requiring the district court to issue a gag order prohibiting the public release of election results, even by non-parties, during the six day extension, which otherwise could "gravely affect the integrity of the election process." *Id.* The *Purcell* Court was itself moved by similar concerns. There, the Supreme Court worried that an injunction close to the election that changed identification requirements at the polls would result in "voter confusion and consequent incentive to remain away from the polls." *Purcell v. Gonzalez*, 549 U.S. 1, 5 (2006). The other cases where such injunctions have issued involved similar facts

indicative of a significant risk of voter confusion, which is not present here. *See also, e.g.*, *Silberberg v. Bd. of Elections of the State of New York*, 216 F. Supp. 3d 411, 421 (S.D.N.Y. 2016); *Flores v. Town of Islip*, 382 F. Supp. 3d 197, 250 (E.D.N.Y. 2019).

But none of those concerns about voter confusion are present here. As the District notes, the June 9, 2020 election will ask voters to decide three issues: (1) election of four open Board Member seats; (2) election of the library trustee; and (3) approval of the District's budget for the 2020-21 fiscal year. Mot. at 2. All the District needs to do is mail the ballots it has already printed, count the votes for the budget and the library trustee, and disregard any votes cast for the Board Member seats. If the District truly wants to mitigate any possibility of confusion, it could mail out postcards, as the Court suggested, either in advance of the election or enclosed with the ballot informing the voters that they need only cast votes for the budget and library trustee as the Board elections have been enjoined by the Court's Decision and will not be counted. Indeed, now that it is public knowledge that the Board elections have been enjoined because they violate the VRA, it is the District's request to forge ahead with an illegal election that risks causing confusion: voters who have heard the extensive publicity regarding the injunction could fail to mark their ballots for the Board election because they believe those elections to be enjoined. That confusion would likely fall heaviest on the minority communities who do not have access to the dominant slating organization. *See Feldman*, 843 F.3d at 368 (declining to stay an injunction that would "not confuse election officials or deter people from going to the polls").

Second, enjoining the June 9, 2020 election does not invoke concerns regarding administrative burdens that animated the decisions in the other cases cited by the District. This case is easily distinguishable from *Flores v. Town of Islip*, where the district court declined to issue a *preliminary injunction* because plaintiffs failed to demonstrate a substantial likelihood of success

on the merits and "not only wanted [the court] to suspend any future election using the current system but [also] want[ed] the Court to craft its own temporary system." 382 F. Supp. 3d 197, 245, 248 (E.D.N.Y. 2019). The *Islip* court also noted that the plaintiffs' proposed relief would have cut short the terms of half of the Town councilmembers after only two years of their four years terms. *Id.* at 249. Another case the District cites, *S.W. Voter Registration Education Project v. Shelley*, is also easily distinguishable because a preliminary injunction suspending a statewide recall election for the governor in California, the most populous state in the country, until numerous counties implemented new voting technology is in no way comparable to an injunction after trial suspending an election for four seats on a single school board. 344 F.3d 914, 919 (9th Cir. 2003).[4] In *Shelley*, the Ninth Circuit declined to enjoin a statewide election on a preliminary injunction issued two months earlier where "enormous resources" had already been invested to "prepare voter information pamphlets and sample ballots, mail absentee ballots, and hire and train poll workers." *Id.* at 916, 919.

---

[4] Several other cases cited by the District similarly involved complex statewide or territory-wide elections. *See, e.g.*, *Konst v. State of N.Y.*, No. 92-cv-615E(H), 1992 WL 281092, at *1 (W.D.N.Y. Oct. 7, 1992) (denying pro se plaintiff's motion for injunctive relief for upcoming federal elections based on claim that state congressional apportionment plan was unconstitutional); *Frank v. Waller*, 574 U.S. 929 (2014) (vacating a stay of the district court's injunction against enforcing a statewide photo ID law while the petition for certiorari was pending); *Colon-Marrero v. Conty-Perez*, 703 F.3d 134, 136 (1st Cir. 2012) (declining to issue injunction eighteen days before general election "ordering the immediate reinstatement of the more than 300,000 voters [in Puerto Rico] who had been stricken from the registration roll"); *Husted v. Ohio State Conf. of N.A.A.C.P.*, 573 U.S. 988, 988 (2014) (vacating preliminary injunction against statewide law reducing early in-person voting by one week); *N. Carolina v. League of Women Voters of N. Carolina*, 574 U.S. 927, 927 (2014) (staying preliminary injunction against statewide omnibus law imposing voter ID requirements, reductions to early voting, eliminating same-day voter registration, and barring votes cast in the wrong precinct from being counted at all); *Veasey v. Abbott*, 830 F.3d 216, 270 (5th Cir. 2016) (en banc) (directing district court to fashion remedial measure to address a finding that a statewide voter ID law was discriminatory).

Here, by contrast, there is no such interference with the District's election machinery or waste of resources. None of the incumbent Board Members' proposed terms would be cut short; in fact, their terms would extend until a special election can be held under a ward system that complies with the Voting Rights Act. *See* N.Y. PUB. OFF. LAW § 5 ("Every officer . . . having duly entered on the duties of his office, shall . . . hold over and continue to discharge the duties of his office, after the expiration of the term for which he shall have been chosen, until his successor shall be chosen and qualified"). Indeed, absent the June 9, 2020 Board Member election, the status quo would continue to operate in the District until a special election is held. There would be no disruption to the administration of the schools in the District. Further, the District is still able to mail out the very same ballots it has already printed for the election. The District simply need not tabulate any votes it receives for the Board seats. The only additional step the District may wish to take is, as this Court suggested, sending a postcard along with the ballot to explain the status of the Board election. Therefore, contrary to the District's claims, its "election machinery" will not be interrupted. Mot. at 8; *Feldman*, 843 F.3d at 368 (upholding a last-minute election-related injunction on the grounds that the injunction would "not affect the state's election processes or machinery" because the normal election processes would "continue unaltered," and would not "have any effect on voters themselves, on the conduct of election officials at the polls, or on the counting of ballots.").

The District also relies on *Goosby* for the proposition that allowing the June 9, 2020 elections to go forward would not harm minority voters in the District. Mot. at 9-10. As an initial matter, *Goosby* did not announce a *per se* rule against enjoining imminent elections. The concern that the *Goosby* court noted on the record was that the plaintiffs' ***request for an injunction*** was filed only two months before the relevant election was scheduled to take place. *See Goosby v.*

9

*Town Bd. of Hempstead*, 981 F. Supp. 751, 762 (E.D.N.Y. 1997) (noting that plaintiffs moved for a preliminary injunction on September 16, 1997 to enjoin an election scheduled for November 7, 1997), *aff'd*, 180 F.3d 476 (2d Cir. 1999). That concern is not present in this case, where Plaintiffs have consistently sought to enjoin the next scheduled election since the filing their complaint in November 2017. Moreover, the District's comparisons to *Goosby* and *Islip* are inapt because of the significant differences between town and school district elections. Town elections are partisan elections, run by the county board of elections, concurrently with elections for other state and county offices. For example, in the November 2019 election, voters in the Town of Hempstead were eligible to vote in county-wide contests for Supreme Court justice and District Attorney, county legislature, county court and district court justice, and Supervisor, Town Clerk, and Councilmembers for the Town of Hempstead. NASSAU COUNTY BOARD OF ELECTIONS, ELECTION RESULTS, https://www.nassaucountyny.gov/571/Election-Results (showing election results for Nov. 5, 2019). By contrast, the District runs its own non-partisan elections, which are not generally concurrent with any other local, state or federal elections—meaning that its operations are not in any way intertwined with the operations of the Rockland County Board of Elections or other election authorities or any political parties. JPTO § VII.B.4-5; PX 257 (30(b)(6) Deposition 16:17-22; 33:20-34:5).[5] That complexity does not exist here.

Finally, the possibility of an injunction comes as no surprise to the District. Plaintiffs requested the injunction over two years ago. In October 2019, after the close of discovery, Plaintiffs asked the Court to set a trial date "in light of the upcoming May 2020 School Board

---

[5] Although this year, as a result of the executive order, East Ramapo elections have been consolidated with the election for trustee of the library district, the library trustee race is uncontested. *See* ECF No. 572-1, Ex. A (showing Denet Alexandre as sole candidate for Trustee of the Finkelstein Memorial Library)

elections." ECF No. 434 at 1. On November 6, 2019, more than six months before the injunction

issued, the Court set a trial date that would allow for injunctive relief in advance of the 2020

election. And after closing arguments on March 24, 2020, the Court indicated to the parties that

the opinion and order would issue before the election. *See* Ex. 2, Tr. 2912:20-22. The District's

failure to take any steps to prepare for or mitigate the effect of a potential injunction, despite having

notice, is a problem of its own making and does not justify the extraordinary remedy of this Court

lifting the injunction that it just issued.[6]

### B. The District's Speculation That Absentee Voting Might Mitigate Its Discriminatory At-Large Election Is Entitled To No Weight.

The District's Motion brazenly seeks to perpetuate the exact same discriminatory system

for the June 9, 2020 election that this Court has determined clearly violates the VRA without

identifying any reason why this election would be different than the others. The closest the District

comes to even trying is to speculate through attorney argument that absentee voting necessitated

by the COVID-19 pandemic might fortuitously mitigate the District's discriminatory election

procedures. The District provides no evidence in support of that speculation and no explanation

for how absentee balloting would, for example, decrease racially polarized voting or provide

minority voters with fair access to the dominant slating organization. Indeed, the District expressly

acknowledges that it is just speculating. *See* Mot. at 11 (How the absentee balloting may affect the

election "is anybody's guess"). Such speculation is entitled to no weight. *See, e.g.*, *Eisemann v.*

---

[6] The District could have taken several measures to prepare for this outcome, including printing the Board election-related material on a separate, detachable page of the ballot, informed the Court of any potential deadlines by which the District needed to take certain steps, and, as the Court suggested in its May 28, 2020 Order, could have created a website to inform the voters of the Court's impending decision or mailed out postcards.

*Herbert*, 401 F.3d 102, 109 (2d Cir. 2005) ("This theory also rests on speculation . . . and fails for lack of any support in the evidence.").

Moreover, the District cites no law or precedent requiring the Court to engage in an ongoing election-by-election analysis after making a finding that a particular election method violates the VRA. That is because there is none. And the cases cited by the District do not establish one. *Mac Govern v. Connolly*, 637 F. Supp. 111 (D. Mass. 1986), which the District cites on page 11 of its Motion, did not concern an injunction issued after a trial on the merits, but instead an order on a motion to dismiss. In contrast, this Court found that the District's at-large election system violated the VRA after a full and detailed trial on the merits.

*Harper v. City of Chicago Heights*, 223 F.3d 593 (7th Cir. 2000), which the District cites on page 12 of its Motion, is likewise inapposite. That case did not even involve a challenge to an enjoined election. Rather, the portion of the opinion cited by the District involved a challenge to the cumulative-voting remedy imposed by the district court to remedy a Section 2 violation. The appellate court vacated the remedy because the district court failed to make any findings that the several alternative methods already provided for under Illinois law would not have been sufficient to remedy the Section 2 violation. Here, in contrast, New York law provides for one method of electing school board members—at-large elections—and the Court thoroughly analyzed that method and found that it violated Section 2 of the VRA.

At its core, the District's argument that it should be allowed to continue holding at-large elections until "the pandemic has abated, and public life has returned more or less to normal" is a craven attempt to use the COVID-19 crisis to delay justice and perpetuate its discriminatory practices. That argument is without evidence and without merit and it should be soundly rejected.

### III.    THE COURT SHOULD NOT STAY ITS ORDER REQUIRING A REDISTRICTING PROPOSAL OR ANY FURTHER PROCEEDINGS PENDING APPEAL

Nor should this Court stay its order requiring the District to devise a remedial plan. Such a stay would impose irreparable harm on Plaintiffs with no countervailing benefit: the District is unlikely to prevail on the merits of its appeal, and the costs of devising a remedial plan are minor when compared with the costs that the District has already borne in litigating this case for the last two and a half years. This Court has issued a final determination on the merits that the District's at-large voting system is against the law. A stay of remedial proceedings would accomplish nothing but the perpetuation of an adjudged violation of law, and should be denied.

#### A.    Factor 1: The District Is Not Likely To Succeed On The Merits.

The District argues that this case will present legal issues of first impression on appeal. Mot. at 13. That is incorrect. The District simply "attempts to recast disagreements with many of the District Court's factual findings as errors of law." *Am. Federated Title Corp. v. GFI Mgmt. Servs., Inc.*, 716 F. App'x 23, 28 (2d Cir. 2017). The District is forced to do so because the evidence it marshalled at trial was weighed and rejected by this Court in its capacity as factfinder. The District's effort is unlikely to succeed, as the Second Circuit "accord[s] the district court considerable discretion in assigning weight to competing evidence, and we will not reverse unless the evidence, as a matter of law, compelled a different conclusion from that reached." *United Union of Roofers v. A.W. Farrell & Son, Inc.*, 547 F. App'x 17, 20 (2d Cir. 2013). "In reviewing findings for clear error, [an appellate court is] not allowed to second guess either the trial court's credibility assessments or its choice between competing inferences . . . . This is so even if [the appellate court] might have weighed the evidence differently." *Id.*

Stripped of its baseless assertions regarding errors of law, the District's arguments regarding the facts merely "rehash[] arguments that have been rejected by this court multiple

13

times." *New York Life Ins. Co. v. Singh*, No. 14CV5726NGSMG, 2017 WL 10187669, at *2 (E.D.N.Y. July 13, 2017). "To make out a 'strong showing' of likely success, a party seeking a stay must do more than simply reiterate arguments with which the court has already disagreed." *Id.* All the District has done here is reiterate its prior arguments.

        1.    <u>The District's Arguments Regarding BISG Present Factual, Not Legal, Questions</u>

The District misstates both the facts and the law in claiming that the Court improperly relied on BISG to the exclusion of CVAP. As an initial matter, the District is wrong to say that the Court's decision "is the first ever in the history of the Voting Rights Act to consider expert opinion about the *Gingles* preconditions based on an analysis using Bayesian Improved Name Geocoding." Mot. at 13 (citing D&O ¶ 39). As this Court already recognized, "[a]t least one other court has found such evidence [i.e., BISG,] reliable enough to be admitted in a bench trial involving a Section 2 challenge to an at-large voting system." D&O ¶ 39 (citing *United States v. City of Eastpointe*, 378 F. Supp. 3d 589, 612-13 (E.D. Mich. 2019)).[7]

This Court properly found as a matter of fact that an expert opinion rooted in BISG analysis persuasively demonstrated that the District's at-large voting system deprived minority voters of their rights under Section 2 of the Voting Rights Act. "The question of what weight to accord expert opinion is a matter committed to the sound discretion of the factfinder, and we will not second guess that decision on appeal absent a basis in the record to think that discretion has been abused." *Pope v. Cty. of Albany*, 687 F.3d 565, 581 (2d Cir. 2012).

---

[7] Indeed, it was the United States Department of Justice that proffered the expert evidence using BISG in that case, contradicting the District's inaccurate and hyperbolic assertion that acceptance of BISG somehow "would beg the question why the United States Department of Justice and Census Bureau even bother collecting CVAP data anymore." Mot. at 14.

Here, the Court did not come close to suggesting that "no court would ever be able to rely on an expert analysis using CVAP data in any Voting Rights Act case ever again." Mot. at 14. To the contrary, the Court analyzed the record to weigh each expert's opinion in this case and held "that, *given the unique characteristics of the District*, BISG is a better data set than CVAP" and that "Defendant's expert Dr. Alford relied on CVAP, which is less reliable *here* . . . ." D&O ¶ 30 (emphasis added). In reaching this conclusion, the Court evaluated evidence from both experts, and found Dr. Barreto's testimony to be credible and persuasive and Dr. Alford's testimony to be less credible and not persuasive. The District's expert "Dr. Alford was not able to draw definitive conclusions about minority voter cohesion or the existence of racially polarized voting." D&O ¶ 31. "In any event, it does not appear that Dr. Alford properly accounted for turnout." D&O ¶ 33. Plaintiffs' expert Dr. Barreto, on the other hand, "used accurate and scientifically validated methods to identify and analyze racially polarized voting in the District." D&O ¶ 17. And in fact, "Dr. Alford also admitted that CVAP was not a 'good data set' for EI because it did not use 'the number of actual voters from each racial group,' … and opined … that BISG-like analysis could correct for CVAP's flaws." D&O ¶ 34.

The Court made similar credibility findings about the District's other expert, Dr. Morrison. *See* D&O ¶ 36 n.33 (quoting DX 99 at 12, n.21 and Tr. 201:1-12) ("A 2017 paper co-authored by Dr. Morrison cited the Imai and Khanna article in support of . . . exactly what Dr. Barreto did . . . . I did not find persuasive Dr. Morrison's attempt to backtrack at trial by suggesting that he did not intend for readers to rely on the footnote where this statement was made."). Based on its evaluation of all of this evidence, the Court concluded that "Dr. Alford's conclusions based on CVAP . . . are not as reliable as Dr. Barreto's conclusions based on BISG." D&O ¶ 33. This is not a legal question

of first impression. This is a traditional evaluation of what weight to accord expert opinion squarely in the domain of the factfinder and unlikely to be upset on appeal. *Pope*, 687 F.3d at 581.

Moreover, the cases cited by the District do not stand for the District's proposition that CVAP is the "uniformly accepted, academically preferred method" for performing ecological inference in Section 2 cases. Mot. at 14 (citing *United States v. Vill. of Port Chester*, 704 F. Supp. 2d 411, 419-20 (S.D.N.Y. 2010); *Rodriguez v. Pataki*, 308 F. Supp. 2d 346, 369 (S.D.N.Y. 2004); *Pope v. Cty. of Albany*, 94 F. Supp. 3d 302, 313 (N.D.N.Y. 2015)). Those opinions all discuss the use of CVAP in the context of a *Gingles* 1 analysis, exactly how it was used in this case, not as input for ecological inference in *Gingles* 2 & 3, as the District incorrectly asserts. Indeed, the Court in *Port Chester* expressly noted that both parties' experts used as the basis for their ecological inference analysis "[voter] sign-in data, which reflects actual voter turnout, and therefore provides a more reliable basis for estimating voter preferences." 704 F. Supp. at 427. Neither expert in *Port Chester* used CVAP data as the basis for their ecological inference analysis.

**2.**   The District Misinterprets The Court's Findings Regarding Confidence Intervals

The District next argues that the Court rejected the "traditional approach to standards for political science research and statistical significance" in a manner "at odds with literally every other court to consider the concept in a Voting Rights Act case." Mot. at 15. That is a striking mischaracterization of this Court's decision. This Court did not reject the probative value of confidence intervals or make any sweeping legal conclusion concerning confidence intervals. Rather, the Court carefully analyzed the point estimates and confidence intervals that Dr. Barreto reported, and explained that his results and analysis were reliable even though not every race reached a 95% confidence level. D&O ¶ 35. In fact, the Court did take into account confidence intervals, noting that "[n]one of the confidence intervals for white voters crossed 50%," and "[t]he

intervals for black voters did not cross 50% for twelve of the fourteen races . . . ." *Id.* The Court also noted that Dr. Alford similarly declined to find confidence intervals dispositive in another case where the results—like in this case—were consistent year after year. D&O ¶ 35; Ex. 2, Tr. 2357:10-2358:9 ("Random variation doesn't produce the same result eight out of ten times. You asked me why I was confident without knowing the confidence intervals, and that's why."). The Court's assessment of the experts' credibility and its careful weighing of the evidence are matters of fact entrusted to this Court's discretion, and do not provide a basis for appeal and certainly are not legal issues of first impression.

      **3.**    <u>The Court Correctly Determined That The Election of Minorities Did Not</u>
              <u>Negate The Inference That Minorities Are Excluded on Account of Race</u>

The District is also wrong that white voters' support of minority candidates on the private school slate presents a legal issue of first impression as to whether minorities are excluded from the political process on account of race. Mot. at 15. The District claims it is "undisputed" that "white voters had regularly supported and elected minority candidates associated with the 'private school' slates of candidates for the school board, to the same extent and degree as white candidates . . . ." Mot. at 15. As a result, the District contends, "if elections are polarized, it must be caused by something other than race." *Id.* To the contrary, the Court evaluated the evidence and determined that race was the determinative factor: "public school community" and "private school community" are, in fact, proxies for race. D&O ¶ 46. This is a factual finding, and will be entitled to deference on appeal under the clearly erroneous standard. *United Union of Roofers*, 547 F. App'x at 20 ("[W]e accord the district court considerable discretion in assigning weight to competing evidence.").

The Court also evaluated the District's evidence that election results were better explained by "something other than race" – in this case, "policy preferences," and found it not credible. In

particular, this Court held that "[t]he District contends that the polarization is best explained by policy preferences, but the record lacks sufficient credible evidence to support such a conclusion." D&O ¶ 45; *id.* ¶ 48 ("[t]he record evidence to that effect … came from past and present Board members each of whom had credibility problems."); *id.* ("The Court will not attempt to apportion fault between the witnesses and Defendant's counsel for the extent to which the witnesses' affidavits – especially Charles's and Germain's – were contradicted by their live testimony, but regardless of who is to blame, their testimony overall was so rife with dissembling that it offered scant, if any, value."). Such an evaluation is afforded "great deference." *Vt. Microsystems, Inc. v. Autodesk, Inc.*, 88 F.3d 142, 151 (2d Cir. 1996); *United Union of Roofers*, 547 F. App'x at 20. Moreover, the Court undertook its analysis under the framework established by the Second Circuit in *Goosby* – hardly raising an issue of "first impression," despite the District's claims. *Goosby v. Town Bd. of Hempstead*, 180 F.3d 476, 493 (2d Cir. 1999). At its core, this aspect of the District's motion is just another disagreement with the Court's evaluation of the evidence under established precedent. Such an argument is unlikely to succeed on appeal.

4.    The Court Correctly Determined That Trial Evidence Showed Manipulation Of Elections To Elect "Safe" Candidates

The Court applied well-established law regarding "safe" minority candidates to the extensive trial record regarding the circumstances under which those minority candidates were elected. Despite the District's complaints, this too is not a legal issue of first impression. Indeed, *Zimmer*, a foundational case in the law of vote dilution, explicitly addresses this scenario: "we cannot endorse the view that the success of black candidates at the polls necessarily forecloses the possibility of dilution of the black vote. Such success might, on occasion, be attributable to the work of politicians, who, apprehending that the support of a black candidate would be politically expedient, campaign to insure his election." *Zimmer v. McKeithen*, 485 F.2d 1297, 1307 (5th Cir.

1973); *Thornburg v. Gingles*, 478 U.S. 30, 75 (1986) (recognizing "the possibility … that the majority citizens might evade § 2 by manipulating the election of a safe minority candidate.") (internal quotation marks and alteration omitted). Courts are clear that the "most important" issue in determining whether the election of a minority candidate should be discounted in the Factor 7 analysis is when the election "does not indicate the absence of vote dilution because it is not clear that [candidate] was the candidate of choice for black voters." *Terrebonne Par. Branch NAACP v. Jindal*, 274 F. Supp. 3d 395, 447 (M.D. La. 2017) (discounting the election of a successful black candidate where "[t]he evidence actually showed that he had the backing of many of the most prominent opponents of a black opportunity subdistrict"); *see United States v. Charleston Cty.*, 316 F. Supp. 2d 268, 279 (D.S.C. 2003) (discounting, in Factor 7 analysis, the election of a minority candidate who was "emphatically not the candidate of choice of the county's African–American voters"), *aff'd sub nom. United States v. Charleston Cty., S.C.*, 365 F.3d 341 (4th Cir. 2004).

Applying this well-established law, the Court made a factual determination that "from 2008 to 2018, no minority-preferred candidate won a contested Board election … and every candidate of color who won was either perceived as 'safe' by the white slating organization or affected by special circumstances." D&O ¶ 72. The Court's Decision documents the efforts of the white slating mechanism to install safe minority candidates and the special circumstances surrounding the rare successful election of minority candidates. *See* D&O ¶ 73 (Charles and Germain selected by white slating mechanism as safe candidates); *id.* ¶ 74 (Corado and Ramirez resigned shortly after election); *id.* (Young-Mercer and Thompson unopposed incumbents); *id.* ¶ 75 (Charles-Pierre appointed and elected with permission of white slating organization); *id.* ¶ 76 (Leveille's election engineered by white slating organization after the District's counsel suggested running a minority).

Based on this record, the Court concluded that "the mere fact that there were some minority candidates, a few of whom were elected, does not carry a lot of weight in light of the evidence that victories were arranged for appearance's sake and/or occurred in unusual circumstances, especially considering how few people of color were ultimately elected." D&O ¶ 77.

### 5. The Court's Remedy Is Appropriate

The District argues the Court's order requiring the District to develop a ward-based remedial plan is a question of first impression. Mot. at 17-18. This, too, is wrong. The Court's order that the District submit a ward-based remedial plan is appropriate and entirely consistent with longstanding precedent. This exact remedy was ordered in the liability opinion in *Goosby*. *Goosby v. Town Bd. of the Town of Hempstead*, 956 F. Supp. 326, 356 (E.D.N.Y. 1997), *aff'd sub nom. Goosby v. Town Bd. of Town of Hempstead, N.Y.*, 180 F.3d 476 (2d Cir. 1999). The Court, having found that at-large voting in the District violates Section 2 of the VRA based on the factual record before it, properly directed the District to prepare the remedial plan. D&O ¶ 88. The District – not the Court or Plaintiffs – has the first opportunity to develop such a plan. The District also complains about the 30-day remedial timeline, saying that this is "by far" the shortest deadline it has been able to identify. Respectfully, the District did not look hard enough. District courts routinely set such deadlines, even in cases involving much more complicated districting problems. *See, e.g.*, *North Carolina v. Covington*, 138 S. Ct. 2548, 2550 (2018) (noting that district court gave the North Carolina legislature one month to draw remedial maps for the North Carolina State House and State Senate); *Pope*, 94 F. Supp. 3d at 352 (requiring defendant to submit a remedial plan to the Court within three weeks). The Court's order that the District devise a remedial ward map within 30 days is reasonable under existing precedent and affords no reason for a stay.

**B.      Factor 2: The District Will Not Be Irreparably Harmed Absent A Stay.**

Under factor two, the court must analyze whether the District will be irreparably harmed absent a stay. *Hilton v. Braunskill*, 481 U.S. 770, 776 (1987). Under well-established precedent, the monetary harm cited by the District cannot constitute irreparable harm on its own. *Centauri Shipping Ltd. v. W. Bulk Carriers KS*, 528 F. Supp. 2d 186, 194 (S.D.N.Y. 2007) (collecting cases). "Mere injuries, however substantial, in terms of money, time and energy necessarily expended in the absence of a stay are not enough." *Malarkey v. Texaco, Inc.*, 794 F. Supp. 1248, 1250 (S.D.N.Y. 1992).

Not only are the District's concerns about the monetary costs of complying with a remedial order insufficient to constitute irreparable harm, they are particularly galling in light of the millions of dollars spent in legal fees on wasteful litigation tactics throughout this case. During discovery, the District refused to produce three Board Members for depositions for almost two years, instigating a costly legal fight that included a frivolous interlocutory appeal of a non-final discovery order with the Second Circuit, which was summarily denied. *See* ECF No. 430. The District also failed to produce complete copies of the Board Members' WhatsApp chats for years, depriving Plaintiffs of highly relevant evidence and resulting in multiple rounds of unnecessary briefing and argument. *See* ECF Nos. 194 and 439 (Plaintiffs' motions to compel); ECF No. 439-2 at 74:1-5; ECF No. 445 (Court's order to produce WhatsApp chats in full); ECF Nos. 518 and 521 (Plaintiffs' motion for sanctions).[8]

At trial, the District submitted declarations riddled with false and implausible testimony, wasting the time and resources of both the Court and the Parties to probe the credibility of the

---

[8] In the Court's Decision, Plaintiffs' motion for sanctions were denied as moot because "Plaintiffs have adduced sufficient evidence to decisively establish Senate Factor 4 without the adverse inference."  D&O  ¶ 57 n.55.

witnesses. *See* D&O ¶ 48 (non-exhaustive list of the Board Members' written testimony contradicted at trial); PFOFCOL ¶¶ 210-216 (same).[9] Even when Plaintiffs offered to conduct Dr. Barreto's rebuttal via video conference, the District refused and demanded that the Parties' bring back their experts to court despite all the costs associated with doing so, even though the Court already had the opportunity to evaluate the experts' credibility in person over several days of trial. *See, e.g.*, ECF No. 538 at 2; Ex. 2, Tr. 2525:22-24. Finally, and perhaps most tellingly, the District made no sincere effort to ensure settlement talks where "the Board President and others failed to provide the Board's members of color with complete or accurate information about this lawsuit, including settlement opportunities that could have saved enormous amounts of money," D&O ¶ 86, including liability for Plaintiffs' attorneys costs and fees, *see* ECF No. 553 at 1 (Plaintiffs' counsel offering to waive legal fees as part of settlement). The District's concern about costs, arising only now, when required to formulate the remedy, is entitled to no weight.

Regardless of the District's disingenuous argument, if the monetary cost of implementing an injunction, standing alone, were sufficient to justify a stay of injunction pending appeal, "stays pending appeal would become routine, conflicting with the rule that such relief should be extraordinary." *NRDC v. United States FDA*, 884 F. Supp. 2d 108, 124 (S.D.N.Y. 2012) (internal quotations omitted).[10] The circumstances here do not warrant an exception to this rule. The

---

[9] Paragraphs 209-216 of Plaintiffs' Proposed Findings of Facts and Conclusions of Law were adopted into the Court's Decision. *See* D&O ¶ 86 n.61.

[10] Plaintiffs also note that technological advances since *Goosby* was decided in 1997 have reduced resources necessary to implement a redistricting remedy. PX 257 (30(b)(6) Deposition) at 44:18-22 ("Q. When did you first raise the issue of rebalancing polling places[.] A. Probably 2010 or '11, but at that time we didn't have NTS, and it is a big job without computerization"). The District maintains a contract with an elections vendor, NTS, which prepares the District's voter registration rolls, assists with absentee ballots, prints poll books, maintains voter history files, and assists in drawing maps for redistricting. *Id.* at 25:18-26:11. The District's 30(b)(6) witness, former District Clerk and chief elections official, Catherine Russell, testified that NTS assists the District with drawing maps for election districts and can create maps in realtime. *Id.* at 28:23-29:23.

administrative business of the District will continue as before, and the Board's operations are not affected by the injunction. This falls far short of irreparable harm.

### C.      Factor 3: A Stay Would Irreparably Harm Minority Voters In The District.

The third stay factor requires the Court to examine whether the issuance of a stay will substantially injure the other parties interested in the proceeding. *Hilton*, 481 U.S. at 776. The District's contention that Plaintiffs will not be harmed by a stay is patently false. Plaintiffs have been unable to participate in the political process or elect candidates of their choice since at least 2007. Indeed, since the filing of the complaint in 2017, Plaintiffs and other members of the District's black and Latino community have endured two elections under an at-large system that violates the Voting Rights Act. If the Court grants the District's motion to stay pending appeal, people of color in East Ramapo are likely to endure, at the very least, two more illegal elections in 2020 and 2021 under a system that dilutes their votes and invidiously excludes them from the political process. D&O ¶ 87.

The District cites *Goosby* for the proposition that Plaintiffs will not be irreparably harmed by a stay. But *Goosby* is a cautionary tale that demonstrates the exact harm that a stay would cause Plaintiffs. In *Goosby*, Judge Gleeson found in favor of the plaintiffs on liability in February 1997 and issued a remedial order in October 1997, but declined to enjoin the November 1997 election at that time, noting that a special election could be scheduled after the conclusion of appeals. 981 F. Supp. 751, 762 (E.D.N.Y. 1997). However, appeals did not conclude until almost three years later, and a special election for the Town Board seats was not held until November 2000. 2000 WL 194686 (E.D.N.Y. Feb. 18, 2000). A similar delay in this case would deprive Plaintiffs of the opportunity to have their votes count in the next three Board elections, during which all nine seats on the Board will turn over. The community of color in East Ramapo should not have to endure additional illegal elections while the District continuously attempts to evade righting a serious

23

wrong. "[J]ustice delayed is justice denied." *Harding v. Fed. Reserve Bank of New York*, 707 F.2d 46, 52 (2d Cir. 1983) (MacMahon, D.J., concurring).

As this Court noted, for too long, black and Latino voters in the District have had their equal access to the electoral process frustrated. *See* D&O at 77. "Dilution irreparably injures plaintiffs' right to vote and to have an equal opportunity to participate in the legal process. Remedies like monetary damages, or more limited injunction provisions, are inadequate to redress the injury and to prevent future harm." *Patino v. City of Pasadena*, 229 F. Supp. 3d 582, 589 (S.D. Tex. 2017) (denying motion to stay pending appeal). "Delaying Plaintiffs' requested relief pending the outcome on appeal would present a substantial risk that the [Plaintiffs endure another illegal election.]" *See Covington v. North Carolina*, 2018 WL 604732, at *6 (M.D.N.C. Jan. 26, 2018) (declining "to give [] Defendants the fruits of victory for another election cycle" and denying motion to stay pending appeal). Plaintiffs and other voters of color in the District will be irreparably harmed by another election that maintains this status quo.

> **D.    Factor 4: The Public Interest Weighs In Favor Of Protecting Minorities' Rights As Enshrined In The Voting Rights Act.**

The public interest weighs in favor of protecting minorities' constitutional rights. "Undeniably the Constitution of the United States protects the right of all qualified citizens to vote…. And the right of suffrage can be denied by a debasement or dilution of the weight of a citizen's vote just as effectively as by wholly prohibiting the free exercise of the franchise." *Reynolds v. Sims*, 377 U.S. 533, 554-55 (1964). The "protection of the Plaintiffs' franchise-related rights is without question in the public interest*." Charles H. Wesley Educ. Found., Inc. v. Cox*, 408 F.3d 1349, 1355 (11th Cir. 2005); *Newsom ex rel. Newsom v. Albermarle Cty. Sch. Bd.*, 354 F.3d 249, 261 (4th Cir. 2003) ("upholding constitutional rights serves the public interest."). Indeed, once an electoral scheme has been found to discriminate against minority rights, "it would be the

unusual case in which a court would be justified in not taking appropriate action to insure that no further elections are conducted under the invalid plan." *Personhuballah v. Alcorn*, 155 F. Supp. 3d 552, 561 (E.D. Va. 2016) (quoting *Reynolds*, 377 U.S. at 585) (declining to stay implementation of remedy). The remedy and timing ordered by the Court are hardly unusual. *See, e.g.*, *Covington*, 138 S. Ct. at 2550 (noting that district court gave the North Carolina legislature one month to draw remedial maps for the North Carolina State House and State Senate); *Pope*, 94 F. Supp. 3d at 352 (requiring defendant to submit a remedial plan to the Court within three weeks).

A deprivation of voting rights is deprivation of a fundamental right that preserves all other rights. It far outweighs any "administrative burden" that the District must undertake to remedy that fundamental deprivation. The District cites no case in support of its argument that "administrative burden" constitutes a matter of public interest overriding the public's interest in fair elections. To the contrary, "administrative burdens" are afforded little to no weight. *See Georgia Coal. for People's Agenda, Inc. v. Kemp*, 347 F. Supp. 3d 1251, 1268 (N.D. Ga. 2018) ("The Court recognizes the administrative burden the Court's order may place on Defendant, particularly this close to the election. However, the Court finds that this burden … is minimal compared to the potential loss of a right to vote altogether by a group of people."); *see also Fish v. Kobach*, 189 F. Supp. 3d 1107, 1151 (D. Kan. 2016) ("Although the Court is cognizant that the injunction will cause some administrative burden to the State, it is a burden that is outweighed by the risk of thousands of otherwise eligible voters being disenfranchised"), *aff'd*, 840 F.3d 710 (10th Cir. 2016). The public interest therefore weighs in favor of denying the District's motion.

## CONCLUSION

For all the foregoing reasons, Plaintiffs respectfully requests that this Court deny the District's motion.

Dated: May 30, 2020
New York, New York

Respectfully submitted,
**LATHAM & WATKINS LLP**

/s/ Claudia T. Salomon

Claudia T. Salomon
Corey A. Calabrese
Andrej Novakovski
Claudia.Salomon@lw.com
Corey.Calabrese@lw.com
Andrej.Novakovski@lw.com
885 Third Avenue
New York, NY 10022
Phone: (212) 906-1200

Marc Zubick
Russell Mangas *(admitted pro hac vice)*
Marc.Zubick@lw.com
Russell.Mangas@lw.com
330 N. Wabash Avenue
Chicago, IL  60601
Phone:  (312) 876-7600

Andrew Clubok
Andrew.Clubok@lw.com
555 Eleventh Street, NW
Suite 1000
Washington, D.C. 20004
Phone: (202) 637-2200

**NEW  YORK  CIVIL  LIBERTIES  UNION
FOUNDATION**

Arthur Eisenberg
Perry Grossman
aeisenberg@nyclu.org
pgrossman@nyclu.org
125 Broad Street
New York, NY 10004
Phone: (212) 607-3329

*Attorneys for Plaintiffs*