UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

---

NATIONAL ASSOCIATION FOR THE
ADVANCEMENT OF COLORED PEOPLE,
SPRING VALLEY BRANCH; JULIO
CLERVEAUX; CHEVON DOS REIS; ERIC
GOODWIN; JOSE VITELIO GREGORIO;
DOROTHY MILLER; HILLARY MOREAU;
and WASHINGTON SANCHEZ,

                Plaintiffs,

    v.

EAST RAMAPO CENTRAL SCHOOL
DISTRICT and MARYELLEN ELIA, IN HER
CAPACITY AS THE COMMISSIONER OF
EDUCATION OF THE STATE OF NEW
YORK,

                Defendants.

17 Civ. 8943 (CS) (JCM)

---

## MEMORANDUM OF LAW IN SUPPORT OF PLAINTIFFS' MOTION FOR ATTORNEYS' FEES AND COSTS

## TABLE OF CONTENTS

**Page**

FACTUAL AND PROCEDURAL BACKGROUND....................................................2

    A.    Preparation for Litigation...........................................................2

    B.    Complaint & Preliminary Injunction .......................................3

    C.    Discovery ..................................................................................4

    D.    Summary Judgment, Daubert, & *Motion in Limine*...............7

    E.    Preparation for Trial & Trial....................................................8

ARGUMENT ...............................................................................................12

I.    PLAINTIFFS' COUNSEL FEES ARE REASONABLE.............................12

    A.    Latham's Requested Rates Are Reasonable. ...........................14

    B.    NYCLU's Rates are Reasonable Under the Circumstances .....20

    C.    Counsel's Hours Spent on this Case are Reasonable.............21

          1.    The Hours Plaintiffs' Counsel Expended Are Reasonable. ......21

          2.    Plaintiffs' Timesheet Entries are Sufficiently Detailed. ...........22

          3.    Plaintiffs' Request for Paralegal and Videotechnology Specialist Fees Are Reasonable.................................................22

II.    THE EXPERT FEES INCURRED BY PLAINTIFFS ARE REASONABLE.................23

III.    PLAINTIFFS' OTHER LITIGATION COSTS ARE REASONABLE...........................24

IV.    RESERVATION OF RIGHTS ...............................................25

CONCLUSION..............................................................................26

i

## <u>TABLE OF AUTHORITIES</u>

**Page(s)**

### CASES

*Abdell v. City of New York*,
 2015 WL 898974 (S.D.N.Y. Mar. 2, 2015) .....................................................................15, 20

*Alicea v. City of New York*,
 272 F. Supp. 3d 603 (S.D.N.Y. 2017)....................................................................................14

*Arbor Hill Concerned Citizens Neighborhood Ass'n v. Cty. of Albany & Albany
 Cty. Bd. of Elections*,
 522 F.3d 182 (2d Cir. 2008)........................................................................................... *passim*

*Bailey v. Pataki*,
 2016 WL 3545941 (S.D.N.Y. June 16, 2016) ..................................................................15, 20

*Balderas v. State*,
 2002 WL 32113829 (E.D. Tex. May 21, 2002)......................................................................21

*Barbour v. City of White Plains*,
 788 F. Supp. 2d 216 (S.D.N.Y. 2011), *aff'd*, 700 F.3d 631 (2d Cir. 2012)......................15, 20

*Barfield v. N.Y.C. Health & Hosps. Corp.*,
 537 F.3d 132 (2d Cir. 2008)...................................................................................................16

*Cameo Convalescent Ctr., Inc. v. Senn*,
 738 F.2d 836 (7th Cir. 1984) .................................................................................................23

*Ceglia v. Zuckerberg*,
 2012 U.S. Dist. LEXIS 18438 (W.D.N.Y. Feb. 14, 2012) .....................................................18

*Citizens for a Better Gretna v. City of Gretna*,
 636 F. Supp. 1113 (E.D. La. 1986)........................................................................................11

*Cruz v. Zucker*,
 2017 WL 1093285 (S.D.N.Y. Mar. 10, 2017) ...........................................................15, 20, 22

*Dancy v. McGinley*,
 141 F. Supp. 3d 231 (S.D.N.Y. 2015)....................................................................................15

*DLJ Mortg. Capital, Inc. v. Act Lending Corp.*,
 2008 WL 5517589 (S.D.N.Y. Dec. 1, 2008) .........................................................................21

*Matter of E. Ramapo Cent. Sc. Dist. v. King*,
 2013 N.Y. Slip Op. 34132(U) (Sup. Ct.) ...............................................................................19

*East Ramapo Cent. Sch. Dist. v. DeLorenzo*,
2013 U.S. Dist. LEXIS 143898 (S.D.N.Y. Dec. 3, 2013) ...................................................19

*East Ramapo Cent. Sch. Dist. v. King*,
130 A.D. 3d 19 (N.Y. 2015) ...........................................................................................19

*East Ramapo Cent. Sch. Dist. v. King*,
29 N.Y.3d 938 (N.Y. 2017) ............................................................................................19

*Favors v. Cuomo*,
39 F. Supp. 3d 276 (E.D.N.Y. 2014) ...............................................................................24

*Frommert v. Conkright*,
223 F. Supp. 3d 140 (W.D.N.Y. 2016) ......................................................................12, 18

*Genger v. Genger*,
2015 U.S. Dist. LEXIS 28813 (2015) ..............................................................................23

*Goosby v. Town Bd. of Hempstead*,
180 F.3d 476 (2d Cir. 1999) ..........................................................................................17

*Heng Chan v. Sung Yue Tung Corp.*,
2007 WL 1373118 (S.D.N.Y. May 8, 2007) ...................................................................18

*Hensley v. Eckerhart*,
461 U.S. 424 (1983) ................................................................................................13, 21

*Kuzma v. IRS*,
821 F.2d 930 (2d Cir. 1987) ..........................................................................................24

*LeBlanc-Sternberg v. Fletcher*,
143 F.3d 748 (2d Cir. 1998) ..........................................................................................24

*LV v. N.Y. City Dep't of Educ.*,
700 F. Supp. 2d 510 (S.D.N.Y. 2010) .............................................................................17

*Mark Andrew of the Palm Beaches, Ltd. v. GMAC Comm. Mortg. Corp.*,
2003 WL 21767633 (S.D.N.Y. July 31, 2003) ............................................................23, 24

*Millea v. Metro-N. R. Co.*,
658 F.3d 154 (2d Cir. 2011) ..................................................................................13, 19, 20

*Missouri v. Jenkins*,
491 U.S. 274 (1989) ......................................................................................................22

*Montes v. City of Yakima*,
2015 WL 11120966 (E.D. Wash. June 19, 2015) .............................................................17

*NAACP v. East Ramapo Central School District*,
No. 18-3481 (2d Cir. 2019) ............................................................................ 6

*Nature's Enters., Inc. v. Pearson*,
2010 WL 447377 (S.D.N.Y. Feb. 9, 2010) .................................................... 14

*New York Youth Club v. Town of Harrison*,
2016 WL 3676690 (S.D.N.Y. July 6, 2016) (Seibel, J.) ..................... 13, 14, 16, 21

*Perdue v. Kenny A. ex rel. Winn*,
——U.S. ——, ——, 130 S.Ct. 1662, 176 L.Ed.2d 494 (2010) ................ 13

*Pope v. Cty. of Albany*,
2015 U.S. Dist. LEXIS 123379 (N.D.N.Y. Sep. 16, 2015) ...................... 23

*Pope v. Cty. of Albany*,
94 F. Supp. 3d 302 (N.D.N.Y. 2015) ................................................... 11, 23

*Ravina v. Columbia Univ.*,
2020 WL 1080780 (S.D.N.Y. Mar. 6, 2020) ........................................... 16

*Regeneron Pharm., Inc. v. Merus N.V.*,
2018 WL 3425013 (S.D.N.Y. June 25, 2018) ........................................ 18

*South Carolina v. Katzenbach*,
383 U.S. 301 (1966) ...................................................................... 11

*Synergy Aero. Corp. v. LLFC Corp.*,
2016 U.S. Dist. LEXIS 137070 (2016) ............................................... 23

*Tucker v. City of New York*,
704 F. Supp. 2d 347 (S.D.N.Y. 2010) ................................................ 22

*Thornburg v. Gingles*,
478 U.S. 30 (1986) .................................................................. 11, 17

*United States v. Charleston Cty.*,
316 F. Supp. 2d 268 (D.S.C. 2003), *aff'd*, 365 F.3d 341 (4th Cir. 2004) ............. 11

*United States v. City of Eastpointe*,
378 F. Supp. 3d 589 (E.D. Mich. 2019) ................................................ 4

*United States v. City of Euclid*,
580 F. Supp. 2d 584 (N.D. Ohio 2008) ............................................... 11

*Vista Outdoor, Inc. v. Reeves Family Tr.*,
2018 WL 3104631 (S.D.N.Y. May 24, 2018) ........................................ 15

*Westport Ins. Corp. v. Hamilton Wharton Grp. Inc.*,
  483 F. App'x 599 (2d Cir. 2012) ............................................................25

*Williams v. Bd. of Comm'rs of McIntosh Cty.*,
  938 F. Supp. 852 (S.D. Ga. 1996)....................................................17, 23

*Williamsburg Fair Hous. Comm. v. N.Y.C. Hous. Auth.*,
  2005 WL 736146 (S.D.N.Y. Mar. 31, 2005) ..........................................22

*Wise v. Kelly*,
  620 F. Supp. 2d 435 (S.D.N.Y. 2008)......................................................18

## STATUTES

28 U.S.C. § 1927.......................................................................................25

52 U.S.C. § 10310(e) ...............................................................1, 12, 13, 24

## OTHER AUTHORITIES

*Associate Hourly Billing Rates Surge Past $1K as Firms Snap Up Bankruptcy
  Work*, LAW.COM (May 22, 2020)...........................................................15

Perry Grossman, The Case for State Attorney General Enforcement of the Voting
  Rights Act Against Local Governments, 50 U. Mich. J.L. Reform 565, 591
  (Spring 2017) ...................................................................................11, 13

Thomas Zambito, *NAACP challenges Orthodox Jewish dominance of East
  Ramapo board in high profile court* case, LOHUD.COM (updated Feb. 11,
  2020) *available at*
  https://www.lohud.com/story/news/education/2020/02/09/federal-judge-
  decide-voting-challenge-naacp-east-ramapo/4682606002/ (last accessed June
  25, 2020) ..........................................................................................19

**INTRODUCTION**

Following a nearly six-week long trial this Court ruled that the at-large system of electing the Board of Education (the "Board") of the East Ramapo Central School District (the "District") violated Section 2 of the Voting Rights Act ("VRA").  This Court found that the at-large system "affords black and Latino residents 'less opportunity than other members of the electorate to participate in the political process and to elect representatives of their choice.'"  ECF No. 568 ("Decision") ¶ 87.  This Court also held that Plaintiffs are entitled to attorney's fees and costs, including expert fees, pursuant to 52 U.S.C. § 10310(e).  Decision ¶ 89.

The trial was the culmination of a litigation process that began approximately three years ago.  Even before the initiation of litigation, minority voters in the District and even the State had long observed the District's history of vexatious, win-at-all-costs approach.  With the prospect of litigating against a national law firm with unrestrained resources, Plaintiffs turned to Latham & Watkins ("Latham"), a law firm that could match the District's outside counsel in resources, expertise, and capabilities, and the New York Civil Liberties Union Foundation ("NYCLU"), an organization with a long track record in voting rights litigation (collectively, "Plaintiffs' counsel").

The District's counsel proved as litigious as expected.  Plaintiffs' counsel expended hundreds of hours of time fighting the District's delay tactics.  The District repeatedly attempted to thwart discovery from the Board, resulting in several motions to compel and the interlocutory appeal of a discovery order that was summarily dismissed by the Second Circuit.  The District filed a summary judgment motion based on obviously disputed facts and seriatim motions to exclude expert testimony.  The District filed testimonial affidavits from the Board riddled with falsehoods and inconsistencies that they nonetheless defended on the witness stand.  In spite of Plaintiffs' repeated effort at a settlement, it was only unearthed during trial that the president of the Board failed to provide the Board Members of color with the full picture of Plaintiffs' proffered

1

settlement terms—which included an offer to waive Plaintiffs' request for attorney costs and fees. The District's counsel drove up Plaintiffs' costs and fees at every turn and has refused (and continues to refuse) any effort at mitigating costs. Plaintiffs' counsel utilized the necessary time and resources to effectively represent their clients in light of the District's counsel's behavior.

Plaintiffs respectfully request that the Court award $9,189,716.47 in attorneys' fees, expenses, and costs, including expert fees, and respectfully submit that those amounts are reasonable and should be fully compensated, for the reasons set forth below. That amount includes the hours for the attorneys who appeared at trial, some of the significant costs incurred in conducting the litigation, and the fees paid to some of the expert witnesses. With respect to Latham's fees, that amount also includes a substantial reduction from the value of the work performed—Latham is not seeking to recover fees for thousands of hours spent by attorneys who contributed to the success of the litigation, but who did not appear at trial. In addition, Latham has reduced their customary hourly rates to reflect the partner and associate rates that public records show the District's counsel charged in this case. Latham intends to donate any fees that the Court awards to non-profit organizations that support children attending public schools in the District.

## FACTUAL AND PROCEDURAL BACKGROUND

### A.    Preparation for Litigation

During the summer of 2017, Plaintiffs retained their counsel to represent them in connection with a potential lawsuit under Section 2 of the VRA. In preparation for the litigation and to develop Plaintiffs' theories of the case, Plaintiffs' counsel performed a thorough investigation of the District and the at-large elections for the Board. Plaintiffs expected that litigating this lawsuit would be exceedingly difficult due to the District's longstanding reputation for hiring large and expensive law firms with vexatious, win-at-all-costs approaches to litigation. *See* Decision ¶ 86, n.62 (discussing the District's "disturbing win-at-all-costs attitude"); Ex. A

2

(PX213, Tr. of Nov. 17, 2014 Fiscal Monitor presentation) at 21:22-24 ("Perhaps the perfect metaphor for the fiscal dysfunction in this district is how they handle legal fees.")).[1]

Following extensive pre-litigation diligence, on October 2, 2017, Plaintiffs sent a letter to the Board, laying out the reasons why Plaintiffs would prevail in a litigation and offering a resolution that would spare both parties time and resources.  Ex. B (Oct. 2, 2017 Ltr.); ECF No. 106 at 1 n.2.  In line with its modus operandi when faced with other grievances raised by minority residents of the District, the Board rejected Plaintiffs' offer, and forced the Plaintiffs to litigate.

### B.    Complaint & Preliminary Injunction

On November 16, 2017, Plaintiffs filed the Complaint.  ECF No. 1.  Plaintiffs also moved for a preliminary injunction ("PI") on December 7, 2017, seeking to enjoin the May 2018 Board elections.  ECF Nos. 15-35.  After an initial attempt to delay the resolution of the PI motion,[2] the parties simultaneously briefed the District's motion to dismiss and the PI motion, including by submitting declarations from fact and expert witnesses and expert reports.  ECF Nos. 76, 79, 100, 102-05, 117-18.

Simultaneously with the motion practice, the parties commenced discovery.  Plaintiffs produced thousands of pages of documents on an expedited basis in response to the District's discovery request for "[a]ll communications and documents concerning this litigation and/or the subject matter of this litigation," Ex. C (Pls.' Response to District's First Set of RFPs) at 6, and produced their fact and expert witnesses for depositions.  The evidence obtained from this

---

[1] References to "Ex." refer to exhibits attached to the Decl. of Corey Calabrese, filed herewith, unless specified otherwise.

[2] On December 15, 2017, the District sought to stay briefing on Plaintiffs' PI motion pending the resolution of its yet-to-be-filed motion to dismiss.  *See* ECF No. 40.  The Court denied the District's motion.  Ex. D (Jan. 2, 2018 Hr'g Tr.) at 14:3-5, 39:1-12.

discovery was used throughout the case, including at trial.  Plaintiffs also began to pursue discovery from the District, engaging in several good-faith meet and confers and modifying and narrowing initial discovery requests to avoid costly and time-consuming disputes.  Due to a health emergency that prevented Plaintiffs' expert witness from continuing in the case, Plaintiffs were forced to withdraw the PI motion.  ECF No. 119.  Plaintiffs' counsel are not seeking to recover fees incurred in drafting the PI motion, drafting that expert's reports, or preparing and defending that expert's deposition, and has removed those entries from its billing records.  That said, the work done on the PI motion materially advanced the litigation and was used towards the ultimate resolution of the case.  Most of the witnesses who submitted declarations during the PI phase testified at trial.  Moreover, the expert disclosures at the PI phase exposed the flawed approach of the District's expert, Dr. Alford, not only in this case (Decision ¶¶ 33-34), but in another successful Voting Rights Act prosecuted by the United States Department of Justice, *see United States v. City of Eastpointe*, 378 F. Supp. 3d 589, 598 (E.D. Mich. 2019) (citing "Dr. John Alford Affidavit submitted in *NAACP v. E. Ramapo Cent. Sch. Dist.*").

On April 13, 2018, this Court denied the District's motion to dismiss.  Ex. E (Apr. 13, 2018 Hr'g Tr.) at 22:13-14.  Unsatisfied with the Court's decision, the District sought to delay the case by requesting "clarification."  ECF Nos. 130, 131, 133.  At the same time, the District refused to engage in discovery while it contested Plaintiffs' ability to replace its expert. ECF Nos. 128-29.

C.     **Discovery**

Throughout discovery, the District displayed a disturbing pattern of refusing to cooperate in good faith in responding to discovery requests or complying with Court orders.  Such actions necessitated additional efforts to meet and confer, changes in plans and execution of litigation strategy, as well as numerous letter motions and other applications to compel the District to produce documents and witnesses.  *E.g.*, ECF Nos. 86, 106, 135, 153, 169, 176, 194, 290, 439,

443.   While the District fought the completion of full discovery every step of the way, Plaintiffs continued to produce thousands of documents in response to the District's overbroad requests.

Plaintiffs ultimately produced over 24,000 documents, took a total of 18 depositions, and defended a total of 18 depositions, including the depositions of two fact witnesses the District insisted on deposing twice.  The depositions aided Plaintiffs in establishing the critical facts upon which Plaintiffs relied during trial.  Perhaps even more importantly, the depositions ensured that the District's witnesses were held to their prior out of court statements, which resulted in over 25 video-taped impeachments during trial.  *See* Ex. F (PX339, Excerpts from Deposition Clips); Decision ¶¶ 48, 49, n. 51.  Plaintiffs served a total of nine expert reports (including affidavits of direct testimony)—although Plaintiffs are not seeking costs and fees related to three expert reports from Dr. Cole —and defended four expert depositions.  Plaintiffs took three depositions of the District's expert witnesses based on the five expert reports (including affidavits of direct testimony) served on Plaintiffs by those experts.

Plaintiffs also reviewed over 38,000 documents produced by the District.  The District fought Plaintiffs on producing these documents, for example, by forcing Plaintiffs to file three separate motions to compel the production of highly relevant chats between the Board members and leaders of the white slating organization.  ECF Nos. 135, 194, 439; *see also* Decision ¶¶ 44, 46, 48, 59, 60, 82 (citing the chats).  Even after the Court granted Plaintiffs' motions, *see* Ex. G (Nov. 9, 2018 Hr'g Tr.) at 76:9-11, the District failed to produce thousands of attachments to those chats, forcing Plaintiffs to spend resources on correspondence and meet and confers until Plaintiffs were forced to move for sanctions.  ECF No. 521.

Similarly, the District forced Plaintiffs to spend almost two years fighting to get three Board Members to sit for their depositions, despite three orders expressly ordering the Board

Members to do so.  ECF Nos. 124, 170, 224.  Instead of complying with either Magistrate Judge McCarthy's or this Court's orders compelling the depositions, the District filed a motion for reconsideration, ECF No. 184, and, once that was denied, filed an interlocutory appeal of a non-final discovery order based on a frivolous claim of legislative immunity.  ECF No. 225.  In response, Plaintiffs were required to prepare several substantive briefs and attend two separate oral argument hearings. *See NAACP v. East Ramapo Central School District*, Case No. 18-3481, ECF Nos. 19-1, 59, 70, 95, 126, 150-1, 155 (2d Cir. 2019).  The Second Circuit dismissed the District's appeal finding that the Board Members "have not raised a colorable claim…."  ECF No. 430 at 2.

The District also did not produce the District's voter files—some of the most crucial evidence in a VRA lawsuit—in native, Excel format, necessitating a team of six to ten secretaries and paralegals working for over a week to convert the files into Excel so that they could be input into the computer programs utilized by voting statisticians.  ECF No. 153. Plaintiffs were also required to travel to the District in person to manually scan the 2013 Voter File, which took a team of paralegals and an attorney two days to complete.

The District also took steps that resulted in needless and time-consuming motion practice in connection with Plaintiffs' non-testifying expert consultant, Steve White.  Despite knowing that Mr. White was engaged as Plaintiffs' consultant, and that Plaintiffs objected to the District's subpoena to him, the District entered into an agreement with Mr. White's attorney to have a vendor collect his data, including Plaintiffs' privileged communications, without notifying Plaintiffs or attempting to meet and confer.  ECF Nos. 206, 281 at 4-5.  Upon learning that the District successfully copied and retained some data from Mr. White that contained privileged communications, Plaintiffs had to demand the District either return or destroy the data.  ECF No. 206.  This incident precipitated expensive motion practice.  Plaintiffs ultimately prevailed on their

privilege claims.  *See* ECF Nos. 280, 307, 312, 314, 325, 329, 334, 375.

The District's vexatious tactics are further illustrated by its behavior with respect to Catalist LLC.  Catalist agreed to voluntarily sit for a deposition on short notice, and Plaintiffs sought to meet and confer with the District about both Catalist's documents and deposition.  *See id.*  But instead of responding to Plaintiffs or attempting to meet and confer, the District wrote a letter to the Court, requiring Plaintiffs to respond.  ECF Nos. 318, 319.  After finally agreeing to meet and confer, the District demanded that Catalist's deponent travel from Denver, Colorado to Washington, D.C. for a deposition and, in a blatant attempt to force Catalist from the case, the District sought all of Catalist's intellectual property and source code for its proprietary race models while simultaneously refusing to agree that it would not disclose Catalist's trade secrets publicly.  ECF No. 327.  Two days before the deposition, after Plaintiffs' counsel and Catalist had already booked nonrefundable travel to Washington, D.C., the District notified Plaintiffs that it did not intend to go forward with Catalist's deposition.  Plaintiffs deposed Catalist at the District's counsel's offices anyway, and elicited the same information that the District could have easily obtained.  Catalist's testimony and data featured prominently at trial, *see* Decision ¶¶ 28, 35, n.31, 37, and was available only at an enormous cost to Plaintiffs due to the District's tactics.

### D.       Summary Judgment, Daubert, & *Motion in Limine*

In March 2019, the District filed an extensive motion for summary judgment, attaching 69 exhibits.  ECF Nos. 355-57.  Plaintiffs prevailed on that motion, which necessitated a nearly 100-page opposition with 124 exhibits to correct the District's many misstatements in its proposed statement of material facts.  ECF Nos. 384, 389-90.  The District simultaneously filed a motion to exclude the testimony of Plaintiffs' testifying experts (the "*Daubert* motion"), and Plaintiffs successfully opposed that motion as well.  ECF Nos. 361-62, 386, 391.  On April 11, 2019, more than a month after the Court's deadline for the District to file its *Daubert* motion, the District

separately filed a motion *in limine* to exclude the Catalist data.  ECF Nos. 405, 413, 417.  Following

briefing, the Court denied the District's motion *in limine*.  ECF No. 420 at 17-20.

### E.        Preparation for Trial & Trial

After the court decided the District's summary judgment motion, the parties proceeded to

prepare for trial.  On January 6, 2020, both parties filed extensive Proposed Findings of Fact and

Conclusions of Law, totaling hundreds of pages, covering the decade-long history of the District's

discriminatory practices leading up to the case and the multi-factor test under the VRA.  ECF Nos.

453, 455.  On January 13, 2020, the Parties submitted affidavits of direct testimony from a total of

21 witnesses.  ECF Nos. 459-79.  On January 21, 2020, Plaintiffs filed three motions *in limine*,

compared to eight such motions from the District.  ECF Nos. 483-86, 488.

On January 30, 2020, the Court ruled on the motions *in limine*, granting two out of the three

motions filed by Plaintiffs in part, and denying all but three of the District's eight motions.  As

part of these rulings, the Court struck significant portions of certain affidavits of direct testimony

submitted by the District because the affidavits contained evidence from non-party Board

Members who previously refused to provide discovery on those topics on the basis of legislative

privilege.  ECF No. 578 at 8:19-17:4.  The District later attempted to circumvent the Court's ruling

by filing a motion for judicial notice that sought to admit the evidence that was previously struck.

ECF No. 503.  Plaintiffs once again successfully opposed that motion.  ECF No. 510.

Again reflecting its scorched-earth approach, in the days leading up to trial, the District

intentionally frustrated settlement negotiations.  Plaintiffs trusted that the District was interested

in finding a mutually agreeable settlement that would have saved millions in attorneys' fees and

benefitted everyone in the District, and Plaintiffs' counsel worked for many hours on proposed

settlement terms.  The Court even delayed the start of trial to accommodate negotiations.  However,

as demonstrated at trial (through WhatsApp chats that the District had improperly withheld), Board

8

President Harry Grossman only selectively shared information with the minority Board Members, excluded them from receiving complete drafts of Plaintiffs' settlement offers, and discouraged them from attending a settlement conference before the Court.  Decision ¶ 75, n.58.  Indeed, certain minority Board Members were not even provided an opportunity to review all the settlement proposals from Plaintiffs, including Plaintiffs' proposal to waive millions of dollars in attorneys' fees.  Trial Tr. 2673:5-18 (Charles-Pierre); ECF No. 553-1.  The District ultimately rejected Plaintiffs' proposal in a process that plainly was designed by the District, at the outset, to fail.

The hard-fought trial that followed spanned six weeks from opening to closing arguments.  A total of 31 witnesses testified.  Plaintiffs admitted 259 exhibits, and the District admitted 131 exhibits.[3]  Plaintiffs and the District each submitted testimony from two experts, with testimony from Drs. Barreto, Alford, and Mr. Cooper, all spanning multiple days of trial.  The District's long and unfocused examination of Dr. Barreto left no time for Plaintiffs to elicit rebuttal testimony before Dr. Barreto had to return to Los Angeles.  The District then insisted that Dr. Barreto fly back to New York and testify in person (instead of over video) thereby unnecessarily increasing the time and costs involved in obtaining that testimony.

During trial, the District engaged in a number of obstructionist practices, requiring significant time and effort from Plaintiffs to combat the same:

- The District submitted multiple witness statements from Board Members that were riddled with false testimony, and those same Board Members provided contradictory testimony on the stand, necessitating additional time and effort from Plaintiffs to address those issues on cross examination.  *See, e.g.*, Decision ¶ 48 ("The Court will not attempt to apportion fault between the witnesses and Defendant's counsel for the extent to which the witnesses' affidavits – especially Charles's and Germain's – were

---

[3] The District refused to cooperate in identifying exhibits that could be admitted through both Parties' consent in advance of trial, costing the Parties several hours of negotiations over the admissibility of various exhibits, and the Court's time.  Trial Tr. 149:1-7.

contradicted by their live testimony, but regardless of who is to blame, their testimony overall was so rife with dissembling that it offered scant, if any, value."); *see also* Ex F (PX339, Excerpts from Deposition Clips).

- The District conducted prolonged and unnecessary cross-examinations of Plaintiffs' witnesses, often delving into irrelevant topics.  *See* Trial Tr. 647:6-9 (Castor) ("[W]e spent an hour on whether the evil Dr. Cohen is manipulating this very impressive young woman.  I don't really see the relevance of it."); *see also* Trial Tr. 1316:19-23.

- The District refused to stipulate to the admission of government records, such as data collected by the New York State Education Department, necessitating lengthy oral arguments and unnecessary witness testimony.  *See* Trial Tr. 889:8-913:10, 2007:15-20; Ex. H (PX372, NYSED Data); *see also* Trial Tr. 772:1-17.

- At trial, the District submitted "surprise" testimony from Board Member Sabrina Charles-Pierre.[4]  Plaintiffs were placed in the position of conducting a deposition mid-trial and then cross-examining Ms. Charles-Pierre shortly thereafter.  ECF No. 528; Tr. 2115:5-2116:6.  Notably, Plaintiffs offered to submit Ms. Charles-Pierre's deposition testimony in lieu of forcing her to testify publicly (and endure the public revelation of how often she had been lied to by Mr. Grossman and others), but the District insisted that she be called to provide live testimony.  *See* Ex. I (Feb. 26, 2020 email).  Moreover, Ms. Charles-Pierre's deposition led to the discovery of unproduced communications the District improperly withheld.  *See* ECF No. 551.

- The District elicited testimony regarding the 2019 elections from Board Member Joel Freilich, Trial Tr. 729:19-23, and then sought to prevent Ashley Leveille, the minority Board Member who was elected in 2019, to testify in rebuttal, Trial Tr. 1722:1-1725:8.  Indeed, the District's counsel even improperly instructed Ms. Leveille that she was not allowed to speak with Plaintiffs' counsel and physically attempted to prevent her from entering the courtroom. Trial Tr. 1724:12-1725:8.

Plaintiffs were also forced to spend significant time and resources seeking the testimony of white slating leader, Rabbi Yehuda Oshry, who took extraordinary steps to avoid testifying, despite having highly relevant evidence.  Rabbi Oshry evaded the court's subpoena for weeks, eventually requiring Plaintiffs to move for, and the Court to hold him in, contempt.  ECF Nos. 516, 523, 524, 520; Trial Tr. 1713:22-1715:21.

The District's vexatious litigation approach did not go unrecognized by the Court, who

---

[4] Ms. Charles-Pierre's declaration was dated February 17, 2020, indicating that the District delayed submitting her declaration.

stated: "the [white Board Members'] failure to provide Board members of color with updated and accurate information about the case, and the false, misleading, or evasive testimony of present and former Board members and their allies at trial, reveal a disturbing win-at-all-costs attitude that suggests bad motives for adhering to the challenged voting practice."  Decision ¶ 86, n.62.

Even without the District's dilatory and scorched-earth tactics, the action presented a complex endeavor that required significant time, expense, and resources from Plaintiffs and their attorneys.  Since enactment of the VRA, courts have recognized that "[v]oting suits are unusually onerous to prepare."  *South Carolina v. Katzenbach*, 383 U.S. 301, 314 (1966).  Lawsuits under Section 2 of the VRA involve nuanced legal issues, require thorough development of the record, and are costly and difficult to litigate.[5]  As this Court is familiar, the *Gingles* preconditions necessitate retaining an expert demographer and an expert statistician.  *See, e.g.*, *Pope v. Cty. of Albany*, 94 F. Supp. 3d 302 (N.D.N.Y. 2015); State Attorney General Enforcement, 50 U. Mich. J.L. Reform at 592-93.  The totality-of-the-circumstances test involves nine non-exclusive factors calling for a fact-intensive inquiry into the conditions in the relevant jurisdiction.  *See Thornburg v. Gingles*, 478 U.S. 30, 44-45 (1986).  Many of the totality of the circumstances factors also necessitate expert testimony.  *See, e.g.*, *United States v. City of Euclid*, 580 F. Supp. 2d 584, 609-10 (N.D. Ohio 2008); *Citizens for a Better Gretna v. City of Gretna*, 636 F. Supp. 1113 (E.D. La. 1986); *United States v. Charleston Cty.*, 316 F. Supp. 2d 268 (D.S.C. 2003), *aff'd*, 365 F.3d 341 (4th Cir. 2004).

Plaintiffs emphasize that they have exercised prudence, good billing judgement, and

---

[5] *See* Perry Grossman, The Case for State Attorney General Enforcement of the Voting Rights Act Against Local Governments, 50 U. Mich. J.L. Reform 565, 591 (Spring 2017) ("State Attorney General Enforcement") (noting that voting rights cases "have only become more complex and resource-intensive as methods of discrimination have become more sophisticated, often requiring multiple expert witnesses whose substantial fees must be paid out-of-pocket")

caution in submitting their request.  Initially, Plaintiffs have substantially reduced their customary hourly rates to reflect the partner and associate rates that they understand the District was charged by its law firm for this case.  Salomon Decl. ¶ 2; Ex. J (PX292, Nov. 21, 2017 Minutes).  Second, Latham only seeks to recover fees for two lead partners and the associates who appeared at trial and NYCLU is not seeking to recover fees for the work of several attorneys and paralegals who contributed to this case.  Specifically, Latham seeks a total of $7,544,015.00 in attorneys' fees, representing 17,022 hours worked by 13 attorneys and staff, after a voluntary reduction of more than 9,000 hours.  Salomon Decl. ¶¶ 21-22.  NYCLU seeks a total of $952,978 for the work of three attorneys.  Eisenberg Decl. at 17.  Third, while Plaintiffs engaged five experts, their request only seeks to recover expenses for three expert witnesses.  *Id*.  This request is more than reasonable in light of the fees expended by the District in this action.  *Arbor Hill Concerned Citizens Neighborhood Ass'n v. Cty. of Albany & Albany Cty. Bd. of Elections*, 522 F.3d 182, 184 (2d Cir. 2008).[6]  In total, Plaintiffs' counsel respectfully requests that the Court award $9,189,716.47 in attorneys' fees, expenses, and costs.

## ARGUMENT

## I.   PLAINTIFFS' COUNSEL FEES ARE REASONABLE

Plaintiffs seek $7,121,915.00 in attorneys' fees for the work of Andrew B. Clubok, Claudia T. Salomon, Corey Calabrese, Russell Mangas, Rakim E. Johnson, Thomas C. Pearce, Andrej Novakovski, Abhinaya Swaminathan, Nicole Scully, Meredith A. Cusick, and Elizabeth C. Sahner, based on 15,294.3 hours at an hourly rate of $650 for partners and $450 for associates.

---

[6] Plaintiffs sought information from the District on their fees and costs in an effort to avoid burdening the Court with yet another dispute between the parties.  The District has refused.  Ex. K (June 21, 2020 email from W. Cravens).  Thus, if the District objects to the reasonableness of the instant request, Plaintiffs will formally seek discovery regarding those issues.  *Frommert v. Conkright*, 223 F. Supp. 3d 140, 151-52 (W.D.N.Y. 2016)

Plaintiffs likewise seek $952,978 for the work of Arthur Eisenberg, Perry Grossman, and Kevin Jason, based on 1742.56 hours at hourly rates of $650, $550, and $300 respectively. Plaintiffs are entitled to these reasonable fees under 52 U.S.C. § 10310(e): "In any action or proceeding to enforce the voting guarantees of the fourteenth or fifteenth amendment, the court, in its discretion, may allow the prevailing party … [1]] a reasonable attorney's fee, [2]] reasonable expert fees, and [3]] other reasonable litigation expenses as part of the costs." 52 U.S.C. § 10310(e). This Court has held that Plaintiffs are entitled to fees and costs and asked Plaintiffs to submit this motion. Decision ¶ 89.

In calculating a "presumptively reasonable fee," the district court must "determine what a reasonable paying client would be willing to pay for the legal services, in other words, the appropriate market rate for counsel over the course of the number of hours appropriately worked." *New York Youth Club v. Town of Harrison*, 2016 WL 3676690, at *2 (S.D.N.Y. July 6, 2016) (Seibel, J.) (internal quotation marks and citations omitted). The very "purpose of fee-shifting statutes" is to "assur[e] that civil rights claims of modest cash value can attract competent counsel." *Millea v. Metro-N. R. Co.*, 658 F.3d 154, 169 (2d Cir. 2011). Because damages are unavailable and the cost of litigating cases under the VRA is enormous, "there are relatively few attorneys willing to bring complex voting cases, and even fewer repeat players with the expertise to do these cases well." State Attorney General Enforcement, 50 U. Mich. J.L. Reform at 592.

Courts first determine the award of a reasonable attorney's fee by calculating the "number of hours reasonably expended on the litigation multiplied by a reasonable hourly rate." *Hensley v. Eckerhart*, 461 U.S. 424, 433 (1983); *Arbor Hill*, 522 F.3d at 186. As the Second Circuit has emphasized:

> Both this Court and the Supreme Court have held that the lodestar—the product of a reasonable hourly rate and the reasonable number of hours required by the

13

case—creates a "presumptively reasonable fee." *Arbor Hill Concerned Citizens Neighborhood Assoc. v. Cnty. of Albany*, 522 F.3d 182, 183 (2d Cir. 2008); *see also Perdue v. Kenny A. ex rel. Winn*, ——U.S. ——, ——, 130 S.Ct. 1662, 1673, 176 L.Ed.2d 494 (2010). While the lodestar is not always conclusive, its presumptive reasonability means that, absent extraordinary circumstances, failing to calculate it as a starting point is legal error.

*Millea*, 658 F.3d at 166.

### A.   <u>Latham's Requested Rates Are Reasonable.</u>

Latham's requested rates are less than or equal to what Plaintiffs understand defense counsel is charging the District in this case.  *See* Ex. J (PX292, Nov. 21, 2017 Minutes).

In setting a reasonable hourly rate, courts consider all of the "case-specific variables that [the Second Circuit] and other courts have identified as relevant to the reasonableness of attorneys' fees," including the so-called *Johnson* factors.[7] *New York Youth Club*, 2016 WL 3676690, at *2 (*citing Arbor Hill*, 522 F.3d at 190);[8] *Alicea v. City of New York*, 272 F. Supp. 3d 603, 608 (S.D.N.Y. 2017).  The hourly rate employed should be "based on market rates in line with those

---

[7] The *Johnson* factors are: (1) the time and labor required; (2) the novelty and difficulty of the questions; (3) the level of skill required to perform the legal service properly; (4) the preclusion of employment by the attorney due to acceptance of the case; (5) the attorney's customary hourly rate; (6) whether the fee is fixed or contingent; (7) the time limitations imposed by the client or the circumstances; (8) the amount involved in the case and the results obtained; (9) the experience, reputation, and ability of the attorneys; (10) the 'undesirability' of the case; (11) the nature and length of the professional relationship with the client; and (12) awards in similar cases. *Arbor Hill*, 522 F.3d at 186 n.3 (internal quotation marks omitted).

[8] *Arbor Hill* also provides that "the district court should, in determining what a reasonable, paying client would be willing to pay, consider factors including, but not limited to, the complexity and difficulty of the case, the available expertise and capacity of the client's other counsel (if any), the resources required to prosecute the case effectively (taking account of the resources being marshaled on the other side but not endorsing scorched earth tactics), the timing demands of the case, whether an attorney might have an interest (independent of that of his client) in achieving the ends of the litigation or might initiate the representation himself, whether an attorney might have initially acted pro bono (such that a client might be aware that the attorney expected low or non-existent remuneration), and other returns (such as reputation, etc.) that an attorney might expect from the representation." *Arbor Hill*, 522 F.3d at 184.

[rates] prevailing in the community for similar services by lawyers of reasonably comparable skill, experience, and reputation.  It is well-established that the prevailing community a district court should consider ... is normally the district in which the court sits."  *New York Youth Club*, 2016 WL 3676690, at *2; *Alicea*, 272 F. Supp. 3d at 608 (quoting *Nature's Enters., Inc. v. Pearson*, 2010 WL 447377, at *9 (S.D.N.Y. Feb. 9, 2010)).

In this case, the relevant community is the Southern District of New York.  Law firms in the Southern District regularly charge hourly rates of more than $500 for associates and rates of more than $1,000 for partners.  *See Vista Outdoor, Inc. v. Reeves Family Tr.*, 2018 WL 3104631, at *6-7 (S.D.N.Y. May 24, 2018) (noting that rates above $1,000 for partners in "big law" in New York and above $500 for associates are reasonable); *Pope v. Cty. of Albany*, No. 1:11-cv-0736 (LEK/CFH), ECF No. 440 (average billing rates ranging from $502 to $1,174); *see also Associate Hourly Billing Rates Surge Past $1K as Firms Snap Up Bankruptcy Work*, LAW.COM (May 22, 2020) ("Members and counsel are now billing from $1,100 to $1,695 at the firm; associates are billing $595 to $1,050; and paraprofessionals are billing between $250 and $435 per hour.").  Although Plaintiffs' counsel would be entitled to rates consistent with what other large firms charge in the S.D.N.Y., Plaintiffs' counsel are seeking rates at a significant discount to the rates Latham regularly receives from its clients in similar complex litigations.  Salomon Decl. ¶ 22.

In addition to reflecting a significant reduction from standard fees in the S.D.N.Y., these rates are consistent with rates that have been awarded in other civil rights litigation.  *See Cruz v. Zucker*, 2017 WL 1093285, at *3 (S.D.N.Y. Mar. 10, 2017) (awarding *pro bono* counsel Willkie Farr hourly rates between $375 for associates and $675 for partners); *Bailey v. Pataki*, 2016 WL 3545941, at *6 (S.D.N.Y. June 16, 2016) (rates of $600 and $550 reasonable for lawyers with over a decade of experience); *Abdell v. City of New York*, 2015 WL 898974, at *3 (S.D.N.Y. Mar. 2,

2015) (rate of $650 reasonable for civil rights litigator in light of "skill and experience"); *Barbour v. City of White Plains*, 788 F. Supp. 2d 216, 225 (S.D.N.Y. 2011) ($625 rate reasonable for civil rights lawyers in light of skill and experience), *aff'd*, 700 F.3d 631 (2d Cir. 2012) (per curiam); *Dancy v. McGinley*, 141 F. Supp. 3d 231, 236-37 (S.D.N.Y. 2015) (cataloguing court-approved attorney rates for experienced civil rights attorneys ranging from $250 to $600 between 2000 and 2010).  These requested fees are therefore reasonable.

The *Johnson* factors also support Plaintiffs' counsel's requested rates.  *First*, the "results obtained" support these rates.  *Arbor Hill*, 522 F.3d at 186 n.3.  "The most critical factor in a district court's determination of what constitutes reasonable attorneys' fees ... is the degree of success obtained by the plaintiff," *New York Youth Club*, 2016 WL 3676690, at *2 (quoting *Barfield v. N.Y.C. Health & Hosps. Corp.*, 537 F.3d 132, 152 (2d Cir. 2008)) (internal quotation marks omitted).  Here, Plaintiffs achieved a complete victory in their VRA claim.  Decision ¶¶ 87-88.  Not only did Plaintiffs prevail at trial, but also over the motion to dismiss, summary judgment, and *Daubert* motions, and the multitude of discovery disputes necessitated by the District's dilatory tactics, including its interlocutory appeal as well as emergency stay motions before this Court and the Second Circuit.  This complete success supports Plaintiffs' counsel's requested rates.

*Second*, the immense time and labor required to litigate this case support Plaintiffs' requested rates.  *Arbor Hill*, 522 F.3d at 186 n.3.  Plaintiffs filed their complaint in November 2017.  ECF No. 1.  Two years of voluminous discovery followed, punctuated by the District's motion to dismiss, motion for summary judgment, and various motions relating to Plaintiffs' experts.  In addition, Plaintiffs were forced to bring and defend numerous discovery disputes brought on by the District's scorched-earth approach to the litigation and meritless resistance to

making Board Members (who were critical trial witnesses) available for depositions.  *E.g.*, ECF Nos. 86, 106, 124, 135, 153, 169, 176, 194, 290, 439, 443.  All of Plaintiffs' counsel's time and labor spent in these efforts was indispensable in delivering a complete victory for their clients after a six-week trial.  In light of these efforts, Plaintiffs' requested rates are more than reasonable.  *See Ravina v. Columbia Univ.*, 2020 WL 1080780, at *6 (S.D.N.Y. Mar. 6, 2020) ("SHS invested significant labor and resources to survive … separate motions for summary judgment and litigate a fifteen-day jury trial."); *Montes v. City of Yakima*, 2015 WL 11120966, at *13 (E.D. Wash. June 19, 2015) ("The city of Yakima chose to litigate this matter tenaciously … it cannot now be heard to complain that an award commensurate to the time Plaintiffs necessarily spent in response to this vigorous defense was unreasonable.").

*Third*, the complex and fact-intensive nature of the questions posed by the case support Plaintiffs' requested rates.  *Arbor Hill*, 522 F.3d at 186 n.3.  VRA cases involve complex questions of facts and law, and their application to the three *Gingles* preconditions and the nine Senate Factors.  *See Gingles*, 478 U.S. at 50-51; *Goosby v. Town Bd. of Hempstead*, 180 F.3d 476, 491-92 (2d Cir. 1999); *Williams v. Bd. of Comm'rs of McIntosh Cty.*, 938 F. Supp. 852, 858 (S.D. Ga. 1996) ("Voting Rights litigation is, in and of itself, an extremely complex and intimidating area of the law.").  As the District itself stated, a "searching, comprehensive analysis of the broader factual context [was] required here to assess Plaintiffs' claim."  ECF No. 76 at 4; ECF No. 571.

*Fourth*, the experience, reputation and ability of Plaintiffs' counsel supports their requested rates.  *Arbor Hill*, 522 F.3d at 186 n.3.  Plaintiffs' counsel have significant litigation and trial experience, which was critical in countering the District's aggressive, vexatious tactics throughout this matter, and in successfully managing a six-week trial and voluminous record.  *See* Salomon Decl. ¶¶ 15-19.  This unmatched experience and ability, and capabilities of Latham to conduct

complex litigation of this type, warrants the requested rates.  *See LV v. N.Y. City Dep't of Educ.*, 700 F. Supp. 2d 510, 517 (S.D.N.Y. 2010) (awarding higher rates to private attorneys because "this was a complex class action, and [the private law firm] was able to supply superior resources, larger staff, and experience with class actions.  The need for such resources and experience reflects the difficulty of this case relative to many other civil rights cases defendants cite in their brief.") (internal citations and quotations omitted).  Indeed, absent the resources of a firm such as Latham, this litigation would likely never have proceeded.  *See, e.g., Heng Chan v. Sung Yue Tung Corp.*, 2007 WL 1373118, at *3 (S.D.N.Y. May 8, 2007) ("The institutional resources of a large firm . . . with the higher overhead and other costs that go with them . . . were in all likelihood a necessary condition for the successful prosecution of this multi-year action ….  It would have been difficult, if not impossible, for most small civil rights firms or nonprofit organizations to take on the case at all.") (internal citation omitted); *Wise v. Kelly*, 620 F. Supp. 2d 435, 446 (S.D.N.Y. 2008) (stating that Skadden, Arps, Slate, Meagher & Flom, litigating a civil rights case as pro bono counsel, was entitled to higher rates by virtue of its lawyers' "skills and experience").

Moreover, other factors listed in *Arbor Hill* also support Latham's rates. *Arbor Hill*, 522 F.3d at 184.  In particular, in determining the reasonableness of the requested rates, the Court may consider "the resources required to prosecute the case effectively (taking account of the resources being marshaled on the other side but not endorsing scorched earth tactics)." *Id.*  This includes consideration of rates paid to the District's lawyers, particularly given Latham's decision to match what the District's counsel is charging.  *See Conkright*, 223 F. Supp. 3d at 151-52 ("[P]laintiffs' claimed rates are at least consonant with defense counsel's rates"); *Ceglia v. Zuckerberg*, 2012 U.S. Dist. LEXIS 18438 (W.D.N.Y. Feb. 14, 2012) (comparing plaintiff and defendant's counsels' rates); *see also Regeneron Pharm., Inc. v. Merus N.V.*, 2018 WL 3425013, at *4 (S.D.N.Y. June

25, 2018) (noting prevailing counsel's rates were lower than opposing counsel's).

In this case, Plaintiffs were compelled to hire a large law firm to match the resources marshalled by the District.  According to an investigation by *The Journal-News*, the District spent approximately $16 million on legal fees between 2012 and 2018.[9]  The District routinely hired large and expensive law firms to represent it *and* its Board in various proceedings, specifically David Butler and Randall Levine (the District's counsel in this matter).  For example, it paid hourly rates of $650 for Mr. Butler and $450 for other attorneys (Calabrese Decl. Ex. L (PX197_0014, July 24, 2017 Minutes)) to challenge NYSED decisions regarding the District's special education placements, all of which it lost.  *See East Ramapo Cent. Sch. Dist. v. DeLorenzo*, 2013 U.S. Dist. LEXIS 143898 (S.D.N.Y. Dec. 3, 2013); *Matter of E. Ramapo Cent. Sc. Dist. v. King*, 2013 N.Y. Slip Op. 34132(U) (Sup. Ct.); *East Ramapo Cent. Sch. Dist. v. King*, 130 A.D. 3d 19 (N.Y. 2015); *East Ramapo Cent. Sch. Dist. v. King*, 29 N.Y.3d 938 (N.Y. 2017).  And the District hired Mr. Butler at the same rates in other litigations as well. *See* Calabrese Decl. Ex. L (PX197, July 24, 2017 Minutes) at PX197_0008-0013; Ex. M (Dec. 18, 2012 Minutes) at 7178-79.  Plaintiffs merely seek rates commensurate with the rates paid to the District's counsel.

Last, Latham's pro bono engagement should not overcome the "presumptive reasonability" of the lodestar for multiple reasons.  *Millea*, 658 F.3d at 166.  The District itself hired a large, national firm, which itself favors the lodestar because that fact itself demonstrates "what a reasonable, paying client would be willing to pay," *Arbor Hill*, 522 F.3d at 184, to lawyers litigating the very issues at hand.  That fact also indicates that a reasonable lawyer in Latham's

---

[9] Thomas Zambito, *NAACP challenges Orthodox Jewish dominance of East Ramapo board in high profile court* case, LOHUD.COM (updated Feb. 11, 2020) *available at* https://www.lohud.com/story/news/education/2020/02/09/federal-judge-decide-voting-challenge-naacp-east-ramapo/4682606002/ (last accessed June 25, 2020).

position – that is, facing the very issues at hand – reasonably would have expected to be paid the requested rates.  *See id.* (suggesting consideration of "what an attorney might expect from the representation.")  Second, like many Section 2 cases, this matter was far-reaching, complex, and fact-intensive.  *See* disc. *supra* at 11; *Arbor Hill*, 522 F.3d at 184 (recommending consideration of "the complexity and difficulty of the case").  Third, the District's litigation strategy required a national law firm possessing the resources to marshal an appropriate set of responses.  *See* disc. *supra* at 17-18; *Arbor Hill*, 522 F.3d at 184 (court should consider "the resources required to prosecute the case effectively").  Fourth, district courts in the Second Circuit routinely award law firms engaged in pro bono cases reasonable fees, reinforcing that counsel may reasonably "expect [such rates] from the representation."  *Arbor Hill*, 522 F.3d at 184; disc. *supra* at 19.  And fifth, Latham already has voluntarily reduced its requested rates, such that it is not requesting "out of district rates."  *Arbor Hill*, 522 F.3d at 191.  Hence, this case hardly presents the type of "extraordinary circumstances" that would warrant departure from the lodestar approach.  *See Millea*, 658 F.3d at 167 ("such adjustments are appropriate only in 'rare circumstances,'").

## B. NYCLU's Rates are Reasonable Under the Circumstances

NYCLU requests reasonable hourly rates of $650 for Arthur Eisenberg and $550 for Perry Grossman, the two lead NYCLU attorneys for this matter, and $300 for Kevin Jason.  Mr. Eisenberg and Mr. Grossman maintain offices in lower Manhattan, and their requested rates are commensurate with rates awarded in civil rights litigation in the Southern District of New York. *See Cruz*, 2017 WL 1093285, at *3; *Bailey*, 2016 WL 3545941, at *6; *Abdell*, 2015 WL 898974, at *3; *Barbour*, 788 F. Supp. 2d at 225. Moreover, the experience, reputation and ability of Mr. Eisenberg and Mr. Grossman support their requested rates.  *Arbor Hill*, 522 F.3d at 186 n.3.  Mr. Eisenberg has worked for NYCLU since 1971 and has extensive experience litigating civil rights cases involving voting rights, equal protection of the laws, and free speech, and has served as the

Legal Director of the NYCLU for more than 25 years.  Eisenberg Decl. ¶ 5, Ex. A.  He has also taught constitutional law, constitutional litigation, civil rights law and election law at the University of Minnesota Law School and the Cardozo School of Law.  Eisenberg Decl. ¶ 5, Ex. A.  Mr. Grossman has practiced since 2008 and has been the Senior Staff Attorney in the Voting Rights Project at NYCLU since 2017, where he has specialized in voting rights litigation. Grossman Decl. ¶ 5, Ex. A.  Mr. Grossman is currently an adjunct professor of law at Fordham University School of Law and has published scholarship concerning Section 2 litigation. Grossman Decl. ¶ 5.  NYCLU's requested rates are reasonable in light of prevailing rates and their extensive experience as civil rights litigators.

### C.    <u>Counsel's Hours Spent on this Case are Reasonable.</u>

The reasonable fee is also determined by calculating the number of hours reasonably expended on the litigation.  *Hensley*, 461 U.S. at 433; *Arbor Hill*, 522 F.3d at 186.  Plaintiffs bear "the burden of establishing entitlement to an award and documenting the appropriate hours expended…. The applicant should exercise 'billing judgment' with respect to hours worked and should maintain billing time records in a manner that will enable a reviewing court to identify distinct claims."  *New York Youth Club*, 2016 WL 3676690, at \*4 (citing *Hensley*, 461 U.S. at 437).  "The court must evaluate the tasks and the time documented in counsel's contemporaneous time records in light of its general experience and its experience with the case."  *DLJ Mortg. Capital, Inc. v. Act Lending Corp.*, 2008 WL 5517589, at \*7 (S.D.N.Y. Dec. 1, 2008).

#### 1.    <u>The Hours Plaintiffs' Counsel Expended Are Reasonable.</u>

As discussed above, this litigation required significant time and effort on the part of Plaintiffs' counsel, particularly in light of both the complexity and fact-intensive nature of the issues and the aggressive tactics employed by the District.  Plaintiffs' counsel would be entitled to recover for all of the hours expended on this matter.  *Balderas v. State*, 2002 WL 32113829, at \*1

(E.D. Tex. May 21, 2002) ("This was complex voting rights litigation. The hours sought are reasonable"). Although Plaintiffs' attorneys all worked diligently and efficiently and their work was cumulatively reasonable and necessary to achieving a successful result at trial, Plaintiffs voluntarily have reduced their attorneys' bills so as not to seek full recovery from the District for all of the work undertaken in this case.

To that end, Plaintiffs are only seeking reimbursement from the District for the hours of a core team of the associates who stood up at trial, plus two of the several partners who managed this team and appeared at trial daily.  Salomon Decl. ¶ 13.  With respect to Latham's hours, this results in foregoing an award for more than 9,000 hours of attorney and paralegal time that contributed to Plaintiffs' victory in this case.  Salomon Decl. ¶ 21.  In such a scenario, even if the "defendant raises some colorable objections to counsel's time, the disputed hours are dwarfed by counsel's across-the-board deductions."  *Zucker*, 2017 WL 1093285, at *4 (declining to reduce number of hours billed because counsel "has applied a 10% across-the-board deduction and has entirely eliminated the hours of certain billers, reducing its fee request by $1,048,794.65"). Latham has reduced its hours by 34.6%. *See* Salomon Decl. ¶ 21.

2.     <u>Plaintiffs' Timesheet Entries are Sufficiently Detailed.</u>

A fee application requires the Court to review time entries for reasonableness and specificity.  *See Williamsburg Fair Hous. Comm. v. N.Y.C. Hous. Auth.*, 2005 WL 736146, at *9 (S.D.N.Y. Mar. 31, 2005).  Records are sufficiently specific if they adequately identify the general subject matter of the work that the attorney did during each time slot.  *Tucker v. City of New York*, 704 F. Supp. 2d 347, 356 (S.D.N.Y. 2010).  Plaintiffs' counsel detailed time entries more than satisfy this standard, and deductions are not necessary. Salomon Decl., Ex. 10.

3.     <u>Plaintiffs' Request for Paralegal and Videotechnology Specialist Fees Are</u>

<u>Reasonable</u>

"Reasonable attorney's fees" includes compensation of paralegals at the prevailing market rate. *Missouri v. Jenkins*, 491 U.S. 274, 285 (1989). "Indeed, the availability of statutory compensation for paralegals, 'encourages the effective delivery of legal services and [reduces] the spiraling cost of civil rights litigation.'" *Williams*, 938 F. Supp. 852, 859 (S.D. Ga. 1996) (quoting *Cameo Convalescent Ctr., Inc. v. Senn*, 738 F.2d 836, 859 (7th Cir. 1984)) (alteration in original). The requested hourly rates of $250 are reasonable. *See Genger v. Genger*, 2015 U.S. Dist. LEXIS 28813, at \*5-6 (2015) (hourly rate of $280 for paralegal); *Synergy Aero. Corp. v. LLFC Corp.*, 2016 U.S. Dist. LEXIS 137070, at \*7-8 (2016) (hourly rate of $265 for paralegal).

Plaintiffs seek reasonable fees for one paralegal and the video technology specialist who appeared each day at trial, totaling $432,100.  Salomon Decl. ¶ 22.  Plaintiffs are not billing for secretarial time or other administrative support.

## II.   THE EXPERT FEES INCURRED BY PLAINTIFFS ARE REASONABLE.

Plaintiffs are seeking $192,463.92 in expert fees for its experts, based on a $150 hourly rate for William Cooper and a $300 hourly rate for Dr. Barreto.[10]  *See Salomon Decl. ¶¶ 27-29; Eisenberg Decl. ¶ 16, Ex. E.  Plaintiffs are entitled to recover reasonable expert fees.  *See generally*, *Mark Andrew of the Palm Beaches, Ltd. v. GMAC Comm. Mortg. Corp.*, 2003 WL 21767633 (S.D.N.Y. July 31, 2003).

Plaintiffs' expert fees are reasonable.  Plaintiffs retained an expert demographer, Mr. Cooper, as well as expert political scientists, Dr. Barreto and Dr. Collingwood, in order to prove the three *Gingles* preconditions – critical aspects of a Section 2 claim under the VRA.  *See, e.g., Pope v. Cty. of Albany*, 94 F. Supp. 3d 302 (N.D.N.Y. 2015).  The Court's in-depth analysis makes

---

[10] Plaintiffs' counsel are not seeking fees for the expert reports of Dr. Steven Cole or Dr. Wells.

plain that the work undertaken by these experts was essential to Plaintiffs' case.  Decision ¶¶ 4-38, 53, 62-63, 67.  In addition, their hourly fees are standard given their industries and relative experience, particularly in light of the discounted rate Dr. Barreto used in this matter.  *See Pope v. Cty. of Albany*, 2015 U.S. Dist. LEXIS 123379, at *45 (N.D.N.Y. Sep. 16, 2015) (noting Mr. Cooper is "a redistrict and mapping expert with decades of experience" and awarding $100 per hour); *Favors v. Cuomo*, 39 F. Supp. 3d 276, 310 (E.D.N.Y. 2014) (approving without reduction, $200 hourly rate for "professor whose areas of expertise include demography, the statistical and quantitative analysis of social science datasets, most particularly including Census data, survey data and administrative records.").  Finally, the experts' costs and expenses were reasonable, as they were required to litigate this case and local experts were not available.  *Cf. Mark Andrew*, 2003 WL 21767633, at *2 n.3  ("[N]o precedent . . . supports the forced payment for travel time of nearly twenty hours without any showing that equally skilled local experts are unavailable.").[11] In an attempt to mitigate travel costs, Plaintiffs sought to have Dr. Barreto, who lives and teaches in Los Angeles, appear by video for his rebuttal testimony because he had already testified in-person over several days, giving the Court ample time to assess Dr. Barreto's credibility.  The District, however, demanded that Dr. Barreto fly back from Los Angeles to New York, extending the trial and unnecessarily increasing travel costs.  Plaintiffs' requested expert fees are therefore reasonable and should be awarded.

## III.   PLAINTIFFS' OTHER LITIGATION COSTS ARE REASONABLE.

Plaintiffs are seeking $490,259.55 in costs, as detailed in the attached declaration.  Salomon Decl. ¶ 32.  Plaintiffs are also entitled to collect reasonable out of pocket expenses normally

---

[11] The District also hired out-of-state experts – Dr. Alford is from Texas and Dr. Morrison is from Minnesota.

charged to clients.  52 U.S.C. § 10310(e); *LeBlanc-Sternberg v. Fletcher*, 143 F.3d 748, 763 (2d Cir. 1998) ("[A]ttorney's fees awards include those reasonable out-of-pocket expenses incurred by attorneys and ordinarily charged to their clients.") (internal quotation marks omitted)); *Kuzma v. IRS*, 821 F.2d 930, 933–34 (2d Cir. 1987) ("Identifiable, out-of-pocket disbursements for items such as photocopying, travel, and telephone costs are generally taxable under § 1988 and are often distinguished from nonrecoverable routine office overhead, which must normally be absorbed within the attorney's hourly rate.").  Plaintiffs are entitled to costs in the amount of $490,259.55, as identified in their supporting declaration.  Salomon Decl. ¶ 32.  These costs include costs for purchasing data (*e.g.*, from Catalist), travel (excluding travel for out-of-district attorneys to and from the district), which Plaintiffs are not seeking from the District, discovery (*e.g.*, document hosting and processing costs, deposition costs) and trial (*e.g.*, technology and lodging costs).  *See Westport Ins. Corp. v. Hamilton Wharton Grp. Inc.*, 483 F. App'x 599, 605 (2d Cir. 2012) (finding the district court had not erred in awarding costs for, "among other things, in-house duplication costs, telephone charges, meals, overtime, local transportation, postage, electronic legal research, and messenger service").

## IV.    RESERVATION OF RIGHTS

Although Plaintiffs' counsel have reduced their rates and fees for the purpose of this Motion, Plaintiffs expressly reserve the right to seek recovery (including sanctions) for any portion of those foregone fees directly from Morgan Lewis based on their vexatious and dilatory tactics throughout this litigation, including but not limited to the instances described herein.  *See* 28 U.S.C. § 1927.  Plaintiffs also expressly reserve their rights to seek from the District and/or Morgan Lewis the attorneys' fees, expert fees, and other costs that may be incurred in connection with continued litigation of the remedy phase or any appeal to this case. Plaintiffs have attempted, pursuant to the Court's directive (*see* Decision at ¶¶ 88 n.63, 89), to meet and confer with the

District regarding both the fees sought by this motion and the remedy for the District's VRA violation, but the District has refused to meet and confer or discuss these issues with Plaintiffs. *See* Calabrese Decl. Ex. K (June 21, 2020 email from W. Cravens to R. Mangas).

## CONCLUSION

For all the foregoing reasons, Plaintiffs respectfully request that this Court grant their motion.

Dated: June 25, 2020
New York, New York

Respectfully submitted,
**LATHAM & WATKINS LLP**

/s/ Claudia T. Salomon

Claudia T. Salomon
Corey A. Calabrese
Andrej Novakovski
Claudia.Salomon@lw.com
Corey.Calabrese@lw.com
Andrej.Novakovski@lw.com
885 Third Avenue
New York, NY 10022
Phone: (212) 906-1200

Marc Zubick
Russell Mangas *(admitted pro hac vice)*
Marc.Zubick@lw.com
Russell.Mangas@lw.com
330 N. Wabash Avenue
Chicago, IL  60601
Phone:  (312) 876-7600

Andrew Clubok
Andrew.Clubok@lw.com
555 Eleventh Street, NW
Suite 1000
Washington, D.C. 20004
Phone: (202) 637-2200

**NEW YORK CIVIL LIBERTIES UNION FOUNDATION**

Arthur Eisenberg

26

Perry Grossman
aeisenberg@nyclu.org
pgrossman@nyclu.org
125 Broad Street
New York, NY 10004
Phone: (212) 607-3329

*Attorneys for Plaintiffs*