**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| NATIONAL ASSOCIATION FOR THE ADVANCEMENT OF COLORED PEOPLE, SPRING VALLEY BRANCH; JULIO CLERVEAUX; CHEVON DOS REIS; ERIC GOODWIN; JOSE VITELIO GREGORIO; DOROTHY MILLER; HILLARY MOREAU; and WASHINGTON SANCHEZ, <br><br> Plaintiffs, <br><br> v. <br><br> EAST RAMAPO CENTRAL SCHOOL DISTRICT and MARYELLEN ELIA, IN HER CAPACITY AS THE COMMISSIONER OF EDUCATION OF THE STATE OF NEW YORK, <br><br> Defendants. | 17 Civ. 8943 (CS) (JCM) |

**PLAINTIFFS' MEMORANDUM OF LAW IN OPPOSITION TO**
**THE DISTRICT'S PROPOSED REMEDIAL PLAN AND IN SUPPORT OF**
**PLAINTIFFS' PROPOSED REMEDIAL PLAN**

## <u>TABLE OF CONTENTS</u>

<u>Page</u>

INTRODUCTION ..................................................................................................1

ARGUMENT ........................................................................................................3

I.     THE DISTRICT HAS FAILED TO OFFER A SERIOUS PROPOSAL OR
ALTERNATIVE REMEDY AND HAS WAIVED ITS RIGHT TO DO SO....................3

II.    THE COURT SHOULD ORDER PLAINTIFFS' REMEDIAL WARD PLAN................9

     A.     The Court Should Not Adopt An Illustrative Plan That Was Not
Developed To Remedy The District's Section 2 Violation ...................................9

     B.     The Court Should Not Adopt The District's Suggestion To Open All Nine
Seats For Election At Once....................................................................13

     C.     Plaintiffs' 2020 Plan Remedies The District's Section 2 Violation ....................14

     D.     The Court Should Order A Special Election Only Of The Four Board
Members Seats Currently Open ...............................................................17

CONCLUSION....................................................................................................18

**TABLE OF AUTHORITIES**

**Page(s)**

**CASES**

*Adamson v. Clayton Cty. Elections & Registrations Bd.*,
876 F. Supp. 2d 1347 (N.D. Ga. 2012) .................................................................11

*African Am. Voting Rights Legal Def. Fund, Inc. v. Villa*,
54 F.3d 1345 (8th Cir. 1995) .................................................................................20

*Arbor Hill Concerned Citizens Neighborhood Ass'n v. Cty. of Albany*,
289 F. Supp. 2d 269 (N.D.N.Y. 2003), *rev'd on other grounds sub nom. Arbor Hill Concerned Citizens v. Cty. of Albany*, 357 F.3d 260 (2d Cir. 2004) ...............16

*Blackmoon v. Charles Mix Cty.*,
2005 WL 2738954 (D.S.D. Oct. 24, 2005) ...........................................................11

*Bone Shirt v. Hazeltine*,
387 F. Supp. 2d 1035 (D.S.D. 2005), *aff'd*, 461 F.3d 1011 (8th Cir. 2006) .....................13, 15

*Cane v. Worcester Cty.*,
35 F.3d 921 (4th Cir. 1994) ...................................................................................16

*Covington v. State*,
267 F. Supp. 3d 664 (M.D.N.C. 2017) ..................................................................11

*Dickinson v. Ind. State Election Bd.*,
933 F.2d 497 (7th Cir. 1991) .....................................................................15, 17, 20

*Goosby v. Town Bd. of Hempstead*,
956 F. Supp. 326 (E.D.N.Y. 1997), *aff'd*, 180 F.3d 476 (2d Cir. 1999)............................6, 10

*Harper v. City of Chicago Heights*,
223 F.3d 593 (7th Cir. 2000) .................................................................................13

*Jamison v. Tupelo*,
471 F. Supp. 2d 706 (N.D. Miss. 2007)................................................................10

*Jeffers v. Tucker*,
847 F. Supp. 655 (E.D. Ark. 1994)........................................................................20

*Ketchum v. Byrne*,
740 F.2d 1398 (7th Cir. 1984) ...............................................................................17

*League of United Latin Am. Citizens v. Perry*,
548 U.S. 399 (2006)................................................................................................19

*Lopez v. Abbott*,
   339 F. Supp. 3d 589 (S.D. Tex. 2018) ...................................................................15

*Luna v. Cty. of Kern*,
   2017 WL 2379934 (E.D. Cal. June 1, 2017) ........................................................15

*Mo. State Conf. of the NAACP v. Ferguson-Florissant Sch. Dist.*,
   2016 WL 5390946 (E.D. Mo. Sept. 27, 2016)...........................................11, 18, 22

*New Rochelle Voter Def. Fund v. City of New Rochelle*,
   308 F. Supp. 2d 152 (S.D.N.Y. 2003) ...................................................................10

*Patino v. City of Pasadena*,
   230 F. Supp. 3d 667 (S.D. Tex. 2017) ...................................................................21

*Paz Sys., Inc. v. Dakota Grp. Corp.*,
   2006 WL 8430241 (E.D.N.Y. June 16, 2006) ......................................................13

*Pope v. Cty. of Albany*,
   687 F.3d 565 (2d Cir. 2012)...................................................................................15

*Pope v. Cty. of Albany*,
   94 F. Supp. 3d 302 (N.D.N.Y. 2015) ....................................................................11

*Puerto Rican Legal Def. & Educ. Fund, Inc. v. Gantt*,
   796 F. Supp. 681 (E.D.N.Y. 1992) .......................................................................11

*Smith v. Clinton*,
   687 F. Supp. 1361 (E.D. Ark. 1988), *aff'd sub nom. Clinton v. Smith*, 488 U.S.
   988 (1988)...............................................................................................................20

*Smith v. Cobb Cty. Bd. of Elections & Registrations*,
   314 F. Supp. 2d 1274 (N.D. Ga. 2002) .................................................................11

*Terrebonne Branch NAACP v. Jindal*,
   2019 WL 4398509 (M.D. La. Apr. 29, 2019), *report and recommendation*
   *adopted sub nom. Terrebonne Par. Branch NAACP v. Edwards*, 399 F. Supp.
   3d 608 (M.D. La. 2019) .........................................................................................19

*United States v. City of Euclid*,
   523 F. Supp. 2d 641 (N.D. Ohio 2007).............................................................17, 20

*United States v. Vill. of Port Chester*,
   704 F. Supp. 2d 411 (S.D.N.Y. 2010)...................................................................14

*Westwego Citizens for Better Gov't v. City of Westwego*,
   946 F.2d 1109 (5th Cir. 1991) ...............................................................................15

*Williams v. City of Texarkana*,
    32 F.3d 1265 (8th Cir. 1994) ................................................................................13

## STATUTES

N.Y. EDUC. LAW
    § 1804(2) ...........................................................................................................19
    § 2502(3) ...........................................................................................................19

## OTHER AUTHORITIES

S. REP. NO. 97-417, at 31 (1982) *as reprinted in* 1982 U.S.C.C.A.N. 177, 208...........................10

## INTRODUCTION

On May 25, 2020, this Court found that the District's at-large election scheme "has operated to invidiously exclude blacks [and Latinos] from effective participation in political life in violation of Section 2 [of the Voting Rights Act]."  ECF No. 568 (the "Decision") ¶ 87 (quoting *Goosby v. Town Bd. of Hempstead*, 956 F. Supp. 326, 356 (E.D.N.Y. 1997), *aff'd*, 180 F.3d 476 (2d Cir. 1999)).  This Court enjoined the District from holding any further elections under that illegal system and ordered the District to propose a plan within 30 days that appropriately remedied the Section 2 violation.  *Id.* ¶ 88.  The Court "urge[d] the parties to reach agreement on the proposed remedial plan if possible."  *Id.* ¶ 88 n.63.

During those 30 days, however, the District rebuffed Plaintiffs' multiple attempts to meet and confer and work collaboratively on a proposal.  Likewise, the District failed to put forth any effort to devise a plan.  Instead, the District waited 30 days and then filed a brief complaining about having to undertake the obligation to remedy its Section 2 violation before making a frivolous proposal to the Court that it adopt an illustrative plan ("Illustrative Plan 2") that the District knows could not remedy the violation.  In fact, in its prior filing with the Court, the District itself called Illustrative Plan 2 "hopelessly out of date and unusable to form legally supportable voting districts."  ECF No. 572 at 19 n.8.  Given its actions, the District has forfeited its right to propose any further alternatives, and none of the District's other complaints hold water.

First, the Court's Decision did not prohibit the District from offering and arguing for alternative remedies alongside the ward plan that it was ordered to provide.  But the District declined to do so other than to briefly mention a few throwaway alternatives that the District admitted it had hardly studied and was not actually prepared to propose.  Second, the District failed to grapple with the precedent establishing that this Court has the power to order a ward system when the facts at trial show that such a remedy is necessary to give minority voters an equal

1

opportunity to participate in the political process.  Third, the District's complaint that it had insufficient time to propose a remedy fails to acknowledge that courts often order Section 2 defendants to devise a remedy within 30 days and that such a timeline is imminently achievable and indeed was achieved by Plaintiffs' expert here.

Not only should the District's misguided complaints be ignored, its half-hearted proposal that the Court should adopt Illustrative Plan 2 must also be rejected.  Illustrative Plan 2 was created before trial merely to establish that majority-minority wards *were possible*.  Additionally, as the District well knows, the data underlying Illustrative Plan 2, which was created more than two years ago, is out of date and because of demographic shifts, current data shows that Illustrative Plan 2 would provide for, at most, two majority-minority wards.  Finally, because Illustrative Plan 2 was created to illustrate that Plaintiffs could satisfy the first *Gingles* precondition, it did not consider the effect of minority registration or turnout on the potential success of the plan.  Consideration of those factors proves conclusively that Illustrative Plan 2 would not remedy the violation.

Instead, the Court should adopt the remedial plan created by Mr. William Cooper (the "2020 Plan").  The 2020 Plan comports with the Voting Rights Act's ("VRA") requirement that the wards be contiguous and compact.  The 2020 Plan also uses current demographic data, takes into account low and declining minority voter turnout due to voter futility, and ensures that minority voters will actually have the opportunity to elect candidates of their choice in the new majority-minority wards.  Indeed, a reconstituted election analysis performed by Dr. Matthew Barreto, described below, shows that, if the 2020 Plan had been in place between 2013 and 2018, the District's minority voters could have successfully elected candidates of their choice in at least three wards.

In its Decision, this Court held that Section 2 exists "to ensure that every voter has equal access to the electoral process.  For too long, black and Latino voters in the District have been frustrated in that most fundamental and precious endeavor.  They, like their white neighbors, are entitled to have their voices heard."  Decision at 77.  The time for that moment is now.  Plaintiffs respectfully request that the Court order the District to implement the 2020 Plan and give minority voters in the District a chance to be heard.

## ARGUMENT

### I.   THE DISTRICT HAS FAILED TO OFFER A SERIOUS PROPOSAL OR ALTERNATIVE REMEDY AND HAS WAIVED ITS RIGHT TO DO SO

Rather than take seriously the Court's order to "propose a remedial plan that fully complies with the VRA within thirty days," Decision ¶ 88, the District wasted its time and spent half of its brief complaining about its obligation to propose a plan before halfheartedly proposing Illustrative Plan 2, which Plaintiffs' expert, Mr. Cooper, created to satisfy the first *Gingles* precondition during the liability phase of this case.  Although the District complains that "this Court's directive fails to follow the proper remedy procedures," ECF No. 583 at 2, the District does not move or seek any relief on that basis.  As such, Plaintiffs will not address all of the District's rhetoric.[1]  However, Plaintiffs will address a few of the District's misstatements that may be relevant to the remedy phase of this case.

As an initial matter, the District fundamentally misunderstands or misrepresents the nature of a ward system and how such a ward system would operate in the District.  The District argues that a ward system would require voters to vote for candidates who live in their ward or who are of the same race as the majority population of the ward.  *See id.*  Not so.  Nothing in the New York

---

[1] Plaintiffs reserve the right to respond fully if the District moves for relief (to the extent not already waived) based on any of its arguments therein.

Education Law requires candidates to reside in any particular area of the District, nor do the District's policies impose such a requirement.  Decision ¶ 6.  Rather, the only mandate under the ward plan would be that only ward residents are entitled to vote for a candidate running for the seat assigned to the ward (regardless of where that candidate resides or that candidate's race).  *See*, *e.g.*, *id.* ¶ 6 n.9; William S. Cooper Declaration ("Cooper Decl.") ¶ 37.

Moreover, the District's repeated claims that the Court violated the law by requiring the District to propose a ward plan within 30 days or that devising such a plan is not feasible in that timeframe are wrong and disingenuous.

<u>First</u>, the District's claim that it was denied an opportunity to first devise a remedial plan intentionally conflates the Court's order to *propose* a ward plan with an order *prohibiting* the District from proposing alternatives to a ward plan (which the Court did not do).  Specifically, the Decision held only that the District must propose a remedial plan within 30 days that "shall divide the District into nine voting wards—one for each Board seat—and require that only those residents living in a voting ward may vote for that ward's seat."  Decision ¶ 88.  The Decision did not prohibit the District from proposing alternate remedies along with the ward plan it was ordered to propose.  The Court made that point clear in its order denying the District's emergency motion to stay when it specifically explained:

> I would entertain an application by Defendant to submit an additional proposal to remedy the Section 2 violation without creating a ward system.  If Defendant wishes to make such an application, it should address whether I am permitted to consider it.  To be clear, I am referring to an alternative proposal in addition to, not in place of, a proposal for a ward system.  To allow only the latter would invite delay.

ECF No. 576 at 8 n.5.[2]  Indeed, the wisdom of the Decision was that it guarded against undue delay in restoring minority voting rights by asking the District for both proposals for the Court to consider at the same time.[3]

Second, the District conveniently ignores that this Court has the power to order the District to propose a remedial plan that includes a specific type of remedy.  *See Goosby*, 956 F. Supp. at 356 (ordering that the Town Board "submit to the Court a remedial plan that divides the Town into six single-member districts"); *see also New Rochelle Voter Def. Fund v. City of New Rochelle*, 308 F. Supp. 2d 152, 163-64 (S.D.N.Y. 2003) (ordering that a city council implement specific district lines to comply with Section 2).[4]  Throughout trial, this Court received expert testimony regarding the stark racial voting patterns in the District, and the white slating mechanism's absolute power to control the outcome of every election for every Board seat in an at-large system.  And the Court heard from many witnesses about the pervasive voter apathy among minority voters who are never

---

[2] Although the Court noted that it may not have the jurisdiction to expressly modify its Decision to incorporate such an invitation, no invitation was necessary because the Court had never prohibited the District from offering alternatives along with the ward plan it was ordered to provide.

[3] Because the District has offered no evidence in support of its musings about the potential to remedy the violation through the use of cumulative voting and/or a hybrid system of at-large seats and single-member wards (ECF No. 583 at 5-6) and because the District acknowledges that it is not actually proposing either one (*id.* at 5 (noting that if it had "time[] to study" them the District "might have been able to propose" such alternatives)), Plaintiffs will not respond to those musings in full, but note that given the high degree of white voter turnout, the high degree of racially polarized voting, the dominant white slating organization that controls District elections, the high degree of minority electoral futility, and the current discrimination-enhancing practices employed by the District, *see* Declaration of Matthew A. Barreto ("Barreto Decl.") ¶¶ 4-13, neither of those half measures would be likely to remedy the violation.

[4] *See also Jamison v. Tupelo*, 471 F. Supp. 2d 706, 716 (N.D. Miss. 2007) (ordering parties "to collaborate in creating either a seven single-member or nine single-member ward plan" to remedy a Section 2 violation); S. REP. NO. 97-417, at 31 (1982) *as reprinted in* 1982 U.S.C.C.A.N. 177, 208 (A "court should exercise its traditional equitable powers to fashion the relief so that it completely remedies the prior dilution of minority voting strength and fully provides equal opportunity for minority citizens to participate and to elect candidates of their choice.").

able to elect their candidates of choice, *see* Decision ¶¶ 62-63, which was buttressed by statistical evidence of "lower (and declining) turnout rates [for minority voters] compared with whites," *id.* ¶ 67.  Having heard and considered such evidence, and having noted "that the white bloc vote holds all the power and controls election outcomes," this Court correctly indicated that a ward system would be the best means of addressing the District's Section 2 violation.  *Id.* ¶¶ 44, 62-63, 67, 88.

Third, the District exaggerates the difficulty of creating a ward plan in 30 days.  *See* ECF No. 583 at 1.  Courts routinely allot 30 days (or less) to propose remedial plans.  *See Pope v. Cty. of Albany*, 94 F. Supp. 3d 302, 352 (N.D.N.Y. 2015) (ordering defendant to create remedial plan within three weeks); *Puerto Rican Legal Def. & Educ. Fund, Inc. v. Gantt*, 796 F. Supp. 681, 685 (E.D.N.Y. 1992) (instructing special master to submit redistricting plan for entire State of New York within two weeks); *Mo. State Conf. of the NAACP v. Ferguson-Florissant Sch. Dist.*, 2016 WL 5390946, at *2 (E.D. Mo. Sept. 27, 2016) (ordering plaintiffs to submit remedial proposals for a new school board election system in one month); *Covington v. State*, 267 F. Supp. 3d 664, 667-68 (M.D.N.C. 2017) (ordering General Assembly to "draw the new districts" and "adopt and enact remedial districting plans" in one month, noting "[t]his is twice as long as the General Assembly has when a state court orders redistricting"); *Blackmoon v. Charles Mix Cty.*, 2005 WL 2738954, at *3 (D.S.D. Oct. 24, 2005) (providing defendants three weeks to submit remedial proposal).  Indeed, Mr. Cooper typically develops ward plans in less than 15 hours.  Cooper Decl. ¶ 5; *see also Adamson v. Clayton Cty. Elections & Registrations Bd.*, 876 F. Supp. 2d 1347, 1352-54 (N.D. Ga. 2012) (court-appointed technical advisor drafted a remedial plan in approximately three weeks); *Smith v. Cobb Cty. Bd. of Elections & Registrations*, 314 F. Supp. 2d 1274, 1300

(N.D. Ga. 2002) (drafting two remedial plans and issuing a brief order in four days where court faced "severe time constraints in drafting remedial plans").

Here, the District has been aware that Plaintiffs intended to seek a ward remedy as early as November 16, 2017, when Plaintiffs explicitly asked the Court to "compel [the District] to replace the current at-large election system with a ward election system that will give the District's Minority citizens an equal opportunity to elect their candidates of choice." *See* ECF No. 1 ¶ 7 & Demand for Relief; *see also* ECF No. 33-1 ¶¶ 3-4, 49-79; ECF No. 35 at 2; PX244A ¶¶ 53-82. Plaintiffs have continued to raise their intention to seek a ward system as a remedy ever since. Moreover, the District has a demographer, Dr. Peter Morrison, and a statistician, Dr. John Alford, who have been on retainer and involved in the factual aspects of this case since at least March 6, 2018. Ex. A (Feb. 21, 2019 Ltr.), at 4-7.[5] There is no reason that the District, armed with requisite professionals and a team of lawyers, could not have complied with the Court's order to devise a ward plan within 30 days.

In any event, if the District truly needed more time, it could have sought an extension, as it has done multiple times before in this case, including jointly with Plaintiffs. *See, e.g.*, ECF Nos. 53, 65, 69, 265, 302, 326. The District did not seek such an extension, nor did it meet and confer with Plaintiffs to ask for one. To the contrary, although the Court urged the parties to work together on a remedial plan, *see* Decision ¶ 88 n.63 ("[T]he Court urges the parties to reach agreement on the proposed remedial plan if possible."), the District steadfastly rebuffed Plaintiffs' multiple offers to meet and confer and to work on a collaborative solution. *See* Ex. B (May 27-July 14, 2020 Emails).

---

[5] Unless otherwise indicated, all references to "Ex._" refer to the exhibits attached to the accompanying Declaration of Claudia T. Salomon.

The District must own its failure to comply in any serious manner with the Court's order by sitting on its hands for 30 days before proposing Illustrative Plan 2, which, less than a month ago, the District told this Court was "legally [un]supportable." ECF No. 572 at 19 n.8. Such a strategy smacks of bad faith. In failing to offer its own proposal (or even any supporting evidence for its support of Illustrative Plan 2), the District has waived its right to propose an alternative remedy.[6]  *See Bone Shirt v. Hazeltine*, 387 F. Supp. 2d 1035, 1038 (D.S.D. 2005) (holding the court will fashion a remedial plan because the defendant jurisdiction "refused to fashion a remedial plan"), *aff'd*, 461 F.3d 1011 (8th Cir. 2006); *Harper v. City of Chicago Heights*, 223 F.3d 593, 599-600 (7th Cir. 2000) ("if the jurisdiction fails to remedy completely the violation . . . the court must itself take measures to remedy the violation.") (internal citation and quotation marks omitted); *Williams v. City of Texarkana*, 32 F.3d 1265, 1268 (8th Cir. 1994) ("If . . . an appropriate legislative body does not propose a remedy, the district court must fashion a remedial plan.") (citation omitted). The Court should therefore immediately order the remedial ward plan offered by Plaintiffs for the reasons discussed below.[7]

---

[6] Moreover, to the extent the District has not also waived its right to object to Plaintiffs' proposal, the District must not be allowed to further delay a remedy by seeking to offer new evidence or affidavits on reply that it could have offered in its opening brief. *See Paz Sys., Inc. v. Dakota Grp. Corp.*, 2006 WL 8430241, at *4 (E.D.N.Y. June 16, 2006) ("Where a [party] has had ample opportunity to present evidence in its initial motion and did not do so, the court may decline to address that evidence.")

[7] The District proposes delaying the implementation of a ward plan (and thereby continuing to deny justice to minority voters) until the 2020 decennial census is released. That delay is unnecessary. The implemented ward plan can, pursuant to Court supervision, be reevaluated, if necessary, once the data from the decennial census is released to ensure that the plan maintains compliance with constitutional and statutory principles, including "one-person, one-vote" and non-dilution of minority voting strength. However, the District's suggestion that any remedial plan will necessarily require redistricting after data from the 2020 census becomes available is speculative because, depending on the 2020 data, no changes may be necessary. Moreover, because of delays due to the pandemic, redistricting data is not scheduled to be delivered to the states until July 31, 2021, more than two months after the May 2021 election. *See* U.S. CENSUS BUREAU, *2020 Census Operational Adjustments Due to COVID-19*,

## II.     THE COURT SHOULD ORDER PLAINTIFFS' REMEDIAL WARD PLAN

As an initial matter, Plaintiffs agree with the District that Mr. Cooper is eminently qualified and best placed to draw a remedial ward plan.  Plaintiffs also acknowledge that the District provided no basis to dispute Mr. Cooper's methodology.  *See* ECF No. 583 at 7 ("[The District] presently is aware of no basis to disagree with [Mr. Cooper's] opinions on these specific points.").  Plaintiffs disagree with the District's proposal, however, because it urges the adoption of a two-year old illustrative plan that was created for the purpose of establishing the first *Gingles* precondition, not for the purpose of remedying the specific facts underlying the District's Section 2 violation that were identified at trial.  Plaintiffs also disagree that the Court should order all nine seats to be up for election at once.  Instead, Plaintiffs propose that the Court adopt Plaintiffs' 2020 Plan and order the District to grandfather in the 2020 Plan over the next three years, starting with a special election of Board members in each of the three majority-minority wards.

### A.     The Court Should Not Adopt An Illustrative Plan That Was Not Developed To Remedy The District's Section 2 Violation

The Court should reject the District's request that it adopt Illustrative Plan 2 because the plan does not remedy the District's Section 2 violation, and even the District has admitted that Illustrative Plan 2 is "out of date and unusable to form legally supportable voting districts."  ECF No. 572 at 19 n.8.  Indeed, Mr. Cooper prepared Illustrative Plan 2 as an *illustrative*, not *remedial*, plan nearly two years ago.

The critical inquiry during the remedial phase is whether a proposed plan will create effective opportunities for minorities to elect their candidates of choice.  *See*, *e.g.*, *United States v. Vill. of Port Chester*, 704 F. Supp. 2d 411, 449-50 (S.D.N.Y. 2010) (a remedial plan must "afford

---

https://www.census.gov/content/dam/Census/library/factsheets/2020/dec/2020-census-operational-adjustments-short-version.pdf (last visited July 19, 2020).

[minorities] in [the District] an equal opportunity to participate in the political processes and to elect candidates of their choice.") (internal quotation marks and citation omitted); *Bone Shirt*, 461 F.3d at 1022-23 (holding that the foremost obligation of a remedial plan is to correct the Section 2 violation and that the remedial plan may not create a new Section 2 violation) (citing *Westwego Citizens for Better Gov't v. City of Westwego*, 946 F.2d 1109, 1124 (5th Cir. 1991)). But in urging the adoption of Illustrative Plan 2, the District ignores the difference between illustrative and remedial plans. *See Pope v. Cty. of Albany*, 687 F.3d 565, 575-76 (2d Cir. 2012); *Bone Shirt*, 461 F.3d at 1019 ("the *Gingles* preconditions are designed to establish liability, and not a remedy. . . ."); *Dickinson v. Ind. State Election Bd.*, 933 F.2d 497, 503 (7th Cir. 1991) (distinguishing between the analysis performed during the liability and remedy phase); *Lopez v. Abbott*, 339 F. Supp. 3d 589, 606-07 (S.D. Tex. 2018) (explaining that *Gingles* plans "need only be illustrative," and "[w]hether the districts would actually perform effectively is a question that can be considered at the remedial phase.") (citation omitted); *Luna v. Cty. of Kern*, 2017 WL 2379934, at *3 (E.D. Cal. June 1, 2017) (stating that in order to satisfy the first *Gingles* precondition, "a plaintiff typically presents illustrative redistricting plans. . . . However, neither the plaintiff nor the court is bound by the precise lines drawn therein; at this stage, a plaintiff need only show that a remedy may be feasibly developed.") (citations omitted).

Illustrative Plan 2 does not provide an effective remedy for two reasons.

<u>First</u>, the CVAP data used to create Illustrative Plan 2 is now two years old, and updated CVAP shows that Illustrative Plan 2 would not remedy the violation. The data Mr. Cooper used to create Illustrative Plan 2 was the 2012-2016 five-year CVAP estimate from the ACS. PX244A ¶ 3 n.2. But recent demographic changes within the District have led to a dilution in minority CVAP across all four majority-minority wards in Illustrative Plan 2, as shown here:

**Illustrative Plan 2**
**2014-2018 ACS vis-à-vis 2012-2016 ACS**

| Ward | 2014-2018 ACS | | | | 2012-2016 ACS | | | |
|---|---|---|---|---|---|---|---|---|
| | % NH Black CVAP | % Latino CVAP | % NH White CVAP | % B + L CVAP | % NH Black CVAP | % Latino CVAP | % NH White CVAP | % B + L CVAP |
| 1 | 56.43% | 7.56% | 16.87% | 63.99% | 57.22% | 14.73% | 17.59% | 71.95% |
| 2 | 46.72% | 9.57% | 28.04% | 56.29% | 46.16% | 17.10% | 28.56% | 63.26% |
| 3 | 33.61% | 5.47% | 47.09% | 39.08% | 47.15% | 9.13% | 40.74% | 56.28% |
| 4 | 43.29% | 4.76% | 41.35% | 48.05% | 43.25% | 10.10% | 41.10% | 53.35% |
| 5 | 5.37% | 4.41% | 81.83% | 9.78% | 7.83% | 9.79% | 79.44% | 17.62% |
| 6 | 3.76% | 0.74% | 95.34% | 4.50% | 4.58% | 1.42% | 92.33% | 6.00% |
| 7 | 1.79% | 0.83% | 95.86% | 2.62% | 1.11% | 2.28% | 94.40% | 3.39% |
| 8 | 11.32% | 4.03% | 75.37% | 15.35% | 8.08% | 8.63% | 76.85% | 16.71% |
| 9 | 9.87% | 6.13% | 75.77% | 16.00% | 9.10% | 8.22% | 76.36% | 17.32% |

Cooper Decl. ¶ 20 (Figure 4).  According to updated data from the 2014-2018 ACS (released by the Census Bureau in 2020), Wards 3 and 4 of Illustrative Plan 2 no longer have a combined black and Latino CVAP majority.  *Id.*  Such "minority-minority" wards are insufficient to constitute an effective remedy.  *See Cane v. Worcester Cty.*, 35 F.3d 921, 927 (4th Cir. 1994) (rejecting a plan where "minority-preferred candidates are no more likely to win a seat on the Board under the [proposed] scheme . . . than they were under the former electoral scheme."); *Arbor Hill Concerned Citizens Neighborhood Ass'n v. Cty. of Albany*, 289 F. Supp. 2d 269, 275 (N.D.N.Y. 2003) (approving remedial plan with majority-minority wards ranging between 57.5% and 60.7%), *rev'd on other grounds sub nom. Arbor Hill Concerned Citizens v. Cty. of Albany*, 357 F.3d 260 (2d Cir. 2004).  Moreover, the combined black and Latino CVAP in Wards 1 and 2, the only remaining majority-minority wards in Illustrative Plan 2, have also declined significantly and are at imminent risk of losing their majority.  Cooper Decl. ¶ 20 (Figure 4).  Because Illustrative Plan 2 is no longer capable of remedying the violation (if it ever was), the District's proposal to implement it must be rejected.

11

Second, remedial plans must take into account minority voter registration and turnout to ensure that they will actually perform in a manner sufficient to remedy the Section 2 violation. *See Dickinson*, 933 F.2d at 503; *see also Ketchum v. Byrne*, 740 F.2d 1398, 1413 (7th Cir. 1984) (finding that the district's court failure to consider lower turnout and voter registration, "which have led other courts to employ such a corrective (frequently 65% of total population or 60% of voting age population . . .) was an abuse of discretion."); *United States v. City of Euclid*, 523 F. Supp. 2d 641, 644-45 (N.D. Ohio 2007) (holding that 60% minority-majority would provide a "sufficient cushion" to remedy the Section 2 violation).  Mr. Cooper did not consider data concerning registration or turnout rates by race in developing Illustrative Plan 2 and analysis of that data now shows that Illustrative Plan 2 is not presently viable.

Regarding voter registration, Mr. Cooper has now analyzed voter registration for each of the nine wards in Illustrative Plan 2 using a copy of the District's 2019 voter registration records to which Dr. Collingwood applied geocoding and WRU race estimates.  Cooper Decl. ¶¶ 21-22. Based on that data, Mr. Cooper has determined that in two of the four original majority-minority wards in Illustrative Plan 2, black and Latino registered voters ("B+LRV") constitute less than 50% of all registered voters and do not significantly outnumber Non-Hispanic white registered voters ("NHWRV").  *Id.* ¶ 23.  Specifically, Ward 3 contained only 49.7% B+LRV but 45.7% NHWRV and Ward 4 contained only 48.8% B+LRV but 44.1% NHWRV.  *Id.*

Regarding voter turnout, Drs. Barreto and Collingwood analyzed voter turnout for each of the nine wards in Illustrative Plan 2 by applying BISG and WRU race estimates to the voter file to determine the racial composition of the actual voters who would have resided in those wards during the years 2013-2018.  Barreto Decl. ¶ 5.  That analysis showed that aggregate black and Latino voter turnout would have failed to exceed 50% of the electorate in two of the four original majority-

minority wards in Illustrative Plan 2 in every contested election from 2013 through 2018, and that the aggregate black and Latino turnout in those wards would have been less than 40% of the electorate from 2016-2018.  *Id.* ¶ 6.[8]  This analysis of minority voter registration and turnout establishes conclusively that Illustrative Plan 2 is not a viable remedy to the District's Section 2 violation.

**B.**     **The Court Should Not Adopt The District's Suggestion To Open All Nine Seats For Election At Once**

The Court should likewise reject the District's suggestion to immediately hold a special election for all nine seats in the District instead of only the four seats currently up for election this year, which appears to be an attempt to cut short the terms of two minorities currently serving on the Board.[9]  ECF No. 583 at 8.  Moreover, in fashioning a remedy in a Section 2 case, the Court's remedial order should not "intrude on state policy any more than is necessary to uphold the requirements of the Constitution, and should accommodate, to the greatest extent possible, the policies and preferences expressed in the legislative policy judgments underlying the current electoral scheme."  *Missouri State Conference of the Nat'l Ass'n for the Advancement of Colored People v. Ferguson-Florissant Sch. Dist.*, 219 F. Supp. 3d 949, 953 (E.D. Mo. 2016) (internal citations and quotation marks omitted); *see also* ECF No. 488 at 11 (District's motion *in limine* arguing the same) (internal quotations omitted).

---

[8] Dr. Barreto also testified at trial that nonwhite voters voted at significantly lower rates than white voters and that the gap was growing.  *See* Trial Tr. at 161:5-6 (Dr. Barreto testifying that "blacks and Latinos did have lower voter turnout because of the election futility."); *see also id.* at 398:5-19 (Barreto testifying to lower minority turnout rates); PX242A ¶ 57 (Dr. Barreto's CVAP analysis showing growing gap between white and nonwhite voter turnout).

[9] Such an election would cut short the terms of two minority candidates, Sabrina Charles-Pierre (whose term expires in 2021) and Ashley Leveille (whose term expires in 2022).

The District's suggestion unnecessarily violates state law and policy in at least two respects. First, holding a special election for all nine seats at once is incompatible with the Education Law requirement that Board members be elected according to staggered terms. N.Y. EDUC. LAW § 1804(2) (requiring board members "be divided into a sufficient number of classes so that as nearly as possible an equal number of members shall be elected to the board each year"). Second, the District's proposal, which would cut short the terms of some Board members and provide for unequal terms for Board members in the upcoming elections, intrudes upon state law concerning the uniform duration of Board members' terms as well as policies against increasing or decreasing the terms of incumbent Board members. N.Y. EDUC. LAW § 2502(3). Plaintiffs' proposal, which is discussed further below, violates neither.[10]

### C.    Plaintiffs' 2020 Plan Remedies The District's Section 2 Violation

Plaintiffs' new 2020 Plan created by Mr. Cooper remedies the District's Section 2 violation and adequately addresses the shortcomings with the District's proposal.[11] The 2020 Plan divides the District into nine wards whose populations consist of the following demographics:

---

[10] Plaintiffs agree with the District's suggestion to implement a "voter education program to teach voters about the new ward system." ECF No. 583 at 8. But that program is no excuse to delay the special election. Indeed, the District should be working on a plan to educate voters now so that it is ready for any special elections that could occur as early as September 1. Moreover, the District should be required to ensure that all voter education efforts are equally available to public school parents and voters in black and Latino communities and should make voter education materials available in both Spanish and Creole in addition to English.

[11] The 2020 Plan also comports with case law requiring the wards to be "contiguous and compact." Cooper Decl. ¶ 35. *See League of United Latin Am. Citizens v. Perry*, 548 U.S. 399, 402 (2006) (noting that the remedial plan must involve districts that are compact); *Terrebonne Branch NAACP v. Jindal*, 2019 WL 4398509, at *4 (M.D. La. Apr. 29, 2019) (ruling that "a remedial district that will be readily recognizable and functional for the residents of these [minority] communities . . . [is] sufficiently compact") (internal quotation marks omitted), *report and recommendation adopted sub nom. Terrebonne Par. Branch NAACP v. Edwards*, 399 F. Supp. 3d 608 (M.D. La. 2019).

14

**2020 Plan**
**CVAP and Registered Voters by District**

| Ward | 2014-2018 ACS | | | | | 2019 Predicted Registered Voters | | | |
|---|---|---|---|---|---|---|---|---|---|
| | % NH Black CVAP | % Latino CVAP | % NH White CVAP | % B + L CVAP | | % NH Black Registered | % Latino Registered | % NH White Registered | % B+L Registered |
| 1 | 51.63% | 13.09% | 19.34% | 64.7% | | 53.5% | 17.7% | 16.1% | 71.2% |
| 2 | 51.82% | 13.13% | 25.61% | 65.0% | | 50.4% | 15.8% | 23.7% | 66.2% |
| 3 | 55.68% | 18.15% | 25.25% | 73.8% | | 54.7% | 19.2% | 21.0% | 73.9% |
| 4 | 16.68% | 9.84% | 65.63% | 26.5% | | 12.2% | 8.5% | 73.3% | 20.7% |
| 5 | 7.95% | 1.59% | 87.94% | 9.5% | | 5.8% | 1.5% | 91.1% | 7.3% |
| 6 | 7.37% | 3.68% | 87.96% | 11.1% | | 6.3% | 4.7% | 88.4% | 11.0% |
| 7 | 1.76% | 1.22% | 97.38% | 3.0% | | 0.7% | 0.8% | 98.2% | 1.5% |
| 8 | 7.46% | 12.12% | 73.90% | 19.6% | | 6.6% | 10.3% | 78.0% | 16.8% |
| 9 | 8.79% | 4.57% | 81.45% | 13.4% | | 4.6% | 4.2% | 87.2% | 8.9% |

*See* Cooper Decl. ¶ 28 (Figure 7).

First, the 2020 Plan creates three *durable* majority-minority wards as opposed to the four majority-minority wards in Illustrative Plan 2, because majority-minority wards in remedial plans "must generally contain more than 'a mere majority even of voting age population.'" *Euclid*, 523 F. Supp. 2d at 644-45 (holding that 60% majority would provide a "sufficient cushion"); *see also Smith v. Clinton*, 687 F. Supp. 1361, 1363 (E.D. Ark. 1988) ("When voting-age population figures are used, a 60% nonwhite majority is appropriate."), *aff'd sub nom. Clinton v. Smith*, 488 U.S. 988 (1988). Courts require such a super majority to overcome typically lower registration and turnout rates among minority voters. *Dickinson*, 933 F.2d at 503; *African Am. Voting Rights Legal Def. Fund, Inc. v. Villa*, 54 F.3d 1345, 1348 n.4 (8th Cir. 1995) (adding 5% cushion each for low turnout and registration); *Jeffers v. Tucker*, 847 F. Supp. 655, 660 (E.D. Ark. 1994) ("[T]he creation of districts with bare majorities is not enough for a complete remedy. In order to compensate for historically low rates of voter registration and turnout, minorities must have something more than a mere majority even of voting age population in order to have a reasonable opportunity to elect a representative of their choice.") (internal quotation marks omitted). Such a cushion is particularly

15

important in the District where a dominant white slating organization has long been able to use the at-large election process to drive white turnout and negate the minority vote.  Here, of the nine wards proposed, three are "super-majority minority" districts where the black and Latino combined minority CVAP is at least 64.7%.  Cooper Decl. ¶ 28 (Figure 7).

Second, the wards in the 2020 Plan also appropriately take into consideration voter registration and the relatively low levels of black and Latino voter turnout attributable to the increasing voter futility amongst those groups in the District.  Aggregate black and Latino voter registration exceeds 66% in each of those three wards.  *Id.*  And Dr. Barreto's analysis of the 2020 Plan shows that aggregate black and Latino turnout in the three proposed majority-minority wards (wards 1-3) would have equaled or exceeded 60% in each ward for nearly every contested election from 2013-2018.  Barreto Decl. ¶ 7.[12]  As such, the 2020 Plan provides black and Latino voters with a true opportunity to elect candidates of their choice.

Additionally, Drs. Barreto and Collingwood performed a Reconstituted Election Analysis, i.e., "a relatively simple method that extracts actual election results from . . . races that subsume the area being analyzed and determines, precinct-by-precinct within the new district, the racial composition of the vote and the 'winner' within the new district," *see Patino v. City of Pasadena*, 230 F. Supp. 3d 667, 693 (S.D. Tex. 2017), to further confirm that the 2020 Plan would remedy the Section 2 violation.  To perform that analysis, Drs. Barreto and Collingwood applied actual, historical election results and voter history data to determine whether and to what extent the 2020 Plan would have given minorities an opportunity to elect their candidates of choice in contested

---

[12] Plaintiffs respectfully request that the Court order the District to meet and confer with Plaintiffs on a mutually agreeable location for polling places in the 2020 Plan's majority-minority wards to ensure that the District does not engineer low turnout through the use of inadequate or inconvenient polling places.

elections from 2013 to 2018.  They first geocoded the voter history files for each election to assign actual voters to each of the nine wards in the 2020 Plan and applied WRU to determine the racial composition of each ward.  They then applied the results of their prior ecological inference analyses to those data to reconstitute the racial composition.  Barreto Decl. ¶ 10.  Drs. Barreto and Collingwood found that, had the 2020 Plan been in place for all contested elections between 2013 and 2018, minority-preferred candidates would have prevailed in the three majority-minority wards by a solid margin in almost every contest over that time period.  *Id.* ¶ 11.

Importantly, the 2020 Plan is also more likely to provide a longer lasting remedy for minorities in the District because the voter cushion provides a buffer against ongoing demographic shifts in the three majority-minority wards.  While the Census Bureau estimates that there has been growth across the District, the areas that have experienced the most growth, Kaser, New Square, and Wesley Hills, are all predominantly white.  Cooper Decl. ¶ 13.  Indeed, even Spring Valley, the District's most populous and diverse community, has experienced substantial growth in white CVAP over the course of the last decade, growing from 33.7% under the 2008-2012 ACS to 37.7% under the 2014-2018 ACS.  Cooper Decl. ¶ 17.  The 2020 Plan's three majority minority wards will buffer these demographic shifts and require less near-term oversight from the Court.

## D.   The Court Should Order A Special Election Only Of The Four Board Members Seats Currently Open

The Court's Decision, finding the District's election system violated Section 2, also enjoined the May 2020 election.  Four board members' seats were up for election in May 2020: Harry Grossman, Mark Berkowitz, Joel Freilich; and the seat vacated by Bernard Charles that is currently being filled by Carole Anderson.  To avoid intruding on state laws and policy any more than necessary, *Missouri State Conference NAACP*, 219 F. Supp. 3d at 953, Plaintiffs propose that the Court order a special election of only these four seats.  Yet, to most swiftly and appropriately

remedy the Section 2 violation, Plaintiffs propose that three of the seats up for election (the seats currently occupied by Messrs. Grossman, Berkowitz, and Freilich) be for Wards 1-3 of the 2020 Plan (i.e. the three majority-minority wards).  Thereafter the District can grandfather in election for seats in Wards 4-6 and 7-9 in each of the following two elections.  Providing for an immediate election in the three majority-minority wards would most quickly remedy the Section 2 violation and restore the political voice to black and Latino voters who have been illegally deprived of one for well over a decade.

## CONCLUSION

For the foregoing reasons, Plaintiffs respectfully ask the Court to order that the District implement the 2020 Plan and hold a special election within 60 days of the Court's order for the four seats that would have been up for election in May 2020.  Plaintiffs also request that three of the four seats be for Wards 1-3 of the 2020 Plan.

Dated: July 27, 2020
New York, New York                        Respectfully submitted,
                                          **LATHAM & WATKINS LLP**

                                          /s/ Claudia T. Salomon
                                          _____
                                          Claudia T. Salomon
                                          Corey A. Calabrese
                                          Andrej Novakovski
                                          Claudia.Salomon@lw.com
                                          Corey.Calabrese@lw.com
                                          Andrej.Novakovski@lw.com
                                          885 Third Avenue
                                          New York, NY 10022
                                          Phone: (212) 906-1200

                                          Marc Zubick
                                          Russell Mangas (admitted *pro hac vice*)
                                          Marc.Zubick@lw.com
                                          Russell.Mangas@lw.com
                                          330 N. Wabash Avenue
                                          Chicago, IL  60601
                                          Phone:  (312) 876-7600

18

Andrew Clubok
Andrew.Clubok@lw.com
555 Eleventh Street, NW
Suite 1000
Washington, D.C. 20004
Phone: (202) 637-2200

**NEW YORK CIVIL LIBERTIES UNION FOUNDATION**

Arthur Eisenberg
Perry Grossman
aeisenberg@nyclu.org
pgrossman@nyclu.org
125 Broad Street
New York, NY 10004
Phone: (212) 607-3329

*Attorneys for Plaintiffs*