UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| NATIONAL ASSOCIATION FOR THE ADVANCEMENT OF COLORED PEOPLE, SPRING VALLEY BRANCH; JULIO CLERVEAUX; CHEVON DOS REIS; ERIC GOODWIN; JOSE VITELIO GREGORIO; DOROTHY MILLER; HILLARY MOREAU; and WASHINGTON SANCHEZ,<br><br>　　　　　　　　　　　Plaintiffs,<br><br>　　　　v.<br><br>EAST RAMAPO CENTRAL SCHOOL DISTRICT and MARYELLEN ELIA, IN HER CAPACITY AS THE COMMISSIONER OF EDUCATION OF THE STATE OF NEW YORK,<br><br>　　　　　　　　　　　Defendants. | 17 Civ. 8943 (CS) (JCM) |

**EXPERT DECLARATION OF DR. MATTHEW A. BARRETO IN SUPPORT OF PLAINTIFFS' OPPOSITION TO THE DISTRICT'S PROPOSED REMEDIAL PLAN AND IN SUPPORT OF PLAINTIFFS' PROPOSED REMEDIAL PLAN**

Matthew A. Barreto, pursuant to the provisions of 28 U.S.C. § 1746, declares as follows:

**I. INTRODUCTION & SUMMARY OF OPINIONS**

1. I have been retained by Latham & Watkins LLP and the New York Civil Liberties Union Foundation, counsel for Plaintiffs in the above-captioned litigation, to prepare an expert opinion regarding the redistricting proposals for the East Ramapo Central School District (the "District") located in Rockland County, New York.

2. I, along with my colleague, Dr. Loren Collingwood, previously filed a declaration and preliminary expert report (PX242B), an expert report (PX242A), and a rebuttal expert report (PX243) in this case. I also testified at trial in White Plains, New York on February 10-12, 2020, February 21, 2020, and March 5, 2020.

3. I file this declaration to present information relating to the remedial plans proposed by the District ("Illustrative Plan 2") and the Plaintiffs (the "2020 Plan"). Based on my analysis below, and the work I performed in my earlier expert reports, I have formed the opinions that: (1) the 2020 Plan would afford black and Latino voters in the District an opportunity to elect candidates of their choice in three of its nine wards; and (2) Illustrative Plan 2 would not provide black and Latino voters with an equal opportunity to elect candidates of their choice because declining minority turnout and voter futility would make it very difficult for black and Latino voters to elect candidates of their choice in more than two of the nine wards.

## II. TURNOUT ANALYSIS

4. As we explained in our expert report, minority voter turnout is less than white turnout in the District and the gap has been growing for years due to decreasing minority turnout. *See* PX242A ¶¶ 56-59.

5. To analyze the effect of declining minority turnout on Illustrative Plan 2 and the 2020 Plan, I, working with Dr. Collingwood, relied on the District's voter files of actual voters for the contested elections from 2013-2018. We used those voters' addresses to place them in their respective wards for both Illustrative Plan 2 and the 2020 Plan and applied a BISG analysis, using the WRU program, to determine the aggregate racial probabilities of the actual voters in each proposed ward. The results of that turnout analysis are attached to this declaration as **Appendix A**. Appendix A shows the composition of the electorate by race in each ward broken down by black, Hispanic, Asian, white, and combined black+Hispanic.

6. Under Illustrative Plan 2, the share of all voters who are black and Hispanic (i.e., Latino) was less than 50% in 7 of the 9 wards for every year 2013-2018. Black and Latino share of all voters was below 40% beginning in 2016 through 2018.

7. Under the 2020 Plan, black and Latino share of all voters was above 60% in 3 of the 9 wards every year from 2013-2018. This cushion above 50% is important because it means that even under a scenario where minority voter turnout continues to decline, black and Latino voters would have an opportunity to elect candidates of their choice in these wards. Given the high rates of voter turnout among White, non-Hispanic in District elections, it is important to create opportunity districts that are well above 50% black + Latino.

### III. RECONSTITUTED ELECTION ANALYSIS

8. To determine whether redistricting plans will perform as intended, political scientists will typically re-arrange the original districting scheme that has been found to violate the Voting Rights Act into a new, compliant districting scheme and re-tally the votes to determine how well the new scheme performs for minority voters, i.e., whether minority voters will be able to elect candidates of their choice. That process is called a reconstituted election analysis.

9. In larger jurisdictions, a reconstituted election analysis is often performed by reconfiguring the voting precincts. In the District, however, there are only a limited number of voting precincts and it was not possible to base districting maps on voting precincts. Therefore, I understand that the Plaintiffs' expert, Mr. William Cooper, used census blocks rather than precincts to create the 2020 Plan. Using that information, we can create a reliable estimate of vote totals by ward in the 2020 Plan using the known vote choice estimates by race from the ecological inference analyses that I performed in PX242A-B and PX243.

10. Specifically, Dr. Collingwood and I took the minority-preferred candidates in the 2013-2018 contested elections (which I had identified in PX242A-B and PX243) and we performed a reconstituted election analysis to determine how the minority-preferred candidates would have performed under the 2020 Plan for those elections using ecological inference. Quite

simply, we take the known vote choice by race from the ecological inference and multiply it by the number of black, Latino, and white voters in each ward.  The results of that reconstituted election analysis is attached to this declaration as **Appendix B**.  Appendix B shows the percentage of the vote that each minority preferred candidate would have received in each ward in contested elections from 2013-2018 (under both the King's EI and the EI RxC methods).

11.     Based on that reconstituted election analysis, I determined that the minority-preferred candidates would have prevailed in contested elections under the 2020 Plan in three of the nine wards every year from 2013-2018.

### V.  CONCLUSION

12.  The 2020 Plan would afford black and Latino voters in the District an opportunity to elect candidates of their choice in three of its nine wards because each of those three wards has sufficient historical levels of black and Latino voter turnout and a reconstituted election analysis shows that minority-preferred candidates would have been successfully elected in those three wards from 2013-2018.

13.  Illustrative Plan 2 splits the black and Latino voting electorate between wards 3 and 4, and thus does not provide black and Latino voters with an equal opportunity to elect candidates of their choice in three wards.  Because wards 3 and 4 have a smaller black and Latino population, coupled with declining minority turnout and voter futility, it would be difficult for black and Latino voters to elect candidates of their choice in more than two of the nine wards..

Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury that the foregoing is true and correct. I reserve the right to continue to supplement my report in light of additional facts, testimony and/or materials that may come to light.

Executed on July 25, 2020

*[signature]*

DR. MATTHEW A. BARRETO