# EXHIBIT A

189knatMS

```
 1   UNITED STATES DISTRICT COURT
     SOUTHERN DISTRICT OF NEW YORK
 2   -------------------------------x

 3   NATIONAL ASSOCIATION FOR THE
     ADVANCEMENT OF COLORED PEOPLE,
 4   SPRING VALLEY BRANCH, et al.,

 5              Plaintiffs,

 6         v.                           17 Civ. 8943(CS)(JCM)
                                        Discovery Conference
 7   EAST RAMAPO CENTRAL SCHOOL
     DISTRICT and MARY ELLEN
 8   ELIA, in her capacity as the
     Commissioner of Education of
 9   the State of New York,

10              Defendants.

11   -------------------------------x

12                                      White Plains, New York
                                        September 20, 2018
13
     Before:
14
                   THE HONORABLE JUDITH C. McCARTHY,
15
                                        Magistrate Judge
16
                            APPEARANCES
17

18   LATHAM & WATKINS LLP(NY)
          Attorneys  for Plaintiffs
19   JENNIFER J. MATYSTIK
     SERRIN A. TURNER
20   COREY ANNE CALABRESE
     RAKIM E. JOHNSON
21
     NEW YORK CITY CIVIL LIBERTIES UNION
22        Attorneys  for Plaintiffs
     PERRY GROSSMAN
23

24

25   Digital recording.
```

189knatMS

1    APPEARANCES:  (Continued)

2    MORGAN, LEWIS & BOCKIUS LLP
         Attorneys for Defendant East Ramapo Central School
3            District
     RANDALL M. LEVINE
4    DAVID J. BUTLER

5                              -  -  -

6            THE DEPUTY CLERK:  In the matter of the NAACP versus

7    East Ramapo Central School District.

8            Counsel, please state your appearances for the record.

9            MS. MATYSTIK:  Jennifer Matystik for the plaintiffs.

10           MR. TURNER:  Serrin Turner for the plaintiffs, your

11   Honor.

12           MS. CALABRESE:  Corey Calabrese for the plaintiffs,

13   your honor.

14           MR. JOHNSON:  Rakim Johnson for the plaintiffs.

15           MR. GROSSMAN:  Perry Grossman for the plaintiffs, your

16   Honor.

17           MR. BUTLER:  David Butler for the defendant.

18           MR. LEVINE:  Randall Levine for the defendant.

19           THE COURT:  You're outnumbered today, gentlemen.

20           MR. LEVINE:  As always.

21           THE COURT:  Okay.  Good afternoon, all.

22           So this was supposed to be just a status conference,

23   where I was going to hear how everything was going, and was

24   cautiously optimistic.  It meant that I had not heard before

25   yesterday that everything was fine.  And I will tell you I

1    review for my cases well before the day before the case.  So I

2    was under the impression this was going to be a status

3    conference in which I was going to hear how discovery was

4    going, not that I was going to hear there were problems.

5          Receiving a letter —— I don't even know what time we

6    got it —— late yesterday, and then getting a response in the

7    wee hours of the morning today is not how I like to see

8    business conducted ever.  It's not good for the parties, it's

9    not good for the attorneys, it's not good for the Court.  I

10   like to come out, have my conferences prepared, to have

11   meaningful conversations, to be able to give thoughtful

12   responses.

13          This isn't the first time you've appeared before me,

14   so you know that's how I like to conduct business.  I'm limited

15   when I don't have the time.  It's not like I have a free day

16   and I get to come in, in the morning and say, "Okay.  What has

17   been sent, and what do I get to read to prepare for the

18   conferences?"  I've been in conferences all morning, which

19   means my lunch was spent reading this correspondence.  But

20   because I've read it, we're going to talk about some of the

21   things in here, and see if we can resolve some of the things

22   without motion practice, because I don't need to waste time on

23   motion practice, either.

24          But I do appreciate that there are some things that I

25   believe are not right, as the defendants have actually pointed

1    out for my discussion.

2          But let's start with the deposition of the Board

3    members, which I think you have set before each other your

4    opinions.  You've had a meet-and-confer.  There was an intent,

5    I think, at least expressed, to file a protective order on this

6    issue.

7          So although I do share defendant's concern about how

8    this came about and the practice -- and we will address some of

9    it -- I will tell you I have seen defendants do some rough

10   things in past practices in cases before me, but I don't like

11   it.  Didn't like it then, don't like it now.

12         But on the deposition of the Board members, is it the

13   defendant's position that you're not -- that you want to move

14   to quash that they have to be deposed at all?  Or is it that

15   you're concerned that there are some things that they're going

16   to be asked that address legislative privilege and they can't

17   answer it?  I was not a hundred percent sure.

18         MR. LEVINE:  Thank you, your Honor.

19         So the position that we have laid out and what we

20   think the key to support is, is that there is a testimonial

21   privilege that is absolute for sitting legislators that is

22   different in scope and claim from the legislative privilege.

23   And so the immunity question is distinct.  And what we didn't

24   see in the Court's prior order was something directing the

25   individual defendants to -- or rather, the individual

1    subpoenaed parties to appear for deposition under the

2    subpoenas.  And so we felt there was an ambiguity there.  And

3    because the cases also draw a very clear distinction between

4    orders directing third-party government officials to produce

5    documents on the one hand and third-party government officials

6    to appear for deposition on the other, that issue wasn't

7    addressed in the Court's order, either.

8            So we wanted to find a way to present it to the Court

9    in an orderly way, present the issues and get it decided on an

10   expedited basis so that we could have a written order, one way

11   or the other, on the issue.

12           THE COURT:  Who wants to be heard on this on the

13   plaintiffs' side?

14           MS. CALABRESE:  Your Honor, we disagree with that

15   characterization of legislative immunity and legislative

16   privilege.  This exact issue was discussed back in March.  I

17   believe your Honor actually decided that legislative immunity

18   does not shield the Board members from any of plaintiffs'

19   requests, discovery requests, which would apply equally to our

20   document requests, as well as to our deposition notices.

21           And your Honor did distinguish between "immunity" and

22   "privilege" in your order from April 27, and did find that

23   immunity was not applicable here.  So to the extent that

24   defendants are retreading old ground and once again saying that

25   the Board members are entitled to a blanket immunity from --

1    back in March, it was from both document requests and

2    depositions, now it's once again depositions, is not correct

3    and is contrary to the law under Rodriguez, a case that your

4    Honor in part relied upon that was discussed during our hearing

5    back in March, and even said that at times, legislators may be

6    called upon not just to produce documents, but also for

7    testimony.

8             That's the plaintiffs' position.

9             THE COURT:   Thank you.

10            MR. LEVINE:   I'll respond to just two points on that,

11    one of which is substantive and has to do with the Rodriguez

12    case, which is, while the Rodriguez case says that in dicta,

13    the Rodriguez case does not involve a motion to compel a

14    sitting legislator to appear for testimony.  And in fact, you

15    will search in vain for the entire body of case law, in this

16    circuit and in any circuit, to find a Court that has actually

17    ordered a sitting legislator to appear for testimony.

18            And the reason for that is because you can look at

19    Supreme Court cases and you can look at the text of the

20    speech-of-the-day clause.  And the one thing that is quite

21    clear from the speech-of-the-day clause --

22            THE COURT:   So why have legislators sat for

23    depositions?  Because they have.  And executives have sat for

24    depositions.  Privilege is applied to them, too.  So are you

25    telling me that they sat because they just were generous with

189knatMS

1    their time, and gracious, and felt that they would just

2    volunteer to sit?

3              MR. LEVINE:  The same reason that two sitting Board

4    members are going to testify in this case, and one former

5    legislator is going to —

6              THE COURT:  Because you get to pick — cherry-pick and

7    choose who you want to have testify?

8              MR. LEVINE:  The legislators get to decide whether to

9    waive their immunity.  And once they do, you know, that

10   actually is not co-extensive for the waiver of legislative

11   privilege, but they have that option to do so, and they have

12   that option to stand on the theory.

13             (Pause)

14             MR. LEVINE:  The second point that I would have made

15   in response, also, is that, you know, the Court's order does

16   not explicitly say that the Board members have to appear for

17   deposition.  The relevant sentence says, "As an initial matter,

18   legislative immunity" —

19             THE COURT:  What page?

20             MR. LEVINE:  At the bottom of Page 8 of the Court's

21   order.

22             "As an initial matter, legislative immunity does not

23   shield the Board members from responding to any of plaintiffs'

24   discovery requests."

25             And then the Court goes on to analyze whether certain

1    discovery requests have to be responded to and documents

2    produced.

3          If the Court meant or implied by that that depositions

4    also would be required, well, then, you know, we'll expect the

5    Court to order that way and to direct the defendant -- the

6    individuals to appear for depositions.  But we'll have a

7    written order, and then that can be reviewed further.  We

8    simply don't have that right now, so we wanted to tee up the

9    issue.

10          THE COURT:  Well, you had it.  Why didn't you -- you

11   lived with this order.  You didn't appeal this.  So is this a

12   backdoor way of trying to get the Court to renew it so then

13   your time to appeal gets renewed?  Is that what you're trying

14   to do here?

15          MR. LEVINE:  Well, no, your Honor.

16          This order directs the subpoena recipients to produce

17   documents.

18          THE COURT:  Yes, but, you know --

19          MR. LEVINE:  And for what it's worth, we actually have

20   (unintelligible) experience dealing with a similar issue from

21   the very last case where the District was here before this

22   Court, where an issue of immunity arose and an order of this

23   Court was referred by Judge Seibel that implicitly required

24   sitting legislators to participate in discovery, but didn't

25   explicitly require it.  And we appealed that ruling further to

1    the Second Circuit, and they ruled that they lacked

2    jurisdiction to decide the question, because there was no

3    explicit order directing any recipient to the third-party

4    subpoena or discovery requests who has immunity to appear and

5    participate in discovery.

6              So to avoid that result this time, we wanted to

7    present the issues squarely, allow the Court to rule on it and

8    create a record.  If we need to appeal, we will.

9              (Pause)

10             THE COURT:  You can have a seat, Mr. Levine.  It's

11   going to take me a second.

12             MR. LEVINE:  Thank you, your Honor.

13             THE COURT:  This is what happens when you don't give

14   me sufficient time.

15             (Pause)

16             THE COURT:  Okay.  This is what I'm going to do.

17             I am not setting forth any briefing schedule.  I am

18   not ruling on this issue right now.

19             The issue that I had ruled on, on -- I believe my

20   decision is Docket 124, April 27th, 2018.  The issue I had

21   ruled on was a motion made by the plaintiffs, and that was

22   Docket 86.  It's a letter motion.  In Docket 86, the plaintiffs

23   moved to compel the Board members to produce nonprivileged

24   documents and deposition testimony.  That's what the motion

25   was.

1        The opposition to that motion specifically said, "We

2   oppose the request for a motion to compel for nonprivileged

3   documents and deposition testimony."  I ruled your opposition

4   was ──

5        (Pause)

6        THE COURT:  The opposition was Docket Number 91.  And

7   in that, you were opposing the motion to compel compliance with

8   third-party subpoena seeking documents and deposition testimony

9   from each of the nonparty Board members.  So clearly, what was

10  tee'd up to the Court was both.

11       The Court's order may be worded in such a way that it

12  seems limited to only the document request.  I am going to

13  review the prior briefing, review the Court's order, and if I

14  believe that this order was not intended to be dealing with the

15  deposition testimony and believe that further briefing is

16  necessary for me to rule on that, I will let the parties know,

17  and I'll issue a briefing schedule which could be very tight.

18       If I believe, however, after review of the moving

19  papers and the decision, that it did also address the

20  deposition testimony, but was inartfully drafted, I will rule

21  on that, also.

22       I will tell you, I remember having this discussion at

23  oral argument.  I remember specifically talking about

24  depositions.  I remember specifically talking about the

25  documents, too.  I also do say in here that this was addressing

1    both the subpoena duces tecum and ad testificandum.  I do
2    address that.

3            But, Mr. Levine, you are right.  It does not look like
4    there's anywhere in here, on a very fast review -- I may find,
5    when I look at it more closely, that I don't agree with what
6    I'm about to say, but it looks like I may have not specifically
7    said, although I may have meant, not to include depositions.
8    So I will evaluate it.  I will determine whether I need any
9    more briefing or whether the briefing I had, which I believe
10   was on everything, and I believe my analysis covered
11   everything.  I don't believe I was distinguishing documents
12   from testifying.  But since I did address in each section the
13   actual documents that were being requested, and at the end, I
14   just said it was granted in part and denied in part.  Now, if I
15   had granted it completely, I would say you're done, because the
16   request was for all of it.

17           So let me look at it.  And I will notify the parties
18   and counsel -- I mean, I'll notify counsel how we're going to
19   proceed on that issue.  Okay?  But I don't want to
20   unnecessarily have to repeat arguments that I've already heard
21   extensively, because I know we had very long, extensive, oral
22   argument on this, where we had talked about depositions, and we
23   had talked about sitting legislators sitting actually for
24   testimony.  So I don't want to repeat it.  And if I can add to
25   my order without further briefing, I will do so.

1           So that's the first issue.

2           The second issue that's come in is the issue of the

3    2015 voter file.  So I understand the arguments here.  I just

4    don't fully understand —— I think I understand the arguments

5    here, although I will tell you, from plaintiffs' letter alone,

6    I had no idea what was going on.  So if I understand this, on

7    the 2015 voter file, this docket that we're —— this Excel

8    document that we're dealing with is an active, nonhistorical

9    document.  Right?  It is an active document as to what's on the

10   computer at this time.  And any updates that have been made

11   since that time would be reflective in the document now.

12           MR. LEVINE:  Yes, straight from the District Clerk's

13   desktop.

14           THE COURT:  Okay.  So it's not like you can go back

15   and freeze this document in a certain time.

16           How did you produce —— do you —— how did you produce

17   the PDF?  Like what was the PDF a PDF of?

18           MR. LEVINE:  The PDF is a table of the —— just the ——

19           THE COURT:  If you could stand.

20           MR. LEVINE:  Certainly.  Sorry.

21           The PDFs that were produced were perhaps from a

22   database that has the historic (unintelligible), and so you can

23   produce these PDFs of tables that show who voted where in past

24   elections.

25           THE COURT:  But what you're producing, is that

1    database an Excel database?

2         MR. LEVINE:  No.

3         THE COURT:  So what happens?  Tell me how it works.

4    At the end of an election, how is the document, the historical

5    document, preserved?

6         MR. LEVINE:  This is the part that I was a bit worried

7    about when I was meeting and conferring with the plaintiffs,

8    which is, I'm not sure I know and understand and can make

9    accurate representations, because there's the District Clerk's

10   Office involved.  There's a separate vendor involved.  I

11   haven't talked to the separate vendor, I have talked to the

12   District clerk, both of whom are available for discovery if

13   they want to send them discovery requests.  But I just don't

14   feel comfortable making representations about what this

15   proprietary software is that this vendor does, what it can spit

16   out and the format that it comes out, all of which can be

17   explored.  But I'm not in a position to tell you about it right

18   now in a way that I feel comfortable won't be wrong.

19        THE COURT:  So the Excel document you have no longer

20   looks like it did in 2015.

21        MR. LEVINE:  That is true.

22        THE COURT:  And there's really no way to make it look

23   like it did in 2015.

24        MR. LEVINE:  So I'm not sure that that's —— there's no

25   way to make that Excel sheet look like it did in 2015.  That is

1    certainly true.  What I don't know and what I'm not sure
2    whether the plaintiffs will even try is that the PDFs that they
3    have, those are -- it's searchable documents -- right? -- just
4    like an Acrobat on your own computer.  And if you go to the
5    little file slot, it says, you know, "Turn to 'Export to
6    Excel'."  And I don't know why that's not working for them.
7    But if it's not working, it shouldn't be too hard to QC it and
8    fix it.  At least that's what the District Clerk told me.  And
9    I asked her if she was required to figure out a way to
10   re-create somehow this old Excel sheet, that would at least be
11   where she would start.

12            THE COURT:  Okay.  So counsel.

13            MS. CALABRESE:  Your Honor, I think the issue is just
14   that Mr. Levine represented that he would not even ask if this
15   2015 Excel sheet with the vendors could be produced with the
16   correct polling places.  As you know, the results came in, in
17   2014.  And that was our -- actually, I think if he goes back
18   and can say for certain that what we have is what we have, and
19   that the Excel document cannot be produced with the correct
20   polling basis, then we would be satisfied.

21            THE COURT:  So what would the vendor have?  I mean,
22   because it sounds like the Excel spreadsheet that you have is
23   the document that is currently -- and is in the form that is
24   currently in --

25            Who possesses this?

1              MR. LEVINE:  The District Clerk.

2              THE COURT:  -- the District Clerk's possession.  The

3    question is whether the historical document that you had in PDF

4    format -- that's really the question, whether that historical

5    document that's in PDF format is somewhere in Excel.

6              MR. LEVINE:  That question, I can answer.  Right.

7              Those PDFs are not -- don't come from Excel.  It's a

8    separate proprietary software.  And if you look at the

9    documents, they don't look anything like Excel sheets.  Right?

10   They're something this vendor generates when we need historical

11   data.

12             MS. CALABRESE:  And, your Honor, I think what we

13   understood the Excel sheets to be was a spit-out from the

14   vendor, and the data that the vendor has in its possession.  So

15   we thought when it spit it out, it spit it out the incorrect

16   polling places for the past elections, because we had asked --

17   we specifically asked for those past elections, but in Excel

18   format, and it came back with incorrect polling places.  We

19   just want to know whether it can be produced with the correct

20   polling places as -- you know, as data spit out from the data

21   that the vendor possesses.

22             THE COURT:  And do you know the answer to that,

23   Mr. Levine?

24             MR. LEVINE:  I truly don't.

25             THE COURT:  All right.

1           MR. LEVINE:  And my recommendation would be, you know,

2   if we're going to have a 30(b)(6) deposition of the District's

3   third schedule, then they can answer that, or --

4           THE COURT:  Yes, but they may not know this, either,

5   as to how the vendor may keep its documents.

6           MR. LEVINE:  Yes.  I mean, that all may be true.  I

7   can try to find out.

8           But here's the thing.  Even if I do run through with

9   this problem that we had discussed, which is, I'm also very

10  uncomfortable asking either the vendor or the District to

11  create this new document --

12          THE COURT:  No, you're not asking them to create

13  anything.

14          MR. LEVINE:  Okay.

15          THE COURT:  What you're doing is -- because it sounds

16  like the District keeps a -- doesn't keep historical records.

17  It keeps an active list that is changed when polling places are

18  changed or people move, and it's an active list.  So it doesn't

19  sound like the Clerk would have necessarily in the same Excel

20  world the historical stuff.  If they do, you need to produce

21  it.

22          MR. LEVINE:  Right.

23          THE COURT:  You don't need to go back and undo things

24  in an active list.  But if the -- now I'm forgetting the word.

25  Who's the -- the contractor, or the --

```
1                 MS. CALABRESE:  The vendor?

2                 MR. LEVINE:  The vendor.  That's the word I'm asking

3      for.

4                 If the vendor has the historical data in format of,

5      you know, Excel, or that is information -- in a format that

6      they can extract really easily from, then that is

7      information -- you're not asking them to create it.  You're

8      saying, "Okay.  Produce it."  And then you give it to them.

9                 MR. LEVINE:  I agree with all of that.

10                My only hesitation is that, you know, we produced what

11     we have from the vendor when we asked them to generate the

12     information.  Right?  And then, they also generated it in the

13     ordinary course of business, so that the District Clerk keeps

14     these historical files on her computer.  And that's what we

15     produced.  So my only concern is that, you know, if the vendor

16     could be creating these things in Excel, we would have produced

17     it already.  I can investigate further.

18                THE COURT:  Unless it just didn't -- it said, "Okay.

19     We have these in PDF.  This is how we provide them to the

20     Clerk.  This is how we're going to provide them in response to

21     discovery."  Which is all fine.  But if they also have them in

22     another format which doesn't require them to create anything,

23     then -- and we know that the PDF is harder to manipulate,

24     because even if you can extract it, it sounds like it required

25     a lot of labor in order to correct and verify (unintelligible).
```

1    And that's my experience with working with PDF is that it

2    can -- when you try to start extracting things from them or

3    changing them or commenting on them, it can move things around.

4           So see if they have -- they may not.  They may extract

5    it into PDF, and then that's it, and we know what we have to

6    work with.  But just find out if they have the historical data

7    in an Excel format, not that they have to re-create it.  Just

8    do they have it.

9           MR. LEVINE:  Okay.

10          THE COURT:  Okay?  And provide it if they do.

11          MS. CALABRESE:  Thank you, your Honor.

12          THE COURT:  Okay.  Now, it sounds like the documents

13   to be produced of Montesa and Schwartz is really not ripe for

14   me.  Is that accurate?

15          MR. LEVINE:  Well, that was my view.  In the letter

16   response to their letter, we took the position that we don't

17   see any way that it could be relevant or proportional in this

18   case, and so weren't being produced.  But we asked them to

19   explain why they think it should be produced, and they haven't

20   done that yet.

21          MS. CALABRESE:  Your Honor, you know, we're happy to

22   go back and meet and confer on this.  I think we have a

23   proposal that, you know, the District might agree to, and

24   that's if they would agree to produce the documents that really

25   (unintelligible) witnesses, then that's all we need to get.

1    And those materials have been used to impeach our witnesses in

2    depositions without us having prior knowledge of them.  It's

3    just that, you know, we brought it to the Court's attention

4    because they're coming to the conference, and didn't seem like

5    the District was going to negotiate it at all on the issues in

6    (unintelligible) they didn't file a response to our request for

7    production and —

8              THE COURT:  When did you request production of that?

9              MS. CALABRESE:  We made that back in March, your

10   Honor.

11             THE COURT:  Okay.  And did you respond to this saying

12   yes or no what you were going to do?

13             MR. LEVINE:  In March?

14             THE COURT:  No, any time from March till now.

15             MR. LEVINE:  Yes — no.  In the course of this

16   meet-and-confer where they raised the issue of this discovery

17   request and we responded, and we provided the formal response,

18   but we also responded in a letter where we said, "We don't see

19   how this could possibly be relevant or proportional in this

20   case, but tell us why you think it is."

21             We also told them that the discovery record from

22   Montesa, the entire record per the (unintelligible), has been

23   sent to an outside vendor for cold storage.

24             THE COURT:  Yes, but you're able to get the stuff on

25   the individuals that you want to ask questions on, so it's not

1 ┃ that difficult for you to get what you need.

2 ┃         MR. LEVINE:  Well, I'm not sure that that's actually

3 ┃ true.

4 ┃         THE COURT:  If you use the records in the deposition,

5 ┃ you have access to some of them.

6 ┃         MR. LEVINE:  Well, so what they pointed to in their

7 ┃ letter was one document that had a Bates label from the prior

8 ┃ case.  And it took me a while, actually, this morning to figure

9 ┃ out what had happened.  But they had produced the same document

10 ┃ from, you know, their witness with their own Bates labels on

11 ┃ it.  And I'm not entirely sure how the two got switched, but I

12 ┃ can say that this one particular document is kind of a crazy

13 ┃ document.  And I do recall that I had actually kept a copy of

14 ┃ it, and it was not sent off site.  It was not part of that

15 ┃ total, you know, dump of the entire discovery record that's in

16 ┃ outside storage.  So maybe there's a smattering of documents

17 ┃ that were marked confidential and that are available because

18 ┃ they happen to still be on my computer.  But you know, that's

19 ┃ not the same thing as a request for, well, 450-something

20 ┃ thousand documents that we have in cold storage.

21 ┃         MS. CALABRESE:  Your Honor, just -- I can't verify

22 ┃ that we did not produce this document.  But I know that the

23 ┃ witness it pertained to, we didn't produce those documents for

24 ┃ that witness until August.  So we did not have access to it

25 ┃ back in March, you know, to use for deposition.

189knatMS

```
 1              THE COURT:  When did you get it, and how did you get
 2    it?
 3              MS. CALABRESE:  The document?
 4              THE COURT:  Yes.
 5              MS. CALABRESE:  I mean, we just found out about it in
 6    Mr. Trottman's deposition, and we produced Mr. Trottman's
 7    documents in August.  And I haven't -- I didn't -- I don't know
 8    if we have it in our collection and if we produced it this past
 9    August when we made our production for Mr. Trottman.  I'll have
10    to confirm that (unintelligible).
11              THE COURT:  Here's my thought on this.  It's not
12    really ripe for me, but I'm going to give you some guidance to
13    help me.  You have a more productive and fruitful
14    meet-and-confer.  I will not take the position, as Judge Seibel
15    did not take the position, that none of these documents are
16    relevant.
17              So a blanket "Montesa is not relevant" isn't going to
18    work.  You really -- but I also will tell you that to request a
19    document dump essentially of all the document discovery
20    produced in Montesa is overburdensome.  As having seen that
21    case and overseen that case and the amount of documents that
22    were produced in that case, that would not be something that --
23    and I'm sure some of them are confidential and have been marked
24    under a protective order.  So they just couldn't be
25    automatically produced.  Also, it would be quite burdensome, I
```

1    believe, to require counsel to go through everything and then

2    pull out what is protected by confidential order or not, and

3    then produce it.

4         However, if there are certain documents and certain

5    things that you can glean from the facts of that case and from

6    the docket sheet of that case that you believe are relevant --

7    for instance, what you just talked about, which are the

8    documents relating to the plaintiffs in your case and the

9    parties that you mentioned in your case -- I don't see why

10   those would not be relevant, even though they may be

11   burdensome.

12        But neither party has really had a chance to delve

13   into that and work with it and to be able to tell me with

14   specificity why either you need it or why it can't be produced

15   because it's too burdensome or et cetera.  I'm not going to

16   rule on it.  My guidance, I'm consistent with Judge Seibel

17   here.  I think Judge Seibel said they may be relevant.  They

18   may be relevant.  So blanket "they're not" is not going to

19   work.  However, I just don't know what it's going to be.  And

20   there may be an off-side charge.  You may have to take them,

21   and there's also that burden that comes in document production,

22   whether with the client or the attorneys having it.

23        So hopefully, the request can be narrowed in such a

24   way, Mr. Levine, that you can analyze it and determine

25   whether -- and so you can produce it, and, if not, why not.

1            MR. LEVINE:  Thank you, your Honor, because, I mean,

2    just to drill down a little bit further on that, in any set of

3    450,000 documents, you may find that there are documents that

4    are relevant and proportional and worth producing in this case,

5    and some that aren't.  Nothing about the fact that they are the

6    Montesa discovery record makes them relevant to this case.  It

7    would be whatever is in the document.  If what the plaintiffs

8    want are documents within the District's possession, custody or

9    control that relate or refer to their clients, that's a very

10   different discovery request.

11           THE COURT:  No, I think that there's a —— I think that

12   is a different discovery request, and that's not what the

13   plaintiffs are asking for.  Plaintiffs may ask for that, but

14   right now, it sounds like they're asking for what Montesa

15   documents were produced related to particular clients.

16           Is that correct, counsel?

17           MS. CALABRESE:  Yes, your Honor.

18           THE COURT:  So I'm not going to say it's not relevant.

19   Judge Seibel did not say it wasn't relevant.  She didn't narrow

20   it to just what was in the District's possession.  Of course,

21   there's no question about that.  If there's documents that are

22   relevant in the District's possession, they're to produce it.

23   So the real question is if there are documents in the Montesa

24   case that are relevant here.  It's not a blanket "you don't

25   have to produce it."  You have to look and evaluate and

1    determine —— you know, an overbroad request is going to get an

2    overbroad response.  You've narrowed the request.  You're going

3    to have to have a meet-and-confer and discuss this.

4              MR. LEVINE:  Sure.

5              THE COURT:  But don't just say because it's in Montesa

6    or rephrase the question and say, "I'll just look and see

7    what's in the District documents."

8              It's different, and it's slightly different enough

9    that I don't think it is —— I don't think it's blanketly

10   irrelevant.

11             MR. LEVINE:  Well, what I mean is that the Montesa

12   documents are just a subset of the District's documents that

13   happen to have Bates labels on the bottom.  So that portion of

14   the Montesa discovery record that is student records, the

15   District has those student records.

16             THE COURT:  But the Montesa discovery —— Mr. Levine,

17   the Montesa discovery documents that you have are not just what

18   you produced.  It's also what you received.

19             MR. LEVINE:  Right.

20             THE COURT:  So there may be things that are in your

21   possession that are not in the District's possession.  They're

22   in the possession of a different class of plaintiffs and a

23   different group of people.  So no, you cannot just narrow it to

24   the District.  It's part of it.

25             MR. LEVINE:  Okay.

1            THE COURT:  So you know, meet and confer on this

2    issue.  Have a conversation.  See what you can produce.  And if

3    you have to send something up to me, you know how to do it.

4    Just don't do it on the eve of a conference.

5            MS. CALABRESE:  Yes, your Honor.

6            THE COURT:  Okay.  Is that everything that came up in

7    the letter?  Otherwise ——

8            MS. CALABRESE:  Yes, your Honor.

9            THE COURT:  —— I want to hear how discovery is going

10   separate from this, because I'm hoping it's going better than

11   the implication I had and the letter would seem.

12            I assume the initial disclosures were served on

13   August 10.  I think that's this last civil case discovery is

14   the one we're working off.  This is the one that's July 12th,

15   2018.

16            MS. CALABRESE:  Yes, your Honor.

17            THE COURT:  Okay.

18            MS. CALABRESE:  And yes, we served —— we exchanged

19   initial disclosures on that date.

20            THE COURT:  And the document production for all

21   outstanding requests for production of third-party subpoenas,

22   was that completed by August 10th?

23            MS. CALABRESE:  Yes, your Honor.

24            We might have some follow-up.  We received the

25   District's privilege logs, and might have follow-up from that.

189knatMS

1          THE COURT:  Yes.  No, I understand you'll talk about

2    that, see if it needs to come --

3          MR. LEVINE:  And same on our end, as well.  They made

4    their production.  They haven't produced a privilege log yet.

5    We've been exchanging letters about cleaning up different areas

6    of the production, but it's ongoing.

7          THE COURT:  Is there a privilege log that you're

8    intending to produce, counsel?

9          MS. CALABRESE:  Yes, your Honor.  There was, your

10   Honor.

11         THE COURT:  Okay.

12         MS. CALABRESE:  If they wish -- they're aiming for the

13   end of next week.

14         THE COURT:  Okay.  We have depositions to proceed, to

15   occur and complete by October 19th.

16         Have we started discussing that and scheduling for

17   that?

18         MS. CALABRESE:  Yes, your Honor.  Both parties have

19   noticed depositions, and we're in conversations about

20   scheduling.

21         THE COURT:  How many depositions have been noticed?

22         MS. CALABRESE:  Your Honor, plaintiffs have noticed

23   eight.  The District has currently noticed fifteen.

24         THE COURT:  How many?

25         MS. CALABRESE:  Fifteen.

1              THE COURT:  Okay.

2              MS. CALABRESE:  And plaintiffs have objected to more

3    than ten, which is what's permitted under the rule.

4              MR. LEVINE:  That's interesting.  That's actually

5    different from the conversation I had with Ms. Matystik

6    yesterday, where I asked whether they were going to stand on

7    that objection or whether there was something else going on,

8    because depositions that we noticed are those of the plaintiffs

9    themselves, their experts and the declarants who submitted

10   affidavits in support of their motion for preliminary

11   injunction, so the witnesses they intend to call.  And I asked

12   whether they were going to make me go to court to get leave to

13   take those depositions, and Ms. Matystik said no.

14             MS. MATYSTIK:  May I, your Honor.

15             THE COURT:  Sure.

16             MS. MATYSTIK:  Last year, the maximum number of

17   depositions was brought up with Mr. Levine.  He asked us if it

18   was plaintiffs' position that absolutely no more than ten

19   depositions would be permitted.  I said that if they wanted to

20   schedule ten depositions, and then discuss anything beyond

21   that, we would be open to it, or if they wanted to let us know

22   who they -- who ten deponents would be, we could discuss any

23   possible deponents beyond that number, but that we weren't

24   going to at the outset just agree to 14 now, 15 as of this

25   morning, depositions.  That's not what we're willing to do on

1   the phone with Mr. Levine.

2              MR. LEVINE:  If that's the case, your Honor, I would

3   like to ask for leave to take the depositions of the named

4   plaintiffs.

5              THE COURT:  How many named plaintiffs are there?

6              MR. LEVINE:  There are perhaps -- and correct me if

7   I'm wrong -- seven or nine.

8              MS. CALABRESE:  Nine.

9              MR. LEVINE:  I have it here.  Well, let's see here.

10   There is one, two, three, four, five, six, seven, eight, nine

11   named plaintiffs.  They have --

12              MS. CALABRESE:  Your Honor, I apologize for

13   interrupting.

14         So not all of our named plaintiffs are on our initial

15   disclosures.  Sorry.  Other witnesses that have been noticed.

16   We've noticed three additional witnesses are not on our initial

17   disclosures, your Honor.

18              THE COURT:  And who are those additional three

19   witnesses?

20              MS. CALABRESE:  Amelia White, Steve White, and Peggy

21   Hatten.

22              THE COURT:  Are they named plaintiffs, Amelia White,

23   Steve White and who?

24              MS. CALABRESE:  Peggy Hatten.

25              They're not named plaintiffs.  Ms. Hatten had

1   submitted a declaration on behalf of the preliminary

2   injunction, but we did not include her in our initial

3   disclosures, because we don't intend to call her as a witness.

4           THE COURT:  Mr. Levine?

5           MR. LEVINE:  Why did you notice those depositions?

6           THE COURT:  Peggy Hatten, because they don't intend to

7   call her, you still want to take her deposition?

8           MR. LEVINE:  Well, I'm not sure.  I mean, we've

9   actually had (unintelligible) to meet and confer.

10          THE COURT:  Yes.

11          MR. LEVINE:  I don't know what the status is of the

12  declaration.

13          THE COURT:  Here's what's going to happen.

14          MR. LEVINE:  I will say they have produced many

15  thousands of Ms. Hatten's documents already.

16          THE COURT:  Yes.  I now remember her name.

17          Amelia White, Steve White, Peggy Hatten.  They're

18  going to be allowed to be deposed if they're over the ten.

19          My familiarity with this case, my familiarity with

20  those names, my familiarity with their documents, because I

21  believe I had to review them in the Montesa case, makes me

22  realize they may have relevant information that would help the

23  defendants, whether you're going to call them as a witness or

24  not.  When you have a case that has this many plaintiffs, then

25  you cannot ask the defendants —— to basically say, "Okay.  You

 1    can only take the plaintiffs' deposition."  I am, though, going

 2    to say —

 3              How many have you noticed right now?

 4              MR. LEVINE:  Fifteen notices.

 5              THE COURT:  Okay.

 6              MR. LEVINE:  For what it's worth, several of those —

 7    I don't have the numbers in front of me, but several of those

 8    are depositions that are not to exceed four hours.

 9              THE COURT:  Yes, because they've been deposed

10    previously.

11              MR. LEVINE:  Right.

12              THE COURT:  And I limited the deposition or you guys

13    agreed to it.  I think we had a discussion, and it's been

14    limited to four hours.

15              MR. LEVINE:  Right.  So we're finishing those

16    depositions.  I think that's five or six of them off the top of

17    my head.

18              THE COURT:  Okay.  Unless good cause is shown, your

19    number is limited to 15.  So if you need to go over 15 — and

20    they're not calling Peggy Hatten.  You know, you may not want

21    to waste your time on that.  You guys can meet and confer about

22    it.  But I don't want to see motion practice on this.

23              MR. LEVINE:  Does that include the depositions that

24    we're just finishing the depositions?

25              THE COURT:  Yes.

1                  MR. LEVINE:  So 15 starting now.

2                  THE COURT:  Yes.  So anybody you're finishing comes

3    into those 15.

4                  MR. LEVINE:  Okay.

5                  THE COURT:  I'm not going to take them out of that and

6    say you have 15 or top of those.

7                  MR. LEVINE:  Okay.  And we can talk with them later --

8                  THE COURT:  Yes.

9                  MR. LEVINE:  -- about whether they're going to

10   withdraw Ms. Hatten's declaration and what they're intending to

11   do with the documents that are (unintelligible).

12                 THE COURT:  Yes.

13                 MR. LEVINE:  Okay.

14                 THE COURT:  You don't have to take any of these

15   depositions.  You don't have to take up to 15.  I just don't

16   want to see any motion practice before me on this issue.  You

17   know, you guys can meet and confer who you think the best to

18   be.  And if you only do ten, you only do ten.  If you are able

19   to talk about and agree that certain people, although they may

20   produce, you know, a thousand documents on them, are not going

21   to be people that are called and rely on and they're not

22   relying on the documents or anything like that, you may not

23   take the deposition, and don't waste everybody's time and money

24   on it.

25                 MR. LEVINE:  Agreed.

1    MS. CALABRESE:  Your Honor, just to be clear, the 15

2  for both sides, or just the District?

3    THE COURT:  Just the District, because I haven't heard

4  why you need more.

5    MS. CALABRESE:  We've only noticed some of the Board

6  members, your Honor.  And we took the ones we thought would be

7  most important when we were thinking that we were limited to

8  ten depositions.  So I think we would also seek to expand the

9  number of depositions we could take to make sure we are able to

10  depose all of the current and some of the former Board members.

11    THE COURT:  Counsel?

12    MR. LEVINE:  Well, they also have several more

13  third-party subpoenas outside of the Board.

14    MS. CALABRESE:  And those were only for — one for a

15  deposition, but two are for documents, because we believed we

16  were limited to ten depositions.

17    MR. LEVINE:  So I wasn't sure what the status of that

18  is.  You have our objection on compelling sitting members of

19  the Board to appear for deposition.  If they want 15, I'm not

20  going to stand on —

21    THE COURT:  I'm going to give both sides 15, and then

22  we'll figure out what's happening on my ruling on the sitting

23  Board members.

24    MS. CALABRESE:  Thank you, your Honor.

25    THE COURT:  Okay?  Anything else that — I really do

1  want those depositions to be done by the 19th of October.  So

2  with this many, you'd better continue to talk about scheduling.

3          Was plaintiffs' expert report served?

4          MS. CALABRESE:  Yes, your Honor.

5          THE COURT:  Okay.

6          (Pause)

7          THE COURT:  Okay.  Anything else we need to deal with

8  today?  Otherwise, I'm going to look for a date for another

9  conference.

10         MR. LEVINE:  One last piece, which we did raise in our

11 letter, which is that the Court's rules are pretty clear about

12 what's allowed to be included in letters to the Court, and they

13 don't include correspondence.  And only one side has been

14 adhering to that, and I feel like I'm fighting with one hand

15 tied behind my back.

16         MS. CALABRESE:  Your Honor, we obviously defer to you.

17 We understood that rule to mean not to file letters, discovery

18 letters, that we send to each other on the docket as their own

19 individual filing, but that in the course of discovery

20 disputes, you would permit parties to submit correspondence.

21         THE COURT:  Give me one second.

22         MS. CALABRESE:  I think that that's as to discovery

23 motions.

24         (Pause)

25         THE COURT:  Okay.  So I'm looking at my individual

1    rules, because I have my understanding of my individual rules,

2    but unfortunately, change them enough that I want to make sure

3    I looked at the most up-to-date one.

4              Under my individual rules:

5              Paragraph 1:  "Communication with chambers.

6              "A.  Letters.  Except as otherwise provided below,

7    communications with chambers shall be by letter with copies

8    simultaneously delivered.  Copies of correspondence between

9    counsel shall not be sent to the Court unless there's a request

10   to file a letter under seal or a letter contains confidential

11   information.  Letters should be filed on ECF."

12             This rule applies to communications between the

13   parties.  It should not be filed on the Court as they're being

14   communicated, because, unfortunately, I'm sometimes bombarded

15   with people's own bickering where there's nothing I need to do

16   about it.  They're just kind of copying the Court on it.

17             When you're making a motion -- sometimes there's

18   motions for sanctions, sometimes there's motions for contempt,

19   sometimes there's motions for discovery failings -- often the

20   evidence that is in support of those motions are communications

21   between counsel, and they're attached as exhibits.  That's what

22   I mean.  That rule does not say do not attach correspondence

23   that is going to support the arguments being made by the

24   parties.  It's really "Don't bring me into something and

25   communicate with each other on something that I don't need to

1    act on," because, one, it clutters my mailbox, so to speak, and

2    two, I will be reading every single letter that comes in on ECF

3    on any case that I am dealing with.  And if I don't have to

4    take any action, it's not a good use of my time.

5         So I have no objections to counsel who need to attach

6    communications with each other in order to show and support the

7    point they're trying to make to the Court.  It's attached as an

8    exhibit.  It's not being filed for me as a stand-alone letter.

9    Don't CC me on correspondence between the parties.

10        So, Mr. Levine, if you misunderstood that, and you

11   have not done that in the past, you're welcome to do it now.

12   But I do not want to see myself become a third party to all of

13   the communications between each other.  I hope that makes --

14   clarifies that rule.

15             MR. LEVINE:  Very useful guidance.

16             Thank you, your Honor.

17             THE COURT:  Anything else?

18             MS. CALABRESE:  Not from the plaintiffs, your Honor.

19             MR. LEVINE:  Not from us.

20             THE COURT:  When should we talk next?  I would say

21   after October 19th.

22             MR. LEVINE:  That sounds right to us.

23             THE COURT:  Beginning of November?

24             MR. LEVINE:  Couple of weeks of October are going to

25   be pretty busy.

189knatMS

```
 1              THE COURT:  First week in November?

 2              MS. CALABRESE:  That works for us, your Honor.

 3              MR. LEVINE:  How about the 8th?

 4              THE COURT:  Is the 8th a Sunday?  November 8, yes.

 5              (Pause)

 6              THE COURT:  Does the 5th of November work for

 7    everyone?

 8              MR. LEVINE:  Yes, works for us.

 9              MS. CALABRESE:  That's fine, your Honor.

10              THE COURT:  You prefer to come in the afternoon,

11    counsel?

12              MR. LEVINE:  Yes.

13              THE COURT:  Ms. Hummel, what do I have available on

14    the 5th in the afternoon?

15              THE DEPUTY CLERK:  You can do 2:00 p.m.

16              THE COURT:  Does 2:00 p.m. work for plaintiffs and

17    defendants?

18              MS. CALABRESE:  Yes, your Honor.

19              THE COURT:  Mr. Levine, is that fine?

20              MR. LEVINE:  Yes, your Honor.

21              THE COURT:  Okay.  So November 5th, 2:00 p.m.,

22    in-person conference.

23              I will let you know if I need to speak to you or any

24    briefing on the issue you've raised regarding the subpoenas.

25    I'll try to do that promptly so that you don't lose any time on
```

189knatMS

1    that issue, especially if I'm going to need any briefing –– any

2    further briefing on that issue.

3              MS. CALABRESE:  Thank you, your Honor.

4              THE COURT:  Okay?  Thank you very much, counsel.

5              Have a good day.

6              And happy holiday to all of you who celebrate it.

7              MR. LEVINE:  Thank you, your Honor.

8                              –   –   –

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25