20-1668
Clerveaux v. E. Ramapo Cent. Sch. Dist.

UNITED STATES COURT OF APPEALS
FOR THE SECOND CIRCUIT

_____

August Term, 2020

(Argued: August 19, 2020                    Decided: January 6, 2021)

Docket No. 20-1668

_____

JULIO CLERVEAUX, CHEVON DOS REIS, ERIC GOODWIN, JOSE VITELIO
GREGORIO, DOROTHY MILLER, HILLARY MOREAU, NATIONAL
ASSOCIATION FOR THE ADVANCEMENT OF COLORED PEOPLE, SPRING
VALLEY BRANCH,

*Plaintiffs-Appellees,*

v.

EAST RAMAPO CENTRAL SCHOOL DISTRICT,

*Defendant-Appellant.*[1]

_____

---

[1] The Clerk of Court is directed to amend the caption to the above.

1  Before: POOLER, HALL, and CHIN, *Circuit Judges*.
2
3    Defendant-Appellant East Ramapo Central School District

4  ("District") appeals from the May 25, 2020 decision and order of the United

5  States District Court for the Southern District of New York (Seibel, *J.*), issued

6  after a bench trial, holding that the at-large election system used by the District to

7  elect members to its Board of Education ("Board") resulted in dilution of black

8  and Latino residents' votes in violation of Section 2 of the Voting Rights Act of

9  1965, 52 U.S.C. § 10301. On appeal, the District argues that: Section 2 requires a

10  finding that racial motivations caused election results; the district court abused

11  its discretion in admitting and relying on Plaintiffs' expert's findings, which used

12  data derived through Bayesian Improved Surname Geocoding ("BISG") rather

13  than the more traditional Citizen Voting Age Population ("CVAP") data; and the

14  totality of the circumstances does not support a finding of impermissible vote

15  dilution.

16    We reject these arguments. We hold that Section 2 does not require racial

17  causation, though the existence or absence of such causation is a relevant factor

18  for consideration. We further hold that the district court did not err in

19  concluding that the analysis using BISG is reliable and superior to analysis using

2

CVAP. Lastly, we hold that the totality of the circumstances supports the finding of a Section 2 violation given the near-perfect correlation between race and school-type; the scant evidence supporting the District's claim that policy preferences, not race, caused election results; the Board's blatant neglect of minority needs; the lack of minority-preferred success in elections; the exclusive, white-dominated slating organization; and evidence suggesting the District acted in bad faith throughout the litigation.

AFFIRMED.

_____

RANDALL M. LEVINE, Morgan, Lewis & Bockius LLP (David J. Butler, William S.D. Cravens, Clara Kollm, David B. Salmons, Bryan Killian, Stephanie Schuster, *on the brief*), Washington, D.C., *for Defendant-Appellant East Ramapo Central School District*.

CHARLES S. DAMERON, Latham & Watkins LLP (Andrew Clubok, Claudia T. Salomon, Corey A. Calabrese, Marc N. Zubick, Russell D. Mangas, *on the brief*), Washington, D.C., *for Plaintiffs-Appellees*.

Arthur N. Eisenberg, Perry M. Grossman, New York Civil Liberties Union Foundation (*on the brief*), New York, N.Y., *for Plaintiffs-Appellees*.

Nathan Lewin, Lewin & Lewin, LLP, Washington, D.C., *for* Agudath Israel of America, *amicus curiae*.

3

1

2   POOLER, *Circuit Judge*:

3       Few rights are more sacred than the right to vote. Indeed, the right to vote

4   is preservative of all other rights, *see Yick Wo v. Hopkins*, 118 U.S. 356, 370 (1986),

5   but historically it has not been granted equally in this country. To rectify this

6   deprivation, Congress passed the Voting Rights Act. Section 2 of that statute

7   prohibits states or political subdivisions from structuring elections "in a manner

8   which results in a denial or abridgement of the right of any citizen of the United

9   States to vote on account of race or color," such that minority citizens "have less

10  opportunity than other members of the electorate to participate in the political

11  process and to elect representatives of their choice." 52 U.S.C. § 10301. In doing

12  so, the Voting Rights Act fulfills the promise of the Fifteenth Amendment—that

13  no citizen shall be denied the right to vote based on "race, color, or previous

14  condition of servitude." U.S. Const. amend. XV.

15      East Ramapo Central School District ("District") appeals from the May 25,

16  2020 decision and order of the United States District Court for the Southern

17  District of New York (Seibel, *J.*), issued following a bench trial, holding that the

18  at-large election system used by the District to elect members to its Board of

4

1   Education ("Board") resulted in dilution of black and Latino residents' votes in

2   violation of Section 2 of the Voting Rights Act, 52 U.S.C. § 10301. On appeal, the

3   District argues that: Section 2 requires a finding that racial motivations caused

4   the election results; the district court abused its discretion in admitting and

5   relying on Plaintiffs' expert's findings, which used data derived through

6   Bayesian Improved Surname Geocoding ("BISG") rather than the more

7   traditional Citizen Voting Age Population ("CVAP") data; and the totality of the

8   circumstances does not support a finding of impermissible vote dilution.

9       We reject these arguments. We hold that Section 2 does not require racial

10  causation, though the existence or absence of such causation is a relevant factor

11  for consideration. We further hold that the district court did not err in

12  concluding that the analysis using BISG is reliable and superior to analysis using

13  CVAP. Lastly, we hold that the totality of the circumstances supports the finding

14  of a Section 2 violation given the near-perfect correlation between race and

15  school-type; the scant evidence supporting the District's claim that policy

16  preferences, not race, caused election results; the Board's blatant neglect of

17  minority needs; the lack of minority-preferred success in elections; the exclusive,

1    white-dominated slating organization[2]; and evidence suggesting the District

2    acted in bad faith throughout the litigation.

3          The order of the district court enjoining Board elections until the District

4    proposes and executes a remedial plan, before us through an interlocutory

5    appeal, is accordingly affirmed. On December 23, 2020, the District moved to

6    stay the district court's injunction pending the resolution of this appeal. As this

7    opinion resolves the appeal and affirms the district court's order, the District's

8    motion is denied as moot.

9                              **BACKGROUND**

10   **I.    Factual Background[3]**

11         **A. The District and Board Elections**

12         Plaintiffs-Appellees are the Spring Valley Branch of the National

13   Association for the Advancement of Colored People and Julio Clerveaux,

14   Chevon Dos Reis, Eric Goodwin, and Dorothy Miller, who are minorities and

15   registered voters in the District. Since 2008, every candidate these individuals

---

[2] A slate is a list of candidates for nomination or election. We use the term "slating organization" to refer to a group that designates candidates for a slate.
[3] These facts are drawn from the district court's decision and order, supplemented as necessary by the record.

have voted for has lost. In addition, Dos Reis and Goodwin unsuccessfully ran

for the Board in 2017 with the perceived support of the public-school

community, a group of residents interested in improving the conditions of public

schools in the District.

The District is a highly segregated political subdivision of New York State

located in Rockland County. The population in the District is approximately

65.7% white, 19.1% black, 10.7% Latino, and 3.3% Asian. During the 2017-2018

school year, approximately 8,843 students attended public schools, while 29,279

students attended private schools. The private-school community consists

primarily of white Orthodox and Hasidic Jewish residents who educate their

children in yeshivas, while the public-school community consists of primarily

black and Latino residents whose children attend public schools. The correlation

between race and school attended in the District is near perfect: 92% of public-

school students are black or Latino, while 98% of private-school students are

white.

The District is governed by a Board, which consists of nine members

whose responsibilities include selecting the Superintendent of Schools and

approving other personnel, setting the budget and levying taxes, establishing

1  policies, and evaluating and communicating the progress and needs of the

2  District to the public and others. As of early 2020, the Board members were:

3  Harry Grossman, president; Sabrina Charles-Pierre, vice president; Mark

4  Berkowitz; Carole Anderson, appointed on an interim basis due to the

5  resignation of Bernard L. Charles, Jr.; Joel Freilich; Ashley Leveille; Yoel T.

6  Trieger; Ephraim Weissmandl; and Yehuda Weissmandl.

7       Board elections are staggered so that three seats, each carrying a three-year

8  term, are open every year (absent special circumstances, such as death or

9  resignation of a member, in which case an extra seat may be available that year).

10  Candidates run for a specific, individually numbered seat. The elections are at-

11  large, meaning that all eligible voters in the District vote in each race. The

12  following table summarizes the results of Board elections from 2008-2018 (with

13  "W" designating white candidates, "B" designating black candidates, and L"

14  designating Latino candidates).[4]

---

[4] The summary table was referenced in the district court's decision and order.

| Yr. | Seat 1 | | | Seat 2 | | | Seat 3 | | | Seat 4 | TOTAL VOTE COUNT |
|---|---|---|---|---|---|---|---|---|---|---|---|
| 2008 | Aaron Wieder (W) (6,261)* | Steve White (W) (2,415) | | Moshe Hopstein (W) (6,533)* | | | Nathan Rothschild (W) (5,103)* | | | | 9,163 |
| 2009 | Morris Kohn (W) (8,768)* | Leonardo Vera (L) (4,548) | | Carolyn Watson (W) (566) | Margaret Hatton (W) (4,236) | Eliyahu Solomon (W) (8,578)* | Emilia White (B) (4,149) | Richard Stone (W) (9,224)* | | | 13,708 |
| 2010 | Antonio Luciano (W) (7,622) | Moses Freidman (W) (7,926)* | | Stephen Price (W) (13,612)* | | | Suzanne Young-Mercer (B) (13,839)* | | | | 16,056 |
| 2011 | Moshe Hopstein (W) (9,904)* | M. Hatton (W) (7,907) | | Yehuda Weissmandl (W) (9,923)* | A. Luciano (W) (7,909) | | Daniel Schwartz (W) (9,947)* | Carole Anderson (B) (7,818) | | Joanne Thompson (B) (13,958)* | 18,206 |
| 2012 | Hiram Rivera (L) (6,315) | Jacob Lefkowitz (W) (8,474)* | | Kim Foskew (W) (6,276)* | E. Solomon (W) (8,460)* | | Yonah Rothman (W) (8,521)* | J. Thompson (B) (6,335) | | | 15,091 |
| 2013 | Maraluz Corado (L) (6,806)* | Margaret Tuck (B) (5,244) | | Eustache Clerveaux (B) (5,085) | Pierre Germain (B) (6,899)* | | Robert Forrest (B) (5,175) | Bernard Charles (B) (6,833)* | | | 12,317 |
| 2014 | M. Hopstein (W) (2,388)* | | | Harry Grossman (W) (2,652)* | | | Yakov Engel (W) (2,381)* | | | Y. Weissmandl (W) (2,379)* | 4,998 |
| 2015 | Sabrina Charles-Pierre (B) (4,600) | Jacob Lefkowitz (W) (6,380)* | Alan Jones (B) (468) | Y. Rothman (W) (6,523) * | Natashia Morales (L) (4,864) | | S. White (W) (4,615) | Yisroel Eisenbach (W) (556) | Juan Pablo Ramirez (L) (6,293)* | | 11,694 |
| 2016 | B. Charles (B) (7,973)* | K. Foskew (W) (3,972) | | P. Germain (B) (7,860)* | Jean Fields (B) (4,137) | | Y. Weissmandl (W) (7,626)* | N. Morales (L) (4,401)) | | S. Charles-Pierre (B) (5,014)* | 12,311 |
| 2017 | Alexandra Manigo (W) (4,964) | Mark Berkowitz (W) (9,158)* | | Eric Goodwin (B) (4,910) | H. Grossman (W) (9,137)* | | Joel Frielich (W) (9,530)* | Chevon Dos Reis (L) (4,503) | | | 14,343 |
| 2018 | S. Charles-Pierre (B) (9,180)* | | | Yoel Trieger (W) (7,179)* | Miriam Moster (W) (1,996) | | E. Weissmandl (W) (6,977)* | Joselito Cintron (L) (2,308) | | | 9,714 |
| | Key: An * denotes the election winner, **Bold** denotes the incumbent candidate | | | | | | | | | | |

1

## B.  The Slating Organization

Influential members of the white, private-school community have an informal slating process by which preferred Board candidates are selected, endorsed, promoted, and elected. Rabbi Yehuda Oshry, an influential Orthodox community leader, selects and approves candidates, controls access to the slating process, and submits petitions on behalf of candidates. Private-school advocate Shaya Glick also helps select candidates and publicizes their candidacy. Yakov Horowitz, a leader in the Orthodox community, connects potential candidates to Rabbi Oshry and approves candidates. The slating organization (the "Organization") has secured victory for the white community's preferred candidate in each contested election. Although some minority candidates have been slated by the Organization and have won seats on the Board, minority voters did not prefer these candidates.

The Organization does not hold an open call for candidates, and only those with connections to the Organization or its leaders have been introduced, vetted, and selected. When vetted, candidates were not asked about their policy views. Multiple successful private-school candidates did not campaign or spend money

1 to get elected; rather, they simply were approved by Rabbi Rosenfeld, Rabbi

2 Oshry, or Glick.

3      For instance, Charles, a black man who won multiple Board elections after

4 being slated by the Organization, was connected to Rabbi Rosenfeld through a

5 mutual acquaintance. Rabbi Rosenfeld met with Charles, but he did not ask

6 Charles about his policy platform. Rabbi Rosenfeld did, however, require

7 interviews with Charles's running mates, and Charles needed Rabbi Rosenfeld's

8 approval to add his running mates to his slate.

9      Charles's situation contrasts with that of public-school candidate and

10 plaintiff Goodwin. Goodwin "genuinely impressed" a former Board member

11 from the private-school community, but he was nonetheless not introduced to

12 anyone in the Orthodox community for endorsement. Supp. App'x at 94. Charles

13 believed that "when it comes to running for the school board . . . you're either

14 working with [the] white community or you're working with the other

15 community." Supp. App'x at AA 146.

16     **C. Minority Board Members**

17      Minority candidates have won seven out of thirty-two contested Board

18 elections in the District from 2005 to 2018. However, from 2008 to 2018, no

11

1    minority-*preferred* candidate won a contested Board election, and each minority

2    candidate who did win did so with the approval and support of the

3    Organization.

4          Most notable are Charles and Pierre Germain, both black men who won

5    four of the elections analyzed. Both were vetted and endorsed by the

6    Organization. Neither candidate campaigned in, nor sought to appeal to the

7    public-school community given that they had already secured the Organization's

8    endorsement and with it the support of the white community. Minority voters

9    did not support Charles and Germain. Once elected, Charles and Germain allied

10    with private-school interests and against public-school interests. For example,

11    Charles did not support the appointment of Charles-Pierre, a black woman, to

12    the Board because he believed she was aligned with public-school advocates.

13    Charles testified that Charles-Pierre was "on the opposing side" and "the lamb

14    who will certainly lead to a slaughter of this board." Trial Tr. at 1851:5-8. While

15    Germain supported Charles-Pierre, he told his fellow Board members that "we

16    can have better control of Sabrina than the Spanish girl," a reference to another

17    public-school community candidate who Germain considered "aggressive."

18    Supp. App'x at 96-97. In addition, Charles "went along" with the decision of

12

1   other Board members to appoint a less experienced, white individual to the

2   Board over a black retired District principal who held two master's degrees,

3   despite the pervasive spelling and grammatical errors in the white candidate's

4   two-paragraph application. Supp. App'x at 150.

5       Two other minority candidates, Maraluz Corado and Juan Pablo Ramirez,

6   won with the support of the white community in 2013 and 2015, respectively.

7   Both resigned from the Board shortly thereafter. The Board appointed Grossman

8   to fill Corado's seat, choosing him over a minority candidate who had also

9   applied to fill the seat. In appointing Grossman, the Board did not interview him

10  publicly, as was required by the District's protocol.

11      The Board appointed Charles-Pierre to fill Ramirez's seat after a state-

12  appointed monitor pressed the Board to include a public-school parent. Charles-

13  Pierre subsequently won an uncontested election in 2016. Grossman told

14  Charles-Pierre that Yehuda Weissmandl had said, "The only reason [Charles-

15  Pierre] is there and ran unopposed is because the board wants to do what [the

16  state-appointed monitor] said." *NAACP v. E. Ramapo Cent. Sch. Dist.*, 462 F. Supp.

17  3d 368, 393 (S.D.N.Y. 2020) (alterations in original) (internal quotation marks

18  omitted). Charles-Pierre was reminded repeatedly that her presence on the Board

13

1    was up to the whims of Grossman and the Orthodox community. For instance,

2    when admonishing Charles-Pierre for supporting a candidate he did not like to

3    fill a Board vacancy, Grossman told Charles-Pierre, "If there really was any

4    desire by anybody to remove you from the [B]oard, all that would need to be

5    done was to run a candidate against you in May . . . . [The] Orthodox community

6    could just have voted you out in May. WE [sic] told them that you were good

7    and not to run a candidate." Supp. App'x at 248. Charles-Pierre complained that

8    the Board kept her in the dark, made her look stupid, and criticized her. In a

9    message to other Board members, Grossman said that while Charles-Pierre "has

10    a voice," "[r]ealistically, . . . she has zero control or influence on direction." Supp.

11    App'x at 169.

12        In 2019, Ashley Leveille, a black public-school candidate, won a contested

13    race. This occurred after Grossman sent a message to Horowitz in April 2018

14    regarding this very litigation, saying, "Spoke to David Butler today. He asked me

15    to convey message that it would be good for the case to have a minority to run

16    against Sabrina that the community could support." Supp. App'x at 128. David

17    Butler is counsel for the District in the present litigation. Originally, Leveille ran

18    unopposed. At that time, another candidate, Pastor Jose Cintron, was collecting

signatures to run for Yehuda Weissmandl's seat. Yehuda Weissmandl then

decided to run again, so Cintron instead ran for the same seat Leveille sought to

fill. After Cintron switched seats, Rabbi Oshry collected signatures for his

campaign, and Grossman reached out to the Organization members in support of

the campaign. Cintron told Leveille that if he ran against her, "they're going to

give me the seat." Trial Tr. at 1776:1. Leveille understood "they" to refer to the

Jewish community because Cintron told her he had been meeting with the

rabbis. Accordingly, Leveille and Cintron both believed Leveille would lose. But

on election day and to her surprise, Leveille won because voter turnout among

the white population in the District was unusually low.

### D. The Board's Favoritism Towards Private-School Interests

In 2014, a state-appointed monitor investigated the Board's activities and

made the "[m]ost disturbing" finding that the "Board appears to favor the

interests of private schools over public schools." Supp. App'x at 280. "Beginning

in 2009[,] [the] Board made draconian spending cuts to public school programs

and services in order to balance its budgets." Supp. App'x at 280. Meanwhile,

"spending on programs benefitting private schools increased." Supp. App'x at

284. "No meaningful effort [was] made to distribute [the] pain of deep budget

1  cuts fairly among private and public schools." Supp. App'x at 284. The monitor

2  found the problem of private-school bias to be "compounded by the Board's

3  failure to conduct meetings in an open and transparent way." Supp. App'x at

4  285. The monitor further observed that the District's leaders responded poorly to

5  disapproval, branding critics as "anti-Semitic" and "political opponents." Supp.

6  App'x at 287.

7       The Board's actions support the monitor's findings of favoritism towards

8  private schools. For example, the Board closed two public schools over minority

9  opposition and made a sweetheart deal with a yeshiva to sell it one of the closed

10 schools at a discounted price. In addition, the Board increased nonmandated

11 private-school services, such as transportation, without restoring public schools'

12 budgets to pre-cut levels. In fact, from 2017 to 2019, the District paid yeshiva

13 contractors to bus 1,172 more private-school students than were even registered

14 to use private-school transportation services, creating $832,584 in

15 unsubstantiated costs. The Board also made accommodations at Board meetings

16 for Yiddish-speaking parents but did not do so for Spanish-speaking parents,

17 resulting in New York State issuing a corrective action plan.

1    The Board also repeatedly failed to respond to public-school concerns.

2  Olivia Castor, a former public-school student now attending law school, attested

3  to the fact that around March 2013, she had gathered and presented responses

4  from her classmates on the quality of their education to the Board during a Board

5  meeting. The Board did not respond, and during the presentation itself, Board

6  members ignored Castor and gave her no attention. When Castor attempted to

7  discuss inadequacies in students' schedules using her classmates' genuine but

8  redacted schedules as examples, the Board accused Castor of falsifying the

9  schedules.

10    In a hallway during the meeting, the Board's attorney, without

11  provocation, directed profanity and threatening language at a seventeen-year-old

12  black student on the honor roll. The student was distressed by the incident, and

13  Castor informed the Board of the occurrence and requested that the attorney be

14  removed from his position. The Board, however, did not address the incident.

15    Similarly, the Board failed to act timely after the former District

16  Superintendent, Joel Klein, made derogatory comments about immigrant

17  students. Klein stated that the influx of "illegal" immigrants from "the southern

18  border" would skew the District's graduation rates "because we know everyone

17

[sic] of these kids are dropping out." Supp. App'x at 238-39. Klein proposed

flimsy, nonsubstantive programming for the immigrant students because

according to him, the students "want to learn the language, they want free lunch,

breakfast and whatever else they can get." Supp. App'x at 239. The Board

nevertheless left Klein in place for more than a year after the comments were

made until state-appointed monitors worked with the Board president to find a

replacement.

## II.  Procedural History

### A. Commencement of the Lawsuit

Plaintiffs filed suit on November 16, 2017. Plaintiffs challenged the

District's use of at-large voting for Board elections on the ground that it denies

black and Latino citizens equal opportunity to participate in the political process

and elect candidates of their choice, in violation of Section 2 of the Voting Rights

Act, 52 U.S.C. § 10301. Plaintiffs requested the district court enter an order

declaring the at-large method violated Section 2; enjoining the District from

conducting further elections using at-large voting; ordering the implementation

of a single-member ward election system; and requiring compliance with Section

2 for all future elections.

18

**B.  Expert Findings and Admissibility Challenges**

**1.  Plaintiffs' Expert: Dr. Matthew Barreto**

Dr. Matthew A. Barreto, a professor of political science at the University of

California, Los Angeles, served as Plaintiffs' expert. Dr. Barreto, working with

his colleague Dr. Loren Collingwood, sought "to examine whether evidence of

racially polarized voting exists in elections for East Ramapo and to determine if

black and Latino eligible voters have their electoral interest blocked by a

combination of institutional arrangements and white bloc-voting." Supp. App'x

at 351. Dr. Barreto concluded that there was "very strong evidence of racially

polarized voting" in Board elections from 2013 to 2018; that minority-preferred

candidates had not won a single contested election during that time; and that the

electoral system in the District contains many features known to reduce minority

voter participation and the opportunities to elect minority-preferred candidates.

Supp. App'x at 351-52. Dr. Barreto found that blacks and Latinos voted

cohesively and that whites voted in a bloc in favor of the winning candidate in

each election.

To determine how groups voted, Dr. Barreto and Dr. Collingwood used

ecological inference ("EI") models, which draw an inference of how groups vote

19

based on an analysis of aggregate ecological data, such as precinct vote totals. Dr. Barreto used two EI models. The first is King's Ecological Inference ("King's EI"), and the second is row by column Ecological Inference ("EI:RxC"). Both work by "regressing candidate choice against racial demographics within the aggregate precinct" to find voting patterns by race. Supp. App'x at 409. King's EI does this by running "a 2-by-2 analysis of each candidate and each racial group, in iterations, whereas [EI:RxC] allows multiple rows and multiple columns to be estimated simultaneously." Supp. App'x at 409. Both methods were used "in tandem to provide greater confidence in results." Supp. App'x at 409.

The aggregate ecological data input into King's EI or EI:RxC can come from a few source methodologies. Dr. Barreto used BISG. In broad strokes, BISG can provide a probability assessment of an individual's race based on the individual's surname and location. BISG does this by using Census Bureau data to determine what percentage of the national population with the individual's surname is black, white, Latino, Asian, or other. That national data is then combined with Census Bureau data pertaining to the individual's geographic "block" (which covers the geographic distance of roughly one city block) to see what percentage of the residents in that block area is black, white, Latino, Asian,

or other. Combining these datapoints "provides a probabilistic prediction of individual ethnicity." App'x at 1368. "Concordance between self-reported race/ethnicity and BISG estimates is typically 90 to 96 percent for the four largest racial/ethnic groups." App'x at 1377.

Take the following illustrative example. If we sought to determine the probability that an individual with the surname Smith living in New York City was black, white, Latino, Asian, or other, we would first look at the Census Bureau data to see what percentage of individuals in the United States with the surname Smith fall into one of these groups. We then look at our specific Smith's residential block in New York City to determine what percentage of residents on this block are black, white, Latino, Asian, or other. Cross-referencing these percentages can provide a probability estimate as to whether Smith is black, white, Latino, Asian, or other.

BISG allowed Dr. Barreto to compile and input actual voter data, as opposed to using CVAP data, which is data of all eligible voters.[5] Dr. Barreto started with each voter's "file," which contains the voter's name and address.

---

[5] Barreto did, however, use CVAP data to cross-check his BISG analysis.

Supp. App'x at 44-45. He then used the "Who Are You" or "WRU" software,

created by scholars Kosuke Imai and Kabir Khanna, "to estimate the probability

that a voter is white, black, Latino, or other, using a combination of surname and

geolocation." Supp. App'x at 352. This yielded a reliable estimate of each actual

voter's race or ethnicity, which was aggregated at the precinct level to assess the

racial composition of each precinct. Once Dr. Barreto estimated the racial

composition at the precinct level, Dr. Barreto used both King's EI and EI:RxC to

estimate what percentage of the white vote, the black vote, and the Latino vote

each candidate in Board elections received.

### 2. The District's Expert: Dr. John Alford

Dr. John Alford, a professor of political science at Rice University, served

as the District's primary expert. Contrary to Dr. Barreto, Dr. Alford concluded

that the evidence does not support a finding of minority voter cohesion or legally

significant, racially polarized voting in the District. While Dr. Alford also used

EI, he used CVAP for the source data. As mentioned above, CVAP data consists

of "a precinct-level summary of the racial breakdown of the eligible voter

population." App'x at 1073. CVAP data comes from the American Community

Survey, which is completed by two percent of the population, for each of five

1 years, creating "what's called a 10 percent sample." Trial Tr. at 256:14-257:2

2 (internal quotation marks omitted). CVAP data provides racial composition

3 within Census Bureau geographic blocks, but these geographic blocks do not

4 align with precinct boundaries.

### 3. The District Court's Admissibility Determination

6 Before trial, the District moved to exclude Dr. Barreto's expert testimony.

7 The district court issued an oral decision finding the testimony admissible and

8 denying the motion. While the District made numerous arguments as to the

9 reliability of BISG data, the district court repeatedly noted that these arguments

10 went to the weight of the evidence as opposed to its admissibility. The district

11 court further informed the parties that it would make its decision as to reliability

12 following trial.

13 As to admissibility, the district court addressed each of the four factors set

14 forth in *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579 (1993). With

15 respect to the first factor—whether the theory or technique could be tested—the

16 district court concluded that it could. The District's primary argument was that

17 Dr. Barreto had not turned over all the materials necessary to replicate his

18 analysis. But the district court dismissed this argument, pointing out that "one of

23

the District's experts was able to get the script to run on the 2015 voter data but

was never asked to complete the EI analysis." App'x at 896-97; *see also* Supp.

App'x at 15-16 (one of the District's experts testifying that he "ran the script" and

"got it to run"). The district court also found that Dr. Alford admitted to being

able to independently run the analysis.

With respect to the second factor—whether the theory or technique has

been subject to peer review—the district court found that the use of BISG on

precinct-level voter data had been peer reviewed. It cited to an article authored

by scholars Imai and Khanna, which proposed the use of BISG for voting rights

litigation. With respect to the third factor—the error rate of the methodology—

the district court found the methodology to be admissible given the strong

concordance, from ninety to ninety-six percent, between self-reported race and

BISG estimates.

With respect to the fourth factor—whether the methodology has been

generally accepted by the academic or scientific community—the district court

did not explicitly address the factor. The district court discussed academic

articles involving the use of BISG; the District argued these articles did not

24

1    support Plaintiffs' use of BISG, but the district court found that the helpfulness of

2    the articles goes to their weight of persuasiveness, not their admissibility.

3           Ultimately, the district court concluded that there "are indications of

4    scientific reliability supporting the opinions' admissibility," and "Plaintiffs have

5    made a sufficient showing that I should hear the testimony and give it whatever

6    weight I find it deserves." App'x at 893. Accordingly, the district court admitted

7    Dr. Barreto's testimony and determined that it would revisit how much weight

8    to give the testimony following the trial.

9           **C.  The Trial**

10          A bench trial was held across the span of seventeen days. The witnesses at

11   trial included the parties' experts, Dr. Barreto and Dr. Alford; members of the

12   public-school community; Plaintiffs; former and current Board members; and

13   influential private-school community leaders involved in slating, such as Hersh

14   Horowitz and Rabbi Oshry.[6]

---

[6] According to the district court, "leading up to and during trial, Rabbi Oshry went to great lengths to avoid testifying." *NAACP*, 462 F. Supp. 3d at 404 n.49. In fact, the district court initially found Oshry in contempt for his failure to appear and testify at trial as instructed. *Id.* The district court purged the contempt order and vacated the warrant when Oshry finally appeared. *Id.*

25

1    **D. The District Court's Decision**

2    Following the bench trial, the district court ruled in favor of Plaintiffs,

3    holding that the at-large Board elections violated Section 2 and resulted in

4    impermissible vote dilution for black and Latino residents.

5    In reaching this conclusion, the district court relied on the testimony of Dr.

6    Barreto and discounted the testimony of Dr. Alford, primarily because it

7    considered the analysis using BISG to be superior to that using CVAP.

8    Accordingly, the district court concluded that, as Dr. Barreto found, the District's

9    black and Latino communities were politically cohesive and that the white

10   majority votes as a bloc in Board elections such that no minority-preferred

11   candidate won a contested election since 2008.

12   The district court also found several Board members and witnesses

13   associated with the private school community not credible. For instance, the

14   district court concluded that Grossman "seems to have no compunction about

15   compromising his legal obligations when it suits his purposes." *NAACP*, 462 F.

16   Supp. 3d at 396. Grossman was impeached at least three times. He also testified

17   that he was not aware of any slating organization in the District, but numerous

18   pieces of testimony indicated that he clearly participated in slating with

26

Horowitz, Oshry, and Glick. In addition, the district court found Yehuda

Weissmandl not credible. He denied the existence of a slating organization and

testified unconvincingly that a text message he sent saying that he "personally

got the blessing for [their] slate" through an influential Rabbi's son was not about

the Board slate. Supp. App'x at 85. Weissmandl testified that he "[didn't] know

what [he] was referring to." Supp. App'x at 86. Weissmandl similarly testified

that, despite having sent an email with the note, "[P]lease respond ASAP as we

discussed" and "one choice" in connection with filling a Board vacancy, he did

not know what he meant by "one choice." Trial Tr. at 1125:1-22. Weissmandl was

impeached twice.

The district court also found the totality of the circumstances weighed

firmly in Plaintiffs' favor. In relevant part, while the district court found no

evidence of official discrimination in the District and no overt or subtle racial

appeals in campaigning, it concluded that the racially polarized voting in the

District was not explained by policy preferences. The district court also found

that an exclusive slating process tightly controlled by a few white individuals

existed in the District. The district court further concluded that while there had

been some minority success in elections, the only minority candidates who had

1    won were those perceived as "safe" by the Organization, while other minority-

2    preferred candidates had not succeeded. *NAACP*, 462 F. Supp. 3d at 409-10. The

3    district court also found that white Board members had lied to minority Board

4    members about settlement negotiations regarding this lawsuit and considered

5    this evidence of some Board members' bad faith in wanting to maintain the at-

6    large voting system.

7        As a result of Plaintiffs' success in proving a Section 2 violation, the district

8    court enjoined the District from holding any further elections under its at-large

9    system, including the election that was scheduled to take place in June 2020.  The

10    District timely appealed.

11                   **DISCUSSION**

12     "[The] resolution of the question of vote dilution is a fact intensive

13    enterprise to be undertaken by the district court. And while we are required to

14    see to the proper application of governing legal principles under a *de novo*

15    standard of review, we are constrained to apply a clearly erroneous standard of

16    review to the district court's ultimate findings of vote dilution, thereby

17    preserving the benefit of the trial court's particular familiarity with the

18    indigenous political reality without endangering the rule of law." *Goosby v. Town*

*Bd.*, 180 F.3d 476, 492 (2d Cir. 1999) (internal quotation marks, brackets, and

citation omitted). A finding is clearly erroneous only if the reviewing court "is

left with the definite and firm conviction that a mistake has been committed."

*Atlantic Specialty Ins. Co. v. Coastal Envt'l Grp., Inc.*, 945 F.3d 53, 63 (2d Cir. 2019)

(internal quotation marks omitted). As Chief Justice Roberts recently

acknowledged in a concurrence:

> The question is not whether we would reach the same findings from
> the same record. These District Court findings entailed primarily
> . . . factual work and therefore are reviewed only for clear error. Clear
> error review follows from a candid appraisal of the comparative
> advantages of trial courts and appellate courts. While we review
> transcripts for a living, they listen to witnesses for a living. While we
> largely read briefs for a living, they largely assess the credibility of
> parties and witnesses for a living.

*June Med. Servs. L.L.C. v. Russo*, 140 S. Ct. 2103, 2141 (2020) (Roberts, *C.J.*,

concurring) (internal alterations, citations, and quotation marks omitted).

Section 2 of the Voting Rights Act provides in its entirety that:

> (a) No voting qualification or prerequisite to voting or
> standard, practice, or procedure shall be imposed or applied by any
> State or political subdivision in a manner which results in a denial or
> abridgement of the right of any citizen of the United States to vote on
> account of race or color, or in contravention of the guarantees set forth
> in section 10303(f)(2) of this title, as provided in subsection (b).
> (b) A violation of subsection (a) is established if, based on the
> totality of circumstances, it is shown that the political processes

leading to nomination or election in the State or political subdivision
are not equally open to participation by members of a class of citizens
protected by subsection (a) in that its members have less opportunity
than other members of the electorate to participate in the political
process and to elect representatives of their choice. The extent to
which members of a protected class have been elected to office in the
State or political subdivision is one circumstance which may be
considered: *Provided*, That nothing in this section establishes a right to
have members of a protected class elected in numbers equal to their
proportion in the population.

52 U.S.C. § 10301.

Congress amended the Voting Rights Act in 1982 to clarify that plaintiffs

need not prove intent to discriminate. *Id.*; *see also Thornburg v. Gingles*, 478 U.S.

30, 35 (1986). The Supreme Court, in a decision two years before the amendment,

held that minority voters must prove that state actors had adopted or maintained

the challenged electoral mechanism with discriminatory intent. *See Mobile v.*

*Bolden*, 446 U.S. 55 (1980). Congress acted in 1982 to "make clear that a violation

could be proved by showing discriminatory effect alone" and adopting a "results

test" as opposed to the intent test used in *Bolden. Gingles*, 478 U.S. at 35; *see also* S.

Rep. No. 97-417, at 28 (1982), as reprinted in 1982 U.S.C.C.A.N. 177, 179, 205

(hereinafter "1982 Senate Report") ("*[T]he specific intent of this amendment* is that

the plaintiffs may choose to establish discriminatory results without proving any

kind of discriminatory purpose. . . . If as a result of the challenged practice or

structure plaintiffs do not have an equal opportunity to participate in the

political processes and to elect candidates of their choice, there is a violation of

this section." (emphasis added) (footnotes omitted)).

The Supreme Court set forth the framework for analyzing claims of

unlawful vote dilution in *Thornburg v. Gingles*, 478 U.S. 30. There, a majority of

the Court held that a plaintiff must establish three "necessary preconditions"

when bringing a Section 2 vote dilution claim: (1) "that [the minority group] is

sufficiently large and geographically compact to constitute a majority in a single

member district"; (2) "that it is politically cohesive"; and (3) "that the white

majority votes sufficiently as a bloc to enable it—in the absence of special

circumstances, such as the minority candidate running unopposed—usually to

defeat the minority's preferred candidate." *Id.* at 50-51.

If a plaintiff successfully shows the *Gingles* preconditions, the court must

next assess whether the totality of the circumstances, based on the following

factors, supports the plaintiff's claim:

> the history of voting-related discrimination in the State or political
> subdivision; the extent to which voting in the elections of the State or
> political subdivision is racially polarized; the extent to which the State

31

1  or political subdivision has used voting practices or procedures that
2  tend to enhance the opportunity for discrimination against the
3  minority group, such as unusually large election districts, majority
4  vote requirements, and prohibitions against bullet voting; the
5  exclusion of members of the minority group from candidate slating
6  processes; the extent to which minority group members bear the
7  effects of past discrimination in areas such as education, employment,
8  and health, which hinder their ability to participate effectively in the
9  political process; the use of overt or subtle racial appeals in political
10  campaigns; and the extent to which members of the minority group
11  have been elected to public office in the jurisdiction.

13  *Id.* at 44-45 (citing 1982 Senate Report at 28-29). These factors (the "Senate

14  Factors") come from the Senate Judiciary Committee Report accompanying the

15  passage of the 1982 amendment. Two other factors in the Senate Judiciary

16  Committee Report (the "Additional Factors") are also probative in some cases:

17  (1) "evidence demonstrating that elected officials are unresponsive to the

18  particularized needs of the members of the minority group"; and (2) evidence

19  "that the policy underlying the State's or the political subdivision's use of the

20  contested practice or structure is tenuous." *Id.* at 45.

21      This list of nine factors is "neither exclusive nor comprehensive." *Goosby*,

22  180 F.3d at 492. "[N]o specified number of factors need be proved, and [] it is not

23  necessary for a majority of the factors to favor one position or another." *Id.* "[T]he

24  ultimate conclusions about equality or inequality of opportunity were intended

1  by Congress to be judgments resting on comprehensive, not limited, canvassing

2  of relevant facts." *Id.* (internal quotation marks and citation omitted).

3     In the present case, the District first argues that Section 2 requires a

4  showing that racial motivations caused the election results at issue. Second, the

5  District contends that Plaintiffs have failed to show the second and third *Gingles*

6  preconditions, which includes a challenge to the district court's decision to admit

7  and find reliable Dr. Barreto's expert analysis and testimony. Third, the District

8  argues that Plaintiffs failed to demonstrate that a totality of the circumstances

9  supports their claim because Senate Factors 2, 4, 7, and Additional Factor 9 weigh

10  in favor of the District, not Plaintiffs. We address each argument in turn.

11  **I.    There is no requirement that a plaintiff must prove racial animus to**

12          **establish a Section 2 vote-dilution claim.**

13     Our Circuit considered an argument similar to that the District makes here

14  in *Goosby v. Town Board*, 180 F.3d at 493. There, the defendant Town Board of the

15  Town of Hempstead, New York ("the Town Board") argued that political

16  partisanship, and not race, explained the adverse election results. *Id.* Therefore,

17  the Town Board claimed that the white bloc voting patterns in the elections could

18  not be legally significant under the third *Gingles* precondition. *Id.* Our Circuit

33

1    acknowledged that the splintered *Gingles* Court left open the issue of what role

2    causation plays in Section 2 analyses following Congress's 1982 amendment. We

3    held that the best reading of the Court's various opinions in *Gingles* counsels for

4    consideration of alternative causal explanations like the Town Board's political-

5    partisanship claim "under the 'totality of the circumstances' analysis rather than

6    as part of the third *Gingles* precondition." *Id.*

7        The District, however, is not concerned with where in the analysis

8    causation is analyzed. Instead, the District urges us to hold that a plaintiff

9    bringing a Section 2 Voting Rights Act claim must prove, at some point, that

10    racial animus caused the challenged election result. Appellants' Br. at 37 ("There

11    must be evidence that *racial animus is a but-for cause of election results . . . .*"

12    (emphasis in original)).

13        That is not so. The District's argument rests on a fundamental

14    misunderstanding of our precedent, Supreme Court precedent, and the

15    framework for Section 2 claims. *See Gingles*, 478 U.S. at 471; *id.* at 100-01

16    (O'Connor, *J.*, concurring); *Goosby*, 180 F.3d at 491-92; 1982 Senate Report at 15-

17    16, 27-28, 36-37. The only facts that must be proven without exception for a

18    Section 2 claim are the *Gingles* preconditions; this is why they are termed

"preconditions." All three preconditions are necessary, but are not sufficient, for a Section 2 violation. Those factors considered under the totality-of-the-circumstances stage of the analysis, on the other hand, are not strict requirements. The factors on the whole must support a vote-dilution finding. But no single specific factor or definite number of factors must be proven. *See Goosby*, 180 F.3d at 492. Nor must a majority of the factors favor the plaintiff for a Section 2 claim to succeed. *Id*. When combined with the *Gingles* preconditions, any one factor or combination of factors may be sufficient, but are not necessary in whole or part, for a Section 2 violation.

*Goosby* holds that the absence or existence of racial causation is a factor properly considered at the totality-of-the-circumstances step. *Id.* at 493 ("We think the best reading of the several opinions in *Gingles*, however, is one that treats causation as irrelevant in the inquiry into the three *Gingles* preconditions but relevant in the totality of circumstances inquiry." (citation omitted)); *see also Lewis v. Alamance County, N.C.*, 99 F.3d 600, 615 n.12 (4th Cir. 1996) (causation is relevant to the totality of the circumstances inquiry and irrelevant when considering the *Gingles* preconditions); *Uno v. City of Holyoke*, 72 F.3d 973, 983 (1st Cir. 1995) (non-racial reasons for divergent voting patterns to be considered

1    under totality of circumstances test); *Nipper v. Smith*, 39 F.3d 1494, 1524 (11th Cir.

2    1994) (courts consider racial and non-racial explanations for community voting

3    patterns under the totality of the circumstances). Causation is just one of many

4    factors courts consider in determining whether "the political processes leading to

5    nomination or election in the State or political subdivision are not equally open

6    to participation by members of a class of citizens protected by [Section 2] in that

7    its members have less opportunity than other members of the electorate to

8    participate in the political process and to elect representatives of their choice." 52

9    U.S.C. § 10301. Section 2 claims do not rise or fall on racial causation.[7] Still, racial

10   causation may be sufficient—though not necessary—to find a Section 2 violation.

---

[7] Some of our sister circuits have similarly expressed that courts may consider evidence of racial causation in resolving Section 2 claims but that such causation is not required to succeed on Section 2 claims. *See Lewis*, 99 F.3d at 615 n.12 (explaining that causation is "relevant" to the totality of the circumstances inquiry); *Nipper*, 39 F.3d at 1524 (explaining that "a violation of Section 2 may be established . . . without proof of discriminatory intent" but that an inquiry into causation may be relevant when the record suggests that "disparate electoral results [are] principally caused by a factor other than race" (footnote omitted)). Legal scholars have categorized our Circuit as one of the many that permit, but do not require, consideration of racial causation. *See* Christopher S. Elmendorf, Kevin M. Quinn & Marisa A. Abrajano, *Racially Polarized Voting*, 83 U. Chi. L. Rev. 587, 614-15 (2016) (explaining that, in many circuits, racial causation "is only one consideration among many to be weighed, either as part of the *Gingles* analysis or at the totality-of-the-circumstances stage." (footnotes omitted)).

36

1    This understanding is in accordance with the legislative intent as well. A

2 causation requirement would entail demonstrating that racial animus caused the

3 election results at issue. Indeed, the District's primary argument on appeal is that

4 at-large voting for Board elections does not violate Section 2 because of the

5 absence of "'racial animus' on the part of Orthodox Jewish voters." Appellant's

6 Br. at 26. But Congress rejected precisely such a showing when it drafted the 1982

7 amendments. Congress considered "the intent test [to be] unnecessarily divisive

8 because it involves charges of racism on the part of individual officials *or entire*

9 *communities*." 1982 Senate Report at 36 (emphasis added); *see also* Christopher S.

10 Elmendorf, *Making Sense of Section 2*, 160 U. Pa. L. Rev. 377, 424 (2012)

11 (explaining that the 1982 amendments addressed what Congress "found

12 objectionable in the *Bolden* plurality's intent requirement" and that "[r]elief

13 under Section 2 ought not to require 'brand[ing] individuals as racist'" (quoting

14 1982 Senate Report at 36)). The legislative record flatly contradicts the District's

15 assertion that Congress only rejected the intent test for officials and still sought to

16 require proof of "'race-based motivation' on the part of the electorate who

17 exploit the challenged practice." Appellant's Br. at 31 (emphasis omitted).

37

Contrary to the District's claims, requiring a showing of racial causation would contravene Congress's unmistakable intent.

For this reason, the District's reliance on *Bostock v. Clayton County*, 140 S. Ct. 1731 (2020), is not persuasive. The District focuses on Section 2's language prohibiting the denial or abridgement of the right to vote "on account of race or color" and argues that similar language in Title VII (which prohibits discrimination "because of" sex) was interpreted in *Bostock* to require but-for causation, *see Bostock*, 140 S. Ct. at 1739. As an initial point, the District fails to acknowledge that the Supreme Court has elsewhere interpreted "because of" language to *not* require proof of race-based intent in the Title VII context. *See Griggs v. Duke Power Co.*, 401 U.S. 424, 432 (1971) (recognizing that Title VII claims may be proved based on a disparate impact). Regardless, however, the Supreme Court has "not hesitated to give a different reading to the same language—whether appearing in separate statutes or in separate provisions of the same statute—if there is strong evidence that Congress did not intend the language to be used uniformly." *Smith v. City of Jackson*, 544 U.S. 228, 260-61 (2005) (O'Connor, *J.*, concurring in the judgment). Here, the unique context of the Voting Rights Act and Congress's clear desire not to require a showing of racial

38

1   animus indicate that "on account of race or color" should not be interpreted to

2   require but-for causation.

3       In sum, our precedent and the legislative history make manifest that

4   Section 2 claims do not require a showing of racial causation. Racial causation is

5   one factor, of many, to be considered when assessing the totality of the

6   circumstances. *Goosby*, 180 F.3d at 493. The existence of such causation may be

7   sufficient for a Section 2 violation, but it is not necessary. *See id.* at 492, 493.

8   **II.    The second and third *Gingles* preconditions are met.**

9       The District next contends that Plaintiffs failed to adduce sufficient

10  evidence to satisfy the second and third *Gingles* preconditions of whether black

11  and Latino residents voted cohesively and whether the white majority voted as a

12  bloc to defeat minority-preferred candidates. Specifically, the District argues that

13  the district court improperly admitted and relied on the testimony and findings

14  of Dr. Barreto, Plaintiffs' expert, establishing that black and Latino residents were

15  politically cohesive and that white residents voted as a bloc.

16      We review the district court's decision to admit Dr. Barreto's expert

17  testimony for abuse of discretion. *See Kumho Tire Co. v. Carmichael*, 526 U.S. 137,

39

152 (1999); *Restivo v. Hessemann*, 846 F.3d 547, 575 (2d Cir. 2017).[8] Similarly, "[t]he

question of what weight to accord expert opinion is a matter committed to the

sound discretion of the factfinder, and we will not second guess that decision on

appeal absent a basis in the record to think that discretion has been abused." *Pope*

*v. County of Albany*, 687 F.3d 565, 581 (2d Cir. 2012).

**A. The district court did not abuse its discretion in admitting Dr.**

**Barreto's testimony.**

"In assessing reliability, the district court should consider the indicia of

reliability identified in [Federal Rule of Evidence] 702, namely, (1) that the

testimony is grounded on sufficient facts or data; (2) that the testimony is the

product of reliable principles and methods; and (3) that the witness has applied

the principles and methods reliably to the facts of the case." *United States v.*

---

[8] The District argues that we should apply de novo review because the district court did not analyze the *Daubert* factors. The District mischaracterizes the record. Although it did not explicitly cite *Daubert* by name, the district court did in fact address the *Daubert* factors when it rendered an oral decision on the District's pretrial motion to exclude Dr. Barreto's expert testimony. To the extent the District considers this oral decision insufficient to satisfy the district court's gatekeeping role, we disagree. There is no requirement that an inquiry into reliability take any specific form. *See Restivo*, 846 F.3d at 576 (explaining the *Daubert* inquiry is a "flexible one" (internal quotation marks omitted)).

1  *Williams*, 506 F.3d 151, 160 (2d Cir. 2007) (internal quotation marks and citation

2  omitted). In addition to these factors, the district court may consider those

3  enumerated in *Daubert*, "some or all of which might prove helpful in

4  determining the reliability of a particular scientific theory or technique." *Kumho*,

5  526 U.S. at 141 (internal quotation marks omitted) (citing *Daubert*, 509 U.S. at 593-

6  94). These factors are: (1) whether the methodology or theory has been or can be

7  tested; (2) whether the methodology or theory has been subjected to peer review

8  and publication; (3) the methodology's error rate; and (4) whether the

9  methodology or technique has gained general acceptance in the relevant

10  scientific community. *Daubert*, 509 U.S. at 593-94.

11  Although the District argues that the BISG methodology fails to satisfy the

12  *Daubert* test, the district court properly considered the *Daubert* factors and did

13  not exceed its discretion by admitting Dr. Barreto's expert testimony.

14  **1. Whether the methodology could be tested**

15  Turning to the first *Daubert* factor, the District argues that Dr. Barreto's

16  analysis "cannot be tested," is "unprecedented," and claims that he "destroyed

17  his bespoke data sets before trial." Appellant's Br. at 56-57. The district court

18  rejected these arguments and correctly concluded that the BISG methodology Dr.

41

Barreto used could be tested. This is borne out by the fact that one of the

District's experts, Dr. Stevenson, began replicating the analysis as to the 2015

voter data and was able to get the scripts to run and reproduce the results,

*NAACP*, 462 F. Supp. 3d at 391, though he was never asked to complete the full

EI analysis. Dr. Alford also indicated that he could have independently run the

BISG model. Additionally, the district court described how Dr. Barreto

"validated his analysis using other methodologies," and that all five of these

validation methods "supported his conclusions." *Id.* at 385.

Although the District on appeal claims that Dr. Barreto failed to preserve

"a spreadsheet whose rows identified voters by surname, address, and race

probabilities" needed to replicate his analysis, Appellant's Br. at 55, the district

court found that Dr. Barreto credibly testified that no such spreadsheet exists. Dr.

Barreto explained that no "interim printout of BISG race estimates" existed

because "[t]hose are just generated in the background of the [WRU] program,

and as those BISG estimates get generated, they then just get plugged into the

precincts and then the precinct analysis is done." Supp. App'x at 54. Dr. Barreto

testified that he had "turned over everything that [he] ran and detailed how the

script could be used to generate those race estimates." Supp. App'x at 54. Given

1   that the District's experts admitted to being able to replicate the analysis and the

2   absence of evidence as to any requisite interim spreadsheet, the district court

3   properly concluded that the BISG methodology could be tested.

4            **2. Whether the methodology had been peer-reviewed**

5       Turning to the second *Daubert* factor, the district court properly concluded

6   that the use of BISG to estimate voter race for precinct-level populations has been

7   subjected to peer review. The district court supported this finding by referencing

8   several peer-reviewed articles, *see NAACP*, 462 F. Supp. 3d at 383, including one

9   written by Imai and Khanna that proposed the use of BISG for voting-rights

10   litigation. As Dr. Barreto explained, the purpose of this article was "to see if [the

11   BISG methodology] could improve our estimates of race and ethnicity *at the*

12   *precinct level*." Supp. App'x at 49 (emphasis added); *see also* App'x at 1372 ("We

13   now estimate voter turnout by racial category and validate our estimates against

14   actual turnout by race at the *precinct* and congressional district levels in Florida."

15   (emphasis added)). Imai and Khanna were successful and concluded that BISG

16   "enables academic researchers and litigators to conduct more reliable ecological

17   inference in states where registered voters are not asked to report their race."

App'x at 1374. The district court found that Dr. Barreto "applied BISG in the manner proposed in the academic literature." *NAACP*, 462 F. Supp. 3d at 384.

Other evidence, such as a footnote in an article co-authored by one of the District's experts, also supports the conclusion that BISG could "assign a race to registrants in a voter file where this quantity is not present and then aggregate these individuals by geographic unit *such as a voting precinct*." App'x at 1276 n.21 (emphasis added).[9] Thus, the district court did not err in finding that the BISG methodology as used by Dr. Barreto had been subjected to peer review.

### 3. The error rate

Turning to the third *Daubert* factor, the District argues that the BISG methodology has a high potential rate of error. This is untrue. The district court discussed two studies finding that "self-reported race matched with . . . BISG race estimate[s]" over 90% of the time: one study found that the probability was 95% for Hispanics and 93% for blacks and whites and the other found a range of 90-96%. *NAACP*, 462 F. Supp. 3d at 383. The District does not challenge this

---

[9] Although the author of this footnote testified at trial that it was aspirational, the district court did not credit this testimony because it contradicted his published work. This determination was not an abuse of discretion. *See Pope*, 687 F.3d at 581.

44

1    concordance finding but instead argues that Dr. Barreto did not calculate error

2    ranges when using BISG to estimate racial probability of District voters.

3          The District fails to understand how the BISG methodology works. As the

4    district court recognized, error rates are not necessary to calculate separately in

5    the BISG analysis because BISG provides racial *probabilities*—that is, the

6    likelihood that an individual is black, white, Latino, or other. As such, error rates

7    are "built into the model." App'x at 969.[10] While miscoding (i.e., improperly

8    coding a white person as having a higher probability of being black, or vice

9    versa) can occur, Dr. Barreto said that this had "no impact on the conclusions [he

10   drew] at all" because he followed "the prescribed methodology of aggregating

11   those probabilities down to a precinct." Supp. App'x at 56. In other words, Dr.

12   Barreto was "not attempting to look at one individual on the file and say this

13   person is black, white, or Hispanic. . . . So where there might be an error, the

14   literature suggests that those things often cancel out and that's why you

15   aggregate the probabilities and then your estimates are extremely accurate."

---

[10] The District points to the Imai and Khanna article as evidence that BISG studies
in the literature include error rates. But the Imai and Khanna study was meant to
validate whether BISG gave accurate predictions, and it was for this end that
error rates were generated in that study.

1   Supp. App'x at 56. Accordingly, the District's assertion that Dr. Barreto was

2   required to generate error rates for his analysis is unfounded. The district court

3   properly found that the strong concordance between BISG results and self-

4   reported race or ethnicity supports the reliability of Dr. Barreto's methodology.

5       **4.   Whether the methodology has been generally accepted by the**

6           **scientific or academic community**

7       Finally, while the use of BISG may be novel in voting-rights litigation, it

8   certainly is not otherwise novel. The record is replete with studies validating the

9   use of BISG, which the district court cited in finding the methodology reliable.

10  The district court found that BISG "has been extensively validated by experts,"

11  and that "[m]any respected scholars have used and validated BISG in the

12  political science context and across a variety of disciplines." *NAACP*, 462 F. Supp.

13  3d at 383**;** *see also id.* at 392 ("The method has been endorsed by respected social

14  scientists in leading publications."). Although the district court acknowledged

15  "[t]his may be the first time that voter-preference estimates based on BISG have

16  been admitted into evidence at a VRA trial," *id.* at 392, the court thoughtfully

17  considered how this case was uniquely suited for the use of BISG data based on

18  the fact that the District was very diverse and highly segregated: "BISG is

46

1 particularly reliable for use in the District because of its unique characteristics,"

2 *id.* at 384. While this may indeed be the first time that the BISG methodology was

3 admitted at a VRA trial,[11] as the district court aptly explained, "[t]here must

4 always be a first time." *Id.* at 392. This is especially true when the new method is

5 superior to the old method with respect to the case at hand. *See id.* at 387

6 ("[G]iven the unique characteristics of the District, BISG is a better data set than

7 CVAP for use as an input for ecological inference, and Dr. Barreto therefore used

8 the superior methodology."). There is more than enough evidence indicating the

9 acceptance of the BISG methodology in the scientific or academic community.

10   In conclusion, because the district court has significant latitude in deciding

11 how to determine reliability, *see Restivo*, 846 F.3d at 575-56, and because the

12 district court conducted a thorough review of the *Daubert* factors, *see NAACP*, 462

13 F. Supp. 3d at 382-92; *see also* App'x at 885-903 (district court's oral ruling on

---

[11] At least one other court has found such evidence reliable enough to be admitted in a case involving a Section 2 challenge to an at-large voting system. *See United States v. City of Eastpointe*, 378 F. Supp. 3d 589, 612-13 (E.D. Mich. 2019). This case, however, was resolved by consent decree before trial, *see* No. 17-CV-10079, 2019 WL 2647355 (E.D. Mich. June 6, 2019), *motion for relief from judgment denied*, 2020 WL 127953, at *1 (E.D. Mich. Jan. 10, 2020).

1 *Daubert* motions), the district court did not abuse its discretion in admitting Dr.

2 Barreto's expert testimony.

3 **B. The district court did not abuse its discretion by according more**

4 **weight to Dr. Barreto's expert testimony than it did to Dr. Alford's**

5 **expert testimony.**

6 The district court ultimately relied on Dr. Barreto's testimony and

7 discounted Dr. Alford's, finding that "given the unique characteristics of the

8 District, BISG is a better data set than CVAP for use as an input for ecological

9 inference, and Dr. Barreto therefore used the superior methodology." *NAACP*,

10 462 F. Supp. 3d at 387. As discussed above, we review for abuse of discretion the

11 weight a district court assigns to expert testimony. *Pope*, 687 F.3d at 581.

12 Here, the district court's ultimate decision to give greater weight to Dr.

13 Barreto's testimony was not an abuse of discretion, and the factual findings

14 underpinning its determination were not clearly erroneous. As the district court

15 explained, it found the BISG data set more reliable than CVAP for three main

16 reasons. *NAACP*, 462 F. Supp. 3d at 387-88.

17 First, CVAP data is less precise than BISG data because CVAP data comes

18 from the American Community Survey which contains all eligible voters in a

48

district, whereas BISG data is pulled from the actual voter file. CVAP data is derived from a sample of only approximately ten percent of the population, *see* Trial Tr. 256:14-257:2, thus, applying that data to the entire district population requires extrapolation. That may yield inaccurate results. Dr. Barreto's BISG methodology uses data as to the actual voters in the District, so no such extrapolation would be required. This makes BISG a more reliable and precise data set.

Second, CVAP data is less precise than BISG data because of geographic misalignment between CVAP data and the data needed for analyzing voting patterns in a precinct. CVAP data provides racial proportions within census block groups, but census blocks are smaller geographically than precincts, *see* Brian Amos, Michael P. McDonald, Russell Watkins, *When Boundaries Collide*, 81 Pub. Opinion Q. 385, 387 (2017), thereby causing a misalignment. Because BISG data, however, uses information on actual voters in the precinct, the BISG methodology generates racial probabilities at the precinct level, making it superior for analyzing voting patterns in a precinct.

Finally, CVAP data is overinclusive. Because CVAP data reflects information on all *eligible* voters, rather than *actual* voters like BISG does, CVAP

49

data overestimates voter turnout. Even Dr. Alford acknowledged flaws with

using CVAP data as a proxy for voter turnout. Dr. Alford cited Dr. Barreto's

research on the turnout-estimation issues with CVAP data and explained that

using some form of double equation regression or double equation EI could have

addressed those issues. However, there is no evidence that Dr. Alford applied

any such double equation regression or EI. Even if he had, Dr. Barreto testified

that CVAP "still start[s] with an incorrect input variable" of "all citizen adults,"

so that issue would not have been cured. Supp. App'x at 175.

Any one of these three reasons, which are all supported by sound factual

findings drawn from sufficient record evidence, suffices to support the district

court's conclusion that BISG is the superior data set, at least in this case.

Therefore, the district court did not abuse its discretion by concluding Dr.

Barreto's expert testimony and analysis was more reliable than that of Dr. Alford.

In sum, because Dr. Barreto's expert findings of political cohesion amongst

black and Latino voters and of a white voting bloc are admissible and reliable

and were afforded greater weight than those of Dr. Alford, the district court did

not clearly err in concluding that Plaintiffs have adduced sufficient evidence to

establish the second and third *Gingles* preconditions.

50

III.    **Senate Factors 2, 4, 7, and Additional Factor 9 weigh in favor of**

        **Plaintiffs.**

The District's final contention is that Plaintiffs failed to demonstrate that a totality of the circumstances supports their vote-dilution claim. On appeal, the District does not challenge the district court's findings as to Senate Factors 1, 3, 5, 6, and Additional Factor 8. Those findings, in any event, are fully supported in the record. The District challenges only the district court's findings that Senate Factors 2, 4, 7, and Additional Factor 9 weigh in Plaintiffs' favor.

### A. Senate Factor 2

Senate Factor 2 requires courts to consider "the extent to which voting in the elections of the State or political subdivisions is racially polarized." *Goosby*, 180 F.3d at 491 (quoting *Gingles*, 478 U.S. at 44-45). It is under this factor that racial causation or alternative explanations, such as partisanship, are properly considered. *Id.* at 493.

The District argues, as it did before the district court, that the primary driver of election results is not race, but rather, the public-private school divide. The District claims that a majority of voters prefer policies, such as lower

1    property taxes and increased benefits to private-school students, that private-

2    school candidates support.

3         The district court did not clearly err when it found that the Board election

4    results were caused by race and not policy preferences. There is a near-perfect

5    correlation between race and schooltype. While correlation is not necessarily

6    causation, the circumstances indicate that schooltype is a proxy for race. Those

7    policies favorable to the private-school community come at the cost of the public-

8    school community. This is apparent from facts in the record, including the

9    Board's closure of two public schools over minority opposition; the Board's

10   subsequent attempt to sell one of the school's buildings to a yeshiva at a deep

11   discount; and the increase in nonmandated private-school transportation while

12   public school cuts were left unrestored. It defies reality to say that those who

13   vote for private-school-friendly policies would be ignorant that the brunt of these

14   policies is borne by minority children. And a finding of vote dilution "depends

15   upon a searching practical evaluation of the past and present *reality*." *Gingles*, 478

16   U.S. at 45 (emphasis added) (internal quotation marks and citation omitted).

17   Given this evidence, the public-school community "can be viewed as a vehicle

1   for advancing distinctively minority interests." *League of United Latin Am. Citizens*

2   *v. Clements*, 999 F.2d 831, 861 (5th Cir. 1993).

3       In addition, as the district court found, there is scant—if any—evidence

4   that Board candidates campaigned on specific policies, a fact that seriously

5   undermines the District's policy-preferences argument. There is no evidence in

6   the record to suggest that private-school candidates campaigned on specific pro-

7   private-school policies, to the extent that they campaigned at all, and there is no

8   evidence that public-school candidates advocated for raising taxes or cutting

9   private-school services. The District does not dispute the absence of this evidence

10  and instead argues that campaigning on particular policies was unnecessary

11  because the voters knew what policies the private-school candidates supported.

12  Even if the voters assumed what the private-school candidates stood for, the

13  leaders who slated these candidates did not ensure that candidates aligned with

14  their policy views. Multiple candidates slated by the Organization testified that

15  they were not asked about their policy positions; the Organization essentially

16  selects election winners by virtue of adding them to the private-school slate. The

17  fact that candidates were not asked about policy positions casts serious doubt on

18  the argument that policy preferences drove election results.

1       More broadly, the existence of an organization that has precluded

2  minority-preferred candidates itself supports the finding that Factor 2 weighs in

3  favor of Plaintiffs.[12] In *Goosby*, we found it probative that "blacks simply are

4  unable to have any preferred candidate elected to the Town Board, given the

5  historical success of the Republican party in all Town Board elections" because

6  no black candidate, besides a "black crony" of the County Chairman, had been

7  slated by the Republican party. 180 F.3d at 496. Here, too, the only minority

8  candidates put forward by the Organization are those the private-school

9  community believed would be easy to control. *See, e.g.*, Supp. App'x at 96

10  (Germain reading an email he wrote in which he indicated he would support

11  Charles-Pierre because "we can have better control of Sabrina than the Spanish

12  girl"); Supp. App'x at 248 (Grossman telling Charles-Pierre that "[i]f there really

13  was any desire by anybody to remove you from the [B]oard, all that would need

14  to be done was to run a candidate against you in May").

---

[12] Although consideration of slating organizations is the focus of Senate Factor 4, discussed below, the presence of a well-established slatting organization can be probative of racial polarization.

1      Furthermore, the record is replete with evidence that the private-school-

2    run Board was chronically unresponsive to public-school concerns. When a

3    public-school student approached the Board about deficiencies in public-school

4    students' schedules, she was accused of lying and ignored. Supp. App'x at 474-

5    78. The Board also neglected to act after its attorney threatened an innocent

6    student. It likewise dilly-dallied when the former District Superintendent made

7    seemingly derisive comments about immigrant students, leaving the

8    Superintendent in place for over a year despite condemnation from the public-

9    school community and taking action only when the monitor intervened.

10    Moreover, the Board routinely favored private-school students over public-

11    school students. And though the Board cut public-school services in the name of

12    budget balancing, it paid yeshiva contractors to bus 1,172 more students than

13    registered, yielding unsubstantiated expenses to the tune of $832,584. We must

14    agree with the state-imposed monitor that such blatant favoritism on the part of

15    the Board is "[m]ost disturbing." Supp. App'x at 280. The Board's lack of

16    responsiveness further supports rejecting the policy-preferences argument. *See*

17    *Goosby*, 180 F.3d at 497.

1    When taken together, the evidence supports the district court's finding in

2    favor of Plaintiffs on Senate Factor 2. The near-perfect correlation between race

3    and school-type, along with the political realities in the District, suggest that "the

4    majority is voting against candidates for reasons of race." *See NAACP v. City of*

5    *Niagara Falls*, 65 F.3d 1002, 1015 (2d Cir. 1995).[13] Additionally, the dearth of

6    evidence that candidates campaigned on specific policies, the Organization's

7    slating process that excludes minority-preferred candidates, and the Board's

8    unresponsiveness to public school concerns all support the conclusion of the

9    district court that the election results are "not best explained by" policy

10   preferences. *Goosby*, 180 F.3d at 497 (internal quotation marks omitted).[14]

---

[13] We note, as the district court explicitly did, that this finding does not suggest "that the white bloc voters harbor conscious racial animus." *NAACP*, 462 F. Supp. 3d at 400. As we explained previously, a finding of racial animus on the part of individuals or communities is not necessary for a Section 2 violation. Accordingly, to the extent the District argues that its "Jewish residents are not White supremacists," Appellant's Br. at 81, that fact has no bearing on our analysis.

[14] We also reject the District's suggestion that purportedly anti-Semitic comments made by Plaintiff Goodwin and public-school candidate Steven White explain why voters rejected public-school candidates. While the state-imposed monitor found it typical of the Board to brand critics as anti-Semitic, we pass no judgment on whether that is what the District is doing in making this argument here. Even assuming arguendo their comments could be interpreted as anti-Semitic, Goodwin ran for a Board seat once and White ran twice. At most, then, these

### B.  Senate Factor 4

The fourth Senate Factor assesses, "if there is a candidate slating process, whether the members of the minority group have been denied access to that process." *Gingles*, 478 U.S. at 37. The district court found that leaders from the private-school, Orthodox community run an exclusive slating process with no input from minorities. There is no open call for candidates, and only candidates with some personal connection to the Organization are introduced, vetted, and supported by it. Even public-school candidates considered impressive by private-school community members were denied an opportunity to be slated. And to the extent any minority candidates were slated, they were either not minority-preferred, perceived to be "safe," or the result of unusual circumstances, as discussed with respect to Senate Factor 7. The slated candidates always prevailed in contested elections. As a result, the district court concluded that "blacks and Latinos did not have the opportunity to participate in the private school slating process, which was tightly controlled by a few white individuals." *NAACP*, 462 F. Supp. 3d at 406.

---

comments contributed to the defeat of minority-preferred candidates in three out of thirty-two contested races analyzed.

1    The District does not challenge the existence of the slating process on

2    appeal. Instead, the District argues that minority candidates have appeared on

3    the private-school slate, and that this is all that is required. According to the

4    District, the district court's focus on the lack of input from minorities and the

5    failure to slate minority-preferred candidates was erroneous. The District points

6    to Bernard Charles as evidence that minority candidates were actively involved

7    in the slating process, and it reiterates its policy-preferences argument to justify

8    the failure to slate minority-preferred candidates.

9    We first take up the District's argument that the lack of minority input and

10   the failure to slate minority-preferred candidates are irrelevant facts. In light of

11   the governing precedent, this argument falls flat. Our Circuit made clear in

12   *Goosby* that the focus is properly on whether minority-preferred, not simply

13   minority, candidates have been slated. *See* 180 F.3d at 496 (stressing that the

14   failure to slate black candidates meant that "blacks simply are unable to have any

15   *preferred* candidate elected to the Town Board" (emphasis added)).

16   Additionally, Supreme Court precedent indicates that consideration of the

17   lack of minority input is both appropriate and important. In *White v. Regester*, 412

18   U.S. 755 (1973), the Court focused on evidence showing that black residents were

1  "generally not permitted to enter into the political process in a reliable and

2  meaningful manner" such that a finding of vote dilution was proper. *Id.* at 767.

3  And the *Gingles* Court emphasized that courts reviewing vote-dilution claims

4  must take a functional view of the political process. *Gingles*, 478 U.S. at 45. For

5  these reasons, it is not enough that minority candidates were occasionally slated.

6  Courts must instead assess, as the district court did in this case, whether

7  minorities were "permitted to enter into the political process in a *reliable* and

8  *meaningful* manner." *White*, 412 U.S. at 767 (emphases added).

9      Here, the largely uncontested facts that the district court relied on, such as

10 the failure to conduct open calls for candidates, the inside connections necessary

11 to be slated, the vetting process, and the use of only "safe" or politically or

12 legally expedient minority candidates, all support the finding that minority

13 candidates and residents were denied meaningful access to the slating process.

14 These facts underscore the significant control of the white private-school leaders

15 over the slating process, which worked to exclude minority interests and

16 viewpoints from the slate and ultimately the Board.

17      Bernard Charles's situation does not alter this conclusion. Although

18 Charles was accepted by the Organization after being vetted, Charles testified

1 that Rabbi Rosenfeld's approval to add running mates to the slate was required.

2 Thus, Charles's involvement in slating was nominal. Regardless, however, any

3 say Charles had in the selection of his running mates is a slender reed upon

4 which to lean. The evidence suggests that the white, private-school community

5 leaders found Charles acceptable because he would further *their* interests.

6 Charles's situation thus does not undermine the finding that minorities were

7 effectively excluded from the slating process. In *Goosby* as well, we discounted

8 the slating of a black candidate because he was selected over a minority-

9 preferred candidate and was a "crony" of the chairman. *Goosby*, 180 F.3d at 496;

10 *cf. Velasquez v. City of Abilene*, 725 F.2d 1017, 1022-23 (5th Cir. 1984) (considering

11 "relevant and substantial" any evidence "that the minority candidates slated by

12 [an organization] were not true representatives of the minority population in the

13 city of Abilene").

14  As for the District's claim that policy preferences explain why minority-

15 preferred candidates were not slated, we reject this argument for the same

16 reasons given with respect to Senate Factor 2. The candidates approved for the

17 private-school slate, such as Charles, were not asked about any specific policy

18 platforms before being slated, and there is no evidence that public-school

60

1 candidates advocated for increasing taxes or decreasing private-school services

2 while campaigning.

3      For these reasons, the district court did not err in concluding that the

4 Organization excludes minority-preferred candidates and minority voices from

5 the slating process. Senate Factor 4 weighs in favor of Plaintiffs.

6      **C. Senate Factor 7**

7      Senate Factor 7 considers "the extent to which members of the minority

8 group have been elected to public office in the jurisdiction." *Gingles*, 478 U.S. at

9 37. We focus primarily on the elected office at issue. *See Goosby*, 180 F.3d at 497.

10 We consider not only whether minority candidates have been elected, but

11 whether minority residents can "elect *their preferred candidates*." *Id.* at 495-97

12 (emphases added) (discounting the placement of a black attorney on Town Board

13 and minority success in exogenous elections because the candidates were not

14 preferred by black residents). Similarly, "the election of a few minority

15 candidates does not necessarily foreclose the possibility of dilution of the black

16 vote, in violation of this section," because "majority citizens might evade the

17 section . . . by manipulating the election of a 'safe' minority candidate." 1982

18 Senate Report at 29 n.115 (internal quotation marks and citation omitted). The

61

1   Senate Report cites favorably to *Zimmer v. McKeithen*, 485 F.2d 1297, 1307 (5th

2   Cir. 1973), which held that minority success may be discounted if it results from

3   "politicians, who, apprehending that the support of a black candidate would be

4   politically expedient, campaign to insure his election" or efforts to "thwart

5   successful challenges to electoral schemes on dilution grounds."

6       The district court concluded that this factor weighs in favor of Plaintiffs

7   because, although minority candidates have won some contested races, between

8   2008 and 2018, no minority-preferred candidate won a contested election. The

9   court held that "every candidate of color who won was either perceived as 'safe'

10  by the white slating [O]rganization or affected by special circumstances."

11  *NAACP*, 462 F. Supp. 3d at 409.

12      The District challenges this conclusion on two grounds. First, the District

13  argues that the district court erroneously focused on whether minority-preferred

14  candidates, as opposed to minority candidates, have succeeded. Second, it argues

15  that the district court misapplied the safe-candidate doctrine. We reject both

16  grounds.

17      The District's belief that the subject of our inquiry is minority candidates,

18  not minority-preferred candidates, is wrong as a matter of law. "Were we to hold

1    that a minority candidate's success at the polls is conclusive proof of a minority

2    group's access to the political process, we would merely be inviting attempts to

3    circumvent the Constitution." *Zimmer*, 485 F.3d at 1307. And contrary to the

4    District's assertion, the text of Section 2 expressly focuses on whether "members

5    have less opportunity than other members of the electorate to participate in the

6    political process and to elect representatives *of their choice*." 52 U.S.C. § 10301(b)

7    (emphasis added). Consistent with this language, our Circuit in *Goosby*

8    discounted election results when minority, but not minority-preferred,

9    candidates prevailed. 180 F.3d at 495-97. Therefore, the district court properly

10    focused on whether minority-preferred candidates were successful.

11        The district court also did not err in finding that the successful minority

12    candidates have been perceived as "safe" or otherwise resulted from unusual

13    circumstances. The district court primarily discussed four candidates in its

14    analysis: Charles, Germain, Charles-Pierre, and Leveille.

15        Charles and Germain, two black men who won four of six contested

16    elections, were heavily vetted and slated by the Organization. They were not

17    minority-preferred candidates. Once elected, they aligned with the white

18    majority and took positions counter to minority interests. For instance, Charles

did not support the appointment of Charles-Pierre because she was "on the

opposing side," Trial Tr. at 1851:5-8, and Germain only supported her because he

thought the Board could maintain "better control" of Charles-Pierre than the

other public-school candidate, whom he dubbed "the Spanish girl," Supp. App'x

at 96-97. In addition, Charles went along with Board members' choice to appoint

a less qualified white applicant with an error-riddled application over a black

candidate with two master's degrees and extensive experience. The district court

thus properly discounted Charles and Germain's election, just as the *Goosby*

Court discounted the election of a slated black candidate not preferred by the

black community who then failed to respond to the community's needs.

Charles-Pierre was selected after Board members recognized that they

needed to follow the state-imposed monitor's instructions of having at least one

public-school parent on the Board. After her election, Grossman constantly

reminded Charles-Pierre that she could be removed at the Orthodox

community's will, and he believed she had "zero control or influence." Supp.

App'x at 169. Because this evidence indicates that Charles-Pierre was selected to

assuage the state monitor, it was appropriate to discount her election as well. *See*

*Zimmer*, 485 F.2d at 1307 (explaining that minority success attributable to

64

1   politicians who support minority candidates because it is "politically expedient"

2   would not undermine a vote-dilution finding).

3        The latest successful minority candidate, Leveille, was elected in 2019. The

4   district court found that her election was "engineered," *NAACP*, 462 F. Supp. 3d

5   at 406, a finding supported by the record. In 2018, counsel for the District

6   suggested that "it would be good for th[is] case to have a minority to run against

7   [Charles-Pierre] that the community could support." Supp. App'x at 128.[15]

8   Originally, Leveille and another minority candidate, Pastor Cintron, were

9   running unopposed for different seats. When Yehuda Weissmandl decided to

10   run again for the seat Cintron was running for, Cintron switched to run against

11   Leveille. The Organization purported to support Cintron. Cintron told Leveille

12   that the rabbis promised him the election if he ran against Leveille, and both he

13   and Leveille believed he would win. But because voter turnout was unusually

---

[15] The fact that the District's counsel purportedly gave this "advice" to the District is deeply troubling. Considering Section 2 case law directs courts to look past such disingenuous ploys, it is bad legal advice. More disturbing, however, is that the advice appears to be directed at aiding the District in flouting the well-established and clear intent of the Voting Rights Act. Such deceptive posturing has no place in the legal profession.

low at polling places in white areas, Leveille won. These facts more than

adequately support the district court's finding that the victory was engineered.

The District does not challenge these facts in arguing that the district court

erred. Instead, it argues that the district court misapplied the safe-candidate

doctrine, which it says "allows courts to discount suspicious elections of a

minority candidate *after a Section 2 case has been filed*." Appellant's Br. at 42. But

this assertion has no basis in the case law. *Zimmer*, the precedent upon which

Congress and the Supreme Court relied for the safe-candidate doctrine, contains

no such requirement. *Zimmer* states that minority success may be discounted

when it is meant to "thwart successful challenges to electoral schemes on

dilution grounds" without any requirement that such efforts postdate litigation.

*See Zimmer*, 485 F.2d at 1307.

For these reasons, the district court did not err in focusing on minority-

preferred candidates' success and in finding that the successful minority

candidates were perceived as safe. Thus, Senate Factor 7 weighs in favor of

Plaintiffs.

### D. Additional Factor 9

The final factor at issue is Additional Factor 9, which asks "whether the policy underlying the . . . political subdivision's use of . . . [the challenged] practice or procedure is tenuous." *Gingles*, 478 U.S. at 37. The district court held that this factor favors Plaintiffs because, although the District reasonably believed that it was required by state law to use at-large voting, "there is evidence that the dominant Board members and the Organization have a desire to adhere to the current system despite its discriminatory effect and went to extraordinary lengths to preserve that system to maintain political power." *NAACP*, 462 F. Supp. 3d at 416. The district court relied on facts such as the Districts' witnesses' disingenuity, the apparent engineering of Leveille's victory, and Board members' failure to give the Board's public-school representatives accurate settlement information. *Id.* at 416-17. As to the settlement discussions, Grossman affirmatively misled minority Board members such as Charles-Pierre and Leveille. When asked why Board members needed to go to court, Grossman said it was because "Judge [Seibel] wants to talk/yell at us" and that the district court "wants to force us to do what the NAACP wants," when in fact it was to attend a settlement conference. D. Ct. Dkt. No. 553-1 ¶ 9. Leveille was also left off

emails and other communications pertaining to settlement proposals. D. Ct. Dkt.
No. 551-3 ¶¶ 6-8.

The District does not challenge the district court's credibility findings or
reliance on Leveille's election, facts which in any event are substantiated in the
record. Nor does the District challenge the factual finding that Board members
were affirmatively misled about settlement negotiations. The District's only
argument as to Additional Factor 9 is that the district court improperly relied on
out-of-court settlement negotiations to reach speculative presumptions about
Board members' motivations.

There was nothing improper about the district court's reliance on the
Board members' actions in failing to provide minority Board members with
accurate settlement information. Evidence pertaining to settlement negotiations
may be used when "offered for a purpose other than to prove the validity,
invalidity, or amount of a disputed claim." Fed. R. Evid. 408 advisory
committee's note to 2006 amendment. Accordingly, evidence of settlement
negotiations may be used to demonstrate bad faith. *Id.* (citing *Athey v. Farmer's
Ins. Exch.*, 234 F.3d 357, 362 (8th Cir. 2000)). And bad faith on the District's part is
probative of whether the District's reasons for maintaining at-large voting are

68

1    tenuous. The district court thus appropriately relied on this evidence and

2    correctly concluded that Additional Factor 9 favors Plaintiffs. [16]

3    **CONCLUSION**

4        For the foregoing reasons, the order of the district court is affirmed. As

5    mentioned above, the District's motion for a stay of the district court's injunction

6    is dismissed as moot.

---

[16] To the extent the District argues that its reasons are not tenuous because it has a legitimate basis for at-large elections, that argument is meritless. In *Goosby*, there was no evidence that at-large voting was implemented for discriminatory purposes, and some legitimate bases for maintaining that system were offered at trial. 180 F.3d at 488, 490. But we nonetheless agreed with the district court that the Town Board sought to "cling" to at-large voting for improper reasons. *Id.* at 497.

69